IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONIA POWELL, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | Case No. 1:06CV1173 (ESH) |
| v. ) | |
| ) | |
| AMERICAN RED CROSS, ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## AMERICAN RED CROSS'S MOTION FOR SUMMARY JUDGMENT

Defendant The American Red Cross (the "Red Cross") hereby moves this Court for summary judgment on Tonia Powell's three count complaint for several reasons. Ms. Powell's first count under the D.C. Human Rights Act ("DCHRA") fails because Ms. Powell's race discrimination claim is barred by the statute of limitations and because she cannot establish a *prima facie* case of discrimination, disparate treatment, or retaliation. Even if the claims were not barred and she could establish a *prima facie* case, the Red Cross had legitimate, nondiscriminatory, and non-retaliatory reasons for its actions. Ms. Powell's second count under the D.C. Wage and Hour Law fails because her position at the Red Cross was exempt from overtime. Ms. Powell's third count for tortious breach of contract fails because it is undisputed that Ms. Powell was an at-will employee and that no contractual obligations existed between the Red Cross and Ms. Powell. Finally, Ms. Powell is not entitled to punitive damages, liquidated damages, or back pay.

Respectfully submitted,


  /s/     Constantinos G. Panagopoulos
Constantinos G. Panagopoulos #430932
Ballard Spahr Andrews & Ingersoll, LLP
601 13th Street, N.W., Suite 1000 South
Washington, DC  20005
Tel:     (202) 661-2200
Fax:     (202) 661-2299

February 12, 2007                    *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of February 2007, The American Red Cross's Motion for Summary Judgment; Statement of Undisputed Material Facts (w/ corresponding exhibits); Memorandum of Points and Authorities in Support of Its Motion; and Proposed Order were electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of filing to counsel of record below, and that, in addition, on February 12, 2007, true and correct copies of the foregoing documents were mailed, First-Class postage prepaid, to the following counsel of record:

Brian C. Plitt
1239 C Street, S.E. - Suite 4
Washington, DC  20003

*Counsel for Plaintiff*

        /s/    Constantinos G. Panagopoulos
Constantinos G. Panagopoulos

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TONIA POWELL,                        )
                                     )
             *Plaintiff,*            )
                                     )        Case No. 1:06CV1173 (ESH)
        v.                           )
                                     )
AMERICAN RED CROSS,                  )
                                     )
             *Defendant.*            )
                                     )

**THE AMERICAN RED CROSS'S**
**STATEMENT OF UNDISPUTED FACTS**

Defendant The American Red Cross (the "Red Cross") submits the following undisputed

material facts for consideration by the Court:

**Background of Ms. Powell's Employment with the Red Cross**

1.       Tonia Powell possessed a registered nurse license for D.C. when she applied for a

position at the Red Cross.  *See* Powell's Professional License, attached as Exhibit 1.

2.       The position of Wellness Nurse II required a current registered nurse license.  *See*

Job Documentation Tool, Wellness Nurse II, attached as Exhibit 2.

3.       Ms. Powell's status as a registered nurse qualified her for the position of Wellness

Nurse II.  *See* Deposition of Anna Shearer, Senior Director of Employee Benefits and Retirement

Programs, 41:2-41:7, Dec. 15, 2006.  Relevant excerpts from Ms. Shearer's deposition are

attached as Exhibit 3.

4.    The Red Cross offered Ms. Powell a position as a Wellness Nurse II[1] on

October 29, 2004, at a salary of $57,096. Ms. Powell started the job on November 15, 2004. *See*

Powell employment offer letter, attached as Exhibit 4.

5.    The offer letter to Ms. Powell explained that she was an at-will employee and that

her employment was exempt from the Fair Labor Standards Act ("FLSA") and the D.C. Wage

and Hour Law. *See id*.

6.    The Red Cross provided Ms. Powell with the "Human Resources Policy and

Procedure Manual" (the "Employee Manual"). The Employee Manual stated that the "manual is

not a contract of employment." It explained that the employment was at-will and that "the

employment relationship may be ended at any time, by either the employee or the Red Cross, for

any reason." *See* Employee Manual, Policy No. 100.00, attached as Exhibit 5.

7.    Ms. Powell read the Employee Manual when she started her job. She understood

that she was an at-will employee and that she did not have a contract with the Red Cross. *See*

Deposition of Tonia Powell, 99:16-100:19, 109:18-110:7, Nov. 10, 2006; Pl.'s Dep. 310:21-

311:13, Nov. 14, 2006. Relevant excerpts from Ms. Powell's deposition are attached as Exhibit

6.

8.    With respect to severance pay, the Employee Manual stated:

Severance pay may be provided only when -- (1) The employee is involuntarily
terminated due to -- A reduction in force . . . or Elimination of the employee's
position; and . . . (2) No comparable new assignment is offered by a Red Cross
unit.

The Employee Manual defined a comparable position as:

Requiring skills and/or training comparable to the skills and/or training needed in
the current position, and [p]roviding a base salary within 10% of the individual's

---

[1]    This position is also referred to as Wellness Associate.

current salary, and [l]ocated within 50 miles of the employee's current home
location.

*See* Employee Manual, Policy No. 204.00, attached as Exhibit 7.

9.    The Employee Manual did not contain any information relating to the
payment of a transportation allowance.

10.    The Employee Manual explained that positions classified as exempt are
not entitled to overtime under the FLSA.  *See* Employee Manual, Policy No. 205.00 and
App. A-1 section VI, attached as Exhibit 8.

11.    The Red Cross determined that the Wellness Nurse II position was exempt
in 2004.  The Red Cross considered a variety of factors relating to the position itself as
well whether other companies classified similar positions as exempt.  *See* Def.'s
Supplemental Resp. to Pl.'s Interrog. # 5, attached as Exhibit 9; Ex. 2.

**Ms. Powell's Duties at the Red Cross as Wellness Nurse II**

12.    Ms. Powell's most important duty as a Wellness Nurse II involved analyzing
medical records for Armed Forces Emergency Services ("AFES") deployment.  *See* Ex. 6, Pl.'s
Dep. 145:10-145:19.

13.    AFES involves providing emergency services to Armed Forces personnel in
various locations.  The AFES workforce is part of the Red Cross's overall purpose.  *See*
Employee Manual, Policies 701.00-703.00, attached as Exhibit 10.

14.    Ms. Powell spent more than sixty percent of her time analyzing AFES medical
records.  *See* Ex. 6, Pl.'s Dep. 127:2-127:4.

15.    The majority of the decisions Ms. Powell made during her employment at the Red
Cross related to AFES.  *See id.* 287:21-288:2.

16.    Ms. Powell was responsible for analyzing AFES employees' medical physical records and comparing the data with military medical requirements to determine if each employee was fit for deployment to a particular geographic location.  *See* Ex. 6, Pl.'s Dep. 35:20-37:12, 77:8-77:21, 165:7-166:4.

17.    The records included lab results, radiology results, immunization records, and prescription drug information.  *See id.* 326:10-326:15; Ex. 3, Shearer Dep. 43:2-44:12.

18.    The Red Cross provided medical guidelines to Ms. Powell for processing AFES personnel.  *See* "Health Requirements for Armed Forces Emergency Service Mobile Personnel" and documents relating to AFES physicals procedure, attached as Exhibit 11.

19.    The Red Cross used military medical requirements from several sources in the process of screening AFES personnel.  *See* "AFES Transition Meeting" and various medical guidelines, attached as Exhibit 12.

20.    Based on the medical guidelines, Ms. Powell used both her medical knowledge and the medical information in the guidelines to make the initial recommendation as to whether an individual was deployable.  The AFES supervisor never overruled her recommendations regarding deployment.  *See* Ex. 6, Pl.'s Dep. 44:1-45:2, 77:8-78:8.

21.    Ms. Powell also consulted on medical issues during the course of an individual's deployment.  *See id.* 37:4-39:1, 79:12-82:1.

22.    Ms. Powell performed other duties as a Wellness Nurse II.  For example, she counseled employees on health issues, filed workers' compensation and OSHA claims, administered first-aid on Red Cross employees, performed ergonomic assessments of employees' workplaces, and maintained files.  *See id.* 33:15-35:17, 40:14-41:11, 45:3-45:17, 60:17-63:3,

82:12-82:20, 85:1-88:21, 94:13-95:10, 118:14-122:14, 126:8-128:12, 186:12-190:20, 225:4-238:7.

23.    In January 2005, Ms. Powell's co-worker, Jane Davis, Wellness Nurse II, resigned her position.  After Ms. Davis resigned, Ms. Powell's workload increased because she performed duties previously split with Ms. Davis.[2]  *See id.* 48:12-50:5.

24.    Ms. Powell spent more time analyzing AFES records.  *See id.* 128:13-129:19.

25.    Ms. Powell did not assume all duties that Ms. Davis performed.  Instead, Ken Thiel, Wellness Manager, assumed some of Ms. Davis' duties and the Red Cross shifted other duties to the Benefits Administrator.  *See* Ex. 3, Shearer Dep. 55:18-57:13, 94:15-95:22.

26.    Ms. Davis' position was not filled because of financial constraints at the Red Cross.  *See id.* 59:3-59:21.

27.    In March 2005, Mr. Thiel resigned his position.  *See id.* 60:22-61:2.

28.    Ms. Powell's workload increased and she assumed some of the duties performed by Mr. Thiel, including the International Services work.  The Benefits Administrator assumed other duties performed by Mr. Thiel.  Mr. Thiel's position was not filled because the Red Cross was considering the elimination of the Wellness Unit at the time he resigned.  *See* Ex. 6, Pl.'s Dep. 55:1-59:21; Ex. 3, Shearer Dep. 63:9-66:10.

29.    International Services is part of the Red Cross's overall purpose.  *See* Employee Manual, Policy No. 113.00, attached as Exhibit 13.

30.    Ms. Powell's role was to ensure an employee who was being considered for International Services deployment had no limitations that prevented deployment.  *See* Ex. 6, Pl.'s Dep. 63:17-66:4.

31.     Ms. Powell obtained and reviewed employees' most recent physicals and medical records.  *See* documents and correspondence relating to International Services screenings, attached as Exhibit 14.

32.     Ms. Powell also used a computer program to confirm that employees had current immunizations for a specific geographic region.  *See* Ex. 6, Pl.'s Dep. 330:12-332:13.

33.     For both AFES and International Services, Ms. Powell handled any concerns that an employee had regarding his or her physical.  If the employee was not deployable, then Ms. Powell instructed that person on how to proceed to become deployable.  She reviewed any updated medical information to determine if the individual met the standards to be deployed. This process involved "some strategy."  *See id.* 71:10-76:20.

