RB              UNITED STATES DISTRICT COURT
                        FOR THE
                   DISTRICT OF COLUMBIA

- - - - - - - - - - - - -x
                          :
TONIA POWELL,             :
                          :
        Plaintive,        :
                          :
    v.,                   :
                          :
AMERICAN RED CROSS,       :
                          :
        Defendant.        :
                          :
- - - - - - - - - - - - -x

                    December 15, 2006
                    Washington, D.C.

     The deposition of ANNA SHEARER, called for
examination by counsel for the Defendant in the
above-entitled matter, pursuant to notice, at the
office of Miller Reporting Company, 735 8th Street,
S.E., Washington, D.C., convened, pursuant to
notice at 10:00 a.m., before David Harris, a
notary public in and for the District of Columbia,
when were present on behalf of the parties.

Page 2

1  APPEARANCES:
2    On behalf of the Defendants:
        BRIAN PLITT, ESQ.
3       1776 K Street, N.W.
        Washington, D.C. 20006
4       (202) 452-7984
5
     On behalf of the Plaintive
6       CONSTANTINOS G. PANAGOPOULOS, ESQ.
        Ballard Spahr Andrews & Ingersoll, LLP
7       601 13th Street, N.W.
        Washington, D.C. 20005
8       (202) 661-2202
9  Also Present:
        ROBBIN BOGGES
10      Court Reporter
11      DAVID HARRIS
        Notary Public
12
13
              C O N T E N T S
14
   WITNESS                              PAGE
15    FOR THE PLAINTIFF                    3
16    FOR THE DEFENDANT                   95
17
18
19
20            EXHIBITS
21
22  No. 1                                 10

Page 3

1           PROCEEDINGS
2       MR. DAVID HARRIS: The reporter taking the
3  deposition today is not a notary in the District.
4  Her application is pending.
5       I'm a notary in the District of Columbia,
6  and I'm here to swear the witness. Would you each
7  raise your right hand?
8  Whereupon,
9            ANNA SHEARER
10 having been duly sworn by the Notary Public
11 testified as follows:
12     EXAMINATION BY COUNSEL FOR PLAINTIFF
13     BY MR. PLITT:
14     Q. Good morning. Ms. Shearer, my name is
15 Brian Plitt. I'm am the attorney for--
16     MR. PANAGOPOULOS: I'm sorry.
17     MR. PLITT: Yeah.
18     MR. PANAGOPOULOS: Just so that you know,
19 Anna has an allergy to cats. There have been a
20 bunch of cats in here.
21     MR. PLITT: All right.
22     MR. PANAGOPOULOS: If we need to take a

Page 4

1  break or if her voice starts cracking or something,
2  we'll let you know, because apparently they board
3  cats here as well, but just an FYI.
4       MR. PLITT: Okay. That sounds fine.
5       BY MR. PLITT:
6       Q. On the record. Ms. Shearer, my name is
7  Brian Plitt. I represent Doreen Rainey in the
8  lawsuit that's the subject of this deposition.
9       MR. PANAGOPOULOS: You mean Tanya Powell?
10      MR. PLITT: I mean Tanya Powell. I'm
11 sorry.
12      BY MR. PLITT:
13      Q. And I'm going to be asking you some
14 questions today related to the lawsuit. You're
15 familiar with Ms. Powell; correct?
16      A. Yes.
17      Q. Okay. The purpose of this deposition is to
18 go over issues or facts related to the lawsuit and
19 for you to recall to the best of your ability, the
20 facts related to it that may be important to the
21 case.
22      Have you given a deposition before?

Page 5

1       A. Yes.
2       Q. Okay. And how many times have given
3  deposition?
4       A. A couple.
5       Q. All right. So you're familiar with the
6  procedure?
7       A. Yes.
8       Q. I'll be asking questions. You'll be giving
9  answers. It's being taken down by a court reporter,
10 and you need to say yes or no and if I ask any
11 questions that you don't understand, please let me
12 know, and I'll ask a better question so we can get
13 the record clear; okay?
14      A. Okay.
15      Q. All right. Can you please give me a brief
16 thumbnail sketch of your employment history?
17      A. At the Red Cross, I was employed in
18 February 2001 and remain employed.
19      Q. Okay. And what was your employment before
20 the Red Cross?
21      A. I worked for INOVA Health System.
22      Q. And what was your employment there at

Page 6

1  INOVA?
2  A. I worked there for about 13 years.
3  Q. Okay. And what was your position at INOVA?
4  A. I held a variety of human resource
5  management positions.
6  Q. Okay. And can you tell me some of those
7  positions, please?
8  A. Employee Relations Manager, Salary and
9  Compensation Manager, Director of HR, HRS Consultant
10 and Director.
11 Q. Okay. So that would be from about what
12 dates to what dates?
13 A. 1987 until 2001.
14 Q. Okay. All right. And what about before
15 INOVA?
16 A. I was the Director of Human Resources at
17 AMI, St. Joseph's Hospital in Omaha, Nebraska.
18 Q. Okay. And did you go to college?
19 A. Yes.
20 Q. About when did you graduate from college?
21 A. I completed my undergraduate degree in 1975
22 and my graduate degree in 1999.

Page 7

1  Q. Okay. And did you have any employment
2  after you graduated from college?
3  A. Yes.
4  Q. And what was that?
5  A. My first job was with the Lutheran Church
6  Board of Pensions in Minneapolis.
7  Q. What was your position there?
8  A. Claims Analyst.
9  Q. Okay. And what type of work was that?
10 What did you do as a Claims Analyst?
11 A. Pension calculations and pension
12 administration work.
13 Q. And was that a salaried position or was
14 that an exempt position--a non-exempt position?
15 A. I don't recall.
16 Q. Okay. Have you ever worked in a position
17 where you were paid for overtime?
18 MR. PANAGOPOULOS: I'm going to object as
19 to form. Yeah, from time to time during the
20 deposition, you may hear me object. You're still to
21 answer the question. The objection is just simply
22 for the record unless I specifically not

Page 8

1  ask--instruct you not to answer. So just go ahead
2  and answer the question if you can.
3  THE WITNESS: I really don't recall.
4  BY MR. PLITT:
5  Q. Okay. Now, you are currently employed the
6  Red Cross?
7  A. Yes.
8  Q. Okay. And you started with the Red Cross
9  in 2001?
10 A. Yes.
11 Q. And can you tell me what your position was
12 when you started with the Red Cross?
13 A. Director, Retirement System.
14 Q. And what department was that in?
15 A. Human Resources.
16 Q. And did you have any people working for
17 you?
18 A. Yes.
19 Q. Okay. Who was working for you at that
20 time?
21 MR. PANAGOPOULOS: Objection as to form.
22 You can answer it.

