1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

TONIA POWELL,                          :

          Plaintiff,                   :

vs.                                    : Case No.
                                         1:06CV1173

AMERICAN RED CROSS,                    :

          Defendant.                   :

- - - - - - - - - - - - - - - x

                    November 10, 2006

                    Washington, D.C.

DEPOSITION OF:

               TONIA POWELL

     Was called for examination by counsel for the

Defendant, pursuant to notice, in the offices of,

Ballard, Spahr, Andrews & Ingersoll, 601 13th

Street, N.W., Suite 1000 South, Washington, D.C.,

commencing at 9:53 a.m., before Carolyn Friend, a

Notary Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Page 2

1  APPEARANCES:

2        BRIAN C. PLITT, ATTORNEY-AT-LAW
         1239 C Street, S.E.
3        Suite 4
         Washington, D.C. 20003
4        (202) 546-5493
         COUNSEL FOR THE PLAINTIFF
5
         CONSTANTINOS G. PANAGOPOULOS,
6        ATTORNEY-AT-LAW
         Ballard, Spahr, Andrews & Ingersoll
7        601 13th Street, N.W., Suite 1000 S
         Washington, D.C. 20005
8        (202) 661-2202
         COUNSEL FOR THE DEFENDANT
9

10              C O N T E N T S

11  WITNESS:        EXAMINATION BY:        PAGE:

12  Tonia Powell          Mr. Panagopoulos    4

13           E X H I B I T S

14  NO.:    DESCRIPTION:              PAGE:

15  1     letter of hire              100

16  2     policies                    107

17  3     job description             116

18  4     job description             117

19  5     job description             131

20  6     job description             135

21  7     job description             140

22  8     job description             142

Page 3

1           E X H I B I T S (CONT'D)

2  9     job description             149

3  10    job description             172

4  11    job description             179

5  12    e-mail                      190

6  13    e-mail                      199

7  14    e-mail                      204

8  15    e-mail                      208

9  16    promotions                  224

10

11  Note:  Exhibits marked and retained by Counsel.

12

13

14

15

16

17

18

19

20

21

22

Page 4

1           P R O C E E D I N G S

2  Whereupon:

3           TONIA POWELL,

4  Was called for examination, and, after being

5  duly sworn, was examined and testified as

6  follows:

7           EXAMINATION BY COUNSEL FOR

8           DEFENDANT

9      BY MR. PANAGOPOULOS:

10     Q  My name is Dino Panagopoulos.  I

11  represent the American Red Cross, and as you know,

12  we are here to take your deposition today.  Have you

13  ever been deposed before, ma'am?

14     A  No.  It's my first time.

15     Q  Well, let me explain the process to you a

16  little bit so that we will all have an understanding

17  going into it what is going to happen.  I will be

18  asking you a series of questions.  You are to answer

19  my questions to the best of your ability fully and

20  completely.  Okay?

21     A  Yes.

22     Q  From time to time, as I ask questions,

Page 5

1  your attorney may object.  The only proper objection

2  in federal court is objection as to form.  So he may

3  say objection as to form.

4           Even if he objects, you are to still

5  answer my question.  That's only for the record so

6  that he can preserve his objection.  If he

7  specifically instructs you not to answer because

8  there is a privilege involved, then you can -- it's

9  your choice as to whether or not to obey that

10  instruction.

11          But if it's simply an objection, you are

12  still to answer.  Okay?

13     A  Yes.

14     Q  I will assume that you understand my

15  questions and answered it as asked unless you tell

16  me there is something about it you don't understand.

17  So if you need me to clarify anything, please let me

18  know.  I am not trying to trick you.  We are just

19  trying to get at what the facts are of this case.

20  Okay?

21     A  Okay.

22     Q  Also, as you can see, we have a Court

Page 10

1  Q  What field do you intend to do your
2  graduate work in?
3     A  It's public and community health focused,
4  but it's organizational management.
5     Q  What was your first full time job?
6     A  First full time job was Harrisburg
7  Hospital in Harrisburg, Pennsylvania in the
8  intensive care unit.
9     Q  What year was that?
10    A  Oh, my goodness.  That was in -- I
11  graduated in '84, moved to Carlisle in, I'm going to
12  say '85, '86.  I have been in nursing 22 years.
13    Q  And what was your position in the
14  intensive care unit?
15    A  Actually, I started as an intern in
16  training, like a fellowship program.  And then once
17  I passed the course, I became a regular staff nurse.
18    Q  How long were you at Harrisburg Hospital?
19    A  Five years.
20    Q  I'd like to talk a little bit about your
21  career progression.  You have already indicated that
22  you started off as an intern and became a staff

Page 11

1  nurse.  Did you have any other positions at the
2  Harrisburg Hospital?
3     A  No.  Only intensive care unit.  We
4  rotated through the three units:  Intensive care,
5  coronary care, and intermediate care.
6     Q  As a staff nurse, what were your duties
7  and responsibilities?
8     A  I'll just categorize my speciality as
9  cardiothoracic surgery and trauma.  We also dealt
10  with acute medical problems any patients on the
11  floor had, acute compromise.
12        So I was dealing with people who required
13  human dynamic monitoring, ventilatory support or
14  respirator support, any use of inotropic drugs,
15  cardiac drugs, administration of narcotics, advanced
16  cardiac life support skills, pacemaker skills,
17  family counseling, interaction.
18        Sometimes I had charge duties as I
19  progressed, probably, in that third or fourth year,
20  rotation on the night or evening, on call.
21    Q  When you say you had charge duties as you
22  progressed, could you just briefly explain to me

Page 12

1  what that means?
2     A  Eventually, I became one of the senior
3  nurses or more experienced nurses, and was
4  responsible for case assignment, helping the new
5  nurse with her skills.
6     Q  And did you work -- strike that.
7        Were you paid on a salary basis?
8     A  I can't remember.  I want to say I was
9  paid hourly.  I really can't remember that.
10    Q  Do you recall whether or not you were
11  paid overtime?
12    A  Yes, I definitely was paid overtime.  It
13  was shift differential as well.
14    Q  I think I understand your answer, but I
15  just want to be clear.  Shift differential is
16  different than overtime.  I understand shift
17  differential, that's if you are working an overnight
18  shift or --
19    A  If you work evenings.
20    Q  -- an otherwise unfavorable shift, right?
21    A  Well, they will pay you more if you had
22  to work evenings or nights.

Page 13

1     Q  And I'm asking overtime, when you worked
2  more than 40 hours a week --
3     A  You get time-and-a-half.
4     Q  This is one of those examples where we
5  need to make sure that we let each other finish
6  answers and questions for the Court Reporter.  We
7  got conversational and it's great for us, but hard
8  on the Court Reporter.
9        Okay.  When did you leave Harrisburg
10  Hospital?
11    A  It was in, I think, 1989.
12    Q  And where did you go to?
13    A  I initially went to G.W. Hospital for
14  like three months, if that.  I also did agency work
15  on the side for one of the agencies.  And then I
16  eventually went to Health Management Strategies,
17  which was a subsidiary of Blue Cross/Blue Shield at
18  that time.
19    Q  Why did you leave Harrisburg Hospital?
20    A  My sister had a baby and my
21  grandmother -- my mom wanted to move to be with her
22  grandchild and I didn't want her up and down between

Page 30

1 last employees that left to make sure all the
2 projects were completed. So I had an extended
3 severance in addition to a bonus.
4   Q   All right. What year was that that it
5 closed?
6   A   That was in -- I'm trying to think of
7 dates. I was trying to think --
8   Q   You indicated you had started in '98.
9   A   I did? Okay.
10   Q   And you were there for five years. Was
11 it approximately 2003?
12   A   I'm trying to think. I'm thinking about
13 my brother-in-law when he deceased. He deceased in
14 '99. Was I still there after he deceased? I can't
15 remember the dates.
16   Q   Okay.
17   A   I'm sorry.
18   Q   How long were you out of a job after
19 ADPIMS closed?
20   A   I was off for the summer. I got a --
21 because I had the severance. I started with an
22 agency, at Atlantic Health Services. That was in --

Page 31

1   Q   An agency where? I'm sorry. I didn't
2 hear.
3   A   It's called Atlantic Health Services.
4   Q   When was that; do you recall?
5   A   That was in late spring.
6   Q   Do you recall the year?
7   A   2004.
8   Q   And how long were you with the agency?
9   A   Just a couple of months because I got a
10 call from the Red Cross recruiter who had my resume,
11 saw my resume on the Internet and wanted me to
12 interview for a position.
13   Q   Had you posted a resume on the Red Cross
14 website?
15   A   No. Just like on Monster.
16   Q   Oh, Monster?
17   A   Right. And she picked me up off one of
18 those.
19   Q   When you were working for Atlantic, what
20 types of positions did you have?
21   A   I was contracted to work for MRDDA here
22 in D.C.

Page 32

1   Q   What is MRDDA?
2   A   That's your Mental Retardation Disability
3 Administration here in D.C. It was down on H
4 Street. And the title there was nurse investigator.
5   Q   What were your duties and
6 responsibilities as a nurse investigator?
7   A   Well, initially, my duties were just to
8 do paper review of abuse allegations, looking at the
9 medical part of the abuse allegations because
10 investigators didn't have medical knowledge.
11        But eventually, that extended to where I
12 actually went out with investigators on my own to
13 the various sites to look into the allegations.
14   Q   Okay. And were you paid by the agency
15 during that time period?
16   A   That's correct. And it was hourly.
17   Q   The agency paid you hourly and contracted
18 your services out to MRDDA?
19   A   That's correct.
20   Q   And that was until you started with the
21 Red Cross; is that correct?
22   A   That's when I started with the Red Cross.

Page 33

1   Q   Your counsel has asked for a break.
2 Before we do that, I'd like -- what was your first
3 position at the American Red Cross?
4   A   I only had one position at the American
5 Red Cross.
6   Q   And what position was that?
7   A   That was called the wellness nurse.
8   Q   When did you start in that position?
9   A   I think end of October.
10   Q   October 2004?
11   A   It had to be because this is 2006.
12   Q   Okay. And when you were hired, were you
13 hired in an exempt or hourly position?
14   A   It was an exempt position.
15   Q   What were your duties and
16 responsibilities?
17   A   I was doing occupational health nursing
18 in a non-industrial setting.
19   Q   Just explain to me briefly what that
20 means.
21   A   What my duties were around that was doing
22 first aid, minimal first aid for clients who injured

Page 34

1 themselves. More, it was record review and
2 preparing physicals for people who were going out
3 for deployment. They had various people that would
4 go out.
5    Q   For AFES?
6    A   For AFES, um-hmm. I would do ergonomic
7 assessment, health education.
8    Q   Ergonomic assessment, what does that
9 mean? I remember when I was at the Red Cross,
10 someone would come around and adjust my chair --
11    A   That's correct.
12    Q   -- and I'd have to put it back to the
13 comfortable position after they left.
14        Is that one of the things you were doing?
15    A   The whole idea was, yes, to make your
16 work station more efficient and be pain free. But
17 you had to know what it was to do that, so --
18    Q   I remember having to take my screen off,
19 my computer screen off all the stands they kept
20 putting under it. And that --
21    A   I wasn't there at that time, so --
22    Q   Okay. Anything else? You have already

Page 35

1 discussed some first aid, records review for AFES
2 deployments, ergonomic review. Anything else?
3    A   Blood pressures, health counseling,
4 keeping their resting or sleeping rooms cleaned and
5 changed, the whole space, that area where they would
6 come in, dispensing of educational material, filling
7 the first aid boxes that were throughout the unit --
8 I shouldn't say throughout the unit, but throughout
9 the entire headquarters, including the ADE monitors,
10 attending --
11    Q   I'm sorry. You mean AED monitors or --
12    A   Um-hmm. And including staff meeting with
13 AFES personnel, briefings and debriefings with AFES
14 personnel, mothers -- the lactation room, can't
15 forget the lactation room, order of supplies, office
16 supplies, medical supplies, stocking, file
17 management.
18    Q   Okay.
19    A   That's what I initially did.
20    Q   Okay. Let's talk about the AFES meetings
21 and AFES reviews. What would you do with respect to
22 those meetings and reviews?

Page 36

1    A   In the meetings, it would be a core group
2 of people. It would be the AFES, managers, and the
3 CMAs, and they were re-reviewing the people who were
4 ready for deployment, for the next deployment, who
5 those people were.
6    Q   When you say CMA, what does that stand
7 for?
8    A   That's your client management associate.
9 That was your liaison between HR and -- and my
10 responsibility and my no role in that was knowing
11 who were the people that were going off for
12 deployment and what stage they were at in their
13 physical assessment, to see if they were ready for
14 deployment.
15        Or if they were coming back, anything
16 that happened to them over there and preparing for
17 their debriefing when they came back and the
18 scheduling of their next physical.
19    Q   Tell me specifically what would happen
20 with respect to the physical review. The individual
21 would be sent to the doctor, they would get a
22 physical, a report, and then you would review that

Page 37

1 report to determine if that person is deployable?
2    A   Right, and our determination would be
3 based on the military guidelines.
4    Q   So you were looking at the doctor's
5 report to determine whether or not that individual
6 was deployable, based on the military guidelines for
7 deployment?
8    A   That's correct.
9    Q   And that was because some of these
10 individuals were deployed into potential combat
11 zones; is that right?
12    A   That's correct.
13    Q   Now, on the return, was it the same type
14 of situation, where you would review their physicals
15 after they returned to determine what --
16    A   Well, the physicals didn't have the
17 review because that was done before they were
18 leaving. But let's say they had injuries or illness
19 while they were over there, we would discuss that
20 with them and follow up and make sure if they needed
21 any medical appointments.
22        We would look at their immunizations,

Page 38

1  because when you come back out, they do give you a
2  PPD testing.  I had one client who actually had a
3  heart attack and ended up needing bypass surgery.
4       So he was in deployment, so I had to make
5  sure while he was there that he was under cardiac
6  care, what did he need, could he stay there, how do
7  we transport him back, can he come back by regular
8  big military flight, or does he have to come back in
9  a different type of flight, will there be medical
10 access on the flight where they can get him safely
11 here.
12   Q   And that was all your responsibility to
13 make those determinations with respect to that
14 cardiac care patient?
15   A   Yes, it was.  The manager would call me
16 and say so-and-so had a heart attack.  Can you
17 follow up what's going on, because they really
18 didn't know the language or the extent of what they
19 needed.  And so they looked to my medical knowledge
20 to help guide them on this client.  And even if he
21 could return, to be fit for duty for the next
22 appointment or if he would be completely discharged

Page 39

1  or released from the Red Cross.
2    Q   What is PPD testing?
3    A   That's tuberculosis testing.
4    Q   Got it.  Okay.  Is that the extent of
5  your duties and responsibilities when you started at
6  the Red Cross?
7    A   When I started?
8    Q   Right.
9    A   No.
10   Q   What else was it that you were doing?
11   A   My duties expanded, doubling when Jane
12 Davis left.
13   Q   I want to talk about now before Jane
14 Davis left, just your initial duties.  Your counsel
15 has asked for a break.  I just want to get a sense
16 of what you did when you first started.
17       You have talked to me about a lot of the
18 administration function you had with respect to file
19 management, supplies.  You have talked to me about
20 some of the discretion you had with respect to
21 taking care of making sure that people who had
22 health issues were taken care of, using the cardiac

Page 40

1  care as an example.
2        You have talked to me about the meetings
3  you had with management on whether or not
4  individuals were deployable, the medical review
5  there.  You have talked to me about order review and
6  file management.  You have talked to me about first
7  aid, taking care of the resting rooms, blood
8  pressure, monitoring some, I guess, health concerns,
9  educational materials.
10       Anything else that you did?
11   A   Workmen's compensation filing.
12   Q   I'm sorry?
13   A   Workmen's compensation filing.
14   Q   What did you do with to respect workers'
15 comp files?
16   A   Any injuries that were reported, I had to
17 do the claims, do the claims submission.
18   Q   You would fill out the information in
19 order to submit it to the Red Cross' carrier?
20   A   Yes, that's correct.  And I think the
21 carrier's thing was Gates McDonald.
22   Q   Ordering supplies, was that you would

Page 41

1  look at the file room or whatever, the supply room,
2  and determine what was needed on your own and make
3  those decisions and order the supplies?
4    A   Right.
5    Q   What about file management?
6    A   File management, keeping files locked.
7  We had different files for workmen's comp injuries,
8  we had different files for the medical excuses that
9  they show when people return from work, notifying
10 the managers for that, that this person had a valid
11 excuse, they can return to work.
12       If there was any ADA issues, how we would
13 refer that.
14            (Interruption by phone
15             ringing.)
16            (Thereupon, a brief recess was
17             taken.)
18   BY MR. PANAGOPOULOS:
19   Q   I believe before we took a break we were
20 talking about your duties and responsibilities in
21 your first position, is that correct, ma'am, first
22 position at the Red Cross?

Page 42

1 A That's correct.
2 Q And just to summarize to make sure I have
3 everything. Your position was wellness nurse, and
4 you started sometime, you believe, late
5 October 2004?
6 A Correct.
7 Q And it was an exempt position, correct?
8 A Correct.
9 Q And you described the job as an
10 occupational health nurse in a non-industrial
11 setting?
12 A Correct.
13 Q And you did first aid and record review
14 for AFES deployment, blood pressure monitoring and
15 dealing with some health conditions; dealt with the
16 resting rooms, educational materials, AFES review
17 with management, ordered supplies, file management,
18 dealing with individuals who were deployed when they
19 had health conditions --
20 A Um-hmm.
21 Q -- filing workers' comp claims or I guess
22 filling out the form work and filing the workers'

Page 43

1 comp claims with the Red Cross' administrator, Gates
2 McDonald, right?
3 A Um-hmm.
4 Q Is that an appropriate summary of what we
5 have discussed so far?
6 A Well, we still have to deal with the
7 manager, the interaction with the manager, Ken
8 Thiel.
9 Q Tell me about that.
10 A Well, we had meetings with him.
11 Q Who was the manager?
12 A Ken Thiel, T-H-I-E-L, I believe.
13 Q What do you mean by interactions with the
14 manager? What would you do?
15 A We had -- well, he was the manager. We
16 had to have staff meetings with him. We reviewed
17 all the AFES deployment. We worked on the
18 spreadsheet. We had a spreadsheet that documented
19 or listed all the people who were for deployment.
20 So we had to list those. He saw the people for
21 deployment, who were for deployment. Staff meetings
22 about -- on members.

Page 44

1 Q Before we go to that part -- I don't mean
2 to interrupt you, just so that we can move through
3 this efficiently. Let me see if I understand the
4 process.
5 You would meet with AFES and AFES staff,
6 you would talk about deployment based on your review
7 of the records?
8 A Um-hmm.
9 Q You would put that information in a chart
10 and when you had a meeting --
11 A A spreadsheet.
12 Q -- a spreadsheet, and when you met with
13 Mr. Thiel, you would discuss where you were on those
14 issues?
15 A Right. Ken Thiel was the manager of the
16 wellness unit. Roger Kingsley was the manager of
17 AFES. So he ran the AFES meeting, Ken Thiel ran the
18 wellness unit.
19 So actually, I reported to Roger about
20 AFES personnel specifically, but also had to report
21 to my manager about the function of the wellness
22 unit, which included AFES and all the other things

Page 45

1 that happened that we were supposed to do in that
2 meeting.
3 Q Now, on the wellness unit side of things,
4 when you did the routine first aid, the rest room --
5 the resting rooms, was that for a particular client
6 group at the Red Cross or was it open to anyone at a
7 particular location?
8 A It was for your Red Cross employees.
9 Let's say a Red Cross employee got off at Farragut
10 North and tripped and hurt her knee. She would come
11 into the wellness unit. I would look at the knee,
12 clean it up, if I could.
13 If she needed to go to the hospital,
14 direct her to the hospital, even if I had to put her
15 in a wheelchair to get her up to -- so she could get
16 to the hospital. So we did first care -- first aid
17 care.
18 Q And you were based at 2025 E Street?
19 A Right, right at national headquarters.
20 Q And so anyone who was based at national
21 headquarters could come in and you would deal with
22 the situation?

Page 46

1    A   Right, and then you may have people over
2  at Jefferson Park, who could walk over to the
3  wellness unit.  They had a wellness unit over at
4  Jefferson Park, but --
5    Q   And that's kind of my question.  I mean,
6  you specifically didn't deal with employees over at
7  Jefferson Park; you dealt with headquarters
8  employees; is that right?
9    A   Well, we were responsible for interacting
10  with people at Jefferson Park.
11    Q   How so?
12    A   Well, I did ergonomic training over at
13  Jefferson Park, I would send health materials over
14  to Jefferson Park.  Either I would walk over with
15  our health pamphlets or I would interdepartment mail
16  them over.
17          The wellness unit was unmanned, and I'm
18  not sure how highly used because Ken Thiel really
19  did not keep an accurate record of it, but that did
20  not mean that injuries were not occurring over
21  there.  And people were calling me for ergonomic
22  assessment or health counseling questions or

Page 47

1  workmen's compensation claims.
2    Q   But if someone trips and falls at
3  Jefferson Park, they don't hop on the Red Cross
4  shuttle and come to the national headquarters for
5  first aid, do they?
6    A   I never had an injury from there, but
7  I've had people come over for blood pressure checks
8  and to talk to me about blood pressure control, diet
9  control, things like that.
10    Q   So someone would call up and make an
11  appointment with you and you would deal with the
12  situation?
13    A   Right.  The other thing that I was slated
14  to do but never occurred was to be an instructor for
15  first responders.  You know, they had employees that
16  were supposed to be taught CPR, laymen's CPR so if
17  something happened in those distant locations, there
18  would be someone there.
19    Q   When you say training to become a first
20  responder, you mean something other than the regular
21  Red Cross first responder classes, the first aid and
22  CPR classes?

Page 48

1    A   Their first aid CPR classes.
2    Q   So you were a first aid CPR instructor?
3    A   I was slated to do that.  I was slated to
4  go for instruction, but when personnel changes
5  happened, it couldn't, you know --
6    Q   Just so I understand.  You were slated to
7  go to instructor training so that you could become
8  an instructor?
9    A   That's correct.
10    Q   And that never happened?
11    A   That never happened.
12    Q   Now, before we took a break, you started
13  to indicate that at some point your duties and
14  responsibilities were expanded; is that correct?
15    A   That's correct.
16    Q   What point did that occur?
17    A   It first occurred when Jane Davis
18  resigned suddenly from the Red Cross.
19    Q   When did Jane Davis resign; do you
20  recall?
21    A   Sometime early in January, I believe.
22    Q   January of '05?

Page 49

1    A   '05.
2    Q   So after you were there for a few months?
3    A   Right.
4    Q   What was Jane Davis' job title?
5    A   She had the same job title.
6    Q   Same duties?
7    A   Same duties.  We split them in half I was
8  hired to be the third person of this unit.  Prior to
9  me being there, they had a contract nurse there
10  doing the duties.  I'm not sure why that person
11  left, but that's who I replaced.
12          Jane Davis indicated that she could not
13  do this function alone and that's why they hired --
14  got someone full time for that position.
15    Q   All right.  So is it a fair
16  characterization, then, that your duties and
17  responsibilities remained the same; it is just that
18  the workload increased because one of the two
19  people, you and Jane Davis, one of those people who
20  were doing those duties left?
21    A   That's correct.  It doubled, the workload
22  double.

Page 50

1  Q  The workload essentially doubled?

2  A  Um-hmm.

3  Q  But there was no change in the duties

4  themselves, right?

5  A  No change in the duties.

6  Q  In other words, there wasn't some duty

7  that Jane was performing that you were not that you

8  had to take on in addition to what you did before,

9  some different duty?

10  A  The only duty that Jane did do was she

11  was an instructor for first responders.

12  Q  But you never got that training, so you

13  never did -- that's a duty that you didn't take on?

14  A  That's correct.

15  Q  Were there any other duties that Jane did

16  that you did not take on?

17  A  Well, she was backup for the manager.

18  When Ken was out, she would take over all of the

19  manager duties, dealing with international services

20  and the OSHA reports.  But she only did that if he

21  was on vacation.

22  Q  And did you become backup for those

Page 51

1  duties when she left?

2  A  No, because he was not on vacation during

3  that time.

4  Q  Well, let me ask it this way:  Were you

5  slated to become backup; you just didn't have an

6  opportunity to do it, or do you know?

7  A  No, to my knowledge, I was not slated to

8  do that.

9  Q  Was there a discussion as to who would

10  take over those duties if he went on vacation?

11  A  No.

12  Q  So you don't know?

13  A  Not to me.

14  Q  Right.  Okay.

15  A  Because Jane trained me.  She was like my

16  supervisor.