34.     For both AFES and International Services, after Ms. Powell reviewed and interpreted the medical records, she advised those employees regarding their health, diet, and medical treatment.  *See* relevant emails, attached as Exhibit 15.

35.     For both AFES and International Services, Ms. Powell briefed employees prior to their deployments and debriefed them upon return from deployments.  After reviewing medical records, Ms. Powell ensured the employees had their medications, provided health education regarding the destinations, and notified them to contact her with any updates concerning their heath.  When the employees returned, Ms. Powell discussed any health issues they may have experienced as well as any conflicts that may have occurred with other Red Cross employees while deployed.  *See* Ex. 6, Pl.'s Dep. 66:5-71:9, 332:14-334:11; example of debriefing, attached as Exhibit 16.

---

[2]     Whether Ms. Powell worked any overtime and, if so, the extent to which she did is disputed, but is not material to this motion.

**The Reduction in Force at the Red Cross and Termination of the Wellness Unit**

36.      From 2004 until 2005, the Red Cross conducted a Core Service Analysis regarding the needs and financial constraints of the Red Cross.  *See* Email from Marty Evans, CEO, dated Feb. 9, 2005, attached as Exhibit 17.

37.      In May 2005, the Red Cross decided to, *inter alia*, eliminate the unit in which Ms. Powell worked.  *See* Email from Ms. Evans dated May 11, 2005, and attachment, attached as Exhibit 18.

38.      Ms. Powell learned of this decision on May 12, 2005.  *See* Ex. 6, Pl.'s Dep. 152:18-153:5.

39.      Ms. Powell acknowledged that the reduction in force resulted in the termination of her position.  *See* Email from Powell to Andrea Longuillo, dated June 8, 2005, attached as Exhibit 19.

40.      Anna Shearer, Senior Director of Employee Benefits and Retirement Programs, and Bill Malfara, Vice President of Disaster Services, offered Ms. Powell another position at the Red Cross called the Wellness Nurse III, also known as Staff Health Nurse.  *See* Ex. 6, Pl.'s Dep. 156:10-157:6; Ex. 3, Shearer Dep. 75:6-77:6.

41.      On May 13, 2005, Ms. Powell inquired about the salary of the Wellness Nurse III position.  On May 15, Carol Miller, Senior Director of Client Services and Equal Employment Opportunity, responded to Ms. Powell and informed Ms. Powell that her salary would remain the same.  *See* Email from Miller to Powell, dated May 15, 2005, and Email from Powell to Malfara, dated May 13, 2005, attached as Exhibit 20.

42.      As of May 15, 2005, Ms. Powell understood that she would make the same salary if she accepted the Wellness Nurse III position.  *See* Ex. 6, Pl.'s Dep. 205:12-206:2.

43.     With respect to salary determinations, the Red Cross uses a market point methodology to establish the salary range for a position.  The salary range is 75 percent to 125 percent of the established market point of the position.  *See* Deposition of Carol Miller, Senior Director of Client Services and Equal Employment Opportunity, 106:7-107:17, 111:6-112:10, Dec. 15, 2006.  Relevant excerpts from Ms. Miller's deposition are attached as Exhibit 21.

44.     At the time of Ms. Powell's employment, the salary range for Wellness Nurse II was $43,760.25 to $72,933.75.  *See id.* 111:11-111:16; relevant market point documents for Wellness Nurse II, attached as Exhibit 22.

45.     At the time of Ms. Powell's employment, the salary range for Wellness Nurse III was $52,554.50 to $87,591.25.  *See* Ex. 21, Miller Dep. 111:11-111:16; relevant market point documents for Wellness Nurse III, attached as Exhibit 23.

46.     The Red Cross did not offer adjusted salaries to any of the employees to whom it offered alternative employment after the reduction in force.  *See* Email from Miller to Al Vinson, Vice President of Human Resource Operations, dated May 25, 2005, attached as Exhibit 24.

47.     On June 2, 2005, Mr. Vinson called Ms. Powell to inform her that her salary would remain the same if she accepted the Wellness Nurse III position.  *See* Ex. 6, Pl.'s Dep. 218:1-219:3.

48.     Ms. Powell declined the offer for the position of Wellness Nurse III on June 2, 2005.  *See* Email from Powell to Longuillo, dated June 6, 2005 and Email from Longuillo to Powell dated June 3, 2005, attached as Exhibit 25; Ex. 6, Pl.'s Dep. 258:2-259:12.

49.     The job descriptions for the positions of Wellness Nurse II and Wellness Nurse III are similar in several respects.  Both descriptions contain identical language for "Part 2b: Organization Summary," and both require, *inter alia*, the employee to review "incoming physical

and mental health provider's statements and . . . establish appropriate restrictions and clearances
for employees." *See* Ex. 2; Job Documentation Tool, Employee Wellness Nurse III, attached as
Exhibit 26.

50.    Ms. Powell would continue to perform her review of AFES medical documents in
the Wellness Nurse III position.  This function would comprise forty percent of the duties in the
Wellness Nurse III position.  She would not be required to perform the other duties that she was
responsible for in her position as Wellness Nurse II.  *See* Ex. 3, Shearer Dep. 76:2-76:20, 88:5-
88:19.

51.    The Red Cross did not pay Ms. Powell severance because she rejected a position
that it determined to be a comparable position to Wellness Nurse II.  *See* Letter from Miller to
Powell, dated June 10, 2005, attached as Exhibit 27; Email from Miller to Powell, dated June 14,
2005, attached as Exhibit 28; Ex. 6, Pl.'s Dep. 274:2-276:17; Ex. 7.

52.    Ms. Powell left her employment at the Red Cross on June 30, 2005.  Ex. 27.

**Events After the Termination of Ms. Powell's Position**

53.    In July 2005, Ms. Powell received four payments from the Maryland Division of
Unemployment each in the amount of $310.  *See* Pl.'s Resp. to Def.'s Interrog. # 20, attached as
Exhibit 29; Ex. 6, Pl.'s Dep. 294:9-295:4.

54.    On August 1, 2005, Ms. Powell started a job at Quadrant.  She received $30 an
hour and worked forty hours a week.  *See* Ex. 6, Pl.'s Dep. 281:11-285:10.

55.    Ms. Powell worked at Quadrant until March 2006.  She then began a job at the
Montgomery County Department of Health and Human Services at a salary of $57,000.  She
now makes over $58,000.  *See id.* 285:11-290:22.

56.     Ms. Powell first considered suing the Red Cross on June 2, 2005.  *See id.* 217:12-218:9; Email from Powell to Pogue, dated June 2, 2005, attached as Exhibit 30.

57.     Ms. Powell acknowledged that she never filed a complaint with the Red Cross regarding any alleged discrimination.  Although Ms. Powell knew about the complaint procedures, she chose instead to hire an attorney to represent her in a lawsuit against the Red Cross.  *See id.* 220:2-224:8, 309:11-310:1.

58.     Ms. Powell filed a lawsuit in the Superior Court of the District of Columbia on June 9, 2006.

Respectfully submitted,


 */s/*     Constantinos G. Panagopoulos
Constantinos G. Panagopoulos #430932
Ballard Spahr Andrews & Ingersoll, LLP
601 13th Street, N.W., Suite 1000 South
Washington, DC  20005
Tel:     (202) 661-2200
Fax:     (202) 661-2299

February 12, 2007                              *Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TONIA POWELL, | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| AMERICAN RED CROSS, | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

Case No. 1:06CV1173 (ESH)

**AMERICAN RED CROSS'S
MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

The American Red Cross (the "Red Cross") is entitled to summary judgment on Tonia Powell's complaint for the reasons set forth below.  First, Ms. Powell's claim under the D.C. Human Rights Act ("DCHRA") fails because her race discrimination claim is barred by the statute of limitations and because she cannot establish a *prima facie* case of discrimination, disparate treatment, or retaliation.  Even if the claims were not barred and she could establish a *prima facie* case, the Red Cross had legitimate, nondiscriminatory, and non-retaliatory reasons for its actions.  Second, Ms. Powell's claim under the D.C. Wage and Hour Law fails because her position at the Red Cross was exempt from overtime.  Third, Ms. Powell's claim for tortious breach of contract fails because it is undisputed that Ms. Powell was an at-will employee and that no contractual obligations existed between the Red Cross and Ms. Powell.  Finally, Ms. Powell is not entitled to punitive damages, liquidated damages, or back pay.

# I.    <u>BACKGROUND</u>

The Red Cross is a humanitarian organization led by volunteers, guided by its Congressional Charter and the Fundamental Principles of the International Red Cross Movement. The Red Cross' humanitarian mission includes, among other things, providing relief to victims of disaster through its Disaster Services department, blood to hospital patients through its Biomedical Services department, health and safety training to the public through its Health and Safety department, emergency social services to U.S. military families through its Armed Forces Emergency Services ("AFES") department, and delegates to the International Red Cross, which provides humanitarian services all over the world, through its International Services department. In fact, the Red Cross responds to over 60,000 disasters each year, provides over one-half of the nation's blood supply, and serves the families of our armed forces all over the world.  In order to serve the families of our armed forces, provide disaster relief services, and provide delegates to the International Red Cross, the Red Cross screens employees and volunteers prior to and after deploying them across the country and across the globe to ensure that they are physically able to perform the missions entrusted to them.

During the time period relevant to this lawsuit, the screening of Red Crossers for International Services and AFES deployment was performed by the Wellness Unit of the Red Cross.  As set forth in more detail below, the Wellness Unit was entrusted both with deployment and with occupational health and wellness issues relating to Red Cross employees.  It was to that unit that Tonia Powell applied for employment in 2004.

## A.    The Nature of Ms. Powell's Employment at the Red Cross.

Tonia Powell applied for a position as a Wellness Nurse II in October 2004.  *See* Powell employment application, attached as Exhibit 31.  Ms. Powell had over 20 years of nursing

experience and possessed a current registered nurse license for D.C. *See* Ex. 6, Pl.'s Dep. 10:12;

Ex. 1. The position Ms. Powell applied for required a current registered nurse license. *See*

Ex. 2, p. 2. Based on her experience and qualifications, the Red Cross offered Ms. Powell a

position as a Wellness Nurse II on October 29, 2004.[3] *See* Ex. 4; Ex. 3, Shearer Dep. 41:2-41:7.