Page 9

1  THE WITNESS: About 40 people.
2  BY MR. PLITT:
3  Q. Okay. All right. And how long did you
4  have that position?
5  A. Until January 2002.
6  Q. And then what was your position after that?
7  A. Senior Director, Employee Benefit and
8  Retirement Programs.
9  Q. Also people working for you?
10 A. Yes.
11 Q. About how many?
12 A. Thirty-five.
13 Q. And then how long did you have that
14 position?
15 A. That is my current position.
16 Q. Now, it's my understanding that you have
17 been designated today to be the corporate
18 representative or one of the corporate
19 representatives for several parts of the deposition
20 notice, which I understand to be A--
21 MR. PANAGOPOULOS: Brian, may I suggest
22 that you--

Page 10

1  MR. PLITT: D.
2  MR. PANAGOPOULOS: --give her the notes
3  you're talking about. I mean she doesn't--I'm
4  fairly confident she doesn't have the notes
5  memorized.
6  MR. PLITT: Fine. I'm going to mark this
7  as number one.
8  [Whereupon, Shearer Exhibit
9  Number 1 was marked for
10  identification.]
11  COURT REPORTER: You want this just at the
12  top?
13  MR. PLITT: Sure. That's fine.
14  BY MR. PLITT:
15  Q. I'm going to hand you Exhibit A, which is
16  the deposition notice for today, Ms. Shearer.
17  A. It's my understanding speaking with counsel
18  that you are designated as the corporate
19  representative or--
20  MR. PANAGOPOULOS: And, Brian, just for
21  clarity, you just said Exhibit A. It's marked as
22  one. Are you going to use letters or numbers?

Page 11

1  MR. PLITT: You did one? Okay. Exhibit 1.
2  MR. PANAGOPOULOS: Okay.
3  BY MR. PLITT:
4  Q. I've handed you what's been marked as
5  Exhibit 1. Thanks. And, Ms. Shearer, you've been
6  designated as the corporate representative for the
7  following letters: A, D, M, L, in whole or in part.
8  Is that correct?
9  MR. PANAGOPOULOS: And "N" in part.
10  THE WITNESS: Yes.
11  MR. PANAGOPOULOS: Brian, before you get to
12  your next question, let me just note for the record
13  that the copy--you know, the objection I made before
14  that the way some of these are drafted, they're
15  very, very broad; that we did what we could to
16  prepare the witnesses for questions reasonably
17  related to their lawsuit, but, you know, we reserve
18  the right to object if it goes too far a field, and
19  I'll just use "A" as a quick example, Defendant's
20  Contact with Its Employees. That will be every
21  contact by the Red Cross with every one of its
22  employees, not limited in any way. We presume

Page 12

1  that's not what you meant, and I think if that is
2  what you meant, that we'd have to call the judge on
3  it, but I'll just state that now for the record and
4  let you go forward; and if we have an issue with any
5  of the questions you ask, we can bring it up at that
6  point in time.
7  MR. PLITT: That's fine.
8  BY MR. PLITT:
9  Q. So it's our understanding you're the
10  corporate representative for those letters, for
11  questions reasonably related to this lawsuit?
12  A. Yes.
13  Q. Okay. Now, did you ever supervise as Red
14  Cross employee the Wellness Unit at the Red Cross?
15  A. Yes.
16  Q. And when did you begin supervising the
17  Wellness Unit?
18  A. February 2002.
19  Q. And how many employees were in the Wellness
20  Unit at that time?
21  A. I believe there were three.
22  Q. Okay. And can you tell me which employees

Page 13

1  those were?
2  A. I don't recall.
3  Q. Was Ken Thiel employed at that time?
4  A. No.
5  Q. Okay. And what about Jane Davis?
6  A. No.
7  Q. Can you tell me what positions there were
8  in the Wellness Unit at the time you were
9  supervising beginning in 2002.
10  A. Manager and two staff nurses.
11  Q. And the two staff nurses, did they have
12  titles? Can you tell me what their titles were?
13  A. I believe the title was Wellness Associate.
14  Q. For both?
15  A. Yes.
16  Q. Okay. And were these full-time or
17  part-time positions?
18  A. Full-time.
19  Q. Okay. And you know whether they were paid
20  on a exempt or non-exempt basis?
21  A. Exempt.
22  Q. All right. And were there any part-time

Page 14

1  workers helping out in wellness at that time?
2     A.  Not Red Cross employees.
3     Q.  But were there employees that were employed
4  as contractors in Wellness Unit?
5        MR. PANAGOPOULOS: Objection as to form.
6        THE WITNESS: No. No. Not employees.
7        BY MR. PLITT:
8     Q.  As a result of these questions, does that
9  refresh your recollection as to anybody who was
10 working in the Wellness Unit back in 2002? You said
11 there were two Wellness Associates. I'm just
12 wondering whether that has refreshed your
13 recollection as to who was working at that time.
14       MR. PANAGOPOULOS: Brian, I will note that
15 this is beyond the, you know, the period that
16 plaintiff was employed at the Red Cross, which was
17 several years after that. I mean you can test her
18 recollection on it, but I think it's beyond the
19 scope.
20       MR. PLITT: I think it's relevant to
21 treatment of the Red Cross of other employees who
22 held the same position, so--

Page 15

1        MR. PANAGOPOULOS: She's just told you they
2  were exempt.
3        MR. PLITT: Yeah. But I think it's--
4        MR. PANAGOPOULOS: I'm not going to
5  instruct her not to answer.
6        MR. PLITT: Okay.
7        MR. PANAGOPOULOS: I'm just noting the
8  objection.
9        MR. PLITT: Okay. That's fine.
10       BY MR. PLITT:
11    Q.  You don't recall the names of the Wellness
12 Associates that were working in 2002?
13    A.  The manager was Linda Burnett.
14    Q.  And do you recall the names of the Wellness
15 Associates?
16    A.  I don't.
17    Q.  Okay. And what kind of duties did the
18 Wellness Associates perform?
19    A.  A variety of duties really related to
20 running an on-site first aid respite area, as well
21 as checking medical clearances for Armed Forces
22 Emergency staff international delegates. They

Page 16

1  handled the worker's compensation claims; provided
2  training on CPR AED; counseled employees on wellness
3  issues.
4     Q.  But what duties took up the majority of
5  their time as employees?
6        MR. PANAGOPOULOS: Objection as to form.
7        THE WITNESS: It varied. It varied from
8  time of year to time of year.
9        BY MR. PLITT:
10    Q.  Can you tell me what--so it was cyclical?
11       MR. PANAGOPOULOS: Objection.
12       BY MR. PLITT:
13    Q.  Was it cyclical?
14    A.  It depended on what was going on at the
15 time; how many deployments were taking place.
16    Q.  Okay. Can you tell me the different parts
17 of the year and what duties took the most time
18 during those parts of the year?
19       MR. PANAGOPOULOS: Objection as to form.
20       MR. PLITT: You can answer it.
21       THE WITNESS: If there was a major
22 international delegate deployment, it could take two