17  Q  Sure.  But, for example, Ken didn't come

18  to you and say, look, you are not going to be the

19  acting manager when I'm on vacation or when I'm

20  gone?

21  A  No.  He always reported to Jane.

22  Q  I am talking about after Jane left.

Page 52

1  A  Well, Ken told me that we were going to

2  replace and I would have to do Jane's job.

3  Q  And did you understand that to include

4  doing -- taking on Ken's duties when he was on

5  vacation or gone?

6  A  I guess I understood it without saying

7  it, but there was -- he had already been on vacation

8  when I got there, so it wasn't an issue for me.

9  Q  It didn't happen while you were there?

10  A  Right.

11  Q  And that's what I am trying to

12  understand.  There wasn't -- no one ever told you

13  this is not something you are going to do when Ken

14  is gone, right?

15  A  I am not sure what you mean.  When --

16  Q  Let me do it this way:  I think we have

17  gotten this, but I just want to make sure.  Jane

18  left and you were told that she is not going to be

19  replaced, correct?

20  A  Right.

21  Q  You had an understanding that if Ken went

22  out, you would also take on what Jane did and

Page 53

1  essentially become Ken while he was gone, but that

2  was never specifically discussed with you?

3  A  That was not discussed with me.

4  Q  But that was your understanding?

5  A  It was my understanding that in Ken's

6  absence -- let's say he got sick and someone came

7  and needed a manager, I would ask what they needed,

8  but let them know that Ken is not here.  I could not

9  perform his manager duties.  I didn't have his keys.

10  I didn't have any of that.

11  Q  Did Jane have his keys?

12  A  I believe she did.

13  Q  But you and Ken never talked about that

14  issue?

15  A  No.

16  Q  When you say you believe she did, do you

17  know whether or not she did, ma'am?

18  A  Well, I seen her go into his office.  She

19  had the ability to go in his office.

20  Q  Do you know whether or not the office

21  door was locked when she went in?

22  A  All the doors were locked.

Page 54

1   Q   Do you know whether he gave her a key on
2 the days that he was gone?
3   A   I just assumed she had a key. I got a
4 key to my office.
5   Q   I understand that you think she had a
6 key. I just want to know if you know whether or not
7 she had a key.
8   A   Well, I seen her go into his office when
9 it was locked, so she had a key.
10   Q   Was it on days that he was there?
11   A   No, because Ken was usually there before
12 we got there. No. I can say that she probably did
13 because if he was in a meeting and there was
14 something that they needed, she would go in his
15 office and get it.
16   Q   Did you ever ask Ken for one of his keys?
17   A   I never needed his key.
18   Q   Fair enough. All right. So January '05
19 Jane leaves, your workload increases, same types of
20 duties with the exceptions that we have discussed.
21 How long did that go on, your assumption of those
22 extra duties?

Page 55

1   A   That went on until I left Red Cross on
2 June 30th.
3   Q   Were you ever given additional duties?
4 Did your workload ever increase again?
5   A   Yes. When Ken Thiel resigned.
6   Q   When did Ken Thiel resign?
7   A   Sometime in -- I guess his last -- well,
8 February, March. I think he put in his resignation
9 in February and he left in March.
10   Q   So February, March Ken leaves. What
11 happens then?
12   A   There is no replacement. There is not
13 assistance from a volunteer. I end up picking up
14 Ken's duties.
15   Q   So you essentially become the manager of
16 the group --
17   A   I was never --
18   Q   -- but there is no group?
19   A   It was just me. I don't get the title of
20 manager. Anna Shearer -- she was our director, or
21 Ken's boss, his first boss -- came down and said,
22 you know, Ken has resigned. This will be his last

Page 56

1 day. I would transition or learn his duty and that
2 I would have to prioritize the work, but everything
3 still had to get done.
4   Q   Triage, huh?
5   A   Well, I don't know if you would call it
6 triage, because in an emergency room you have other
7 people to help you. I didn't have anyone else to
8 help me.
9   Q   What were the extra duties you were told
10 you would have to learn, Ken's duties?
11   A   I had to learn to do the OSHA reports. I
12 took up -- over international services, which
13 included additional briefings and debriefings of the
14 clientele --
15   Q   OKay.
16   A   -- interaction with other department
17 levels, dealing with issues, getting the passwords
18 or codes for our accounts with Travax, which was
19 the --
20   Q   I'm sorry. Your accounts with what?
21   A   Travax, which --
22   Q   Can you spell that for me?

Page 57

1   A   T-R-A-V-A-X. And we used --
2   Q   What was that?
3   A   That was our resource that we used to
4 look at immunizations, what immunizations were
5 needed cross-country or when they went out of
6 country.
7     You would go in, find the particular area
8 they were going, and look at the necessary
9 immunizations that they needed. I also got access
10 to his computers, which I got Jane Davis' -- well,
11 no, actually, he gave me Jane Davis' file folder
12 when she resigned, so I already had that, that I
13 didn't have access to.
14     Then I got access to his file folder and
15 the previous managerial predecessor's file folders,
16 in which all of the policies and procedures were
17 on-line, you know, what the physical
18 responsibilities were for the next year and what the
19 target plans or the goals were for how they want the
20 wellness unit to expand and take place.
21     I took over the ADA responsibilities and
22 interaction with the general counsel. I stepped up

| Page 58 | Page 60 |
|---|---|
| 1 in helping the FMLA benefits nurse, helping her with<br>2 her duties, because if there was ever a medical<br>3 question that she did not understand, I would be the<br>4 person to help her with that.<br>5       I think I had a good rapport with the<br>6 managers with AFES, but I had to introduce myself to<br>7 the managers with international services. I knew<br>8 them, but I never had to work with them and know<br>9 what their expectations were with international<br>10 services.<br>11       And at that time, it was Patty Barns, but<br>12 she is deceased. Then the other person that I<br>13 talked to about international services, she actually<br>14 was the client management associate for that group,<br>15 and that was Corinthia Sanderson or Nicky Sanderson.<br>16       So she gave me the whole history of<br>17 international services and the interaction or<br>18 history that Ken Thiel had with that department and<br>19 what the weak -- the weaknesses and the strengths<br>20 were, you know, with dealing with that population<br>21 because they are different from AFES.<br>22       AFES was short time, you know, | 1  A  You know what? No, I did not. I'm<br>2 sorry. He also was in charge of the John Barton<br>3 Payne fund. That fund was given to the FMLA<br>4 representative.<br>5  Q  That wasn't a duty you took on?<br>6  A  No, but I knew of that duty and saw the<br>7 record. There was like an EPA file, you know.<br>8  Q  Did you deal with that?<br>9  A  We didn't have any issues, per se, with<br>10 that organization, but there were some things that<br>11 came in from Oklahoma. There were some personnel<br>12 issues that came in.<br>13  Q  We will talk about that in a minute.<br>14 Anything else?<br>15  A  I think that's what I can recall right<br>16 now.<br>17  Q  One of the first things you identified<br>18 was OSHA reports. What did you have to do with OSHA<br>19 reports? What was your responsibility there?<br>20  A  OSHA reports is the reporting of all the<br>21 injuries, all the workmen's comp injuries that<br>22 occurred in 2025, Jefferson Park, and the unit we |

| Page 59 | Page 61 |
|---|---|
| 1 deployment, but you had people at international<br>2 services that could be placed for a year or more and<br>3 we were lacking in getting responses or making sure<br>4 that they were sending us information that they were<br>5 keeping current with their immunizations.<br>6       So there were some things there that<br>7 needed to be ironed out as far as following the<br>8 personnel.<br>9  Q  What else? What other duties?<br>10  A  Well, just going through, making sure all<br>11 the policies and procedures were up to date. So<br>12 each of us had a set of policies, but I think he had<br>13 the original policy, so I had to make sure that what<br>14 I had was current with his policies, all the file<br>15 duties related to international services, which is a<br>16 different file system, different spreadsheet.<br>17  Q  I will talk about the specific duties you<br>18 identified. What I want now is just some -- any<br>19 other general categories of duties you assumed.<br>20 Have you identified all of those?<br>21  A  I think I have with Ken.<br>22  Q  Okay. You indicated that -- | 1 had over in D.C. -- I mean, in Virginia.<br>2  Q  So let's say someone carrying a file box<br>3 in 2025 trips, falls, skins the knee. What do you<br>4 have to do with respect to OSHA?<br>5  A  Dual duty. Workmen's comp has to be in<br>6 the files, and the OSHA report has to be listed.<br>7 You have to list all the injuries. You keep a<br>8 running log of it.<br>9       So at the end of the time period, the end<br>10 of the year, you send that report to OSHA that you<br>11 categorized what the injuries were, because they<br>12 want to know about any other extenuating<br>13 circumstances, that there is; biohazards, bloodborne<br>14 pathogens, all those things have to be reported.<br>15  Q  And you would make a determination as to<br>16 what to report, what to fill out on the form?<br>17  A  The OSHA report has guidelines as to what<br>18 types of injuries they want reported. So I reported<br>19 as -- according to what the guidelines stated.<br>20  Q  Right. And it was your discretion as to<br>21 what to report; you would look at the form, you<br>22 would look at the guidelines, and you would make a |

Page 62

1 decision as to what to put on the form; is that
2 correct?
3   A  Based on the OSHA guidelines.
4   Q  Sure.
5   A  Right.
6   Q  Sure.  But I guess what I am saying is,
7 no one would say to you, Tonia, you have to fill out
8 boxes A, B, C, D here; you would look at it, make a
9 determination as to what needed to be reported,
10 based on the guidelines and fill it out?
11   A  Well, Ken gave me a mini training of the
12 OSHA reporting that we went over, what the OSHA
13 report looks like.
14   Q  Sure.  But we are talking about after
15 he's gone now.
16   A  Right.
17   Q  So Ken didn't tell you -- I understand
18 that he trained you on how to do it, but you were
19 the one, once he left --
20   A  Responsible for knowing when it was due,
21 responsible for filling it out, responsible for
22 getting it on time, because if you don't, there's a

Page 63

1 fine, a monetary fine, a huge monetary fine.
2   Q  And that was all your responsibility?
3   A  That was my responsibility to do that.
4   Q  All right.  Now, you mentioned the John
5 Barton Payne fund, but I believe you said you didn't
6 have any responsibilities towards that fund.  Is
7 that correct?
8   A  No.  I actually did not sit on the
9 committee or -- but I had seen the reports come in
10 because they come onto my fax machine, and I would
11 put them in, you know, confidential areas.
12   Q  You just forwarded them on?
13   A  Yes.
14   Q  To the person who was dealing with that
15 issue?
16   A  That's correct.
17   Q  You then mentioned international
18 services, and I think we got into a little bit of
19 detail on that.  Let me see if I can summarize this
20 fairly and if I haven't just tell me.
21       Just like AFES deploys people,
22 international services also deploys people to

Page 64

1 various international locations, correct?
2   A  That's correct.
3   Q  And before they are deployed, they need
4 to have, at times, medical exams, and a
5 determination had to be made on whether or not they
6 needed any immunizations as well; is that correct?
7   A  Right, based on the state's requirement.
8   Q  What were your duties with respect to
9 that process?
10   A  My duties -- I would be notified by the
11 international department and they would tell me
12 where this patient -- that patient -- I'm sorry --
13 that person was going, what country they were going
14 to.
15   Q  They would tell you, we are sending Brian
16 Plitt to Greece?
17   A  Or Cambodia, and then I would ask for the
18 physicals --
19   Q  I think he would enjoy Greece more.
20   A  -- their recent physical examination from
21 a physician to make sure there was no limitations.
22 I would do a search on the country into where they

Page 65

1 were going specifically, about the terrain, to make
2 sure they would get the proper immunizations,
3 especially if it's dealing with malaria.
4   Q  So if it's tropical or subtropical?
5   A  Exactly.
6   Q  And that was all your determination as to
7 what needed to be done, based on your review?
8   A  Based on the review of what Travax report
9 they gave me, yes.  So I would pull up a report, let
10 the international people know this is what is
11 required of that person.
12       Sometimes they could go to their own
13 doctor and get the immunizations or a travel
14 specialist.  But sometimes we could use the Farragut
15 medical clinic, and then there was also G.W. that
16 was available for them to get that.
17   Q  Did you have any interactions with the
18 clinic they would go to to get their immunizations
19 from?
20   A  Sometimes we would have phone calls or
21 conversations, but that was at a minimal.
22   Q  What about their own doctor?  You just

Page 66

1 simply needed some type of proof from the --
2   A   Right.  They had to bring their
3 immunization records in that I could see that they
4 had those done.
5   Q   Anything else you did with respect to
6 international services, other than the deployment
7 issues we have discussed?
8   A   No.  Briefing and debriefing.
9   Q   When you say briefing, does that mean you
10 would brief employees before they went?
11   A   Absolutely.
12   Q   What types of things would you brief them
13 on?
14   A   We would review the medical records, make
15 sure they had all their medications and extra
16 eyeglasses, et cetera, make sure they understood to
17 report all injuries to me, make sure that they kept
18 up with -- if they were going to be there for two
19 years, I would insist that they remember to update
20 me yearly.  They had to give me a yearly update as
21 to what's going on, how to access me by e-mail and
22 number, how to access Gates McDonald as well.

Page 67

1        And then we gave them a little travel
2 pack that consisted of first aid, Gatorade, things
3 like that, to get them over to the trip.
4   Q   You'd tell them to watch out for
5 mosquitos?
6   A   Gave a health education.  Yes, we did
7 health education.
8   Q   And the health education varied based on
9 where these individuals were going?
10   A   Where they were going.
11   Q   And who made the determination as to
12 which particular health education training to give
13 these individuals?
14   A   That was the policies established by the
15 Red Cross.
16   Q   So in other words, again, we are
17 deploying Brian here to Cambodia.  What would you do
18 to determine which health briefing to give him?
19   A   Well, we only had one health briefing
20 that was general, but then the health briefing that
21 we got from Travax, those were the protocols that we
22 used as --

Page 68

1   Q   I see.  So you would say you need these
2 immunizations and this is what you need to watch out
3 for when you are there?
4   A   That's correct, in addition to telling
5 them to boil water, avoid fresh fruits, things like
6 that, any type of, you know, out of country travel.
7   Q   So you would basically be responsible for
8 telling them everything they needed to be aware of
9 from a health perspective?
10   A   Correct.
11   Q   And you would be responsible for making
12 sure that they had whatever protections they needed
13 from a health perspective with respect to their
14 health condition to their current health status and
15 immunization; is that correct?
16   A   That's correct.
17   Q   You would make sure that if there are
18 medications that they are on, that they had enough
19 of those medications, correct?
20   A   Correct.
21   Q   And make sure that they've got their
22 eyeglasses, extra pairs, contacts, whatever the case

Page 69

1 may be; is that right?
2   A   That's correct.
3   Q   Anything else you did with respect to the
4 deployment briefings?
5   A   No.
6   Q   Let's talk about debriefing.  What would
7 you do in order to debrief people?
8   A   Debriefing was when they came back, we
9 discussed any injuries or anything that happened.
10 Basically, talked about their trip.  The biggest
11 thing was looking at any stressors, any type of
12 emotional stressors that came back.
13        Sometimes, especially with the AFES team,
14 being a team, personality conflicts occurred.  So I
15 would look at those things and make sure that there
16 was no type of personnel issues that needed to be
17 resolved of that the manager needed to be aware of.
18   Q   You just said AFES.  I take it that you
19 did that for AFES and international services; is
20 that correct?
21   A   Correct.
22   Q   So with respect to the deployment, the

Page 70

1 briefing, and the debriefing it's the same set of
2 duties, but for two different units of the Red
3 Cross, one is AFES, the other is international
4 services?
5 A  Right.  International services is always
6 one on one for briefing and debriefing.  With AFES,
7 you did a group briefing.
8 Q  Because there were more people with AFES?
9 A  Exactly.  Your debriefing was one on one.
10 Q  So AFES, we have a group of people we are
11 sending to Bosnia, for example, you would bring
12 those people into --
13 A  Into a setting such as this.
14 Q  -- into a conference room?
15 A  We would use Power Point to do the
16 presentation.
17 Q  Was it just you giving the presentation?
18 A  Yes.  So I was responsible for all the
19 PACS, all the x-rays, all the -- you know, because
20 they had to have the Panorex of their teeth so if
21 something should happen, there would be a process of
22 identifying them.

Page 71

1 Q  That's pleasant, isn't it?
2 A  It's unfortunate, but that's what they
3 do.  And it's a lot of files.
4 Q  Okay.  So you would have to make sure
5 that everyone had all that information for --
6 A  Absolutely, that they had copies of that.
7 Q  And that was both for AFES and
8 international services?
9 A  Correct.
10 Q  Anything else that we haven't already
11 discussed with respect to your duties and
12 responsibilities as they related to AFES and
13 international services?
14 A  For Ken or just in general?
15 Q  In general.
16 A  In my whole time period being there?
17 Q  Yes.
18 A  Telephones, there were constant e-mails
19 that I got from personnel.
20 Q  Relating to what types of issues?
21 A  Lots of issues.  Personnel issues, people
22 being sick, trying -- I think the biggest argument

Page 72

1 was the physicals, how often they had to get their
2 physicals, because they had less personnel, some
3 more people were being deployed; so -- and then the
4 cost or the expense and just -- I was the person
5 that they could kill the messenger, essentially, so
6 I took the brunt of a lot of their frustration.
7 Q  So if someone says, look, I don't want to
8 have to take a physical every two years, you would
9 get that e-mail?
10 A  I sure would.
11 Q  And you would have to respond to that
12 e-mail?
13 A  I would respond to it.  I would first
14 contact the manager, Roger, and let him know that I
15 have a client that was pretty upset about the
16 physical, so I'm going to reiterate what the policy
17 is, but you need to be aware that this is someone
18 who, you know, is upset.
19 Q  So you would respond appropriately and
20 then inform the manager that you were responding to
21 the call?
22 A  To the best of my abilities, yes, I did.

Page 73

1 Q  You also mentioned -- that's what you
2 would do when someone griped about the physical, but
3 you also mentioned personnel issues.  If there is a
4 personnel issue, what would you do there?
5 A  The same thing, because each of the
6 groups had their CMA or their client management
7 associate who was a liaison between HR and -- and we
8 would basically discuss those issues in the
9 meetings, when we had the team meetings with AFES
10 personnel.  Whether it's at the time before
11 deployment or after they came back, those things
12 would be discussed.
13 Q  So with respect to personnel issues,
14 would you try to deal with the issue and then inform
15 the CMA, or would you just simply pass it on to the
16 CMA, or some other response?
17 A  Well, actually, they would be there.  I
18 would inform it first to Roger, because he was the
19 manager, and then it would be discussed openly or at
20 the meeting.  But I never contacted the CMA
21 directly.  I would actually go to the manager first.
22 Q  So there would be a group discussion on

Page 74

1 how to respond. Who would respond, then? Would it
2 be you or the CMA? So describe to me what would
3 happen. Someone comes in with a personnel issue,
4 you go to Roger. What happens then?
5      A For example, I had a client that has an
6 issue with their blood pressure and the AFES
7 standard or military standard says that your blood
8 pressure has to be within a certain parameter. If
9 it is not, there is a blood pressure monitoring that
10 you have to do for over a five-day period.
11      Once you monitor them for the five-day
12 period, I need to know those results. And based on
13 those results, I can determine, based on the
14 criteria of the military, if this person is
15 deployable or not.
16      If that person's blood pressure is out of
17 whack, if it's higher, they can't go. I have to
18 stand them down and let them know at this time,
19 based on your blood pressure results or the
20 recordings that you submitted to me, you are
21 ineligible for deployment. What are you doing with
22 your physician? Get them to, you know, go to the

Page 75

1 physician, get their medication, and have their
2 doctor let me know what's going on for their blood
3 pressure.
4      In addition, after that, I would talk to
5 Roger about what I discovered and give him the
6 information without exposing their medical
7 confidentiality.
8    Q Sure.
9    A Then I had to notify or let the AFES
10 military personnel know that I have a person with
11 this blood pressure, and we are looking at him to
12 see if he will be able to -- or be eligible for
13 deployment.
14    Q So with respect to Roger, what you would
15 say is, look, I have a medical deferment issue I'm
16 dealing with or something along those lines?
17    A Right. And they need to know that
18 information because at any time they have to replace
19 that person out, especially -- they do everything on
20 a cycle. So they have to know who they can contact,
21 who they can move from one station to another
22 station for deployment.

Page 76

1      So that really took some strategic
2 planning to see if this person was going to meet the
3 deadline or not.
4    Q And you were part of that planning
5 process from the medical perspective, because you
6 had to let people know whether or not Brian is
7 deployable or Dino is deployable or whoever that
8 person is?
9    A Say the question again.
10    Q You would have to tell them whether or
11 not personnel were deployable?
12    A Based on the guidelines.
13    Q From a medical perspective, right, based
14 on the guidelines?
15    A Yes, military guidelines.
16    Q And you made that decision by reviewing
17 the guidelines and reviewing whatever health
18 information you had?
19    A Through -- with the group and the
20 military guidelines.
21    Q When you say with the group, what do you
22 mean with the group?

Page 77

1    A The AFES group that we met, Roger
2 Kingsley, the manager, the CMA, and I, and there
3 were actually -- I don't know what Sheila Dunlow's
4 position was right now. She was with AFES too, but
5 I'm not sure of her title. But she was one of the
6 people that would coordinate who was scheduled for
7 deployment.
8    Q Right. And I'm not talking about the
9 entire deployment process. But you basically had
10 responsibility for the medical part of that process,
11 though, right?
12    A Right. I was hired to review that, yes.
13    Q And you would make recommendations with
14 respect to the medical part of that process?
15    A Yes.
16    Q So if, in your opinion, someone was not
17 deployable from a medical standard, you would say,
18 look, you can't deploy this person based on the
19 guidelines here?
20    A I would let them know that this person is
21 not meeting the criteria for deployment, yes.
22    Q Did anyone ever overrule you on that?