The Red Cross offered Ms. Powell a salary of $57,096.00 which met her salary requirement of

$57,000 to $59,000. *See* Ex. 4; Ex. 31. Ms. Powell started the job on November 15, 2004. *See*

Ex. 4.

Ms. Powell was an at-will employee. Both the Red Cross's offer letter to Ms. Powell and

the Employee Manual stated that there was no contract of employment, and that Ms. Powell and

the Red Cross both had the right to end the employment at any time and for any reason. *See*

Ex. 4; Ex. 5. Ms. Powell understood the nature of this employment relationship. *See* Ex. 6, Pl.'s

Dep. 99:16-100:19, 109:18-110:7, 310:21-311:13.

Ms. Powell's employment at the Red Cross was always classified as exempt from the

Fair Labor Standards Act ("FLSA") and D.C. Wage and Hour Law. *See* Ex. 2; Ex. 4; Ex. 8.

Ms. Powell understood that her position at the Red Cross was exempt. *See* Ex. 6, Pl.'s

Dep. 33:1-33:14, 111:6-113:3. In evaluating the exempt status of this position, the Red Cross

considered a variety of factors relating to the position itself as well as whether other companies

classified similar positions as exempt. *See* Ex. 9, Def.'s Resp. to Pl.'s Interrog. # 5; Ex. 2.

The Employee Manual also set out the Red Cross's severance policy. The Red Cross

does not pay severance when an employee terminated pursuant to a reduction in force rejects an

offer of a comparable position at the Red Cross. *See* Ex. 7. A comparable position of

employment is defined as a position requiring the same skills and/or training as the current

---

[3]    The position Wellness Nurse II is also called Wellness Associate.

position, providing a base salary within ten percent of the current salary, and located within 50 miles of the employee's current home location.  *See id.*

Ms. Powell worked in the Wellness Unit with another Wellness Nurse II, Jane Davis, and the Wellness Manager, Ken Thiel.  *See* Ex. 3, Shearer Dep. 17:14-18:17.  Anna Shearer was and is the Senior Director of Employee Benefits and Retirement Programs at the Red Cross.  *See id.* 9:6-9:15.  She supervised the Wellness Unit during Ms. Powell's employment.  *See id.* 12:13-12:18.  She later directly supervised Ms. Powell after Mr. Thiel resigned.  *See* Ex. 21, Miller Dep. 7:18-8:1.

**B.     Ms. Powell's Duties at the Red Cross as Wellness Nurse II.**

Ms. Powell's most important duty as a Wellness Nurse II involved analyzing medical issues relating to AFES deployments.  *See* Ex. 6, Pl.'s Dep. 145:10-145:19.  The Red Cross's policy with respect to AFES is "to maintain a workforce that supports the organizational mission on a worldwide scope."  *See* Ex. 10, Policy No. 701.00, p. 1.  As part of this policy, mobile AFES staff "must be medically approved prior to departing."  *Id.*  The medical requirements were established "to ensure, to the greatest extent possible, that mobile staff are physically and mentally able to endure conditions on assignments that pose significant difficulty and hardship." *Id.*, Policy No. 703.00.

Ms. Powell initially spent over sixty percent of her time analyzing AFES medical records.  *See* Ex. 6, Pl.'s Dep. 127:2-127:4.  Moreover, the majority of the decisions that Ms. Powell made related to AFES.  *See id.* 287:21-288:2. Ms. Powell was responsible for analyzing employees' medical physical records and comparing the data with military medical requirements to determine if those employees were fit for deployment to a particular geographic location.  *See id.* 35:20-37:12, 77:8-77:21, 165:7-166:4.  The records included lab results,

4

radiology results, immunization records, and prescription drug information. *See id.* 326:10-326:15; Ex. 3, Shearer Dep. 43:2-44:12.

Ms. Powell used military medical guidelines that the Red Cross provided her. *See* Ex. 11; Ex. 12. Ms. Powell used both her medical knowledge and the medical information in the guidelines to make initial recommendations as to whether employees were deployable. *See* Ex. 6, Pl.'s Dep. 76:10-78:8. She included the information in a spreadsheet and passed her recommendations to Roger Kingsley, the AFES manager. *See id.* 44:1-45:2. Mr. Kingsley never overturned Ms. Powell's recommendations regarding deployment. *See id.* 77:16-78:8.

Ms. Powell also consulted on medical issues during the course of an employee's deployment. For example, she assisted in the medical care and transport of an AFES employee who suffered a heart attack while deployed. *See id.* 37:4-39:1, 79:12-82:1. A Red Cross manager contacted Ms. Powell and instructed her to handle the situation. *See id.* 38:15-39:1. As Ms. Powell testified, the Red Cross manager did not "know the language or the extent of what they needed . . . . so they looked to my medical knowledge to help guide them on this client." *Id.*

In addition to AFES, Ms. Powell performed other duties as a Wellness Nurse II. For example, she counseled employees on health issues, filed workers' compensation and OSHA claims, administered first-aid on Red Cross employees, performed ergonomic assessments of employees' workplaces, and maintained files. *See id.* 33:15-35:17, 40:14-41:11, 45:3-45:17, 60:17-63:3, 82:12-82:20, 85:1-88:21, 94:13-95:10, 118:14-122:14, 126:8-128:12, 186:12-190:20, 225:4-238:7.

In January 2005, Ms. Powell's co-worker, Jane Davis, resigned. After Ms. Davis resigned, Ms. Powell's workload increased because she performed duties previously split with Ms. Davis. *See id.* 48:12-50:7. Specifically, Ms. Powell spent more time analyzing AFES

records.  *See id.* 128:13-129:19.  Ms. Powell did not, however, assume all duties that Ms. Davis

performed.  Instead, Mr. Thiel assumed some of Ms. Davis' duties and the Red Cross shifted

other duties to the Benefits Administrator.  *See* Ex. 3, Shearer Dep. 55:18-57:13, 94:15-95:22.

Ms. Davis' position was not filled with another employee because of financial constraints at the

Red Cross.  *See id.* 59:3-59:21.

In March 2005, Mr. Thiel resigned.  *See id.* 60:22-61:2.  Again, Ms. Powell's workload

increased and she assumed some of the duties performed by Mr. Thiel, including the

International Services work.[4]  *See* Ex. 6, Pl.'s Dep. 55:3-55:9.  The Benefits Administrator

assumed other duties performed by Mr. Thiel.  *See* Ex. 3, Shearer Dep. 64:18-65:1.  Mr. Thiel's

position was not filled because the Red Cross was considering the elimination of the Wellness

Unit at the time he resigned.  *See id.* 65:20-66:13.

Like AFES, International Services is part of the Red Cross's overall purpose and involves

the deployment of personnel to assist in operations in various locations.  The Red Cross's policy

is "to maintain a workforce that supports the organizational mission on a worldwide scope."  *See*

Ex. 13.  The employees who participate in this service, "must be medically approved prior to

departing . . . . by the Wellness Unit at national headquarters after reviewing results of the staff

member's recent physical examinations and special tests, if applicable."  *Id.*  Ms. Powell ensured

that an employee who was being deployed had no limitation preventing deployment.  *See* Ex. 6,

Pl.'s Dep. 63:17-66:4.  Ms. Powell obtained and reviewed employees' most recent physicals and

medical records.  *See* Ex. 14.  Ms. Powell also used a computer program to confirm the

employee had current immunizations for the specific geographic region.  *See* Ex. 6, Pl.'s Dep.

330:12-332:13.

For both AFES and International Services, Ms. Powell handled any concerns an employee had regarding his or her physical.  If the employee was not deployable, then Ms. Powell instructed that person on how to proceed to become deployable.  *See id.* 71:10-76:20. She reviewed any updated medical information to determine if the employee met the deployment standards.  *See id.* 74:5-75:3.  This process involved "some strategy."  *See id.* 76:1-76:3.  After Ms. Powell reviewed and interpreted the medical records, she advised employees regarding their health, diet, and medical treatment.  *See* Ex. 15.

Ms. Powell used her medical knowledge to provide advice to individuals.  For example, Ms. Powell advised:

> I am aware of the findings that describe the condition of your cardiac status and the military physicians feel the EKG is not necessary.  However, 40-501 regulation 2-18 states the following: ["]The causes for rejection for deployment: all valvular heart disease congenital, acquire, including those improve [sic] by surgery except mitral valve prolapse and bicuspid aortic valve.  These later [sic] two conditions are not reasons for rejection unless there is associate [sic] tachyarrhythmia, mitral regurgitation, aortic stenosis, insufficiency or cardiomegaly.["]  The echo report conclusion is mild aortic valve insufficiency and mitral valve regurgitation.  I really want to avoid any complications at the CRC, I MUST insist you get the EKG prior to the scheduled deployment in October 2005; if the military physician wants to wave [sic] the testing, it must be documented.

*See* Email from Powell to [redacted], dated June 16, 2005, attached as Exhibit 15.

Ms. Powell briefed both AFES and International Services employees prior to deployment and debriefed them upon return.  *See* Ex. 6, Pl.'s Dep. 66:5-71:9, 332:14-334:11; Ex. 16.  After reviewing medical records, Ms. Powell ensured that employees had their medications, provided health education regarding the destination, and notified them to contact her with any updates concerning their heath.  *See id.* 66:5-69:5.  When the employees returned, Ms. Powell discussed

---

[4]    Ms. Powell, of course, assumed no supervisory duties since there was no one left to supervise.

any health issues they may have experienced as well as any conflicts that may have occurred with other Red Cross employees while deployed.  *See id.* 69:6-71:9.

**C.    The Reduction in Force at the Red Cross and Termination of the Wellness Unit.**

In 2004 and 2005, the Red Cross conducted a Core Service Analysis regarding the needs and financial constraints of the Red Cross.  *See* Ex. 17.  The analysis affected the entire organization.  *See id.*  In May 2005, the Red Cross decided to eliminate the unit in which Ms. Powell worked.  *See* Ex. 18.  Ms. Powell learned of this decision on May 12, 2005.  *See* Ex. 6, Pl.'s Dep. 152:18-153:5.  She acknowledged that the reduction in force resulted in the termination of her position.  *See* Ex. 19.  Even though the Red Cross decided to eliminate the Wellness Unit, and Ms. Powell's position along with it, on May 12, Ms. Shearer and Bill Malfara, Vice President of Disaster Services, offered Ms. Powell another position at the Red Cross - Wellness Nurse III.[5]  *See* Ex. 6, Pl.'s Dep. 156:10-157:6; Ex. 3, Shearer Dep. 75:6-77:6.