Page 17

1  days a week to handle that group of people leaving.
2        BY MR. PLITT:
3     Q.  Okay. But outside of that sort of major
4  event, what was the typical duties it would take the
5  most of their time as employees?
6        MR. PANAGOPOULOS: Objection. Asked and
7  answered. You can answer it now.
8        THE WITNESS: I don't know that I can
9  assess that.
10       BY MR. PLITT:
11    Q.  When did--what were Linda Burnette's duties
12 as manager?
13    A.  Supervise the unit.
14    Q.  When did Linda Burnette leave as an
15 employee?
16    A.  End of 2002, I believe.
17    Q.  And then who replaced her?
18    A.  Ken Thiel.
19    Q.  Okay. And then there were two Wellness
20 Associates when you began supervising the Wellness
21 Unit. Did there then become more Wellness
22 Associates employed by that unit?

Page 18

1  A. No.
2  Q. You stated two?
3  A. Correct.
4  Q. All right. So when did the--when did those
5  Wellness Associates change, if at all?
6     MR. PANAGOPOULOS: Objection as to form.
7     THE WITNESS: I don't recall.
8     MR. PANAGOPOULOS: Go ahead.
9     THE WITNESS: I don't recall.
10    BY MR. PLITT:
11 Q. Okay. Did Jane Davis become a Wellness
12 Associate?
13 A. Yes.
14 Q. All right. About when did she start?
15 A. I don't recall.
16 Q. Was it 2003 or 2004, can you give me some--
17 A. I would guess 2004.
18 Q. --estimate? And do you recall who she
19 replaced?
20 A. I do not recall.
21 Q. Were there more than the two Wellness
22 Associates whose names you can't recall that worked

Page 19

1 there before she began after you started supervising
2 the unit?
3 A. As Red Cross employees? I'm sorry. Ask
4 your question again.
5 Q. As Red Cross employees?
6 A. Could you repeat your question?
7 Q. Were there more Wellness Associates other
8 than the two wellness whose names you don't recall
9 who worked in the Wellness Unit before Jane Davis
10 began work there as a Wellness Associate?
11 A. Not as Red Cross employees.
12 Q. Okay. All right. Then were there some
13 people then performing some of the duties of
14 Wellness Associates who were not Red Cross
15 employees?
16 A. Yes.
17 Q. Okay. Can you tell me about that?
18 A. We used contract staff from Corporate
19 Nurse.
20    MR. PANAGOPOULOS: Anna, make sure you let
21 Brian finish the question before you start
22 answering. It's, you know, it's easy to anticipate

Page 20

1 and it gets conversational, but it makes it a little
2 harder.
3    BY MR. PLITT:
4 Q. So what period of time did these people
5 work for the Red Cross in doing the Wellness Unit?
6    MR. PANAGOPOULOS: Objection as to form.
7    BY MR. PLITT:
8 Q. In doing the Wellness Associate duties?
9    MR. PANAGOPOULOS: Same objection.
10   THE WITNESS: Mid 2002 through late 2003.
11   BY MR. PLITT:
12 Q. And you said it was corporate nurse?
13 A. Yes.
14 Q. That's the company?
15 A. Yes.
16 Q. Was it a staffing agency?
17 A. Yes.
18 Q. All right. And which of the functions of
19 Wellness Associate did these contract staff perform?
20 A. They handled more of the walk-in traffic
21 and activities like flu shots.
22 Q. Okay. Can you state all the duties that

Page 21

1 they performed during this time period?
2    MR. PANAGOPOULOS: Objection as to form.
3    THE WITNESS: No, I would not be able to
4 state all of their duties.
5    BY MR. PLITT:
6 Q. Okay. Could you state any of the duties of
7 Wellness Associate that these staff, that these
8 contract staff did not perform during this time?
9 A. CPR AED training. They would not have
10 reviewed international delegate files. They would
11 not have handled worker's compensation claims.
12 Those are the three that I can recall.
13 Q. Those are the three that they wouldn't have
14 performed?
15 A. Predominantly.
16 Q. Well, is there anything else?
17    MR. PANAGOPOULOS: Objection as to form.
18    THE WITNESS: They would not have done
19 higher-level employee counseling. They would not
20 have made referrals to the employee assistance
21 program, for instance.
22    BY MR. PLITT:

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 38

1    MR. PLITT: Sure.
2    MR. PANAGOPOULOS: Okay.
3    MR. PLITT: I understand.
4    MR. PANAGOPOULOS: Record keeping practices
5  of the company. That's a specific item, and you're
6  sitting here trying to put that item in another
7  broad, generalized category, and I've told you that
8  the designee for this is Carol, and we've got two
9  people here in order to do this efficiently; we're
10 not going to go over ground twice. I've told you
11 who the designee is on record keeping.
12    I mean she knows the--and I haven't told
13 her not to answer, but I'm trying to keep this
14 efficient and you're going beyond the scope for this
15 particular witness.
16    MR. PLITT: So is this witness being
17 tendered at all to speak about the hours that Ms.
18 Rainey, I mean Ms. Powell worked as an employee and
19 her duties as an employee?
20    MR. PANAGOPOULOS: Yeah, she's told you
21 about her duties. With respect to the hours worked,
22 I think she can tell you something about that as

Page 39

1  well, but when you're asking about the types of
2  records the Red Cross keeps and its general record
3  keeping practices on employees, I think you're going
4  beyond the scope of this particular witness. That's
5  all.
6     MR. PLITT: She's not being tendered as
7  your representative on that issue is what you're
8  saying?
9     MR. PANAGOPOULOS: That's what I said twice
10 at the beginning, once off the record, once on the
11 record.
12    MR. PLITT: That you're saying it's going
13 to be Ms. Miller?
14    MR. PANAGOPOULOS: And a third time now.
15    MR. PLITT: All right. You're saying it's
16 going to be Ms. Miller. That's fine.
17    All right.
18    BY MR. PLITT:
19    MR. PANAGOPOULOS: We've been going for
20 about an hour now. Can we take a quick break?
21    MR. PLITT: Yeah. That's fine.
22    MR. PANAGOPOULOS: Thanks.