## Page 78

1  A   No, because those people would either --
2  do what was required. And the stand-down would come
3  from Roger.
4      Q   But Roger never overruled one of your
5  decisions?
6      A   We never had a decision that had to be
7  overruled. Everyone came into line as to what was
8  required.
9          Did you know we had a medical doctor, a
10 medical director, for the wellness unit?
11     Q   Who was the medical director for that?
12     A   His name was Tee Guidoti. He was a
13 contractor from G.W.
14     Q   And that's if you had any questions about
15 the medical issues, that's who you were free to
16 contact to discuss those issues with, right?
17     A   Right. Is that who you -- yes, Tee
18 Guidoti. I'm not sure if he is still there or not.
19 I know his contract was up. Well, he is probably
20 not, because the wellness unit is no longer there.
21         But prior to me knowing that the wellness
22 unit was going to be closed, he was our medical

## Page 79

1  director for the wellness unit.
2      Q   So on what occasions would you contact
3  the doctor?
4      A   We had rare occasion as far as AFES
5  personnel. We contacted him as far as our Hep B
6  vaccine, hepatitis B vaccine. For sometime or
7  before I got there, they had where the nurses could
8  give the Hep B vaccine if one of the AFES personnel
9  needed it.
10         But that never happened during the time I
11 was there, that I had to administer a vaccination.
12     Q   Did you ever have to consult with him?
13     A   I consulted with him one time with a
14 client. And I can't remember the client's name.
15     Q   I don't need the name. Do you remember
16 what the issue was?
17     A   It was the cardiac guy. So I notified
18 him and let him know that we had someone who had a
19 cardiac issue, internationally, bring them back, and
20 bring him back through a private airplane and not
21 through the military transport.
22     Q   What was his role in that decision

## Page 80

1  process, if any? You just simply talked to him
2  about whether or not it was appropriate to use the
3  military transport?
4      A   Well, no. I talked to him to notify him
5  that there was a medical issue, a big medical issue,
6  just to keep him aware of what was going on.
7      Q   Okay. So you were just updating him?
8      A   Right.
9      Q   You made the decision on how to get the
10 person back, when to get the person back, but you
11 just kept the doctor up to speed on what was going
12 on?
13     A   I played a part in how he would get back.
14     Q   What part did you play?
15     A   By talking to the military doctors there
16 and asking him how should he travel back, what do I
17 need to get this person back safely. And he came --
18 they decided that he needed, you know, someone to be
19 with him medically, if something happened.
20         So he came back on a private plane. He
21 did not come back by military --
22     Q   When you say private plane --

## Page 81

1  A   By commercial airlines.
2      Q   Commercial airlines.
3      A   Commercial airlines. Not on the
4  military --
5      Q   Transport?
6      A   Right, which I understand can be very
7  rough and exhausting and uncomfortable.
8      Q   All right. So if I understand how that
9  process worked, the person has the medical issue,
10 you already described your role in dealing with his
11 treatment overseas, but then you talked to the
12 medical doctors that were treating him to determine
13 the best way to bring him back to the States, and
14 you dealt with that issue.
15         What did you do? You talked to Roger and
16 said, look, he needs to come back by commercial
17 carrier, or you told him you need to make
18 reservations by commercial carrier? What did you do
19 next?
20     A   I let Roger know what the medical doctor
21 had recommended and they made the transportation --
22     Q   The arrangements?

| Page 82 | Page 84 |
|---|---|
| 1   A   Right. | 1  password for Travax and after that point you -- |
| 2   Q   Anything else that you dealt with with | 2   A   I was able to access it, and I also, I |
| 3  respect -- that we have not already discussed with | 3  had to renew it.  It had renewal. |
| 4  respect to AFES and/or international services? | 4   Q   So you managed, essentially, Red Cross |
| 5   A   We talked about file management, | 5  access to the Travax system; is that fair? |
| 6  spreadsheet, data, software. | 6   A   Right, renewals for the educational |
| 7   Q   When you say file management -- | 7  materials that we had. |
| 8   A   We had actually -- I'm sorry. | 8   Q   But before Ken left, I take it you didn't |
| 9   Q   Go ahead. | 9  have to deal with Travax because that was more of an |
| 10   A   We had actually hard copy files of the | 10  international services issue than an AFES issue? |
| 11  spreadsheets on the computer software. | 11   A   Well -- that's correct.  That's correct. |
| 12   Q   When you say hard copy, what types of | 12   Q   Depending on the place, there might be an |
| 13  files were you managing? | 13  immunization issue, though, right? |
| 14   A   Paper files, medical record, confidential | 14   A   That's correct. |
| 15  records, excuses for people who returned back from | 15   Q   But not on a regular basis? |
| 16  work, ADA claims, workmen's comp claims, all those | 16   A   That's correct. |
| 17  claims. | 17   Q   Whereas most of the international |
| 18   Q   So you were responsible for maintaining | 18  services deployments are in locations where you |
| 19  all of those records and files? | 19  really have to consider whether or not you need |
| 20   A   Right. | 20  immunizations: Africa, Southeast Asia, locations |
| 21   Q   Now, one of the other things you | 21  like that right, right? |
| 22  mentioned was interactions with department levels. | 22   A   Right, like Sri Lanka, that's -- yeah. |

| Page 83 | Page 85 |
|---|---|
| 1  What do you mean by that? | 1   Q   The next thing you mentioned was EPA |
| 2   A   Well, with international services, I | 2  issues and employees for Oklahoma.  Did you mean EAP |
| 3  never had to work with them until Ken had left.  So | 3  rather than -- |
| 4  I didn't know anyone.  I didn't know who -- what the | 4   A   Employee assistance program. |
| 5  chain of command was, who was the manager, were | 5   Q   The employee assistance program. |
| 6  there any problems, what's the what current issue, | 6   A   What did I say? |
| 7  what was unresolved, what needs to be resolved. | 7   Q   EPA. |
| 8   Q   So you met with them to discuss those | 8   A   I'm sorry.  EAP. |
| 9  issues? | 9   Q   EAP.  All right.  And what was your role |
| 10   A   That's correct. | 10  with respect to EAP? |
| 11   Q   One of the other things you mentioned was | 11   A   Well, in that one particular case, there |
| 12  passwords for Travax immunization tracking. | 12  was a big blow-up over environmental allergens. |
| 13   A   Um-hmm. | 13  They had an employee who really felt that she was |
| 14   Q   You have already talked to us about what | 14  reacting and it just took several levels of |
| 15  Travax is.  But what do you mean by dealing with | 15  complaints and anonymous callings and employees |
| 16  passwords? | 16  feeling like they were, you know, being not heard or |
| 17   A   Because it's password protected. | 17  misrepresented or cheated or -- |
| 18   Q   What was your role in that? | 18   Q   And were you counseling the employee? |
| 19   A   I didn't have access to Travax. | 19  What was your role? |
| 20   Q   Until what point in time? | 20   A   Well, when I first got the call, I just |
| 21   A   When Ken left. | 21  heard a client that was very upset and angry.  And I |
| 22   Q   So once Ken left, you just had to get a | 22  let Anna Shearer know.  As a result of that, we |

Page 86

1 ended up having an HR meeting for the very first
2 time with Carol Miller, a couple of people from OIC
3 about this particular client at issue.
4    Q And your role in the process was simply
5 the intake from the client? Anything else?
6    A The intake and the medical part of it,
7 how do you rule out environmental allergens.
8    Q Explain to me what your role was in that.
9    A My role in that was taking the complaint.
10 The complaint was constant enough that I felt that
11 my supervisor had to know about it. It initiated or
12 prompted an HR meeting, where HR actually had to go
13 to Oklahoma and make sure -- and actually look at
14 the environment, did they have enough ventilation,
15 that the carpets were clean, that it was a safe
16 environment.
17    Q I understand all that part. I just want
18 to focus on your role. Your role was taking in the
19 complaint, getting it to the right level?
20    A That's right, and those other things
21 happened.
22    Q As a result --

Page 87

1    A If I hadn't -- right. If I had not done
2 it, I was concerned that the person's issue would
3 have not been addressed.
4    Q If someone had called and said, you know
5 what, I've got a little cough, I think it might be
6 the workplace, but you had no other evidence, did
7 you have the discretion to decide not to forward
8 something to HR?
9    A No, never did. And what I would do is,
10 either talk to Ken first or talk to Anna about what
11 the complaint was and how really to search it out.
12    Q Did you have any role in determining
13 whether it was a serious complaint or not a serious
14 complaint?
15    A Well, what I found out is that you would
16 have employees that would have a history of
17 absences, and they would come back with a medical
18 excuse for that.
19    And it just seemed like the manager or
20 the CMA sometimes had difficulty in understanding
21 that it was a medical issue, and that -- I don't
22 handle HR issues. If the person has absences

Page 88

1 because of what was happening between them and that
2 manager, I don't handle that. I just handled the
3 medical part.
4    So I always had to have the role of
5 telling them I have a valid medical excuse for that
6 person, without divulging their medical
7 confidentiality.
8    Q So you say that you would review the
9 excuse, you would review whatever the issue was and
10 you would say to the HR rep, this is a valid medical
11 excuse or --
12    A Right.
13    Q -- I don't have enough information here
14 to tell --
15    A No. I would just say, I received a note
16 from this person's physician that they were out for
17 this day and that's it.
18    Q Got it. Okay.
19    A But very often, they would come back and
20 tell me other things, and I would tell them, I have
21 a medical excuse.
22    Q You also mentioned access to Ken's

Page 89

1 computer. What additional role did that give you?
2    A Well, it gave me his file folder, so
3 everything that he had on files with clients that
4 are outstanding, the ADAs, because I didn't --
5 wasn't involved in that, so I'd have to pick up that
6 work.
7    Q So you just got access to the materials
8 you needed to deal with the other work that you were
9 doing?
10    A That's correct.
11    Q ADA responsibilities with the general
12 counsel. Tell me what that involved.
13    A They were involved simply because if
14 there were any issues of how to do work
15 accommodations for that particular person's illness.
16 And I think that was just tradition that they were
17 there. I don't know how that --
18    Q So it was part of the interactive process
19 that someone comes to -- goes somewhere and says, I
20 need an accommodation and you are involved in
21 determining whether the accommodation is
22 appropriate; is that fair?

---

**Page 94**

1      MR. PANAGOPOULOS: Well, look, there is a
2 question pending right now. As soon as you --
3      THE WITNESS: Okay. I do remember that
4 rule.
5      MR. PANAGOPOULOS: As soon as you answer
6 the question, we can take a break.
7      THE WITNESS: So what was the question
8 again, please?
9      MR. PANAGOPOULOS: Please read the
10 question back to the witness.
11      (Thereupon, the tape-recorded
12      record was played back.)
13      THE WITNESS: I believe your question
14 asking my involvement in the interactive process
15 regarding accommodations.
16      MR. PANAGOPOULOS: Right.
17      THE WITNESS: I had a client that came in
18 that has a visual impairment. And his doctor gave
19 him a note saying that he needs a different type of
20 computer. I take that note, I get all the
21 accommodation records for him to fill it out,
22 because there has to be a record of him requesting a

**Page 95**

1 work accommodation.
2      After that record is completed, it goes
3 to the supervisor. There is whatever the policy is
4 with Red Cross, if they are going to justify it, if
5 they can accommodate that person's request or they
6 cannot. They will either have to accommodate him or
7 give him another job where he can do that function.
8      So the manager was able to accommodate
9 the computer he needed for his visual impairment.
10 That was my interactive process in that.
11      MR. PANAGOPOULOS: Do you guys still need
12 a break?
13      THE WITNESS: I do.
14      MR. PANAGOPOULOS: Let's go off the
15 record.
16      (Thereupon, a discussion was
17      had off the record.)
18      (Thereupon, at 12:23 p.m., a
19      lunch recess was taken.)
20
21
22

**Page 96**

1      AFTERNOON SESSION
2      (Thereupon, at 1:06 p.m., the
3      afternoon session commenced.)
4 BY MR. PANAGOPOULOS:
5  Q  Good afternoon again.
6  A  Good afternoon.
7  Q  You agree you are still under oath?
8  A  I do agree I'm still under oath. But I
9 have a statement.
10  Q  Okay.
11  A  I have decided that each question you ask
12 me, I would like to write it down, simply because
13 that little lawyer banter kind of threw me off, the
14 confrontation that you and Brian had over the
15 objection.
16      The objection of your questioning just --
17 just threw my mindset off a little bit, and so I
18 just -- I will write it down and then I will repeat
19 it to you and you tell me if I have asked the
20 question --
21  Q  We are not going to do that. I am going
22 to ask the questions. If you want to take the time

**Page 97**

1 to write it down and repeat it to me, that's up to
2 you. But if we do that, that time is on your dime,
3 not mine.
4  A  On my dime?
5  Q  And if I have to go to the court on that,
6 I will go to the court on that. All Brian was doing
7 was objecting. All I was doing was responding to
8 his objection. It's not unusual. We had a
9 discussion about it. We even had a discussion of
10 whether it was appropriate during the break.
11      This deposition has been moving fairly
12 well. There have been far fewer objections and
13 colloquies than in many other depositions.
14      Again you can talk to Brian off the
15 record about whether or not you want to do something
16 like that. But to the extent it makes the
17 deposition take a lot longer, then that's your
18 decision and we will take what action we need to
19 take with respect to that.
20      That's completely, in my view,
21 inappropriate, bulky, and unnecessary. We have gone
22 from 10 o'clock this morning to our lunch break

---

Page 98

1 asking questions, answering those questions, moving
2 forward talking with each other.
3        We have the Court Reporter who is taking
4 a record. At the end of the deposition you will be
5 given the opportunity to either read and sign the
6 deposition or waive that right.
7        And that's the end of my statement. If
8 you guys want to go off the record and talk and make
9 a decision, that's fine. If you want to continue in
10 this manner, that's fine. I don't care. You want
11 to go off so you can talk to her?
12        MR. PLITT: Let's go off the record just
13 for a second, yeah.
14              (Thereupon, a brief recess was
15              taken.)
16        MR. PANAGOPOULOS: Do we have a
17 resolution of this issue?
18        MR. PLITT: Yes. We are going to just
19 proceed on with the deposition.
20        BY MR. PANAGOPOULOS:
21    Q    Have you ever sued anyone before?
22    A    No, I have not.

Page 99

1    Q    Have you ever been sued?
2    A    No, I have not.
3    Q    Have you ever been a witness in any legal
4 proceeding?
5    A    I have been called for jury duty.
6    Q    Have you been a witness?
7    A    To?
8    Q    Have you been called as a witness in any
9 legal proceeding? Have you had to testify before?
10    A    No, I've never been called for jury -- I
11 mean, never been selected.
12    Q    I would like to talk to you about the
13 duties you had identified that you were first hired
14 for. We have gone through those duties. Actually,
15 it may be helpful if we mark an exhibit here. Once
16 I get to this exhibit -- do you recall being told
17 that you were an at-will employee at the Red Cross?
18    A    I was hired and said that it was at-will.
19    Q    And do you recall that the Red Cross'
20 policies and policies and procedures manual is
21 on-line?
22    A    That's correct, it is on-line.

Page 100

1    Q    Did you ever review that policies and
2 procedures manual?
3    A    I have a copy of it.
4    Q    Excuse me.
5    A    I have a copy of it that.
6    Q    You have a copy of it. My question is,
7 have you ever reviewed it?
8    A    Oh, absolutely.
9    Q    When did you first review it?
10    A    We had to review it when you got hired.
11 I mean, it was available for you to review it. I
12 reviewed it in-depth at the time when they decided
13 that the organization or that wellness unit would be
14 closed. And within that policy is a severance --
15    Q    We will get to that. My only question
16 was, if you reviewed it.
17    A    I did review it initially very briefly
18 when I started. More intensely as the position was
19 eliminated.
20        MR. PANAGOPOULOS: This is 1.
21              (Whereupon, Deposition
22              Exhibit Number 1 was marked

Page 101

1              for Identification:)
2        BY MR. PANAGOPOULOS:
3    Q    Ms. Powell, you have been handed what has
4 been marked as Powell Exhibit Number 1. Do you
5 recognize this document?
6    A    Yes, I do.
7    Q    What is this document?
8    A    This is my letter of hire for employment.
9    Q    With the Red Cross?
10    A    That's correct.
11    Q    And is that your signature at the bottom?
12    A    That's correct.
13    Q    And did you sign this document on or
14 about 11/2/2004?
15    A    That's correct. That's also my
16 correction on the page of the address because the
17 address was wrong. I had to call the recruiter and
18 let her know or verify really what building I would
19 be at, if I would be at the JP building or if I
20 would be at the headquarters.
21    Q    Is the starting salary here correct?
22    A    That's correct.

## Page 106

1  Q  So when you say without compensation,
2  that's not true?  You were offered a job with a
3  compensation level that you believed was
4  inappropriate?
5     A  No.  I was offered a job that, according
6  to their pay scale, was a higher rate and a higher
7  grade than which I was hired.
8     Q  Well, you talked to several people about
9  that, and we will get to that.  But you actually
10 asked for a review of that, several people reviewed
11 that issue, and you got a response, right?
12    A  I got no response.
13    Q  You got no response?
14    A  Al Vincin, basically told me -- he is the
15 VP of the HR department -- actually, acknowledged
16 that there was a $5,000 difference in the salary and
17 if I did not like the job, I could just quit.
18    Q  We will talk about who said what to you
19 and we have got documents that show who said what to
20 you in a minute.
21    A  Okay.  Are they my documents?
22    Q  And we will go through that.

## Page 107

1     A  Oh, and as well as his documents, as
2  well.  Okay.
3     Q  Sure.  We will be seeing the documents.
4              (Whereupon, Deposition
5              Exhibit Number 2 was marked
6              for Identification.)
7     BY MR. PANAGOPOULOS:
8     Q  You have been handed what has been marked
9  as Powell Exhibit Number 2.  I'd like you to review
10 that document and let me know when you are ready to
11 proceed.
12    A  Is this the full policy, the full HR
13 policy?
14    Q  Are you ready to proceed, ma'am?
15    A  No.
16    Q  Let me know when you are ready.
17    A  (Witness reviewing document.)
18    Q  This is going to be attached to the
19 transcript, and I see that you are marking on it.
20 It's probably not a great idea, but if you want, you
21 can.  I just wanted to make sure you are aware that
22 it will be attached to the deposition.

## Page 108

1     A  You didn't tell me that up-front.  I just
2  thought it was something that you were giving me,
3  but I didn't know that.
4     Q  I just wanted to make you aware.  I saw
5  that you are writing on it, so --
6     A  I guess you should have told me that
7  up-front, and I wouldn't have written on it.  I
8  would have found another way to make notations.
9     Q  Well, you are making notations on the
10 document.  If you want to do that, that's fine.  All
11 I asked you to do was take a look at the document
12 and let me know when you are ready to proceed.  I
13 may or may not ask you questions about everything in
14 there.
15    A  That's fine.
16    Q  You take whatever time you want to take,
17 but, again, you are the one extending this
18 deposition.  I think it's a fairly simple act and
19 question to ask you to review that document and let
20 me know when you are ready.
21    A  Okay.  I will do that.  I'm ready.
22    Q  Do you recognize that package as several

## Page 109

1  Red Cross policies?
2     A  Yes, I do recognize it to be the HR
3  policy.
4     Q  Do you know whether or not this is the
5  policy manual that you printed out?
6     A  It seems similar to that.  I would have
7  to do a page by page comparison to --
8     Q  Well, I will tell you that you produced
9  it to us.
10    A  Okay.
11    Q  If you produced it to us, would it be one
12 that you printed out?
13    A  Okay.  Great.  Then it is.  And I
14 probably printed it out sometime in June.
15    Q  Fantastic.  Take a look at the second
16 page.
17    A  Yes.
18    Q  And you see there, again, it tells you
19 that you are an employee at will, right?
20    A  That's correct.
21    Q  And it tells you that it's a manual; it's
22 not a contract, right?

Multi-Page™

Page 110

1   A   It does say that.
2   Q   And did you read and understand that?
3   A   Yes, I did.
4   Q   Did you find anything confusing about
5   that?
6   A   No.  A lot of employers hire people at
7   will.
8   Q   I'd like you to turn to policy number
9   204?
10   A   And what's the title of it?
11   A   Severance pay?
12   A   You are not going to discuss employment
13   movement or --
14   Q   I'd like you to turn to policy 204,
15   severance pay, please.
16   A   I'm there.
17   Q   Do you recognize that as the Red Cross
18   severance policy?
19   A   I do.
20   Q   Did you read that policy?
21   A   I do -- or I did.
22   Q   Look down at page 205 -- I'm sorry --

Page 111

1   policy 205.  Let me know when you are there.
2   A   Did you complete all the policy for 204?
3   Q   That's why I need you to turn to 205.
4   Yes.
5   A   Okay.
6   Q   Do you recognize that as the overtime
7   pay/FLSA policy?
8   A   Yes, I do.
9   Q   Did you read that policy?
10   A   Yes, I did.
11   Q   What is your understanding of what an
12   exempt employee is?
13   A   I beg your pardon.
14   Q   What is your understanding of what an
15   exempt employee is?
16   A   Employers usually hire people,
17   professional people with education, saying they're
18   exempt and on salary, so they will not be paid
19   hourly.
20   Q   Now, did you understand when you were
21   hired that you were being hired into what the Red
22   Cross has classified as an exempt position?

Page 112

1   A   I understand that I was in the category
2   as an exempt employee, but I was not hired to work
3   for three people.
4   Q   I didn't ask you that.  Do you remember
5   my question?
6   A   I did, but that's my answer.
7   Q   My question was, did you understand at
8   the time you were hired that the Red Cross had
9   classified your position as an exempt position?
10   A   Again, I do realize they hired me as an
11   exempt employee, but I'm not hired for two other
12   people.
13   Q   And with respect to being hired as an
14   exempt employee, did you understand that you would
15   not be paid overtime at the time you were hired?
16   A   As an exempt employee, I would be paid
17   for the hours of -- 40 hours.
18   Q   You would not be paid overtime as an
19   exempt employee?
20   A   Would be paid for 40 hours.
21   Q   My point is you were on a salary, you
22   weren't entitled to overtime as an exempt employee,

Page 113

1   right?
2   A   That's correct, but I was not entitled to
3   work for two other people.
4   Q   I understand that you don't agree how the
5   Red Cross staffed, but that's not what I'm asking
6   you.  Were you given a job description when you
7   started at the Red Cross?
8   A   No, I was not.  I talked to the recruiter
9   because she hired me from my resume posted on-line.
10   Q   Did you ever see a job description?
11   A   Never saw a job description.  She talked
12   to me about a job description.  Ken Thiel talked to
13   me about a job description.  Jane Davis talked to me
14   about the job description.  Anna Shearer talked to
15   me about the job description.
16       When I started the job, I was given a
17   list of duties, verbal duties that I would do.  It
18   was not until Jane Davis resigned and Ken Thiel
19   resigned that I saw the history of what my job
20   duties were.
21   Q   So the answer to my question is, you
22   didn't see a job description?

Page 118

1 been marked as Powell Exhibit Number 4. Do you
2 recognize this document?
3    A  Yes, I do.
4    Q  Where did you get this document?
5    A  This document was also in one of the file
6 folders of the job descriptions. I'm not sure if it
7 was Ken Thiel's or Linda Burnett's job description
8 for the nurse. She was the manager before Ken
9 Thiel.
10    Q  Was this the position that you were
11 working at the Red Cross when you were hired?
12    A  This is the position that I was working
13 when I was hired at the Red Cross.
14    Q  Did you ensure compliance with federal
15 regulations related to occupational health?
16    A  When I did the OSHA reports, when Ken
17 left, yes.
18    Q  Did you maintain confidential medical
19 records?
20    A  Yes, I did.
21    Q  Did you provide occupational health
22 services to the national headquarters staff?

Page 119

1    A  I did ergonomic training.
2    Q  You also did first aid training, right?
3    A  Well, first aid.
4    Q  You did first aid, right. And with
5 respect to ergonomic -- you also did other general
6 health training as well, right?
7    A  Health counseling and education.
8    Q  Health counseling and education. So back
9 to my question. Did you provide varied occupational
10 health services to national headquarters staff?
11    A  Yes, I did.
12    Q  Did you manage workers' compensation
13 claims?
14    A  Yes, I did.
15    Q  Did you provide guidance to injured
16 employees and information to the insurance carrier?
17    A  Yes, I did.
18    Q  Did you confer with the insurance carrier
19 and the case management company as needed to ensure
20 timely return to work?
21    A  That's correct.
22    Q  Did you provide training to an emergency

Page 120

1 response team?
2    A  No, I did not.
3    Q  That was the one thing we talked about
4 that you didn't get a chance to do; is that right?
5    A  That's correct.
6    Q  Did you confer with ARC managers and the
7 short-term disability management company regarding
8 medical situations affecting staff?
9    A  For the AFES deployment, yes, and then
10 later the international when Ken left.
11    Q  Did you advise regarding accommodations
12 in the job or workplace?
13    A  Yes, after Ken left.
14    Q  Did you initiate and respond to employee
15 inquiries regarding workplace ergonomics?
16    A  Yes, I did.
17    Q  Did you make suggestions regarding the
18 physical working environment?
19    A  Only the desk station.
20    Q  Excuse me?
21    A  Only the desk station. That's
22 ergonomics.

Page 121

1    Q  That's where people worked, right?
2    A  Well, work environment could mean a lot.
3 I didn't go into the janitorial section and say,
4 this should be that. My ergonomic assessment was
5 strictly related to the working cube space, where
6 there's a computer, and that.
7    Q  You went into where people worked and
8 determined whether or not it was ergonomic, and you
9 made suggestions, right?
10    A  No at times, simply because there was a
11 mail room. I never did ergonomic assessments with
12 people that were in the mail room. It was only
13 limited to the scope of people who were computer
14 oriented.
15    Q  So people who were in cubicles or in
16 offices?
17    A  Yes.
18    Q  So you went into people's cubicles and
19 you went into people's offices and looked at their
20 workspace and made suggestions?
21    A  Yes.
22    Q  Did you represent the wellness unit and

Page 122

1 their activities to others in the organization?
2   A  Yes. As a matter of fact, Al Binson's
3 recruiting team had invited me to a meeting where
4 they were trying to come up with a target or
5 marketing plan for recruitment and wanted to know
6 what the wellness unit did to just give their
7 employees an update.
8      I was invited by one of his personnels
9 and I invited Ken Thiel along. And we sat in the
10 recruiting meeting and just told them what we were
11 doing and what our services were all about.
12   Q  Did you provide nursing and medical care
13 under the direction of the wellness manager?
14   A  Yes, I did, Ken Thiel.
15   Q  Did you possess an RN?
16   A  Yes, but I'm no longer licensed in D.C.
17 because I work in Maryland.
18   Q  At the time did you have a D.C. license?
19   A  Yes, I did.
20   Q  At the time, did you have five years
21 experience in nursing?
22   A  No. It says here in occupational health,

Page 123

1 which I told her that I did not. That's what it
2 says here.
3   Q  Well, it says five years experience in
4 nursing with one in occupational health. Do you see
5 that?
6   A  Five years and none in occupational
7 health.
8   Q  So you had the five years experience in
9 nursing?
10   A  Correct.
11   Q  You didn't have the one year in
12 occupational health.
13   A  That's correct.
14   Q  Did you have knowledge of occupational
15 health and safety principles?
16   A  No, I did not. I learned that there.
17   Q  Did you have knowledge of adults
18 education principles?
19   A  Yes, I did.
20   Q  Did you have knowledge of emergency care
21 procedures?
22   A  Yes, I did.