On May 13, Ms. Powell inquired about the salary of the position.  *See* Ex. 20.  On May 15, Carol Miller, Senior Director of Client Services and Equal Employment Opportunity, responded to Ms. Powell and informed Ms. Powell that her salary would remain the same.  *Id.* The Red Cross makes its salary determinations by using a market point to establish a salary range for a position.  *See* Ex. 21, Miller Dep. 106:7-107:17.  In doing so, the Red Cross evaluates the salaries that other organizations pay for a similar position.  *See id.*; Ex. 22; Ex. 23.  After analyzing this information, the Red Cross sets its salaries at the 50th percentile, or market point, of that range.  *See* Ex. 21, Miller Dep. 106:11-106:21.  After establishing the market point, the Red Cross offers a salary between 75 percent to 125 percent of the market point.  *See id.* 111:6-112:10.  The Red Cross utilized this criteria when addressing Ms. Powell's concerns about her

---

[5]        This position is also known as Staff Health Nurse.

salary.  *See* Ex. 24.  The range of the Wellness Nurse II position was from $43,760.25 to

$72,933.75.  *See* Ex. 22.  The range of the Wellness Nurse III position was from $52,554.50 to

$87,591.25.  *See* Ex. 23.  Because her current salary as Wellness Nurse II was within the salary

band for Wellness Nurse III, the Red Cross did not increase her salary.  *See* Ex. 24.  Indeed, the

Red Cross did not offer adjusted salaries to any of the employees to whom it offered alternative

employment after the reduction in force.  *See id.*  Accordingly, as of May 15, 2005, Ms. Powell

understood that she would make the same salary if she accepted the Wellness Nurse III position.

*See* Ex. 6, Pl.'s Dep. 205:12-206:2.

      Ms. Powell continued to express her desire for a higher salary.  On May 20, 2005,

Ms. Powell met with Rick Pogue, Senior Vice President, Human Resources and Diversity, to

discuss the Wellness Nurse III salary.  *See* Ex. 30.  Mr. Pogue informed Ms. Powell that the

Wellness Nurse III position differed from the Wellness Nurse II position by $5,000.  *See* Ex. 6,

Pl.'s Dep. 197:14-199:8, 204:1-204:11, 249:2-251:19.  On May 31, Ms. Powell contacted

Mr. Pogue again to inquire about the salary difference.  *See* Ex. 30 .  Mr. Pogue had informed

Ms. Powell that Al Vinson, Vice President of Human Resource Operations, would review the

salary difference and contact Ms. Powell.  *See id.*  On June 2, Jane Jones, Human Resources

Associate, contacted Ms. Powell to determine if she would be accepting the Wellness Nurse III

position.  *See id.*  Ms. Powell then emailed Mr. Pogue to follow-up her previous inquiry because

Mr. Vinson had not contacted her about the salary.  *See id.*  On June 2, Mr. Vinson called

Ms. Powell to inform her that her salary would remain the same if she accepted the Wellness

Nurse III position.  *See* Ex. 6, Pl.'s Dep. 218:1-219:3.  Ms. Powell declined the offer for the

position on June 2, 2005.  *See* Ex. 25; Ex. 6, Pl.'s Dep. 258:2-259:12.

The job descriptions for the positions of Wellness Nurse II and Wellness Nurse III are similar in several respects. *See* Ex. 2; Ex. 26. Ms. Powell would have continued to perform her review of AFES medical documents. *See* Ex. 3, Shearer Dep. 76:2-76:20. This function would have comprised forty percent of the duties in the Wellness Nurse III position. *See id.* 88:5-88:19. She would not have been required to perform the other duties for which she was responsible in her position as Wellness Nurse II. *See id.* 76:13-76:20. The Wellness Nurse III position resided in Disaster Services. *See id.* 75:14-20. The position was responsible for screening employees and volunteers prior to deployment on disaster relief missions. *See* Ex. 6, Pl.'s Dep. 63:17-66:4. At the time of the Core Services Analysis, the duties of the position were being performed by a volunteer nurse. *See id.* 159:11-159:21. After the analysis, the Red Cross shifted responsibility for the International Services screening to the International Department, and added the AFES screening to the Wellness Nurse III position. *See* Ex. 3, Shearer Dep. 91:17-92:20. The Wellness Nurse III position was headquartered in the same building where Ms. Powell worked and obviously involved similar duties.

Because Ms. Powell turned down the offer of a comparable position, Wellness Nurse III, she received no severance pay. See. Ex. 27; Ex. 7. The Red Cross notified Ms. Powell on June 10, 2005 that she would not receive severance pay. *See* Ex. 27; Ex. 6, Pl.'s Dep. 274:2-276:17. The Red Cross notified Ms. Powell again on June 14, 2005 that she would not receive severance pay. *See* Ex. 28. Ms. Powell testified that she could still be employed at the Red Cross had she accepted the Wellness Nurse III position. *See* Ex. 6, Pl.'s Dep. 383:3-383:18.

**D.    Events Following the Termination of Ms. Powell's Position**

Ms. Powell left her employment at the Red Cross on June 30, 2005. *See* Ex. 27. In July 2005, she received four payments from the Maryland Division of Unemployment each in the

amount of $310. *See* Ex. 29, Pl.'s Resp. to Def.'s Interrog. # 20; Ex. 6, Pl.'s Dep. 294:9-295:4.

On August 1, 2005, Ms. Powell started a job at Quadrant where she received $30 an hour and

worked forty hours a week. *See* Ex. 6, Pl.'s Dep. 281:11-285:10. This amounted to

approximately $2,400 every two weeks - more than she made at the Red Cross. Ms. Powell

worked at Quadrant until March 2006. *See id.* She then began a job at the Montgomery County

Department of Health and Human Services at a salary of $57,000 - almost exactly what she made

at the Red Cross. *See id.* 285:11-290:22. She now makes over $58,000. *See id.*

　　　Ms. Powell first considered suing the Red Cross on June 3, 2005. *See* Ex. 6, Pl.'s Dep.

217:12-218:9; Ex. 30. Ms. Powell, however, acknowledged that she never filed a complaint with

the Red Cross regarding any alleged discrimination. Although Ms. Powell knew about the

complaint procedures, she chose instead to hire an attorney to represent her in a lawsuit against

the Red Cross. *See id.* 220:2-221:11, 223:13-224:8, 309:11-310:1.

## II.　　ARGUMENT

　　　A court should grant summary judgment if the pleadings, depositions, answers to

interrogatories, admissions, and affidavits demonstrate that there is no genuine issue of material

fact in dispute and that the moving party is entitled to judgment as a matter of law. FED. R. CIV.

P. 56(C); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Pilates, Inc. v. Georgetown

Bodyworks Deep Muscle Ctrs.*, 157 F. Supp. 2d 75, 79 (D.D.C. 2001).

　　　Ms. Powell must set forth admissible evidence to establish each element of her claims.

The mere existence of a factual dispute by itself is insufficient to bar summary judgment. *See

Pilates*, 157 F. Supp. 2d at 79. As the Supreme Court stated in *Celotex*:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment,
> after adequate discovery and upon motion, *against a party who fails to make a
> showing sufficient to establish the existence of an element to that party's case,
> and on which that party will bear the burden of proof at trial.* In such situations,

> there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all facts immaterial. The moving party "is entitled to summary judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23 (emphasis added). Based on this standard, if Ms. Powell cannot establish all the elements of her claims, the Court should enter summary judgment for the Red Cross.

**A.     Ms. Powell's Race Discrimination Claim Is Barred by the Statute of Limitations.**

Ms. Powell's claim for race discrimination under the DCHRA, D.C. Code Ann., section 2-1402.11(a)(1) is barred by the statute of limitations. A plaintiff must bring an action alleging a violation of the DCHRA within one year after the "occurrence of the unlawful discriminatory practice, or the discovery thereof." D.C. CODE ANN. § 2-1403.04; *see also Davis v. Potomac Elec. Power Co.*, 449 A.2d 278, 281 (D.C. 1982) (recognizing that the limitations period applies to civil complaints). The statute of limitations begins running on the date of the discriminatory act or on the date of the last allegation of discrimination. *See, e.g.*, *Simpson v. Dist. of Columbia Office of Human Rights*, 597 A.2d 392, 399 (D.C. 1991); *Jones v. Howard Univ.*, 574 A.2d 1343, 1346 (D.C. 1990). Any claims relating to discriminatory conduct filed beyond the one-year period are barred. *See Paul v. Howard Univ.*, 754 A.2d 297, 311-12 (D.C. 2000).

All of Ms. Powell's allegations regarding her claim of discrimination relating to the Wellness Nurse III salary occurred more than one year before Ms. Powell filed her complaint. By May 12, 2005, the Red Cross notified Ms. Powell that it was eliminating her position and offered Ms. Powell the comparable position of Wellness Nurse III. *See* Ex. 18; Ex. 6, Pl.'s Dep. 152:18-153:5, 156:10-156:14. Ms. Powell responded to the offer by inquiring about the salary of the position on May 13. *See* Ex. 20. On May 15, the Red Cross notified her that her

salary in the Wellness Nurse III position would remain the same.  *See id.*  At this time,

Ms. Powell understood that she would be paid the same salary if she accepted the Wellness

Nurse III position.  *See* Ex. 6, Pl.'s Dep. 205:12-206:2.  Although Ms. Powell inquired with

different people at the Red Cross about this issue several times in May 2005, the Red Cross did

not change its position.  As a result, Ms. Powell turned down the offer of the Wellness Nurse III

position on June 2, 2005.  *See* Ex. 25.  Because Ms. Powell rejected the offered position, her

employment at the Red Cross ended due to the elimination of her position on June 30, 2005.  *See*

Ex. 27.  Ms. Powell does not allege any other discriminatory acts with respect to the offer of the

Wellness Nurse III position at the same salary.  In fact, Ms. Powell considered suing the Red

Cross on June 3, 2005 over this issue.  *See* Ex. 6, Pl.'s Dep. 217:12-218:9.  Ms. Powell filed her

original complaint in the Superior Court of the District of Columbia on June 9, 2006, more than

one year after she was offered the Wellness Nurse III position.[6]

        In her complaint, Ms. Powell alleges that the Red Cross discriminated against her and,

thus, violated the DCHRA because it offered her the Wellness Nurse III position without

increasing her salary.  *See* Compl. ¶¶ 29-30.  Because Ms. Powell understood the Red Cross's

position with respect to the salary issue on May 15, 2005, and the last instance of any disparate

treatment that Ms. Powell alleges occurred on June 2, 2005, her claim is barred by the statute of

limitations.[7]

---

[6]        The Red Cross removed her complaint to Federal court on June 27, 2006.