Page 40

1    [Recess.]
2    MR. PLITT: Everybody ready to get started
3  again?
4    MR. PANAGOPOULOS: Yeah.
5    MR. PLITT: Back on the record.
6    MR. PANAGOPOULOS: Back on the record.
7    BY MR. PLITT:
8    Q. All right. Ms. Shearer, we're going to
9  talk a little bit more about the Wellness Unit
10 before Ms. Powell started.
11    Do I take it that your testimony is that
12 before Ms. Powell started in the Wellness Unit, the
13 Wellness Unit always had at least two Wellness
14 Associates and a manager?
15    MR. PANAGOPOULOS: Objection as to form.
16    THE WITNESS: Not consistently. There was
17 turnover in staff, and while there were staff
18 vacancies, we used the contract agency.
19    BY MR. PLITT:
20    Q. To fill in the gap?
21    A. Correct.
22    Q. Left by less than two Wellness Associates?

Page 41

1    A. Correct.
2    Q. All right. Now, what position was Ms.
3  Powell hired for? Was it Wellness Associate?
4    A. Yes.
5    Q. And what skills did she have that made her
6  qualified to work as a Wellness Associate?
7    A. Registered nurse.
8    Q. Were there any complaints about her work
9  ethics or professionalism or dress while she was a
10 Red Cross employee?
11    A. Not to my knowledge.
12    Q. Okay. Did you consider her to be an
13 accountable person, reliable and trustworthy
14 employee?
15    MR. PANAGOPOULOS: Objection as to form.
16    MR. PLITT: You can answer.
17    THE WITNESS: I only directly supervised
18 her for about three months. During that period, I
19 had no concerns with her performance.
20    BY MR. PLITT:
21    Q. Okay. Now, can you state the job duties
22 that Ms. Powell performed when she first began as a

Page 42

1 Wellness Associate at the Red Cross?
2    A. She primarily handled walk-in employees,
3 tended to the respite area, the lactation area,
4 blood pressure checks, rate checks, employee health
5 counseling, those sorts of activities.
6    Q. In terms of the walk-in employees, the
7 respite area, the blood, the lactation duties that
8 you just described, about what percentage of her
9 time did she spend on those duties?
10    A. I wouldn't be able to estimate. I didn't
11 supervise her at that time.
12    Q. All right. In terms of the employee
13 counseling, what did that involve?
14    A. I'm sorry what did that involve?
15    Q. Mm hmm. Yeah.
16    A. Employees coming to the Wellness Center not
17 feeling well; anticipating being off for periods of
18 illness or surgery; a return to work question;
19 accommodation questions; some ergonomic questions;
20 workplace environment issues.
21    Q. And about what percentage of her time was
22 taken up with those duties?

Page 43

1    A. I would not be able to estimate.
2    Q. And then what other duties did Ms. Powell
3 perform?
4    A. My recollection is reasonably soon after
5 employment, she started learning some of the
6 specialty medical review work that that Wellness
7 Unit did: the review of medical records, the review
8 of--or developing her learning and understanding of
9 the military medical requirements, the international
10 requirements, becoming familiar with the software
11 systems that were used.
12    Q. Can you be more specific as to what that
13 involved?
14      MR. PANAGOPOULOS: Objection as to form.
15      What's that?
16      MR. PLITT: What you've just described.
17 The duties you just described in your last answer.
18      THE WITNESS: The medical record review?
19      BY MR. PLITT:
20    Q. Mm hmm.
21      MR. PANAGOPOULOS: You want her to go
22 through each of them?

Page 44

1      MR. PLITT: I'd like to know what Ms.
2 Powell did in terms of medical record review.
3      THE WITNESS: For both the Armed Forces
4 Emergency Services staff and the International
5 Service delegates, it's two different sets of
6 criteria, but the process is similar. It's
7 reviewing an individual's medical records, test
8 results, lab results, radiology results,
9 drug--prescription drug utilization, immunization
10 records, to be sure that they meet the required
11 criteria for a specific location and set of
12 conditions that a person is going to.
13      BY MR. PLITT:
14    Q. Okay. And what percentage of her time was
15 taken up with those duties?
16    A. It would have varied.
17    Q. And can you tell me what percentage--what
18 range of percentage was taken up with those duties?
19    A. Anywhere from 10 percent to 75 percent.
20    Q. What would--on the average, what was the
21 percentage of her time per week that was taken up
22 with those duties?

Page 45

1      MR. PANAGOPOULOS: Objection as to form.
2      MR. PLITT: When she performed them?
3      THE WITNESS: For the period of time that I
4 am most familiar with 50 percent.
5      BY MR. PLITT:
6    Q. Were there other duties that she performed?
7    A. Yes.
8    Q. What were those duties?
9    A. I think I've already described them, but
10 handling sick employees.
11    Q. I mean other than what you've described to
12 me so far.
13      MR. PANAGOPOULOS: Do you want to give her
14 the list that she's given you so far, so we're not
15 repeating?
16      THE WITNESS: Worker's comp.
17      MR. PLITT: I think she knows what she's
18 told me.
19      THE WITNESS: Review. Family Medical Leave
20 Act Review. Ergonomic assessments. Briefings and
21 debriefing sessions of in-bound, out-bound
22 international travelers.

Page 54

1  if you can estimate within reason.
2    A. Can you ask your question again?
3    Q. All right. Can you please tell me about
4  how long the Wellness Associate position was vacant
5  before Ms. Powell began?
6    A. Six months.
7    Q. Okay. And who performed that work while Ms.
8  Powell was--was still away?
9    A. Contract staff.
10   Q. Okay. All right. Now, when Ms. Powell
11 began work as a Wellness Associate, was her direct
12 supervisor Ken Thiel?
13   A. Yes.
14   Q. All right. Now, did Jane Davis then resign
15 around January 2005?
16   A. Yes.
17   Q. All right. And at that time, she was not
18 replaced with another Wellness Associate; correct?
19   A. Correct.
20   Q. And her duties were then assigned to Ms.
21 Powell after she left; isn't that correct?
22   A. Some of her duties were assigned.