Page 124

1   Q  Did you have record keeping skills?
2   A  Yes, I did.
3   Q  You had familiarity with word processing
4 and computers?
5   A  Yes, I did.
6   Q  You were not certified as in instructor
7 in CPR and AED training, right?
8   A  That's correct.
9   Q  But you could have obtained one within a
10 month of employment; is that correct?
11   A  Right. They were trying to schedule a
12 time, but it never worked out.
13   Q  With respect to --
14   A  The ability to work independently and
15 collaborate, is that a requirement?
16   Q  I didn't ask that. I assumed that you
17 could do that, but I am going to a different
18 question. With respect to this document, as I
19 understand it, no one ever said this is your job
20 description, right?
21   A  That's correct; no one ever said it's my
22 job description. There should be another exhibit in

Page 125

1 there that says what my daily activities were.
2 That's what I was given the first day. This is what
3 you come in and do every day. That's how I was
4 directed by Jane to do that.
5      And so when she left, all these other
6 things came about.
7   Q  You know, this is going to move a lot
8 quicker if you just let me ask the questions. There
9 are some things I care about. There are some things
10 I don't. If you want an opportunity to tell your
11 story, you can do that with your counsel, you can do
12 that in court if this case ever gets to trial.
13      The purpose of this is just for me to ask
14 questions to understand what I need to understand
15 about your claim. I understand that you have this
16 need to say things, but it's just going to make it
17 go longer.
18   A  I disagree with that.
19   Q  With respect to the duties described in
20 this Exhibit Number 4, which of these items took the
21 most of your time? Was it fairly spread out among
22 these items, or did some items take more time than

Page 126

1  others?

2  A  You need to clarify that. Are you asking

3  me my duties when all three persons were there, or

4  are you asking the duties when --

5  Q  Let's start when you were first hired.

6  A  When I was first hired, I could do 40

7  hours.

8  Q  That's not what I'm asking you. I'm

9  asking you to kind of, if you would, quantify for me

10  which of these particular duties took most of your

11  time.

12  A  Most of my day was assigned to AFES

13  personnel.

14  Q  So it was dealing with the medical and

15  certification issues that we were discussing earlier

16  with --

17  A  All the responsibilities related to AFES

18  personnel, from briefing to debriefing, which

19  included keeping track of where they are in their

20  physical process, documentation of the medical

21  records, working on the spreadsheet, meeting with

22  AFES team manager, e-mails, telephone from AFES

Page 127

1  personnel.

2  Q  What percentage of your day did the AFES

3  component of your job take up?

4  A  Probably 60 to 70 percent of the day.

5  Q  What was the other 30 to 40 percent

6  composed of?

7  A  Doing blood pressure checks, cleaning the

8  cot rooms -- you know they have rooms where people

9  come in and they can lay down?

10  Q  You told me that.

11  A  Those were supplied with sheets, paper

12  sheets and paper pillow cases -- making sure the

13  lactation room was clean, filing workmen's

14  compensation, doing the ergonomic assessments,

15  filing, stocking of medical supplies, stocking of

16  the first aid boxes that are throughout the campus,

17  in addition, the first aid box, the AED was right

18  next to it, so communicating to the security that I

19  did those checks and that they were done. They can

20  go and re-lock the box, re-lock the first aid boxes,

21  passing out any type of medical literature

22  throughout the campus.

Page 128

1  Q  It sounds like you are describing

2  everything else. Was everything else basically, I

3  guess, equal in increments, so that you had your

4  main duties dealing with AFES, and everything else

5  took up some period of time?

6  A  That's correct.

7  Q  Okay.

8  A  The first aid box, for instance, we would

9  get a trigger from the security department saying,

10  these boxes and this for the campus were open and I

11  had to go and check those particular boxes and

12  restock them.

13  Q  Fair enough. Now, when Jane Davis left,

14  you have already told us what duties were added.

15  I'd like you to tell me which duty or duties took up

16  most of your time during that time frame.

17  A  The AFES consumed it. It was a hundred

18  percent of the time.

19       (Court Reporter changing

20       paper.)

21  BY MR. PANAGOPOULOS:

22  Q  Okay. You indicated AFES consumed it 100

Page 129

1  percent of the time?

2  A  That's correct.

3  Q  That means you weren't able to perform

4  any of the other duties?

5  A  After work, I did.

6  Q  So it wasn't 100 percent of your time,

7  then; you spent other time doing the other duties?

8  A  After work hours, yes. After filing any

9  workmen's comp claims that came in, probably started

10  at 5:00 or so. If I was there to do first aid -- I

11  don't know if Ken actually did. I mean, I wasn't

12  there.

13  Q  So how many hours a day did the AFES

14  stuff take?

15  A  The whole day, eight hours, because I now

16  had from one to two teams that I had to get ready

17  for deployment up to five teams, especially when she

18  left, there were five teams that had to

19  go out within a period of two months.

20  Q  So it varied a bit based on the

21  deployments that were going out?

22  A  Yes, but considering that war time that

Page 142

1    Q   Thank you.  You can explain later if your
2  counsel asks you if you want to put a statement on
3  the record at some point.  That's all I have for you
4  on that document.
5          (Whereupon, Deposition
6          Exhibit Number 8 was marked
7          for Identification.)
8      BY MR. PANAGOPOULOS:
9    Q   All right.  Is it safe to assume that
10  this is one of the documents you have been itching
11  to talk about, the daily activities you were given?
12    A   You know, itching is -- no, I'm not
13  itching.  Itching usually is a nursing perspective,
14  I have some type of rash or I've been bitten, or
15  something, and I have a need to itch.
16    Q   Or scratch.
17    A   What I would like to do is to explain,
18  period.  So the little side comments I'm very
19  offended to, and I'm not going to accept it anymore.
20    Q   I'm sorry.  They're what?
21    A   They're offensive.
22    Q   Are these the duties you have been asking

Page 143

1  to describe?
2    A   These are the daily duties that Jane
3  Davis actually gave to me.
4    Q   So this actual document, did you actually
5  get it in an e-mail from Ms. Davis?
6    A   No.  Actually, she printed it out and
7  then sent it to me in an e-mail which I put in a
8  file folder.
9    Q   Which you what?
10    A   Which I put in my personal file folder.
11    Q   Now, the date on this is Friday, June 3,
12  2005.  Do you see that?
13    A   Yes.
14    Q   And it seems to be another one of those
15  documents that you e-mailed from yourself at work to
16  yourself at home, right?
17    A   Yes.
18    Q   So is this a document you pulled off of
19  Ms. Davis' files?
20    A   It's a document that Jane gave to me that
21  I put in my personal file folders that I took and
22  sent it to my home address.

Page 144

1    Q   Why is the date on this, then, June 5th?
2  Why is there not -- if she e-mailed it to you, why
3  isn't there an e-mail chain on this; do you know?
4    A   Probably because I didn't do an e-mail
5  chain on it.  Why --
6    Q   Well, you said she sent this to you in an
7  e-mail, right?
8    A   Right.
9    Q   Was it as a separate attachment?
10    A   Yes, it was a separate attachment.
11    Q   I see.  Well, why is there not an
12  attachment here?
13    A   Because all I did was copy and past it
14  and put it in.
15    Q   Now, is this what you did on a daily
16  basis?
17    A   Unlock filing cabinets and cabinets in
18  medicine room, review the blood pressure memory, and
19  check of blood pressure daily charts --
20    Q   I don't need you to read the whole thing
21  to the Court Reporter.  As I told you, these
22  exhibits are attached.  The question was simply, are

Page 145

1  these the duties you performed on a daily basis?
2    A   These are the daily duties.
3    Q   Thank you.  Now, number 6, daily wellness
4  issues, it says, address and prioritize, with two
5  exclamation points.  Do you see that?
6    A   Um-hmm.
7    Q   You need to answer orally with a yes or a
8  no.
9    A   Oh, I'm sorry.  I forgot.  Yes.
10    Q   Now, did you have an understanding of
11  which of these duties were more important?
12    A   Yes, I did.
13    Q   Which of these duties were more
14  important?
15    A   AFES was always important.
16    Q   What about the daily wellness issues that
17  say, address and prioritize?
18    A   Address and prioritize, meaning that AFES
19  always came first.  If someone came into the unit
20  for a blood pressure check, you had to talk to them
21  and had to really negotiate my time what I had to do
22  what meeting I had to report to.

Page 150

1 for the employees, period.
2    Q   Right?
3    A   That was the scope of what they did.
4    Q   And that was my first question.
5        (Whereupon, Deposition
6        Exhibit Number 10 was marked
7        for Identification.)
8    BY MR. PANAGOPOULOS:
9    Q   Once you were performing all the duties
10 with the wellness unit after Ms. Davis left and
11 Mr. Thiel left, how -- I believe you already told me
12 how many hours a day you were working after
13 Ms. Davis left.  How many hours a day were you
14 working after Mr. Thiel left?
15    A   I'm trying not to show my frustration,
16 but they were longer hours.
17    Q   But you don't have any records of them,
18 right?
19    A   No record of them.
20    Q   And no way to reconstruct the records of
21 them, right?
22    A   No need to reconstruct them.

Page 151

1    Q   I asked if there was a way to reconstruct
2 them.
3    A   I don't know.  How would I reconstruct
4 them?
5    Q   This isn't a question for your attorney.
6 This is a question for you.
7    A   I don't know how I would reconstruct
8 them.
9    Q   So the answer to my question is, you
10 don't know of a way to reconstruct them?
11    A   No.  I wouldn't dream of reconstructing
12 them.
13    Q   All right.  Did there come a point in
14 time when you were informed that there was going to
15 be some type of reorganization at the Red Cross?
16    A   On May 11th is when we got a memo that
17 there was a -- well, no.  Let me back up on that.
18 When I was hired in October, there was
19 reconstruction going on in Red Cross.  There were
20 layoffs in various places.  I think one of the
21 biggest or first layoffs happened in February.
22    Q   Happened when?

Page 152

1    A   In February.
2    Q   Okay.
3    A   But no hint from Anna Shearer or Ken
4 Thiel that reconstruction would affect the
5 wellness unit.  It was not until May 11th that we
6 received notification of further reconstruction, and
7 within that reconstruction was an attachment of how
8 the wellness unit would be affected.
9        So when we received it, it was at the end
10 of my workday.  I saw it come in.  I did not open it
11 up until the next day.  At about 7:30 in the morning
12 Anna came down and asked me did, you know, I see the
13 memo.  And I was like, no.  I saw something, but I
14 didn't open it up.
15        And that's when she told me the wellness
16 unit had been closed.  So no, I had no clue that
17 the reorganization would affect me personally.
18    Q   On May 11th, that's when you found out
19 that the wellness unit would be closed?
20    A   Actually, on May 12th.  May 11th --
21    Q   May 12th?
22    A   Right.

Page 153

1    Q   The memo was sent to you on May 11th; you
2 saw it come in, but you didn't open it?
3    A   Right.  It came in at the end of the day
4 when I was leaving.  I was packing, ready to go,
5 ready to shut down.
6    Q   Sure.  Were you aware from February on
7 that there was -- that the Red Cross was considering
8 how to restructure and how to reorganize?
9    A   No, I did not.
10    Q   Did you read all the e-mails you received
11 at the Red Cross?
12    A   Yes, I did.
13    Q   How many e-mails a day did you receive?
14    A   Oh, gosh.  Probably about 25 to 30
15 related to AFES, but that's not including the
16 telephone calls.  Then before Jane and Ken left, we
17 e-mailed each other what we were doing, so --
18    Q   The only question --
19    A   I'm just saying those are e-mails.
20    Q   I know you are trying to think out loud,
21 but I'm just trying to keep the deposition moving.
22    A   I understand.

## Page 154

1  Q  I'm not trying to be rude, and I
2  apologize if you think I am.  But I am just trying
3  to -- you know, it's already 2:30.  I'm just trying
4  to keep this thing moving.
5  A  I understand that.
6  Q  Do you know if it was more than 50 a day?
7  A  But I definitely got 25 to 30 just with
8  AFES alone.
9  Q  Sure.  Was it more than 50 a day?
10  A  On some days, it probably was more than
11  50 a day.
12  Q  More than a hundred a day?
13  A  No, I wouldn't say more than a hundred a
14  day.
15  Q  Did you read all the e-mails you got?
16  A  I read AFES e-mail, but I did not always
17  read some of the organization announcements.  But we
18  had meetings and Anna never said there was
19  reorganization that was affecting the wellness unit.
20  I know you don't want to hear that, any explanation,
21  but --
22  Q  It's not whether I want to hear it or

## Page 155

1  not.  It's whether I think it's relevant, whether
2  it's making the deposition take longer than it needs
3  to be.
4      It was just a simple question of whether
5  you heard something.  There are e-mails that went
6  out.  I've got that.  That's all I care about and
7  I'm ready to move on.  Again, I'm not trying to be
8  rude or cut you off.
9      But there are things that matter to me
10  and things that don't matter to me in this
11  deposition, and so that's the only reason.  I am
12  just trying to keep it moving.
13  A  And I understand your position, but the
14  things that don't matter to you doesn't mean that
15  it's not an issue.
16  Q  Well, the point is that if they matter to
17  your side of the case, your counsel will bring them
18  up.  I understand that sometimes it can be cathartic
19  to explain this stuff and sometimes to do it over
20  and over again, but it doesn't make for an efficient
21  deposition.  And that's all I'm trying to get is an
22  efficient deposition.

## Page 156

1      And so, again, I apologize if you think
2  I'm being curt, but I am just trying to keep things
3  moving.  I mean, after the deposition is over, if
4  you want to sit down and talk about this, I'm happy
5  to sit and listen for as long as you want to talk.
6      But I'd rather just finish today, if we
7  can, rather than talking a couple of hours about
8  coming back another day to finish.  That's all I'm
9  saying.
10      When you heard about the reorganization
11  in your department, what happened next?
12  A  Anna Shearer came down on the morning of
13  May 12th, about 7:30 in the morning and told me that
14  the unit was being closed.
15  Q  And then what happened next?
16  A  And she said to me that there may be a
17  position that she hoped that I would be interested
18  in taking and that she would introduce me to that
19  director of that department to come down and talk
20  with me about the job.
21  Q  And what position was that?
22  A  It was the disasters health services

## Page 157

1  position.
2  Q  Do you remember the job title?
3  A  The disasters health services position,
4  disasters staff health position.
5  Q  Disaster staff health position?
6  A  Yes.
7  Q  And were the duties of that position
8  described to you?
9  A  Well, going back to Exhibit Number 3,
10  this is what was posted on the Red Cross website,
11  and then talking to Bill Malfera about this
12  position, he informed me that there was not a
13  manager and that I would be dealing directly with
14  him and that there would be long hours, you know,
15  related to the position and that he was not sure how
16  AFES and international services would be handled,
17  but they're working on it, with the intent that I
18  would still have my current duties as well as moving
19  into the new position.
20      I let him know that I was in the process
21  of graduating from my undergrad and that doing the
22  extended time would be difficult for me because my

Page 158

1 priority was to graduate. I was not going to put
2 off my graduation to work and did he understand that
3 my education was a priority and that I would
4 graduate in July.
5       And he said, oh, no, that wouldn't be a
6 problem because hurricane season doesn't start until
7 a certain time. But I knew that this position was
8 more than what I was doing, currently.
9    Q  I think my question was whether or not
10 you understood what the duties of this position were
11 and you pointed me to -- back to Exhibit Number 3,
12 and then you told me about your conversation with
13 Mr. Malfera.
14       Can we get back to my question about the
15 job duties. Were the duties that are described in
16 Exhibit Number 3 the duties that were described to
17 you? And it looks like -- this is a document you
18 gave us. It looks like the right side is cut off.
19 I think that happens sometimes off of Internet
20 printing.
21       But you can tell me if there is something
22 there that's missing, if you recall. Are these the

Page 159

1 duties that were described to you?
2    A  Bill Malfera told me the duties were more
3 expanded, that they were more difficult and
4 challenging duties and that I was required to work
5 longer hours.
6    Q  Let's do this: Were you told that the
7 duties described here were at least some of the
8 duties you would have to perform?
9    A  According to this, he said, yes, they
10 were the duties.
11    Q  And he indicates you would have been
12 responsible for administering the health management.
13 I assume that's program and operation staff
14 development. Did you have an understanding of what
15 that meant?
16    A  No, I did not. They --
17    Q  Did you ask?
18    A  Well, they arranged that I could shadow
19 with the volunteer nurse, Carolyn Williams, so I
20 would get a better insight of what the job duties
21 were.
22    Q  Did you do that?

Page 160

1    A  I did.
2    Q  How many did you shadow with her?
3    A  Just a day.
4    Q  And did you get a sense of what she did?
5    A  Yes, I did.
6    Q  What did she do?
7    A  She did a job that I don't see how one
8 person could do.
9    Q  What did the job include?
10    A  It was beyond the scope of just doing
11 physical assessments for disaster services.
12    Q  And she did it as a volunteer?
13    A  Well, she lived out in Oregon, so they
14 paid for her to come back and forth. She got a
15 company car. They paid for --
16    Q  They didn't pay for her time, right; they
17 paid to bring her out here?
18    A  Well --
19    Q  Which is only fair. My only question is,
20 she did it as a volunteer? Did she get an hourly
21 wage?
22    A  She didn't get an hourly wage, but she

Page 161

1 was compensated.
2    Q  Did she get any salary?
3    A  She didn't get a salary, but she was
4 compensated.
5    Q  She got a plane ticket and she got a car,
6 right?
7    A  So I'm supposed to work for free?
8    Q  I didn't ask you if you were working for
9 free. All I'm asking is whether or not she did this
10 as a volunteer, and you are trying to make it sound
11 like she was getting paid.
12    A  Well, compensation. She had other
13 compensation.
14    Q  What was her compensation?
15    A  You just mentioned it.
16    Q  Her expenses. So you think it was
17 inappropriate for the Red Cross to reimburse a
18 volunteer her expenses, when she is doing a job that
19 you can't understand how one person can do?
20    A  No.
21    Q  Great.
22    A  It wasn't expenses.

Page 162

1    Q    It wasn't expenses?

2    A    No.

3    Q    I see.  Did it not cost her anything to
4  fly out from Oregon?

5    A    That's not what Carolyn told me.  They
6  paid for her.

7    Q    They what?

8    A    They paid for her to go back and forth.

9    Q    Yeah, they paid for her to go back and
10  forth.  They paid for her plane ticket.

11    A    Which is not cheap.

12    Q    I see.  All right.  And what is this
13  tremendous job that this volunteer was doing for
14  free plane rides?  Can you tell me what it was she
15  did when you shadowed her for the day?

16    A    Well, I wouldn't say it's a free plane
17  ride.  I think it was compensation for the work that
18  she was doing as a volunteer.

19    Q    I see.  Well, you told me about the free
20  plane rides, you've told me that, I guess, they had
21  a rental car for her, and I don't know, maybe a
22  place to stay.

Page 163

1    A    Housing, right.

2    Q    But when you shadowed her for that plane
3  ride and the cost of a car and whatever other
4  expenses she had, what was this person doing?

5    A    Carolyn was doing beyond the scope of
6  physicals that I was doing for AFES personnel.  She
7  was responsible for policies and procedures, for --
8  that encompassed health care individually, health
9  care for work sites, health care for disasters,
10  where all the volunteer people that are involved in
11  all the states for American Red Cross, including the
12  workmen's compensation, including the training of
13  the other nurses that were designated, which was at
14  least ten.

15        She also was responsible for some
16  management training.  She was the essential person
17  or point of contact for all of those different
18  various areas.  So ten nurses plus however many
19  managers.

20        I'm not sure of who her medical director
21  was.

22    Q    Is that it?

Page 164

1    A    Well, it sounds like that's it to you,
2  but it compensated -- or had a broad impact over a
3  large number of people, a larger number of people
4  than I worked with.

5    Q    And did that frighten you?

6    A    Did it frighten me?  No.  I understood
7  the extent or the scope of the more responsibility
8  and accountability that I had, which Bill Malfera
9  thought I was qualified for.  He didn't even want to
10  look at my resume.  He offered me the job based on
11  word of mouth that I was an excellent employee.

12    Q    With respect to the health care for all
13  states, what is your understanding of what that
14  means?

15    A    Well, I should say that in this state --
16  let's say a disaster occurs in Louisiana.  Red Cross
17  has chapters located in Louisiana.  They have
18  volunteers that come in to assist with those.  And
19  Red Cross has a policy of making sure that their
20  volunteers and paid staff who are assigned to go to
21  these disaster areas are fit for duty.
22        So she is not only responsible for making

Page 165

1  sure they're fit for duty, but she is also
2  responsible for making sure those chapters in that
3  area or that state or that nurse assigned to that
4  chapter and state are complying to the Red Cross
5  policies for OSHA standards, deployment standards,
6  or physical examinations, for housing.

7    Q    Let's take one piece at a time.  With
8  respect to the making sure that people are available
9  to be or are the appropriate -- or are healthy
10  enough to be deployed, that's essentially what you
11  were doing for AFES and for international, right?

12    A    On a smaller scale.

13    Q    How many AFES deployments were there per
14  year?

15    A    I wasn't there for a full year, but the
16  six months that I was there, we probably sent out
17  anywhere from maybe 20 to 30 teams of three people
18  each.

19    Q    So 20 to 30 teams of about three people
20  each is what you sent out in a six-month period?

21    A    Yes, that's my estimate.

22    Q    So you basically were responsible for

Page 166

1  ensuring those people were fit for duty, correct?
2      A   Um-hmm.
3      Q   You need to answer audibly.
4      A   Oh, I'm sorry.  Yes.
5      That's all right.  It's been a long day
6  and getting longer.
7      A   I'm not making it longer.
8      Q   I'm not suggesting that you are.  We are
9  all here together in the same boat.  It's just
10 getting longer.
11      How many people -- well, how many
12 disasters a year does the Red Cross respond to; do
13 you know?
14      A   No, I don't know, but there are disasters
15 that are in the news like Sri Lanka, and there are
16 disasters that are not in the news.  Whether it's a
17 train wreck or if someone's house had burned, they
18 respond -- the chapter will respond to that need.
19      Q   Let's be fair, though, because, when you
20 look at what national does with respect to
21 disasters, hopefully, as you well know, national
22 doesn't get involved unless the disaster reaches a

Page 167

1  certain scope.
2      I understand that there are daily
3  disasters that occur everywhere that chapters deal
4  with on a daily basis that doesn't involve national
5  and many times that doesn't involve even deployment
6  of chapter staff.
7      Do you have any understanding of how many
8  disasters there are per year where the Red Cross has
9  to deploy national staff?
10      A   I don't have any knowledge of how many
11 disasters they respond to.
12      Q   Do you have any knowledge as to how many
13 personnel have to have their health situation
14 reviewed each year for disaster services purposes?
15      A   I'm sure every personnel does, whether
16 they are paid or volunteer.  That's part of the Red
17 Cross policy.
18      Q   Do you understand how many people that
19 is, is my question?
20      A   That's variable.  I don't know, but it's
21 a variable number.
22      Q   Do you know what -- okay.  That's fair

Page 168

1  enough.  You don't know.  Was the Red Cross in the
2  process of responding to a disaster on the day that
3  you shadowed the volunteer that you shadowed?
4      A   I can't remember.  I don't know what
5  happened on May 12, 2000, if it was a fire or train
6  wreck.
7      Q   I didn't ask about a particular disaster.
8  I would assume that if you guys were busy going
9  through a bunch of health records that you would
10 know if there was a disaster going on on the one day
11 you shadowed her.  That's all I'm asking.
12      A   I don't remember that.
13      Q   Do you recall what you did on that one
14 day?
15      A   On May 12th?
16      Q   On the one day that you shadowed her.
17 Was that on May 12th?
18      A   No.  I was asking you about May 12th.
19 But you are asking me the day that I shadowed with
20 Carolyn?
21      Q   Yeah.
22      A   I shadowed with Carolyn.  I spent the day

Page 169

1  with her, time with her.
2      Q   I understand.  What did you do?
3      A   Went over all the policies and procedures
4  and things that she does, all the project planning
5  that she's done --
6      Q   So is it fair to say --
7      A   -- got a history of what's been going on
8  and the help that she needed.
9      Q   Is it fair to say, then, that you didn't
10 really shadow her on the job; what you did was sit
11 down and talked with her about what the job was
12 about?
13      A   Well, they called it shadowing, so I'm
14 just --
15      Q   I understand.  I'm just trying to
16 understand what that means.  That's all.
17      A   Well, that's a term that --
18      Q   I'm not suggesting that you said anything
19 inappropriate.  I just want to know, is it fair to
20 say that rather than working with her for a day, the
21 two of you sat down and said, look, this is the
22 deal?  That's my question.