[7]        To the extent that Ms. Powell claims that the offer of the comparable position at the same
        salary constituted retaliation, the claim is barred by the statute of limitations for the same
        reasons set forth above.

**B.    Ms. Powell's DCHRA Claims Fail Because Ms. Powell Has Not Established *Prima Facie* Cases, and the Red Cross Had Legitimate, Nondiscriminatory Reasons For Its Actions.**

In considering claims brought under the DCHRA, the District of Columbia Court of Appeals has stated that it "rel[ies] on the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802 (D.C. 2003) (internal quotations omitted). Moreover, the D.C. Court of Appeals looks to cases construing Title VII for guidance. *See Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 869 n.3 (D.C. 1997).

Ms. Powell is required to establish a *prima facie* showing of disparate treatment, discrimination, and retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. 792, 802 (1973); *see Guerrero v. Univ. of Dist. of Columbia*, 251 F. Supp. 2d 13, 23, 25-26 (D.D.C. 2003) (acknowledging that the burden shifting framework applies to retaliation and disparate treatment claims) (citations omitted); *Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571 (D.C. 2000) (applying the burden shifting standard to discriminatory termination).

"If the plaintiff establishes [her] prima facie case, the defendant then bears the burden of 'produc[ing] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). However, the Red Cross's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Once the Red Cross articulates its legitimate, nondiscriminatory reasons, Ms. Powell must show that the reasons are a pretext for discrimination. *See Hollins*, 760 A.2d at 571

14

("[O]nce the employer has met its burden of producing a legitimate, nondiscriminatory reason for the termination, the presumption drops from the case. . . . From that point onward, the [applicant] must show *both* that the reason was false, *and* that discrimination was the real reason.") (internal citations and quotations omitted); *see also Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 74 (D.D.C. 2002) (noting that, to defeat summary judgment, a plaintiff must proffer evidence to show that the defendant's explanations are a pretext for discrimination). Ms. Powell cannot point to any evidence whatsoever that indicates the Red Cross's explanations for its actions with respect to her employment are a pretext for discrimination based on her race.

       1.    <u>Ms. Powell Cannot Establish a *Prima Facie* Case of Discriminatory Treatment</u>.

Ms. Powell cannot establish a *prima facie* case of discriminatory treatment regarding the offer of the comparable position because Ms. Powell did not suffer an adverse employment action. To establish a *prima facie* case, Ms. Powell must establish that (1) she is a member of a protected class, (2) she suffered an adverse action with respect to her employment, and (3) the action gives rise to an inference of discrimination. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) (citations omitted); *Tsehaye v. William C. Smith & Co., Inc.*, 402 F. Supp. 2d 185, 193 (D.D.C. 2005) (citations omitted); *see also Dickerson*, 238 F. Supp. 2d at 73 (applying this standard to cases under the DCHRA).

An adverse employment decision includes "hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a change in benefits." *Russell v. Principi*, 257 F. 3d 815, 818 (D.C. Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Henderson v. Rice*, 407 F. Supp. 2d 47, 52 (D.D.C. 2005) (stating that an adverse action must be an "objectively tangible harm") (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). However, "[i]f a plaintiff has not suffered a reduction in benefits or pay, then an adverse personnel action can only be established if it is

shown that the employer's action had materially adverse consequences affecting the terms, conditions, or privileges of employment." *Tsehaye*, 402 F. Supp. at 193 (internal quotation marks and citations omitted). The action must result in a "tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. Washington Metro. Area Transit Auth.*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (citations omitted). Even though a plaintiff may believe an action is adverse, for purposes of a discrimination claim, "mere inconveniences and alteration of job responsibilities will not rise to the level of adverse action." *Moore v. Ashcroft*, 401 F. Supp. 2d 1, 20 (D.D.C. 2005) (citations omitted).

Further, it is not sufficient for Ms. Powell to allege that the Red Cross discriminated against her solely because it did not offer her a comparable position at a higher salary. Rather, Ms. Powell must prove that the Red Cross did not pay her the higher salary as a result of her race. *See Machakos v. Meese*, 647 F. Supp. 1253, 1261 (D.D.C. 1986) (citing *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324 (1977)).

Ms. Powell did not suffer an adverse employment action. Ms. Powell claims that the salary of the Wellness Nurse III position should have been higher because some of the duties of the Wellness Nurse III position differed from those of Wellness Nurse II. *See* Ex. 6, Pl.'s Dep. 195:15-196:15. She also alleges that she should have been paid more because the market points of the two jobs differed. *See id.* 299:6-300:8. Despite these allegations, the offer of a comparable position at the same salary to an employee whose position has been eliminated is not an adverse employment decision. The Red Cross could have terminated Ms. Powell's position and not offered her anything. The Red Cross's attempt to retain an employee affected by a reduction in force can hardly constitute an adverse action solely because the employee was not happy with a reasonable offer.

Ms. Powell's salary at the time the Red Cross eliminated the Wellness Unit fell within the salary range for the Wellness Nurse III position. *See Hayslett v. Perry*, 332 F. Supp. 2d 93, 105 (D.D.C. 2004) (noting that plaintiff did not suffer an adverse action when, absent any material adverse consequence, plaintiff's current position and offered position were within the same pay scale). Ms. Powell made $57,096 as a Wellness Nurse II. *See* Ex. 4. The salary band for the Wellness Nurse III position spanned from $52,554.75 to $87,591.25. *See* Ex. 23; Ex. 21, Miller Dep. 111:11-111:16. Ms. Powell's salary as a Wellness Nurse II, therefore, was within the Red Cross's range for the Wellness Nurse III position. She would have remained eligible for merit increases. *See* Ex. 24. Indeed, because the upper range of the Wellness Nurse III position exceeded that of Wellness Nurse II, the Red Cross offered Ms. Powell a position in which she could make more money over time had she accepted the position and remained at the Red Cross.

Furthermore, there is no evidence that the two positions differed with respect to benefits. *See, e.g.*, *Brown*, 199 F.3d at 457 (finding no adverse action involving a lateral transfer that provides employee with same benefits and pay absent any other "materially adverse consequence"); *Walker*, 102 F. Supp. 2d at 29 (citations omitted) (recognizing that an employment action involving a change of duties or working conditions is not an adverse action unless the action results in a material disadvantage to the plaintiff).

Finally, the offer of Wellness Nurse III did not materially disadvantage Ms. Powell. There was no tangible change in Ms. Powell's employment or any objective harm to Ms. Powell whatsoever. An increase in responsibilities is not an adverse action. *See Lester v. Natsios*, 290 F. Supp. 2d 11, 13 (D.D.C. 2003) ("Courts have recognized that increases in workload or changes in responsibility are not adverse employment actions, but rather constitute only the ordinary tribulations of the workplace, which employees should expect.") (citations omitted); *cf.*

*Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (finding no adverse action when plaintiff's responsibilities did not decrease and he was given additional responsibilities); *Baloch v. Norton*, 355 F. Supp. 2d 246, 256-58 (D.D.C. 2005) (holding that plaintiff's failure to show "significantly diminished material responsibilities" prevented a finding of an adverse action).

 The offer of the Wellness Nurse III position did not disadvantage Ms. Powell. The Red Cross offered her a comparable job doing something with which she was familiar. Although Ms. Powell would have increased responsibilities, almost half of her time in the position would have consisted of analyzing medical records relating to AFES deployment. *See* Ex. 3, Shearer Dep. 76:2-76:20, 88:5-88:19. She had spent a substantial amount of her time as a Wellness Nurse II working on AFES. *See* Ex. 6, Pl.'s Dep. 127:2-127:4.

 Ms. Powell cannot establish any adverse employment action and, therefore, cannot establish any inference of discrimination based on the Red Cross's offer of the Wellness Nurse III position at the same salary. In fact, during her deposition, Ms. Powell seemed unsure as to the basis of the alleged discrimination:

> Q. And do you contend the discrimination is based on race, sex, national origin, or some other basis?
> A. Well, I guess it could be race and some other basis.
> Q. Okay. You say you guess. What facts do you -- what facts do you have that support your contention that any difference in pay or proposed pay was based on your race?
> A. Jane Davis is white.
> Q. Okay. Anything else other than Jane Davis is white?
> A. That Carol Miller and them could just decide not to pay me. We don't want to pay you. Almost like a special good old boys club. We're not going to pay you, because I don't have to pay you.

Ex. 6, Pl.'s Dep. 305:17-306:10. Because Ms. Powell is unable to plead a *prima facie* case of discriminatory treatment, her claim fails.

2.     <u>Ms. Powell Cannot Establish a *Prima Facie* Case of Discriminatory Termination</u>.

Ms. Powell cannot establish a *prima facie* case of discriminatory termination because Ms. Powell cannot put forth any facts or evidence that give rise to an inference of discrimination. The *prima facie* standard for discriminatory discharge is similar to discriminatory treatment.  *See Tsehaye*, 402 F. Supp. 2d at 194.  Under the DCHRA, D.C. courts require a plaintiff to establish that (1) she belongs to a protected class, (2) that she was qualified for the job from which she was terminated, (3) that her termination occurred despite her qualifications, and (4) that her termination was based on a characteristic that placed her in the protected class.  *See Futrell*, 816 A.2d at 803.  Ms. Powell must also show that that "the position continues to exist and was filled - sufficient proof that the position was not simply eliminated."  *Mastro*, 447 F.3d at 851. Ms. Powell cannot make this showing.

The termination of Ms. Powell's position does not create an inference of discrimination sufficient to support a claim under the DCHRA.  The Red Cross did not make any decisions on the basis of or even consider Ms. Powell's race when it eliminated the Wellness Unit.  Rather, Ms. Powell lost her job at the Red Cross after a series of company-wide decisions involving its financial situation.  *See* Ex. 17; Ex. 18.  The Red Cross decided that it no longer needed the Wellness Unit and decided to eliminate the department.  See Ex. 18, attachment p. 2.  As a result, Ms. Powell's position was terminated and, therefore, Ms. Powell cannot even allege that her position continued to exist after her termination.

Ms. Powell understood she was terminated because of the reduction in force.  While still employed at the Red Cross, Ms. Powell admitted that the reduction in force, not discrimination, resulted in the termination of her position.  *See* Ex. 19.  She also admitted during her deposition that had she had accepted the Wellness Nurse III position, she could still be employed by the Red

Cross.  *See* Ex. 6, Pl.'s Dep. 383:3-383:18.  As implied in Ms. Powell's statements, if the Red Cross wanted to terminate her, it would not have offered her comparable employment at the organization.