Page 55

1    Q. Okay. And which of her duties were
2  assigned to Ms. Powell?
3    A. I can't give you a complete list, but the
4  Armed Forces Emergency Services work.
5    Q. Okay. Anything else?
6    A. Some other things that would have been
7  shared between the two of them. Some of that work
8  went to Tanya--walk-in.
9    Q. Can you tell me what work was shared
10 between them that went to Ms. Powell?
11   A. Primarily the walk-in traffic, the
12 counseling.
13   Q. Anything else?
14   A. Blood pressure checks. Monitoring the
15 lactation area and the cot rooms.
16   Q. Is there anything else?
17   A. That's to the best of my recollection.
18   Q. And what of Ms. Davis' work did not go to
19 Ms. Powell?
20   A. Some of the Armed Forces Emergency Services
21 stuff went to the manager. Worker's comp went to
22 the manager. FML, short-term disability work went

Page 56

1  to the manager. Employee counseling, some of the
2  employee counseling went to the manager.
3    Q. Okay. And which part of the Armed Forces
4  work went to the manager?
5    A. To the best of my recollection, it was some
6  of the briefing/debriefing work was done by the
7  manager. Some of the calls to the military.
8  Consulting our physician advisor, MD advisor.
9    Q. And then--and what part of employee
10 counseling went to the manager, the manager being
11 Ken Thiel; right?
12   A. Correct.
13   Q. Which part of that went to him?
14   A. Not a specific part or type of counseling.
15   Q. Can you describe which part went to Ken
16 Thiel and which part went to Ms. Powell?
17     MR. PANAGOPOULOS: Objection as to form.
18     BY MR. PLITT:
19   Q. Which employee counseling went to Ken
20 Thiel, which employee counseling went to Tanya
21 Powell?
22     MR. PANAGOPOULOS: The same objection.

Page 57

1     THE WITNESS: I'm not really able to answer
2  that question. I don't know. It would have been
3  based on who was there, what the workload was for
4  the day, who was busy doing something else.
5     BY MR. PLITT:
6    Q. So it's fair to say that was shared between
7  the two of them on an ongoing basis?
8    A. Correct.
9    Q. I see. And what about the disability work
10 that went to the manager. What did that involve?
11   A. Predominantly related to FML when employees
12 are out on disability; making sure that they had
13 returned to work authorization.
14   Q. Okay. Now, after Jane Davis resigned,
15 there were no contractors who came in to perform any
16 part of her duties after that time; is that correct?
17   A. That's correct.
18   Q. Now, after she resigned, Jane Davis, what
19 factors determined that she would not be replaced?
20   A. I did not feel that it was necessary given
21 the workload of that unit. We also shifted some of
22 the FML short-term disability processing to a

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 58

1  benefits administrator level person.
2    Q. And who was that?
3    A. The name is Vicky Fleming.
4    Q. And which part of Jane Davis' work did she
5  perform?
6        MR. PANAGOPOULOS: Objection as to form.
7        THE WITNESS: She took over some of the
8  communication with employees, advising them of the
9  status of their claims.
10       BY MR. PLITT:
11   Q. And what was her position?
12   A. Benefits administrator.
13   Q. And was she paid on an hourly basis or a
14  exempt basis?
15   A. Exempt.
16   Q. Okay. And about what percentage of the
17  work had this--of Ms. Jane Davis' work had this work
18  taken up in terms of her time doing?
19       MR. PANAGOPOULOS: Objection as to form.
20       BY MR. PLITT:
21   Q. About how much of Jane Davis' time per week
22  had been taken up with this work that later went to

Page 59

1  Vicky Fleming after Jane left?
2    A. Ten percent.
3    Q. Were there budgetary considerations that
4  were affecting the Wellness Unit at the time that
5  Jane Davis left?
6    A. Yes. There are always budgetary
7  considerations.
8    Q. Can you describe what considerations those
9  were at that time?
10   A. Trying to reduce expense.
11   Q. Was there an effort also to reduce the
12  number of positions?
13       MR. PANAGOPOULOS: Objection as to form.
14       MR. PLITT: You can answer.
15       MR. PANAGOPOULOS: If you can.
16       MR. PLITT: You can answer.
17       THE WITNESS: Yes. Any time there is a
18  vacancy, there's an evaluation done as to whether
19  that position needs to be replaced, either as it was
20  previously or in some other fashion, or if there are
21  other individuals that can assume some of the work.
22       BY MR. PLITT:

Page 60

1    Q. All right. Now, after Jane Davis resigned,
2  and Tony Powell took over, at least some part of her
3  workload--did Tony Powell work hours over 40 a week
4  in her position as Wellness Associate?
5    A. Not to my knowledge.
6    Q. Okay. Do you dispute that she did work
7  hours over 40 a week after Jane Davis left and
8  before Ken Thiel left?
9        MR. PANAGOPOULOS: Objection as to form.
10       THE WITNESS: She may have occasionally
11  worked in excess of 40 hours per week, but not on
12  routine or scheduled basis.
13       BY MR. PLITT:
14   Q. Do you--can you make an estimate of how
15  many hours over a week she worked on average after
16  Jane Davis resigned and before Ken Thiel left Red
17  Cross?
18       MR. PANAGOPOULOS: Objection as to form.
19       THE WITNESS: No. I was not her immediate
20  supervisor.
21       BY MR. PLITT:
22   Q. Now, in March 2005, around March 16th, did

Page 61

1  Ken Thiel resign?
2    A. Yes.
3    Q. Do you have any knowledge of why Ken Thiel
4  resigned?
5        MR. PANAGOPOULOS: Objection. Ken is
6  improper as to have--in the deposition notice or the
7  allegations in this case.
8        MR. PLITT: Because the--you know, the
9  evidence will show that certain of Ken Thiel's job
10  duties were taken over by Tony Powell.
11       MR. PANAGOPOULOS: That has nothing to do
12  with the reason for his resignation.
13       MR. PLITT: It relates to the likelihood
14  that Ms. Powell had to take over his duties, which
15  relates to the likelihood that she had to work
16  overtime.
17       MR. PANAGOPOULOS: No, the fact that he
18  left relates to the fact that she may have taken her
19  duties, not the reason that he left.
20       MR. PLITT: Well, I think--
21       MR. PANAGOPOULOS: And I don't think that's
22  within the scope and I don't think that it's

Page 62

1  relevant.
2     MR. PLITT: It may relate to the level of
3  work in the organization, which relates to the
4  likelihood that she performed overtime work.
5     MR. PANAGOPOULOS: How does it relate to
6  the level of work in the organization and the reason
7  he left?
8     MR. PLITT: That can be a reason for
9  leaving.
10    MR. PANAGOPOULOS: That he didn't have
11 enough work? Or that he had too much work? I mean
12 I'm fine with you asking those questions if those
13 are the two specific reasons that he left, but I
14 don't think anything else is relevant to this.
15    MR. PLITT: I think it's relevant that it
16 could lead to relevant information, which is--
17    MR. PANAGOPOULOS: How?
18    MR. PLITT: --by the answer. And--
19    MR. PANAGOPOULOS: Well, I mean, we'll
20 stipulate that he didn't leave because of lack of
21 work or because of too much work.
22    MR. PLITT: I think we've got some broadly