Page 186

1 and weight, hepatitis A, B; measles, rubella, you
2 know, the polio vaccines --
3    Q   For disasters?
4    A   -- you know, childhood immunizations --
5 no. For AFES and international. And including
6 their immunizations for tropical travel, if they
7 went international.
8    Q   What about for disaster services?
9    A   Don't know.
10    Q   You don't know?
11    A   Um-um.
12    Q   Now, you dealt with OSHA issues in your
13 previous job, correct, in staff wellness job?
14    A   I dealt with OSHA issues related to
15 workmen's comp injuries and -- injuries that happen
16 within that building or the three -- or two other
17 campuses.
18    Q   And you dealt with ergonomic design,
19 right?
20    A   Within the campus.
21    Q   Sure. And you dealt with individuals'
22 physical capacities, in the sense that you helped on

Page 187

1 ADA issues, right?
2    A   Yes.
3    Q   You dealt with insurance claims at the
4 Red Cross, right?
5    A   Yes, workmen's comp.
6    Q   Workers' comp. And you maintained the
7 insurance claims, right?
8    A   We filed them.
9    Q   And you dealt with workers' compensation
10 claims, right?
11    A   Yes. I said that. If you are making a
12 clarification between another insurance claim, the
13 only insurance claims I was responsible for was
14 workmen's comp, no other claims.
15    Q   You had dealt with other insurance claims
16 before in your career, though, right?
17    A   That's correct.
18    Q   In your view, is there significant
19 difference between working with the workers'
20 compensation claims and any other types of insurance
21 injury claim?
22    A   There can be some differences, depending

Page 188

1 on the subscriber.
2    Q   Well, assuming you have the same
3 subscriber. If someone gets injured on the job or
4 if someone gets injured off the job, is there a
5 significant difference in dealing with that claim?
6    A   Yes, because it could be related to
7 benefits, I mean, how they file, the timeliness of
8 the file. Do they have to file immediately? Can
9 they go to the emergency room and file later? You
10 know, there's various caveats to it.
11    Q   Other than the timing, any other
12 differences.
13    A   Between health insurance claim and a
14 workmen's comp claim?
15    Q   Yes.
16    A   Not too much. You know, the health
17 insurance, you may have pre-certification, other --
18 yeah, things like that, but it just depends on the
19 language of the --
20    Q   Neither one of them are very complicated,
21 right?
22    A   Well, it depends.

Page 189

1    Q   On what?
2    A   Well, it depends on if, like I said, if
3 there is a certification, if there is a need for a
4 continued stay that I have to follow up to see if
5 the person is still in the hospital, is the stay
6 medically necessary, is any second opinions done, if
7 there was a surgery.
8       With workmen's comp claims, all I do is
9 take -- the injury had occurred, I report it, I let
10 it go. I'm not responsible for follow-up. I'm not
11 responsible for if they, you know, got surgery. I'm
12 not responsible if they get paid or not paid. You
13 know, I don't actually get involved in that.
14       In health claims, I have been involved
15 through the whole process, from the filing to
16 discharge to even the appeal process. So --
17    Q   Do you know whether or not from the
18 third-party injury claim perspective that the
19 treatment would be any different? Like, for
20 example, a volunteer claims some injury and it's not
21 a workers' comp claim, do you know what the Red
22 Cross internal process is on dealing with those

Page 190

1  claims?
2     A   If the worker had an injury --
3     Q.  Not a worker; a volunteer.  A volunteer
4  goes out, gets injured upon a disaster.  Do you know
5  if that's a workers' comp claim or some type of
6  other third-party claim?
7     A   Well, we would have to investigate it.
8  We would have to investigate it.  You were hoping
9  that that volunteer would say, my injury was
10  job-related.
11    Q   Well, let's say it's job-related.  Is it
12  a workers' comp claim, in your view?
13    A   If it's job-related, it is a workmen's
14  comp claim.
15    Q   What if it's related to volunteer work
16  that the volunteer was doing on the disaster?
17    A   Outside of his job duties?
18    Q.  Yes.
19    A   Then he would have to go through his own
20  health insurance.
21         (Whereupon, Deposition
22         Exhibit Number 12 was marked

Page 191

1           for Identification.)
2        BY MR. PANAGOPOULOS:
3     Q   You have been handed what has been marked
4  as Powell Exhibit Number 12.  Have you seen this
5  document before?
6     A   I have.
7     Q   Did you read this document on or about
8  February 9, 2005?
9     A   Um-hmm.
10    Q   You need to answer orally, ma'am.
11    A·  Oh, I'm sorry.  Yes.
12    Q   Now, was there any discussion among
13  employees at the Red Cross about changes going on at
14  the Red Cross?
15    A   There was a lot of discussion.
16    Q   And did the discussions about changes
17  continue after this February 2005 e-mail?
18    A   Yes and no.  I think it got kind of
19  hush-hush because when we had our meeting with Anna
20  Shearer, she was just saying what -- the changes
21  that were happening, a lot of people were talking
22  about it, and it's a very hard issue for a lot of

Page 192

1  people and not to get involved in the rumor mills
2  and that if any changes that were coming that
3  affected our department, she would let us know.
4     Q   And if you look at the third page of this
5  document, page 3 of 3.  It talks about --
6     A   Page 3 of 3.
7     Q   Let me know when you are there.
8     A   I'm there.
9     Q   Okay.  If you look at the -- do you see
10  the four bullet points?
11    A   Um-hmm.
12    Q   And if you look right below that, it
13  talks about changes that reduce the reporting
14  layers, grade efficiency, and improve overall
15  organizational lines and functions.  Do you see
16  that?
17    A   Yes, I do.
18    Q   And do you see that it states there, they
19  lay the groundwork for further evaluating the
20  activities and work products of national
21  headquarters departments.  Do you see that?
22    A   I will review these recommendations?

Page 193

1     Q   No.  Do you mind if I point it out to
2  you, ma'am?
3     A   They lay the groundwork for further
4  evaluating the activities and work products of the
5  national headquarter departments.
6     Q   Right.  And the next sentence tells you
7  that, department leaders will be identifying
8  products and activities that can be reduced or
9  stopped altogether and also work that needs to be
10  realigned and impact of the actions on the top
11  structure of their departments.  Do you see that?
12    A   Yes, I do.
13    Q   And it says that the recommendations
14  would be reviewed with anticipated decisions in late
15  March.  Do you see that?
16    A   That's correct.
17    Q   So you guys were told at least as of
18  February 9, the Red Cross was considering further
19  organizational structures which could include the
20  elimination of some functions, right?
21    A   Yes.
22    Q   You didn't misunderstand that, did you?

Page 194

1    A   No, but it's very general.  It could mean
2  my unit, could not mean my unit.
3    Q   Sure, absolutely.
4    A   But that's not the issue.
5    Q   You were offered the disaster job,
6  correct?
7    A   Correct.
8    Q   At what salary?
9    A   They didn't offer a salary.
10   Q   At what rate of pay?
11   A   They wanted me to move into the job at my
12 same salary.
13   Q   Same salary?
14   A   Um-hmm.
15   Q   You need to answer orally.
16   A   I'm sorry.  Yes, they wanted me to enter
17 the job at my same salary.
18   Q   So they did tell you a salary and it was
19 your same salary?
20   A   Well, they didn't give me the number, but
21 there was -- okay.
22   Q   You knew --

Page 195

1    A   But no, I didn't get a verbal say.  You
2  want me to say that someone said -- no -- you want
3  me to say that Anna came and said to me, you will be
4  paid your same salary.  No, that did not come out.
5    Q   All I want to know is were you offered a
6  job at the same pay rate.
7    A   They offered me a job.
8    Q   And it was at the same pay rate, right?
9    A   They did not discuss -- I brought up the
10 issue of salary.
11   Q   And did you find out in bringing up the
12 issue of salary that it was at the same pay rate?
13   A   I discovered the job was at a higher
14 rate.
15   Q   Well, the job you were being offered.  I
16 understand you believed you should be paid higher.
17 But were you offered a job at the same pay rate?
18   A   They offered me a job.  They didn't offer
19 any salary.
20   Q   You didn't know what you were going to be
21 paid?
22   A   No.

Page 196

1    Q   They never talked about what you would be
2  paid?
3    A   No.  It was not until I investigated the
4  job differences and was shadowing with Carolyn that
5  I realized that I might be due some compensation
6  here.  I know you don't want to hear that, but
7  that's my answer.
8    Q   I understand that.  All I want to know
9  is -- apparently, at some point in time you
10 discovered somehow that when they gave you the job
11 offer, the pay that you would be paid is the same
12 rate that you were being paid at the time, right?
13   A   I discovered, when I spent the day with
14 Carolyn, that this job was beyond the scope of what
15 I was doing.  I know you don't want to hear that.
16   Q   It's not that I don't want to hear it.  I
17 understand.
18   A   But no one offered me a salary.  No one
19 offered me a salary.
20   Q   I will tell you right now that I
21 understand that you believe you should have been
22 paid more, okay.  I understand that.  You have made

Page 197

1  that clear.  That's very obvious.  Okay.  I
2  understand that.
3        All I want is the simple answer to my
4  question, which is what was offered to you; not what
5  you thought you were worth.
6    A   I was offered nothing.  There was not a
7  formal offer.
8    Q   Did you have an understanding as to what
9  the Red Cross intended to pay you?
10   A   No, I did not.
11   Q   So they offered you a job without any
12 numbers, whatsoever?
13   A   That's correct.
14   Q   Did there ever come a point in time when
15 you found out what number the Red Cross intended to
16 pay you for that job?
17   A   Yes, there was a point in time that I
18 did.
19   Q   At what point in time did that occur?
20   A   When I went to talk to Rick Pogue, who
21 was the director or --
22   Q   To Rick Pogue, P-O-G-U-E?

Page 198

1   A   Yes.

2   Q   And when was that?

3   A   I will guesstimate.  It was definitely
4  after I had shadowed with Carolyn Williams.

5   Q   And what were you told?

6   A   Maybe a week or so after that.

7   Q   And what were you told?

8   A   Well, he went over to his PC and looked
9  at the different pay grades and saw that there was a
10  difference in the pay grades.  And he said that he
11  understood my position and he will have Al Vincin
12  investigate.

13   Q   Well, were you ever given a number of
14  what you would be paid in that position?

15   A   Yes, he did, and we gave that pay range,
16  I think.

17   Q   Excuse me?

18   A   Yes, we did, and I gave my time to pay
19  range of what it was.  But it started at like 62.
20  It's a $5,000 difference from what I was making.

21   Q   Did they offer you a pay in that range?

22   A   No.  Al Vincin, actually, when he did

Page 199

1  contact me several weeks later -- was that it would
2  be a $5,000 difference.

3   Q   So that you would receive a $5,000
4  increase?

5   A   He said it was a $5,000 difference.

6   Q   Did you understand that to mean an
7  increase?

8   A   I understand that to be an increase.

9   MR. PLITT:  Can we take a two-minute
10  break?

11   MR. PANAGOPOULOS:  You bet you.

12   (Thereupon, a brief recess was
13   taken.)

14   (Whereupon, Deposition
15   Exhibit Number 13 was marked
16   for Identification.)

17   BY MR. PANAGOPOULOS:

18   Q   You have been handed what has been marked
19  as Exhibit Number 13.  Who is Vicky Fleming?

20   A   Vicky Fleming is the senior benefits
21  administrator.  She is the person who did the
22  FMLA chart.

Page 200

1   Q   Okay.  She forwarded to you an e-mail
2  dated May 11th that was distributed to everybody,
3  right, distributed to all?

4   A   Right.

5   Q   Did you not see it on May 11th?

6   A   Right.  She asked me if I got it.  I had
7  not opened up my computer.  She had already gotten
8  there and taken off her coat.  I was coming into the
9  office taking off my coat.

10   She said, did you get the e-mail that the
11  unit was closing?  And I don't think I did,
12  not knowing what she was saying.  I mean, I knew we
13  had it, but I didn't know the attachment and that it
14  affected us.  So she forwarded it, you know, again
15  to me.

16   And I said, oh, yeah, I already have that
17  one.  So that's how that happened.

18   Q   I guess I'm a little confused.  You had
19  already read this particular e-mail on June 3rd?

20   A   No -- oh, on June 3rd, I had already read
21  it, that's correct.

22   Q   And she sent this to you on June 3rd?

Page 201

1   A   Right.

2   Q   But you didn't understand that your
3  department was closing on June 3rd?

4   A   No.  She had asked me did I receive this
5  memo, and I was like, no, I don't have that memo.
6  And she says, yes, you do.  And I said, no, I don't.
7  She sent it to me again.

8   It was a miscommunication of a memo.  I
9  was thinking another memo was sent out about another
10  layoff, but what she was sending me was the memo of
11  our layoff.  There was no difference in the memo.
12  And that's why I got it on June 3rd.

13   Q   So let me see if I understand.

14   MR. PLITT:  This is like going to a --
15  (unintelligible.)

16   THE WITNESS:  Right.

17   MR. PANAGOPOULOS:  Going to the what, the
18  dentist?

19   MR. PLITT:  No, I didn't say that.

20   THE REPORTER:  What did you say?  I
21  didn't hear it.

22   THE WITNESS:  I feel like I'm at the

Page 202

1 dentist. He can say it.

2     MR. PANAGOPOULOS: I won't be offended.

3 Come on. Now you've got me curious.

4     THE WITNESS: Oh, let him hang.

5     MR. PLITT: That's all right. Go ahead.

6     BY MR. PANAGOPOULOS:

7   Q  May 11th, the e-mail comes out.

8   A  Right.

9   Q  You don't read it until -- that day

10 because it's late in the day, so you read the e-mail

11 May 12th?

12   A  Right.

13   Q  That's when you understand your

14 department is gone, right?

15   A  Right.

16   Q  June 3rd, you come in, you are talking to

17 Vicky Fleming. She says, hey, do you realize you

18 are gone; did you see the memo?

19   A  No, I can't remember what our

20 conversation -- we were talking about all the

21 changes that were going on. And I understood her as

22 if another layoff was happening, another memo was

Page 203

1 sent out. So she said, you got the memo. I'm like,

2 no, I didn't get that memo.

3     So when I got it, I realized it was the

4 same one. I just misunderstood her in our

5 conversation. So it wasn't like I didn't have it.

6 I thought she was talking about another department

7 was going down.

8   Q  Did you keep copies of leave records?

9   A  Of my leave records? I didn't have any

10 leave.

11   Q  What do you mean you didn't -- you

12 didn't have any leave records; is that what you

13 said?

14   A  No. I don't even think I called in sick.

15 I don't remember really missing a day.

16   Q  Did you keep a copy of your PTO records?

17   A  Of my what?

18   Q  PTO.

19   A  Oh, paid time off?

20   Q  Yes.

21   A  No, because I don't think I took any time

22 off. I don't recall missing any days.

Page 204

1   Q  Now, as I recall your earlier testimony,

2 you indicated that no one at the Red Cross ever told

3 you what the pay would be for the new job; you just

4 figured out it was going to be the same until you

5 got a $5,000 increase offer on it; is that correct?

6   A  I wasn't offered a $5,000 increase. Rick

7 Pogue said there was a difference in the salary. He

8 gave me the salary range, and Al Vincin verified the

9 salary range, said there was a $5,000 difference

10 between the position that was closed and the

11 position that I was moving into.

12   Q  I see.

13     (Whereupon, Deposition

14     Exhibit Number 14 was marked

15     for Identification.)

16     BY MR. PANAGOPOULOS:

17   Q  You have been handed what has been marked

18 as Exhibit Number 14. It's an e-mail string. Do

19 you recognize these e-mails?

20   A  Right. This is my e-mail that I sent

21 to --

22   Q  Well, it starts off on Friday the 13th,

Page 205

1 you sent an e-mail to Bill Malfera; is that right?

2   A  That's correct.

3   Q  And on the 13th, you are basically asking

4 Mr. Malfera to discuss compensation; is that right?

5   A  That's correct.

6   Q  And he tells you on that same date,

7 right, that compensation matters need to be directed

8 to Andrea Longuelow, right?

9   A  Um-hmm.

10   Q  You need to answer orally.

11   A  Oh, yes, it does.

12   Q  And then Carol Miller sent you an e-mail

13 on Sunday, the 15th, saying, hey, sorry about any

14 confusion, but your salary remains unchanged, right?

15   A  Right.

16   Q  Excuse me?

17   A  Right.

18   Q  So that you knew as of May 15th the

19 salary you were being offered in the new position

20 was the same as in the old position, correct?

21   A  Right, and that's when I went to Rick

22 Pogue. And if you'll notice on this, it's the

Page 206

1 disaster response position.  It was not wellness,
2 but that's okay.  You don't want to know that.
3    Q.  I mean, to you, is there any significance
4 in the job title?
5    A.  Yes, it is because that job title was a
6 prized position.  It was a more responsible
7 position.  Working in that unit was a more prized
8 unit, and they compensated for working in that unit
9 because of the challenges and the responsibilities
10 and longer work hours in that position, so, yes.
11    Q.  So that's what to you is the significance
12 in the title change?
13    A.  Right, because they tried to make it
14 similar like it was something I was already doing.
15    Q.  What do you mean they tried to make it
16 similar?  Who did you talk to about why the change
17 was made in the title?
18    A.  Well, the day that I spent with Carolyn,
19 she was very upset that they changed the title of
20 the position.  And I don't know what -- who she
21 talked to, but she verbally said to me they told her
22 they're changing it and there's nothing that she can

Page 207

1 do about it.
2    Q.  So they changed the job title, but it
3 doesn't sound like they told her why, does it?
4    A.  No.
5    Q.  And did you talk to anyone about why the
6 job title was changed?
7    A.  No.
8    Q.  Did anyone ever tell you why the job
9 title was changed?
10    A.  Because they wanted it to be similar to
11 my position.
12    Q.  No.  My question was, did anyone ever
13 tell you why the job title was being changed?
14    A.  I think in one of the e-mails they tried
15 to say that it was a similar position.
16    Q.  So you are telling me that there is an
17 e-mail here in this stack that says we're changing
18 the job title because it's a similar position?
19    A.  No.  What it says is that my skills in
20 the wellness unit were similar skills in the
21 disaster position and they were equal.  And if that
22 was the case, they should have originally had the

Page 208

1 same title, but they didn't.
2    Q.  My question to you is, I believe, simple,
3 did anyone ever tell you that they were changing the
4 job title of the position to make it look similar to
5 your previous position?
6    A.  No one told me they were changing the
7 title to make it look like a similar position.
8    Q.  Thank you.
9        (Whereupon, Deposition
10        Exhibit Number 15 was marked
11        for Identification.)
12    BY MR. PANAGOPOULOS:
13    Q.  Who is Tina Johnson?
14    A.  Tina Johnson is a young lady who was
15 interested in working in staff health in the
16 position they had offered.  She sent this
17 e-mail to Carolyn Williams and somewhere Carolyn
18 Williams felt that I should have this information
19 specifically because it dealt with the job duties.
20        And somewhere in along paragraph number
21 3, she talks about staff health, which is the title
22 of that position; that it was beyond the scope of

Page 209

1 the activities that she had given me, the activities
2 that she does, and that why this person, who was
3 physically challenged, could not handle this
4 position.
5    Q.  Well, you are saying that the third
6 paragraph does all that?
7    A.  Well, beginning in the third paragraph.
8 That's where it starts.
9    Q.  Let's figure that out.  It says, staff
10 health is just not at HQ anymore, right?
11    A.  That's correct.
12    Q.  So that indicates that --
13    A.  I travel.
14    Q.  -- you might have to travel, right?
15    A.  Absolutely.
16    Q.  And that was in the earlier job
17 description that we went over?  I believe it was
18 Exhibit Number 3, correct?
19    A.  That's correct.
20    Q.  It indicated, I believe, 25 to 50 percent
21 travel time, something along those lines?
22    A.  Correct, which I've never had to do.

Page 214

1  Q  Did you talk to her about the job?
2  A  When I first came, she told me about the
3  position and --
4  Q  Did she bear any scars from disaster
5  relief operations?
6  A  The scars that she beared [sic] is the
7  difficulty that it was in doing the assignment, the
8  extended travel, the extended time.
9  Q  So it's time and travel?
10  A  Time and travel and also exposure
11  because --
12  Q  What was she exposed to?
13  A  Well, she talked about her experience
14  at -- down at 9/11 when she was there.  Whether she
15  was there in relation to that disaster position or
16  not, but she was there.
17  Q  She was there, but you don't even know if
18  it was for this position?  You do understand that --
19  A  Because she was a Red Cross volunteer.
20  Q  Let me finish.  Right.  And that's my
21  point.  She wasn't necessarily there in that
22  position; she was there in her position as a

Page 215

1  volunteer.
2  A  Ummm.
3  Q  Okay.  Did you talk to her about any
4  exposure related to the position?
5  MR. PLITT: I think we just have to let
6  the witness answer some of the questions.  I think
7  that at one point the witness was trying to
8  formulate an answer, and you went on to another
9  question.
10  MR. PANAGOPOULOS: You know what, she can
11  tell me if she's trying to formulate an answer.
12  What I have heard -- I'm sorry, but what I've heard
13  are not answers to my --
14  THE WITNESS: To his liking.
15  MR. PANAGOPOULOS: Well, no.  To my
16  questions.
17  BY MR. PANAGOPOULOS:
18  Q  I don't care about my liking.  I just
19  want to know what it is you are going to say with
20  respect to my questions.
21  MR. PLITT: I think at one point the
22  witness was making a sound, getting ready to say an

Page 216

1  answer.
2  MR. PANAGOPOULOS: Well, I interrupted in
3  the middle of a sound; I apologize.
4  BY MR. PANAGOPOULOS:
5  Q  But did you talk to her about what
6  exposure she had while in the position; not as a
7  volunteer, but in the position?
8  A  Not per se.
9  Q  Did you ever read the staff health
10  workbook?
11  A  No.  It wasn't introduced to me at the
12  time that I was with Carolyn.
13  Q  I'm sorry.  It what?
14  A  It was not introduced to me at the time
15  that I was with Carolyn.
16  Q  Did you ask about it?
17  A  No.  We spent the day in showing me
18  initially what I needed to know.
19  Q  The answer to my question is no.  And
20  when you saw this e-mail referring to the staff
21  health workbook, the manual, did you ask her about
22  it then?

Page 217

1  A  No, I did not ask her about it.  I didn't
2  even know --
3  Q  All you did was forward it to your home
4  e-mail account, right?
5  A  That's right.
6  Q  Were you forwarding all these e-mails to
7  yourself in preparation for a lawsuit?
8  A  Yes, because I felt I was being cheated.
9  Q  So as of June 3rd, you were preparing to
10  sue?
11  A  Yes.
12  Q  When did you make the decision to sue?
13  A  Probably sometime in August, July.
14  Q  August, July of what --
15  A  July of 2005.
16  Q  But you were preparing to sue before
17  then?
18  A  Yes.
19  Q  At what point did you think, I may have
20  to sue here?
21  A  When I was threatened to resign -- that I
22  had to resign.