Ms. Powell's termination from the Red Cross was not based on her race.  Put simply, there is no possible inference of discrimination to be drawn from Ms. Powell's evidence or allegations.  As a result, Ms. Powell's claim for discriminatory termination fails.

       3.    <u>Ms. Powell Cannot Establish a *Prima Facie* Case of Retaliation</u>.

Ms. Powell must put forth evidence that she was "engaged in a statutorily protected activity; that [she] suffered from an adverse employment action; and that a causal connection existed between the two."[8]  *McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (citing *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)); *see also Hollins*, 760 A.2d at 579.  To allege that an exchange or conversation with an employer constituted protected activity, the plaintiff must put forth facts that indicate the plaintiff complained of "unlawful discrimination, not just frustrated ambition."  *McIntyre*, 460 F. Supp. 2d at 134 (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)); *see Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994) ("[T]he plaintiff must alert the employer that she is lodging a complaint about allegedly discriminatory conduct.").

A generous reading of her complaint suggests that Ms. Powell claims the Red Cross retaliated against her when (1) the Red Cross refused to increase her salary if she accepted the Wellness Nurse III position, and when (2) the Red Cross terminated her position when she did

---

[8]      To the extent Ms. Powell alleges wrongful discharge in violation of public policy (*i.e.*, the DCHRA), her claim fails for the same reasons as her retaliation claim.  *See Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 137, 141 (D.D.C. 2004) (considering a wrongful discharge claim and noting that plaintiff must show that the sole reason for termination was engaging in the protected activity).

not take the Wellness Nurse III position.  *See* Compl. ¶¶ 30, 33.  However, there is no evidence

and Ms. Powell does not allege that she engaged in a protected activity or that the Red Cross's

decision with respect to her employment was based on any protected activity.

> a.     *Ms. Powell did not engage in protected activity.*

The only conceivable protected activity in which Ms. Powell could have engaged relates

to the discussions with the Red Cross regarding her termination and the salary of the Wellness

Nurse III position.  At no other time did Ms. Powell interact with the Red Cross regarding any of

the allegations in her complaint.  During the course of the discussions, however, Ms. Powell did

not articulate her concerns regarding any perceived discrimination.  As Ms. Powell candidly

admits, she did not file a complaint with the Red Cross regarding any perceived discrimination,

but, instead, decided to obtain an attorney:

> Q.     You never complained about discrimination at the Red Cross, right?
> A.     Not until I was cheated out of my salary.
> Q.     Okay.  When did you complain about discrimination?
> A.     When I hired the attorney.  That was my complaint, and then you --
>
> ***
>
> Q.     Yeah.  I'm talking about while you worked at the Red Cross, did you ever
>        complain about discrimination?
> A.     No, I did not.

Ex. 6, Pl.'s Dep. 309:11-310:1.  Furthermore, Ms. Powell stated that she did not even mention

discrimination to anyone at the Red Cross.  *See id.* 220:2-220:9, 221:4-221:11.  Instead, when

offered the Wellness Nurse III position, Ms. Powell merely pointed out to the Red Cross Human

Resources Department that her current salary was different than the Wellness Nurse III salary

and that she wanted more money.  *See* Ex. 20.  As a result, Ms. Powell has not established that

she engaged in a protected activity and, therefore, her retaliation claim fails.

      b.      *Ms. Powell cannot prove a causal connection regarding the offer of the Wellness Nurse III position or her termination.*

Even assuming that Ms. Powell did engage in a protected activity, she cannot prove a causal connection between the activity and the actions of the Red Cross. To show a causal connection, Ms. Powell must show that the employer had prior knowledge of the protected activity in which the plaintiff engaged before taking an adverse action against the plaintiff. *McIntyre*, 460 F. Supp. 2d at 134-35 (citing *Laboy v. O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir Mar. 13, 2002)); *see also Dickerson*, 238 F. Supp. 2d at 86-87 (granting summary judgment for defendant when defendant established that it made decisions regarding plaintiffs employment prior to plaintiffs' complaints).

Here, any protected activity that Ms. Powell implies she engaged in occurred <u>after</u> the Red Cross took action. Specifically, the Red Cross informed Ms. Powell of the decision to terminate Ms. Powell's position based on a reduction in force analysis on May 11, 2005. *See* Ex. 18. Ms. Powell learned of the decision the next day. *See* Ex. 6, Pl.'s Dep. 152:18-153:5, 156:10-156:14. Moreover, the Red Cross offered Ms. Powell the comparable position of the Wellness Nurse III before Ms. Powell even mentioned her concerns with the salary. *See* Ex. 20. Clearly, the Red Cross made its decisions and acted prior to any discussions with Ms. Powell. As a result, there can be no causal connection between the Red Cross's decisions and any activity of Ms. Powell.

    4.    <u>The Red Cross Had Legitimate, Nondiscriminatory, And Non-Retaliatory Reasons for Its Decisions Regarding Ms. Powell's Employment</u>.

Even assuming that Ms. Powell established *prima facie* cases of discrimination or retaliation, summary judgment for the Red Cross should be granted because of its legitimate, nondiscriminatory, and non-retaliatory reasons for terminating Ms. Powell's position and offering her the Wellness Nurse III position at her current salary. As a result, to avoid summary

judgment, Ms. Powell "must produce some objective evidence showing that defendant's proffered reasons are mere pretext." *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 18 (D.D.C. 1999) (citing *Ridley v. Dist. of Columbia*, 945 F. Supp. 333, 342 (D.D.C. 1996)).

The Red Cross made business decisions regarding the organization as a whole and Ms. Powell in particular. These decisions, however, were not discriminatory or retaliatory. *See Tsehaye*, 402 F. Supp. 2d at 195 (acknowledging that a reduction in workforce is a legitimate business decision); *Futrell*, 816 A.2d at 804 ("[C]ourts are not in a position to pass on the appropriateness or inappropriateness of an employer's business decisions when there is no evidence of discrimination.") (citing *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir. 1983)).

a.    *Ms. Powell's position was eliminated as a result of corporate restructuring at the Red Cross.*

The Red Cross eliminated Ms. Powell's position after conducting an organizational restructuring. From 2004 until 2005, the Red Cross performed a Core Services Analysis regarding the Red Cross as a whole and made decisions based on its needs and financial constraints. *See* Ex. 17. Specifically, the Red Cross "conducted a detailed inventory of all the activities and work product of our departments . . . . reviewed budgets, business plans and structures . . . . to ensure the national organization is optimally structured and aligned to accomplish [the Red Cross's] Strategic Plan in the most cost-effective manner." *Id.* This company-wide analysis affected the entire company. After the Red Cross completed its analysis, in May 2005, the Red Cross made other decisions, including the elimination of the Wellness Unit. *See* Ex. 18. When the Red Cross made this decision, Ms. Powell's position as Wellness Nurse II was eliminated as well. The elimination of the Wellness Unit was a business decision that was both legitimate and nondiscriminatory.

       b.     *The salary offered to Ms. Powell overlapped with the salary range of her current salary.*

The Red Cross's offer of the Wellness Nurse III position at the same salary was consistent with its salary practices. *See* Ex. 24. After the Red Cross's financial decision to streamline the organization, the Red Cross attempted to place those employees who were affected by the decision into other open positions. *See* Ex. 18, p. 2. The Red Cross offered the position of Wellness Nurse III to Ms. Powell on May 12. *See* Ex. 6, Pl.'s Dep. 156:10-157:6; Ex. 3, Shearer Dep. 75:6-77:6. Ms. Powell would be paid the same salary of $57,096 in that position. Based on the 75 to 125 percent salary range of the midpoint, Ms. Powell could have made a little as $43,760,25 or as much as $72,933.75 in the Wellness Nurse II position. *See* Ex. 22; *See* Ex. 21, Miller Dep. 111:11-111:16. Based on the same criteria, Ms. Powell could have made as little as $52,554.50 and as much as $87,591.25 in the Wellness Nurse III position. *See* Ex. 23; *See* Ex. 21, Miller Dep. 111:11-111:16. Her salary of $57,096 fit within both parameters.

The Red Cross's treatment of Ms. Powell's salary was exactly the same as its treatment of other individuals affected by the analysis. *See* Ex. 24. In fact, during the course of offering comparable positions to those employees affected by the reduction in force, the Red Cross did not offer higher salaries to <u>any</u> employees. *See id.* Because her salary fit within the range of both positions, the Red Cross did not offer Ms. Powell a higher salary. Therefore, the offer of the Wellness Nurse III position at the same salary was not a discriminatory or retaliatory practice. Rather, it was a legitimate, consistent decision based on company policy.

**C.    Ms. Powell's D.C. Wage and Hour Law Claim Fails Because Her Position Was Exempt from Overtime Compensation.**

Ms. Powell was not entitled to overtime compensation because she was "employed in a bona fide executive, administrative, or professional capacity." D.C. CODE ANN. § 32-1004(a)(1);

*see also* 29 U.S.C. § 213(a)(1).[9]  Ms. Powell's employment was exempt under the professional

and administrative exemption.  Whether an exemption applies to an employee depends on the

nature of the work the employee performed rather than the employer's characterization of the job

as exempt or the description of the job.  *See, e.g.*, *Meyer v. Worsley Cos., Inc.*, 881 F. Supp.

1014, 1019 (E.D.N.C. 1994).

      1.    <u>Ms. Powell is exempt under the professional exemption</u>.

      Ms. Powell fell under the professional exemption of the D.C. Wage and Hour Law and,

therefore, she was not entitled to overtime compensation.  A professional employee is an

employee who is paid $455 or more a week on a salary basis, and works primarily in a job that

requires advanced knowledge in a field of science.  *See* 29 C.F.R. § 541.300.  This "learned

professional" position must perform a primary duty that meets a three-part test.  The employee

must: (1) perform work requiring advanced knowledge that involves the exercise of judgment

and discretion, (2) in a field of science, (3) that is customarily acquired by a prolonged course of

specialized intellectual instruction.  *See* 29 C.F.R. § 541.301(a).  Moreover, "[a]n employee who

performs work requiring advanced knowledge generally uses the advanced knowledge to

analyze, interpret or make deductions from varying facts or circumstances."  29 C.F.R. §

541.301(b).