Page 63

1  way to ask questions that may lead to relevant
2  information.
3     MR. PANAGOPOULOS: And I'm asking you for a
4  proffer as to how the reason if he left, if it's
5  unrelated to volume of work can lead to relevant
6  admissible evidence?
7     MR. PLITT: Okay.
8     BY MR. PLITT:
9     Q. Let me ask another question. Ken Thiel
10 resigned, Ms. Shearer. After he resigned, was Ms.
11 Powell then assigned Ken Thiel's duties?
12    A. Yes. Some of his duties were transferred
13 to her.
14    Q. Okay. And who assigned her those duties?
15    A. I did.
16    Q. Okay. And which duties that Ken Thiel had
17 been performing were assigned to Ms. Powell?
18    A. International Services work.
19    Q. All right. And what did that work involve?
20    A. Reviewing medical records for people being
21 deployed as an international delegate.
22    Q. And does this begin the period of time

Page 64

1  where you said that you could talk about her--what
2  she did?
3     A. Yes.
4     Q. All right. And what other duties were
5  assigned by you to her from Ken Thiel?
6     A. Worker's compensation claims.
7     Q. Okay. And what are the duties?
8     A. Pardon?
9     Q. What are the duties?
10    A. In the event of a worker's compensation
11 claim, monitoring it, getting the first report,
12 reporting it to the third party administrator,
13 talking to the employee about their absence, keeping
14 track of the number of days, talking to the manager
15 about when they would likely be returning to work;
16 if there were any accommodations that were going to
17 be necessary.
18    Q. Okay. What about FMLA work?
19    MR. PANAGOPOULOS: Objection as to form.
20    BY MR. PLITT:
21    Q. Was that assigned to--from Ken Thiel to
22 Tony Powell?

Page 65

1     A. Some of that work went to Vicky Fleming.
2     Q. Okay. And did some of it go to Tanya
3  Powell?
4     A. Tanya was more involved in the review of
5  the medical information related to FML, but not the
6  employee counseling notification process.
7     Q. Okay. What other duties of Ken Thiel did
8  you assign to the Tanya Powell?
9     A. That's the most--those are the most
10 significant duties.
11    Q. Okay. Were any contractors or any other
12 employees other than you mentioned Vicky Fleming
13 employed to take over the duties that had been
14 performed by Ken Thiel?
15    A. No.
16    Q. About what percentage of Ken Thiel's time
17 per week was taken up with the FMLA work or other
18 work that was sent to Ms. Fleming after he left?
19    A. I would estimate 20 percent.
20    Q. Was Ken Thiel then replaced at any point as
21 manager?
22    A. No.

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 66

1  Q. What factors determined he would not be
2  replaced?
3  A. The organization was going through what we
4  call the Core Services Review, and it was--we were
5  at the stage where it was possible that the Wellness
6  Unit would be closed down. So a decision was made
7  not to replace the manager.
8  Q. Now, was cost a part of that--the factors
9  leading to that?
10 A. Yes. Yes.
11 Q. The decision to close the unit was not made
12 until after Ken Thiel resigned?
13 A. Correct.
14 Q. Who was responsible for the budget and
15 operations of the Wellness Unit?
16 A. The manager.
17 Q. Okay. And Ken Thiel when he was there, in
18 other words?
19 A. Correct.
20 Q. Okay. Was human resources responsible for
21 that budget in operations?
22 A. Yes. The Wellness Unit was a division,

Page 67

1  department, whatever you want to call it within the
2  Human Resources Department.
3  Q. Now did Ms. Powell have any duties as a
4  supervisor while she worked in the Wellness Unit?
5  A. No.
6  Q. Did--after Ken Thiel resigned, did Tony
7  Powell then work hours over 40 hours a week at the
8  Red Cross?
9  A. Not on a routine or consistent basis.
10 Q. Okay. But did she work at times hours more
11 than 40 a week?
12 A. She may have occasionally worked over 40
13 hours a week.
14 Q. About how many hours over 40 per week on
15 average did she work as an employee after Ken Thiel
16 resigned?
17    MR. PANAGOPOULOS: Objection as to form.
18    THE WITNESS: One to two hours.
19    BY MR. PLITT:
20 Q. And how do you know she worked hours over
21 40 a week after Ken Thiel resigned?
22 A. For instance, on occasion, there would be a

Page 68

1  luncheon meeting of the Armed Forces Emergency
2  Services Group, and she would attend that luncheon.
3  Q. And how did you know that she was working
4  hours over 40 to attend that luncheon?
5  A. Because her normal hours were 7:30 to 4:30,
6  with an hour for lunch, and I would be aware of when
7  the meeting was scheduled.
8  Q. Okay.
9  A. And it would have been over her normal
10 pattern of taking lunch for an hour at about twelve
11 to one.
12 Q. Any other indication that you had that she
13 was working hours over 40 per week?
14 A. Occasionally, there would be an e-mail or a
15 conversation at 4:45 in the afternoon, if somebody
16 had just arrived at the unit at 4:25, Tanya would
17 not leave at 4:30. She would stay to finish out
18 whatever that activity was. But as--
19 Q. Now, after Ken Thiel resigned, you were
20 aware that Tanya Powell was continuing to perform
21 the duties that were assigned to her from Jane Davis
22 after Jane Davis resigned?

Page 69

1  A. Correct.
2  Q. Okay. And after Ken Thiel resigned, the
3  duties performed by Jane Davis weren't assigned to
4  anybody else other than what we've discussed--Tanya
5  Powell and to some extent the other worker, Vicky
6  Fleming?
7  A. That's correct. Some work was just
8  stopped. They stopped doing some work. So--
9  Q. And what work was that?
10 A. Employee education development, delivery.
11 Q. This is work that Jane Davis had been
12 performing?
13 A. Mm hmm. Yes.
14 Q. And do you have an estimate of what
15 percentage of Jane Davis' time that that work had
16 taken up?
17 A. I'm not able to estimate.
18 Q. Now, did you have any contact with Tanya
19 Powell regarding whether her job as Wellness
20 Associate would be eliminated?
21 A. Yes.
22 Q. Okay. Can you tell me what that contact

Page 74

1  Q. Per employee?
2  A. It's a third party administrator, ASO,
3  administrative services only, contract. It's on a
4  per head.
5  Q. And what's the company that's performing
6  that duty?
7  A. Aetna
8  Q. Okay. And which location?
9  A. Tampa, Florida.
10 Q. Any other part to the name Aetna?
11 A. Pardon?
12 Q. Any other part to that name, Aetna? Is it
13 just Aetna or is Aetna Financial Services or is
14 there more to the name?
15 A. It's just Aetna. It's a disability
16 services division under Aetna.
17 Q. Do you know what part of Florida?
18 A. Pardon?
19 Q. Do you know what city in Florida?
20 A. Tampa.
21 Q. Okay. And what about the Armed Forces
22 Services work that Ms. Powell had been performing,

Page 75

1  who ended up performing that work after she left?
2  A. Caroline Williams.
3  Q. And was Caroline Williams employed or was
4  she a volunteer?
5  A. I don't know.
6  Q. Now, did you have any contact with Ms.
7  Powell regarding her receiving an offer of another
8  job after she found out that her job as Wellness
9  Associate would be eliminated?
10 A. Another Red Cross job?
11 Q. Yes.
12 A. Yes.
13 Q. Can you tell me what that contact was?
14 A. At the time that she was informed that the
15 Wellness Unit was closing, I and Bill Malfara met
16 with her to let her know that some of the duties
17 that she had been performing as a Wellness Associate
18 were transitioning to disaster and that she would be
19 transferred to that department or she had the
20 opportunity to transfer to that department.
21 Q. And did you discuss the rate of pay issue
22 with her?