## Page 218

1  Q   When was that?  When were you told you
2  had to resign?
3  A   When Jane Smith called me and was asking
4  me -- or telling me that I had by 12:00 noon to
5  decide if I was going to accept this position under
6  Bill Malfera.
7  Q   What date was that?
8  A   I don't know.  It's in the e-mail.  I
9  can't remember.  It was sometime in June.  And my
10  response to her was that, I was still -- I'm waiting
11  to hear from Rick Pogue and Al Vincin about the
12  salary negotiation, despite Carol saying no, there's
13  some confusion.
14       About three hours or so, at the end of
15  the day, Al Vincin calls me while he's on a train
16  trip to somewhere else, and we have the discussion
17  about the salary difference and that, that it's, you
18  know, the $5,000 salary difference, and if I didn't
19  like the job, I can just quit.
20       And so the next day Andrea Longuelow says
21  to me, well, I need your resignation because you
22  didn't accept this position.  I said, I'm not

## Page 219

1  resigning from anywhere because you eliminated my
2  job.  There's nothing to resign from.  And that too
3  is also in the e-mail.
4  Q   Yeah.  Did you ever meet with Carol
5  Miller?
6  A   Nope.  About this particular issue or --
7  Q   About any issue ever.
8  A   I met with her for the issue of
9  Oklahoma -- the Oklahoma -- Oklahoma environmental
10  issue.  That's the first time I dealt with her one
11  on one about any procedures.
12  Q   So it wasn't an issue relating to you; it
13  was a work issue related to the duties to your
14  position and --
15  A   To other employee, yes.
16  Q   Other employees.  Other than that, did
17  you ever talk to her?
18  A   No.  She wasn't a person that was
19  friendly.
20  Q   How often did you see her?
21  A   I saw her quite often because we had what
22  they would call HR get-togethers.  We would have a

## Page 220

1  theme party or something like that.
2  Q   Did you ever tell anyone at the Red Cross
3  that you believed you were being treated unfairly?
4  A   A lot of people told me that I was being
5  treated unfairly.
6  Q   No.  My question was, did you ever tell
7  anyone that you believed you were being treated
8  unfairly?
9  A   No.  I just continued with my job.
10  Q   You read the Red Cross' policy manual,
11  correct?
12  A   Um-hmm.
13  Q   You need to answer orally.
14  A   Yes.
15  Q   Do you know what the confidential hotline
16  is?
17  A   Like for employee assistance?
18  Q   Well, for employee complaints.
19  A   I know what the hotline is, and I refer
20  people to hotlines, but --
21  Q   Have you ever called it?
22  A   I thought that my issue would be resolved

## Page 221

1  by going through the chain of command that I did.
2  Q   So the --
3  A   But I did not call it.
4  Q   Thank you.  That's all I am asking.  Did
5  you ever lodge any type of complaint with HR about
6  how you were being treated?
7  A   No, I did not.
8  Q   Did you ever lodge any type of complaint
9  with the office of general counsel regarding how you
10  were being treated?
11  A   No, I did not.
12  Q   You indicated that you worked with
13  general counsel no ADA issues, right?
14  A   Yes, I did.
15  Q   Who in general counsel's office did you
16  work with?
17  A   Oh, my goodness.  I want to call her
18  Cathy.  I always said her name wrong.  Give me a
19  moment.  I never thought I had to remember those
20  people.  Oh, my gosh.  Cisneros, Mary Elizabeth
21  Cisneros, C-I-S-N-E-R-O-S.  And I know it's another
22  person, a woman who was part time.

Page 222

1    Q    Kind of a long name?  Cheveness, perhaps?
2    A    No, I don't remember that name, but I
3  can't really remember any names.  And I'm trying to
4  think of the guy's name.
5    Q    Chris Hanson?
6    A    Yes, Chris Hanson.
7    Q    How many times did you talk to any of the
8  attorneys from general counsel's office about ADA
9  issues while you were with the Red Cross?
10    A    I sat in on almost every ADA meeting.
11    Q    The question is, how many times?
12    A    Oh.  How often was ADA meetings?  Once or
13  twice a week or once every other week or something.
14    Q    So you talked to these people on a fairly
15  regular basis?
16    A    Right.  Actually, I had more outside or
17  friendly conversation with Mary Elizabeth nor [sic]
18  I had with Chris.
19    Q    And you knew that they were the Red
20  Cross' employment attorneys, right?
21    A    Right.
22    Q    Did you ever talk to them about the fact

Page 223

1  that you believed you were being treated unfairly?
2    A    I remember Mary Elizabeth giving an
3  in-service about that.  They are not employees in
4  terms -- who will handle grievances.  I never
5  understood that that's what they were there for, to
6  handle my grievance.  They were there to handle
7  recommendations of how the managers or the employer
8  should respond to the needs of the clients.
9        So for me to go to Mary Elizabeth and say
10  they are cheating me out of my pay, that -- I felt
11  -- I understood that to be inappropriate, so I
12  didn't.
13    Q    Did you understand where you would go to
14  to complain about that issue?
15    A    No.  I just started looking for
16  employment lawyers, civil lawyers.
17    Q    So you didn't even bother to look in the
18  Red Cross policy manual to see what the complaint
19  procedures were?
20    A    I did.
21    Q    And you chose not to follow it?
22    A    I chose to go and get my outside

Page 224

1  attorney.
2    Q    So the answer to my question is, you
3  chose not to follow that procedure?
4    A    I chose to get my outside attorney, yes,
5  I did.
6    Q    So, again, the answer to my question is,
7  you chose not to follow that procedure?
8    A    Okay.  Correct.
9    Q    Thank you.
10            (Whereupon, Deposition
11            Exhibit Number 16 was marked
12            for Identification.)
13        BY MR. PANAGOPOULOS:
14    Q    Do you recognize this document?
15    A    Yes.
16    Q    What is this document?
17    A    This is a document on various things or
18  promotions at the -- what the wellness unit would
19  do.
20    Q    Who created this document?
21    A    I believe it was Linda Burnett and
22  another nurse that worked there.

Page 225

1    Q    Did you have occasion to use this
2  document?
3    A    No.
4    Q    Did you provide health counsel?
5    A    I did.
6    Q    It says, we see 20 to 30 employees on a
7  walk-in basis each day for health counseling.  Is
8  that correct?
9    A    This is an older setting or an older
10  procedure or job description.
11    Q    Right.
12    A    So I want to say that it's more.
13    Q    You were seeing more than 20 to 30
14  employees a day?
15    A    Absolutely, because we kept statistics of
16  how often the blood pressures or the lactation rooms
17  were used, or first aid, and we did it on a monthly
18  basis, and we would see sometimes anywhere -- 400,
19  500 people within that month, using the various
20  amenities in the room, whether it's blood pressure,
21  lactation room, someone getting first aid, someone
22  came in to rest.

Page 226

1  Q  So those are just strict nursing services
2  that you were providing, right?
3  A  Right, and we didn't do medication.
4  Medication is not what we did currently.  We did not
5  give medication.
6  Q  There was a medication cabinet, right?
7  A  Right, there was -- well, they are
8  talking about medication like -- someone -- you can
9  give someone their allergy shots, something like
10  that, no.  We are talking over-the-counter stuff,
11  which they had at one time open for people to take.
12  But Tylenol, ointment, so over-the-counter and
13  medication can be considered differently.
14      When I think medication, I'm thinking
15  prescribed medication, and we don't give prescribed
16  medication.  Over-the-counter, we can offer.
17  Q  Well, this doesn't distinguish between
18  the two.
19  A  Right, so that's why I wanted to clarify.
20  Q  Right.  So there was over-the-counter
21  medication?
22  A  Yes.

Page 227

1  Q  Okay.  Health promotion and seminars --
2  tell me about that -- for women's health.  What is
3  that?
4  A  It was before my conception.  It was
5  before I was there.
6  Q  Did you do any women's health seminars?
7  A  We did not do -- we were planning for
8  brown-bag lunches under Ken Thiel, but that never
9  took off.  Why, I don't know.
10  Q  Did you do any other types of seminars?
11  A  We did not do any brown-bag lunches.
12  Most of our health education was done over the
13  e-mail, over -- through e-mail, through the web, or
14  through the publications that were purchased by the
15  unit, and they were available in the unit, as well
16  as me or Jane dispersing them throughout the campus.
17  Q  Did you ever write any of the e-mail?
18  A  I did one, and I can't think which one it
19  was.  I think it had -- something around the
20  holidays.  We were doing proportions on foods and
21  portion sizes.  I think that's one, and then after
22  that, we really couldn't do any because everybody

Page 228

1  was sending something out about health and drinking
2  and driving.
3      That's when we got the memo to cease with
4  that type of education.
5  Q  Too many e-mails, huh?
6  A  Well, you know, the wellness unit was
7  targeted to do those things.  It should have come
8  from the wellness unit, but that's a different
9  political piece.  I won't even try to get into that.
10  Q  Health and safety of the pilot
11  instructor.  You didn't do any instruction, right?
12  A  No.
13  Q  Weight watchers workplace class.  Was
14  that organized?
15  A  Well, there was a group of women who did
16  a weight loss contest, and I helped with them.  I
17  was the person who kept the -- that tallied the
18  weight, who was involved in the teams and we did
19  their initial weigh-ins.  And they would come in and
20  weigh weekly.
21      I was the person who kept the weight, and
22  they, amongst themselves, decided what the goal

Page 229

1  prize would be who accomplished that.  But it wasn't
2  weight watchers.
3  Q  And then we've got miscellaneous services
4  performed as needed.  I think we have already talked
5  about --
6  A  Yes, we have.
7  Q  -- most of these.
8      Archive records.  Were you still
9  archiving records?
10  A  We did have an archive records system,
11  but most of the records that I had archived -- well,
12  I didn't archive them.  They were just in the
13  closets.  You know, older records were put in closed
14  closets.
15      And so I discovered those records as I
16  was closing down the unit.
17  Q  What did you do with them?
18  A  I labeled them and showed Anna what was
19  what.
20  Q  Now, the next thing it's got is a time
21  breakdown for wellness associate.  Do you see that?
22  A  Um-hmm.

Page 230

1    Q   You need to answer orally.
2    A   Oh, yes, I do.
3    Q   It states, 60 to 70 percent of the
4 wellness associate's time is spent dealing with
5 short-term disability. Do you see that?
6    A   Yes, I do.
7    Q   Was that your experience as well?
8    A   No, because Vicky Fleming, the senior
9 benefits administrator, handled that job.
10    Q   By that point in time, by the time you
11 got into this job, you were -- I think you already
12 testified that you were spending most of your time
13 dealing with AFES issues. Correct?
14    A   That's correct.
15    Q   That means you didn't deal with
16 short-term disability at all, then, because Vicky
17 Fleming was handling that?
18    A   Only if she had questions about the
19 medical aspects of it.
20    Q   How much of your time was spent dealing
21 with medical questions on --
22    A   She was a pretty proficient individual.

Page 231

1    Q   Would you hear from her once a week, once
2 a day, once a month, once an hour?
3    A   Maybe once a week, if that.
4    Q   Family medical leave. Did you deal with
5 family medical leave certifications?
6    A   It was only Vicky, unless she had a
7 question, because that required, you know, going
8 into the pay scale and looking at how many days they
9 had, et cetera, and so I wasn't involved in that.
10    Q   Did you deal with physician
11 certifications for family medical leave?
12    A   Ken did that. And when Ken left, I took
13 it over and then when I took it over, that wasn't an
14 issue that had come up for me to deal with the
15 certification, so --
16    Q   Got it. It was within your
17 responsibilities, but you never had to deal with it?
18    A   Right.
19    Q   We have already talked about workers'
20 comp. How many workers' comp cases did you have
21 when you were there; do you know?
22    A   I started in 2004. I don't know how many

Page 232

1 claims I did then. I would say anywhere from 10 to
2 20 in 2004 and, oh, maybe 30 claims after that.
3    Q   Does this document do a fair job of
4 describing the process for dealing with workers'
5 compensation claims?
6    A   No. She said it was 40 non-reportable in
7 2000.
8    Q   I am not talking about --
9    A   The number.
10    Q   -- how many she said. I am just talking
11 about -- if you look, she describes the process.
12 See, where it says in the bullet point, every --
13 each workers' compensation takes a minimum of two
14 hours in addition to first aid and it list duties,
15 and it starts with that first bullet and goes on to
16 the second page? That's what I'm asking.
17        Is that the process that you followed for
18 dealing with a workers' compensation case? Again,
19 not dealing with the number of employees. But is
20 that generally the process?
21    A   This is generally the process for one
22 person, as far as the time.

Page 233

1    Q   Right. So I'm at the Red Cross. Someone
2 gets tired of me and hits me on the head, I come to
3 you. You stick a bandage on me and you start this
4 process of verifying these things and making these
5 calls, correct?
6    A   Um-hmm.
7    Q   Is that correct?
8    A   That's correct.
9    Q   And did that take about two hours?
10    A   It took about two hours if there were no
11 interruptions.
12    Q   Okay. It also says, the wellness unit
13 gets frequent calls from other units requesting
14 information about the workmen's comp issues. Do you
15 see that?
16    A   Yes.
17    Q   What is your understanding of other
18 units? Does that mean chapters and blood regions?
19    A   No.
20    Q   What does it mean?
21    A   It means other -- well, I didn't hear
22 from blood regions because the blood regions had

Page 234

1  their own person who handled the workmen's comp,
2  because it's a different type of OSHA reporting.
3      Q   Right.
4      A   Within the campus, JP, that's in the
5  campus of -- the Virginia campus.  I had a workmen's
6  comp from one person in Florida.  But the majority
7  of my workmen's comp cases were locally, within
8  the chapter.
9      Q   My only question is that it says here
10  that you get calls from other units.
11      A   Yes.
12      Q   Did you get calls from chapters?
13      A   No, because each chapter had their --
14  no -- they did, because if they weren't under the
15  national headquarters umbrella, I didn't do their
16  workmen's comp.  So they had to be under the
17  national headquarters umbrella.  If that chapter was
18  under the national headquarters umbrella, yes, I
19  took it.
20      Q   So you would get calls from chapters,
21  right?
22      A   Yes.

Page 235

1      Q   And ergonomics.  You have already talked
2  about that, but it indicates the process.  Do you
3  see that, the process involved?
4      A   On-site evaluation of work stations.
5      Q   Right.  And my only question is, is that
6  a fair summation of the process of doing an on-site
7  evaluation and the time involved for that on-site
8  evaluation?
9      A   Without any extenuating circumstances,
10  yes.  If I didn't have a client that had carpal
11  tunnel or --
12      Q   Right.  We are just talking on average,
13  your average ergonomic issues.
14      A   But I just wanted to know -- that you
15  know that it takes longer if someone has a
16  medical -- underlying medical problem.
17      Q   Let's say someone has back problems.
18  What changes?  What do you do that's different?
19      A   Well, first of all, I need to know
20  exactly what the back problems are.  Was there a
21  physician's recommendation, because it could be an
22  ADA issue, more than me just doing the work --

Page 236

1  ergonomic assessment, because I don't want to cross
2  the line of what your doctor prescribed and we are
3  just doing a general ergonomic assessment.  That
4  leads to a lot of liability for me, Red Cross.
5      Q   If someone has carpal tunnel, what do you
6  have to do there?
7      A   Same thing.
8      Q   It indicates that the wellness unit
9  teaches one-hour seminars on ergonomic on demand.
10  Did you ever have to do that?
11      A   What is on demand -- we never responded
12  on demand.  The person would call and we'd set an
13  appointment.
14      Q   So if someone calls and says, you know,
15  look, I've got aches and pains; I'm not comfortable;
16  can I come in and talk to you about what I'm doing,
17  and you consult with them on ergonomics?
18      A   Well, usually, if they are in that much
19  difficulty, I try to find out what it is.  And if
20  anything, you know, offer them over-the-counter pain
21  relief, if that's applicable.
22          But if that person is in that much pain

Page 237

1  and that uncomfortable, I would recommend them
2  calling a physician and deciding what to do from
3  there, which they may recommend, come in and let me
4  see you.
5      Q   So what types of circumstances would you
6  get a call to set up an appointment to talk about
7  ergonomics?
8      A   Well, most of the calls were, I heard
9  that you have that benefit, and I just want to work
10  more efficiently and proficient, because I do a lot
11  of typing, I'm a writer, and can you help me, you
12  know, set up an appointment to do that, and that's
13  what I did.
14      Q   And so they set up an appointment and you
15  would discuss what they should be doing, in general?
16      A   Right.  We set up an appointment.  I
17  would send them some information prior to that
18  through the e-mail, and it was just on some tips on
19  what to look at before I get there.
20          I would take that same information with
21  me just in case they discarded it or lost it,
22  whatever they did.  And then we would just go from

Page 238

1  the station, looking at the chair, looking at the
2  height of the chair, looking at the desk space, the
3  lighting, you know, screen protectors, just the
4  whole set-up of the desk, the telephone, things
5  within reach, do they need a footboard underneath of
6  their legs, if they were a short person or, you
7  know, things like that.
8    Q   All right.
9       MR. PANAGOPOULOS:  Off the record.
10          (Thereupon, a discussion was
11          had off the record)
12      MR. PANAGOPOULOS:  For the record, we are
13  adjourning the deposition at approximately 4:25
14  today to -- and we are going to continue the
15  deposition on Tuesday, November 14th at 2:00 p.m.,
16  the same location.
17          (Whereupon, signature having
18          not been waived, at 4:25 p.m.,
19          the deposition was suspended
20          to reconvene on November
21          14th.)
22

Page 239

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Carolyn E. Friend, the Officer before
3  whom the foregoing Deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing Deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting by
8  me; that the said Deposition is a true record of the
9  testimony given by said witness; that I am neither
10  counsel for, related to, nor employed by any of the
11  parties to this litigation; and further that I am
12  not a relative or an employee of any attorney or
13  counsel employed by the parties hereto, nor
14  financially or otherwise interested in the outcome
15  of this matter.
16
17  _____
     Notary Public in and for
18          the District of Columbia
19
   My Commission Expires:
20  November 1, 2009
21
22

240

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                                    :
TONIA POWELL,                       :
                                    :
          Plaintiff,                :
                                    :
     vs.                            : Case No. 1:06CV1173
                                    :
AMERICAN RED CROSS,                 :
                                    :
          Defendant.                :
                                    :
- - - - - - - - - - - - - - -x VOLUME II

                         Washington, D.C.

                         Tuesday, November 14, 2006

Continued Deposition of

          TONIA S. POWELL

     Plaintiff, taken on behalf of counsel for the

Defendant in the above-entitled matter, before Denise

M. Brunet, RPR and Notary Public in and for the

District of Columbia, taken at the offices of Ballard

Spahr Andrews & Ingersoll, LLP, 601 13th Street,

Northwest, Suite 1000 South, Washington, D.C,

commencing at 2:18 p.m., when were present on behalf

of the respective parties:

Page 241

```
1            A P P E A R A N C E S :
2  ON BEHALF OF THE PLAINTIFF:
3       BRIAN C. PLITT, ESQUIRE
        1239 C Street, Southeast
4       Suite 4
        Washington, D.C.  20003
5       (202) 546-5493
6
7  ON BEHALF OF THE DEFENDANT:
8       CONSTANTINOS G. PANAGOPOULOS, ESQUIRE
        Ballard Spahr Andrews & Ingersoll, LLP
        601 13th Street, Northwest
9       Suite 1000 South
        Washington, D.C. 20005
10      (202) 661-2200
11
12
13
14
15              -o0o-
16
17
18
19
20
21
22
```

Page 242

```
1              I N D E X
2    CONTINUED DEPOSITION OF TONIA S. POWELL
3           NOVEMBER 14, 2006
4  EXAMINATION BY                      PAGE
5    Mr. Panagopoulos                  243
6    Mr. Plitt                         316
7    Mr. Panagopoulos                  372
8    Mr. Plitt                         384
9
10 EXHIBITS        DESCRIPTION         PAGE
11 Powell 17    Series of E-mails      251
12 Powell 18    Series of E-mails      259
13 Powell 19    Letter dated 6/10/05   266
14 Powell 20    Series of E-mails      268
15 Powell 21    Series of E-mails      278
16 Powell 22    Exit Procedure Checklist  279
                Employee Separation Form
17
   Powell 23    State of Maryland Unemployment  291
18              Insurance Request for Information
19 Powell 24    Letter dated 7/23/05   295
20 Powell 25    Organizational Chart   295
21 Powell 26    Resume of Tonia S. Powell  297
22    (Note:  Exhibits attached to transcript.)
```

Page 243

P R O C E E D I N G S

Thereupon,

TONIA S. POWELL

was called for further examination by counsel for the Defendant and, after having been resworn by the Notary Public, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. PANAGOPOULOS:

Q   Good afternoon, Ms. Powell.  As you know, my name is Dino Panagopoulos.  We're here today to resume and complete the deposition that we started the other day.

The same instructions and rules apply with respect to questions and answers.  I won't bother repeating them unless you don't recall them and would like me to go through it again.

Do you recall my instructions regarding how the deposition would work, ma'am?

A   Yes, I do.

Q   And the last time we met, you indicated you were not on any types of medications which would

Page 244

prevent you from understanding and fully responding to my questions.

Is the same true today?

A   That's correct.

Q   And have you had any alcohol in the last 24 hours?

A   No, I have not.

Q   I believe when we broke, one of the things that we were doing was going through what had happened once it had been announced that there were going to be changes at the Red Cross along with a reduction in force.  And you had indicated that you were asked to shadow a position with Carolyn Williams and Bill Malfera's group, and we had talked some about that.

I'd like to continue on with that discussion, if we may.  Okay?

A   Okay.

Q   How long did you shadow Ms. Williams?

A   I think I spent one day.

Q   One day?  Did you have any contact with her after that day?

A   With Carolyn Williams?

Page 249

1    A   Nothing I can really recall at this time.
2    Q   Okay.  You had spoken to me briefly about a
3  meeting you had with Rick Pogue regarding the
4  compensation for the staff health nurse position for
5  disaster services.
6    A   That's correct.
7    Q   I would like, you know, at this point to go
8  into more detail regarding that conversation.
9        Could you tell me where that conversation
10  occurred?
11    A   In his office.
12    Q   Was anyone present other than you and
13  Mr. Pogue?
14    A   No, but the door was open.
15    Q   Okay.  And that conversation took place on
16  or about May 20th; is that correct?
17    A   Yeah, that's correct, that I can recall.  I
18  can't specifically remember that date.
19    Q   All right.  And -- well, let me tell you
20  that there are e-mails that say that's when it took
21  place.
22    A   Okay.

Page 250

1    Q   Whether it did or not, that's fine.
2    A   Okay.
3    Q   I just want to give you a little context as
4  to the timeline.
5    A   Okay.  I accept those e-mails.
6    Q   All right.  And we'll go over one of them
7  in a moment, but what I would like you to do is run
8  through that meeting with me.  Tell me exactly, you
9  know, what was said by whom and whether any documents
10  were shared, and if so, what those documents were.
11    A   Okay.  First of all, I requested to have a
12  meeting with him because I wanted to discuss with him
13  the pay differences in the two positions.
14    Q   And when you say the two positions, just so
15  that we're clear, we're talking the --
16    A   Wellness associate position.
17    Q   And the staff health nurse for disaster
18  services position?
19    A   That's correct.
20    Q   Okay.
21    A   And he invited me into his office, and I
22  explained the situation to him.  And that in spending

Page 251

1  time with Carolyn and knowing a little bit about the
2  position, that it's definitely different than what I
3  had.
4        I gave him the -- or showed him my -- a
5  description of the job as wellness associate level II,
6  and the staff health position was a level III.  The
7  starting salary for me, I did not know because I
8  wasn't recruited.  I didn't come in through the door
9  applying directly.  I was recruited by their HR
10  person.
11        He went to his PC and looked up the two
12  jobs and saw that there was a difference and showed me
13  that it was like, I think, 57 to 60 was for my
14  position, the wellness nurse associate level II, and
15  that the staff health position did begin at 62,000 --
16  it was a little bit more -- sixty-two three and some
17  odd cents.  And he said that there was a difference in
18  the position, and he would have Al Vinson take a look
19  at it.
20    Q   Okay.
21        (Thereupon, the document was marked as
22        Powell Deposition Exhibit No. 17 for

Page 252

1        identification.)
2    BY MR. PANAGOPOULOS:
3    Q   Ms. Powell, you've been handed what's been
4  marked as Exhibit Number 17.  It's a series of e-mails
5  that go chronologically back to front.  They're
6  documents you have produced to us.  The back page just
7  seems to be a tag with an unknown attachment, but if
8  you look at that -- the second page at the bottom,
9  there's an e-mail from Jane Jones to you.
10        Do you see that, starting at the bottom of
11  page 2, from Jane Jones sent Thursday, June 2 at
12  9:11 a.m.?
13    A   Okay.
14    Q   All right.  It says I need to speak with
15  you right away regarding the offer.
16        Did you call her that day?
17    A   I did call her.
18    Q   And what did she say?
19    A   She called me and asked me if I was going
20  to accept the position, and I told her that I had not
21  heard back from Al Vinson about the salary,
22  compensation.  And she says, well, you know, that's

## Page 257

1    Do you see that?

2    A    Right.

3    Q    Now, is it fair to say that between May 31

4    and June 2, when you sent that other e-mail, you

5    hadn't heard anything from Mr. Pogue?

6    A    That's correct.

7    Q    And you hadn't heard anything from

8    Mr. Vinson?

9    A    That's correct.  So really, May 31st was

10    the first e-mail and then June 2nd.  Okay.  May comes

11    before June.

12    Q    Yes, it does.

13    A    Oh, okay.  Okay.  I'm sorry.  I just wanted

14    to make sure we were on the --

15    Q    Yeah, we are.  That's what I said.  They

16    were in the -- they seemed a little bit out of order.