      An employee is considered a professional employee even though the employee performs

non-professional duties.  Courts not only look to the time an employee spent on professional

activities, but also "that which is of principal importance to the employer."  *Reich v. Wyoming*,

993 F.2d 739, 742 (10th Cir. 1993); *see Rutline v. Prime Succession, Inc.*, 220 F.3d 737, 742-43

---

[9]     The D.C. Wage and Hour Law is modeled after the FLSA provision and incorporates the
definitions of the FLSA regulations in the Code of Federal Regulations ("C.F.R.").  *See*
29 U.S.C. § 207(a)(1).

(6th Cir. 2000) (concluding that the performance of collateral duties that do not require a license is not a basis for determining that an employee is not exempt from overtime statute). *See also Hills v. W. Paper Comp.*, 825 F. Supp 936, 938 (D. Kan. 1993) ("Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the pertinent factors support such a conclusion.").

The Federal Regulations explicitly state that registered nurses "generally meet the duties requirements for the learned professional exemption." 29 C.F.R. § 541.301(e)(2). Moreover, courts have acknowledged that registered nurses are exempt from overtime compensation laws because they are learned professionals. *See, e.g.*, *Bongat v. Fairview Nursing Care Ctr.*, 341 F. Supp. 2d 181, 187 (E.D.N.Y. 2004) (interpreting the New York state statute relating to employee compensation); *Richardson v. Genesee County Cmty. Mental Health Servs.*, 45 F. Supp. 2d 610 (E.D. Mich. 1999). An employee such as a registered nurse may still be exempt if the employee uses manuals to interpret information that can "be understood or interpreted only by those with advanced or specialized knowledge or skill." 29 C.F.R. § 541.704.

As a registered nurse, Ms. Powell was exempt from overtime compensation under the professional exemption. First, Ms. Powell made more than $455 a week on a salary basis. *See* Ex. 4. Second, Ms. Powell worked in the field of medicine, nursing, and health care at the Red Cross. Ms. Powell had a current registered nurse license, a Diploma of Nursing, 22 years of nursing experience, and was in the process of obtaining a Bachelor's Degree in Health Care Administration. *See* employment documents relating to Ms. Powell, attached as Exhibit 32. In fact, Ms. Powell qualified for the Wellness Nurse II position and the Red Cross hired her for the position because she had a registered nurse license. *See* Ex. 2; Ex. 3, Shearer Dep. 41:2-41:7.

Third, Ms. Powell spent the clear majority of her time at the Red Cross engaged in duties relating to her field of study in which she exercised discretion based on her knowledge. Ms. Powell's work relating to AFES and International Services involved that which is of primary importance to the Red Cross.  *See* Ex. 10; Ex. 13.  A clear majority of Ms. Powell's daily activities involved the analysis of AFES medical records.  *See* Ex. 6, Pl.'s Dep. 127:2-127:4. After Ms. Davis resigned, Ms. Powell's workload in this area increased.  *See id.* 128:13-129:19. When Mr. Thiel resigned, Ms. Powell started reviewing medical records relating to International Services - another duty that involved her knowledge of medicine and health care.  *See id.* 56:9-56:14.

Ms. Powell also used her medical knowledge to review military medical guidelines to make determinations regarding the deployments of Red Cross employees to certain geographic locations.  *See id.* 36:19-37:8, 63:17-66:4; Ex. 14; Ex. 15.  Ms. Powell understood the records that came in the form of lab results, radiology results, immunization records, and prescription drug information.  *See* Ex. 6, Pl.'s Dep. 326:10-326:15; Ex. 3, Shearer Dep. 44:3-44:12.  After her review, Ms. Powell made initial determinations with respect to whether employees were fit to be deployed.  *See* Ex. 6, Pl.'s Dep. 76:10-78:8.  Her supervisor never overturned her recommendations.  *See id.* 77:16-78:8.

Ms. Powell also counseled AFES and International Services candidates on health issues. Ms. Powell provided advice to an employee that was contrary to the advice the doctors provided to that person.  Specifically, Ms. Powell wrote:

> I am aware of the findings that describe the condition of your cardiac status and the military physicians feel the EKG is not necessary.  However, 40-501 regulation 2-18 states the following: ["]The causes for rejection for deployment: all valvular heart disease congenital, acquire, including those improve [sic] by surgery except mitral valve prolapse and bicuspid aortic valve.  These later [sic] two conditions are not reasons for rejection unless there is associate [sic]

> tachyarrhythmia, mitral regurgitation, aortic stenosis, insufficiency or
> cardiomegaly.["]  The echo report conclusion is mild aortic valve insufficiency
> and mitral valve regurgitation.  I really want to avoid any complications at the
> CRC, I MUST insist you get the EKG prior to the scheduled deployment in
> October 2005; if the military physician wants to wave [sic] the testing, it must be
> documented.

*See* Email from Powell to [redacted], dated June 16, 2005, attached as Exhibit 15.  In

another email, Ms. Powell advised an employee on dietary approaches to lowering

cholesterol even though the cholesterol levels were not an issue for deployment at the

time.  *See* Email from Powell to [redacted], dated Mar. 9, 2005, attached as Exhibit 15.[10]

   Additionally, Ms. Powell was informed of the status of the employees who were

deployed and remained involved in decisions regarding their health.  For example, Ms. Powell

was directly involved in making decisions regarding the safe transport of a Red Cross employee

who suffered a heart attack while deployed.  *See* Ex. 6, Pl.'s Dep. 37:4-39:1, 79:12-82:1.

Ms. Powell stated that she was assigned to the task because the Red Cross deferred to her

"medical knowledge to help guide them."  *See id.* 38:15-39:1.

   Finally, Ms. Powell also participated in briefings and debriefings of deployed employees.

*See id.* 66:5-71:9, 332:14-334:11.  After reviewing medical records, Ms. Powell ensured that

employees had their medications, provided health education regarding the destination, and

notified them to contact Ms. Powell with any updates concerning their heath.  *See id.* 66:5-69:5.

When employees returned, Ms. Powell discussed any health issues with them, including any

conflicts that may have occurred with any other Red Cross employees while deployed.  *See id.*

69:6-71:9.  She characterized these types of decisions as involving "some strategy."  *Id.* 76:1-

76:3.

---

[10]     The above two examples are two of many examples set forth in Exhibit 15.

Ms. Powell's position was exempt notwithstanding the fact that she used guidelines and performed other duties that may not have required a professional background.  The analysis of the medical records and the comparison of that data to the standards in the military guidelines required medical knowledge.  *See id.* 76:10-78:8; Ex. 12.  In short, Ms. Powell needed her medical knowledge when using the guidelines.  Even though Ms. Powell performed additional duties at the Red Cross such as file maintenance that may not have required a registered nurse license, these duties were collateral to her AFES and International Services work.

It is clear that Ms. Powell not only had the medical background to understand the medical guidelines and patient records, but that her position required such knowledge.  Ms. Powell also exercised discretion in the course of her duties such as offering her own medical advice.  Ms. Powell's employment, therefore, was exempt under the professional exemption.

2.    <u>Ms. Powell is exempt under the administrative exemption</u>.

Even if this Court finds that Ms. Powell's employment is not exempt under the professional exemption, Ms. Powell's position at the Red Cross was exempt under the administrative exemption.  An administrative employee must meet a three-part test.  First, the employee must be paid $455 or more a week on a salary basis.  Second, the employee's primary duty must be the "performance of work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.201(a); *see, e.g.*, *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 538-43 (7th Cir. 1999).  Third, the employee must include "the exercise of discretion and independent judgment with respect to matters of significance."[11]  29. U.S.C. § 541.202(a).

---

[11]     As defined in the C.F.R., "the term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 U.S.C. § 541.202(a).

Regarding the second element, a primary duty exempt from overtime includes that which is "directly related to assisting with the running or servicing of the business" as distinguished from an employee who works on a "manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a); *see also Robinson-Smith v. Gov't Employees Ins. Comp.*, 323 F. Supp. 2d 12, 22-23 (D.D.C. 2004). This exemption includes employees working in "insurance . . . safety and health . . . employee benefits, [and] legal and regulatory compliance." 29 C.F.R. § 541.201(b). The employee's duty must be of principal importance to the employer and any other duties must be collateral to that duty. *See, e.g.*, *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004). Courts have held that the primary duty may include participation in the formulation of the company's policies or operation of the business as a whole. *See Rainey v. Am. Forest and Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 96 (D.D.C. 1998).

With respect to the third element, discretion and independent judgment "involve[] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Although this element involves a factual consideration, the regulations state that relevant factors to determine whether the exemption applies include whether the employee "performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business . . . [and] whether the employee provides consultation or expert advice to management." 29 C.F.R. § 541.202(b). Moreover, employees may be exempt even though their recommendations are reviewed. *See* 29 C.F.R. § 541.202(c). Finally, this element of the administrative exemption requires more than "applying well-established techniques, procedures or specific standards described in manuals or other sources."

29 C.F.R. § 541.202(e); *see also, e.g.*, *Robinson-Smith*, 323 F. Supp. 2d at 25-26.  Importantly,

however, an employee may still be exempt from overtime if the employee uses manuals to

interpret information that can "only be understood by those with advanced or specialized

knowledge or skill."  29 C.F.R. § 541.704.

       Ms. Powell meets the three elements of the administrative exemption.  First, as discussed

above, she made more than $455 a week.  Second, Ms. Powell's primary duty related to the

general business of the Red Cross in an office environment.[12]  The medical clearance and health

counseling of AFES and International Services employees is directly related to the AFES and

International Services work of the Red Cross.  *See* Ex. 10; Ex. 13.  Without medical clearance,

the individuals would not be able to be deployed and the Red Cross would be unable to operate

these services.  *See* Ex. 10; Ex. 13.  Ms. Powell's duties assisted in the functioning of these

aspects of the Red Cross's business.  Soon after Ms. Powell started her employment at the Red

Cross, she spent more than sixty percent of her time on working on AFES tasks.  *See* Ex. 6, Pl.'s

Dep. 127:2-127:4.  This increased when Ms. Davis resigned from the Red Cross.  *See id.* 128:13-

129:19.  Ms. Powell began International Services work after Mr. Thiel resigned.  *See id.* 55:3-

55:9.