Page 76

1  A. I did not.
2  Q. And which of her duties were being
3  transferred to this new position?
4  A. The Armed Forces Emergency Services work.
5  Q. Okay. Was it your understanding that
6  she--that she was expected to perform any other part
7  of what she had been performing as previously as
8  Wellness Associate in this new position?
9  MR. PANAGOPOULOS: Objection as to form.
10 THE WITNESS: Could you ask the question
11 again?
12 BY MR. PLITT:
13 Q. Okay. Was it your understanding that after
14 it--to continue doing other parts of what she had
15 been doing as Wellness Associate other than this
16 Armed Forces work?
17 MR. PANAGOPOULOS: Objection as to form.
18 THE WITNESS: She should not have expected
19 to have to do any of the other duties. The unit was
20 closing.
21 BY MR. PLITT:
22 Q. Now, this new position of--what did you say

Page 77

1  the name of it was?
2  A. Staff health associate, I think. I'm not
3  sure.
4  Q. Was this the same job that had been
5  entitled staff health nurse for disaster services?
6  A. I believe so.
7  Q. And this was the same position that Jane
8  Davis had held some years previously?
9  A. I don't know that.
10 Q. Did you have any contact with Ms. Powell
11 regarding her desire that the position of staff
12 nurse for disaster services should be paid at a rate
13 higher than the rate paid for Wellness Associate?
14 MR. PANAGOPOULOS: Objection as to form.
15 THE WITNESS: Yes. Tanya and I were both
16 aware that the position in disaster was a level
17 three staff position. Wellness associate is a level
18 two staff position.
19 BY MR. PLITT:
20 Q. And what contact did you have with her
21 about that issue?
22 A. She did express to me that she thought she

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 86

1  the cot rooms. Other than that, yes, she may have
2  done these things when she was the only staff person
3  there. When there were more people there, because
4  she left at 4:30, she would not have locked files
5  and cabinets. She would have been leaving before
6  the work day was over.
7      Q. Okay. And who expected to clean the cot
8  rooms?
9      A. Facilities. The cleaning crew.
10     Q. What about locking up after did you say the
11  cabinets?
12     A. Yeah. All cabinets at the Red Cross are
13  kept locked. Specifically within the Wellness Unit,
14  there was a room or was a room that had medical
15  record file cabinets and a medication refrigerator.
16  That specific office, like lots of other offices in
17  the Red Cross, are locked. Like I lock my office at
18  night. I also unlocked in the morning. The staff
19  in the Wellness Center all had keys, so whoever came
20  in first in the morning, would unlock things. The
21  person who left at the end of the day would lock
22  them.

Page 87

1      Q. So who was responsible for locking?
2      A. The manager was responsible for making sure
3  that the unit was secure and all of the medications
4  and records were secure.
5      Q. So in other words, the last person working
6  in the Wellness Unit was responsible for locking the
7  cabinets?
8      A. Yes, takes all of one minute.
9      MR. PANAGOPOULUS: Do you want that
10  calculated as a percentage of time?
11     BY MR. PLITT:
12     Q. No. But I'd like to know after Ken Thiel
13  resigned, that that duty fell to Ms. Powell
14  entirely; correct?
15     A. Yes, although I would because Tanya left at
16  4:30 generally, I would sometimes go down there at
17  5:30 or so just to ensure that things were locked
18  and that employees were not there having expected to
19  get services or maybe they could think they can talk
20  to somebody a nurse about their blood pressure or
21  blood sugar or illness.
22     Q. Now, Ms. Powell did not always leave at

Page 88

1  4:30; is that correct?
2      A. Yeah, she did not leave every day at
3  exactly 4:30. We don't keep clock-in, clock-out
4  times. She would occasionally stay past 4:30.
5      Q. You testified about the period of time
6  where Ms. Powell's position as Wellness Associate
7  had been announced to be eliminated and she was
8  offered this position as Staff Health Nurse for
9  Disaster Services, and you testified that certain
10  functions were to be transferred to the staff health
11  nurse section.
12     A. Yes.
13     Q. About what percentage of the time of Ms.
14  Powell's--about what percentage of the time that Ms.
15  Powell had been putting in in terms of Wellness
16  Associate was to be transferred to the staff health
17  nurse position?
18     MR. PANAGOPOULOS: Objection as to form.
19     THE WITNESS: I would estimate 40 percent.
20     BY MR. PLITT:
21     Q. Okay. About how many employees were
22  working at the Red Cross at the time that Ms. Powell

Page 89

1  was employed with the Red Cross?
2      MR. PANAGOPOULOS: Objection as to form.
3      THE WITNESS: National Center employees?
4      BY MR. PLITT:
5      Q. Yeah. At that same location.
6      A. At that location?
7      Q. Mm hmm.
8      A. A thousand to 1,200.
9      Q. Okay. And you know about what percentage
10  of those employees were compensated as non-exempt
11  employees?
12     A. I do not know that.
13     MR. PANAGOPOULOS: And I'm going to
14  obviously object to it as beyond the scope.
15     MR. PLITT: Okay. I'm just asking, so I
16  think it might be Part "D," but I understand the
17  objection.
18     MR. PANAGOPOULOS: No, I don't think it's
19  Part "D" at all, at least not Part "D" that, you
20  know, we would have prepared to answer for this
21  lawsuit. You asked for duties of plaintiff and
22  people in the wellness area. You didn't ask