17    That's the order they were stapled in.  I think we've

18    got the order now.

19    A    Okay.

20    Q    What happened next?

21    A    As far as what?

22    Q    After June 2 with respect to -- well, let's

## Page 258

1    take it a piece at a time.

2    Did you ever hear back from Mr. Pogue or

3    Mr. Vinson regarding compensation for the position?

4    A    Last time I heard from Al Vinson was when

5    he was on his train trip talking to me through his

6    BlackBerry.

7    Q    Okay.  So was that before -- that was

8    before June 2nd, though, right, or not?

9    A    I can't remember the date.

10    Q    Okay.  Because you don't remember if it was

11    before or after the series of e-mails we just went

12    over in Exhibit 17?

13    A    It was the same day that Jane gave me an

14    ultimatum of the 12 noon deadline that I heard from Al

15    Vinson.  So that was June 2nd.

16    Q    Okay.  June 2nd, all right.

17    And I know you said he kept cutting out,

18    but was any conclusion reached?

19    A    His conclusions that I could quit if I

20    didn't like the job.

21    Q    In other words, his conclusion that you

22    could take the job, then decide if you wanted to do

## Page 259

1    it.  If you didn't like it, you could quit.

2    A    Right.

3    Q    So what happened next with respect to the

4    job itself?  Did you ever decide to accept the job?

5    A    I got a call from Andrea Longuillo, who was

6    my CMA as the wellness nurse, that I had to resign

7    since I did not accept the staff health position.

8    And my response to her was that my position

9    was eliminated and I'm not resigning from anywhere.  I

10    understand according to Anna Shearer, my last day is

11    June 30th.  I will work until June 30th with all the

12    assignments --

13    Q    I don't want to interrupt you, but I've got

14    that e-mail chain, so it might be easier to go over

15    this conversation with the e-mail so we don't have to

16    do it twice.

17    A    Great.

18    (Thereupon, the document was marked as

19    Powell Deposition Exhibit No. 18 for

20    identification.)

21    BY MR. PANAGOPOULOS:

22    Q    Ms. Powell, you've been handed what's been

## Page 260

1    marked as Powell Exhibit Number 18, which I -- is a

2    series of e-mails, again, in reverse chronological

3    order, which appears to reflect the series of

4    conversations that you were in the middle of

5    describing when we marked the exhibit.

6    If you take a look, the last message on the

7    last page is from Andrea Longuillo to you dated

8    Friday, June 3rd, just after noon.

9    Do you see that?

10    A    Yes.

11    Q    Okay.  And here what she says is that if

12    you decided to decline the position that it's a

13    voluntary resignation; is that right?

14    A    That's what she has here.

15    Q    And what she has here is she then asks you

16    to send a resignation letter that includes your last

17    day as of --

18    A    June 30th.

19    Q    -- June 30th.

20    All right.  And then there's no response

21    from you on that date; is that correct?

22    A    June 3rd --

Page 265

1 interview questions, but I didn't give any answers. I
2 didn't give any responses to her questions.
3    Q   You refused to respond to her questions?
4    A   Well, I just said that I don't have
5 anything to discuss with you in regards to those
6 questions. I believe that's the verbal thing that I
7 gave her, but I didn't write anything down.
8    Q   Okay. So let me just see if I understand
9 this. She would ask you a question from the exit
10 interview form, something like how did you like the
11 job, and your response was I'm not going to talk to
12 you about that?
13    A   That's correct. I did not talk to her
14 about the job. And also, Anna Shearer was present at
15 the exit interview.
16    Q   Okay. Between June 2 and this series of
17 e-mails we just discussed, did you talk to anyone else
18 about -- anyone else in HR about the reorganization at
19 the Red Cross or the job that you had been offered?
20    A   In the HR department?
21    Q   Yes.
22    A   No. It was Jane Smith, Andrea Longuillo.

Page 266

1 Anna Shearer knows that --
2    Q   I'm sorry. You said Jane Smith, but you
3 meant Jane Jones, right?
4    A   I'm sorry. Jane Jones. And Anna Shearer
5 knew that I was trying to get compensation.
6        (Thereupon, the document was marked as
7        Powell Deposition Exhibit No. 19 for
8        identification.)
9    BY MR. PANAGOPOULOS:
10    Q   Ms. Powell, you've been handed what's been
11 marked as Powell Exhibit Number 19. It's a letter to
12 you from Carol Miller dated June 10th, 2005.
13        Take a look at that letter and let me know
14 when you're ready to proceed.
15    A   Okay.
16    Q   Did you receive this letter?
17    A   Yes, I did.
18    Q   Did you read it at the time you received
19 it?
20    A   Yes, I did.
21    Q   And did you call Ms. Miller to talk to her
22 about this letter?

Page 267

1    A   No, because I had -- I'm trying to think.
2 Was this before or after that I -- I'm thinking out
3 loud.
4        I think I did respond to her, but was it
5 before or after. When did -- it must have been after
6 this letter I did respond because of the severance
7 statement.
8        According to the policy, I was eligible for
9 severance, for six months, three weeks. I was
10 employed by the Red Cross for six months, and they
11 would give you a three-week severance.
12    Q   In your view, you were entitled to three
13 weeks' severance because you had worked for the Red
14 Cross for six months?
15    A   Correct.
16    Q   All right. Carol Miller is telling you
17 here that you were not eligible for severance because
18 in the Red Cross's view, a comparable position was
19 offered but declined?
20    A   In her view, yes, it was a comparable
21 position.
22    Q   And you said you did contact her after this

Page 268

1 letter?
2    A   That's correct.
3    Q   How did you contact her? Did you meet with
4 her in person? Was it a telephone call? Was it an
5 e-mail?
6    A   I think it was an e-mail that I sent her.
7    Q   What did you say in that e-mail?
8    A   I believe in that e-mail I disagreed that
9 the position was considered comparable. They were not
10 the same position.
11    Q   And did she respond?
12    A   She responded again saying that I -- it was
13 a comparable position, that the only thing I had to do
14 was a walk upstairs and would be doing the same
15 duties. But that's why we're here in disagreement of
16 the job duties.
17        (Thereupon, the document was marked as
18        Powell Deposition Exhibit No. 20 for
19        identification.)
20    BY MR. PANAGOPOULOS:
21    Q   All right. You've been handed what's been
22 marked as Exhibit Number 20, which is a series of

| Page 273 | Page 275 |
|---|---|
| 1  in the school know what it -- it's a big project you | 1        You see that? |
| 2  have to complete to show that you understand all the | 2    A  Yes, I do. |
| 3  knowledge you did over your course, over your | 3    Q  Skills and training in your current |
| 4  specialty. | 4  position, less than a 10 percent salary reduction and |
| 5    Q  All right.  So you had, what, two to three | 5  less than a 50 mile change in work location. |
| 6  hours of classes on Sunday maybe? | 6        Do you see that? |
| 7    A  Four hours.  Classes are four hours. | 7    A  I do. |
| 8    Q  But no time to respond? | 8    Q  Okay.  And it says that the review found |
| 9    A  I chose not to respond because other | 9  that the RN and other medical skills and training were |
| 10  priorities, graduating. | 10  comparable to the skills and training in the new job. |
| 11    Q  All right.  And then Monday, apparently, | 11        Do you see that? |
| 12  what, you chose not to respond in the morning why? | 12    A  I do see that. |
| 13    A  Because of duties.  My work duties. | 13    Q  And it also indicates that there's no |
| 14    Q  Finally, you decided to respond on -- | 14  salary reduction. |
| 15    A  In the evening. | 15        Do you see that? |
| 16    Q  -- in the evening on June 14th; is that | 16    A  I do see that. |
| 17  right? | 17    Q  And it also indicates that no relocation |
| 18    A  That's correct. | 18  was required? |
| 19    Q  At 4:30 in the afternoon? | 19    A  I do see that. |
| 20    A  That's correct. | 20    Q  Okay.  And there was no salary reduction, |
| 21    Q  And the e-mail is to Carol Miller with a | 21  right? |
| 22  cc: to Anna Shearer. | 22    A  Well, they didn't want to give me a salary |

| Page 274 | Page 276 |
|---|---|
| 1    A  Correct. | 1  that was comparable to positions that I moved into. |
| 2    Q  And you note that you received the letter | 2    Q  That's not my question.  My question is |
| 3  dated June 10th and note that severance was denied | 3  there was no proposed reduction of your salary in this |
| 4  because you hadn't accepted what was called the | 4  new position.  You were going to be paid the same that |
| 5  comparable position.  And then you describe that you | 5  you were making? |
| 6  believe the position you were offered exceeds -- to | 6    A  That's correct.  They wanted me to accept |
| 7  use your words, quote, far exceeds, end quote, the | 7  the same pay. |
| 8  responsibilities of your current position; is that | 8    Q  All right.  And there was no relocation as |
| 9  right? | 9  far as where -- I understand that you contend that |
| 10    A  That's correct. | 10  there's travel, but the place that you would be |
| 11    Q  And Carol responded to you, Carol Miller | 11  working from, your base of operations, was in the same |
| 12  responded to you that very same day at 7:37 that | 12  building, right? |
| 13  night, right? | 13    A  Right. |
| 14    A  That's what it has here, uh-huh. | 14    Q  And the job that you were offered required |
| 15    Q  Okay.  And she tells you that HR, including | 15  RN and other medical skills and training that your job |
| 16  Rick Pogue, looked into your concerns related to the | 16  as wellness associate required, right? |
| 17  offer being comparable. | 17    A  That's correct. |
| 18        Do you see that? | 18        MR. PANAGOPOULOS:  Off the record for a |
| 19    A  I do see it. | 19  second. |
| 20    Q  And it also states that according to our | 20        (Discussion held off the record.) |
| 21  severance policy, a comparable job includes three | 21        BY MR. PANAGOPOULOS: |
| 22  basic items. | 22    Q  Did you respond to Ms. Miller's e-mail? |

Page 281

1 on June 30th and you then left the organization.
2      When did you start applying for new jobs?
3   A  I think according to unemployment, you have
4 to do like three or four jobs a week.  So immediately.
5   Q  You immediately started applying for jobs?
6   A  I started applying to -- yeah.
7   Q  How long were you unemployed before you got
8 a new job?
9   A  Just 30 days.  I started a contract job
10 August 1.
11   Q  So on August 1, you started a contract job
12 with who?
13   A  That was -- the agency was called Quadrant,
14 Incorporated.  They're located out in Herndon,
15 Virginia.  But the assign --
16   Q  Do you have an address for them?
17   A  I'm sure it's on the resume.  I don't know
18 it by heart.
19   Q  I don't think we received your resume.
20      MR. PANAGOPOULOS:  Did you give us her
21 resume --
22      THE WITNESS:  You should have.

Page 282

1      MR. PANAGOPOULOS:  -- Brian?
2      MR. PLITT:  I don't believe so.  I'm not
3 sure we did.
4      MR. PANAGOPOULOS:  Can I get that --
5      THE WITNESS:  Because you asked me for it
6 and I sent it to you.  I'm sure I did.
7      MR. PANAGOPOULOS:  Could we get that from
8 you?
9      THE WITNESS:  I wish I'd have known.  I
10 would have brought one with me.
11      MR. PLITT:  That's okay.
12      Yeah, we can see about that.
13      MR. PANAGOPOULOS:  Well, see, it's a simple
14 question.  If it's got the address of her employer,
15 it's certainly, you know, within the scope of our
16 discovery request on subsequent employment.
17      MR. PLITT:  Okay.  All right.  Let me see
18 if I can find it during the break and get it to you.
19      MR. PANAGOPOULOS:  Fantastic.  Thank you.
20      BY MR. PANAGOPOULOS:
21   Q  All right.  And how much were you paid?
22   A  I was paid hourly, and I think it was 30

Page 283

1 bucks an hour or 28 -- 28 to 30 bucks an hour.
2   Q  Okay.  And --
3   A  No benefits, though.
4   Q  Right.  It was just an hourly wage.  You
5 were a contractor, no benefits?
6   A  Correct.
7   Q  Were you -- had you -- at that point in
8 time, had you accepted COBRA under the -- you got a
9 COBRA notification?
10   A  I did get a COBRA notification.
11   Q  All right.  And did you take the COBRA
12 benefits?
13   A  It was too late because by the time I
14 was -- received my money for unemployment, I had
15 already missed the first payment to meet the COBRA
16 coverage.
17   Q  So you accepted COBRA coverage, but you
18 missed the payment so your COBRA coverage was
19 cancelled?
20   A  Or not in effect.
21   Q  Not in effect --
22   A  Right.

Page 284

1   Q  -- because you didn't make the payment?
2   A  Right.
3   Q  Okay.
4   A  Tuition.
5   Q  Okay.  How many hours a week were you
6 working for Quadrant?
7   A  It was 40 hours a week.
8   Q  And how long did you work for Quadrant?
9   A  I worked with Quadrant until the end of --
10 end of March or -- the third or fourth week of March,
11 because I started my current job, my first day with
12 the county was April 3rd.
13   Q  April 3rd of 2006?
14   A  That's correct.
15   Q  And you worked with Quadrant up until you
16 started your job with the county?
17   A  That's correct.
18   Q  And did you work regularly 40 hours a week
19 for Quadrant while you were there from August through
20 April?
21   A  Pretty much, but it was a private company
22 and they had special holidays.  So when the president

Page 285

1 had his holiday, we don't work. I didn't get paid.
2 So -- but, yes, I tried to do all the hours I could.
3    Q  And it was generally 40 hours a week?
4    A  Yes.
5    Q  Was it ever more than 40 hours a week?
6    A  It did at the end get to 40 hours a week.
7 I was -- they asked me to lead a project for them in
8 closing up a study project. And that took some
9 overtime which he did pay me for, but that was at the
10 very end.
11    Q  Okay. And where do you -- where did you
12 start on April 3rd?
13    A  Montgomery County Department of Health and
14 Human Services.
15    Q  And what's your job title with the
16 Montgomery County Department of Health and Human
17 Services?
18    A  Community health nurse.
19    Q  And what are your duties and
20 responsibilities as a community health nurse?
21    A  I specifically work with the aging and
22 disability paid population, Montgomery County. And

Page 286

1 there's various county dollars that -- or federal
2 dollars that are awarded to the state for the elderly
3 and disabled to maximize their living at home or their
4 return to home from the nursing home or from a
5 community to assisted living and nursing home.
6       I also work directly with Adult Protective
7 Services for abuse or neglect cases. I work directly
8 with social workers and -- well, they say social
9 worker to adult cases as a consult.
10    Q  And do you work within certain guidelines
11 and procedures?
12    A  Oh, absolutely.
13    Q  Is your position classified as exempt or
14 non-exempt?
15    A  It is an exempt position.
16    Q  And under your position, when you say you
17 operate within the guidelines and procedures, how does
18 that work? Do you have a procedures manual?
19    A  Procedures manual. Uh-huh.
20    Q  That tells you what an appropriate response
21 is for any particular situation?
22    A  That's correct.

Page 287

1    Q  How often do you refer to that procedures
2 manual throughout the course of the day?
3    A  Initially it was daily. As I'm getting
4 more familiar with the job, it's not as daily, but you
5 still have to refer to it because I don't do -- I
6 don't have the same case every time.
7       There's various programs that a client can
8 access or be eligible for. They have to be eligible
9 medically and financially. So there's different
10 dollars that are available that could help clients.
11    Q  When you were at the Red Cross and were
12 working your various duties, did you have a manual or
13 procedures that you would have to look at to determine
14 how to respond to certain situations?
15    A  We did have procedure manuals, yes.
16    Q  How often did you refer to those procedure
17 manuals?
18    A  Initially they were daily.
19    Q  And then as time went on, you didn't have
20 to refer to them?
21    A  It got pretty routine because I stayed in
22 one really basic or confined area of work and decision

Page 288

1 making where the greatest bulk of the decision making
2 was with AFES. The next biggest bulk would be
3 considered workmen compensation. Later it graduated
4 to international services and ADA accommodations. We
5 always had the medical excuses, but they weren't as
6 time-consuming as the other work. But it was a very
7 limited scope of my function at the national
8 headquarters.
9    Q  Well, with respect to ADA accommodation
10 issues, I mean, the disability obviously could be, you
11 know, anything, right?
12    A  Right.
13    Q  And the proposed accommodation could be
14 anything, right?
15    A  It could be.
16    Q  Okay. So with respect to your duties
17 there, it could be varied depending on the situation?
18    A  Well, yes.
19    Q  Okay. And with respect to your duties with
20 AFES, you know, again, the medical information you
21 received was fairly varied, right?
22    A  It was varied because they're individual

## Page 289

1  results, but the same testing or the same scope of
2  what we were trying to get the client to meet
3  according to their medical criteria was the same.
4     Q   Right.
5     A   So it did not go outside the scope.  It was
6  still a very focused scope, still a routine.  It was
7  still a routine.
8     Q   Sure.  You had to determine based on a
9  medical exam report you received whether an individual
10 was eligible for deployment, right?
11    A   Would be cleared for deployment, correct.
12    Q   And the same is true for international
13 services.  There, it was a little bit different.
14 You'd look at medical exams, but they weren't required
15 to follow military procedures, right, or military
16 guidelines?
17    A   No.
18    Q   But the complicating factor there was the
19 vaccines that might be needed for the different
20 deployments for which you'd use the Travax system,
21 right?
22    A   Correct.

## Page 290

1     Q   And the educational component with respect
2  to international service was again different based on
3  where people were deployed?
4     A   Correct.
5     Q   Did you receive any raises while you were
6  at Quadrant?
7     A   No.
8     Q   So you started at $30 an hour, you ended at
9  $30 an hour when you started with the county?
10    A   That's correct.
11    Q   Okay.  What is your rate of pay at the
12 county?
13    A   Fifty-seven -- well, no, I did get a raise.
14 It's almost -- no, I'm right.  It's almost 58,000.
15 It's not quite 58,000.  I started at 57, got a
16 3 percent because of the union.  I got a 3 percent
17 because of the union.
18    Q   Okay.  So you're at just under 59, then?
19    A   I'm just at 58.
20    Q   You're at 58?
21    A   I'm at 58, right.  But I have benefits and
22 tuition benefits.

## Page 291

1     Q   Okay.  What benefits do you receive at the
2  county?
3     A   Full medical, dental, eye, tuition.  I get
4  compensation.  I get comp time.
5     Q   Okay.  What else?  You already said
6  tuition.
7     A   Right.
8     Q   Are they comparable --
9     A   Retirement plan.
10    Q   Are the benefits better than your Red Cross
11 benefits?
12    A   Yes.
13        (Thereupon, the document was marked as
14        Powell Deposition Exhibit No. 23 for
15        identification.)
16     BY MR. PANAGOPOULOS:
17    Q   You've been handed what's been marked as
18 Exhibit Number 23.
19    A   Uh-huh.
20    Q   Do you recognize this document?
21    A   No, not really.  I would have to look at it
22 real good.  Let's see.  Unemployment insurance.

## Page 292

1     Q   This is what the Red Cross submitted to
2  unemployment.  Do you know if you've seen this before?
3     A   No.  This is the first time I've seen it.
4     Q   Do you see where it says reason for
5  separation down there in the middle?
6     A   Uh-huh.
7     Q   I'm sorry.  You need to --
8     A   Oh, I'm sorry.  Yes, I do.
9     Q   And the reason they checked was number 6,
10 quit.
11        Do you see that?
12    A   Correct.  I do see that.
13    Q   And did you understand that that's what
14 they were going to say based on the position they took
15 with you, that your failure to accept a position was
16 considered a voluntary resignation?
17    A   No.  I know that Andrea Longuillo at the
18 time of the interview said that the Red Cross is not
19 responsible or has no decision as to if I would be
20 eligible for unemployment benefits.
21    Q   All right.  Well, that's not my question.
22    A   Oh, okay.

Page 293

1    Q    My question is did you understand that, if
2    asked, the Red Cross would say that you resigned from
3    your position based on their position that your
4    failure to accept the disaster services position was a
5    voluntary resignation?
6         Did you understand that?
7    A    No.
8    Q    You did not understand that?
9    A    I did not understand that.
10   Q    Did you understand that in the Red Cross's
11   view, you had resigned?
12   A    No, I did not.  I know they were asking me
13   to resign, but, no, I did not.
14   Q    Okay.  Did you understand that in the Red
15   Cross's view, you left voluntarily because you didn't
16   accept another position that they believed was
17   comparable?
18   A    No, I did not.
19   Q    Did you receive unemployment benefits?
20   A    I did after an appeal process.
21   Q    Okay.  You appealed, and the Department of
22   Labor decided you were entitled to benefits, right?

Page 294

1    A    Well, what happened is that I received a
2    letter demanding that I be available at a certain time
3    to discuss what happened as to why they were --
4    Q    I don't need all the details.
5    A    Okay.
6    Q    I just want the end result.
7         The end result was you got benefits, right?
8    A    That's right.
9    Q    Okay.  Do you recall how much you received
10   in unemployment?
11   A    Less than 300.  I can't remember.
12   Q    I'm sorry?
13   A    Less than 300.
14   Q    A week or total?  If it's total, it wasn't
15   worth it, was it?
16   A    I think it was a week.
17   Q    So just under 300 a week?
18   A    Yeah, I think so.
19   Q    For how long, until you started working
20   again?
21   A    Yeah, that's right, for the time that I
22   worked.  I think I received four checks.

Page 295

1    Q    Okay.  So you were out for a month, you
2    received just under 1200 bucks then?
3    A    That's correct, if I remember the amount
4    correctly.
5    Q    You what?
6    A    If I remember the amount correctly.
7         (Thereupon, the document was marked as
8         Powell Deposition Exhibit No. 24 for
9         identification.)
10        BY MR. PANAGOPOULOS:
11   Q    You've been handed what's been marked as
12   Powell Exhibit Number 24.
13        Did you receive this letter?
14   A    Yes, I did.
15   Q    Did you respond to this letter in any way?
16   A    Did I respond to it?  No.
17   Q    Okay.  Are you permitted to send personal
18   faxes from your workstation, from your current
19   workplace?
20   A    Yes.
21        (Thereupon, the document was marked as
22        Powell Deposition Exhibit No. 25 for

Page 296

1         identification.)
2         BY MR. PANAGOPOULOS:
3    Q    You've been handed what's been marked as
4    Exhibit Number 25.
5    A    Yes.
6    Q    What is this document?
7    A    This is the family tree or the corporate
8    tree of the disaster service area.  And I had -- I got
9    it from Carolyn Williams, and she was showing me the
10   layout and where I fell into the situation.
11   Q    So if you look at the far left there,
12   individual client services, that's the services that
13   disaster services provides to those affected by
14   disasters, right?
15   A    I don't know.  That's not my department.  I
16   fell under staff services.
17   Q    And staff services, as you understood it,
18   was providing services to staff members of the Red
19   Cross?
20   A    To paid and volunteer at all the aides'
21   geographical regions.
22   Q    Right.  To paid and volunteer staff?

Page 297

1   A   To paid and volunteer staff.
2   Q   Correct. Okay.
3       MR. PANAGOPOULOS: Off the record.
4       (Whereupon, a short recess was taken.)
5       (Thereupon, the document was marked as
6       Powell Deposition Exhibit No. 26 for
7       identification.)
8       BY MR. PANAGOPOULOS:
9   Q   Ms. Powell, you've been handed what's been
10  marked as Exhibit 26. It's the resume that your
11  counsel gave to us right after the break that we took.
12      Is this your updated resume?
13  A   Yes, it is.
14  Q   And does it accurately reflect your job
15  history?
16  A   Yes, it does.
17  Q   There's no date for -- I'm sorry. There's
18  no address for Quadrant. It's in -- you indicate that
19  it's in Herndon.
20      Do you recall the address? Do you remember
21  what street it's on?
22  A   No. Probably Herndon Parkway. Herndon

Page 298

1   Parkway, because it's right off -- when I go, it's
2   right off the Parkway.
3   Q   Okay.
4   A   So I'm going to say Herndon Parkway. But I
5   have the information at home. I can give that to
6   Attorney Plitt and he can get it to you.
7   Q   Okay. Thank you. I appreciate that.
8       Have you graduated from Columbia Union yet?
9   A   Yes. Back in July 2005.
10  Q   In your lawsuit, in the complaint filed
11  against the Red Cross, you assert claims of
12  discrimination, retaliation, violation of D.C. wage
13  and hour law, and breach of express or implied
14  contract. I'd like to talk with you about those
15  claims now so I can see if I understand the basis of
16  them. Okay?
17  A   Okay.
18  Q   All right. Describe for me, if you would,
19  on what facts you contend -- strike that. Let me try
20  that over again.
21      Tell me the basis of your discrimination
22  claim, the factual basis.