       Third, for the same reasons discussed in relation to the professional exemption,

Ms. Powell exercised discretion and independent judgment.  She counseled AFES and

International Services personnel, made initial determinations as to whether an individual was fit

to be deployed, and interpreted records to ascertain any problems an individual may have while

deployed.  Ms. Powell did analyze the AFES and International Services records using military

---

[12]    As Ms. Powell stated, her work at the Red Cross was "health nursing in a non-industrial
setting."  *See* Ex. 6, P.'s Dep. 33:17-33:18.

medical guidelines.  Nevertheless, Ms. Powell's "advanced or specialized knowledge or skill" as a registered nurse enabled her to understand the guidelines and apply contents of the medical records to the information in the guidelines.  The use of the guidelines does not, therefore, preclude a finding that Ms. Powell is exempt under the administrative exemption.  Accordingly, Ms. Powell's employment at the Red Cross was exempt under the administrative exemption.

**D.    Ms. Powell's Breach of Contract Claim Fails Because No Contractual Obligations Existed Between Her and the Red Cross.**

Ms. Powell cannot recover on her breach of contract claim because there is no contract at issue.[13]  Under D.C. law, hiring a person without establishing a specific term of duration for that person's employment creates an employment at-will that is terminable by either the employee or the employer.  *See Strass v. Kaiser Found. Health Plan of Mid-Atlantic*, 744 A.2d 1000, 1011 (D.C. 2000) (quoting *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 816 (D.C. 1991)); *see also Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington v. Beards*, 680 A.2d 419, 432-33 (D.C. 1996).  Further, if a plaintiff cannot put forth evidence that the parties established a definite duration of employment, then the employment is terminable at-will.  *See Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 268 (D.C. 1993) (affirming summary judgment for employer).  Even if the employer provides the employee with an employment manual, the employee is still at-will when the employer disclaims that the manual is not a contract and states that the employment relationship is at-will.  *See U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 747 (D.C. Cir. 1998) (collecting D.C. cases); *Boulton*

---

[13]    The District of Columbia does not recognize the tort of wrongful discharge regarding the termination of an at-will employee unless an at-will employee alleges that the termination violated public policy.  *See* supra, note 6.  For the reasons set forth in Section II.B., the termination of Ms. Powell's position did not violate public policy.  Any claim for wrongful discharge fails.

*v. Inst. of Int'l Educ.*, 808 A.2d 499, 504-05 (D.C. 2002); *see also Taylor v. Washington Metro. Area Transit Auth.*, 922 F. Supp. 665 (D.D.C. 1996) ("The existence of a personnel manual, in and of itself, does not convert an employee's status from at-will to 'permanent.'") (citation omitted). Moreover, an employee manual does not create contractual rights for an employee where that manual specifically disclaims that any contract exists. *See Strass*, 744 A.2d at 1011 (citing *Smith*, 620 A.2d at 269); *see also Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 766-67 (D.C. Cir. 2002) (affirming summary judgment to employer when employee failed to offer evidence that the employer's policies granted the employee any contractual rights regarding employment).

The Red Cross did not have a contract or any contractual obligations regarding the duration of Ms. Powell's employment. Both the offer letter and the Employee Manual informed Ms. Powell that she was an at-will employee and that neither document created a contract. *See* Ex. 4, Ex. 5. Ms. Powell reviewed both documents and acknowledged in her deposition that she realized she was an at-will employee. *See* Ex. 6, Pl.'s Dep. 99:16-100:19, 109:18-110:7. Accordingly, the termination of Ms. Powell's position did not violate any contract.

Further, the Red Cross Employee Manual did not create any obligations with respect to severance pay. The severance policy states that it does not form a contract with the employee. *See* Ex. 7. Second, the language of the policy is permissive in that it states that severance pay "may be provided" when certain conditions are met.[14] *Id.*

_____

[14]     In any event, the Red Cross offered Ms. Powell comparable employment with a base salary within ten percent of her current position that was located in the same building as her current position. *See* Ex. 7; Ex. 3, Shearer Dep. 76:2-76:20, 88:5-88:19; Ex. 6, Pl.'s Dep. 274:20-276:17.

Finally, Ms. Powell alleges that she is entitled to a transportation allowance.  *See* Compl. ¶ 38.  There is no mention of a transportation allowance in the Employee Manual.  Ms. Powell alleges that the Red Cross provided the transportation allowance to employees on July 1, 2005. *See* Pl.'s Resp. to Def.'s Interrog. # 11, attached as Exhibit 33.  At that time, Ms. Powell was no longer employed by the Red Cross.

**E.      Ms. Powell Is Not Entitled To Punitive Damages, Liquidated Damages, or Back Pay.**

       1.      <u>Ms. Powell is not entitled to punitive damages</u>.

Ms. Powell's claim for punitive damages fails.  First, because the Red Cross is a federal instrumentality, it enjoys the same immunity from claims for punitive damages as does the United States.  *See Barton v. Am. Red Cross*, 826 F. Supp. 407, 410-11 (M.D. Ala. 1993) (holding that the Red Cross enjoys immunity from claims for punitive damages and granting the Red Cross's motion to strike plaintiff's punitive damages claim); *Doe v. Am. Nat'l Red Cross*, 837 F. Supp. 121, 121 (E.D.N.C. 1992) (finding that the Red Cross is immune from punitive damages).  As such, Ms. Powell cannot seek punitive damages from the Red Cross.

Second, as discussed above, Ms. Powell cannot demonstrate a case of discrimination or retaliation by the Red Cross under the DCHRA.  Even if she could, she cannot demonstrate that the Red Cross acted with the requisite intent necessary for an award of punitive damages. "Under District of Columbia law, 'punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury.'" *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 52 (D.D.C. 2003) (citing *Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4, 12 (D.D.C. 1997)).  Proof of "evil motive or actual malice" is required. *Arthur Young & Co.*, 631 A.2d 354, 372 (D.C. 1993); *see also Daka, Inc. v. Breiner*, 711 A.2d

86, 98 (D.C. 1998). In the DCHRA context, the mere finding of discriminatory action, without more, will not support an award of punitive damages. *See Arthur Young & Co.*, 631 A.2d at 372. Ms. Powell can establish no facts demonstrating, either directly or by inference, that the Red Cross acted maliciously in its dealings with her.

    2.    <u>Ms. Powell is not entitled to liquidated damages.</u>

Ms. Powell's claim for liquidated damages fails because she cannot establish that the Red Cross did not act in good faith and was unreasonable. Under the D.C. Wage and Hour Law, a court is precluded from awarding liquidated damages if "the employer shows to the satisfaction of the court that the act or omission that gave rise to the action was in good faith and that the employer had reasonable ground for the belief that the act or omission was not a violation of this subchapter." D.C. CODE § 32-1012(a).

If this Court determines that Ms. Powell's employment was not exempt from overtime, the Red Cross's failure to pay overtime was not in bad faith or unreasonable. The Red Cross's Compensation Department evaluates each position at the Red Cross to determine whether the position is exempt. *See* Ex. 9, Def.'s Resp. to Pl.'s Interrog. # 5. The Red Cross evaluated the Wellness Nurse II position in 2004. *See id.*; Ex. 2. This analysis considered the position's job function and scope and nature of the work involved, including the level of knowledge required to perform the job, the type and amount of problem-solving required, the amount of discretion and latitude to be exercised, and the impact of errors on the Red Cross. *See* Ex. 9, Def.'s Resp. to Pl.'s Interrog. # 5. The Red Cross also considered Survey Position Description Summaries to determine whether other companies classified the positions as exempt. *See id.*; Ex. 2. The Red Cross relied on the Department of Labor standards and several other sources for guidance. *See* Ex. 9, Def.'s Resp. to Pl.'s Interrog. # 5.

Because the Red Cross had recently performed a comprehensive analysis of the Wellness Nurse II position and relied on reputable guidelines in doing so, liquidated damages are not appropriate in the event the Red Cross is found liable.

      3.     <u>Ms. Powell's claim for back pay is limited</u>.

If this Court finds that summary judgment is not appropriate, then Ms. Powell's back pay damages for any alleged discrimination should be limited to $2,054. "The appropriate standard for the measurement of a back pay award is to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained." *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1120 (3d Cir. 1988). Furthermore, "[c]ourts interpreting Title VII have terminated the back pay period when the defendant has acquired employment which is more lucrative than the job he lost." *Denton v. Boilermakers Local 29*, 673 F. Supp. 37, 50 (D. Mass. 1987); *accord Matthews v. A-1, Inc.*, 748 F.2d 975, 979 (5th Cir. 1984) (noting that "courts have found that a claim for back pay ceases when the claimant begins to earn more than she had been earning with the defendant employer").

Ms. Powell cannot recover an award of back pay after August 1, 2005. Her claim for back pay must be limited from July 1, 2005 to July 31, 2005, and offset by the unemployment payments, resulting in a net claim of $2,054. As a Wellness Nurse II, Ms. Powell earned $2,196.00, or $156.86 per day of work. *See* Ex. 4. In July 2005, she would have been credited for 21 days of work. In sum, she would have earned a total of $3,294. Ms. Powell collected four unemployment checks each in the amount of $310 during July 2005. *See* Ex. 29, Pl.'s Resp. to Def.'s Interrog. # 20; Ex. 6, Pl.'s Dep. 294:9-295:4. If awarded back pay for July, that amount would be offset by the $1,240 in unemployment payments resulting in $2,054.

Ms. Powell began employment at Quadrant on August 1, 2005.  *See* Ex. 6, Pl.'s Dep. 281:11-281:18.  She made $30 an hour and worked 40 hours a week.  *See id.* 282:21-285:10. This amounts to wage of $2,400 every two weeks.  At this time, therefore, Ms. Powell made more than she did at the Red Cross.  At the end of March 2006, Ms. Powell's employment at Quadrant ended.  *See id.* 284:8-284:12.  She then started a job at the Montgomery County Department of Health and Human Services on April 3, 2006, at a salary of $57,000.  *See id.* 285:11-285:14; 290:11-290:17.  She is currently employed in that position and earning $58,000. *See id.* 290:11-290:22.  Ms. Powell is not entitled to any other back pay based on speculation as to how much she could have earned if she continued employment with the Red Cross.  This Court, therefore, should limit Ms. Powell's claim for back pay to $2,054.

### III.    CONCLUSION

For the foregoing reasons, the Red Cross should be granted summary judgment on all counts alleged in Ms. Powell's complaint.

Respectfully submitted,


  /s/    Constantinos G. Panagopoulos
Constantinos G. Panagopoulos #430932
Ballard Spahr Andrews & Ingersoll, LLP
601 13th Street, N.W., Suite 1000 South
Washington, DC  20005
Tel:    (202) 661-2200
Fax:    (202) 661-2299

February 12, 2007                    *Counsel for Defendant*