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 90

1  anything about all the employees.
2      MR. PLITT: Okay. I've got two people, so
3  I've got to try at least.
4      MR. PANAGOPOULOS: Yeah. Well, you're
5  going to get the same objection with the second
6  person.
7      MR. PLITT: All right.
8      MR. PANAGOPOULOS: Do you know about how
9  much longer you have to go with her?
10     MR. PLITT: Probably just a couple minutes.
11 I'm just looking through to see if there's anything
12 else. What do we have around 12:00 o'clock?
13     MR. PANAGOPOULOS: No. 12:30.
14     MR. PLITT: 12:30? Okay. Let me see if
15 there's anything else, and we should be able to
16 finish up.
17     MR. PANAGOPOULOS: Why don't we take a two-
18 or three-minute break so you can review your notes?
19 That way, we can take a break because she's been
20 going for over an hour at this point as well. That
21 way, you can clean up whatever you have to clean,
22 but we can be done with one witness and start the

Page 91

1  next.
2      MR. PLITT: That's fine. Okay.
3      [Recess.]
4      MR. PANAGOPOULOS: Back on the record.
5      MR. PLITT: Okay. Everybody ready?
6      MR. PANAGOPOULOS: Do we need a drum roll
7  for the last question?
8      MR. PLITT: Well, it's one and maybe a
9  follow up.
10     BY MR. PLITT:
11     Q. But you testified earlier that after Ms.
12 Powell's job was--after she left the Red Cross that
13 her job was then divided up among a number of
14 people.
15     MR. PANAGOPOULOS: Objection as to form.
16     BY MR. PLITT:
17     Q. And you testified that during the period
18 that you were able to speak about that she had a
19 duty involving reviewing medical records. You said
20 that was about 50 percent of her time. Can you tell
21 me the names of the people that assumed that duty
22 after she left?

Page 92

1      A. The Armed Forces Emergency Services went to
2  Disaster Services. I believe Caroline Williams
3  performed that work for a period of time. The
4  International Delegate work went to the
5  international department, and I believe they
6  initially pursued outsourcing that work to Farragut
7  Medical Center.
8      Q. And did anyone perform the work?
9      A. Yes.
10     Q. And who performed it?
11     MR. PANAGOPOULOS: Are you talking about
12 the international part?
13     MR. PLITT: The international part.
14     THE WITNESS: I don't know if the
15 arrangement with Farragut Medical was finalized or
16 if it continued.
17     BY MR. PLITT:
18     Q. And do you know whether any employees of
19 the Red Cross performed that international work?
20     A. I do not know that.
21     Q. And do you know how long Caroline Williams
22 performed the Armed Forces work?

Page 93

1      A. I do not know.
2      Q. Is Caroline Williams still working at the
3  Red Cross?
4      A. I don't know.
5      MR. PANAGOPOULOS: You might be in an area
6  where you'd get better answers from Caroline on this
7  stuff; right?
8      MR. PLITT: Okay.
9      THE WITNESS: Yeah. My responsibilities
10 for the Wellness Unit and that work ended on June
11 30th, 2005.
12     BY MR. PLITT:
13     Q. And was that when you left your position
14 you'd had before that time?
15     MR. PANAGOPOULOS: Objection as to form.
16     THE WITNESS: No. I'm still employed at
17 the Red Cross.
18     BY MR. PLITT:
19     Q. In the same--
20     A. In the same position.
21     Q. --that you were when you were--
22     A. Correct.

Page 94

1  Q. During when Ms. Powell was working for you?
2     MR. PANAGOPOULOS: Brian, all she's saying
3  is that the Wellness Unit was eliminated so there's
4  nothing left to supervise.
5     MR. PLITT: Right. Right. Right.
6     BY MR. PLITT:
7  Q. But it's the same position you were in when
8  Ms. Powell was working--
9  A. Correct.
10 Q. --in the Wellness Unit and when there was
11 one. Okay.
12    MR. PLITT: All right. I'm sorry.
13    EXAMINATION BY COUNSEL FOR THE DEFENDANT
14    BY MR. PANAGOPOULOS:
15 Q. Okay. I have just a couple of questions,
16 clarification questions.
17    Ms. Shearer, you indicated that when Jane
18 Davis left that some of Ms. Davis' duties were no
19 longer performed and one of the examples were or
20 that you gave I believe was employee education.
21 When Ms. Davis left, were there any duties that Ms.
22 Powell had prior to that time that she no longer had

Page 95

1  to perform in assuming some of Ms. Davis' duties?
2     MR. PLITT: Objection as to form.
3     THE WITNESS: Yes. Some of the duties
4  associated with short-term disability claims, FML
5  claims, went to Vicky Fleming, the benefits
6  administrator, who was physically located near that
7  area. So in terms of file maintenance,
8  notifications to employees, notifications to
9  payroll, problem solving payroll problems, problem
10 solving manager questions, Vicky took on some of
11 those responsibilities.
12    BY MR. PANAGOPOULOS:
13 Q. Okay.
14 A. Anything having to do with a medical issue
15 or interpretation of a medical condition or return
16 to work was done by the registered nurse.
17 Q. Okay. So the point is, however, that even
18 though some duties were added to Ms. Powell's plate,
19 there were other duties that were essentially taken
20 away or shifted elsewhere?
21    MR. PLITT: Objection as to form.
22    THE WITNESS: Yes.

Page 96

1     BY MR. PANAGOPOULOS:
2  Q. Okay.
3  A. As the staff shrunk, some things were just
4  eliminated or scaled back.
5  Q. Okay.
6  A. And the employee counseling education is
7  probably the best example; the development of
8  educational programs, brown bag lunch type things
9  were just discontinued. And Tanya and Jane would
10 have both done that type of work.
11 Q. Okay. Now, what about when Mr. Thiel left?
12 You explained what additional duties Ms. Powell
13 assumed. Were there other duties that she had
14 performed prior to that time that she no longer had
15 to do from that point forward?
16 A. Sort of the same response. Just additional
17 scaling back, and some work of Ken's just no longer
18 done, for example, attending Safety Committee
19 meetings. That would normally have been done by the
20 wellness manager.
21 Q. Okay.
22 A. We just stopped participating in those

Page 97

1  meetings.
2  Q. Okay. And obviously, Mr. Thiel was a
3  supervisor. There were no more supervisory duties
4  to perform--
5  A. Correct.
6  Q. --either; correct?
7  A. And we scaled back the hours that the unit
8  was staffed.
9  Q. Okay. Do you know whether or not Ms.
10 Powell typically took her one-hour lunch break?
11 A. Yes, she did.
12 Q. Okay. Tell me about how you're aware of
13 that?
14 A. I would say she had a pretty set pattern of
15 taking lunch, 11:45, 12:00 o'clock; leaving the
16 building for about an hour; walking--so, you know,
17 putting on her sneakers and walking; taking a walk
18 around the neighborhood.
19 Q. Okay.
20 A. And eating presumably at the same time.
21 Q. Okay. And do you know whether she did this
22 typically alone or with others?