Page 299

1       MR. PLITT: I'm just going to object as to
2   form.
3       MR. PANAGOPOULOS: Okay.
4       BY MR. PANAGOPOULOS:
5   Q   You can answer.
6   A   I object to -- or I accuse the Red Cross of
7   wage discrimination simply because I was offered a job
8   that definitely starts at a different salary than the
9   wellness associate position. That change or hint that
10  there is a difference in salary is in how the
11  positions are titled. The wellness associate position
12  is a level II. The staff health disaster position is
13  a level III.
14      In my stay with the Red Cross in the six
15  months when it was a full unit, meaning that Jane
16  Davis and Ken Thiel were my partners or we worked
17  together in that unit, they did talk about the staff
18  health position and they did talk about the extensive
19  responsibilities attached to it, the travel and the
20  long hours with it, and it was deemed, unquote, or,
21  you know, quote, a glorified position. It was a noted
22  and popular or esteemed position that came with more

Page 300

1   dollars attached to it.
2       I also know that Jane Davis occupied this
3   position and then moved to the wellness unit. And as
4   much as she did not reveal her actual dollars, they
5   did not change her salary. She did not get a
6   reduction in salary. They kept her at the same wage,
7   which was higher than my entry wage into the wellness
8   unit.
9   Q   Okay. So from the staff health position,
10  Jane Davis came into her position at wellness --
11  A   Right.
12  Q   -- and did not receive a change in wage?
13  A   Right. She was hired at a higher dollar
14  amount.
15  Q   Okay. How much experience did Jane Davis
16  have, do you know?
17  A   Jane Davis told me she never really had a
18  salaried position. She's done a lot of volunteer
19  positions. Her husband was a pretty significant
20  person in the military as a physician, so she
21  travelled and did a lot of things like that.
22      She did tell me about her experience at

Page 301

1 9/11, that she was, you know, somewhere near Ground
2 Zero, and I believe that's how she met Ken Thiel.
3    Q    I'm just talking about general -- if you
4 know --
5    A    Right.
6    Q    -- I'm just wondering if you know what her
7 overall general job experience is.  It sounds like you
8 don't.
9    A    No.  She did a lot of volunteer work, she
10 told me.
11    Q    Okay.  Do you know about how old she is?
12    A    We're probably about the same age, although
13 she's married with children.  So I just turned 45.
14 She might be 55, if that.
15    Q    Did she tell you why she left the staff
16 health position?
17    A    I do know why she left, but I think that
18 might be a different area of confidence.
19    Q    Well, I'm asking you the question.
20    A    Yes.
21    Q    Unfortunately, you have to answer it.
22    A    I have to tell you the details as to why

Page 302

1 she resigned?
2    Q    If you know.
3    A    Well, she accused Ken Thiel of sexual
4 harassment.
5    Q    Okay.  I'm not talking about resigned from
6 the wellness position.  I'm talking about -- you said
7 she was at staff health, and from staff health, she
8 came into wellness, right?
9    A    Right.
10    Q    I'm talking about that first position from
11 staff health into wellness.
12    A    No.  I only heard rumor.  She didn't tell
13 me anything directly of why she left.  I only know
14 rumor.
15    Q    Okay.  What's the rumor?
16    A    Rumor from Carolyn Williams is that she and
17 Brenda Goolsbey, that former manager, did not get
18 along.
19    Q    What did Jane Davis say about the staff
20 health position to you?
21    A    That it required a lot of training.
22    Q    Training of others?

Page 303

1    A    Training of different areas in nursing.
2 Areas in nursing into how to manage the paid and
3 volunteer staff.
4    Q    Let me see if I can make the question
5 clear, because I think we might be talking past each
6 other.
7    A    Okay.
8    Q    When you say it required a lot of training,
9 did that mean that she said she had to receive a lot
10 of training to do it or that the position involved a
11 lot of training of others, that the position involved
12 training?
13    A    Both.  That she would be training and she
14 would be -- that she had received training.
15    Q    Okay.
16    A    But then she also had disaster experience
17 from 9/11.  I don't know if she had any other previous
18 disaster experience, but she definitely did tell me
19 quite a bit about the 9/11 experience.
20    Q    All right.  On what other facts do you base
21 your claim of discrimination?
22    A    I base it on the fact that I did get

Page 304

1 salary -- a confirmation as to the salary differences.
2 I also base it on that -- and the job description,
3 that they're not comparable jobs.  They are separately
4 and distinctly different.
5    Q    So basically what we've been talking about
6 the last couple of days?
7    A    Yeah.
8    Q    Okay.  Anything other than what we've been
9 talking about the last couple of days?
10    A    No, not that I can recall.
11    Q    In other words, you've told me what you
12 believe the differences are between the two jobs and
13 the reason you felt you should have been paid more,
14 right?
15    A    Well, the differences are documented in the
16 job descriptions.
17    Q    Well, I understand.  What I'm talking about
18 is, you know, we've been in deposition here over, you
19 know, a day and a half or so, and I think we've talked
20 in detail about your feelings with respect to one job
21 versus the other.
22        You know, I don't want to go over old

Page 305

1 territory. I just want to know if at this point I
2 have a complete answer from you as to what the
3 differences are between the two jobs in your view.
4    A   Yes, you do.
5    Q   Okay. And is that the sum and substance of
6 your wage discrimination complaint, that the jobs were
7 different, therefore, you should have been offered a
8 different pay rate for it?
9    A   Right, or I should have not been offered a
10 job because it's not comparable. They should have
11 just exited me out with my severance.
12    Q   Okay. And you would have been happy with
13 that, just being exited out with your severance at
14 that point in time?
15    A   Either the severance or the compensation,
16 that's correct.
17    Q   And do you contend the discrimination is
18 based on race, sex, national origin or some other
19 basis?
20    A   Well, I guess it could be race and some
21 other basis.
22    Q   Okay. You say you guess. What facts do

Page 306

1 you -- what facts do you have that support your
2 contention that any difference in pay or proposed pay
3 was based on your race?
4    A   Jane Davis is white.
5    Q   Okay. Anything else other than Jane Davis
6 is white?
7    A   That Carol Miller and them could just
8 decide not to pay me. We don't want to pay you.
9 Almost like a special good old boys club. We're not
10 going to pay you, because I don't have to pay you.
11    Q   The Red Cross just went through an analysis
12 cutting costs across the board, right?
13    A   That's true.
14    Q   Okay. And how do you know they decided not
15 to, you know, offer you a higher pay rate in order to
16 save money?
17    A   Because the job was posted internally and
18 externally.
19    Q   When?
20    A   When? It's always been -- the position was
21 open when I was a wellness associate. They've been
22 trying to recruit for that position since I've been

Page 307

1 there.
2    Q   Okay. And I'm talking about after the
3 reorganization.
4    A   I'm sure it was still posted externally.
5    Q   Okay. Are you guessing --
6    A   No.
7    Q   -- did you see it?
8    A   I did see it. I did see it on the Web.
9    Q   When?
10    A   After I had left.
11    Q   Okay. Did you --
12    A   But it does not --
13    Q   -- print it out?
14    A   -- mean that it wasn't -- no, I did not
15 print it out.
16    Q   Okay. Do we have a copy of that anywhere?
17    A   I'm not sure if you have a copy of it, but
18 I didn't print it out.
19    Q   Did you produce anything like that to us?
20    A   No, I did not.
21    Q   Okay. Any other facts?
22    A   Pertaining to?

Page 308

1    Q   Alleged discrimination based on race.
2    A   No. Just the difference between Jane's
3 salary, my salary and the job. The job actually shows
4 a different starting salary.
5    Q   Okay.
6    A   If I have come externally and applied for
7 that position, the starting salary is different, 62
8 grand. Here I am, an internal candidate, and have
9 demonstrated my ability to work and manage and get --
10 and move into that position, and even -- at one day,
11 even going to management, I was denied.
12       I did not even get an evaluation in the six
13 months I was there. You know, Anna's response was,
14 well, you know, I'll talk to Bill about it. Bill
15 never knew the details of my job, so I would have been
16 missing the opportunity to get a pay raise for the
17 work that I've done in the wellness unit.
18    Q   Is that it?
19    A   Uh-huh.
20    Q   Okay. So any other facts that lead you to
21 believe that you were discriminated against based on
22 your race?

Page 309

1    A   That's the only facts that I will hold.
2        MR. PLITT: I guess I've just got -- I'll
3   just repeat. I've just got a continuing objection to
4   questions of basis for allegations as to form.
5        Just for the record, just sort of a
6   continuing objection.
7        MR. PANAGOPOULOS: That's fine. That's
8   fine. We're here to get facts. She's giving me the
9   facts.
10       BY MR. PANAGOPOULOS:
11   Q   You never complained about discrimination
12  at the Red Cross, right?
13   A   Not until I was cheated out of my salary.
14   Q   Okay. When did you complain about
15  discrimination?
16   A   When I hired the attorney. That was my
17  complaint, and then you --
18   Q   All right. Well --
19   A   But internally before --
20   Q   Yeah. I'm talking about while you worked
21  at the Red Cross, did you ever complain about
22  discrimination?

Page 310

1    A   No, I did not.
2    Q   In fact, the sum and substance of your
3   conversations or communications with the Red Cross
4   regarding the salary issues we've already discussed in
5   this deposition and seen in the deposition exhibits,
6   right?
7    A   Yes.
8        MR. PLITT: I've got just a continuing
9   objection as to form.
10       MR. PANAGOPOULOS: You've already said it.
11  I mean, it's there.
12       MR. PLITT: Okay.
13       BY MR. PANAGOPOULOS:
14   Q   All right. With respect to violation of
15  D.C. wage and hour law, I take it it's your contention
16  that the duties that you've described to us were
17  duties for which you should have been paid overtime
18  pay if you worked overtime; is that correct?
19   A   I believe that to be correct on the counsel
20  of my attorney.
21   Q   All right. You understood you were an
22  at-will employee with the Red Cross, right?

Page 311

1    A   Yes.
2    Q   You understood that you did not have an
3   employment contract, right?
4    A   That I did not have a what?
5    Q   An employment contract.
6    A   You mean I was a contractor?
7    Q   Right.
8    A   That's correct. I was not a contractor for
9   the Red Cross.
10   Q   And you had no written employment contract?
11   A   I'm not sure what you mean. I've never, to
12  my knowledge, signed a written employment contract in
13  my employment history.
14   Q   Okay. Great. Are you claiming damages for
15  emotional distress?
16   A   We did under counsel.
17   Q   Did you ever see a doctor for any type of
18  emotional distress?
19   A   No. I've never had psychiatric care.
20   Q   You haven't in the past and you didn't as a
21  result of any emotional distress you allege you
22  suffered due to the -- your allegations in the

Page 312

1   complaint or amended complaint, correct?
2    A   That's correct. I haven't seen a
3   psychiatrist.
4        And actually, I discussed with attorney, I
5   prefer instead of emotional distress is the
6   intimidation and humiliation through the whole process
7   is really the words that I would like to use, but then
8   I'm not an attorney. There's certain languages that
9   you guys use.
10   Q   The intimidation being that you were told
11  to resign, in essence?
12   A   Right.
13   Q   Is that the only intimidation factor there?
14   A   Well, there was subjective hints of
15  intimidation beyond the 12:00 deadline, we need to
16  know. I still performed my work duties under stress.
17   Q   You still went to school?
18   A   Still had to go to school. No one still
19  came to work. The work still had to get done. I
20  still had to close up the unit.
21   Q   You lived your life?
22   A   There were a lot of things I still had to

Page 325

1 to the military guidelines. They had to meet that
2 specification. Then that was submitted to the AFES
3 manager for their employees to know or their personnel
4 to know they were going to be deployed or not.
5    Q   So was it the manager who then made the
6 decision as to whether or not that individual would be
7 deployed?
8    A   Yes. They have to say you're going to go
9 for deployment, yes.
10    Q   And you did not make that decision?
11    A   Right. I don't deploy people. That
12 department deploys people.
13    Q   Was your role entirely one of collecting
14 information from the employee to fill in to a chart or
15 spreadsheet or according to certain guidelines that
16 had been given to you?
17    A   Yes.
18       MR. PANAGOPOULOS: Objection as to form.
19       THE WITNESS: Yes. I would review medical
20 records based on the medical -- the criteria of the
21 military guidelines, and those records would be in a
22 file as well as on a spreadsheet so we can keep track

Page 326

1 of who was on target for the deployment schedule.
2       BY MR. PLITT:
3    Q   So you had certain schedules that you
4 worked with, certain pre-prepared schedules?
5    A   Right. The AFES team had short-term
6 deployments, three to six months. So they had people
7 who were always being prepared for deployment six
8 months to a year out or sometimes even shorter, like
9 three months. So it was on a cycle.
10    Q   Did you take down information that the AFES
11 people gave you, the employees?
12    A   Yes. We asked for their submission of
13 their medical records, lab results, chest x-ray,
14 immunization records. Any other type of records from
15 their physician, we would ask for those.
16    Q   And you then -- were you then in charge of
17 collecting all that information?
18    A   Yes. And it was kept in a file.
19    Q   And then were you in charge of then turning
20 over that information to someone else?
21    A   We would give them the information to save
22 that they had met the requirement for medical

Page 327

1 deployment, but they actually didn't get their
2 records. We kept all of the medical records in the
3 wellness unit in a cabinet, in a file cabinet.
4    Q   But in terms of determining whether or not
5 someone met the criteria for deployment, was that
6 cutoff determined by the regulations?
7    A   Yes. By military regulations.
8    Q   Okay. So you didn't have anything to say
9 about --
10    A   No.
11    Q   -- determining whether in fact it met that
12 cutoff or not?
13    A   That's correct. If I had a question about
14 a result or a test, I would call the CRC where -- to
15 where they were going, where they were -- which is the
16 command receiving center and talk to that physician
17 there and let them know this person is a Red Cross
18 AFES employee targeted for this type of deployment at
19 this particular time. This is the test result. Is
20 this person deemed necessary or eligible for
21 deployment.
22    Q   So that was a question for the

Page 328

1 discretion --
2    A   Sure.
3    Q   -- of the CRC?
4    A   Right.
5    Q   Now --
6    A   Because they still have to go through
7 another physical once we do a physical here, once they
8 go through deployment for the CRC. They look at all
9 the medical records that they have, and they're going
10 to keep a copy and I have a copy, and that medical
11 physician or that Army personnel or doctor is going to
12 look at those records and then also look to see if
13 they are medically cleared. So it's like a double
14 process.
15    Q   So basically, can you state whether or not
16 what you're doing at AFES was collecting information
17 regarding these employees and then passing it on to
18 other people?
19       MR. PANAGOPOULOS: Objection, asked and
20 answered several times already.
21       MR. PLITT: Okay. Again, we've had the
22 agreement the objection is going to be as to form.

Page 329

1     MR. PANAGOPOULOS: Well, yeah, we have an
2  agreement, but you said you were going to clarify some
3  issues and all you're doing is asking the same
4  question over and over again.
5     BY MR. PLITT:
6     Q   Again, you can answer the question.
7     A   I would collect the medical records which
8  would be sent with the client. They would have a copy
9  of it, so when they went through the CRC, that medical
10 personnel, that physician would also have those
11 records before they can go actually into the area that
12 they would be stationed.
13    Q   Were you the only person working on
14 collecting this information about the AFES people --
15    MR. PANAGOPOULOS: Objection as to form.
16    BY MR. PLITT:
17    Q   -- and transmitting it as you discussed?
18    A   Initially, no. Yes, after Jane Davis
19 resigned.
20    Q   And then after she resigned, about how many
21 AFES people were you working on a month?
22    MR. PANAGOPOULOS: Objection as to form.

Page 330

1     THE WITNESS: When Jane resigned, we had
2  about three to five teams that were scheduled for
3  deployment within two months, and there was about
4  three to four people in each team.
5     BY MR. PLITT:
6     Q   And did that continue in terms of that
7  level throughout the rest of the time you were at Red
8  Cross?
9     A   It was dependent on their schedule, on how
10 the AFES department scheduled their personnel for
11 deployment.
12    Q   In terms of the international services
13 employees --
14    A   Uh-huh.
15    Q   -- do you recall testifying about the work
16 you did for those people?
17    A   Yes, I do.
18    Q   All right. In terms of those employees,
19 there was a -- there was some work you did in terms of
20 immunization for those employees.
21       Do you recall testifying about that?
22    A   Right.

Page 331

1     Q   Again, in terms of immunization of -- can
2  you state whether or not you had the -- made any final
3  determination about whether or not these people would
4  actually be immunized as opposed to collecting
5  information from them for someone else to determine
6  that?
7     MR. PANAGOPOULOS: Objection as to form.
8     THE WITNESS: They use what we called the
9  Travax travel service to look at what immunization
10 would be required for that person depending upon what
11 country they were going to.
12    BY MR. PLITT:
13    Q   So you would collect information from them
14 as to what --
15    A   Right.
16    Q   -- country they were going to, and then
17 compare that against a prepared chart that would state
18 what immunizations were required for that country?
19    A   It was the CDC and Travax. See, Travax
20 uses CDC reports. That's basically what they do.
21 They use CDC recommendations on what a client or any
22 person going internationally, what they need for

Page 332

1  health protection.
2     Q   Travax had already been -- that information
3  had already been prepared?
4     A   Right.
5     Q   You didn't play a part in preparing that
6  information?
7     A   No. That's all based on CDC
8  recommendations.
9     Q   And so then you would look in that Travax
10 and then transmit that information?
11    A   That's right.
12    Q   And that was your job?
13    A   That was my job.
14    Q   And that was the majority of the work in
15 terms of international services --
16    MR. PANAGOPOULOS: Objection as to form.
17    THE WITNESS: Right, including the
18 briefings and debriefings.
19    BY MR. PLITT:
20    Q   Briefings would be -- can you state whether
21 or not that was to speak with the people to
22 understand?

Page 333

1    A    Right.  Briefings -- briefing was all
2 about -- I'm sorry.
3    Q    That's okay.
4        MR. PANAGOPOULOS: While she's drinking
5 water, I'm just going to go ahead and state another
6 objection as to form.
7        THE WITNESS: The briefings were -- with
8 AFES, there would be a group of people, three to four
9 people depending on how many teams. And we would give
10 a PowerPoint presentation of travel precautions and
11 things that they needed for travel, their medications,
12 eyeglasses, et cetera --
13        BY MR. PLITT:
14    Q    And you were transmitting --
15    A    -- their medical records.
16    Q    -- information from -- information that had
17 already been prepared for you --
18    A    Right.
19    Q    -- to them?
20        MR. PANAGOPOULOS: Objection as to form.
21        THE WITNESS: We actually had a program, a
22 software program that someone did on PowerPoint.

Page 334

1        The briefings with the international people
2 occurred one to one because they didn't go out in
3 groups.
4        Debriefings was always one to one, whether
5 it was AFES or international. It was a more
6 confidential type of review of their trip, going over
7 any problems, if they had any injuries or medical
8 illnesses. Also an opportunity for me to identify if
9 there were any stressors involved that their
10 management team needs to know about, any employment
11 issues, staff issues.
12        Also, usually when they come back, they get
13 some type of immunization on the way back with AFES
14 personnel. International service, maybe they did,
15 maybe they did not, depending on the availability or
16 where they were as far as a medical center where they
17 could get that type of care.
18        MR. PANAGOPOULOS: Counsel, I'd like to
19 talk to you about where we're going at this point. If
20 you want to do this without your client in the room,
21 if you're concerned about the scope of the objection,
22 that's fine. But at this point, I think I've got a

Page 335

1 fairly serious issue that we need to talk about, about
2 what's going on.
3        Again, if you don't want your client to
4 hear the basis of the objection because it's more than
5 just to form, that's fine, but I do want this issue on
6 the record.
7        MR. PLITT: That's fine. I'm not going to
8 take a lot of time on it, because, you know, we've --
9 just for the record, I mean, we've had a day and a
10 half of your deposition and there's a lot of ground
11 that I want to cover and clarify. So I don't want to
12 eat into the time that we have here today.
13        MR. PANAGOPOULOS: I just have a simple
14 question for you. Do you want to do this out of the
15 presence of your client or in the presence of your
16 client?
17        MR. PLITT: I'll do it out of the presence,
18 but --
19        MR. PANAGOPOULOS: Okay.
20        MR. PLITT: -- I'm not going to take
21 much --
22        MR. PANAGOPOULOS: Why don't you give us a

Page 336

1 minute -- it's not going to be much. I just want to
2 state the basis of this objection.
3        MR. PLITT: I'm not going to take much time
4 on it because we really have to cover a good deal of
5 information. So maybe we ought to step out of the
6 room and talk.
7        MR. PANAGOPOULOS: Well, no. I want this
8 on the record.
9        MR. PLITT: Oh, on the record?
10        MR. PANAGOPOULOS: Yeah. But if you're
11 concerned that it's going to, you know, suggest
12 answers or something, that's why I -- or it's
13 inappropriate in some way.
14        You know, the reason for the objections as
15 to form is, you know, because you don't want someone's
16 lawyer coaching them. But when you have that own
17 person's lawyer asking the questions, I think it's
18 different --
19        MR. PLITT: Okay. I think we're getting
20 into something with the client in the room, and I
21 don't think --
22        MR. PANAGOPOULOS: Let's -- yeah, just for

Page 381

```
1    Q   Yes.
2    A   I don't know.
3    Q   Does she have a college degree?
4    A   I believe she does.  She's a baccalaureate
5  person.
6    Q.  Do you know from where?
7    A   No, I do not know.
8    Q   Do you know whether she has any higher
9  education other than her baccalaureate degree?
10   A   No, I do not know.
11   Q   Okay.  Do you know how many years' work
12 experience she has?
13   A   No.
14   Q   Okay.  Your knowledge of Ms. Davis's rate
15 of pay, is that based on what she told you?
16   A   Yes.
17   Q   Your knowledge of Mr. Thiel's rate of pay,
18 is that based on what he told you?
19   A   It's based on what Jane has told me.
20   Q   What who?
21   A   Jane has told me.
22   Q   Oh, okay.  So Jane told you what she
```

Page 382

```
1  thought Thiel was making?
2    A   That's correct.
3    Q   All right.  So the Red Cross grapevine, so
4  to speak.
5    A   Well, I hate to say grapevine, but everyone
6  is aware of the pay range or has knowledge of the pay
7  range for managers and all the different positions.
8    Q   Right.  Now, you understand that your
9  position ended because you chose not to accept a
10 different position within the organization?
11   A   Disagree.
12       MR. PLITT: Object as to form.
13       BY MR. PANAGOPOULOS:
14   Q   Okay.  Well, let me ask you this:  You had
15 the option of accepting a position?
16   A   I was offered a position.
17   Q   You were offered a position?
18   A   Uh-huh.
19   Q   You need to answer orally.
20   A   Yes, I did.
21   Q   Okay.  And you're the one who chose not to
22 take that position at that rate of pay that was
```

Page 383

```
1  offered to you?
2    A   That's correct.
3    Q   Okay.  If you had chosen to take that
4  position, you could potentially still be working at
5  the Red Cross at that rate of pay right now, correct?
6        MR. PLITT: Objection as to form.
7        THE WITNESS:  If I had accepted that?
8        BY MR. PANAGOPOULOS:
9    Q   If you had accepted it.
10   A   I would only accept it if they were going
11 to compensate me.
12   Q   Well, my question's different.  You do --
13   A   I understand that.
14   Q   -- understand that it was -- you had the
15 choice to accept it.  So if you would have accepted
16 that position, you would still potentially be working
17 at the Red Cross today, right?
18   A   Potentially, yes.
19   Q   Okay.
20       MR. PANAGOPOULOS: I have no further
21 questions.
22       MR. PLITT:  I've got one question based on
```

Page 384

```
1  the -- two questions based on the questions asked.
2    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
3        BY MR. PLITT:
4    Q   Talking about the hours of overtime pay
5  that you worked, is it possible for you to estimate
6  the number of hours of overtime over 40 hours a week
7  that you worked after Ms. Jane Davis left?
8        MR. PANAGOPOULOS: Objection as to form.
9        THE WITNESS:  Yes.  We did estimate that.
10       BY MR. PLITT:
11   Q   That's in your complaint?
12   A   That is in the complaint.
13   Q   Is it possible for you to estimate the
14 number of hours of overtime over 40 a week that you
15 had to work after Mr. Ken Thiel left?
16   A   That too is in the complaint.
17       MR. PANAGOPOULOS: All right.  Ms. Powell,
18 you have the right to review the deposition and read
19 and sign it, or you can waive that right.  That choice
20 is yours.
21       I would suggest you talk to your counsel
```