**AFES TRANSITION MEETING**
**Thursday June 23, 2005**
Attendees: Nancy Smith, Carolyn Williams, Nikki Sanderson, Kay Walton, Roger
Kingsley, Anna Shearer, Tonia Powell

1. Review of AFES Tiers
   a. Tier 3 need annual physical examination
   b. Verification of Tier 2 Reservist/Contingent personnel
   c. New hires for Tier 3 complete physical

2. CRC: Fort Bliss & Fort Benning
   a. Evidence of disconnect between CRC to adherence of policy
   b. Fort Bliss more restrictive (review tagged sections)
   c. Website links
   d. Current contacts
   Major Patricia Carnahan Commander of SRP
   Patricia.carnahan@amedd.army.mil
   915-569-6802

   Major Nina Britton
   Nina.britton@amedd.army.mil
   719-440-5491

3. Standards of Fitness 40-501
   a. Chapter 2
      i. BP/cholesterol
      ii. Diagnostic tests for cardiac
      iii. CPAP machine
   b. Reg 690-11 (appendix)

4. Information for DNA
   a. Repository 301-319-0366
   b. Need employee SS#

5. DoD Emergency Use Authorization for Anthrax April 2005
   a. Use of CDC website

6. Wellness Unit Procedures & Forms for AFES Physical Examinations
   a. All information on F-drive
   b. Spreadsheet
   c. Templates for all forms
   d. Review of chart file at later date

DEPARTMENT OF THE ARMY
2291ˢᵗ US ARMY HOSPITAL, DETACHMENT 8
FORT BLISS, EL PASO TEXAS

AFRC-CAR-HK                                           22 April 2004

MEMORANDUM FOR RECORD

SUBJECT: Guidelines for Civilians Deployment

1. References.

    a.  DA PAM 690-47 Civilian Employee Deployment Guide, 1 Nov 1995.
    b.  DA PAM 715-16 Contractor Deployment Guide, 27 Feb 1998.
    c.  AR 715-9 Contractor Accompanying the Force, 29 Oct 1999.
    d.  AR 40-562 Immunizations and Chemoprophylaxis, 1 Nov 1995.
    e.  AR 40-501 Standards of Medical Fitness, 19 Feb 2004.
    f.  Annex E (Medical and Dental), PPG ISO Contingency.
    g.  Annex I Dept. of the Army Civilians and DOD Contractors.
    h.  RTD 251804Z DA Washington DC for Federal Deployment Center, Jul 2003
    i.  TTP-SRP, 2291ˢᵗ USAH, IMSU, WBAMC, Ft. Bliss, Texas.

2. Federal employees and contractors serving under the auspices of the military services are subject to certain health requirements. All personnel deploying to South West Asia (SWA) Theater of Operation must be fit and possess basic skills in order to mitigate any threat and/or environmental situation they may encounter.

3. Several issues need to be considered before deploying a civilian to an area of operation. There are minimal requirements that are expected of any member in the service. Decisions need to be made on a case by case basis. The length of deployment is of particular importance for personnel with medical conditions. In general, they should be fit to perform their job and support our mission. Considering that Medical Treatment Facilities (MTF) in Area of Operation (AO) have limited resources and capabilities, civilians with unresolved conditions and/or special care needs should not be deployed. Allowing them to go could be detrimental to their health, armed forces mission and may carry a risk of legal responsibilities.

4. To ensure all personnel identified for deployment meet the requirement of Army Regulations and the combatant commander, the following guidelines should be enforced:

    a.  Pre-deployment Physical Exam. Complete physical and dental exam within 12 months of the reporting time. Emphasis during the physical exam is placed on evaluation of cardiovascular,

MEMORANDUM FOR RECORD
SUBJECT: Guidelines for Civilians Deployment

pulmonary, orthopedic, neurologic, endocrine, dermatologic, psychological, visual, and auditory fitness which may interfere with full performance of their duties. It should include CBC, U/A, blood sugar and any other pertinent lab according to the civilian conditions. For an individual over 40, a lipid evaluation and EKG are required. If there is an abnormal EKG or cardiac symptoms (chest pain, passing out or difficulty breathing), further cardiac evaluation is needed (stress test, echocardiogram). For females, a PAP smear and mammogram are required, following regular health maintenance guidelines. Also they should not be due during deployment. (For example, should have PAP performed if due within 3 months of deployment.) As a general rule, a PAP smear is done every year, mammograms every 2 years if over 40 and yearly if over 50. For abnormal PAP smears, colposcopy or gynecologic clearance is needed.

b.  Vaccines and immunizations. As a general rule all civilians are expected to have the same immunizations as deploying military personnel. Basic immunizations include; hepatitis A, polio, MMR, current annual influenza, tetanus-diphtheria and current PPD (last 12 months). Additional shots may include typhoid, anthrax and smallpox. Hepatitis B is required for food preparers, medical personnel and for security force individuals that may by exposed to blood/bodily fluids. Test for HIV in the last 6 months is required by most SWA countries. A negative HIV result is required prior to smallpox vaccine. Malaria prophylaxis may be indicated and a G6PD blood test will be required if Primaquine is to be given. Additionally, blood type should be known.

c.  Disqualifying Medical Conditions. The basic rule is that deployable civilians should be fit to operate in areas with limited medical facilities, environmental threats and possible hostile events. Medications could be lost and difficult to replace. Water, electricity and sanitary facilities may be inadequate or not available. Working hours and sleeping periods may be irregular. In some cases these factors may be detrimental to civilians with certain medical conditions. Also they should not be a hazard to others or affect military operations. Finally they should be able to wear a mask and other combat/protections devices and be physically fit to avoid, escape or resist hostile events. If there are any doubts or questions, final decisions will be considered on a case by case basis.

5.  Point of contact for this memorandum is the undersigned, 915-569-6850.

OMAR L. IZQUIERDO
COL, MC
Commanding

Encls (2)

ENCLOSURE 1:   Disqualifying Medical Conditions for Civilian Personnel

1.   The current guideline is to apply AR 40-501, Standards of Medical Fitness, 19 February 2004. This regulation provides information on medical fitness standards for induction, enlistment, appointment, retention, and related policies and procedures.

2.   It is the responsibility of the employer or agency to provide qualified, capable personnel to perform assigned duties. They need to be physically fit to perform their job in the theater and meet any other requirements specified by the in-theater commander.

3.   Civilians serving beside deployed units must be fit to function in the same military infrastructure. They may be subject to difficult geographical conditions like heat and sand. Exposure to uncommon infectious diseases is possible. In theater medical treatment facilities are equipped to provide basic medical care including initial management of most emergencies. Management of chronic illness is minimal. Personnel with special medical needs might consider use of local resources, if available.

4.   The final determination to deploy civilian personnel will be done by the responsible medical SRP / mobilization unit. The screening process begins with a required physical exam prior to deployment. If a medical condition is identified, the provider should recommend in favor or against deployment. Sometimes providers are not familiar with mobilization requirements. If not clear or if any doubt, a deployment risk assessment should be done.

5.   Deployment Risk Assessment. The idea is to use the AR 40-501 guidelines for Medical Fitness in conjunction with two other criteria. In general, medical condition that would disqualify an individual to be in the service are non-deployable conditions. Since a civilian is not expected to have the same physical fitness than a soldier, other factors need to be considered. First, consider the geographical and climate conditions including heat, sand, electricity, water and meal availability. Second, there are hostile and combat events. Factors to be considered are stress, mobility and use of combat gear. In summary, if you can not visualize a person with a particular medical condition performing their duties under extremes circumstances including combat exposure, "don't send that individual".



# Fort Bliss *Mobilization Station* (5035th GSU mission)

[ _Home_ ] [ _MOBILIZATION_ ] [ _DEMOBILIZATION_ ] [ _MED HOLD_ ] [ _POC_ ] [ _CRC_ ] [ _Publications_ ]
[ _Area of Interest_ ] 



| Dental | Finance |
| --- | --- |

**Mobilization Reserve Component Support Division, Fort Bliss, Texas**

**Soldier Readiness Processing (S.R.P.)**

## 1.  Administrative (Personnel):

Bring the following items (if applicable) to help your deployment processing:
Orders with paragraph and line number
Military identification card
Active Duty Armed Forces Identification Card (DD Form 2-Active)
At least one Black Pen to fill out Forms
Armed Forces Identification Card (DD Form 1173) (Civilian personnel)
ID TAGS (Dog Tags) – (Two complete sets with two ID tags in each set)
Current USAREUR driver's license
Officer Record Brief (DA Form 4037)
Personnel Qualification Record (DA Form 2-1)
SIDPERS Personnel Qualification Record
Enlisted (DA Form 2A)
Officer (DA Form 2B)
Record of Emergency Data (DD Form 93)
Family care plan
Marriage license
Mortgage or rental agreement
Service Members Group Life Insurance Election and Certificate (SGLI-8286)
Medical/Dental
Evidence of DNA specimen
HIV (negative) results within the last six months
Medical warning tags
Current shot record
Hearing aids
Two pair of eyeglasses and one pair of NBC mask inserts
90 day supply of prescription medicine and copy of prescription
Dental records with panographic x-ray
Current SF 93 (Report of Medical History)

Most Recent SF 88 (Report of Medical Examination)
Current DA Form 8007 (signed by MD)
Official US passport and any required visa (Civilian personnel)
Department of Defense Geneva Convention Card (DD Form 489)
Civilians, chaplains, and medical personnel only.

ALL TRAINING RECORDS
Weapon qualification card within last six months
APFT results
CTT results.
Units should coordinate with the Fort Bliss Mobilization (5035 GSU) for additional
requirements.

Civilians should coordinate with their local civilian personnel office and/or employer prior to
deployment. For further guidance regarding deployment, civilians should refer to:
Department of the Army Pamphlet 600-8-1, Personnel Processing
Army Regulation 600-8-1, Personnel Processing
Department of the Army Pamphlet 715-16, Contractor Deployment Guide
Army Regulation 715-XX, Army Contractors on the Battlefield
Department of the Army Pamphlet 690-47, Civilian Employee Deployment Guide
Deployed Civilians On-Line Website
http://www.chrma.hqusareur.army.mil/ (Click on Deployed Civilians)

**2. Medical:** The following is required for all personnel before deploying:

1. Physical examination documentation

a. Report of Medical Examination (Standard form 88)
b. Report of Medical History (Standard Form 93)

Physical examinations must have been completed within the last five years and be signed and
stamped by a medical doctor. For individuals over 40 years of age, the physical examination
must have been completed within two years.

2. Immunization Record (Standard Form 601) dated, signed and stamped by a medical doctor
for the following immunizations:

a. Hepatitis A (Two-injection series - 2nd injection given six months to one year after 1st
injection).

b. Hepatitus B (3-injection series - 2nd injection given 30 days after 1st injection, 3rd injection
given six month injection given six months after 2nd injection,).

Note: Hepatitus B immunization is required for food preparation/service personnel, medical
personnel, military police and those personnel likely to be exposed to body fluids.

c. Tetanus-Diptheria - within 10 years.

d. Measles, Mumps and Rubella (MMR) - one-time injection (born before 1956, injection is not
required).

e. PPD (Tuberculin Tine Test) - one year before going OCONUS.

f. . Typhoid - within three years if given injection or within five years if given by pills.

g. Influenza - required once a year.

h. Yellow Fever - every ten years.

Anthrax?

Note: All immunizations must be annotated properly on Standard Form 601. If not, all required immunizations will be given before deployment.

3. HIV Test - Hard copy proof of negative results dated within the last year and signed and stamped by a medical doctor. Exception can be postcard, annotation in medical records, or annotation on individual's orders.

4. DNA specimen - hard copy proof of collection with date of collection, signed and stamped by a medical doctor.
5. Medical Warning Tags (Dog Tags) - two complete sets. If medical condition requires wearing, medical warning tags, they should be acquired before reporting to Fort Benning.

6. All personnel who wear prescription glasses are required to deploy with at least two pair (one of which may be of civilian type design), one pair protective mask lens inserts, and a current copy of prescription.

7. All personnel currently taking prescription medication are required to bring a copy of the prescription and at least a 90-day supply of the medication.

For more information, call 5035 GSU/MRCS.

3. **Dental:** The following is required for all personnel before deploying:

Proof of panographic X-ray (panorex).
All deploying personnel must show proof of a valid panographic X-ray. Military personnel not allowed to bring an actual copy of the X-ray because of service or installation restrictions must bring the original Home Station Soldier and Civilian Checklist (TRADOC Form 60-8-101) dated, signed and stamped by a dentist certifying a panographic X-ray is on file.

Proof of dental classification.
Personnel in dental classification three or four receiving treatment for pain, trauma, oral infection or follow-up care will not deploy until treatment is completed.

For more information contact (706) 544-3956; DSN, 784-3956

4. **Validation:** **Click on Hyperlink**

5. **Baggage:**
THIS MESSAGE IS APPROVED FOR RELEASE BY COL EVANS, TACC/XOG, DSN 779-

2760

SUBJECT: MOVEMENT OF EXCESS BAGGAGE, WEAPONS AND SMALL ARMS
AMMUNITION ABOARD AMC MISSIONS

1.EXCESS BAGGAGE.
A. IN RECENT WEEKS MOBILITY PERSONNEL HAVE BEEN TRAVELING VIA AMC
CHANNEL MISSIONS IN LIEU OF DEDICATED CONTINGENCY OR SAAM AIRLIFT.
CHANNEL MISSIONS DO NOT PLAN FOR THE EXTRA WEIGHT THAT THESE TDY
PERSONNEL NEED TO CARRY (A, B, C, ETC BAGS). THERE HAVE BEEN SEVERAL
OCCASIONS WHERE TROOPS WERE TRAVELING WITH EQUIPMENT, BOXES, OR
BAGS UNDER THE GUISE OF EXCESS BAGGAGE, WHICH SHOULD HAVE BEEN
SHIPPED AS CARGO. LARGE AMOUNTS OF AUTHORIZED EXCESS BAGGAGE HAVE
EXCEEDED THE MAXIMUM AIRCRAFT CABIN LOAD (ACL) ON SEVERAL PATRIOT
EXPRESS MISSIONS AND THEREFORE SOME BAGGAGE WAS LEFT BEHIND. IN THE
LATEST INCIDENT, 151 PIECES OF BAGGAGE WERE LEFT BEHIND AND HAD TO BE
FORWARDED AT A LATER TIME. RESULT: WAR FIGHTERS ARE ARRIVING IN THEATER
WITHOUT PERSONAL OR GOVERNMENT ISSUED GEAR; THUS IMPACTING THEIR
ABILITY TO PERFORM THE MISSION. LONG TERM RESOLUTION: TACC/XOG WILL
INCREASE REQUIREMENT AND AMC/DOY WILL CONTRACT FOR LARGER AIRFRAMES
DURING AEF ROTATIONS. OTHER EXAMPLES OF EXCESS BAGGAGE CONCERNS:

1) ONE TEAM OF 22 CHECKED IN AT BALTIMORE GATEWAY WITH 92 BAGS AT 4,010
POUNDS AND 30 CRATES AT 2,914 POUNDS, AT LEAST 6 CRATES WERE OVER 200
LBS.

2) A 54 PERSON TEAM TRAVELING FROM BALTIMORE WITH EXCESS BAGGAGE
AUTHORIZED HAD A TOTAL OF 215 BAGS AT 9,108 POUNDS.

B. IAW AMCI 24-101, VOLUME 15, MILITARY AIRLIFT, AND DOD 4500.9, DTR PART 1,
PASSENGERS ARE AUTHORIZED TO CHECK TWO PIECES OF BAGGAGE NOT TO
EXCEED 70 POUNDS EACH (140 POUNDS TOTAL) AND 62 LINEAR INCHES (THE SUM
OF THE LENGTH PLUS THE WIDTH PLUS HEIGHT). SINGLE ITEMS EXCEEDING 70
POUNDS AND/OR 62 LINEAR INCHES WILL BE COUNTED AS TWO PIECES AND
THEREFORE, FULFILL THE ALLOWANCE FOR THE PASSENGER. ITEMS EXCEEDING
100 POUNDS WILL NOT BE ACCEPTED. ALL AUTHORIZED EXCESS BAGGAGE MUST
BE ANNOTATED ON TRAVEL ORDERS AND MUST INDICATE THE NUMBER OF
AUTHORIZED PIECES.

2. WEAPONS AND SMALL ARMS AMMUNITION. THERE HAVE BEEN SEVERAL
PROBLEMS WITH WEAPONS AND SMALL ARMS AMMUNITION (1.4S.). IAW THE DTR
PART 1, APPENDIX I, SMALL ARMS AMMUNITIONS (1.4S) AND HAZMAT CANNOT BE
SHIPPED IN CHECKED BAGGAGE. SMALL ARMS AMMUNITION MUST BE CERTIFIED
AND SHIPPED AS FREIGHT FROM A MILITARY INSTALLATION. NOTE: THERE IS NO
SPECIAL HANDLING SECTION TO PROCESS HAZMAT CARGO AT THE AMC
COMMERCIAL GATEWAYS (I.E. BALTIMORE, SEATAC). IF DEPLOYING TROOPS
ARRIVE AT COMMERCIAL GATEWAYS WITH 1.4S, THEY WILL BE INSTRUCTED TO GO
TO A MILITARY INSTALLATION TO HAVE THE AMMUNITION CERTIFIED AND MOVED
AS FREIGHT, OR IT MUST BE LEFT BEHIND AT A NEARBY MILITARY INSTALLATION.
PLEASE KEEP IN MIND THAT WEAPONS CAN BE ACCOMMODATED, BUT MUST BE IN A

LOCKED CONTAINER AND PROCESSED AS CHECKED BAGGAGE. ADDITIONALLY, WEAPONS STORAGE CAPABILITY IS NON EXISTENT AT COMMERCIAL GATEWAYS, THEREFORE, TROOPS ARE RESPONSIBLE FOR STORING WEAPONS IF TROOPS ARRIVE EARLY OR THE MISSION DELAYS.

3. PLEASE REMIND ALL DEPLOYING UNITS OF THESE POLICIES SO THEIR DEPLOYMENTS GO AS SMOOTHLY AS POSSIBLE. THIS IS A COORDINATED MESSAGE BETWEEN USTRANSCOM, TACC/XOG/XOP, AND AMC/DONP.

//SIGNED//
CLARENCE J. EVANS, COLONEL, USAF
DIRECTOR, GLOBEL CHANNEL OPERATIONS

UNCLAS//

---

**5035th Garrison Support Unit (GSU)/Mobilization Detachment (MRCS)**
Staff Duty (24 hours): (915) 568-5098, DSN 978; Fax (915) 568-6528.
(Bldg) 2444 Cassidy Rd., Fort Bliss, TX 79916-3500 USA



Army Regulation 690–11

Civilian Personnel

# Use and Management of Civilian Personnel in Support of Military Contingency Operations

Headquarters
Department of the Army
Washington, DC
26 May 2004

UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 690-11
Use and Management of Civilian Personnel in Support of Military Contingency
Operations

This revision dated 26 May 2004--

o  Changes the title of this regulation from Mobilization Planning and
   Management to Use and Management of Civilian Personnel in Support of Military
   Contingency Operations.

o  Updates roles and responsibilities (paras 1-4 through 1-9).

o  Updates the definition of Emergency-Essential (para 1-10).

o  Outlines the requirements for contingency and emergency planning (para 2-1).

o  Outlines the entitlements of deployed civilians (para 2-2a).

o  Outlines the requirements for processing of personnel for overseas
   replacement (para 2-2c).

o  Outlines the training, clothing, and equipment requirements for deploying
   civilians (para 2-2d).

o  Revises the listing of required and related publications (app A).

o  Revises the listing of terms and definitions (glossary).

Headquarters
Department of the Army
Washington, DC
26 May 2004

*Army Regulation 690–11

Effective 26 June 2004

Civilian Personnel

# Use and Management of Civilian Personnel in Support of Military Contingency Operations

By order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

*[signature]*

JOEL B. HUDSON
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This regulation on the mobilization, deployment planning, and management of Department of the Army civilians in support of the Army's mission in all crisis situations, implements DOD directives 1400.31 and 1404.10 and DOD Instructions 1400.32.

**Applicability.** This regulation applies to the Active Army, the Army National Guard of the United States, and the U.S. Army Reserve. During mobilization, the proponent may change policies and procedures in this regulation. This regulation applies to peacetime planning for all military contingency operations, including peacekeeping and humanitarian operations from pre–emergency through partial, full, and total mobilization execution. It applies to all levels of Army command with

mobilization missions that include planning for the deployment and management of Army civilian personnel paid from appropriated funds. This regulation does not apply to contractor employees (other than for tracking purposes) and has limited applicability to nonappropriated fund and foreign nationals outside continental U.S. personnel. Commanders may follow this regulation as a guideline, when appropriate, to maintain nonappropriated fund support during mobilization. Foreign national support is subject to governing treaties and local agreements.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling laws and regulations. The proponent may delegate the approval authority, in writing, to a division chief within the proponent agency or a direct reporting unit or field operating agency of the proponent agency in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy

proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions in accordance with Army regulation 11–2, but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1, ATTN: DAPE–MP–PRO, 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) to Deputy Chief of Staff, G–1, ATTN: DAPE–MP–PRO, 300 Army Pentagon, Washington, DC 20310–0300.

**Distribution.** Distribution of this publication is available in electronic media only and is intended for command levels A, B, C, D, and E for Active Army, the Army National Guard of the United States, and the U.S. Army Reserve.

# Contents (Listed by paragraph and page number)

## Chapter 1
Introduction, *page 1*

*Section I*
*Provisions, page 1*
Purpose • 1–1, *page 1*

---

*This regulation supersedes Army regulation 690–11, 14 September 1990.

AR 690–11 • 26 May 2004

i

**UNCLASSIFIED**

## Contents—Continued

References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*

*Section II*
*Responsibilities, page 1*
Deputy Chief of Staff, G–1 • 1–4, *page 1*
Deputy Chief of Staff, G–3 • 1–5, *page 1*
Commanding General, U.S. Army Human Resources Command • 1–6, *page 2*
The combatant commander • 1–7, *page 2*
Commanders of major commands and heads of independent reporting activities • 1–8, *page 2*
All commanders with mobilization missions • 1–9, *page 2*

*Section III*
*Emergency–Essential, Key, and Cadre Positions and Employees, page 3*
Emergency–Essential positions categories • 1–10, *page 3*
Key positions and employees • 1–11, *page 3*
Cadre positions and employees • 1–12, *page 3*
Alternate positions and employees • 1–13, *page 3*

**Chapter 2**
**Civilian Contingency and Emergency Planning,** *page 4*
Personnel guidance • 2–1, *page 4*
Preparedness planning • 2–2, *page 4*

**Appendix A.**   References, *page 6*

**Glossary**

# Chapter 1
# Introduction

## Section I
## Provisions

### 1–1. Purpose
This regulation establishes policy and procedures on preparing and maintaining plans to recruit, train, mobilize, deploy, and redeploy Department of the Army (DA) civilian employees who are required to perform emergency functions in support of military contingency operations.

### 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

## Section II
## Responsibilities

### 1–4. Deputy Chief of Staff, G–1
The Deputy Chief of Staff (DCS), G–1, DAPE–MP–PRO will—

*a.* Issue policy on the establishment of positions for and the use of DA civilian employees as Emergency–Essential (E–E), key, cadre, and alternates.

*b.* Propose modifications to Joint Travel Regulations entitlements, as required.

*c.* Recommend legislation and executive orders needed to resolve civilian personnel management issues under emergency or non–emergency conditions.

*d.* Establish policy for the mobilization and deployment of E–E civilian designees or alternates.

*e.* Determine functional requirements of management information systems that allow for the identification and tracking of employees who have been designated as E–E, key, and cadre.

*f.* Coordinate automation actions with Office of Secretary of Defense, other Department of Defense (DOD) components, and internal Army organizations to ensure that mobilization planning and execution requirements for the identification and deployment of civilian employees are supported.

*g.* Direct the inclusion of mobilization planning and execution requirements in appropriate training courses.

*h.* Coordinate with career program functional chiefs and personnel proponents on mobilization issues.

*i.* Establish policy and criteria for selecting E–E, key, cadre, and alternate employees.

*j.* Advise and assist Army Staff agencies in planning for the use and management of DA civilian employees in support of military operations.

*k.* Monitor exercises that test and validate DA civilian personnel plans, policies, and procedures.

*l.* Provide guidance to the Department of the Army Civilian Personnel community regarding the responsibilities for mobilization planning and execution and deployment of DA civilian employees.

*m.* Develop and coordinate procedures and plans for the use of DA civilian employees in military contingency operations and for the expansion of civilian and military manpower to meet the crisis situations.

*n.* Develop and coordinate Army mobilization and deployment personnel procedures and plans, to include—

(1) Accountability and reporting of all civilian categories (Army, other DOD components, Red Cross, Army and Air Force Exchange Service, contractors, and so on) deployed in support of contingency operations.

(2) Evaluation of the adequacy and effectiveness of Department of Army (DA) instructions and guidance for the deployment of civilian employees.

*o.* Develop post–mobilization (M–Day) (during crises) guidance for major commands (MACOMs) in the application of emergency civilian personnel procedures.

### 1–5. Deputy Chief of Staff, G–3
The Deputy Chief of Staff (DCS), G–3 will—

*a.* Integrate E–E, key, and cadre considerations into total force planning.

*b.* Ensure the documentation of E–E, key, and cadre positions on Table of Distribution and Allowance/Mobilization Table of Distributions and Allowances or other related manning documents.

*c.* Require Situation Reports (SITREPs) to report status of all civilian categories (Army, other DOD components, Red Cross, Army and Air Force Exchange Service, contractors, and so on) deployed by name, social security number, category, skills, location, and unit supported.

*d.* Be the sole tasking agent for DA civilian requirements in support of contingency operations.

## 1–6. Commanding General, U.S. Army Human Resources Command
The Commanding General, U.S. Army Human Resources Command (USA HRC) will—

*a.* Execute manpower mobilization plans and procedures for Army transition from peacetime to wartime, including support for military contingency operations.

*b.* Develop operational plans and procedures for implementing the policy requirements pertaining to the mobilization and deployment of DA civilians.

*c.* Maintain status of mobilization and deployment requirements for DA civilians and others as designated, identify shortfalls, and make recommendations as required.

*d.* Establish procedures to ensure the orderly deployment of E–E employees and others through designated processing sites.

*e.* Execute procedures to track and report status of all civilian categories (Army, other DOD components, Red Cross, Army and Air Force Exchange Service, contractors, and so on) deployed in the area of operations.

*f.* Serve as point of contact for individual civilian replacement and augmentation actions.

## 1–7. The combatant commander
The combatant commander will—

*a.* Establish requirements for E–E employees (for example, numbers, skills) in the theater of operations.

*b.* Establish procedures and coordinate with DCS, G–3 (DAMO–ODO) for individual replacements and augmentees.

*c.* Receive and in-process E–E employees during military operations.

*d.* Account for and report the status of all civilian categories (Army, other DOD components, Red Cross, Army and Air Force Exchange Service, contractors, and so on) assigned or attached in support of a contingency operation and provide SITREPs to DCS, G–1 (DAPE–MP–PRO–PCC).

*e.* Establish Time Phased Force Deployment Data priorities for E–E employees.

*f.* Establish and announce the administrative workweek to ensure that E–E employees receive proper payment for all hours worked.

*g.* Determine theater and/or specific operation deployability requirements such as medical and physical requirements, clothing and equipment, weapons issue policy for E–E employees, deployed personnel tracking and reporting procedures, theater unique cultural and environmental training, and provide this information to DCS, G–1 (DAPE–MP–PRO–PCC) prior to deployment of DA civilians.

## 1–8. Commanders of major commands and heads of independent reporting activities
The commanders of MACOMs and heads of independent reporting activities will—

*a.* Develop and implement mobilization and deployment, plans and procedures needed to ensure the implementation of DOD and DA policy affecting civilians.

*b.* Develop and maintain plans required to support military contingency operations at all levels of mobilization, to include plans to recruit, train, assign, and deploy DA civilian employees in correct numbers with required skills to ensure effective support of the military mission.

*c.* Maintain awareness of civilian mobilization and deployment requirements, identify shortfalls, and take appropriate corrective action.

## 1–9. All commanders with mobilization missions
All commanders who have mobilization missions will—

*a.* Ensure the correct designation and documentation of E–E, key, and cadre positions on all appropriate documents and systems, for example, position descriptions, vacancy announcements, automated personnel systems, Table of Distribution and Allowances, and Mobilization Table of Distribution and Allowances.

*b.* Provide the necessary resources and support for E–E employees and alternates as specified in DODD 1404.10.

*c.* Ensure the annual screening of E–E designees and their alternates as reflected in DODD 1200.7 to ensure that ready reservists and military retirees in recall status do not occupy E–E positions unless they have received an exemption.

*d.* Ensure all deploying DA civilians process through a designated continental U.S. (CONUS) Replacement Center (CRC) and/or Individual Deployment Site.

*e.* Ensure that appropriate plans, procedures, and standby emergency implementation documents have been developed.

*f.* Ensure that field and command post exercises are conducted as joint military–civilian exercises. These exercises will test the capability of civilian emergency plans to provide essential civilian support to ensure success of the military mission.

*g.* Periodically evaluate the effectiveness of installation mobilization planning.

*h.* Establish procedures to identify E–E, key, and cadre positions. Ensure the identification of both primary and an alternate employee, as appropriate.

*i.* Include the Civilian Personnel Advisory Center's staff in all aspects of mobilization planning as appropriate.

**Section III**
**Emergency–Essential, Key, and Cadre Positions and Employees**

**1–10. Emergency–Essential positions categories**
Civilian employees will continue to support the Army's military mission in all crisis situations. Emergency–Essential civilian positions must be limited to those positions specifically required to ensure the success of combat operations or the availability of combat–essential systems.

*a. Pre–identified positions.* Employees assigned to pre–identified positions must sign a DD Form 2365 (DOD Civilian Employees Overseas Emergency–Essential Position Agreement) as a condition of employment. The agreement specifies that the employee must continue to perform the duties and requirements of the E–E position in the event of crisis situation or wartime. For an E–E employee who occupies an overseas E–E position, this agreement takes precedence over any existing transportation agreement. If a person with military recall status, that is, Ready Reserve, Standby Reserve, or other military recall status is selected for an E–E position, his or her nonavailability for military mobilization will be reported promptly to the appropriate military personnel center so that he or she may be removed from military recall status. Any employee selected for an E–E position who cannot be exempted from recall to active duty will not be appointed to an E–E position.

*b. Positions not pre–identified.* Because of unforeseen circumstances, it may become necessary to identify positions as E–E that have not previously been so identified. These positions may be located overseas or may be positions in the United States from which an employee would be sent to the location of the military contingency or other crisis overseas.

(1) Employees in positions located overseas that are identified as E–E after the outbreak of a military crisis will be asked to execute an E–E agreement. If the employee declines, the employee will continue to perform the functions of the position if no other qualified employee or military member is reasonably available. The employee will be entitled to the benefits and protections of an E–E employee, but will be reassigned out of the position and assigned to a non–E–E position as soon as reasonably practicable under the circumstances.

(2) An employee in the United States who occupies a position that is identified as E–E after a crisis develops or contingency mission begins, will be asked to execute a DD Form 2365 and participate in contingency operations during the crisis. If the incumbent declines to sign the agreement or perform in the newly designated E–E position, the employing activity will seek another employee to volunteer to fill the position. If a volunteer is available, the incumbent will be detailed or transferred to a non–E–E position, if one is available, at the same grade for which he or she is qualified. If a volunteer is not found, and the incumbent declines to sign the agreement but possesses the skills and expertise, which in management's view renders it necessary that he or she perform in the E–E position without an E–E agreement, the employee may be involuntarily assigned the E–E duties at the location where needed, and directed to perform the duties at that location on a temporary basis.

**1–11. Key positions and employees**
Some DA civilians occupy positions that cannot be vacated during national emergency or mobilization without seriously impairing the capability of their organization. To ensure continuity in mission, commanders may designate these positions as key. Civilians in key positions must be exempted from recall to active duty because of Reserve or retired military obligation.

**1–12. Cadre positions and employees**
Cadre positions form the core of emergency or expanded functions at an existing installation or an installation to be activated upon mobilization. Department of the Army civilians designated to fill cadre positions upon mobilization are cadre employees. Any employee selected for a cadre position who cannot be exempted from recall to active duty will not be appointed to a cadre position.

**1–13. Alternate positions and employees**
Alternate employees, as defined in DODD 1404.10, are DA civilians who agree to perform the duties of an E–E civilian position in the absence of an E–E employee during a crisis situation. Alternate employees must meet the same criteria required of E–E employees.

# Chapter 2
# Civilian Contingency and Emergency Planning

## 2–1. Personnel guidance
This chapter provides civilian personnel guidance for developing plans for identifying, training, deploying, and sustaining DA civilians required to perform E–E functions in support of the military contingency mission.

## 2–2. Preparedness planning
*a. Plans and procedures.* Plans and procedures for the mobilization and deployment of the civilian workforce during contingencies and emergencies must be based on guidance provided in DODD 1400.31 and DODI 1400.32.

*b. Entitlements.*

(1) Department of the Army civilians, including E–E employees, who remain in or are deployed to areas of contingencies or emergencies during a declared emergency or outbreak of war, are normally entitled to—

*(a)* Evacuation of their family members (same priority and services or assistance as family members of military personnel, in accordance with DODD 3025.14).

*(b)* Payments and allowances (for example, danger pay; post differential; separate maintenance allowance if family members are evacuated due to dangerous living conditions; continued pay and allowances if captured or missing; overtime or other premium pay), as authorized.

*(c)* Protective equipment and training commensurate with the anticipated threat and theater policy.

*(d)* Geneva Convention identity cards in accordance with DODI 1000.1.

*(e)* Personal and family services (for example, legal assistance in accordance with AR 27–3, family support programs, Post Exchange, commissary privileges, and use of Morale, Welfare, and Recreation facilities and activities).

*(f)* Medical services (medical treatment same as provided military members while deployed and continued care for illness, disease, or injury sustained while deployed during contingency operations). Civilian employees who sustain injury or death while deployed may also receive benefits provided by the Federal Employees Compensation Act.

*(g)* Casualty services (tracking under military casualty system; next–of–kin notification by Casualty Area Command; military escort of remains; and a U.S. flag and casket provided at Government expense).

*(h)* Automatic restoration of annual leave lost by an E–E employee while deployed to a combat zone, without having to preschedule and get supervisor's approval.

*(i)* Authorization to enroll in basic Federal Employees Group Life Insurance (FEGLI) coverage upon designation as an E–E employee.

(2) Standard benefits and entitlements for federally employed civilians will continue throughout the deployment, including any FEGLI coverage.

(3) In accordance with DSSR 131–2, living quarters allowance for DOD civilians overseas is authorized for employees' family members if the employee is deployed to a remote assignment and the family members reside at the assigned location or relocate to another overseas site.

*c. Medical fitness.*

(1) Personnel selected for or occupying E–E and alternate positions will meet the medical fitness and physical requirements of the job as determined by the combatant or MACOM commander.

(2) Any special medical fitness requirements must be job related and/or theater specific.

(3) E–E and alternate employees will be encouraged, but not required, to participate in physical fitness and conditioning activities in accordance with AR 600–63.

*d. Overseas replacement.*

(1) Replacement of E–E employees will be at the discretion of the combatant commander. Emergency–Essential employees will be released from their agreement and permitted to leave the crisis area after the initial evacuation of noncombatants only when appropriate management authority determines that they are no longer required or able to perform their assigned duties. In making that determination, the appropriate authority will take into consideration any rotation policy and procedures established for military members during the contingency.

(2) All CONUS–based DA civilians (E–E, volunteers, and replacements) will process through a designated CRC prior to deployment.

(3) During periods of mobilization, to include a Presidential Reserve Call–up, the commander, USA HRC is authorized (when delegated the authority by DCS, G–3) to task across MACOMs to fill required E–E positions.

(4) Processing of personnel for overseas replacement will meet the requirements of this regulation, the Army Mobilization Operations Planning and Execution System (AMOPES), the operational specific criteria established by the gaining command, and AR 600–8–101.

*e. Training, clothing, and equipment.*

(1) E–E employees and alternates.

*(a)* Headquarters, Department of the Army mandated training includes the following: first aid and other soldier field survival tasks; hands–on Mission Oriented Protective Posture (all levels); Geneva Convention (relative to the treatment

of Prisoners of War, August, 12, 1949), review and update; and an explanation of entitlements and the circumstances under which the entitlements are authorized. Training requirements are the responsibility of the employee's home installation and will be conducted in accordance with AMOPES and MACOM guidance.

*(b)* Combatant commanders may approve, under certain conditions, issuance of a personal military weapon for selfdefense to DA civilians. Prior to issuing a personal military weapon for selfdefense to civilians, they must receive weapons familiarization training in the proper use and safe handling of firearms. Acceptance of a personal military weapon for selfdefense is voluntary. Civilians may not be assigned to guard duty or perimeter defense or to engage in offensive combat operations. Only Government–issued weapons or ammunitions may be authorized.

(2) *Key civilian employees.* These employees will receive the training necessary to ensure mission accomplishment in support of CONUS sustaining base operations during mobilization.

(3) *Cadre civilian employees.* These employees will receive the training necessary to ensure mission accomplishment in support of CONUS sustaining base operations during mobilization.

(4) *Deploying civilians.* All deploying civilians are expected to wear the appropriate military uniform as determined and directed by the theater commander. DA Pam 690–47 and AR 670–1 contain more details on the issuance and wearing of military uniforms and equipment.

## Appendix A
## References

### Section I
### Required Publications

**AR 27–3**
The Army Legal Assistance Program. (Cited in 2–2b(1)(e).) Available at http://www.apd.army.mil.

**AR 600–63**
Army Health Promotion. (Cited in para 2–2c(3).) Available at http://www.apd.army.mil.

**AR 600–8–101**
Personnel Processing (In–, Out–, Soldier Readiness, Mobilization and Deployment Processing). (Cited in para 2–2d(4).) Available at http://www.apd.army.mil.

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia. (Cited in para 2–2d(4).) Available at http://www.apd.army.mil.

**DA Pam 690–47**
DA Civilian Employee Deployment Guide Use and Administration of Local Civilians in Foreign Areas during Hostilities. (Cited in para 2–2e(4).) Available at http://www.apd.army.mil.

**DODD 1200.7**
Screening the Ready Reserve. (Cited in para 1–9c.) Available at http://www.dtic.mil/whs/directives.

**DODD 1400.31**
DOD Civilian Work Force Contingency and Emergency Planning and Execution. (Cited in para 2–2a.) Available at http://www.dtic.mil/whs/directives.

**DODD 1404.10**
Emergency–Essential (E–E) DOD U.S. Citizen Civilian Employees. (Cited in para 1–9b.) Available at http://www.dtic.mil/whs/directives.

**DODD 3025.14**
Protection and Evacuation of U.S. Citizens and Designated Aliens in Danger Areas Abroad (Short Title: Noncombatant Evacuation Operations). (Cited in para 2–2b(1)(a).) Available at http://www.dtic.mil/whs/directives.

**DODI 1000.1**
Issuance of Identity Cards Required by the Geneva Convention relative to the treatment of Prisoners of War, August 12, 1949. (Cited in para 2–2a(1)(d).) Available at http://www.dtic.mil/whs/directives.

**DODI 1400.32**
DOD Civilian Work Force Contingency and Emergency Planning Guidelines and Procedures. (Cited in para 2–2a.) Available at http://www.dtic.mil/whs/directives.

**DSSR 131–2**
Department of State Standardized Regulations: Living Quarters Allowance. (Cited in para 2–2b(3).) Available at http://www.state.gov/m/a/als/1728.htm.

### Section II
### Related Publications
A related publication is a source of additional information. The user does not have to read it to understand this publication.

**AR 71–32**
Force Development and Documentation–Consolidated Policies

**AR 135–133**
Ready Reserve Screening, Qualification Records System and Change of Address Reports

**AR 600–8–14**
Identification Cards for Members of the Uniformed Services, their Eligible Family Members, and Other Eligible Personnel

**AR 601–10**
Management and Mobilization of Retired Soldiers of the Army

**AR 690–400**
Total Army Performance Evaluation System (chap 4302)

**AR 500–5**
Army Mobilization

**FM 12–6**
Personnel Doctrine http://www.adtdl.army.mil/atdls.htm

**FM 100–17**
Mobilization, Deployment, Redeployment, Demobilization http://www.adtdl.army.mil/atdls.htm

**5 CFR 230**
Agency Authority to Take Personnel Actions in a National Emergency http://www.gpoaccess.gov/cfr

**JTR, Volume 2**
Department of Defense Civilian Personnel Joint Travel Regulations http://www.dtic.mil/perdiem/trvlregs.html

**10 USC 129**
Prohibition of certain civilian personnel management constraints http://www.army.mil

**Section III**
**Prescribed Forms**

**DD Form 2365**
DOD Civilian Employee Overseas Emergency–Essential Position Agreement. (Prescribed in 1–10a.) Available at http://www.apd.army.mil.

**Section IV**
**Referenced Forms**
This section contains no entries.

# Glossary

## Section I
## Abbreviations

**AMOPES**
Army Mobilization Operations Planning and Execution System

**AR**
Army Regulation

**CONUS**
continental United States

**CRC**
CONUS Replacement Center

**DA**
Department of the Army

**DA Pam**
Department of the Army Pamphlet

**DOD**
Department of Defense

**DODD**
Department of Defense Directive

**DODI**
Department of Defense Instruction

**E–E**
Emergency–Essential

**FEGLI**
Federal Employees Group Life Insurance

**MACOM**
major Army command

**M–Day**
mobilization–day

**SITREPs**
Situation Reports

## Section II
## Terms

**Active duty**
Full–time duty in the active military service of the United States.

**Civilian employee**
A direct hire U.S. employee who is appointed either temporarily or permanently to a position with the Department of the Army or other DOD component.

**CONUS**
United States territory, including the adjacent territorial waters, located within the North American Continent between

Canada and Mexico. For the purpose of this regulation, CONUS includes Alaska, Hawaii, Puerto Rico, and the U.S. Virgin Islands (Joint Publication 1–02, DOD Dictionary of Military and Associated Terms).

**CONUS Replacement Center (CRC)**
CONUS centers established to validate processing for overseas replacement operations.

**D–Day**
The day on which an operation begins or is due to begin. This may be the commencement of hostilities or any other operation.

**Deployment**
Depending on the context: (1) the movement of forces within operational areas; (2) the positioning of forces into a formation for battle; or (3) the relocation of forces and materiel to desired operational areas. Deployment encompasses all activities from origin or home station through destination, specifically including intracontinental United States, intertheater, and intratheater movement legs, staging, and holding areas.

**Emergency–Essential (E–E) civilian position**
An "F1" civilian position located overseas or that would be transferred overseas during a crisis situation or which requires the incumbent to deploy or to perform temporary duty assignments overseas during a crisis in support of a military operation. That position is required to ensure the success of combat operations or to support combat–essential systems subsequent to mobilization, an evacuation order, or some other type of military crisis. That position cannot be converted to a military position because it requires uninterrupted performance to provide immediate and continuing support for combat operations and/or support maintenance and repair of combat–essential systems.

**Full mobilization**
Expansion of the active armed forces resulting from action by Congress and the President to mobilize all Reserve Component units in the existing approved force structure, as well as all individual reservists, retired military personnel, and the resources needed for their support to meet the requirements of a war or other national emergency involving an external threat to the national security. Reserve personnel can be placed on active duty for the duration of the emergency plus 6 months (Section 12301(a), Title 10, United States Code).

**M–Day**
The day on which full mobilization begins or is to begin.

**Mobilization**
The act of assembling and organizing national resources to support national objectives in time of war or other emergencies. The process by which the armed forces or a part of them are brought to a state of readiness for war or other national emergency. This includes activating all or part of the Reserve Components as well as assembling and organizing personnel, supplies, and materiel.

**Operations plan (OPLAN)**
A classified plan containing details of a military operation. A separate OPLAN exists for each theater of operations.

**Outside continental U.S. (OCONUS)**
All locations outside the continental United States. For the purpose of this regulation, OCONUS excludes Alaska, Hawaii, Puerto Rico, and the U.S. Virgin Islands (Joint Publication 1–02, DOD Dictionary of Military and Associated Terms).

**Partial mobilization**
Expansion of the active armed forces resulting from action by Congress (up to full mobilization) or by the President of not more than 1 million Ready Reservists for not more than 24 consecutive months, under Section 12302, Title 10, United States Code and the resources needed for their support to meet the requirements of a war or other national emergency involving an external threat to the national security. Reserve personnel can be placed on active duty for the duration of the emergency plus 6 months.

**Post–mobilization**
after M–Day.

**Pre–emergency**
Peacetime preceding a national emergency.

**Pre–mobilization**
before M–Day.

**Presidential Reserve Call–up (PRC) Authority**
Provision of Section 12304, Title 10, United States Code that provides the President a means to activate, without declaration of national emergency, not more than 200,000 members of the Selective Reserve and the Individual Ready Reserve, for not more than 270 days to meet the support requirement of any operational mission.

**Ready Reserve**
Consists of the Selected Reserve, Individual Ready Reserve, and the Inactive National Guard (ING). Members of the Ready Reserve are liable for active duty as prescribed by law (sections 10142, 12301, and 12302, Title 10, United States Code).

**Standby emergency implementation documents**
Letters, messages memorandums, or other documents that authorize or prescribe specific emergency actions. These documents are prepared in advance but are not implemented until an emergency takes place.

**Standby Reserve**
Those members of the Reserve Components (other than those in the Ready Reserve or Retired Reserve) who are liable for active duty only as provided in sections 12301 and 12306, Title 10, United States Code.

**Total mobilization**
Expansion of the active armed forces resulting from action by Congress and the President to organize and/or generate additional units or personnel beyond the existing force structure, and the resources needed for their support, to meet the total requirements of a war or other national emergency involving an external threat to the national security.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.



ELECTRONIC PUBLISHING SYSTEM
OneCol FORMATTER WIN32 Version 214

PIN:           056954–000
DATE:          05-26-04
TIME:          11:35:08
PAGES SET:     14

DATA FILE:     C:\wincomp\r690-11.fil
DOCUMENT:      AR 690–11

SECURITY:      UNCLASSIFIED
DOC STATUS:    REVISION

# STANDARDS OF FITNESS

**USFK Reg 690-11**

## APPENDIX E

**MINIMUM MEDICAL QUALIFICATION REQUIREMENTS FOR CIVILIAN EMERGENCY ESSENTIAL (E-E)/MISSION ESSENTIAL (M-E) EMPOLYEES**

**E-1.** This appendix establishes minimum medical requirements for USFK civilian employees assigned to Emergency Essential (E-E) and Mission Essential (M-E) positions. Duties in some job descriptions may exceed these requirements and require more stringent standards.

**E-2.** Failure to meet medical standards or physical requirements will disqualify the individual for the position unless a waiver is granted. Management may waive any of the physical requirements except required immunizations and ability to wear protective mask and clothing. Minimum authority for waiver is the employee's second level of supervision.

**E-3.** Minimum Physical Requirements.

    a.  Moderate lifting (15-44 pounds).

    b.  Moderate carrying (15-44 pounds).

    c.  Use of fingers.

    d.  Both hands required.

    e.  Walking (cane permitted).

    f.  Standing (cane permitted).

    g.  Near vision correctable to 20/30 either eye.

    h.  Far vision correctable to 20/40 either eye.

    i.  Hearing (aid permitted).

**E-4.** Environmental Factors.

    a.  Ability to work outside and inside.

    b.  Ability to work in conditions of excessive humidity.

    c.  Ability to work around slippery or uneven walking surfaces.

d.   Ability to work closely with others.

e.   Protracted or irregular hours of work.

E-1

**USFK Reg 690-11**

**E-5.** Other Medical Requirements.

a.   DNA test.

b.   Blood type identification test.

c.   Emotional and mental stability.

d.   EKG test.

e.   Ability to wear protective mask and clothing for extended period of time.

f.   Immunizations as required by command.

E-2

Health Requirements Criteria

**A staff member who has any of the following disorders, diseases, or illnesses may not be fit for mobility. The medical circumstances of each disorder, disease, or illness listed will be considered by the American Red Cross Medical Director in determining fitness for mobility.**

Uncontrolled hypertension (3 consecutive readings with a systolic of 159 mm Hg or more, diastolic of 90 mm Hg or more; readings taken on 5 consecutive days)

History of or current cardiovascular disorders

Asthma or other chronic or recent respiratory problems

Vascular abnormalities such as aneurysms

Insulin dependent diabetes

Recurrent or recent cholelithiasis (gallstones)

Chronic diarrhea (regardless of cause)

Urinary incontinence

Seizures

Recent or untreated stomach ulcer

Chronic disease which may prevent performance of regular duties or which requires frequent medical monitoring

Immunodeficiency disease

Bleeding disorder

Glaucoma

Blindness in one eye

Absence of one kidney

Musculoskeletal problems including history of or current back or knee disorders

History of or current mental health problems

Medication regime without which the individual may suffer serious health consequences

A: INTROLTR new staff

- 2 -

Army Regulation 40–501

Medical Services

# Standards of Medical Fitness

Headquarters
Department of the Army
Washington, DC
1 February 2005

**UNCLASSIFIED**

# SUMMARY of CHANGE

AR 40-501
Standards of Medical Fitness

This rapid action revision, dated 1 February 2005--

o  Implements changes in the enlistment/appointment standards on asthma
   mandated by DOD Instruction 6130.4, 2 April 2004 (para 2-23d).

o  Implements changes in the enlistment/appointment standards on attention
   deficit disorder mandated by DOD Instruction 6130.4, 2 April 2004 (para 2-
   29d).

o  Modifies the retention standard on blastomycosis (para 3-40b).

o  Adds a list of medical conditions that may prevent deployment. It also refers
   the reader to the Deputy Chief of Staff, G-1 web site containing their
   personnel policy guidance for deployment (para 5-14).

o  Adds a requirement to perform a separation examination on soldiers who are
   administratively separated under paragraph 5-17 of AR 635-200 (table 8-2).

o  Revises guidance on annual dental examinations for the National Guard (para
   10-27).

This revision, dated 12 April 2004-

o  Reinstates Class 4 air traffic controller provisions that were inadvertently
   dropped by the 19 February 2004 revision (para 4-2e).

o  Corrects a paragraph title to reflect the applicability of the paragraph to
   all air traffic controller personnel (para 4-33).

This revision, dated 19 February 2004-

o  Clarifies the certification requirements for contractor pilots who fly
   acceptance, maintenance, experimental, developmental, or test flights (chap
   4).

o  Implements a revised DA Form 3349, Physical Profile, and provides updated
   profile guidance (chap 7).

o  Clarifies provisions regarding profile approval authorities (para 7-8f).

o  Removes references to obsolete forms SF 88 and SF 93 (paras 8-5 and 10-7).

o  Changes the term 'Ready Reserve' to 'Selected Reserve' in conformance with 10
   USC 10206 (para 8-19c(4)).

o  Makes corrections to reflect the reorganization of the United States Army Personnel Command (PERSCOM) as the United States Army Human Resources Command (AHRC) throughout the regulation.

o  Corrects references to ARNGUS to include ARNG where appropriate throughout the regulation.

This revision, dated 29 August 2003--

o  Clarifies the medical examination requirements for Army aviation (chaps 4 and 6).

o  Deletes flying duty Class 2S (chaps 4 and 6).

o  Expands the physical profiling authority for podiatrists (para 7-6a(5)).

o  Adds requirements for the medical examinations for Ranger School applicants (para 8-12k).

o  Changes the requirements for age specific periodic medical examinations to an every 5 year schedule (para 8-19c(3)).

o  Deletes the requirement to have a duplicate medical examination recorded on DD Form 2808 (Report of Medical Exam) if a separation medical examination has already been completed by the Department of Veterans Affairs (para 8-23e).

o  Rescinds DA Form 5675 (Health Risk Appraisal).

This administrative revision dated 30 September 2002--

o  Corrects an error in the conditions of the lower extremities that are causes for rejection for appointment, enlistment, and induction (para 2-10c(2)).

o  Corrects an error in a paragraph reference for certain physical exams (para 10-23d).

o  Includes correction of publication titles and sources in appendix A.

This revision (dated 28 March 2002)--

o  Revises the list of authorities who approve waivers for the medical fitness standards contained in chapters 2, 3, 4, or 5 (para 1-6).

o  Revises the medical accession standards in compliance with DOD Directive 6130.3, "Physical Standards for Appointment, Enlistment, or Induction," 15 December 2000, and DOD Instruction 6130.4, "Criteria and Procedure Requirements for Physical Standards for Appointment, Enlistment, or Induction in the Armed Forces," 14 December 2000 (chap 2).

o  Adds the International Classification of Disease codes for medical conditions causing rejection for appointment, enlistment, and induction (chap 2).

o  Revises the medical retention standards, including new standards on asthma
   (chap 3).

o  Adds metabolic equivalent testing to functional classifications of patients
   with cardiovascular disease (table 3-1).

o  Revises the aviation chapters (chap 4 and chap 6).

o  Reduces the number of physician signatures on permanent 3 or 4 profiles (chap
   7) and updates the description of profile codes (table 7-1).

o  Adds occupational history requirements to the pregnancy profile (chap 7).

o  Replaces SF 93 (Report of Medical History) and SF 88 (Report of Medical
   Examination) with two new forms, DD Form 2807-1 (Report of Medical History)
   and DD Form 2808 (Report of Medical Examination) (chap 8 and table 8-1).

o  Revises the Cardiovascular Screening program requirements (chap 8).

o  Adds policies for medical examinations and physical standards for the Army
   National Guard (chap 10).

o  Rescinds DA Form 4970 and DA Form 4970-E (Medical Screening Summary--Over 40
   Physical Fitness Program).

Headquarters
Department of the Army
Washington, DC
1 February 2005

*Army Regulation 40–501

Effective 1 March 2005

Medical Services

# Standards of Medical Fitness

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army
Chief of Staff*

Official:

*Sandra R. Riley*

SANDRA R. RILEY
*Administrative Assistant to the
Secretary of the Army*

**History.** This publication is a rapid action revision. The portions affected by this rapid action revision are listed in the summary of change.

**Summary.** This regulation provides information on medical fitness standards for induction, enlistment, appointment, retention, and related policies and procedures. This publication implements DOD Directive 6130.3 and DOD Instruction 6130.4.

**Applicability.** This regulation applies to candidates for military service and to Active Army personnel. It also applies to the Army National Guard of the United States, including periods when operating in their Army National Guard capacity, and the U.S. Army Reserve. This publication is applicable during mobilization.

**Proponent and exception authority.** The proponent of this regulation is the Office of the Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulation. The proponent may delegate this approval authority, in writing, to a division chief with the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the agency's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions in accordance with AR 11–2, but it does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command or local forms are prohibited without prior approval from HQDA (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (DASG–HS–AS), 5109 Leesburg Pike, Falls Church, VA 22041–3258.

**Distribution.** This publication is available in electronic media only, and is intended for command levels A, B, C, D, and E for medical activities only of the Active Army, the Army National Guard of the United States, and the U.S. Army Reserve.

# Contents (Listed by paragraph and page number)

**Chapter 1**
**General Provisions,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Medical classification • 1–5, *page 1*
Review authorities and waivers • 1–6, *page 1*

**Chapter 2**
**Physical Standards for Enlistment, Appointment, and Induction,** *page 2*
General • 2–1, *page 2*
Application and responsibilities • 2–2, *page 2*

---

*This regulation supersedes Army Regulation 40–501, dated 12 April 2004.

**UNCLASSIFIED**

## Contents—Continued

Abdominal organs and gastrointestinal system • 2–3, *page 3*
Blood and blood-forming tissue diseases • 2–4, *page 4*
Dental • 2–5, *page 4*
Ears • 2–6, *page 5*
Hearing • 2–7, *page 5*
Endocrine and metabolic disorders • 2–8, *page 5*
Upper extremities • 2–9, *page 5*
Lower extremities • 2–10, *page 6*
Miscellaneous conditions of the extremities • 2–11, *page 7*
Eyes • 2–12, *page 7*
Vision • 2–13, *page 8*
Genitalia • 2–14, *page 9*
Urinary system • 2–15, *page 9*
Head • 2–16, *page 10*
Neck • 2–17, *page 10*
Heart • 2–18, *page 10*
Vascular system • 2–19, *page 11*
Height • 2–20, *page 11*
Weight • 2–21, *page 11*
Body build • 2–22, *page 11*
Lungs, chest wall, pleura, and mediastinum • 2–23, *page 11*
Mouth • 2–24, *page 12*
Nose, sinuses, and larynx • 2–25, *page 12*
Neurological disorders • 2–26, *page 12*
Disorders with psychotic features • 2–27, *page 13*
Neurotic, anxiety, mood, somatoform, dissociative, or factitious disorders • 2–28, *page 13*
Personality, conduct, and behavior disorders • 2–29, *page 13*
Psychosexual conditions • 2–30, *page 13*
Substance misuse • 2–31, *page 13*
Skin and cellular tissues • 2–32, *page 14*
Spine and sacroiliac joints • 2–33, *page 15*
Systemic diseases • 2–34, *page 15*
General and miscellaneous conditions and defects • 2–35, *page 15*
Tumors and malignant diseases • 2–36, *page 16*
Miscellaneous • 2–37, *page 16*

## Chapter 3
## Medical Fitness Standards for Retention and Separation, Including Retirement, *page 18*

General • 3–1, *page 18*
Application • 3–2, *page 18*
Disposition • 3–3, *page 18*
General policy • 3–4, *page 19*
Abdominal and gastrointestinal defects and diseases • 3–5, *page 19*
Gastrointestinal and abdominal surgery • 3–6, *page 19*
Blood and blood-forming tissue diseases • 3–7, *page 20*
Dental diseases and abnormalities of the jaws • 3–8, *page 20*
Ears • 3–9, *page 20*
Hearing • 3–10, *page 20*
Endocrine and metabolic disorders • 3–11, *page 20*
Upper extremities • 3–12, *page 21*
Lower extremities • 3–13, *page 21*
Miscellaneous conditions of the extremities • 3–14, *page 22*
Eyes • 3–15, *page 22*
Vision • 3–16, *page 23*
Genitourinary system • 3–17, *page 23*

## Contents—Continued

Genitourinary and gynecological surgery • 3–18, *page 24*
Head • 3–19, *page 24*
Neck • 3–20, *page 24*
Heart • 3–21, *page 24*
Vascular system • 3–22, *page 25*
Miscellaneous cardiovascular conditions • 3–23, *page 26*
Surgery and other invasive procedures involving the heart, pericardium, or vascular system • 3–24, *page 26*
Trial of duty and profiling for cardiovascular conditions • 3–25, *page 26*
Tuberculosis, pulmonary • 3–26, *page 27*
Miscellaneous respiratory disorders • 3–27, *page 27*
Surgery of the lungs • 3–28, *page 28*
Mouth, esophagus, nose, pharynx, larynx, and trachea • 3–29, *page 28*
Neurological disorders • 3–30, *page 28*
Disorders with psychotic features • 3–31, *page 29*
Mood disorders • 3–32, *page 29*
Anxiety, somatoform, or dissociative disorders • 3–33, *page 29*
Dementia and other cognitive disorders due to general medical condition • 3–34, *page 29*
Personality, sexual and gender identity, or factitious disorders; disorders of impulse control not elsewhere classified;
    substance-related disorders • 3–35, *page 29*
Adjustment disorders • 3–36, *page 29*
Eating disorders • 3–37, *page 30*
Skin and cellular tissues • 3–38, *page 30*
Spine, scapulae, ribs, and sacroiliac joints • 3–39, *page 30*
Systemic diseases • 3–40, *page 31*
General and miscellaneous conditions and defects • 3–41, *page 32*
Malignant neoplasms • 3–42, *page 32*
Benign neoplasms • 3–43, *page 32*
Sexually transmitted diseases • 3–44, *page 32*
Heat illness and injury • 3–45, *page 33*
Cold injury • 3–46, *page 33*

## Chapter 4
## Medical Fitness Standards For Flying Duty, *page 35*

General • 4–1, *page 35*
Classes of medical standards for flying and applicability • 4–2, *page 35*
Aeromedical consultation • 4–3, *page 36*
Abdomen and gastrointestinal system • 4–4, *page 36*
Blood and blood–forming tissue diseases • 4–5, *page 36*
Dental • 4–6, *page 37*
Ears • 4–7, *page 37*
Hearing • 4–8, *page 37*
Endocrine and metabolic diseases • 4–9, *page 37*
Extremities • 4–10, *page 37*
Eyes • 4–11, *page 37*
Vision • 4–12, *page 38*
Genitourinary • 4–13, *page 39*
Head and neck • 4–14, *page 39*
Heart and vascular system • 4–15, *page 39*
Linear anthropometric dimensions • 4–16, *page 40*
Weight and body build • 4–17, *page 40*
Lung and chest wall • 4–18, *page 40*
Mouth • 4–19, *page 40*
Nose • 4–20, *page 41*
Pharynx, larynx, trachea, and esophagus • 4–21, *page 41*
Neurological disorders • 4–22, *page 41*

**Contents—Continued**

Mental disorders • 4–23, *page 42*
Skin and cellular tissues • 4–24, *page 43*
Spine, scapula, ribs, and sacroiliac joints • 4–25, *page 43*
Systemic diseases • 4–26, *page 43*
Malignant diseases and tumors • 4–27, *page 43*
Sexually transmitted diseases • 4–28, *page 43*
Aeromedical adaptability • 4–29, *page 43*
Reading Aloud Test • 4–30, *page 44*
Department of the Army civilian and contract civilian aircrew members • 4–31, *page 44*
Medical standards for Class 3 personnel • 4–32, *page 45*
Medical standards for ATC personnel • 4–33, *page 45*

**Chapter 5**
**Medical Fitness Standards for Miscellaneous Purposes,** *page 46*
General • 5–1, *page 46*
Application • 5–2, *page 47*
Medical fitness standards for initial selection for Airborne training, Ranger training, and Special Forces training • 5–3, *page 47*
Medical fitness standards for selection for survival, evasion, resistance, escape training • 5–4, *page 48*
Medical fitness standards for retention for Airborne duty, Ranger duty, and Special Forces duty • 5–5, *page 49*
Medical fitness standards for initial selection for free fall parachute training • 5–6, *page 49*
Medical fitness standards for retention for free fall parachute duty • 5–7, *page 51*
Medical fitness standards for Army service schools • 5–8, *page 51*
Medical fitness standards for initial selection for marine diving training (Special Forces and Ranger combat diving) • 5–9, *page 51*
Medical fitness standards for retention for marine diving duty (Special Forces and Ranger combat diving) • 5–10, *page 52*
Medical fitness standards for initial selection for other marine diving training (MOS 00B) • 5–11, *page 53*
Medical fitness standards for retention for other marine diving duty (MOS 00B) • 5–12, *page 54*
Asplenic soldiers • 5–13, *page 55*
Medical fitness standards for deployment and certain geographical areas • 5–14, *page 55*
Height—U.S. Military Academy, Reserve Officers—Training Corps, and Uniformed Services University of Health Sciences • 5–15, *page 57*

**Chapter 6**
**Aeromedical Administration,** *page 57*
General • 6–1, *page 57*
Definition of terms • 6–2, *page 58*
Application • 6–3, *page 58*
Responsibilities • 6–4, *page 59*
Authorizations • 6–5, *page 59*
Classification of FDMEs • 6–6, *page 60*
Purpose of FDMEs • 6–7, *page 60*
Frequency and period of validity of FDMEs • 6–8, *page 60*
Facilities and examiners • 6–9, *page 61*
Disposition and review of FDMEs • 6–10, *page 62*
Issuing DA Form 4186 • 6–11, *page 62*
General principles • 6–12, *page 63*
Responsibilities and review following a change in health of aircrew members • 6–13, *page 64*
Review and disposition of disqualifications for Classes 1/1A • 6–14, *page 64*
Review and disposition of disqualifications for Class 3 • 6–15, *page 65*
Review and disposition of disqualifications for Classes 2/2F/4 • 6–16, *page 65*
Temporary medical suspension • 6–17, *page 65*
Medical termination from aviation service • 6–18, *page 66*
Aeromedical waiver • 6–19, *page 66*

Contents—Continued

Aeromedical requalification • 6–20, *page 67*
Waiver and suspension authorities • 6–21, *page 67*

Chapter 7
Physical Profiling, *page 68*
General • 7–1, *page 68*
Application • 7–2, *page 68*
Physical profile serial system • 7–3, *page 68*
Temporary vs. permanent profiles • 7–4, *page 69*
Representative profile serial and codes • 7–5, *page 69*
Profiling officer • 7–6, *page 69*
Recording and reporting of initial physical profile • 7–7, *page 70*
Profiling reviews and approvals • 7–8, *page 70*
Profiling pregnant soldiers • 7–9, *page 71*
Postpartum profiles • 7–10, *page 72*
Preparation, approval, and disposition of DA Form 3349 • 7–11, *page 72*
Responsibility for personnel actions • 7–12, *page 74*
Physical profile and the Army Weight Control Program • 7–13, *page 74*

Chapter 8
Medical Examinations—Administrative Procedures, *page 77*
General • 8–1, *page 77*
Applications • 8–2, *page 77*
Physical fitness • 8–3, *page 77*
Consultations • 8–4, *page 78*
Distribution of medical reports • 8–5, *page 78*
Documentary medical evidence • 8–6, *page 78*
Facilities and examiners • 8–7, *page 78*
Hospitalization • 8–8, *page 79*
Objectives of medical examinations • 8–9, *page 79*
Recording of medical examinations • 8–10, *page 79*
Scope of medical examinations • 8–11, *page 79*
Medical examination requirements and required forms • 8–12, *page 79*
Report of medical history forms • 8–13, *page 81*
Validity times for DD Forms 2808 • 8–14, *page 82*
Procurement medical examinations • 8–15, *page 83*
Active duty for training, active duty for special work, and inactive duty training • 8–16, *page 83*
Health records • 8–17, *page 83*
Mobilization of units and members of Reserve Components of the Army • 8–18, *page 83*
Periodic medical examinations • 8–19, *page 83*
Frequency of additional/alternate examinations • 8–20, *page 84*
Deferment of examinations • 8–21, *page 84*
Promotion • 8–22, *page 84*
Separation and retirement examinations • 8–23, *page 84*
Miscellaneous medical examinations • 8–24, *page 86*
Cardiovascular Screening Program • 8–25, *page 86*
Speech Recognition in Noise Test for H3 profile soldiers • 8–26, *page 87*

Chapter 9
Army Reserve Medical Examinations, *page 95*
General • 9–1, *page 95*
Application • 9–2, *page 95*
Responsibility for medical fitness • 9–3, *page 95*
Examiners and examination facilities • 9–4, *page 95*
Examination reports • 9–5, *page 95*

## Contents—Continued

Conduct of examinations • 9–6, *page 95*
Types of examinations and their scheduling • 9–7, *page 95*
Physical profiling • 9–8, *page 95*
Examination reviews • 9–9, *page 96*
Disposition of medically unfit Reservists • 9–10, *page 96*
Requests for continuation in the USAR • 9–11, *page 96*
Request for PEB evaluation • 9–12, *page 96*
Disposition of Reservists temporarily disqualified because of medical defects • 9–13, *page 96*

## Chapter 10
## Army National Guard, *page 97*

General • 10–1, *page 97*
Application • 10–2, *page 97*
Medical standards • 10–3, *page 97*
Entry into AGR (Title 10/32) Program • 10–4, *page 97*
Active duty for more than 30 days (other than Title 10/32 AGR) • 10–5, *page 97*
Re–entry on active duty or FTNGD • 10–6, *page 97*
Applications for Federal Recognition • 10–7, *page 97*
General officer medical examinations • 10–8, *page 97*
Immunizations • 10–9, *page 98*
Periodic medical examinations • 10–10, *page 98*
Waivers • 10–11, *page 98*
Profiling • 10–12, *page 98*
Individual responsibility • 10–13, *page 98*
Significant incident reporting responsibility • 10–14, *page 98*
Duty restrictions • 10–15, *page 98*
Authorization for examinations • 10–16, *page 99*
Examination authorities • 10–17, *page 99*
Examination review requirements/quality assurance • 10–18, *page 99*
Scope of medical examinations • 10–19, *page 99*
Report of medical examinations • 10–20, *page 100*
Directed examinations • 10–21, *page 100*
Administrative information • 10–22, *page 100*
Special examinations • 10–23, *page 100*
Cardiovascular Screening Program (AGR soldiers) • 10–24, *page 100*
Annual medical screening • 10–25, *page 101*
Soldiers pending separation for failing to meet medical retention standards • 10–26, *page 102*
Annual dental examinations • 10–27, *page 102*
Physical inspections prior to annual training • 10–28, *page 102*

## Appendix A.   References, *page 104*

## Table List

Table 2–1: Military acceptable weight (in pounds) as related to age and height for males—Initial Army procurement[1], [2], *page 16*
Table 2–2: Military acceptable weight (in pounds) as related to age and height for females—Initial Army procurement[1], [2], *page 17*
Table 3–1: Methods of assessing cardiovascular disability, *page 34*
Table 4–1: Acceptable audiometric hearing level for Army aviation and air traffic control, *page 46*
Table 4–2: Head injury guidelines for Army aviation, *page 46*
Table 5–1: Guidance on deployment of soldiers with diabetes, *page 57*
Table 6–1: Number of months for which a flying duty medical examination (FDME) is valid (Active Component)*, *page 67*
Table 7–1: Physical profile functional capacity guide, *page 75*
Table 7–2: Profile codes*, *page 76*

Contents—Continued

Table 8–1: Recording of medical examination[1], *page 87*
Table 8–2: Schedule of separation medical examination*, *page 92*
Table 8–3: Results of Speech Recognition in Noise Test (SPRINT), *page 93*

Figure List

Figure 8–1: Normative data from speech recognition in noise test, *page 94*

Glossary

Chapter 1
General Provisions

1–1. Purpose

This regulation governs—

*a.* Medical fitness standards for enlistment, induction, and appointment, including officer procurement programs.

*b.* Medical fitness standards for retention and separation, including retirement.

*c.* Medical fitness standards for diving, Special Forces, Airborne, Ranger, free fall parachute training and duty, and certain enlisted military occupational specialties (MOSs) and officer assignments.

*d.* Medical standards and policies for aviation.

*e.* Physical profiles.

*f.* Medical examinations.

1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

1–3. Explanation of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

1–4. Responsibilities

*a.* The Surgeon General (TSG) will develop, revise, interpret, and disseminate current Army medical fitness standards and ensure Army compliance with Department of Defense (DOD) directives pertaining to those standards. TSG has the authority to issue exceptions to policies that are contained in this regulation.

*b.* Director, Department of Defense Medical Examination Review Board (DODMERB); Director, Army National Guard; Chief, U.S. Army Reserve (USAR); Superintendent, U.S. Military Academy (USMA), Director, Uniformed Services University of the Health Sciences (USUHS), and commanders of the U.S. Army Military Entrance Processing Command (MEPCOM), U.S. Army Recruiting Command (USAREC), U.S. Training and Doctrine Command, U.S. Army Medical Command (USAMEDCOM), U.S. Army Human Resources Command (AHRC), State Adjutants General, and all Army military treatment facilities (MTFs) worldwide, will implement policies prescribed in this regulation applicable to all Active Army and Reserve Component (RC) personnel and applicants for appointment (including all officer procurement programs), enlistment, and induction.

*c.* Commanders and military personnel officers at all levels of command will implement administrative and command provisions of chapters 5, 7, 8, 9, and 10.

1–5. Medical classification

Individuals evaluated under the medical fitness standards contained in this regulation will be reported as indicated below.

*a. Medically acceptable.* Medical examiners will report as "medically acceptable" all individuals who meet the medical fitness standards established for the particular purpose for which examined. No individual will be accepted on a provisional basis subject to the successful treatment or correction of a disqualifying defect.

*b. Medically unacceptable.*

(1) Medical examiners will report as "medically unacceptable" by reason of medical unfitness all individuals who possess any one or more of the medical conditions or physical defects listed in this regulation as a cause for rejection for the specific purpose for which examined, except as noted in (2) below.

(2) Medical examiners will report as "Medically unacceptable—prior administrative waiver granted" all individuals who do not meet the medical fitness standards established for the particular purpose for which examined when a waiver has been previously granted and the applicable provisions of paragraph 1–6 apply.

1–6. Review authorities and waivers

*a.* Medical fitness standards cannot be waived by medical examiners or by the examinee.

*b.* Examinees initially reported as medically unacceptable by reason of medical unfitness when the medical fitness standards in chapter 2, 3, 4, or 5 apply, may request a waiver of the medical fitness standards in accordance with the basic administrative directive governing the personnel action. Upon such request, the designated administrative authority or his or her designees for the purpose may grant such a waiver in accordance with current directives. The Office of the Surgeon General provides guidance when necessary to the review and waiver authorities on the interpretation of the medical standards and appropriateness of medical waivers. The Secretary of the Army is the waiver authority for accession. That authority is delegated down through the Deputy Chief of Staff for Personnel to the authorities listed in paragraphs *c* through *i* below.

*c.* The DODMERB, U.S. Air Force Academy, Colorado Springs, CO 80840–6518 is the review authority for reports of examinations given applicants for entrance into the Reserve Officers' Training Corps (ROTC) Scholarship Program

and the USMA. (See AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8.) The waiver authority for ROTC is the Commanding General, ROTC Command. The waiver authority for USMA is the Superintendent, USMA.

  *d.* Military Entrance Processing Stations (MEPS), under the purview of MEPCOM, are the review authorities for enlistment and nonscholarship ROTC program examinations accomplished in their facilities. The Commanding General, USAREC, is the waiver authority for original enlistment. The Director, Army National Guard is the waiver authority for the Army National Guard (ARNG) and the Army National Guard of the United States (ARNGUS).

  *e.* U.S. Army Medical Center (MEDCEN) or medical department activity (MEDDAC) Commanders are the review authorities for entry into nonscholarship ROTC programs (unless accomplished at the MEPS), retention in all ROTC programs, and appointment as commissioned officers from the ROTC program. In ROTC programs when personnel are examined by other Government medical facilities or by civilian facilities, reviews will be made by the MEDDAC or MEDCEN commander in the area where the examined person's college or university is located.

  *f.* Waiver authority for applicants for U.S. Army Medical Department (AMEDD) personnel procurement programs (except USUHS) is USAREC. This waiver authority may be changed by TSG after appropriate coordination with the Office of the Deputy Chief of Staff, G-1 (ODCS, G-1). The waiver authority for students already enrolled in AMEDD procurement programs is TSG (ATTN: DASG–HS–AS). The waiver authority for applicants for USUHS is the Assistant Secretary of Defense (Health Affairs) (ASD(HA)).

  *g.* Review and waiver authority for other direct appointment programs (for example, Chaplain Corps) is USAREC. The waiver authority for initial selection for the Judge Advocate General Corps is AHRC.

  *h.* Waiver authority for Special Forces training, Special Forces Assessment and Selection (SFAS), survival, evasion, resistance, escape (SERE) training, Military Freefall (MFF), and Special Forces Combat Diving Qualification Course (CDQC) is the Commandant, U.S. Army John F. Kennedy Special Warfare Center and School (USAJFKSWCS). Waiver authority for the Airborne School is the Commandant, U.S. Army Infantry School in coordination with U.S. Army Human Resources Command (AHRC).

  *i.* Waivers for initial enlistment or appointment, including entrance and retention in officer procurement programs, will not be granted if the applicant does not meet the retention standards of chapter 3. Requests from waiver authorities for exception to this policy will only be made under extraordinary circumstances and only with the approval of TSG (Headquarters, Department of the Army, (HQDA) (DASG–HS–AS)).

  *j.* Waivers of medical fitness standards that have been previously granted apply automatically to subsequent medical actions pertinent to the program or purpose for which granted without the necessity of confirmation or termination when—

  (1) The duration of the waiver was not limited at the time it was granted and the medical condition or physical defect has not interfered with the individual's successful performance of military duty.

  (2) The medical condition or physical defect waived was below retention medical fitness standards applicable to the particular program involved and the medical condition or physical defect has remained essentially unchanged.

  (3) The medical condition or physical defect waived was below procurement medical fitness standards applicable to the particular program involved and the medical condition or physical defect, although worse, is within the retention medical fitness standards prescribed for the program or purpose involved.

# Chapter 2
# Physical Standards for Enlistment, Appointment, and Induction

## 2–1. General
This chapter implements DOD Directive 6130.3, Physical Standards for Appointment, Enlistment, and Induction, December 15, 2000, and DOD Instruction 6130.4, Criteria and Procedure Requirements for Physical Standards for Appointment, Enlistment, or Induction in the Armed Forces, December 14, 2000.

## 2–2. Application and responsibilities
  *a. Purpose.* The purpose of the standards contained in this chapter is to ensure that individuals medically qualified are—

  (1) Free of contagious diseases that would likely endanger the health of other personnel.

  (2) Free of medical conditions or physical defects that would require excessive time lost from duty for necessary treatment or hospitalization or would likely result in separation from the Army for medical unfitness.

  (3) Medically capable of satisfactorily completing required training.

  (4) Medically adaptable to the military environment without the necessity of geographical area limitations.

  (5) Medically capable of performing duties without aggravation of existing physical defects or medical conditions.

  *b. Application.* This chapter prescribes the medical conditions and physical defects that are causes for rejection for appointment, enlistment, and induction into military service. Other standards may be prescribed by DOD in the event

of mobilization or a national emergency. Those individuals found medically qualified based on the medical standards of chapter 2 that were in effect prior to this publication will not be disqualified solely on the basis of the new standards. The designated waiver authorities may grant waivers for selection or continuation in the programs described below, provided the individual meets the retention standards of chapter 3. However, the standard in paragraph 2–35*l* will not be waived regardless of whether chapter 2 or chapter 3 standards are applied.

*c.* Scope. The standards of chapter 2 apply to—

(1) Applicants for appointment as commissioned or warrant officers in the Active Army and RCs, including appointment as a soldier in the USAR or the Army National Guard of the United States (ARNG/ARNGUS). This includes enlisted soldier applicants for appointment as commissioned or warrant officers. (However, for officers of the ARNG/ARNGUS or USAR who apply for appointment in the Active Army, the standards of chap 3 are applicable.)

(2) Applicants for enlistment in the Regular Army. For medical conditions or physical defects predating original enlistment, these standards are applicable for enlistees' first 6 months of active duty. (However, for enlisted soldiers of the ARNG/ARNGUS or USAR who apply for enlistment in the Regular Army or who re-enter active duty for training (ADT) under the "split-training" option, the standards of chapter 3 are applicable.)

*(a)* Enlisted soldiers identified within the first 6 months of active duty with a condition that existed prior to service that does not meet the standards of chapter 2 may be separated (or receive a waiver to remain on active duty) following an evaluation by an Entrance Physical Standards Board, in accordance with AR 635–200, chapter 5, with the exception as noted in *(b)* below.

*(b)* Enlisted soldiers identified within the first 6 months of active duty with a condition that existed prior to service that does not meet the standards of chapter 2 or chapter 3 must be evaluated by a medical evaluation board (MEB). The soldier will then be referred to a physical evaluation board (PEB) unless the soldier waives his or her right to the PEB in accordance with AR 635–40.

(3) Applicants for enlistment in the RC and federally recognized units or organizations of the ARNG/ARNGUS. For medical conditions or physical defects predating original enlistment, these standards are applicable during the enlistees' initial period of ADT.

(4) Applicants for reenlistment in the Active Army, RC, and ARNG/ARNGUS after a period of more than 6 months has elapsed since discharge.

(5) Applicants (civilian applicants or enlisted soldier applicants) for the USMA, Scholarship or Advanced Course ROTC, USUHS, Health Professions Scholarship Program (HPSP), Officer Candidate School (OCS), Warrant Officer Candidate School, and all other Army special officer personnel procurement programs. (See chap 3 for retention of students in HPSP and USUHS programs.)

(6) Retention of cadets and midshipmen at the United States Armed Forces academies and students enrolled in ROTC. (However, the Commander, ROTC Cadet Command or the Superintendent, USMA has the authority to grant medical waivers for continuation in these programs, provided the cadet meets the retention standards of chap 3.)

(7) All individuals being inducted into the Army.

*d.* Responsibilities. The Secretary of the Army shall—

(1) Revise Army policies to conform with the standards contained in DOD Directive 6130.3 and DOD Instruction 6130.4.

(2) Ensure uniformity of application and implementation of DOD Instruction 6130.4.

(3) Have authority to grant a waiver of the standards in individual cases for applicable reasons and ensure uniformity of waiver determinations. Delegated waiver authorities are noted in chapter 1.

(4) Have authority to change Army-specific visual standards (particularly for officer-accession programs) and establish other standards for special programs. Notification of any proposed changes in standards will be provided to the ASD(HA) 60 days before their implementation.

(5) Ensure that accurate International Classification of Disease (ICD) Codes are assigned to all medical conditions resulting in a personnel action such as medical waiver or medical separation.

(6) Eliminate inconsistencies and inequities based on race, sex, or examination location in the application of the standards.

*e.* Medical conditions. The disqualifying medical conditions are listed in paragraphs 2–3 through 2–37 below. (The ICD codes are listed in parentheses following each standard in chap 2.)

## 2–3. Abdominal organs and gastrointestinal system

The causes for rejection for appointment, enlistment, and induction are an authenticated history of:

*a.* Esophagus. Ulceration, varices, fistula, achalasia, or other dismotility disorders; chronic or recurrent esophagitis if confirmed by appropriate x-ray or endoscopic examination (530).

*b.* Stomach and duodenum.

(1) Gastritis. Chronic hypertrophic, or severe (535).

(2) Active ulcer of the stomach or duodenum confirmed by x-ray or endoscopy (533).

(3) Congenital abnormalities of the stomach or duodenum causing symptoms or requiring surgical treatment (751), except a history of surgical correction of hypertrophic pyloric stenosis of infancy.

*c.* Small and large intestine.

(1) Inflammatory bowel disease. Regional enteritis (555), ulcerative colitis (556), ulcerative proctitis (556).

(2) Duodenal diverticula with symptoms or sequelae (hemorrhage, perforation, etc.) (562.02).

(3) Intestinal malabsorption syndromes, including postsurgical and idiopathic (579).

(4) Congenital (751). Condition, to include Meckel's diverticulum or functional (564) abnormalities, persisting or symptomatic within the past 2 years.

*d.* Gastrointestinal bleeding. History of, unless the cause has been corrected, and is not otherwise disqualifying (578).

*e.* Hepato-pancreatic-biliary tract.

(1) Viral hepatitis (070), or unspecified hepatitis (570), within the preceding 6 months or persistence of symptoms after 6 months, or objective evidence of impairment of liver function, chronic hepatitis, and hepatitis B carriers (070). (Individuals who are known to have tested positive for hepatitis C virus (HCV) infection require confirmatory testing. If positive, individuals should be clinically evaluated for objective evidence of liver function impairment. If evaluation reveals no signs or symptoms of disease, the applicant meets the standards.)

(2) Cirrhosis (571), hepatic cysts and abscess (572), and sequelae of chronic liver disease (572).

(3) Cholecystitis, acute or chronic, with or without cholelithiasis (574), and other disorders of the gallbladder including post-cholecystectomy syndrome (575), and biliary system (576).

*Note.* Cholecystectomy is not disqualifying 60 days postsurgery (or 30 days post-laproscopic surgery), providing there are no disqualifying residuals from treatment.

(4) Pancreatitis. Acute (577.0) and chronic (577.1).

*f.* Anorectal.

(1) Anal fissure if persistent, or anal fistula (565).

(2) Anal or rectal polyp (569.0), prolapse (569.1), stricture (569.2), or incontinence (787.6).

(3) Hemorrhoids, internal or external, when large, symptomatic, or history of bleeding (455).

*g.* Spleen.

(1) Splenomegaly, if persistent (789.2).

(2) Splenectomy (P41.5), except when accomplished for trauma, or conditions unrelated to the spleen, or for hereditary spherocytosis (282.0).

*h.* Abdominal wall.

(1) Hernia, including inguinal (550), and other abdominal (553), except for small, asymptomatic umbilical or asymptomatic hiatal.

(2) History of abdominal surgery within the preceding 60 days (P54), except that individuals post-laparoscopic cholecystectomy may be qualified after 30 days.

*i.* Other.

(1) Gastrointestinal bypass (P43) or stomach stapling (P44) for control of obesity.

(2) Persons with artificial openings (V44).

## 2–4. Blood and blood-forming tissue diseases

The causes for rejection for appointment, enlistment, and induction are an authenticated history of:

*a.* Anemia. Any hereditary (282), acquired (283), aplastic (284), or unspecified (285) anemia that has not permanently corrected with therapy.

*b.* Hemorrhagic disorders. Any congenital (286) or acquired (287) tendency to bleed due to a platelet or coagulation disorder.

*c.* Leukopenia. Chronic or recurrent (288), based upon available norms for ethnic background.

*d.* Immunodeficiency (279).

## 2–5. Dental

The causes for rejection are for appointment, enlistment, and induction are:

*a.* Diseases of the jaw or associated tissues which are not easily remediable, and will incapacitate the individual or otherwise prevent the satisfactory performance of duty. This includes temporomandibular disorders (524.6) and/or myofascial pain dysfunction that is not easily corrected or has the potential for significant future problems with pain and function.

*b.* Severe malocclusion (524) that interferes with normal mastication or requires early and protracted treatment; or relationship between mandible and maxilla that prevents satisfactory future prosthodontic replacement.

*c.* Insufficient natural healthy teeth (521) or lack of a serviceable prosthesis, preventing adequate mastication and incision of a normal diet. This includes complex (multiple fixture) dental implant systems that have associated

complications that severely limit assignments and adversely affect performance of world–wide duty. Dental implants systems must be successfully osseointegrated and completed.

*d.* Orthodontic appliances for continued treatment (V53.4) (attached or removable). Retainer appliances are permissible, provided all active orthodontic treatment has been satisfactorily completed.

## 2–6. Ears
The causes for rejection for appointment, enlistment, and induction are:

*a.* External ear. Atresia or severe microtia (744), acquired stenosis (380.5), severe chronic or acute otitis externa (380.2), or severe traumatic deformity (738.7).

*b.* Mastoids. Mastoiditis (383), residual of mastoid operation with fistula (383.81), or marked external deformity that prevents or interferes with wearing a protective mask or helmet (383.3).

*c.* Meniere's Syndrome. Or other diseases of the vestibular system (386).

*d.* Middle and inner ear. Acute or chronic otitis media (382), cholesteatoma (385.3), or history of any inner (P20) or middle (P19) ear surgery excluding myringotomy or successful tympanoplasty.

*e.* Tympanic membrane. Any perforation of the tympanic membrane (384), or surgery to correct perforation within 120 days of examination (P19).

## 2–7. Hearing
The cause for rejection for appointment, enlistment, and induction is a hearing threshold level greater than that described in paragraph c below.

*a.* Audiometers, calibrated to standards of the International Standards Organization (ISO 1964) or the American National Standards Institute (ANSI 1996), will be used to test the hearing of all applicants.

*b.* All audiometric tracings or audiometric readings recorded on reports of medical examination or other medical records will be clearly identified.

*c.* Acceptable audiometric hearing levels (both ears) are:

(1) Pure tone at 500, 1000, and 2000 cycles per second of not more than 30 decibels (dB) on the average (each ear), with no individual level greater than 35dB at these frequencies.

(2) Pure tone level not more than 45 dB at 3000 cycles per second each ear, and 55 dB at 4000 cycles per second each ear.

## 2–8. Endocrine and metabolic disorders
The causes for rejection for appointment, enlistment, and induction are an authenticated history of:

*a.* Adrenal dysfunction (255) of any degree.

*b.* Diabetes mellitus (250) of any type.

*c.* Glycosuria. Persistent, when associated with impaired glucose tolerance (250) or renal tubular defects (271.4).

*d.* Acromegaly. Gigantism or other disorder of pituitary function (253).

*e.* Gout (274).

*f.* Hyperinsulinism (251.1).

*g.* Hyperparathyroidism (252.0) and hypoparathyroidism (252.1).

*h.* Thyroid disorders.

(1) Goiter, persistent or untreated (240).

(2) Hypothyroidism, uncontrolled by medication (244).

(3) Cretinism (243).

(4) Hyperthyroidism (242).

(5) Thyroiditis (245).

*i.* Nutritional deficiency diseases. Such diseases include beriberi (265), pellagra (265.2), and scurvy (267).

*j.* Other endocrine or metabolic disorders such as cystic fibrosis (277), porphyria (277.1), and amyloidosis (277.3) that obviously prevent satisfactory performance of duty or require frequent or prolonged treatment.

## 2–9. Upper extremities
(See also para 2–11.) The causes for rejection for appointment, enlistment, and induction are:

*a.* Limitation of motion. An individual will be considered unacceptable if the joint ranges of motion are less than the measurements listed below. Methods of measurement appear in TC 8–640.

(1) Shoulder (726.1):

*(a)* Forward elevation to 90 degrees.

*(b)* Abduction to 90 degrees.

(2) Elbow (726.3):

*(a)* Flexion to 100 degrees.

*(b)* Extension to 15 degrees.

(3) Wrist (726.4): a total range of 60 degrees (extension plus flexion) or radial and ulnar deviation combined arc 30 degrees.

(4) Hand (726.4):

*(a)* Pronation to 45 degrees.

*(b)* Supination to 45 degrees.

(5) Fingers and thumb (726.4): inability to clench fist, pick up a pin, grasp an object, or touch tips of at least three fingers with thumb.

*b.* Hand and fingers.

(1) Absence of the distal phalanx of either thumb (885).

(2) Absence of distal and middle phalanx of an index, middle, or ring finger of either hand, irrespective of the absence or loss of little finger (886).

(3) Absence of more than the distal phalanx of any two of the following fingers: index, middle finger, or ring finger of either hand (886).

(4) Absence of hand or any portion thereof (887) except for fingers as noted above.

(5) Polydactyly (755).

(6) Scars and deformities of the fingers or hand (905.2) that are symptomatic or that impair normal function to such a degree as to interfere with the satisfactory performance of military duty.

(7) Intrinsic paralysis or weakness, including nerve palsy (354) sufficient to produce physical findings in the hand such as muscle atrophy or weakness.

(8) Wrist, forearm, elbow, arm, or shoulder. Recovery from disease or injury with residual weakness or symptoms such as to preclude satisfactory performance of duty (905.2), or grip strength of less than 75 percent of predicted normal when injured hand is compared with the normal hand (non-dominant is 80 percent of dominant grip).

## 2–10. Lower extremities

(See also para 2–11.) The causes for rejection for appointment, enlistment, and induction are:

*a.* Limitation of motion. An individual will be considered unacceptable if the joint ranges of motion are less that the measurements listed below. Methods of measurement appear in TC 8–640.

(1) Hip (due to disease (726.5), injury (905.2)):

*(a)* Flexion to 90 degrees.

*(b)* No demonstrable flexion contracture.

*(c)* Extension to 10 degrees (beyond 0 degrees).

*(d)* Abduction to 45 degrees.

*(e)* Rotation of 60 degrees (internal and external combined).

(2) Knee (due to disease (726.6), injury (905.4)):

*(a)* Full extension compared with contralateral.

*(b)* Flexion to 90 degrees.

(3) Ankle (due to disease (726.7), injury (905.4)):

*(a)* Dorsiflexion to 10 degrees.

*(b)* Planter flexion to 30 degrees.

(4) Subtalar (due to disease (726.7) or injury (905.4)): eversion and inversion (total to 5 degrees).

*b.* Foot and ankle.

(1) Absences of one or more small toes (895) if function of the foot is poor or running or jumping is prevented; absence of a foot (896) or any portion thereof except for toes.

(2) Absence of great toe(s) (895); loss of dorsal/plantar flexion if function of the foot is impaired (905.4).

(3) Deformities of the toes, either acquired (735) or congenital (755.66), including polydactyly (755.02), that prevent wearing military footwear or impair walking, marching, running, or jumping. This includes hallux valgus (735).

(4) Clubfoot or Pes Cavus (754.5), if stiffness or deformity prevents foot function or wearing military footwear.

(5) Symptomatic pes planus, acquired (734) or congenital (754.6) or pronounced cases, with absence of subtalar motion.

(6) Ingrown toenails (703), if severe.

(7) Planter fascitis (728.7), persistent.

(8) Neuroma (355.6), confirmed condition and refractory to medical treatment or will impair function of the foot.

*c.* Leg, knee, thigh, and hip.

(1) Loose or foreign bodies within the knee joint (717.6).

(2) Physical findings of an unstable or internally deranged joint (717.9). History of uncorrected anterior (717.83) or posterior (717.84) cruciate ligament injury.

(3) Surgical correction of any knee ligaments if symptomatic or unstable (P81).

(4) History of congenital dislocation of the hip (754.3), osteochondritis of the hip (Legg-Perthes disease) (732.1), or slipped femoral epiphysis of the hip (732.2).

(5) Hip dislocation (835) within 2 years before examination.

(6) Osteochondritis of the tibial tuberosity (Osgood-Schlatter disease) (732.4), if symptomatic.

*d.* General.

(1) Deformities (905.4), disease or chronic pain (719.4) of one or both lower extremities that have interfered with function to such a degree as to prevent the individual from following a physically active vocation in civilian life or that would interfere with walking, running, or weight bearing, or the satisfactory completion of prescribed training or military duty.

(2) Shortening of a lower extremity (736.81) resulting in a noticeable limp or scoliosis.

## 2–11. Miscellaneous conditions of the extremities

(See also paras 2–9 and 2–10.) The causes for rejection for appointment, enlistment, and induction are an authenticated history of:

*a.* Arthritis.

(1) Active, subacute, or chronic arthritis (716).

(2) Chronic osteoarthritis (715.3) or traumatic arthritis (716.1) of isolated joints of more than a minimal degree, which has interfered with the following of a physically active vocation in civilian life or that prevents the satisfactory performance of military duty.

*b.* Chronic Retro Patellar Knee Pain Syndrome with or without confirmatory arthroscopic evaluation (717.7).

*c.* Dislocation if unreduced, or recurrent dislocations of any major joint such as shoulder (831), hip (835), elbow (832), or knee (836); or instability of any major joint such as shoulder (718.1), elbow (718.3), or hip (718.5).

*d.* Fractures.

(1) Malunion or non-union of any fracture (733.8), except ulnar styloid process.

(2) Orthopedic hardware (733.99), including plates, pins, rods, wires, or screws used for fixation and left in place; except that a pin, wire, or screw not subject to easy trauma is not disqualifying.

*e.* Injury of a bone or joint of more than a minor nature, with or without fracture or dislocation, that occurred within the preceding 6 weeks: upper extremity (923), lower extremity (924), ribs and clavicle (922).

*f.* Joint replacement (V43.6).

*g.* Muscular paralysis, contracture, or atrophy (728), if progressive or of sufficient degree to interfere with military service and muscular dystrophies (359).

*h.* Osteochondritis dessicans (732.7).

*i.* Osteochondromatosis or Multiple Cartilaginous Exostoses (727.82).

*j.* Osteoporosis (733).

*k.* Osteomyelitis (730), active or recurrent.

*l.* Scars (709.2), extensive, deep, or adherent to the skin and soft tissues that interfere with muscular movements.

*m.* Implants, silastic or other devices implanted to correct orthopedic abnormalities (V43).

## 2–12. Eyes

The causes for rejection for appointment, enlistment, and induction are:

*a.* Lids.

(1) Blepharitis (373), chronic, of more than mild degree.

(2) Blepharospasm (333.81).

(3) Dacryocystitis, acute or chronic (375.3).

(4) Deformity of the lids (374.4), complete or extensive, sufficient to interfere with vision or impair protection of the eye from exposure.

*b.* Conjunctiva.

(1) Conjunctivitis, chronic (372.1), including trachoma (076) and allergic conjunctivitis (372.13).

(2) Pterygium, (372.4), if encroaching on the cornea in excess of 3 millimeters (mm), interfering with vision, progressive (372.42), or recurring after two operative procedures (372.45).

(3) Xerophthalmia (372.53).

*c.* Cornea.

(1) Dystrophy, corneal, of any type (371.5), including keratoconus (371.6) of any degree.

(2) Keratorefractive surgery, history of lamellar (P11.7) and/or penetrating keratoplasty (P11.6). Laser surgery or appliance utilized to reconfigure the cornea is also disqualifying.

(3) Keratitis (370), acute or chronic, which includes recurrent corneal ulcers, erosions (abrasions), or herpetic ulcers (054.42).

(4) Vascularization (370.6) or opacification (371) of the cornea from any cause that is progressive or reduces vision below the standards prescribed in paragraph 2–13 below.

*d.* Uveitis (364) or iridocyclitis.

*e.* Retina.

(1) Angiomatosis (759.6), or other congenitohereditary retinal dystrophy (362.7) that impairs visual function.

(2) Chorioretinitis or inflammation of the retina (363), including histoplasmosis, toxoplasmosis, or vascular conditions of the eye to include Coats' disease, Eales' disease, and retinitis proliferans, unless a single episode of known cause that has healed and does not interfere with vision.

(3) Congenital or degenerative changes of any part of the retina (362).

(4) Detachment of the retina (361), history of surgery for same, or peripheral retinal injury or degeneration that may cause retinal detachment.

*f.* Optic nerve.

(1) Optic neuritis (377.3), neuroretinitis, secondary optic atrophy, or documented history of attacks of retrobulbar neuritis.

(2) Optic atrophy (377.1), or cortical blindness (377.7).

(3) Papilledema (377.0).

*g.* Lens.

(1) Aphakia (379.3), lens implant, or dislocation of a lens.

(2) Opacities of the lens (366) that interfere with vision or that are considered to be progressive.

*h.* Ocular mobility and motility.

(1) Diplopia (386.2), documented, constant or intermittent.

(2) Nystagmus (379.5).

(3) Strabismus (378), uncorrectable by lenses to less than 40 diopters or accompanied by diplopia.

(4) Strabismus, surgery (P15) for the correction of, within the preceding 6 months.

(5) For entrance into the USMA or ROTC programs, the following conditions are also disqualifying: esotropia of over 15 prism diopters; exotropia of over 10 prism diopters; hypertropia of over 5 prism diopters.

*i.* Miscellaneous defects and conditions.

(1) Abnormal visual fields due to disease of the eye or central nervous system (368.4), or trauma (368.9). Meridian-specific visual field minimums are as follows:

*(a)* Temporal, 85 degrees.

*(b)* Superior-temporal, 55 degrees.

*(c)* Superior, 45 degrees.

*(d)* Superior nasal, 55 degrees.

*(e)* Nasal, 60 degrees.

*(f)* Inferior nasal, 50 degrees.

*(g)* Inferior, 65 degrees.

*(h)* Inferior-temporal, 85 degrees.

(2) Absence of an eye, congenital (743) or acquired (360.8).

(3) Asthenopia (368.13), severe.

(4) Exophthalmos (376), unilateral or bilateral, non–familial.

(5) Glaucoma (365), primary, or secondary, or pre-glaucoma as evidenced by intraocular pressure above 21 millimeters of mercury (mmHg), or the secondary changes in the optic disc or visual field loss associated with glaucoma.

(6) Loss of normal pupillary reflex reactions to accommodation (367.5) or light (379.4), including Adie's syndrome.

(7) Night blindness (368.6).

(8) Retained intraocular foreign body (360).

(9) Growth or tumors of the eyelid, other than small basal cell tumors which can be cured by treatment, and small nonprogressive asymptomatic benign lesions.

(10) Any organic disease of the eye (360) or adnexa (376) not specified above, that threatens vision or visual function.

## 2–13. Vision

The causes for rejection for appointment, enlistment, and induction are:

*a.* Distant visual acuity of any degree that does not correct with spectacle lenses to at least one of the following (367):

(1) 20/40 in one eye and 20/70 in the other eye.

(2) 20/30 in one eye and 20/100 in the other eye.

(3) 20/20 in one eye and 20/400 in the other eye. However, for entrance into USMA or ROTC, distant visual acuity

that does not correct to 20/20 in one eye and 20/40 in the other eye is disqualifying. For entrance into OCS, distant visual acuity that does not correct to 20/20 in one eye and 20/100 in the other eye is disqualifying.

   b. Near visual acuity (367) of any degree that does not correct to 20/40 in the better eye.

   c. Refractive error (hyperopia (367.0), myopia (367.1), astigmatism (367.2)), in any spherical equivalent of worse than −8.00 or +8.00 diopters; if ordinary spectacles cause discomfort by reason of ghost images or prismatic displacement; or if corrected by orthokeratology or keratorefractive surgery. However, for entrance into USMA or Army ROTC programs, the following conditions are disqualifying:

   (1) Astigmatism, all types over 3 diopters.
   (2) Hyperopia over 8.00 diopters spherical equivalent.
   (3) Myopia over 8 diopters spherical equivalent.
   (4) Refractive error corrected by orthokeratology or keratorefractive surgery.

   d. Contact lenses: Complicated cases requiring contact lenses for adequate correction of vision, such as corneal scars (371) and irregular astigmatism (367.2).

   e. Color vision (368.5). Although there is no standard, color vision will be tested because adequate color vision is a prerequisite for entry into many military specialties. However, for entrance into the USMA or Army ROTC or OCS programs, the inability to distinguish and identify without confusion the color of an object, substance, material, or light that is uniformly colored a vivid red or vivid green is disqualifying.

## 2–14. Genitalia
The causes for rejection for appointment, enlistment, and induction are:

   a. Female genitalia.
   (1) Abnormal uterine bleeding (626.2), including menorrhagia, metrorrhagia, or polymenorrhea.
   (2) Amenorrhea (626.0), unexplained.
   (3) Dysmenorrhea (625.3), incapacitating to a degree recurrently necessitating absences of more than a few hours from routine activities.
   (4) Endometriosis (617).
   (5) Hermaphroditism (752.7).
   (6) Menopausal syndrome (627), if manifested by more than mild constitutional or mental symptoms, or artificial menopause if less than 1 year's duration.
   (7) Ovarian cysts (620), persistent, clinically significant.
   (8) Pelvic inflammatory disease (614), acute or chronic.
   (9) Pregnancy (V22).
   (10) Uterus, congenital absence of (752.3), or enlargement due to any cause (621.2).
   (11) Vulvar or vaginal ulceration (616.5), including herpes genitalia (054.11) and condyloma acuminatum (078.11), acute or chronic, not amenable to treatment. Such treatment must be given and demonstrated effective prior to accession.
   (12) Abnormal Papanicolaou's test (Pap smear) (795) graded LGSIL or higher severity, or any smear in which the descriptive terms carcinoma-in-situ, invasive cancer, condyloma acuminatum, human papilloma virus, or dysplasia are used.
   (13) Major abnormalities and defects of the genitalia such as a change of sex (P64.5). A history thereof, or dysfunctional residuals from surgical correction of these conditions.

   b. Male genitalia.
   (1) Absence of both testicles, either congenital (752.8), or acquired (878.2), or unexplained absence of a testicle.
   (2) Epispadias or Hypospadias (752.6), when accompanied by evidence of infection of the urinary tract, or if clothing is soiled when voiding.
   (3) Undiagnosed enlargement or mass of testicle or epididymis (608.9).
   (4) Undescended testicle(s) (752.5).
   (5) Orchitis (604), acute or chronic epididymitis.
   (6) Penis, amputation of (878), if the resulting stump is insufficient to permit normal micturition.
   (7) Penile infectious lesions, including herpes genitalis (054.1) and condyloma acuminata (078.11), acute or chronic, not amenable to treatment. Such treatment must be given and demonstrated effective prior to accession.
   (8) Prostatitis (601), acute or chronic.
   (9) Hydrocele (603.9). Left varicocele, if painful, or any right varicocele (456.4).

   c. Major abnormalities and defects of the genitalia, such as a change of sex (P64.5), a history thereof, or dysfunctional residuals from surgical correction of these conditions.

## 2–15. Urinary system
(See para 2–8.) The causes for rejection for appointment, enlistment, and induction are:

*a.* Cystitis (595).

*b.* Urethritis (597).

*c.* Enuresis (788.3) or incontinence of urine beyond age 12. (See also para 2–29.)

*d.* Hematuria, pyuria, or other findings indicative of renal tract disease (599).

*e.* Urethral stricture (598) or fistula (599.1).

*f.* Kidney.

(1) Absence of one kidney, congenital (753.0) or acquired (593.89).

(2) Infections, acute or chronic (590).

(3) Polycystic kidney (753.1), confirmed history of.

(4) Horseshoe kidney (753.3).

(5) Hydronephrosis (591).

(6) Nephritis, acute (580) or chronic (582).

*g.* Proteinuria (791) under normal activity (at least 48 hours after strenuous exercise) greater than 200 milligrams (mg)/24 hours, or a protein to creatinine ratio greater than 0.2 in a random urine sample, unless nephrologic consultation determines the condition to be benign orthostatic proteinuria.

*h.* Renal calculus (592) within the previous 12 months, recurrent calculus, nephrocalcinosis, or bilateral renal calculi at any time.

## 2–16. Head

The causes for rejection for appointment, enlistment, and induction are:

*a.* Injuries, including severe contusions and other wounds of the scalp (920) and cerebral concussion (850), until a period of 3 months has elapsed. (See para 2–26.)

*b.* Deformities of the skull, face, or jaw (754.0) of a degree that would prevent the individual from wearing a protective mask or military headgear.

*c.* Defects (756.0), loss or congenital absence of the bony substance of the skull not successfully corrected by reconstructive materials, or leaving residual defect in excess of 1 square inch (6.45 centimeter (cm)$^2$) or the size of a 25 cent piece.

## 2–17. Neck

The causes for rejection for appointment, enlistment, and induction are:

*a.* Cervical ribs (756.2), if symptomatic or so obvious that they are found on routine physical examination. (Detection based primarily on x-rays is not considered to meet this criterion.)

*b.* Congenital cysts (744.4) of branchial cleft origin or those developing from remnants of the thyroglossal duct, with or without fistulous tracts.

*c.* Contraction (723.8) of the muscles of the neck, spastic or non–spastic, or cicatricial contracture of the neck to the extent that it interferes with wearing a uniform or military equipment or is so disfiguring as to impair military bearing.

## 2–18. Heart

The causes for rejection for appointment, enlistment, and induction are:

*a.* All valvular heart diseases, congenital (746) or acquired (394), including those improved by surgery except mitral valve prolapse and bicuspid aortic valve. These latter two conditions are not reasons for rejection unless there is associated tachyarrhythmia, mitral regurgitation, aortic stenosis, insufficiency, or cardiomegaly.

*b.* Coronary heart disease (410).

*c.* Symptomatic arrhythmia (or electrocardiographic evidence of arrhythmia), history of.

(1) Supraventricular tachycardia (427.0), or any dysrhythmia originating from the atrium or sinoatrial node, such as atrial flutter, and atrial fibrillation, unless there has been no recurrence during the preceding 2 years while off all medications. Premature atrial or ventricular contractions are disqualifying when sufficiently symptomatic to require treatment or result in physical or psychological impairment.

(2) Ventricular arrhythmias (427.1), including ventricular fibrillation, tachycardia, and multi focal premature ventricular contractions. Occasional asymptomatic premature ventricular contractions are not disqualifying.

(3) Ventricular conduction disorders, left bundle branch block (426.2), Mobitz type II second degree atrioventricular (AV) block (426.12), and third degree AV block (426.0). Wolff-Parkinson-White Syndrome (426.7) and Lown-Ganong-Levine-Syndrome (426.81) associated with an arrhythmia are also disqualifying.

(4) Conduction disturbances such as first degree AV block (426.11), left anterior hemiblock (426.2), right bundle branch block (426.4), or Mobitz type I second degree AV block (426.13) are disqualifying when symptomatic or associated with underlying cardiovascular disease.

*d.* Hypertrophy or dilatation of the heart (429.3).

*e.* Cardiomyopathy (425), including myocarditis (422), or history of congestive heart failure (428) even though currently compensated.

*f.* Pericarditis (420).

*g.* Persistent tachycardia (785) (resting pulse rate of 100 or greater).

*h.* Congenital anomalies of heart and great vessels (746), except for corrected patent ductus arteriosus.

## 2–19. Vascular system

The causes for rejection for appointment, enlistment, and induction are:

*a.* Abnormalities of the arteries and blood vessels (447), including aneurysms (442), even if repaired, atherosclerosis (440), or arteritis (446).

*b.* Hypertensive vascular disease (401), evidenced by the average of three consecutive diastolic blood pressure measurements greater than 90 mmHg or three consecutive systolic pressure measurements greater than 140 mmHg. High blood pressure requiring medication or a history of treatment including dietary restriction.

*c.* Pulmonary (415) or systemic embolization (444).

*d.* Peripheral vascular disease, including Raynaud's phenomenon (443).

*e.* Vein diseases, recurrent thrombophlebitis (451), thrombophlebitis during the preceding year, or any evidence of venous incompetence, such as large or symptomatic varicose veins, edema, or skin ulceration (454).

## 2–20. Height

The causes for rejection for appointment, enlistment, and induction are:

*a.* Men: Height below 60 inches or over 80 inches. < 5.0

*b.* Women: Height below 58 inches or over 80 inches. <4'8"

## 2–21. Weight

*a.* Army applicants for initial appointment as commissioned officers (to include appointment as commissioned warrant officers) must meet the standards of AR 600–9. Body fat composition is used as the final determinant in evaluating an applicant's acceptability when the weight exceeds the weight tables.

*b.* All other applicants must meet the standards of tables 2–1 and 2–2. Body fat composition is used as the final determinant in evaluating an applicant's acceptability when the weight exceeds the weight tables.

## 2–22. Body build

The cause for rejection for appointment, enlistment, and induction is deficient muscular development that would interfere with the completion of required training.

## 2–23. Lungs, chest wall, pleura, and mediastinum

The causes for rejection for appointment, enlistment, and induction are:

*a.* Abnormal elevation of the diaphragm (793.2), either side.

*b.* Abscess of the lung (513).

*c.* Acute infectious processes of the lung (518), until cured.

*d.* Asthma (493), including reactive airway disease, exercise-induced bronchospasm or asthmatic bronchitis, reliably diagnosed and symptomatic after the 13th birthday. Reliable diagnostic criteria may include any of the following: substantiated history of cough, wheeze, chest tightness, and/or dyspnea which persists or recurs over a prolonged period of time, generally more than 12 months.

*e.* Bronchitis (490), chronic, symptoms over 3 months occurring at least twice a year.

*f.* Bronchiectasis (494).

*g.* Bronchopleural fistula (510).

*h.* Bullous or generalized pulmonary emphysema (492).

*i.* Chronic mycotic diseases (117) of the lung including coccidioidomycosis.

*j.* Chest wall malformation (754) or fracture (807) that interferes with vigorous physical exertion.

*k.* Empyema (510), including residual pleural effusion (511.9) or unhealed sinuses of chest wall (510).

*l.* Extensive pulmonary fibrosis (515).

*m.* Foreign body in lung, trachea, or bronchus (934).

*n.* Lobectomy, with residual pulmonary disease or removal of more than one lobe (P32.4).

*o.* Pleurisy with effusion (511.9), within the previous 2 years if known or unknown origin.

*p.* Pneumothorax (512) during the year preceding examination if due to a simple trauma or surgery; during the 3 years preceding examination from spontaneous origin. Recurrent spontaneous pneumothorax after surgical correction or pleural sclerosis.

*q.* Sarcoidosis (135). (See para 2–34.)

*r.* Silicone breast implants, encapsulated (85.53) if less than 9 months since surgery or with symptomatic complications.

*s.* Tuberculous lesions. (See para 2–34.)

## 2–24. Mouth
The causes for rejection for appointment, enlistment, and induction are:
*a.* Cleft lip or palate defects (749), unless satisfactorily repaired by surgery.
*b.* Leukoplakia (528.6).

## 2–25. Nose, sinuses, and larynx
The causes for rejection for appointment, enlistment, and induction are:
*a.* Allergic manifestations.
(1) Allergic or vasomotor rhinitis (477), if moderate or severe and not controlled by oral medications, desensitization, or topical corticosteroid medication.
(2) Atrophic rhinitis (472).
(3) Vocal cord paralysis (478.3), or symptomatic disease of the larynx (478.7).
*b.* Anosmia or parosmia (352).
*c.* Epistaxis (784.7), recurrent.
*d.* Nasal polyps (471), unless surgery was performed at least 1 year before examination.
*e.* Perforation of nasal septum (478.1), if symptomatic or progressive.
*f.* Sinusitis (461), acute.
*g.* Sinusitis, chronic (473), when evidenced by chronic purulent nasal discharge, hyperplastic changes of the nasal tissue, symptoms requiring frequent medical attention, or x–ray findings.
*h.* Larynx ulceration, polyps, granulated tissue, or chronic laryngitis (476).
*i.* Tracheostomy (V44) or tracheal fistula.
*j.* Deformities or conditions (750.9) of the mouth, tongue, palate throat, pharynx, larynx, and nose that interfere with chewing, swallowing, speech, or breathing.
*k.* Pharyngitis (462) and nasopharyngitis (472.2), chronic.

## 2–26. Neurological disorders
The causes for rejection for appointment, enlistment, and induction are:
*a.* Cerebrovascular conditions, any history of subarachnoid (430) or intracerebral (431) hemorrhage, vascular insufficiency, aneurysm, or arteriovenous malformation (437).
*b.* Congenital malformations (742), if associated with neurological manifestations or if known to be progressive; meningocele (741), even if uncomplicated.
*c.* Degenerative and hereditodegenerative disorders affecting the cerebrum (330), basal ganglia (333), cerebellum (334), spinal cord (335), and peripheral nerves, or muscles (337).
*d.* Recurrent headaches (784) of all types if they are of sufficient severity or frequency to interfere with normal function within 3 years.
*e.* Head injury (854).
(1) Applicants with a history of head injury with—
*(a)* Late post-traumatic epilepsy (occurring more than 1 week after injury).
*(b)* Permanent motor or sensory deficits.
*(c)* Impairment of intellectual function.
*(d)* Alteration of personality.
*(e)* Central nervous system shunt.
(2) Applicants with a history of severe head injury are unfit for a period of at least 5 years, after which they may be considered fit if complete neurological and neurophysical evaluation shows no residual dysfunction or complications. Applicants with a history of severe penetrating head injury are unfit for a period of at least 10 years after the injury. After 10 years they may be considered fit if complete neurological and neuropsychological evaluation shows no residuals dysfunction or complications. Severe head injuries are defined by one or more of the following:
*(a)* Unconsciousness or amnesia, alone or in combination, of 24 hours duration or longer.
*(b)* Depressed skull fracture.
*(c)* Laceration or contusion of dura or brain.
*(d)* Epidural, subdural, subarachnoid, or intracerebral hematoma.
*(e)* Associated abscess or meningitis.
*(f)* Cerebrospinal fluid rhinorrhea or otorrhea persisting more than 7 days.
*(g)* Focal neurologic signs.
*(h)* Radiographic evidence of retained metallic or bony fragments.
*(i)* Leptomeningeal cysts or arteriovenous fistula.

*(j)* Early post-traumatic seizure(s) occurring within 1 week of injury but more than 30 minutes after injury.

(3) Applicants with a history of moderate head injury are unfit for a period of at least 2 years after injury, after which they may be considered fit if complete neurological evaluation shows no residual dysfunction or complications. Moderate head injuries are defined by unconsciousness or amnesia, alone or in combination of 1 to 24 hours duration or linear skull fracture.

(4) Applicants with a history of mild head injury, as defined by a period of unconsciousness or amnesia, alone or in combination, of 1 hour or less, are unfit for at least 1 month after injury; after which they may be acceptable if neurological evaluation shows no residual dysfunction or complications.

(5) Persistent post-traumatic sequelae, as manifested by headache, vomiting, disorientation, spatial disequilibrium, personality changes, impaired memory, poor mental concentration, shortened attention span, dizziness, altered sleep patterns, or any findings consistent with organic brain syndrome are disqualifying until full recovery has been confirmed by complete neurological and neuropsychological evaluation.

*f.* Infectious diseases.

(1) Meningitis (322), encephalitis (323), or poliomyelitis (045) within 1 year before examination, or if there are residual neurological defects.

(2) Neurosyphilis (094) of any form, general paresis, tabes dorsalis meningovascular syphilis.

*g.* Narcolepsy (347), sleep apnea syndrome (780.57).

*h.* Paralysis, weakness, lack of coordination, pain, sensory disturbance (344).

*i.* Epilepsy (345), beyond the age of 5 unless the applicant has been free of seizures for a period of 5 years while taking no medication for seizure control, and has a normal electroencephalogram (EEG). All such applicants will have a current neurology consultation with current EEG results. EEG may be requested by the reviewing authority.

*j.* Chronic disorders such as myasthenia gravis (358) and multiple sclerosis (340).

*k.* Central nervous system shunts of all kinds (V45.2).

## 2–27. Disorders with psychotic features

The causes for rejection for appointment, enlistment, and induction are disorders with psychotic features (295).

## 2–28. Neurotic, anxiety, mood, somatoform, dissociative, or factitious disorders

The causes for rejection for appointment, enlistment, and induction are a history of such disorders (300) resulting in any or all of the below:

*a.* Admission to a hospital or residential facility.

*b.* Care by a physician or other mental health professional for more than 6 months.

*c.* Symptoms or behavior of a repeated nature that impaired social, school, or work efficiency.

## 2–29. Personality, conduct, and behavior disorders

The causes for rejection for appointment, enlistment, and induction are:

*a.* Personality (301), conduct (312), or behavior disorders (313) as evidenced by frequent encounters with law enforcement agencies, antisocial attitudes or behavior, which, while not sufficient cause for administrative rejection, are tangible evidence of impaired capacity to adapt to military service.

*b.* Personality (301), conduct (312), or behavior (313) disorders where it is evident by history, interview, or psychological testing that the degree of immaturity, instability, personality inadequacy, impulsiveness, or dependency will seriously interfere with adjustment in the Army as demonstrated by repeated inability to maintain reasonable adjustment in school, with employers and fellow workers, and with other social groups.

*c.* Other behavior disorders including but not limited to conditions such as authenticated evidence of functional enuresis (307.6) or encopresis (307.7), sleepwalking (307.6), or eating disorders that are habitual or persistent (307.1 or 307.5) occurring beyond age 12, or stammering (307.0) of such a degree that the individual is normally unable to express himself or herself clearly or to repeat commands.

*d.* Attention deficit disorder/attention deficit hyperactivity disorder (ADD/ADHD) (314), or perceptual/learning disorder(s) (315) unless applicant can demonstrate passing academic performance and there has been no use of medication(s) in the previous 12 months.

*e.* Suicide, history of attempted or suicidal behavior (300.9).

## 2–30. Psychosexual conditions

The causes for rejection for appointment, enlistment, and induction are transsexualism, exhibitionism, transvestitism, voyeurism, and other paraphilias (302).

## 2–31. Substance misuse

The causes for rejection for appointment, enlistment, and induction are:

*a.* Alcohol dependence (303).

*b.* Drug dependence (304).

*c.* Non-dependent use of drugs characterized by—

(1) The evidence of use of any controlled hallucinogenic, or other intoxicating substance at time of examination (305), when the use cannot be accounted for as the result of a prescription of a physician.

(2) Documented misuse or abuse of any controlled substance (including cannabinoids or anabolic steroids) requiring professional care (305).

(3) The repeated self-procurement and self-administration of any drug or chemical substance, including cannabinoids or anabolic steroids, with such frequency that it appears that the applicant has accepted the use of or reliance on these substances as part of his or her pattern of behavior (305).

*d.* The use of LSD (305.3) within a 2-year period of the examination.

*e.* Alcohol abuse (305), use of alcoholic beverages that leads to misconduct, unacceptable social behavior, poor work or academic performance, impaired physical or mental health, lack of financial responsibility, or a disrupted personal relationship.

## 2–32. Skin and cellular tissues

The causes for rejection for appointment, enlistment, and induction are:

*a.* Acne (706), severe, or when extensive involvement of the neck, shoulders, chest, or back would be aggravated by or interfere with the wearing of military equipment, and would not be amenable to treatment. Patients under treatment with isotretinoin (Accutane) are medically unacceptable until 8 weeks after completion of course of therapy.

*b.* Atopic dermatitis (691) or eczema (692), with active or residual lesions in characteristic areas (face, neck, antecubital, and or/popliteal fossae, occasionally wrists and hands), or documented history thereof after the age of 8.

*c.* Contact dermatitis (692.4), especially involving rubber or other materials used in any type of required protective equipment.

*d.* Cysts.

(1) Cysts (706.2), other than pilonidal, of such a size or location as to interfere with the normal wearing of military equipment.

(2) Pilonidal cysts (685), if evidenced by the presence of a tumor mass or a discharging sinus. History of pilonidal cystectomy within 6 months before examination is disqualifying.

*e.* Dermatitis factitia (698.4).

*f.* Bullous dermatoses (694), such as Dermatitis Herpetiformis, pemphigus, and epidermolysis bullosa.

*g.* Chronic Lymphedema (457).

*h.* Fungus infections (117), systemic or superficial types, if extensive and not amenable to treatment.

*i.* Furunculosis (680), extensive recurrent, or chronic.

*j.* Hyperhidrosis of hands or feet (780.8), chronic or severe.

*k.* Ichthyosis, or other congenital (757) or acquired (216) anomalies of the skin such as nevi or vascular tumors that interfere with function or are exposed to constant irritation.

*l.* Keloid formation (701.4), if the tendency is marked or interferes with the wearing of military equipment.

*m.* Leprosy (030.9), any type.

*n.* Lichen planus (697.0).

*o.* Neurofibromatosis (von Recklinghausen's disease) (237.7).

*p.* Photosensitivity (692.72), any primary sun-sensitive condition, such as polymorphous light eruption or solar urticaria; any dermatosis aggravated by sunlight such as lupus erythematosus.

*q.* Psoriasis (696.1), unless mild by degree, not involving nail pitting, and not interfering with wearing military equipment or clothing.

*r.* Radiodermatitis (692.82).

*s.* Scars (709.2) that are so extensive, deep, or adherent that they may interfere with the wearing of military clothing or equipment, exhibit a tendency to ulcerate, or interfere with function. Includes scars at skin graft donor or recipient sites if the area is susceptible to trauma.

*t.* Scleroderma (710.1).

*u.* Tattoos (709.9) that will significantly limit effective performance of military service or that are otherwise prohibited under AR 670–1.

*v.* Urticaria (708.8), chronic.

*w.* Warts, plantar (078.19), symptomatic.

*x.* Xanthoma (272.2), if disabling or accompanied by hyperlipemia.

*y.* Any other chronic skin disorder of a degree or nature, such as Dysplastic Nevi Syndrome (448.1), which requires frequent outpatient treatment or hospitalization, or interferes with the satisfactory performance of duty.

## 2–33. Spine and sacroiliac joints

(See also para 2–11.) The causes for rejection for appointment, enlistment, and induction are:

*a.* Arthritis (720). (See para 2–11*a.*)

*b.* Complaint of a disease or injury of the spine or sacroiliac joints with or without objective signs that has prevented the individual from successfully following a physically active vocation in civilian life (724) or that is associated with pain referred to the lower extremities, muscular spasm, postural deformities, or limitation of motion.

*c.* Deviation or curvature of spine (737) from normal alignment, structure, or function if—

(1) It prevents the individual from following a physically active vocation in civilian life.

(2) It interferes with wearing a uniform or military equipment.

(3) It is symptomatic and associated with positive physical finding(s) and demonstrable by x-ray.

(4) There is lumbar scoliosis greater than 20 degrees, thoracic scoliosis greater than 30 degrees, and kyphosis or lordosis greater than 55 degrees when measured by the Cobb method.

*d.* Fusion, congenital (756.15), involving more than two vertebrae. Any surgical fusion (81.0P) is disqualifying.

*e.* Healed fractures or dislocations of the vertebrae (805). A compression fracture, involving less than 25 percent of a single vertebra is not disqualifying if the injury occurred more than 1 year before examination and the applicant is asymptomatic. A history of fractures of the transverse or spinous processes is not disqualifying if the applicant is asymptomatic.

*f.* Juvenile epiphysitis (732.6) with any degree of residual change indicated by x-ray or kyphosis.

*g.* Ruptured nucleus pulposus (722), herniation of intervertebral disk or history of operation for this condition.

*h.* Spina bifida (741) when symptomatic or if there is more than one vertebra involved, dimpling of the overlying skin, or a history of surgical repair.

*i.* Spondylolysis (756.1) and spondylolisthesis (738.4).

*j.* Weak or painful back (724) requiring external support such as a corset or brace; recurrent sprains or strains requiring limitation of physical activity or frequent treatment.

## 2–34. Systemic diseases

The causes for rejection for appointment, enlistment, and induction are:

*a.* Amyloidosis (277.3).

*b.* Ankylosing spondylitis (720).

*c.* Eosinophilic granuloma (277.8) when occurring as a single localized bony lesion and not associated with soft tissue or other involvement should not be a cause for rejection once healing has occurred. All other forms of the Histiocytosis X spectrum should be rejected.

*d.* Lupus erythematosus (710) and mixed connective tissue disease.

*e.* Polymyositis/dermatomyositis complex (710).

*f.* Progressive Systemic Sclerosis (710), including calcinosis, Raynaud's phenomenon, sclerodactyly, and telangiectasis variant. A single plaque of localized scleroderma (morphea) that has been stable for at least 2 years is not disqualifying.

*g.* Reiter's Disease (099.3).

*h.* Rheumatoid arthritis (714).

*i.* Rhabdomyolysis (728.9).

*j.* Sarcoidosis (135), unless there is substantiated evidence of a complete spontaneous remission of at least 2 years duration.

*k.* Sjogren's Syndrome (710.2).

*l.* Tuberculosis (010).

(1) Active tuberculosis in any form or location, or history of active tuberculosis within the previous 2 years.

(2) One or more reactivations.

(3) Residual physical or mental defects from past tuberculosis that would preclude the satisfactory performance of duty.

(4) Individuals with a past history of active tuberculosis MORE than 2 years prior to enlistment, induction and appointment are QUALIFIED IF they have received a complete course of standard chemotherapy for tuberculosis. In addition, individuals with a tuberculin reaction 10 mm or greater and without evidence of residual disease are qualified once they have been treated with chemoprophylaxis.

(5) Vasculitis (446) such as Bechet's, Wegener's granulomatosis, polyarteritis nodosa.

## 2–35. General and miscellaneous conditions and defects

The causes for rejection for appointment, enlistment, and induction are:

*a.* Allergic manifestations (995.0). A reliable history of anaphylaxis to stinging insects. Reliable history of a moderate to severe reaction to common foods, spices, or food additives.

*b.* Any acute pathological condition, including acute communicable diseases, until recovery has occurred without sequelae.

*c.* Chronic metallic poisoning with lead, arsenic, or silver (985), or beryllium or manganese (985).

*d.* Cold injury (991), residuals of, such as: frostbite, chilblain, immersion foot, trench foot, deep–seated ache, paresthesia, hyperhidrosis, easily traumatized skin, cyanosis, amputation of any digit, or ankylosis.

*e.* Cold urticaria (708.2) and angioedema; hereditary angioedema (277.6).

*f.* Filariasis (125), trypanosomiasis (086), schistosomiasis (120), uncinariasis (126.9), or other parasitic conditions, if symptomatic or carrier states.

*g.* Heat pyrexia, heatstroke, or sunstroke (992). Documented evidence of a predisposition (including disorders of sweat mechanism and a previous serious episode), recurrent episodes requiring medical attention, or residual injury (especially cardiac, cerebral, hepatic, and renal); malignant hyperthermia (995.89).

*h.* Industrial solvent and other chemical intoxication (982).

*i.* Motion sickness (994.6). An authenticated history of frequent incapacitating motion sickness after the 12th birthday.

*j.* Mycotic (114) infection of internal organs.

*k.* Organ transplant recipient (V42).

*l.* Presence of human immunodeficiency virus (HIV–I) or antibody (042). Presence is confirmed by repeatedly reactive enzyme-linked immunoassay serological test and positive immunoelectrophoresis (Western Blot) test, or other DOD-approved confirmatory test.

*m.* Reactive tests for syphilis (093) such as the rapid plasma reagin (RPR) test or venereal disease research laboratory (VDRL) followed by a reactive, confirmatory Fluorescent Treponemal Antibody Absorption (FTA–ABS) test unless there is a documented history of adequately treated syphilis. In the absence of clinical findings, the presence of reactive RPR or VDRL followed by a negative FTA–ABS test is not disqualifying if a cause for the false positive reaction can be identified and is not otherwise disqualifying.

*n.* Residual of tropical fevers, such as malaria (084) and various parasitic or protozoal infestations that prevent the satisfactory performance of military duty.

*o.* Rheumatic fever (390) during the previous 2 years, or any history of recurrent attacks; Sydenham's chorea at any age.

*p.* Sleep apnea (780.57).

## 2–36. Tumors and malignant diseases

The causes for rejection for appointment, enlistment, and induction are:

*a.* Benign tumors (M8000) that interfere with function, prevent wearing the uniform or protective equipment, would require frequent specialized attention, or have a high malignant potential.

*b.* Malignant tumors (V10), exception for basal cell carcinoma, removed with no residual. In addition, the following cases should be qualified if on careful review they meet the following criteria: individuals who have a history of childhood cancer who have not received any surgical or medical cancer therapy for 5 years and are free of cancer; individuals with a history of Wilm's tumor and germ cell tumors of the testis treated surgically and/or with chemotherapy after a 2-year disease-free interval off all treatment; individuals with a history of Hodgkin's disease treated with radiation therapy and/or chemotherapy and disease free off treatment for 5 years; individuals with a history of large cell lymphoma after a 2-year disease-free interval off all therapy.

## 2–37. Miscellaneous

Any condition that in the opinion of the examining medical officer will significantly interfere with the successful performance of military duty or training (796) may be a cause for rejection for appointment, enlistment, and induction.

Table 2–1
Military acceptable weight (in pounds) as related to age and height for males—Initial Army procurement[1, 2]

| Height (inches) | Minimum weight any age | Maximum weight by years of age | | | |
|---|---|---|---|---|---|
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| 60 | 100 | 139 | 141 | 143 | 146 |
| 61 | 102 | 144 | 146 | 148 | 151 |
| 62 | 103 | 148 | 150 | 153 | 156 |
| 63 | 104 | 153 | 155 | 158 | 161 |
| 64 | 105 | 158 | 160 | 163 | 166 |
| 65 | 106 | 163 | 165 | 168 | 171 |

Table 2–1
Military acceptable weight (in pounds) as related to age and height for males—Initial Army procurement[1, 2]—Continued

| Height (inches) | Minimum weight any age | Maximum weight by years of age | | | |
|---|---|---|---|---|---|
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| 66 | 107 | 168 | 170 | 173 | 177 |
| 67 | 111 | 174 | 176 | 179 | 182 |
| 68 | 115 | 179 | 181 | 184 | 187 |
| 69 | 119 | 184 | 186 | 189 | 193 |
| 70 | 123 | 189 | 192 | 195 | 199 |
| 71 | 127 | 194 | 197 | 201 | 204 |
| 72 | 131 | 200 | 203 | 206 | 210 |
| 73 | 135 | 205 | 208 | 212 | 216 |
| 74 | 139 | 211 | 214 | 218 | 222 |
| 75 | 143 | 217 | 220 | 224 | 228 |
| 76 | 147 | 223 | 226 | 230 | 234 |
| 77 | 151 | 229 | 232 | 236 | 240 |
| 78 | 153 | 235 | 238 | 242 | 247 |
| 79 | 159 | 241 | 244 | 248 | 253 |
| 80 | 166 | 247 | 250 | 255 | 259 |

| | Maximum body fat by years of age | | |
|---|---|---|---|
| 17–20 | 21–27 | 28–39 | 40 and over |
| 24% | 26% | 28% | 30% |

Notes:
[1] If a male exceeds these weights, percent body fat will be measured by the method described in AR 600–9.
[2] If a male also exceeds this body fat, he will be rejected for service.

Table 2–2
Military acceptable weight (in pounds) as related to age and height for females—Initial Army procurement[1, 2]

| Height (inches) | Minimum weight any age | Maximum weight by years of age | | | |
|---|---|---|---|---|---|
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| 58 | 90 | 112 | 115 | 119 | 122 |
| 59 | 92 | 116 | 119 | 123 | 126 |
| 60 | 94 | 120 | 123 | 127 | 130 |
| 61 | 96 | 124 | 127 | 131 | 135 |
| 62 | 98 | 129 | 132 | 137 | 139 |
| 63 | 100 | 133 | 137 | 141 | 144 |
| 64 | 102 | 137 | 141 | 145 | 148 |
| 65 | 104 | 141 | 145 | 149 | 153 |
| 66 | 106 | 146 | 150 | 154 | 158 |
| 67 | 109 | 149 | 154 | 159 | 162 |
| 68 | 112 | 154 | 159 | 164 | 167 |
| 69 | 115 | 158 | 163 | 168 | 172 |
| 70 | 118 | 163 | 168 | 173 | 177 |
| 71 | 122 | 167 | 172 | 177 | 182 |
| 72 | 125 | 172 | 177 | 183 | 188 |
| 73 | 128 | 177 | 182 | 188 | 193 |
| 74 | 130 | 183 | 189 | 194 | 198 |
| 75 | 133 | 188 | 194 | 200 | 204 |
| 76 | 136 | 194 | 200 | 206 | 209 |

Table 2–2
Military acceptable weight (in pounds) as related to age and height for females—Initial Army procurement[1, 2]—Continued

| Height (inches) | Minimum weight any age | Maximum weight by years of age | | | |
|---|---|---|---|---|---|
| | | 17–20 | 21–27 | 28–39 | 40 and over |
| 77 | 139 | 199 | 205 | 211 | 215 |
| 78 | 141 | 204 | 210 | 216 | 220 |
| 79 | 144 | 209 | 215 | 222 | 226 |
| 80 | 147 | 214 | 220 | 227 | 232 |

| | Maximum body fat by years of age | | | |
|---|---|---|---|---|
| | 17–20 | 21–27 | 28–39 | 40 and over |
| | 30% | 32% | 34% | 36% |

Notes:
[1] If a female exceeds these weights, percent body fat will be measured by the method described in AR 600–9.
[2] If a female also exceeds this body fat, she will be rejected for service.

# Chapter 3
# Medical Fitness Standards for Retention and Separation, Including Retirement

## 3–1. General
This chapter gives the various medical conditions and physical defects which may render a soldier unfit for further military service and which fall below the standards required for the individuals in paragraph 3–2 below.

## 3–2. Application
These standards apply to the following individuals (see chaps 4 and 5 for other standards that apply to specific specialties):

a. All commissioned and warrant officers of the Active Army, ARNG/ARNGUS, and USAR.

b. All enlisted soldiers of the Active Army, ARNG/ARNGUS, and USAR.

c. Students already enrolled in the HPSP and USUHS programs.

d. Enlisted soldiers of the ARNG/ARNGUS or USAR who apply for enlistment in the regular Army.

e. Commissioned and warrant officers of the ARNG/ARNGUS or USAR who apply for appointment in the Active Army.

f. Soldiers of the ARNG/ARNGUS or USAR who re-enter active duty under the "split-training option." (However, the weight standards of tables 2–1 and 2–2 apply to split option trainees.)

g. Retired soldiers recalled to active duty.

## 3–3. Disposition
Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by an MEB as defined in AR 40–400 and will be referred to a PEB as defined in AR 635–40 with the following caveats:

a. USAR or ARNG/ARNGUS soldiers not on active duty, whose medical condition was not incurred or aggravated during an active duty period, will be processed in accordance with chapter 9 and chapter 10 of this regulation.

b. Soldiers pending separation in accordance with provisions of AR 635–200 or AR 600–8–24 authorizing separation under other than honorable conditions who do not meet medical retention standards will be referred to an MEB. In the case of enlisted soldiers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 635–200 and AR 635–40. In the case of commissioned or warrant officers, the physical disability processing and the administrative separation processing will be conducted in accordance with the provisions of AR 600–8–24 and AR 635–40.

c. A soldier will not be referred to an MEB or a PEB because of impairments that were known to exist at the time of acceptance in the Army and that have remained essentially the same in degree of severity and have not interfered with successful performance of duty.

d. Physicians who identify soldiers with medical conditions listed in this chapter should initiate an MEB at the time of identification. Physicians should not defer initiating the MEB until the soldier is being processed for nondisability retirement. Many of the conditions listed in this chapter (for example, arthritis in para 3–14b) fall below retention standards only if the condition has precluded or prevented successful performance of duty. In those cases when it is

clear the condition is long standing and has not prevented the soldier from reaching retirement, then the soldier meets the standard and an MEB is not required.

*e.* Soldiers who have previously been found unfit for duty by a PEB, but were continued on active duty (COAD) under the provisions of AR 635–40, chapter 6, will be referred to a PEB prior to retirement or separation processing.

*f.* If the Secretary of Defense prescribes less stringent standards during partial or full mobilization, individuals who meet the less stringent standards but do not meet the standards of this chapter will not be referred for an MEB or a PEB, until the termination of the mobilization or as directed by the Secretary of the Army.

## 3–4. General policy

Possession of one or more of the conditions listed in this chapter does not mean automatic retirement or separation from the Service. Physicians are responsible for referring soldiers with conditions listed below to an MEB. It is critical that MEBs are complete and reflect all of the soldier's medical problems and physical limitations. The PEB will make the determination of fitness or unfitness. The PEB, under the authority of the U.S. Army Physical Disability Agency, will consider the results of the MEB, as well as the requirements of the soldier's MOS, in determining fitness. (See chapter 9 and chapter 10 of this regulation for processing of RC soldiers.)

## 3–5. Abdominal and gastrointestinal defects and diseases

The causes for referral to an MEB are as follows:

*a.* Achalasia (cardiospasm) with dysphagia not controlled by dilatation or surgery, continuous discomfort, or inability to maintain weight.

*b.* Amoebic abscess with persistent abnormal liver function tests and failure to maintain weight and vigor after appropriate treatment.

*c.* Biliary dyskinesia with frequent abdominal pain not relieved by simple medication, or with periodic jaundice.

*d.* Cirrhosis of the liver with recurrent jaundice, ascites, or demonstrable esophageal varices or history of bleeding therefrom.

*e.* Gastritis, if severe, chronic hypertrophic gastritis with repeated symptomatology and hospitalization, confirmed by gastroscopic examination.

*f.* Hepatitis, chronic, when, after a reasonable time (1 or 2 years) following the acute stage, symptoms persist, and there is objective evidence of impairment of liver function.

*g.* Hernia, including inguinal, and other abdominal, except for small asymptomatic umbilical, with severe symptoms not relieved by dietary or medical therapy, or recurrent bleeding in spite of prescribed treatment or other hernias if symptomatic and if operative repair is contraindicated for medical reasons or when not amenable to surgical repair.

*h.* Crohn's Disease/Ileitis, regional, except when responding well to treatment.

*i.* Pancreatitis, chronic, with frequent abdominal pain of a severe nature; steatorrhea or disturbance of glucose metabolism requiring hypoglycemic agents.

*j.* Peritoneal adhesions with recurring episodes of intestinal obstruction characterized by abdominal colicky pain, vomiting, and intractable constipation requiring frequent admissions to the hospital.

*k.* Proctitis, chronic, with moderate to severe symptoms of bleeding, painful defecation, tenesmus, and diarrhea, and repeated admissions to the hospital.

*l.* Ulcer, duodenal, or gastric with repeated hospitalization, or "sick in quarters" because of frequent recurrence of symptoms (pain, vomiting, or bleeding) in spite of good medical management and supported by endoscopic evidence of activity.

*m.* Ulcerative colitis, except when responding well to treatment.

*n.* Rectum, stricture of with severe symptoms of obstruction characterized by intractable constipation, pain on defecation, or difficult bowel movements, requiring the regular use of laxatives or enemas, or requiring repeated hospitalization.

## 3–6. Gastrointestinal and abdominal surgery

The causes for referral to an MEB are as follows:

*a.* Colectomy, partial, when more than mild symptoms of diarrhea remain or if complicated by colostomy.

*b.* Colostomy, when permanent.

*c.* Enterostomy, when permanent.

*d.* Gastrectomy, total.

*e.* Gastrectomy, subtotal, with or without vagotomy, or gastrojejunostomy, with or without vagotomy, when, in spite of good medical management, the individual develops "dumping syndrome" which persists for 6 months postoperatively; or develops frequent episodes of epigastric distress with characteristic circulatory symptoms or diarrhea persisting 6 months postoperatively; or continues to demonstrate appreciable weight loss 6 months postoperatively.

*f.* Gastrostomy, when permanent.

*g.* Ileostomy, when permanent.

*h.* Pancreatectomy.

*i.* Pancreaticoduodenostomy, pancreaticogastrostomy, or pancreaticojejunostomy, followed by more than mild symptoms of digestive disturbance, or requiring insulin.

*j.* Proctectomy.

*k.* Proctopexy, proctoplasty, proctorrhaphy, or proctotomy, if fecal incontinence remains after an appropriate treatment period.

## 3–7. Blood and blood-forming tissue diseases

The causes for referral to an MEB are as follows:

*a.* Anemia, hereditary, acquired, aplastic, or unspecified, when response to therapy is unsatisfactory, or when therapy is such as to require prolonged, intensive medical supervision.

*b.* Hemolytic crisis, chronic and symptomatic.

*c.* Leukopenia, chronic, when response to therapy is unsatisfactory, or when therapy is such as to require prolonged, intensive medical supervision.

*d.* Hypogammaglobulinemia with objective evidence of function deficiency and severe symptoms not controlled with treatment.

*e.* Purpura and other bleeding diseases, when response to therapy is unsatisfactory, or when therapy is such as to require prolonged, intensive medical supervision.

*f.* Thromboembolic disease when response to therapy is unsatisfactory, or when therapy is such as to require prolonged, intensive medical supervision.

*g.* Splenomegaly, chronic.

*h.* HIV confirmed antibody positivity, with the presence of progressive clinical illness or immunological deficiency. For regular Army soldiers and RC soldiers on active duty for more than 30 days (except for evaluation under the Walter Reed Staging System or for training under 10 USC 10148), an MEB must be accomplished and, if appropriate, the soldier must be referred to a PEB under AR 635–40. For RC soldiers not on active duty for more than 30 days or on ADT under 10 USC 10148, referral to a PEB will be determined under AR 635–40. Records of official diagnoses provided by private physicians (that is, civilian doctors providing evaluations under contract with Department of the Army (DA) or DOD, or civilian public health officials) concerning the presence of progressive clinical illness or immunological deficiency in RC soldiers may be used as a basis for administrative action under, for example, AR 135–133, AR 135–175, AR 135–178, or AR 140–10, as appropriate. (See AR 600–110 for HIV policies, including testing requirements.)

## 3–8. Dental diseases and abnormalities of the jaws

The causes for referral to an MEB are diseases of the jaws, periodontium, or associated tissues when, following restorative surgery, there are residuals that are incapacitating or interfere with the individual's satisfactory performance of military duty.

## 3–9. Ears

The causes for referral to an MEB are as follows:

*a.* Infections of the external auditory canal when chronic and severe, resulting in thickening and excoriation of the canal or chronic secondary infection requiring frequent and prolonged medical treatment and hospitalization.

*b.* Malfunction of the acoustic nerve. (Evaluate functional impairment of hearing under para 3–10.)

*c.* Mastoiditis, chronic, with constant drainage from the mastoid cavity, requiring frequent and prolonged medical care.

*d.* Mastoiditis, chronic, following mastoidectomy, with constant drainage from the mastoid cavity, requiring frequent and prolonged medical care or hospitalization.

*e.* Meniere's syndrome or any peripheral imbalance, syndrome or labyrinthine disorder with recurrent attacks of sufficient frequency and severity as to interfere with the satisfactory performance of duty or requiring frequent or prolonged medical care or hospitalization.

*f.* Otitis media, moderate, chronic, suppurative, resistant to treatment, and necessitating frequent and prolonged medical care or hospitalization.

## 3–10. Hearing

Trained and experienced personnel will not be categorically disqualified if they are capable of effective performance of duty with a hearing aid. Most soldiers having a hearing defect can be returned to duty with appropriate assignment limitations. Soldiers incapable of performing duty with a hearing aid will be referred for MEB/PEB processing. (See paragraph 8–26.)

## 3–11. Endocrine and metabolic disorders

The causes for referral to an MEB are as follows:

a. Acromegaly with severe function impairment.

b. Adrenal dysfunction that does not respond to therapy satisfactorily or where replacement therapy presents serious problems in management.

c. Diabetes insipidus unless mild and the patient shows good response to treatment.

d. Diabetes mellitus when proven to require insulin or oral medications for control.

e. Goiter causing breathing obstruction.

f. Gout in advanced cases with frequent acute exacerbations and severe bone, joint, or kidney damage.

g. Hyperinsulinism when caused by a tumor or when the condition is not readily controlled.

h. Hyperparathyroidism when residuals or complications of surgical correction such as renal disease or bony deformities preclude the reasonable performance of military duty.

i. Hypofunction, adrenal cortex requiring medication for control.

j. Osteomalacia with residuals after therapy of such nature or degree as to preclude the satisfactory performance of duty.

## 3–12. Upper extremities

The causes for referral to an MEB are as follows (see also para 3–14):

a. Amputation of part or parts of an upper extremity equal to or greater than—

(1) A thumb proximal to the interphalangeal joint.

(2) Two fingers of one hand, other than the little finger, at the proximal interphalangeal joints.

(3) One finger, other than the little finger, at the metacarpophalangeal joint and the thumb of the same hand at the interphalangeal joint.

b. Joint ranges of motion which do not equal or exceed the measurements listed below. Measurements must be made with a goniometer and conform to the methods illustrated and described in TC 8–640.

(1) Shoulder—forward elevation to 90 degrees, or abduction to 90 degrees.

(2) Elbow—flexion to 100 degrees, or extension to 60 degrees.

(3) Wrist—a total range extension plus flexion of 15 degrees.

(4) Hand (for this purpose, combined joint motion is the arithmetic sum of the motion at each of the three finger joints (TC 8–640))—an active flexor value of combined joint motions of 135 degrees in each of two or more fingers of the same hand, or an active extensor value of combined joint motions of 75 degrees in each of the same two or more fingers, or limitation of motion of the thumb that precludes opposition to at least two finger tips.

c. Recurrent dislocations of the shoulder, when not repairable or surgery is contraindicated.

## 3–13. Lower extremities

The causes for referral to an MEB are as follows (see also para 3–14):

a. Amputations.

(1) Loss of toes that precludes the abilities to run or walk without a perceptible limp and to engage in fairly strenuous jobs.

(2) Any loss greater than that specified above to include foot, ankle, below the knee, above the knee, femur, hip.

b. Feet.

(1) Hallux valgus when moderately severe, with exostosis or rigidity and pronounced symptoms; or severe with arthritic changes.

(2) Pes planus, when symptomatic, more than moderate, with pronation on weight bearing which prevents the wearing of military footwear, or when associated with vascular changes.

(3) Pes cavus when moderately severe, with moderate discomfort on prolonged standing and walking, metatarsalgia, and which prevents the wearing of military footwear.

(4) Neuroma that is refractory to medical treatment, refractory to surgical treatment, and interferes with the satisfactory performance of military duties.

(5) Plantar fasciitis or heel spur syndrome that is refractory to medical or surgical treatment, interferes with the satisfactory performance of military duties, or prevents the wearing of military footwear.

(6) Hammertoes, severe, that precludes the wearing of appropriate military footwear, refractory to surgery, or interferes with satisfactory performance of duty.

(7) Hallux limitus, hallux rigidus.

c. Internal derangement of the knee.

(1) Residual instability following remedial measures, if more than moderate in degree.

(2) If complicated by arthritis, see paragraph 3–14a.

d. Joint ranges of motion. Motion that does not equal or exceed the measurements listed below. Measurements must be made with a goniometer and conform to the methods illustrated and described in TC 8–640.

(1) Hip—flexion to 90 degrees or extension to 0 degree.

(2) Knee—flexion to 90 degrees or extension to 15 degrees.

(3) Ankle—dorsiflexion to 10 degrees or planter flexion to 10 degrees.

*e.* Shortening of an extremity that exceeds 2 inches.

*f.* Recurrent dislocations of the patella.

## 3–14. Miscellaneous conditions of the extremities

The causes for referral to an MEB are as follows (see also paras 3–12 and 3–13):

*a.* Arthritis due to infection, associated with persistent pain and marked loss of function with objective x-ray evidence and documented history of recurrent incapacity for prolonged periods. For arthritis due to gonococcic or tuberculous infection, see paragraphs 3–40 and 3–45*b*.

*b.* Arthritis due to trauma, when surgical treatment fails or is contraindicated and there is functional impairment of the involved joints so as to preclude the satisfactory performance of duty.

*c.* Osteoarthritis, with severe symptoms associated with impairment of function, supported by x-ray evidence and documented history of recurrent incapacity for prolonged periods.

*d.* Avascular necrosis of bone when severe enough to prevent successful performance of duty.

*e.* Chondromalacia or osteochondritis dissecans, severe, manifested by frequent joint effusion, more than moderate interference with function, or with severe residuals from surgery.

*f.* Fractures.

(1) Malunion of fractures, when, after appropriate treatment, there is more than moderate malunion with marked deformity and more than moderate loss of function.

(2) Nonunion of fractures, when, after an appropriate healing period, the nonunion precludes satisfactory performance of duty.

(3) Bone fusion defect, when manifested by more than moderate pain and loss of function.

(4) Callus, excessive, following fracture, when functional impairment precludes satisfactory performance of duty and the callus does not respond to adequate treatment.

*g.* Joints.

(1) Arthroplasty with severe pain, limitation of motion, and of function.

(2) Bony or fibrous ankylosis, with severe pain involving major joints or spinal segments in an unfavorable position, and with marked loss of function.

(3) Contracture of joint, with marked loss of function and the condition is not remediable by surgery.

(4) Loose bodies within a joint, with marked functional impairment and complicated by arthritis to such a degree as to preclude favorable results of treatment or not remediable by surgery.

(5) Prosthetic replacement of major joints if there is resultant loss of function or pain that precludes satisfactory performance of duty.

*h.* Muscles.

(1) Flaccid paralysis of one or more muscles with loss of function that precludes satisfactory performance of duty following surgical correction or if not remediable by surgery.

(2) Spastic paralysis of one or more muscles with loss of function that precludes the satisfactory performance of military duty.

*i.* Myotonia congenita.

*j.* Osteitis deformans (Paget's disease) with involvement of single or multiple bones with resultant deformities or symptoms severely interfering with function.

*k.* Osteoarthropathy, hypertrophic, secondary with moderately severe to severe pain present, with joint effusion occurring intermittently in one or multiple joints, and with at least moderate loss of function.

*l.* Osteomyelitis, chronic, with recurrent episodes not responsive to treatment and involving the bone to a degree that interferes with stability and function.

*m.* Tendon transplant with fair or poor restoration of function with weakness that seriously interferes with the function of the affected part.

## 3–15. Eyes

The causes for referral to an MEB are as follows:

*a.* Active eye disease or any progressive organic disease or degeneration, regardless of the stage of activity, that is resistant to treatment and affects the distant visual acuity or visual fields so that distant visual acuity does not meet the standard stated in paragraph 3–16*e* or the diameter of the field of vision in the better eye is less than 20 degrees.

*b.* Aphakia, bilateral.

*c.* Atrophy of the optic nerve due to disease.

*d.* Glaucoma, if resistant to treatment or affecting visual fields as in *a* above, or if side effects of required medication are functionally incapacitating.

*e.* Degenerations, when vision does not meet the standards of paragraph 3–16*e*, or when vision is correctable only by the use of contact lenses or other special corrective devices (telescopic lenses, etc.).

*f.* Diseases and infections of the eye, when chronic, more than mildly symptomatic, progressive, and resistant to treatment after a reasonable period. This includes intractable allergic conjunctivitis inadequately controlled by medications and immunotherapy.

*g.* Residuals or complications of injury or disease, when progressive or when reduced visual acuity does not meet the criteria stated in paragraph 3–16*e*.

*h.* Unilateral detachment of retina if any of the following exists:

(1) Visual acuity does not meet the standard stated in paragraph 3–16*e*.

(2) The visual field in the better eye is constricted to less than 20 degrees.

(3) Uncorrectable diplopia exists.

(4) Detachment results from organic progressive disease or new growth, regardless of the condition of the better eye.

*i.* Bilateral detachment of retina, regardless of etiology or results of corrective surgery.

## 3–16. Vision

The causes for referral to an MEB are as follows:

*a.* Aniseikonia, with subjective eye discomfort, neurologic symptoms, sensations of motion sickness and other gastrointestinal disturbances, functional disturbances and difficulties in form sense, and not corrected by iseikonica lenses.

*b.* Binocular diplopia, not correctable by surgery, that is severe, constant, and in a zone less than 20 degrees from the primary position.

*c.* Hemianopsia, of any type if bilateral, permanent, and based on an organic defect. Those due to a functional neurosis and those due to transitory conditions, such as periodic migraine, are not considered to fall below required standards.

*d.* Night blindness, of such a degree that the soldier requires assistance in any travel at night.

*e.* Visual acuity.

(1) Vision that cannot be corrected with ordinary spectacle lenses (contact lenses or other special corrective devices (telescopic lenses, etc.) are unacceptable) to at least: 20/60 in one eye and 20/60 in the other eye, or 20/50 in one eye and 20/80 in the other eye, or 20/40 in one eye and 20/100 in the other eye, or 20/20 in one eye and 20/800 in the other eye; or

(2) An eye has been enucleated.

*f.* Visual field with bilateral concentric constriction to less than 20 degrees.

## 3–17. Genitourinary system

The causes for referral to an MEB are as follows:

*a.* Cystitis, when complications or residuals of treatment themselves preclude satisfactory performance of duty.

*b.* Dysmenorrhea, when symptomatic, irregular cycle, not amenable to treatment, and of such severity as to necessitate recurrent absences of more than 1 day.

*c.* Endometriosis, symptomatic and incapacitating to a degree that necessitates recurrent absences of more than 1 day.

*d.* Hypospadias, when accompanied by evidence of chronic infection of the genitourinary tract or instances where the urine is voided in such a manner as to soil clothes or surroundings and the condition is not amenable to treatment.

*e.* Incontinence of urine, due to disease or defect not amenable to treatment and of such severity as to necessitate recurrent absence from duty.

*f.* Kidney.

(1) Calculus in kidney, when bilateral, resulting in frequent or recurring infections, or when there is evidence of obstructive uropathy not responding to medical or surgical treatment.

(2) Congenital anomaly, when bilateral, resulting in frequent or recurring infections, or when there is evidence of obstructive uropathy not responding to medical or surgical treatment.

(3) Cystic kidney (polycystic kidney), when symptomatic and renal function is impaired or is the focus of frequent infection.

(4) Glomerulonephritis, when chronic.

(5) Hydronephrosis, when more than mild, bilateral, and causing continuous or frequent symptoms.

(6) Hypoplasia of the kidney, when symptomatic and associated with elevated blood pressure or frequent infections and not controlled by surgery.

(7) Nephritis, when chronic.

(8) Nephrosis.

(9) Perirenal abscess, with residuals of a degree that precludes the satisfactory performance of duty.

(10) Pyelonephritis or pyelitis, when chronic, that has not responded to medical or surgical treatment, with evidence of hypertension, eye–ground changes, cardiac abnormalities.

(11) Pyonephrosis, when not responding to treatment.

g. Menopausal syndrome, physiologic or artificial, when symptoms are not amenable to treatment and preclude successful performance of duty.

h. Chronic pelvic pain with or without demonstrative pathology that has not responded to medical or surgical treatment and of such severity to necessitate recurrent absence from duty.

i. Strictures of the urethra or ureter, when severe and not amenable to treatment.

j. Urethritis, chronic, when not responsive to treatment and necessitating frequent absences from duty.

## 3–18. Genitourinary and gynecological surgery

The causes for referral to an MEB are as follows:

a. Cystectomy.

b. Cystoplasty, if reconstruction is unsatisfactory or if residual urine persists in excess of 50 cubic centimeters or if refractory symptomatic infection persists.

c. Hysterectomy, when residual symptoms or complications preclude the satisfactory performance of duty.

d. Nephrectomy, when after treatment, there is infection or pathology in the remaining kidney.

e. Nephrostomy, if drainage persists.

f. Oophorectomy, when complications or residual symptoms are not amenable to treatment and preclude successful performance of duty.

g. Pyelostomy, if drainage persists.

h. Ureterocolostomy.

i. Ureterocystostomy, when both ureters are markedly dilated with irreversible changes.

j. Ureteroileostomy cutaneous.

k. Ureteroplasty.

(1) When unilateral procedure is unsuccessful and nephrectomy is necessary, consider it on the basis of the standard for a nephrectomy; or

(2) When bilateral, evaluate residual obstruction or hydronephrosis and consider it on the basis of the residuals involved.

l. Ureterosigmoidostomy.

m. Ureterostomy, external or cutaneous.

n. Urethrostomy, if there is complete amputation of the penis or when a satisfactory urethra cannot be restored.

o. Kidney transplant recipient.

## 3–19. Head

The causes for referral to an MEB are loss of substance of the skull with or without prosthetic replacement when accompanied by moderate residual signs and symptoms such as described in paragraph 3–30. (See also para 3–29.) A skull defect that poses a danger to the soldier or interferes with the wearing of protective headgear is cause for referral to an MEB/PEB.

## 3–20. Neck

The causes for referral to an MEB are torticollis (wry neck); severe fixed deformity with cervical scoliosis, flattening of the head and face, and loss of cervical mobility. (See also para 3–11.)

## 3–21. Heart

The causes for referral to an MEB are as follows (see table 3–1 for functional classifications and for metabolic equivalents (METS) ratings to be included in the MEB):

a. Coronary heart disease associated with—

(1) Myocardial infarction, angina pectoris, or congestive heart failure due to fixed obstructive coronary artery disease or coronary artery spasm. The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply. The trial of duty will be for 120 days.

(2) Myocardial infarction with normal coronary artery anatomy. The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply. The trial of duty will be for 120 days.

(3) Angina pectoris in association with objective evidence of myocardial ischemia in the presence of normal coronary artery anatomy.

(4) Fixed obstructive coronary artery disease, asymptomatic but with objective evidence of myocardial ischemia. The policies for trial of duty of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply. The trial of duty will be for 120 days.

b. Supraventricular tachyarrhythmias, when life threatening or symptomatic enough to interfere with performance of

duty and when not adequately controlled. This includes atrial fibrillation, atrial flutter, paroxysmal supraventricular tachycardia, and others.

*c.* Endocarditis with any residual abnormality or if associated with valvular, congenital, or hypertrophic myocardial disease.

*d.* Heart block (second degree or third degree AV block) and symptomatic bradyarrhythmias, even in the absence of organic heart disease or syncope. Wenckebach second degree heart block occurring in healthy asymptomatic individuals without evidence of organic heart disease is not a cause for referral to a PEB. None of these conditions is cause for MEB/PEB when associated with recognizable temporary precipitating conditions: for example, perioperative period, hypoxia, electrolyte disturbance, drug toxicity, acute illness.

*e.* Myocardial disease, New York Heart Association or Canadian Cardiovascular Society Functional Class II or worse. (See table 3–1.)

*f.* Ventricular flutter and fibrillation, ventricular tachycardia when potentially life threatening (for example, when associated with forms of heart disease that are recognized to predispose to increased risk of death and when there is no definitive therapy available to reduce this risk) or when symptomatic enough to interfere with the performance of duty. None of these ventricular arrhythmias are a cause for medical board referral to a PEB when associated with recognizable temporary precipitating conditions: for example, perioperative period, hypoxia, electrolyte disturbance, drug toxicity, or acute illness.

*g.* Sudden cardiac death, when an individual survives sudden cardiac death that is not associated with a temporary or treatable cause, and when there is no definitive therapy available to reduce the risk of recurrent sudden cardiac death.

*h.* Hypertrophic cardiomyopathy when of sufficient degree to restrict activity.

*i.* Pericarditis as follows:

(1) Chronic constrictive pericarditis unless successful remedial surgery has been performed.

(2) Chronic serous pericarditis.

*j.* Valvular heart disease with cardiac insufficiency at functional capacity of Class II or worse as defined by the New York Heart Association. (See table 3–1.)

*k.* Ventricular premature contractions with frequent or continuous attacks, whether or not associated with organic heart disease, accompanied by discomfort or fear of such a degree as to interfere with the satisfactory performance of duty.

*l.* Recurrent syncope or near syncope of cardiovascular etiology that is not controlled or when it interferes with the performance of duty, even if the etiology is unknown.

*m.* Any cardiovascular disorder requiring chronic drug therapy in order to prevent the occurrence of potentially fatal or severely symptomatic events that would interfere with duty performance.

## 3–22. Vascular system

The causes for referral to an MEB are as follows:

*a.* Arteriosclerosis obliterans when any of the following pertain:

(1) Intermittent claudication of sufficient severity to produce discomfort and inability to complete a walk of 200 yards or less on level ground at 112 steps per minute without a rest.

(2) Objective evidence of arterial disease with symptoms of claudication, ischemic rest pain, or with gangrenous or ulcerative skin changes of a permanent degree in the distal extremity.

(3) Involvement of more than one organ, system, or anatomic region (the lower extremities comprise one region for this purpose) with symptoms of arterial insufficiency.

*b.* Major cardiovascular anomalies including coarctation of the aorta, unless satisfactorily treated by surgical correction or other newly developed techniques, and without any residual abnormalities or complications.

*c.* Aneurysm of any vessel not correctable by surgery and aneurysm corrected by surgery after a period of up to 90 days trial of duty that results in the individual's inability to perform satisfactory duty. The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply.

*d.* Periarteritis nodosa with definite evidence of functional impairment.

*e.* Chronic venous insufficiency (postphlebitic syndrome) when more than mild and symptomatic despite elastic support.

*f.* Raynaud's phenomenon manifested by trophic changes of the involved parts characterized by scarring of the skin or ulceration.

*g.* Thromboangiitis obliterans with intermittent claudication of sufficient severity to produce discomfort and inability to complete a walk of 200 yards or less on level ground at 112 steps per minute without rest, or other complications.

*h.* Thrombophlebitis when repeated attacks requiring treatment are of such frequency as to interfere with the satisfactory performance of duty.

*i.* Varicose veins that are severe and symptomatic despite therapy.

*j.* Cold injury. (See paragraph 3–46).

### 3–23. Miscellaneous cardiovascular conditions

The causes for referral to an MEB are as follows:

*a.* Hypertensive cardiovascular disease and hypertensive vascular disease. Diastolic pressure consistently more than 110 mmHg following an adequate period of therapy in an ambulatory status.

*b.* Rheumatic fever, active, with heart damage. Recurrent attacks.

### 3–24. Surgery and other invasive procedures involving the heart, pericardium, or vascular system

These procedures include newly developed techniques or prostheses not otherwise covered in this paragraph. The causes for referral to an MEB are as follows:

*a.* Permanent prosthetic valve implantation.

*b.* Implantation of permanent pacemakers, antitachycardia and defibrillator devices, and similar newly developed devices.

*c.* Reconstructive cardiovascular surgery employing exogenous grafting material.

*d.* Vascular reconstruction, after a period of 90 days trial of duty when medically advisable, that results in the individual's inability to perform satisfactory duty. The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply.

*e.* Coronary artery revascularization, with the option of a 120-day trial of duty based upon physician recommendation when the individual is asymptomatic, without objective evidence of myocardial ischemia, and when other functional assessment (such as exercise testing and newly developed techniques) indicates that it is medically advisable. Any individual undergoing median sternotomy for surgery will be restricted from lifting 25 pounds or more, performing pullups and pushups, or as otherwise prescribed by a physician for a period of 90 days from the date of surgery on DA Form 3349 (Physical Profile). The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply.

*f.* Heart or heart-lung transplantation.

*g.* Coronary or valvular angioplasty procedures, with the option of a 180-day trial of duty based upon physician recommendation when the individual is asymptomatic, without objective evidence of myocardial ischemia, and when other functional assessment (such as cardiac catheterization, exercise testing, and newly developed techniques) indicates that it is medically advisable. The policies for trial of duty, profiling, and referral to an MEB and a PEB (as outlined in para 3–25) apply.

*h.* Cardiac arrhythmia ablation procedures, with the option of a 180-day trial of duty based upon physician recommendation when asymptomatic, and no evidence of any unfitting arrhythmia as noted in paragraph 3–21. The policies for trial of duty, MEB, and physical profile (as outlined in para 3–25) apply.

### 3–25. Trial of duty and profiling for cardiovascular conditions

*a.* Trial of duty will be based upon physician recommendation when the individual is asymptomatic without objective evidence of myocardial ischemia, and when other functional assessment (such as coronary angiography, exercise testing, and newly developed techniques) indicates it is medically advisable.

*b.* Prior to commencing the trial of duty period, an MEB will be accomplished in all cases (including evaluation by a cardiologist or internist) and a physical activity prescription on DA Form 3349 will be provided by a physician. Upon completion of the trial of duty period, the results will be incorporated into the MEB. The results of the trial of duty will include the individual's interim history, present condition, prognosis, and the final recommendations. A detailed report from the commander or supervisor clearly describing the individual's ability to accomplish assigned duties and to perform physical activity will be incorporated into the MEB record. The results of the MEB and an updated DA Form 3349 will then be forwarded to a PEB in all cases except for the following: If the soldier successfully completes the trial of duty, is considered a New York Heart Association Functional Class I, AND there are no physical or assignments restrictions, the soldier may be returned to duty without referral to a PEB. If the soldier's condition becomes worse at a later date, a new MEB will be accomplished and the soldier will be referred to a PEB. For RC soldiers not on active duty, the trial of duty may consider performance in the soldier's civilian position, as well as any military duty that may have been performed in the interim.

*c.* The following profile guidelines supplement chapter 7. Individuals returning to a trial of duty will be given a temporary P–3 profile with specific written limitations and instructions for physical and cardiovascular rehabilitation on DA Form 3349. The completed MEB will include a permanent numerical designator in the "P" factor of the physical profile that is based on functional assessment as follows:

(1) Numerical designator "1." Individuals who are asymptomatic, without objective evidence of myocardial ischemia or other cardiovascular functional abnormality (New York Heart Association Functional Class I).

(2) Numerical designator "2." Individuals with minor physical activity limitations or who require frequent medical follow–up.

(3) Numerical Designator "3." Individuals who are asymptomatic but with objective evidence of myocardial ischemia or other cardiovascular functional abnormality. Those requiring assignment limitations.

(4) Numerical designator "4." Individuals who are symptomatic (New York Heart Association Functional Class II or worse).

## 3–26. Tuberculosis, pulmonary

The cause for referral to an MEB for pulmonary tuberculosis—

*a.* If an expiration of service will occur before completion of the period of hospitalization. (Career soldiers who express a desire to reenlist after treatment may extend their enlistment to cover the period of hospitalization.)

*b.* When a member of the USAR or ARNG/ARNGUS not on active duty has active disease that will probably require treatment for more than 12 to 15 months including an appropriate period of convalescence before he or she can perform full-time military duty. Individuals who are retained in the USAR or ARNG/ARNGUS while undergoing treatment may not be called or ordered to active duty (including mobilization), ADT, or inactive duty training (IDT) during the period of treatment and convalescence.

## 3–27. Miscellaneous respiratory disorders

The causes for referral to an MEB are as follows:

*a.* Asthma. This includes reactive airway disease, exercise-induced bronchospasm, asthmatic bronchospasm, or asthmatic bronchitis within the criteria outlined in paragraphs (1) through (4) below.

(1) Definitions/diagnostic criteria are as follows.

*(a)* Asthma is a clinical syndrome characterized by cough, wheeze, or dyspnea and physiologic evidence of reversible airflow obstruction or airway hyperactivity that persists over a prolonged period of time (generally more than 6 to 12 months).

*(b)* Reversible airflow obstruction is defined as more than 15 percent increase in FEVI following the administration of an inhaled bronchodilator or prolonged corticosteroid therapy.

*(c)* Increased bronchial responsiveness is the presence of an exaggerated decrease in airflow induced by a standard bronchoprovocation challenge such as methacholine inhalation (PD20 FEV1 less than or equal to 4mg/ml). Demonstration of exercise induced bronchospasm (15 percent decline in FEV1) is also diagnostic of increased bronchial responsiveness; however, failure to induce bronchospasm with exercise does not rule out the diagnosis of asthma. Bronchoprovacation or exercise testing should be performed by a credentialed provider privileged to perform the procedures.

*(d)* Soldiers who are diagnosed as having asthma may be placed on a temporary profile under the "P" factor of the physical profile for up to 12 months trial of duty, when medically advisable. If at the end of that period, the soldier is unable to perform all military training and duty as cited below, the soldier will be referred to MEB/PEB.

*(e)* Acute, self limited, reversible airflow obstruction and airway hyperactivity can be caused by upper respiratory infections and inhalation of irritant gases or pollutants. This should not be permanently diagnosed as asthma unless significant symptoms or airflow abnormalities persist for more than 12 months.

(2) Chronic asthma is cause for a permanent P–3 or P–4 profile and MEB/PEB referral if it—

*(a)* Results in repetitive hospitalizations, repetitive emergency room visits or excessive time lost from duty.

*(b)* Requires repetitive use of oral corticosteroids to enable the soldier to perform all military training and duties.

*(c)* Results in inability to run outdoors at a pace that meets the standards for the timed 2-mile run despite medications. (The P–3 for the inability to perform the run refers to the inability due to asthma and should not be confused with giving an L2 or L3 based on an underlying orthopedic condition that requires an alternate Army Physical Fitness Test (APFT).)

*(d)* Prevents the soldier from wearing a protective mask.

(3) All soldiers meeting an MEB for asthma should receive a consultation from an internist, pulmonologist, or allergist.

(4) Chronic asthma meets retention standards, but is a cause for a permanent P–2 profile if it—

*(a)* Requires regular medications including low dose inhaled corticosteroids and/or oral or inhaled bronchodilators; but

*(b)* Does not prevent the soldier from otherwise performing all military training and duties including the 2 mile run within time standards.

(5) Soldiers with a diagnosis of asthma who require no medications or activity limitations require no profiling action.

*b.* Atelectasis, or massive collapse of the lung. Moderately symptomatic with paroxysmal cough at frequent intervals throughout the day or with moderate emphysema or with residuals or complications that require repeated hospitalization.

*c.* Bronchiectasis or bronchiolectasis. Cylindrical or saccular type that is moderately symptomatic, with paroxysmal cough at frequent intervals throughout the day or with moderate emphysema with a moderate amount of bronchiectatic sputum or with recurrent pneumonia or with residuals or complications that require repeated hospitalization.

*d.* Bronchitis. Chronic, severe, persistent cough, with considerable expectoration or with dyspnea at rest or on slight exertion or with residuals or complications that require repeated hospitalization.

*e.* Cystic disease of the lung, congenital disease involving more than one lobe of a lung.

*f.* Diaphragm, congenital defect. Symptomatic.

*g.* Hemopneumothorax, hemothorax, or pyopneumothorax. More than moderate pleuritic residuals with persistent underweight or marked restriction of respiratory excursions and chest deformity or marked weakness and fatigue on slight exertion.

*h.* Histoplasmosis. Chronic and not responding to treatment.

*i.* Pleurisy, chronic, or pleural adhesions. Severe dyspnea or pain on mild exertion associated with definite evidence of pleural adhesions and demonstrable moderate reduction of pulmonary function.

*j.* Pneumothorax, spontaneous. Recurrent episodes of pneumothorax not corrected by surgery or pleural sclerosis.

*k.* Pneumoconiosis. Severe, with dyspnea on mild exertion.

*l.* Pulmonary calcification. Multiple calcifications associated with significant respiratory embarrassment or active disease not responsive to treatment.

*m.* Pulmonary emphysema. Marked emphysema with dyspnea on mild exertion and demonstrable moderate reduction in pulmonary function.

*n.* Pulmonary fibrosis. Linear fibrosis or fibrocalcific residuals of such a degree as to cause dyspnea on mild exertion and demonstrable moderate reduction in pulmonary function.

*o.* Pulmonary sarcoidosis. If not responding to therapy and complicated by demonstrable moderate reduction in pulmonary function.

*p.* Stenosis, bronchus. Severe stenosis associated with repeated attacks of bronchopulmonary infections requiring hospitalization of such frequency as to interfere with the satisfactory performance of duty.

## 3–28. Surgery of the lungs

The cause for referral to an MEB is a complete lobectomy, if pulmonary function (ventilatory tests) is impaired to a moderate degree or more.

## 3–29. Mouth, esophagus, nose, pharynx, larynx, and trachea

The causes for referral to an MEB are as follows:

*a.* Esophagus.

(1) Achalasia, unless controlled by medical therapy.

(2) Esophagitis, persistent and severe.

(3) Diverticulum of the esophagus of such a degree as to cause frequent regurgitation, obstruction, and weight loss that does not respond to treatment.

(4) Stricture of the esophagus of such a degree as to almost restrict diet to liquids, require frequent dilatation and hospitalization, and cause difficulty in maintaining weight and nutrition.

*b.* Larynx.

(1) Paralysis of the larynx characterized by bilateral vocal cord paralysis seriously interfering with speech and adequate airway.

(2) Stenosis of the larynx of a degree causing respiratory embarrassment upon more than minimal exertion.

*c.* Obstructive edema of glottis. If chronic, not amenable to treatment, and requires a tracheotomy.

*d.* Rhinitis. Atrophic rhinitis characterized by bilateral atrophy of nasal mucous membrane with severe crusting, concomitant severe headaches, and foul, fetid odor.

*e.* Sinusitis. Severe, chronic sinusitis that is suppurative, complicated by chronic or recurrent polyps, and that does not respond to treatment.

*f.* Trachea. Stenosis of trachea.

## 3–30. Neurological disorders

The causes for referral to an MEB are as follows:

*a.* Amyotrophic lateral sclerosis and all other forms of progressive neurogenic muscular atrophy.

*b.* All primary muscle disorders including facioscapulohumeral dystrophy, limb girdle atrophy, and myotonia dystrophy characterized by progressive weakness and atrophy.

*c.* Myasthenia gravis unless clinically restricted to the extraocular muscles.

*d.* Progressive degenerative disorders of the basal ganglia and cerebellum including Parkinson's disease, Huntington's chorea, hepatolenticular degeneration, and variants of Friedreich's ataxia.

*e.* Multiple sclerosis, optic neuritis, transverse myelitis, and similar demyelinating disorders.

*f.* Stroke, including both the effects of ischemia and hemorrhage, when residuals affect performance.

*g.* Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks.

*h.* Narcolepsy, sleep apnea syndrome, or similar disorders. (See para 3–41.)

*i.* Seizure disorders and epilepsy. Seizures by themselves are not disqualifying unless they are manifestations of epilepsy. However, they may be considered along with other disabilities in judging fitness. In general, epilepsy is disqualifying unless the soldier can be maintained free of clinical seizures of all types by nontoxic doses of medications. The following guidance applies when determining whether a soldier will be referred to an MEB/PEB.

(1) All active duty soldiers with suspected epilepsy must be evaluated by a neurologist who will determine whether epilepsy exists and whether the soldier should be given a trial of therapy on active duty or referred directly to an MEB for referral to a PEB. In making the determination, the neurologist may consider the underlying cause, EEG findings, type of seizure, duration of epilepsy, family history, soldier's likelihood of compliance with therapeutic program, absence of substance abuse, or any other clinical factor influencing the probability of control or the soldier's ability to perform duty during the trial of treatment.

(2) If a trial of duty on treatment is elected by the neurologist, the soldier will be given a temporary P–3 profile with as few restrictions as possible.

(3) Once the soldier has been seizure free for 1 year, the profile may be reduced to a P–2 profile with restrictions specifying no assignment to an area where medical treatment is not available.

(4) If seizures recur beyond 6 months after the initiation of treatment, the soldier will be referred to an MEB.

(5) Should seizures recur during a later attempt to withdraw medications or during transient illness, referral to a PEB is at the discretion of the physician or MEB.

(6) If the soldier has remained seizure free for 36 months, he or she may be removed from profile restrictions.

(7) Recurrent pseudoseizures are disqualifying under the same rules as epilepsy.

*j.* Any other neurologic conditions, regardless of etiology, when after adequate treatment there remains residual symptoms and impairments such as persistent severe headaches, uncontrolled seizures, weakness, paralysis, or atrophy of important muscle groups, deformity, uncoordination, tremor, pain, or sensory disturbance, alteration of consciousness, speech, personality, or mental function of such a degree as to significantly interfere with performance of duty.

*Note.* Diagnostic concepts and terms used in paragraphs 3–31 through 3–37 are in consonance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV). The minimum psychiatric evaluation will include Axis I, II, and III.

## 3–31. Disorders with psychotic features
The causes for referral to an MEB are mental disorders not secondary to intoxication, infectious, toxic, or other organic causes, with gross impairment in reality testing, resulting in interference with duty or social adjustment.

## 3–32. Mood disorders
The causes for referral to an MEB are as follows:

*a.* Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization; or
*b.* Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or
*c.* Persistence or recurrence of symptoms resulting in interference with effective military performance.

## 3–33. Anxiety, somatoform, or dissociative disorders
The causes for referral to an MEB are as follows:

*a.* Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization; or
*b.* Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or
*c.* Persistence or recurrence of symptoms resulting in interference with effective military performance.

## 3–34. Dementia and other cognitive disorders due to general medical condition
The causes for referral to an MEB include persistence of symptoms or associated personality change sufficient to interfere with the performance of duty or social adjustment.

## 3–35. Personality, sexual and gender identity, or factitious disorders; disorders of impulse control not elsewhere classified; substance-related disorders
The conditions may render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty in association with these conditions will be dealt with through administrative channels.

## 3–36. Adjustment disorders
Situational maladjustments due to acute or chronic situational stress do not render an individual unfit because of physical disability, but may be the basis for administrative separation if recurrent and causing interference with military duty.

## 3–37. Eating disorders

The causes for referral to an MEB are eating disorders that are unresponsive to treatment or that interfere with the satisfactory performance of duty.

## 3–38. Skin and cellular tissues

The causes for referral to an MEB are as follows:

*a.* Acne. Severe, unresponsive to treatment, and interfering with the satisfactory performance of duty or wearing of the uniform or other military equipment.

*b.* Atopic dermatitis. More than moderate and after hospitalization interfering with performance of duty.

*c.* Amyloidosis. Generalized.

*d.* Cysts and tumors. (See paras 3–42 and 3–43.)

*e.* Dermatitis herpetiformis. Not responsive to therapy.

*f.* Dermatomyositis.

*g.* Dermographism. Interfering with the performance of duty.

*h.* Eczema, chronic. Regardless of type, when there is more than minimal involvement and the condition is unresponsive to treatment and interferes with the satisfactory performance of duty.

*i.* Elephantiasis or chronic lymphedema. Not responsive to treatment.

*j.* Epidermolysis bullosa.

*k.* Erythema multiforme. More than moderate and recurrent or chronic.

*l.* Exfoliative dermatitis. Chronic.

*m.* Fungus infections, superficial or systemic types. If not responsive to therapy and interfering with the satisfactory performance of duty.

*n.* Hidradenitis suppurative and/or folliculitis decalvans (dissecting cellulitis of the scalp).

*o.* Hyperhidrosis. On the hands or feet, when severe or complicated by a dermatitis or infection, either fungal or bacterial and not amenable to treatment.

*p.* Leukemia cutis or mycosis fungoides or cutaneous T–Cell lymphoma. (See also para 3–42.)

*q.* Lichen planus. Generalized and not responsive to treatment.

*r.* Lupus erythematosus. Cutaneous or mucous membranes involvement that is unresponsive to therapy and interferes with the satisfactory performance of duty.

*s.* Neurofibromatosis. When interfering with the satisfactory performance of duty.

*t.* Panniculitis. Relapsing, febrile, nodular.

*u.* Parapsoriasis. Extensive and not controlled by treatment.

*v.* Pemphigus. Not responsive to treatment and with moderate constitutional or systemic symptoms, or interfering with the satisfactory performance of duty.

*w.* Psoriasis. Extensive and not controllable by treatment.

*x.* Radiodermatitis. If resulting in malignant degeneration at a site not amenable to treatment.

*y.* Scars and keloids. So extensive or adherent that they seriously interfere with the function of an extremity or interfere with the performance of duty.

*z.* Scleroderma. Generalized or of the linear type that seriously interferes with the function of an extremity.

*aa.* Tuberculosis of the skin. (See paragraph 3–40.)

*ab.* Ulcers of the skin. Not responsive to treatment after an appropriate period of time if interfering with the satisfactory performance of duty.

*ac.* Urticaria/Angioedema. Chronic, severe, and not responsive to treatment.

*ad.* Xanthoma. Regardless of type, but only when interfering with the satisfactory performance of duty.

*ae.* Intractable plantar keratosis, chronic. Requires frequent medical/surgical care or that interferes with the satisfactory performance of duty.

*af.* Other skin disorders. If chronic or of a nature that requires frequent medical care, or interferes with the satisfactory performance of military duty.

## 3–39. Spine, scapulae, ribs, and sacroiliac joints

The causes for referral to an MEB are as follows (see also para 3–14):

*a.* Dislocation. Congenital, of hip.

*b.* Spina bifida. Demonstrable signs and moderate symptoms of root or cord involvement.

*c.* Spondylolysis or spondylolisthesis. More than mild symptoms resulting in repeated outpatient visits, or repeated hospitalization or limitations effecting performance of duty.

*d.* Coxa vara. More than moderate with pain, deformity, and arthritic changes.

*e.* Herniation of nucleus pulposus. More than mild symptoms following appropriate treatment or remedial measures, with sufficient objective findings to demonstrate interference with the satisfactory performance of duty.

*f.* Kyphosis. More than moderate, interfering with military duties.

*g.* Scoliosis. Severe deformity with over 2 inches deviation of tips of spinous process from the midline, or of lesser degree if recurrently symptomatic and interfering with military duties.

*h.* Nonradicular pain involving the cervical, thoracic, lumbosacral, or coccygeal spine, whether idiopathic or secondary to degenerative disc or joint disease, that fails to respond to adequate conservative treatment and necessitates significant limitation of physical activity.

## 3–40. Systemic diseases

The causes for referral to an MEB are as follows:

*a.* Amyloidosis.

*b.* Blastomycosis. If not responding to therapy or if resulting in residuals which interfere with military duties.

*c.* Brucellosis. Chronic with substantiated, recurring febrile episodes, severe fatigue, lassitude, depression, or general malaise.

*d.* Leprosy. Any type that seriously interferes with performance of duty or is not completely responsive to appropriate treatment.

*e.* Myasthenia gravis.

*f.* Mycosis. Active, not responsive to therapy or requiring prolonged treatment, or when complicated by residuals that themselves are unfitting.

*g.* Panniculitis. Relapsing, febrile, nodular.

*h.* Porphyria, cutanea tarda.

*i.* Sarcoidosis. Progressive with severe or multiple organ involvement and not responsive to therapy.

*j.* Tuberculosis.

(1) Meningitis, tuberculous.

(2) Pulmonary tuberculosis (see para 3–26), tuberculous empyema, and tuberculous pleurisy.

(3) Tuberculosis of the male genitalia. Involvement of the prostate or seminal vesicles and other instances not corrected by surgical excision, or when residuals are more than minimal, or are symptomatic.

(4) Tuberculosis of the female genitalia.

(5) Tuberculosis of the kidney.

(6) Tuberculosis of the larynx.

(7) Tuberculosis of the lymph nodes, skin, bone, joints, eyes, intestines, and peritoneum or mesentery. These will be evaluated on an individual basis, considering the associated involvement, residuals, and complications.

*k.* Rheumatoid arthritis that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*l.* Spondyloarthropathies. Chronic or recurring episodes of arthritis causing functional impairment interfering with successful performance of duty supported by objective, subjective, and radiographic findings, or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

(1) Ankylosingpondylitis.

(2) Reiter's syndrome.

(3) Psoriatic arthritis.

(4) Arthritis associated with inflammatory bowel disease.

(5) Whipple's disease.

*m.* Systemic lupus erythematosus that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*n.* Sjogren's syndrome. When chronic, more than mildly symptomatic and resistant to treatment after a reasonable period of time.

*o.* Progressive systemic sclerosis, diffuse and limited disease that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*p.* Myopathy, to include inflammatory, metabolic or inherited, that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*q.* Systemic vasculitis involving major organ systems, chronic, that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*r.* Hypersensitivity angiitis when chronic or having recurring episodes that are more than mildly symptomatic or show definite evidence of functional impairment which is resistant to treatment after a reasonable period of time.

*s.* Behcet's syndrome that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*t.* Adult onset Still's disease that interferes with successful performance of duty or requires geographic assignment limitations or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*u.* Mixed connective tissue disease and other overlap syndromes that interfere with successful performance of duty or require geographic assignment limitations or require medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

*v.* Any chronic or recurrent systemic inflammatory disease or arthritis not listed above that interferes with successful performance of duty or requires geographic assignment limitations, or requires medication for control that requires frequent monitoring by a physician due to debilitating or serious side effects.

## 3–41. General and miscellaneous conditions and defects
The causes for referral to an MEB are as follows:

*a.* Allergic manifestations.

(1) Allergic rhinitis, chronic, severe, and not responsive to treatment. (See also paras 3–29*d* and 3–29*e*.)

(2) Asthma. (See para 3–27*a*.)

(3) Allergic dermatoses. (See para 3–38.)

*b.* Cold injury/heat injury. (See paras 3–45 and 3–46.)

*c.* Sleep apnea. Obstructive sleep apnea or sleep-disordered breathing that causes daytime hypersomnolence or snoring that interferes with the sleep of others and that cannot be corrected with medical therapy, surgery, or oral prosthesis. The diagnosis must be based upon a nocturnal polysomnogram and the evaluation of a pulmonologist, neurologist, or a provider with expertise in sleep medicine. A 12-month trial of therapy with nasal continuous positive air pressure may be attempted to assist in weight reduction or other interventions, during which time the individual will be profiled as T3. Long-term therapy with nasal continuous positive air pressure requires referral to an MEB.

*d.* Fibromyalgia, when severe enough to prevent successful performance of duty. Diagnosis will include evaluation by a rheumatologist.

*e.* Miscellaneous conditions and defects. Conditions and defects not mentioned elsewhere in this chapter are causes for referral to an MEB, if—

(1) The conditions (individually or in combination) result in interference with satisfactory performance of duty as substantiated by the individual's commander or supervisor.

(2) The individual's health or well-being would be compromised if he or she were to remain in the military service.

(3) In view of the soldier's condition, his or her retention in the military service would prejudice the best interests of the Government (for example, a carrier of communicable disease who poses a health threat to others). Questionable cases, including those involving latent impairment, will be referred to PEBs.

## 3–42. Malignant neoplasms
The causes for referral to an MEB are as follows:

*a.* Malignant neoplasms that are unresponsive to therapy, or when the residuals of treatment are in themselves unfitting under other provisions of this chapter.

*b.* Neoplastic conditions of the lymphoid and blood-forming tissues that are unresponsive to therapy, or when the residuals of treatment are in themselves unfitting under other provisions of this chapter.

*c.* Malignant neoplasms, when on evaluation for administrative separation or retirement, the observation period subsequent to treatment is deemed inadequate in accordance with accepted medical principles.

*d.* The above definitions of malignancy or malignant disease exclude basal cell carcinoma of the skin.

## 3–43. Benign neoplasms
The causes for referral to an MEB are as follows:

*a.* Benign tumors if their condition precludes the satisfactory performance of military duty.

*b.* Ganglioneuroma.

*c.* Meningeal fibroblastoma, when the brain is involved.

*d.* Pigmented villonodular synovitis when severe enough to prevent successful performance of duty.

## 3–44. Sexually transmitted diseases
The causes for referral to an MEB are as follows:

*a.* Symptomatic neurosyphilis in any form.

*b.* Complications or residuals of a sexually transmitted disease of such chronicity or degree that the individual is incapable of performing useful duty.

## 3–45. Heat illness and injury

The causes for referral to an MEB are as follows:

*a.* Heat exhaustion.

(1) Heat exhaustion is defined as collapse, including syncope, occurring during or immediately following exercise–heat stress without evidence of organ damage or systemic inflammatory activation.

(2) Individual episodes of heat exhaustion are not cause for MEB referral. However, soldiers suffering from recurrent episodes of heat exhaustion (three or more in less than 24 months) should be referred for complete medical evaluation for contributing factors.

(3) If no remediable factor causing recurrent heat exhaustion is identified, then the soldier will be referred to an MEB.

*b.* Heat stroke.

(1) The definitions of heat stroke are as follows.

*(a)* Heat stroke: A syndrome of hyperpyrexia, collapse, and encephalopathy with evidence of organ damage and/or systemic inflammatory activation occurring in the setting of environmental heat stress.

*(b)* Exertional rhabdomyolysis: Rhabdomyolysis with myoglobinuria occurring with exercise–heat stress but without the encephalopathy of heat stroke.

(2) Soldiers will be referred to an MEB after an episode of heat stroke or exertional rhabdomyolysis. If the soldier has had full clinical recovery, and particularly if a circumstantial contributing factor to the episode can be identified, the MEB may recommend a trial of duty with a P–3 (T) profile. The profile will restrict the soldier from performing vigorous physical exercise for periods longer than 15 minutes. Maximal efforts, such as the APFT 2-mile run are not permitted. If, after 3 months, the soldier has not manifested any heat intolerance, the profile may be modified to P–2 (T) and normal unrestricted work permitted. Maximal exertion and significant heat exposure (such as wearing Mission Oriented Protective Posture (MOPP) IV) are still restricted. If the soldier manifests no heat intolerance, including a season of significant environmental heat stress, normal activities can be resumed and the soldier may be returned to duty without a PEB. Any evidence of significant heat intolerance, either during the period of the profile or subsequently, requires a referral to a PEB. (A description of the heat intolerance should be included in the MEB narrative summary.)

## 3–46. Cold injury

The causes for referral to an MEB are as follows:

*a.* Frostbite (freezing cold injury).

(1) The definition of frostbite is the consequence of freezing of tissue. First degree frostbite is manifested by superficial injury without blistering. Second degree frostbite is manifested by superficial injury with clear blisters with only epidermal tissue loss. Third degree and fourth degree frostbite are manifested by significant subepidermal tissue loss.

(2) Soldiers with first degree frostbite after clinical healing will be given a permanent P–2 profile permitting the use of extra cold weather protective clothing, including nonregulation items, to be worn under authorized outer garments.

(3) Soldiers with frostbite more than first degree will be given a P–3 profile, renewed as appropriate, for the duration of the cold season restricting them from any exposure to temperatures below 0 degrees C (32 degrees F) and from any activities limited by the remainder of the season. After the cold season, soldiers will be reevaluated and, if appropriate, given the P–2 profile described in (2) above.

(4) Soldiers will be referred to an MEB for recurrent cold injury, recurrent or persistent cold sensitivity despite the P–2 profile, vascular or neuropathic symptoms, or disability due to tissue lost from cold injury.

*b.* Trench foot (nonfreezing cold injury).

(1) The definition of trench foot is the consequence of prolonged cold immersion of an extremity. It is manifested by maceration of tissue and neurovascular injury.

(2) Soldiers with residual symptoms or significant tissue loss after healing will be referred to an MEB.

*c.* Accidental hypothermia.

(1) The definition of accidental hypothermia is clinically significant depression of body temperature due to environmental cold exposure.

(2) Soldiers with significant symptoms of cold intolerance or a recurrence of hypothermia after an episode of accidental hypothermia will be referred to an MEB.

Table 3–1
Methods of assessing cardiovascular disability

| Class | New York Heart Association Functional Classification | Canadian Cardiovascular Society Functional Classification | Specific activity scale (Goldstein et al: Circulation 64:1227, 1981) | New York Heart Association Functional Classification (Revised) |
|---|---|---|---|---|
| I. | Patient with cardiac disease but without resulting limitations of physical activity. Ordinary physical activity does not cause undue fatigue, palpitations, dyspnea, or anginal pain.. | Ordinary physical activity, such as walking and climbing, stairs, does not cause angina. Angina with strenuous or rapid or prolonged exertion at work or recreation. | Patients can perform to completion any activity requiring 7 metabolic equivalents: for example, can carry 24 lbs up eight steps, carry objects that weigh 80 lbs, do outdoor work. (shovel snow, spade soil), do recreational activities (skiing, basketball, handball, jog, and walk 5 mph). | Cardiac status uncompromised. |
| II. | Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain | Slight limitations of ordinary activity. Walking or climbing stairs rapidly, walking uphill, walking or stair climbing after meals, in cold, in wind, or when under emotional stress, or only during the few hours after awakening. Walking more than 2 blocks on the level and climbing more than one flight of ordinary stairs at a normal pace and in normal conditions. | Patient can perform to completion any activity requiring ≥5 metabolic equivalents, but cannot and does not perform to completion activities requiring metabolic equivalents: for example, have sexual intercourse without stopping, garden, rake, weed, roller skate, dance fox trot, walk at 4 mph on level ground. | Slightly compromised. |
| III. | Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary physical activity causes fatigue, palpitation, dyspnea, or anginal pain. | Marked limitation of ordinary physical activity. Walking one to two blocks on the level and climbing more than one flight in normal conditions. | Patient can perform to completion any activity requiring ≥2 metabolic equivalents but cannot and does not perform to completion activities requiring ≥5 metabolic equivalents: for example, shower without stopping, strip and make bed, clean windows, walk 2.5 mph, bowl, play golf, dress without stopping. | Moderately compromised. |
| IV. | Patient with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of cardiac insufficiency or of the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort is increased. | Inability to carry on any physical activity without discomfort—anginal syndrome may be present at rest. | Patient cannot or does not perform to completion activities requiring ≥2 metabolic equivalents. Cannot carry activities listed above (specify activity scale, Class III). | Severely compromised. |

New York Heart Association Therapeutic Classification

| Therapeutic Classification | | Revised classification (prognosis) |
|---|---|---|
| Class A– | Patients with cardiac disease whose physical activity need not be restricted | Class I—Good. |
| Class B– | Patients with cardiac disease whose ordinary activity need not be restricted, but who should be advised against severe or competitive physical efforts. | Class II—Good with therapy. |
| Class C– | Patients with cardiac disease whose ordinary physical activity should be moderately restricted, and whose more strenuous efforts should be discontinued. | Class III—Fair with therapy. |
| Class D– | Patients with cardiac disease who should be at complete rest, confined to bed or chair. | Class IV—Guarded despite therapy. |

METS Equivalents (Required for PEB adjudication)

Table 6–1
Number of months for which a flying duty medical examination (FDME) is valid (Active Component)*—Continued

| Birth Month | Month in which last FDME was given | | | | | | | | | | | |
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec | 11 | 10 | 9 | 8 | 7 | 18 | 17 | 16 | 15 | 14 | 13 | 12 |

Notes:
* Read down the left column to the examinee's birth month; read across to month of last FDME; intersection number is the maximum validity period. When last FDME was within the 3-month period preceding the end of the birth month, the validity period will normally not exceed 15 months. When the last FDME was for entry into aviation training, for FEB, postaccident, posthospitalization, pre-appointment (warrant officer candidate) etc., the validity period will range from 7 to 18 months. Validity periods may be extended, in accordance with 6–11i, by 1 month only for completion of an examination begun before the end of the birth month.

# Chapter 7
# Physical Profiling

## 7–1. General
This chapter prescribes a system for classifying individuals according to functional abilities. See also paragraphs 3–25, 3–27, 3–30, 3–45, and 3–46 for additional guidance on coronary artery disease, asthma, seizure disorders, and heat and cold injuries.

## 7–2. Application
The physical profile system is applicable to the following categories of personnel:
    a. Registrants who undergo an induction or pre-induction medical examination related to Selective Service processing.
    b. All applicants examined for enlistment, appointment, or induction.
    c. Members of any component of the U.S. Army throughout their military service, whether or not on active duty.

## 7–3. Physical profile serial system
    a. The physical profile serial system is based primarily upon the function of body systems and their relation to military duties. The functions of the various organs, systems, and integral parts of the body are considered. Since the analysis of the individual's medical, physical, and mental status plays an important role in assignment and welfare, not only must the functional grading be executed with great care, but clear and accurate descriptions of medical, physical, and mental deviations from normal are essential.
    b. In developing the system, the functions have been considered under six factors designated "P–U–L–H–E–S." Four numerical designations are used to reflect different levels of functional capacity. The basic purpose of the physical profile serial is to provide an index to overall functional capacity. Therefore, the functional capacity of a particular organ or system of the body, RATHER THAN THE DEFECT PER SE, will be evaluated in determining the numerical designation 1, 2, 3, or 4.
    c. The factors to be considered are as follows:
    (1) P—Physical capacity or stamina. This factor, general physical capacity, normally includes conditions of the heart; respiratory system; gastrointestinal system; genitourinary system; nervous system; allergic, endocrine, metabolic and nutritional diseases; diseases of the blood and blood forming tissues; dental conditions; diseases of the breast; and other organic defects and diseases that do not fall under other specific factors of the system.
    (2) U—Upper extremities. This factor concerns the hands, arms, shoulder girdle, and upper spine (cervical, thoracic, and upper lumbar) in regard to strength, range of motion, and general efficiency.
    (3) L—Lower extremities. This factor concerns the feet, legs, pelvic girdle, lower back musculature and lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency.
    (4) H—Hearing and ears. This factor concerns auditory acuity and disease and defects of the ear.
    (5) E—Eyes. This factor concerns visual acuity and diseases and defects of the eye.
    (6) S—Psychiatric. This factor concerns personality, emotional stability, and psychiatric diseases.
    d. Four numerical designations are assigned for evaluating the individual's functional capacity in each of the six factors. Guidance for assigning numerical designators is contained in table 7–1. The numerical designator is not an automatic indicator of "deployability" or assignment restrictions, or referral to an MEB/PEB. Likewise, the conditions listed in chapter 3, rather than the numerical designator of the profile, will be the determinant for MEB processing.
    (1) An individual having a numerical designation of "1" under all factors is considered to possess a high level of medical fitness.
    (2) A physical profile designator of "2" under any or all factors indicates that an individual possesses some medical condition or physical defect that may require some activity limitations.

AR 40–501 • 1 February 2005

(3) A profile containing one or more numerical designators of "3" signifies that the individual has one or more medical conditions or physical defects that may require significant limitations. The individual should receive assignments commensurate with his or her physical capability for military duty.

(4) A profile serial containing one or more numerical designators of "4" indicates that the individual has one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited.

e. Anatomical defects or pathological conditions will not of themselves form the sole basis for recommending assignment or duty limitations. While these conditions must be given consideration when accomplishing the profile, the prognosis and the possibility of further aggravation must also be considered. In this respect, profiling officers must consider the effect of their recommendations upon the soldier's ability to perform duty. Profiles must be realistic. All profiles and assignment limitations must be legible, specific, and written in lay terms. If the commander has questions about a profile or is unable to use the soldier within the profile, the procedures in paragraph 7–12 will apply.

(1) Determination of individual assignment or duties to be performed are command/administrative matters. Limitations such as "no field duty," or "no overseas duty," are not proper medical recommendations. (However, they are included as administrative guidelines in pregnancy profiles.) Profiling officers should provide enough information regarding the soldier's physical limitations to enable the nonmedical commander and AHRC to make a determination on individual assignments or duties.

(2) It is the responsibility of the commander or personnel management officer to determine proper assignment and duty, based upon knowledge of the soldier's profile, assignment limitations, and the duties of his or her grade and MOS.

(3) Table 7–1 contains the physical profile functional capacity guide.

(4) See TB MED 287 for profiling soldiers with pseudofolliculitis.

## 7–4. Temporary vs. permanent profiles

a. Permanent profiles. A profile is considered permanent unless a modifier of "T" (temporary) is added as described in b below. A permanent profile may only be awarded or changed by the authority designated in paragraph 7–6.

(1) If the profile is permanent the profiling officer must assess if the soldier meets retention standards by chapter 3. Those soldiers on active duty who do not meet retention standards must be referred to an MEB as per chapter 3. (See paras 9–10 and 10–26 for disposition of USAR and ARNG soldiers not on active duty who do not meet medical retention standards.)

(2) Those soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600–60, unless waived by the MMRB convening authority.

(3) Permanent profiles may be amended at any time if clinically indicated and will automatically be reviewed at the time of a soldier's periodic examination.

(4) The soldier's commander may also request a review of a permanent profile in accordance with paragraph 7–12.

b. Temporary profiles. A temporary profile is given if the condition is considered temporary, the correction or treatment of the condition is medically advisable, and correction usually will result in a higher physical capacity. Soldiers on active duty and RC soldiers not on active duty with a temporary profile will be medically evaluated at least once every 3 months at which time the profile may be extended by the profiling officer.

(1) The profiling officer must review previous profiles before making a decision to extend a temporary profile. Any extension of a temporary profile must be recorded on DA Form 3349, and if renewed, item 9 on the DA Form 3349 must contain the following statement: "This temporary profile is an extension of a temporary profile first issued on (date)."

(2) Temporary profiles should specify an expiration date. If no date is specified, the profile will automatically expire at the end of 30 days from issuance of the profile. In no case will soldiers carry a temporary profile that has been extended for more than 12 months. If a profile is needed beyond the 12 months the temporary profile should be changed to a permanent profile.

## 7–5. Representative profile serial and codes

To facilitate the assignment of individuals after they have been given a physical profile serial and for statistical purposes, code designations have been adopted to represent certain combinations of physical limitations or assignment guidance. (See table 7–2.) The alphabetical coding system will be recorded on personnel qualifications records. This coding system will not be used on medical records to identify limitations. The numerical designations under each profile factor, PULHES, are given in table 7–1.

## 7–6. Profiling officer

a. Commanders of Army MTFs are authorized to designate one or more physicians, dentists, optometrists, podiatrists, audiologists, nurse practitioners, nurse midwives, licensed clinical psychologists, and physician assistants as

profiling officers. The commander will assure that those designated are thoroughly familiar with the contents of this regulation. Profiling officer limitations are as follows:

(1). *Physicians.* No limitations.

(2). *Dentists, optometrists, physical therapists, and occupational therapists.* No limitation within their specialty for awarding numerical designators "1" and "2." A temporary numerical designator "3" may be awarded for a period not to exceed 30 days. Any extension beyond 30 days must be signed by a physician. (See para. 7–8.)

(3) *Audiologists.* No limitation within their specialty for awarding permanent numerical designators "1," "2," "3," or "4" in cases of sensorineural hearing loss if retrocochlear lesion has been ruled out. Changing from or to a permanent numerical designator "3" or "4" requires the co-signature of a physician approving authority (para. 7–8).

(4) *Physician assistants, nurse midwives, nurse practitioners, and licensed clinical psychologists.* Limited to awarding temporary numerical designators "1," "2," and "3" for a period not to exceed 30 days. Any extension of a temporary profile beyond 30 days must be confirmed by a physician, except when the provisions of paragraph 7–9 apply. However, physician assistants with AOC 65DM1 certified in orthopedics have no limitations in awarding temporary orthopedic profiles or permanent profiles with a numerical designator of "1" or "2." Physician assistants with AOC 65DM1 may award permanent orthopedic profiles of "3" or "4" provided the profile is signed by the physician approving authority.

(5) *Podiatrists.* No limitations within their specialty for awarding temporary or permanent profiles with a numerical designator of "1" or "2." Podiatrists may award permanent profiles of "3" or "4" providing the profile is co-signed by a physician approving authority.

*b.* MEPS physicians will also be designated as profiling officers. (See para 7–7b.)

## 7–7. Recording and reporting of initial physical profile

*a.* Individuals accepted for initial appointment, enlistment, or induction in peacetime normally will be given a numerical designator "1" or "2" physical profile in accordance with the instructions contained in this regulation. Initial physical profiles will be recorded on DD Form 2808 by the medical profiling officer at the time of the initial appointment, enlistment, or induction medical examination.

*b.* The initial physical profile serial will be entered on DD Form 2808 and also recorded on DD Forms 1966/1 through 5 (Record of Military Processing—Armed Forces of the United States), in the appropriate spaces. When the modifier "T" is entered on the profile serial, or in those exceptional cases where the numerical designator "3" is used on initial entry, a brief, nontechnical description of the defect will be recorded in the "Summary of Defects" section on the DD Form 2808, in addition to the exact diagnosis. All physical, geographic, or climatic area limitations applicable to the defect will also be entered in that section. If sufficient room for a full explanation is not available in that section, proper reference will be made in that section number and an additional sheet of paper attached. It is not uncommon for the MEPS to assign a profile with the numerical designator of "3" or "0" pending a medical waiver review of a disqualifying condition. This is for their administrative purposes only. If the individual receives a medical waiver, the waiver documentation completed by the waiver authority should indicate the appropriate profile in accordance with table 7–1.

## 7–8. Profiling reviews and approvals

*a.* Permanent "3" or "4" profiles require the signatures of 2 profiling officers, one of which is a physician approving authority (unless the provisions of 7–8f apply). (Permanent profiles of "3" or "4" for the Individual Ready Reserve are valid with only one signature if signed by the AHRC Surgeon or his/her designee.) Temporary or permanent profiles of "1" or "2" require the signature of one profiling officer. See paragraph 7–6 to determine who is authorized to sign profiles.

*b.* Situations that require a mandatory review of an existing physical profile include—

(1) Return to duty of a soldier hospitalized. The attending physician will ensure that the patient has the correct physical profile, assignment limitations(s), and medical followup instructions, as appropriate.

(2) When directed by the appointing authority in cases of a problematical or controversial nature requiring temporary revision of profile.

(3) At the time of the periodic medical examination.

(4) Upon request of the unit commander.

(5) On request of a PEB.

*c.* A temporary revision of profile will be completed when, in the opinion of the profiling officer, the functional capacity of the individual has changed to such an extent that it temporarily alters the individual's ability to perform duty. Temporary profiles written on DA Form 3349 will not exceed 3 months except as provided for in paragraphs 7–8d and 7–9. Temporary profiles written on DD Form 689 (Individual Sick Slip) will not exceed 30 days.

*d.* Tuberculous patients returned to a duty status who require anti-tuberculous chemotherapy following hospitalization will be given a temporary "2" profile under the P factor of the physical profile for a period of 1 year with recommendation that the soldier be placed on duty at a fixed installation and will be provided the required medical supervision for a period of 1 year.

*e.* The physical profile in controversial or equivocal cases may be verified or revised by the hospital commander or command surgeon.

*f.* Physical profiles for Reservists not on active duty may be accomplished by the U.S. Army Regional Readiness Command (RRC) surgeons, division staff surgeons, Active Army or USAR medical facility profiling officers, the Army Reserve (ARC) Command Surgeon, the AHRC Command Surgeon or their designees. For ARNG/ARNGUS soldiers not on active duty, profiles will be accomplished by State ARNG/ARNGUS providers. The respective State Surgeons will be the approving authority for permanent "3" or "4" profiles. Approval authorities for the Army Reserve are the ARC Command Surgeon, the AHRC Command Surgeon, the U.S. Army Special Operations Command Surgeon, and the Regional Readiness Command Surgeons. Division surgeons that function as Command surgeons may be delegated profile approving authority by the supporting RRC Surgeon or the ARC Command Surgeon.

*g.* Individuals who were found unfit by a PEB but COAD used to be assigned a code "V" on their physical profile code. The code "V" is no longer used for this purpose but rather to identify soldiers with restrictions on deployment.

*h.* MEB members must ensure that the physical profile and assignment limitations are fully recorded on DA Form 3349. In cases where the soldier is referred to a PEB, a copy of the most current DA Form 3349 will be forwarded to the PEB with the MEB proceeding, with distribution of the form as indicated in the "Distribution" block of DA Form 3349. Cooperation between the MEBs, PEB liaison officers, and the PEB is essential when additional medical information or profile reconsideration is requested from the MTF by the PEB. The limitations described on the profile form may affect the decision of fitness by the PEB. Table 7–1 should be used when determining the numerical designator of the PULHES factors. (For example, a soldier should not be given a "3" or "4" solely on the basis of a referral to a PEB.)

## 7–9. Profiling pregnant soldiers

*a. Intent.* The intent of these provisions is to protect the fetus while ensuring productive use of the soldier. Common sense, good judgement, and cooperation must prevail between policy, soldier, and soldier's commander to ensure a viable program. This profile has been revised from the previous profile published in the 1995 edition of this regulation. This revision includes mandating an occupation health interview to assess risks to the soldier and fetus and adding additional restrictions to reduce exposure to solvents, lead, and fuels that may be associated with adverse pregnancy outcomes.

*b. Responsibilities.*

(1) *Soldier.* The soldier will seek medical confirmation of pregnancy and will comply with the instructions of medical personnel and the individual's unit commander.

(2) *Medical personnel.* A physician will confirm pregnancy and once confirmed will initiate prenatal care of the soldier and issue a physical profile. Nurse midwives or nurse practitioners are authorized to issue routine or standard pregnancy profiles for the duration of the pregnancy. An occupational history will be taken at the first visit to assess potential exposures related to the soldier's specific MOS. This history is ideally taken by the occupational medicine physician or nurse. However, if this is not feasible, the profiling officer must complete the occupational history. After review of the occupational history, the profiling physician, in conjunction with the occupational health clinic as needed, will determine whether any additional occupational exposures, other than those indicated in the paragraphs below, should be avoided for the remainder of the pregnancy. Examples include but are not limited to hazardous chemicals, ionizing radiation, and excessive vibration. If the occupational history or industrial hygiene sampling data indicate significant exposure to physical, chemical, or biological hazards, then the profile should be revised to restrict exposure from these workplace hazards.

(3) *Unit commander.* The commander will counsel all female soldiers as required by AR 600–8–24 or AR 635–200. The unit commander will consult with medical personnel as required. This includes establishing liaison with the occupational health clinic and requesting site visits by the occupational health personnel if necessary to assess any work place hazards.

*c. Physical profiles.*

(1) Profiles will be issued for the duration of the pregnancy. The MTF should ensure that the unit commander is provided a copy of the profile, and advise the unit commander as required. Upon termination of pregnancy, a new profile will be issued reflecting revised profile information. Physical profiles will be issued as follows:

(2) Under factor "P" of the physical profile, indicate "T–3."

(3) List diagnosis as "pregnancy, estimated delivery date."

*d. Limitations.* Unless superceded by an occupational health assessment, the standard pregnancy profile, DA Form 3349, will indicate the following limitations:

(1) Except under unusual circumstances, the soldier should not be reassigned to overseas commands until pregnancy is terminated. (See AR 614–30 for waiver provisions and for criteria curtailing OCONUS tours.) She may be assigned within CONUS. Medical clearance must be obtained prior to any reassignment.

(2) The soldier will not receive an assignment to duties where nausea, easy fatigue, or sudden lightheadedness would be hazardous to the soldier, or others, to include all aviation duty, Classes 1/1A/2/3. (However, there are specific

provisions in para 4–13c that allow the aircrew member to request and be granted permission to remain on flight status. ATC personnel may continue ATC duties with approval of the flight surgeon, obstetrician, and ATC supervisor.)

(3) Restrict exposures to military fuels. Pregnant soldiers must be restricted from assignments involving frequent or routine exposures to fuel vapors or skin exposure to spilled fuel such as fuel handling or otherwise filling military vehicles with fuels such as mogas, JP8, and JP4.

(4) No weapons training in indoor firing ranges due to airborne lead concentrations and bore gas emissions. Firing of weapons is permitted at outdoor sites. (See (9), below, for other weapons training restrictions.) No exposure to organic solvent vapors above permissible levels. (For example, work in ARMS room is permitted if solvents are restricted to 1999 MIL–PRF–680, degreasing solvent.)

(5) No work in the motor pool involving painting, welding, soldering, grinding, and sanding on metal, parts washing, or other duties where the soldier is routinely exposed to carbon monoxide, diesel exhaust, hazardous chemicals, paints, organic solvent vapors, or metal dusts and fumes (for example, motor vehicle mechanics). It does not apply to pregnant soldiers who perform preventive maintenance checks and services (PMCS) on military vehicles using impermeable gloves and coveralls, nor does it apply to soldiers who do work in areas adjacent to the motor pool bay (for example, administrative offices) if the work site is adequately ventilated and industrial hygiene sampling shows carbon monoxide, benzene, organic solvent vapors, metal dusts and fumes do not pose a hazard to pregnant soldiers. (See (11), below, for PMCS restrictions at 20 weeks of pregnancy.)

(6) The soldier should avoid excessive vibrations. Excessive vibrations occur in larger ground vehicles (greater than 1 1/4 ton) when the vehicle is driven on unpaved surfaces.

(7) Upon the diagnosis of pregnancy, the soldier is exempt from mandatory physical training (PT) and from PT testing. Pregnant soldiers are encouraged to participate in a pregnancy PT program, where available. If they participate in a pregnancy PT program, they should obtain the profiling officer's approval prior to beginning the program. The soldier is exempt from wearing of load bearing equipment, including web belt.

(8) The soldier is exempt from all immunizations except influenza and tetanus-diphtheria and from exposure to all fetotoxic chemicals noted on the occupational history form. The soldier is exempt from exposure to chemical warfare and riot control agents (for example, nuclear, biological, and chemical training) and wearing MOPP gear at any time.

(9) The soldier may work shifts.

(10) The soldier must not climb or work on ladders or scaffolding.

(11) At 20 weeks of pregnancy, the soldier is exempt from standing at parade rest or attention for longer than 15 minutes. The soldier is exempt from participating in swimming qualifications, drown proofing, field duty, and weapons training. The soldier should not ride in, perform PMCS on, or drive in vehicles larger than light medium tactical vehicles due to concerns regarding balance and possible hazards from falls.

(12) At 28 weeks of pregnancy, the soldier must be provided a 15-minute rest period every 2 hours. Her workweek should not exceed 40 hours and the soldier should not work more than 8 hours in any one day. The duty day begins when reporting for formation or duty and ends 8 hours later.

*e. Performance of duty.* A woman who is experiencing a normal pregnancy may continue to perform military duty until delivery. Only those women experiencing unusual and complicated problems (for example, pregnancy-induced hypertension) will be excused from all duty, in which case they may be hospitalized or placed sick in quarters. Medical personnel will assist unit commanders in determining duties.

*f. Sick in quarters.* A pregnant soldier will not be placed sick in quarters solely on the basis of her pregnancy unless there are complications present that would preclude any type of duty performance.

## 7–10. Postpartum profiles

*a.* Convalescent leave (as prescribed by AR 600–8–10) after delivery will be for a period determined by the attending physician. This will normally be for 42 days following normal pregnancy and delivery.

*b.* Convalescent leave after a termination of pregnancy (for example, miscarriage) will be determined on an individual basis by the attending physician.

*c.* Prior to commencing convalescent leave, postpartum soldiers will be issued a post partum profile. The temporary profile will be for 45 days. It begins on the day of birth or termination of pregnancy and will allow PT at the soldier's own pace. If a soldier decides to return early from convalescent leave, the temporary profile remains in effect for the entire 45 days.

*d.* Soldiers will receive clearance from the profiling officer to return to full duty.

*e.* In accordance with DOD Directive 1308.1, post partum soldiers are exempt from the APFT for 180 days following termination of pregnancy. They are expected to use the time in preparation for the APFT after receiving clearance from their physician to resume physical training.

*f.* The above guidance will only be modified if, upon evaluation of a physician, it has been determined the post partum soldier requires a more restrictive or longer profile because of complicated or unusual medical problems.

## 7–11. Preparation, approval, and disposition of DA Form 3349

*a. Preparation of DA Form 3349.*

(1) DA Form 3349 will be used to record both permanent profiles and temporary profiles. DD Form 689 (Individual Sick Slip) may be used in lieu of DA Form 3349 for temporary profiles not to exceed 30 days and may include information on activities the soldier can perform as well as the physical limitations. An SF 600 may be used to attach additional information to the DA Form 3349 on the physical activities a soldier can or cannot perform if there is inadequate space on the DA Form 3349. This additional SF 600 should be clearly labeled as a continuation of the DA Form 3349.

(2) DA Form 3349 will be prepared as follows:

*(a) Item 1.* Record medical conditions and/or physical defects in common usage, nontechnical language that a layman can understand. For example, "compound comminuted fracture, left tibia" might simply be described as "broken leg." The checkboxes labeled Injury and Illness/Disease are used for tracking purposes. Check the injury box if the soldier's medical condition is the result of an injury; otherwise, check the box labeled Illness/Disease.

*(b) Item 2.* Code designations (defined in table 7-2) are limited to permanent profiles for administrative use only and are to be completed by the profiling officer. The complete assignment limitations are recorded in item 10.

*(c) Item 3.* Enter under each permanent and temporary PULHES factors the appropriate profile serial code (1, 2, 3, 4, as prescribed) for the specific PULHES factor. A soldier may have a permanent profile for one condition and a temporary profile for another. All permanent profile blocks must be filled in. Only the applicable block under the temporary profile needs to be completed. For example, a soldier with a sprain ankle who has permanent H3 hearing loss would be coded 111311 in the permanent PULHES space but _ _ 3 _ _ under the temporary PULHES space.

*(d) Item 4.* Check the appropriate block for the type of profile. If the profile is temporary, enter the expiration date. If the profile is permanent, the profiling officer must assess if the soldier meets retention standards by chapter 3. Those soldiers on active duty who do not meet retention standards must be referred to an MEB as per chapter 3. (See paras 9-10 and 10-26 for disposition of USAR and ARNG soldiers not on active duty who do not meet medical retention standards). Those soldiers (active duty and USAR/ARNG) who meet retention standards but have at least a 3 or 4 PULHES serial will be referred to a Medical MOS Retention Board (MMRB) in accordance with AR 600-60, unless waived by the MMRB convening authority.

*(e) Item 5.* Answer Yes or No to items 5a through 5f. These functional activities are the minimum requirements to be considered medically qualified for worldwide deployment. If any answer is No then the appropriate profile serial should in most cases be at least a 3. This will ensure that the soldier's case will be individually reviewed by either an MEB or MMRB.

*(f) Item 6.* Physical Fitness Test. Check either yes or no to indicate whether the soldier can perform the activities for the APFT. The yes or no blocks on the alternate APFT need only be completed if the soldier has restrictions for the regular APFT. If the soldier cannot perform at least an alternate APFT the profile serial should be at least a 3.

*(g) Item 7.* Check yes or no for all standard aerobic conditioning activities that the individual can or cannot do. The yes or no blocks on the modified aerobic conditioning activities need only be completed if there are restrictions on the standard conditioning activities.

*(h) Item 8 and 9.* Check either yes or no to indicate whether the soldier can or cannot perform upper or lower body weight training according to FM 21-20.

*(i) Item 10.* This space is for the following uses. In accordance with paragraph 7-4b, the profiling officer must review previous profiles before making a decision to extend a temporary profile. If this is an extension of a previous temporary profile, fill in the date of the original temporary profile in the space provided. Item 10 may also be used to list any other physical activity or physical activity restrictions not listed elsewhere on the form. Item 10 is continued on page 2 of the profile if there is insufficient space in item 10 on the front of the profile. Page 2 of the profile is optional.

*(j) Item 11.* This is optional. It allows the profiling officer to put specific limits on some common functional activities with respect to time, distance, weight and repetition parameters. If no values are listed it will be assumed these are within the normal limitations of a healthy individual.

*(k) Item 12, Item 13, and Item 14 signatures.* Print name and grade of profiling officer, signature, and date. Permanent "1" or "2" profiles require the signature of one profiling officer. The signature of the profiling officer for "1" or "2" profiles is written in the section: "Typed name and grade of profiling officer." Permanent "3" or "4" profiles require the signatures of two profiling officers, one of which is the physician approving authority (unless the provisions of 7-8f apply). (See para 7-8 to determine who is qualified to be a profiling officer.) Temporary profiles require only the signature of one profiling officer except for extensions of profiles noted in para 7-6a(2).

*(l) Item 15, Item 16, Item 17, and Item 18.* Action by approving authority. The approving authority checks "approved or not approved," signs, and dates the profile form. The approving authority will be designated by the MTF commander. (In the case of RC soldiers not on active duty, see para 7-8f.) The approving authority for permanent "3" or "4" profiles must be a physician. If the approving authority does not concur with the profiling officer recommendation, the MTF commander will make the final decision.

*(m) Item 19, Item 20, and Item 21.* Action by the unit commander. This paragraph is optional and used if the commander disagrees with the profile and wants the profiling officer to reconsider the profile. It is also used if the commander indicates that the profile requires a change in the soldier's MOS or duty assignment (see para 7-12b).

*(n) Item 24.* Include patient identification.

*(o) Item 25.* Include soldier's unit.

*(p) Item 26.* Include the name of the issuing clinic and provider phone number. Provider e-mail is optional.

*b. Disposition of the physical profile form (permanent profiles) by the MTF.* The unit commander and military personnel office (MILPO) copies of DA Form 3349 will be delivered by means other than the individual on whom the report is made.

(1) Original to the soldier's health record.

(2) One copy to the unit commander.

(3) One copy to the soldier.

(4) One copy to the MILPO.

*c. Disposition of the physical profile form (temporary profiles).*

(1) Original in the soldier's health record.

(2) One copy to the unit commander.

(3) One copy to the soldier.

*d.* The profiling officer (or approving authority if applicable) is responsible for ensuring the PULHES and Date of Profile is entered into the Medical Protection System (MEDPROS).

## 7–12. Responsibility for personnel actions

*a.* Unit commanders and personnel officers are responsible for necessary personnel actions, including appropriate entries on personnel management records and the assignment of the individual to military duties commensurate with the individual's physical profile and recorded assignment limitations.

*b.* If the soldier's commander believes the soldier cannot perform with the permanent profile, the commander will make appropriate comments on the profile form in the section entitled "Action by Unit Commander" and request reconsideration of the profile by the profiling physician. Reconsideration must be accomplished by the physician who will either amend the profile or revalidate the profile as appropriate. Commanders may also request a review of temporary profiles.

## 7–13. Physical profile and the Army Weight Control Program

DA Form 3349 will not be used to excuse soldiers from the provisions of AR 600–9. AR 600–9 contains a standard memorandum for completion by a physician if there is an underlying or associated disease process that is the cause of the overweight condition. The inability to perform all APFT events or the use of certain medications is not generally considered sufficient medical rationale to exempt a soldier from AR 600–9.

Table 7–1
Physical profile functional capacity guide

| Profile | P | U | L | H | E | S |
|---|---|---|---|---|---|---|
| Serial | Physical capacity | Upper extremities | Lower extremities | Hearing–ears | Vision–eyes | Psychiatric |
| Factors to be considered. | Organic defects, strength, stamina, agility, energy, muscular coordination, function, and similar factors. | Strength, range of motion, and general efficiency of upper arm, shoulder girdle, and upper back, including cervical and thoracic vertebrae. | Strength, range of movement, and efficiency of feet, legs, lower back and pelvic girdle. | Auditory sensitivity and organic disease of the ears | Visual acuity, and organic disease of the eyes and lids. | Type severity, and duration of the psychiatric symptoms or disorder existing at the time the profile is determined. Amount of external precipitating stress. Predisposition as determined by the basic personality makeup, intelligence, performance, and history of past psychiatric disorder impairment of functional capacity |
| 1 | Good muscular development with ability to perform maximum effort for indefinite periods. | No loss of digits or limitation of motion; no demonstrable abnormality; able to do hand to hand fighting. | No loss of digits or limitation of motion; no demonstrable abnormality; able to perform long marches, stand over long periods, run. | Audiometer average level for each ear not more than 25 dB at 500, 1000, 2000 Hz with no individual level greater then 30 dB. Not over 45 dB at 4000 Hz | Uncorrected visual acuity 20/200 correctable to 20/20, in each eye. | No psychiatric pathology. May have history of a transient personality disorder. |
| 2 | Able to perform maximum effort over long periods. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent hand–to–hand fighting and do not disqualify for prolonged effort. | Slightly limited mobility of joints, muscular weakness, or other musculo-skeletal defects that do not prevent moderate marching, climbing, timed walking, or prolonged effort. | Audiometer average level for each ear at 500, 1000, 2000 Hz, or not more than 30 dB, with no individual level greater than 35 dB at these frequencies, and level not more than 55 dB at 4000 Hz; or audiometer level 30 dB at 500 Hz, 25 dB at 1000 and 2000 Hz, and 35 dB at 4000 Hz in better ear. (Poorer ear may be deaf.) | Distant visual acuity correctable to not worse than 20/40 and 20/70, or 20/30 and 20/100, or 20/20 and 20/400. | May have history of recovery from an acute psychotic reaction due to external or toxic causes unrelated to alcohol or drug addiction. |
| 3 | Unable to perform full effort except for brief or moderate periods. | Defects or impairments that require *significant* restriction of use. | Defects or impairments that require *significant* restriction of use. | Speech reception threshold in best ear not greater than 30 dB HL, measured with or without hearing aid; or acute or chronic ear disease. | Uncorrected distant visual acuity of any degree that is correctable not less than 20/40 in the better eye. | Satisfactory remission from an acute psychotic or neurotic episode that permits utilization under specific conditions (assignment when outpatient psychiatric treatment is available or certain duties can be avoided). |
| 4 | *Functional level below P3.* | *Functional level below U3.* | *Functional level below L3.* | *Functional level below H3.* | *Visual acuity below E3.* | Does not meet S3 above. |

Table 7–2
Profile codes*

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE A | No assignment limitation. | No demonstrable anatomical or physiological impairment within standards established in table 7–1. |
| CODE B | May have assignment limitations that are intended to protect against further physical damage/injury. May have minor impairments under one or more PULHES factors that disqualify for certain MOS training or assignment. | Minimal loss of joint motion, visual and hearing loss |
| CODES C through P | Possesses impairments that limit functions or assignments. *The codes listed below are for military personnel administrative purposes. Corresponding limitations are general guidelines and are not to be taken as verbatim limitations. (For example, a soldier with a code C may not be able to run but may have no restrictions on marching or standing.) Item 3 of DA Form 3349 will contain the specific limitations.* | |
| CODE C | Limitations in running, marching, standing for long periods etc. | Orthopedic or neurological conditions |
| CODE D | Limitations in any type of strenuous physical activity. | Organic cardiac disease; pulmonary insufficiency |
| CODE E | Limitations requiring dietary restrictions preventing consumption of combat rations. | Endocrine disorders—recent or repeated peptic ulcer activity—chronic gastrointestinal disease requiring dietary management. |
| CODE F | Limitations prohibiting assignment or deployment to OCONUS areas where definitive medical care is not available. | Individuals who require continued medical supervision with hospitalization or frequent outpatient visits for serious illness or injury. |
| CODE G | Limitations prohibiting wearing Kevlar, LBE, lifting heavy materials required of the MOS, overhead work. | Arthritis of the neck or joints of the extremities with restricted motion; disk disease; recurrent shoulder dislocation. |
| CODE H | Limitations on duty where sudden loss of consciousness would be dangerous to self or to others such as work on scaffolding, vehicle driving, or near moving machinery. | Seizure disorders; other disorders producing syncopal attacks of severe vertigo, such as Meniere's syndrome. |
| CODE J | Hearing Protection Measures required to prevent further hearing loss.<br><br>1. No exposure to noise in excess of 85 dBA (decibels measured on the A scale) or weapon firing without use of properly fitted hearing protection. Annual hearing test required.<br><br>2. Further exposure to noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for preparation of replacements for overseas movement (POR) qualification or annual weapons qualification with proper ear protection). Annual hearing test required.<br><br>3. No exposure to noise in excess of 85 dBA or weapon firing without use of properly fitted hearing protection. This individual is 'deaf' in one ear. Any permanent hearing loss in the good ear will cause a serious handicap. Annual Hearing test required.<br><br>4. Further duty requiring exposure to high intensity noise is hazardous to health. No duty or assignment to noise levels in excess of 85 dBA or weapon firing (not to include firing for overseas movement (POR) or weapon firing without use of properly fitted ear protection). No duty requiring acute hearing. A hearing aid must be worn to meet medical fitness standards. | Susceptibility to acoustic trauma. |

Table 7–2
Profile codes*—Continued

| Code | Description/assignment limitation | Medical criteria (examples) |
|---|---|---|
| CODE L | Limitations restricting assignment to cold climates. | Documented history of cold injury; vascular insufficiency; collagen disease, with vascular or skin manifestations. |
| CODE M | Limitations restricting exposure to high environmental temperature. | History of heat stroke; history of skin malignancy or other chronic skin diseases that are aggravated by sunlight or high environmental temperature. |
| CODE N | Limitations restricting wearing of combat boots. | Any vascular or skin condition of the feet or legs that, when aggravated by continuous wear of combat boots, tends to develop unfitting ulcers. |
| CODE P | Limitations restricting wearing or being exposed to required items necessary to perform duty (for example, Latex, wool). | Established allergy to wool, latex. |
| CODE U | Limitation not otherwise described, to be considered individually. (Briefly define limitation in item 8.) | Any significant functional assignment limitation not specifically identified elsewhere. |
| CODE V | Deployment. This code identifies a soldier with restrictions on deployment. Specific restrictions are noted in the medical record. | |
| CODE W | MMRB. This code identifies a soldier with a permanent profile who has been returned to duty by an MMRB (MOS Medical Review Board.) | |
| CODE X | This code identifies a soldier who is allowed to continue in the military service with a disease, injury, or medical defect that is below medical retention standards, pursuant to a waiver of retention standards under chapter 9 or 10 of this publication, or waiver of unfit finding and continued on active duty or in active Reserve status under AR 635–40. | |
| CODE Y | Fit for duty. This code identifies the case of a soldier who has been determined to be fit for duty (not entitled to separation or retirement because of physical disability) after complete processing under AR 635–40. | |

Notes:
* Codes do not automatically correspond to a specific numerical designator of the profile but are based on the general physical/assignment limitations.

# Chapter 8
# Medical Examinations—Administrative Procedures

## 8–1. General
(See chap 6 for aviation administration procedures.) This chapter provides—
   a. General administrative policies relative to military medical examinations.
   b. Requirements for periodic, separation, mobilization, and other medical examinations.
   c. Policies relative to hospitalization of examinees for diagnostic purposes and use of documentary medical evidence, consultations, and the individual health record.
   d. Policies relative to the scope and recording of medical examinations accomplished for stated purposes.

## 8–2. Applications
The provisions contained in this chapter apply to all medical examinations accomplished at U.S. Army medical facilities or accomplished for the U.S. Army.

## 8–3. Physical fitness
Maintenance of physical and medical fitness is an individual military responsibility, particularly with reference to preventable conditions and remediable defects. Soldiers have an obligation to maintain themselves in a state of good physical condition so that they may perform their duties efficiently. Soldiers should seek timely medical advice whenever they have reason to believe that a medical condition or physical defect affects, or is likely to affect, their physical or mental well–being. They should not wait until the time of their periodic medical examination to make such

a condition or defect known. Commanders will bring this matter to the attention of all soldiers during initial orientation and periodically throughout their period of service.

## 8–4. Consultations

*a.* The use of specialty consultants, either military or civilian, is authorized in AR 40–400 and AR 601–270/AFR 33–7/MCO P–1100.75A.

*b.* A consultation will be completed in the case of an individual being considered for military service, including USMA and ROTC, whenever—

(1) Verification, or establishment, of the exact nature or degree of a given medical condition or physical defect is necessary for the determination of the examinee's medical acceptability or unacceptability based on prescribed medical fitness standards; or

(2) It will assist higher headquarters in the review and resolution of a questionable or borderline case; or

(3) The examining physician deems it necessary.

*c.* A consultation will be accomplished in the case of a soldier on active duty whenever it is indicated to ensure the proper medical care and disposition of the soldier.

*d.* A medical examiner requesting a consultation will routinely furnish the consultant with—

(1) The purpose or reason for which the individual is being examined; for example, enlistment.

(2) The reason for the consultation; for example, persistent tachycardia.

(3) A brief statement on what is desired of the consultant.

(4) Pertinent extracts from available medical records.

*e.* Reports of consultation will be appended to DD Form 2808 as outlined in paragraph 8–5.

## 8–5. Distribution of medical reports

*a.* DD Form 2808 and DD Form 2807–1 are to be used for all military examinations. Previous medical examinations/histories accomplished on soldiers in accordance with this chapter should be considered valid. However, once the DD Forms are available for use, the DD Forms should be used. DD Form 2807–2 (Medical Prescreen of Medical History Report) is not required for military medical examinations.

*b.* A minimum of two copies (both signed) of DD Form 2807–1 and DD Form 2808 will be prepared. One copy of each will be retained by the examining facility. The other copy will be filed as a permanent record in the health record (AR 40–66) or outpatient treatment record. Special instructions for preparation and distribution of additional copies are contained elsewhere in this chapter or in other regulations dealing with programs involving or requiring medical examinations. Copies may be reproduced from signed copies by any duplicating process that produces legible and permanent copies. Such copies are acceptable for any purpose unless specifically prohibited by the applicable regulation. Distribution of copies will not be made to unauthorized personnel or agencies.

*c.* In the case of general officers (grade O7 and above), the duplicate DD Form 2808 will be forwarded by the examining facility directly to Department of the Army, General Officer Management Office, ATTN: DACS–GO, 200 Army Pentagon, Washington, DC 20310–0200.

## 8–6. Documentary medical evidence

*a.* Documentary medical records and other documents prepared by physicians or other individuals may be submitted by, or on behalf of, an examinee as evidence of the presence, absence, or treatment of a defect or disease, and will be given due consideration by the examiner(s). Submission and use of such documentary medical evidence is encouraged. If insufficient copies are received, copies will be reproduced to meet the needs of *b* and *c* below.

*b.* A copy of each piece of documentary medical evidence received will be appended to each copy of the DD Form 2808, and a statement to this effect will be made in the Summary of Defects section and cross-referenced by the pertinent item number.

*c.* When a report of consultation or special test is obtained for an examinee, a copy will be attached to each DD Form 2808 as an integral part of the medical report, and a statement to this effect will be made on the DD Form 2808 and cross-referenced by the pertinent item number.

## 8–7. Facilities and examiners

*a.* Physicians may perform medical examinations of any type except where a specific requirement exists for the examination to be conducted by a physician qualified in a specialty. Physician assistants, nurse practitioners, optometrists, audiologists, and podiatrists, properly qualified by appropriate training and experience, may accomplish such phases of the medical examination as are deemed appropriate by the examining physician. They may sign the report of medical examination for the portions of the examination they actually accomplish, but the supervising physician will sign the report of medical examination in all cases.

*b.* In general, medical examinations conducted for the Army will be completed at facilities of the Armed Forces, using military medical officers on Active or Reserve duty, or full-time or part-time civilian employee physicians, with the assistance of dentists, physician assistants, nurse practitioners, optometrists, audiologists, and podiatrists. There may

be contract agreements with civilian or Department of Veterans Affairs (VA) facilities to perform military medical or separation examinations for Active or Reserve Component Forces. In such cases, agreements must be worked out with the overseeing Army MTF or Reserve Command to ensure that the medical examinations are reviewed by individuals who are familiar with the medical retention standards of chapter 3 (for example, military physicians) and can make a competent determination on whether the soldier meets the medical retention standards of chapter 3 and is therefore medically fit for retention, retirement, or separation.

*c.* Medical examinations for qualification and admission to the USMA, the U.S. Naval Academy, the U.S. Air Force Academy, and the respective preparatory schools will be conducted in coordination with DODMERB. (See AR 40–29/ AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8.)

## 8–8. Hospitalization

Whenever hospitalization is necessary for evaluation in connection with a medical examination, it may be furnished as authorized in AR 40–400.

## 8–9. Objectives of medical examinations

The objectives of military medical examinations are to provide information—

*a.* To inform the individual of modifiable health risks and to identify potential lifestyle modifications.

*b.* Needed to initiate treatment of illness.

*c.* To meet administrative and legal requirements.

## 8–10. Recording of medical examinations

The results of a medical examination will be recorded on DD Form 2808 and such other forms as may be required. (See AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8 for DODMERB forms.) Results will be transferred to DD Form 2766 (Adult Preventive and Chronic Care Flowsheet) as needed.

## 8–11. Scope of medical examinations

*a.* The scope of a medical examination is prescribed in paragraph 8–12 and will conform to the intended use of the examination.

*b.* Limited or screening examinations, special tests, or inspections required for specific purposes (for example, drivers, personnel exposed to industrial hazards, blood donors, food handlers) may be prescribed by other regulations.

*c.* Each abnormality, whether or not it affects the examinee's medical fitness to perform military duty, will be routinely described. All diagnoses and symptoms will be noted.

## 8–12. Medical examination requirements and required forms

*a. Required forms.* The required form for all Army military medical examinations is DD Form 2808. The "Laboratory Findings" section of this form may not contain enough space to include all required tests. If additional space is needed, the "Notes" section in box 73 may be used for that purpose. (MTFs are encouraged to use standard overprints, stamps, etc., in box 73 for that purpose.) Table 8–1 contains model entries and explanatory notes for every box on the DD Form 2808. All items are NOT required on all examinations.

*b. All examinations.* The following items ARE REQUIRED on ALL Army military medical examinations. (Additional items may be accomplished if clinically indicated.) See paragraphs (3) through (8) below for additional items required for special examinations. The box number from the DD Form 2808 that corresponds to the appropriate item to be completed is listed following each item.

(1) *Administrative data.* Date of examination (box 1), SSN (box 2), Name of examinee (box 3), Home address (current address, not "home of record" if different) (box 4), Home or contact telephone number (box 5), Grade/rank (box 6), Date of birth (box 7), Age (box 8), Sex (box 9), Race (box 10), Service (box 15a), Component (box 15b), Purpose of exam (box 15c), and Name of examining facility (box 16). (Name and SSN will also be completed on the top of pages 2 and 3 of the DD Form 2808.)

(2) *Clinical evaluation section (boxes 17 through 39).* This includes examination of head, face, neck, scalp, nose, sinuses, mouth, throat, ears (drums), eyes (includes ophthalmoscopic), heart, lungs, vascular system, anus, abdomen, upper and lower extremities, feet, spine, skin, breast exam, neurologic exam, and testicular exam on males. (Rectal exams are not required on all examinations. Pelvic exams and Pap tests are not required on all female examinations. See paras (3) through (8) below for specific requirements.)

(3) *Dental section (box 43), usually completed by a physician or physician's assistant who will be noting any obvious gross abnormalities.* This does not replace the dental examination by a dentist required in AR 40–3. The physician or physician assistant will check the box acceptable or unacceptable. The section in this item for dental "class" will not be completed unless it is completed by a dentist.

(4) *Notes section (box 44) (to explain any abnormalities).*

(5) *Urinalysis for albumin and sugar (boxes 45a and 45b).*

(6) *Miscellaneous measurements.* Height (box 53), weight (box 54), temperature (box 56), pulse (box 57), blood pressure (box 58a), distant vision (box 61), near vision (box 63), and audiometer results (box 71a).

(7) *Qualification for service (box 74a).* For periodic, separation, and retirement exams, qualification is based on whether the examinee meets the medical retention standards of chapter 3.

(8) *Physical profile (box 74b).* This section does not replace the requirements for a DA Form 3349 as described in chapter 7.

(9) *Summary of defects (box 77).*

(10) *Recommendations (box 78).*

(11) *Name and signatures of examining physician assistants (boxes 81a and 81b), and of examining or approving physician (boxes 82a and 82b or 84a and 84b).*

c. *Periodic, under age 40.* In addition to the items listed in "All Examinations" (*b*(2) above), the following items are required:

(1) HCT or HGB (box 47).

(2) HIV testing (box 49). (See AR 600–110.)

(3) Cholesterol. (Record results in box 73.)

(4) See paragraph 8–20 for annual pap and pelvic exam and mammogram requirements for female soldiers on active duty. For ARNG/ARNGUS soldiers and USAR soldiers not on active duty, the periodic examination should include a pap test and pelvic exam or alternatively, results of such tests done within 1 year of the exam may be attached to the DD Form 2808.

d. *Periodic, age 40 and older.* In addition to the items listed in "All Examinations" (*b*(2) above), the following items are required. Tests below include those required for the Cardiovascular Screening Program (CVSP). (See para 8–25 for CVSP guidelines.)

(1) Prostate examination for males (box 30).

(2) HIV testing (box 49). (See AR 600–110.)

(3) Rectal exam with stool for occult blood (box 30 for exam). (For occult blood results, record in box 73.)

(4) PSA test (males). (Record in box 52b.)

(5) Urine specific gravity and urine microscopic. (Record results in box 52c.)

(6) Test for intraocular pressure (box 70).

(7) Fasting blood sugar. (Record results in box 73.)

(8) Fasting lipid profile, including total cholesterol, LDL, HDL, and triglycerides. (Record results in box 73.)

(9) EKG. (Record results in box 73.)

(10) See paragraph 8–20 for annual pap and pelvic exam and mammogram requirements for female soldiers on active duty. For ARNG/ARNGUS soldiers and USAR soldiers not on active duty, the periodic examination should include a pap test and pelvic exam or alternatively, results of such tests done within 1 year of the exam may be attached to the DD Form 2808.

(11) CVSP. (See para 8–25.)

e. *Examination for retirement or separation.* (In accordance with para 8–23, retirement examinations are mandatory. Separation examinations are conducted on the request of the soldier or if on review of the medical records it is clinically indicated.) In addition to the items listed in "All Examinations" (*b*(2) above), the following items are required:

(1) Prostate for males age 40 and older (box 30).

(2) Rectal exam with stool for occult blood test for age 40 and older (box 30 for exam). (Use box 73 for occult blood results.)

(3) HCT or HGB (box 47).

(4) PSA test for males 40 and older. (Record results in box 52b.)

(5) Urine specific gravity and urine microscopic. (Record results in box 52c.)

(6) Chest x–ray (only for soldiers 40 and older). (Record results in box 73.)

(7) Cholesterol. (Record results in box 73.)

(8) FBS for those 40 and older. (Record in box 73.)

(9) EKG for those 40 and over or if clinically indicated. (Record in box 73.)

(10) See paragraph 8–23*i* for hepatitis screening requirements.

(11) DD Form 2697 (Report of Medical Assessment) will also be completed.

f. *Initial examinations for appointment, enlistment, or induction.* In addition to the items listed in "All Examinations" (*b*(2) above), the following items are required. (See AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8 for DODMERB exams.)

*Note.* MEPCOM will provide instructions to the MEPS on completion of the required forms for Army applicants. These instructions will include additional items on the DD Form 2808 that are to be used solely by the MEPS (for example, boxes 75, 79, and 80).

(1) Pregnancy testing on female applicants (box 46).

(2) HIV testing (box 49). (See AR 600–110.)

(3) Drug and alcohol test. (ROTC cadets will be tested during precommissioning physical (boxes 50 and 51).)

(4) Chest x-ray only if clinically indicated. (Record in box 73.)

(5) Pelvic exams and pap tests are not required.

(6) Color vision. (Record results in box 66.)

*g. Initial exam for Special Forces, SERE, free fall parachute training (high altitude low opening (HALO), marine diving (Special Forces and Ranger combat diving) and other marine diving (MOS 00B).* In addition to the items listed in "All Examinations" (*b*(2) above), the following items are required:

(1) Rectal exam with stool for occult blood (required for Special Forces, SERE, HALO, Special Forces and Ranger combat diving) (box 30 for exam). (Use box 73 for occult blood results.)

(2) HCT (box 47).

(3) HIV (box 49).

(4) Urine specific gravity and urine microscopic. (Record in box 52c.)

(5) Color vision (boxes 59 and 60).

(6) Refraction, if vision does not correct to 20/20 in each eye with spectacle or contact lenses or if uncorrected vision is worse than 20/70 in either eye (not required for SERE) (box 62).

(7) Valsalva (required for diving and HALO only) (box 72b).

(8) Chest x-ray (not required for SERE). (Record in box 73.)

(9) EKG. (Record in box 73.)

(10) White blood cell count (diving and HALO only). (Record in box 73.)

(11) Sickle cell screen. (Record in box 73.)

(12) Glucose–6–phosphate dehydrogenase (MOS 00B diving, CDQC, and MFF only). (Record in box 73.)

(13) Dental examination by a dentist (not required for SERE).

*h. Additional examinations for female soldiers on active duty or ADT tours in excess of 1 year (see paragraph 8–20a).*

*i. Flying Duty Medical Examinations (see ATB 2, Army Flight Surgeon's Administrative Guide).*

*j. Airborne Examinations.* In addition to the items listed in "All Examinations" (b*(2)* above), the following items are required:

(1) Valsalva (box 72b).

(2) Color vision (boxes 59 and 60).

*k. Examination for Ranger School.* In addition to the items listed in "All Examinations" (*b*(2) above) the following items are required:

(1) *Age 34 and under.* Urinalysis with microscopy (box 52), HCT (box 47), HIV test within 2 years (box 49), Sickle-Dex (box 73). An evaluation by a dentist is also required.

(2) *Age 35 and older.* Urinalysis with microscopy (box 52), HCT (box 47), HIV test within 2 years (box 49), FBS (box 73), CBC (box 52), Fasting Lipid Panel, EKG, Rectal exam with occult blood. An evaluation by a dentist is also required. The requirements in paragraph 8-25d for indications of medical follow-up for elevated or abnormal test results should be followed for these exams on applicants 35 and older and the results forwarded with the medical examination to the Ranger School for review.

## 8–13. Report of medical history forms

*a. Preparation of DD Form 2807–1.* (DD Form 2807–2 (Medical Prescreen of Medical History Report) is not required.) This form is completed by the examinee prior to being examined. The DD Form 2807–1 must be prepared in all cases when the DD Form 2808 is also completed. It provides the examining physician with an indication of the need for special discussion with the examinee and the areas in which detailed examination, special tests, or consultation referral may be indicated. The information entered on this form is considered confidential and will not be released to unauthorized sources. The examinee should be informed of the confidential nature of his or her entries and comments. Trained enlisted medical service personnel and qualified civilians may be used to instruct and assist examinees in the preparation of the report, but will make no entries on the form other than the date of examination and the examining facility. The DD Form 2807–1 will normally be prepared in an original and one copy. All items will be completed. Responses will be typewritten or printed in ink.

*b. Signature.* The examinee will sign the form in black or dark blue ink.

*c. The physician's (or physician assistant's) summary and elaboration of the examinee's medical history.*

(1) The physician (or physician assistant) will summarize and elaborate upon the examinee's medical history, and in the case of military personnel, the examinee's health record, cross–referencing his or her comments by item number. All items checked in the affirmative will be clarified and the examiner will fully describe all abnormalities including those of a non–disqualifying nature.

(2) If the examinee is applying for enlistment or appointment and answers reveal that he or she was previously

rejected for military service or was discharged for medical reasons, the exact reason should be ascertained and recorded.

(3) A facsimile stamp will not be used for signature. The typed or printed name of the physician or physician assistant and the date will be entered in the designated blocks. The physician or physician assistant will sign in black or dark-blue ink.

## 8–14. Validity times for DD Forms 2808

*a.* Medical examinations will be valid for the purpose and within the periods prescribed below, provided there has been no significant change in the individual's medical condition.

(1) Medical examinations will be valid for 24 months from the date of medical examination to qualify for entrance into USMA, the USUHS, ROTC, OCS, USMA Preparatory School, induction, enlistment, initial appointment as a commissioned officer or warrant officer (with the exceptions noted in (2) below).

(2) At National Advanced Leaders Camp, a medical screening on DD Form 2807-1, with a focused medical examination if clinically indicated, and laboratory screening tests for DNA, HIV, and drug/alcohol testing will be accomplished. This medical screening and required laboratory tests will be used to qualify a cadet for continuation in ROTC and subsequent commission. The entry examination for USMA may be used as the commission examination providing the DNA, HIV and drug/alcohol tests have been accomplished during the cadet's tenure; and a DD Form 2807-1 is completed prior to commission with a focused medical examination performed if clinically indicated. The entry examination to qualify for Physician Assistant School may be used for the commission examination providing there has been no change in the student's medical condition since the last examination. (A DA Form 3081 will be completed.)

(3) See paragraph 6–8 for validity periods for FDMEs.

(4) When accomplished incident to retirement, discharge, or release from active duty, medical examinations are valid for a period of 12 months from the date of examination. If the examination is accomplished more than 4 months prior to release from active duty, discharge, or retirement (or 4 months prior to transition leave date if the soldier requests it), DA Form 3081 (Periodic Medical Examination (Statement of Exemption)) will be attached to the original DD Form 2808.

(5) See table 6–1 for FDMEs.

(6) Medical examinations are valid for 60 months from the date of medical examination to qualify for airborne training. If an ROTC or USMA Cadet examination was recorded on DD Form 2351 instead of DD Form 2808, the examination is still valid. If the examination is older than 2 years, applicants for airborne school must complete DA Form 3081 and note if there has been any known change in their medical condition since the last examination. Any notes that there has been a change needs to be reviewed by a physician to ensure they meet airborne school medical standards.

(7) Medical examinations are valid for 24 months from completion date of medical examination for entrance to all USAJFKSWCS schools. This includes SFAS; Special Forces Qualification Course (SFQC); MFF; Special Forces CDQC; and SERE training. (Military Freefall Jumpmaster, Dive Supervisor, and Diving Medical Technician (DMT) training are not initial qualification courses. As such, these courses only require a current MFF/CDQC physical that is valid for the period specified in 8–19c(2.) Candidates for DMT, not on dive status, require an initial CDQC physical to attend this school.)

(8) A current periodic medical examination for Active Army soldiers and ARNGUS and USAR soldiers will be valid for reenlistment, attendance at Army or civilian schools, ADT, and active duty for special work (ADSW) and temporary tour of active duty tours unless the specific school requires a shorter validity period (for example, special forces, diving school, or aviation training). (See para 8–19c for definition of a periodic medical examination for active and RC soldiers.) (Shorter validity periods for Army Schools must be prescribed by Army regulation or DA pamphlet.) The periodic examinations will be valid only if there has been no change in the soldier's medical condition since the last complete medical examination. USAR and ARNG/ARNGUS soldiers will complete DA Form 3081 to indicate there has been no significant change since the last examination. See AR 600–110 for separate requirements for HIV testing.

(9) Medical examinations are valid for 18 months for entry into Ranger School, diving training (MOS OOB), and entry into aviation Classes 1/1A/2/3.

*b.* Except for flying duty, discharge, or release from active duty, a medical examination conducted for one purpose is valid for any other purpose within the prescribed validity periods, provided the examination is of the proper scope specified in table 8–1. If the examination is deficient in scope, only those tests and procedures needed to meet additional requirements need be accomplished and results recorded.

*c.* The periodic examination obtained from members of the ARNG/ARNGUS and USAR as defined in paragraph 8–19c(4) will be valid for the purpose of qualifying for immediate reenlistment in ARNG/ARNGUS and USAR, provided there has been no change in the individual's medical condition since his or her last complete medical examination. (See para 8–18 for requirements at mobilization or contingency operations.)

## 8–15. Procurement medical examinations

For administrative procedures pertaining to procurement medical examinations (para 2–1) conducted at MEPS, see AR 601–270/AFR 33–7/MCO P-1100.75A. For procedures pertaining to appointment and enlistment in the ARNG/ ARNGUS and USAR, see chapters 9 and 10 of this regulation. For procedures pertaining to enrollment in the Army ROTC, see AR 145–1. For procedures pertaining to USMA and ROTC Scholarship applicants, see AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8.

## 8–16. Active duty for training, active duty for special work, and inactive duty training

*a.* Individuals on ADT/ADSW for 30 days or less are not required to undergo medical examinations prior to separation unless there is clinical indication for the examination.

*b.* An individual on ADT/ADSW will be given a medical examination if he or she incurs an injury during such training that may result in disability or he or she alleges medical unfitness or disability.

*c.* Evaluation of medical fitness will be based on the medical fitness standards contained in chapter 3.

## 8–17. Health records

Medical examiners will review the health record (AR 40–66) of each examinee whenever an examination is conducted for the purpose of relief from active duty, resignation, retirement, separation from the Service, or when accomplished in connection with a periodic medical examination, and will note any significant problems and follow–up as appropriate.

## 8–18. Mobilization of units and members of Reserve Components of the Army

A current periodic medical examination or a new medical examination is not required incident to mobilization or call-up for war or contingency operations. See paragraph 8–23 for requirements for separation examinations.

## 8–19. Periodic medical examinations

(See para 8–5 for distribution of reports.)

*a. Application.*

(1) A periodic medical examination is required for all officers, warrant officers, and enlisted personnel of the Army, regardless of component.

(2) Other than required medical surveillance, the periodic medical examination is not required for an individual who has undergone a medical examination within 1 year, the scope of which is equal to or greater than that of the required periodic medical examination. The soldier will be furnished DA Form 3081 to annotate, if he or she concurs, that there has been no change in his or her condition since the last examination.

(3) The examining physician will thoroughly investigate the examinee's current medical status. When medical history, the examinee's complaints, or review of any available past medical records indicate significant findings, these findings will be described in detail, using SF 507 (Clinical Record—Report on or Continuation of SF), if necessary. The physical profile will be reviewed and revised as appropriate. (See chap 7.)

(4) Soldiers will be found qualified for retention on active duty if they meet the requirements of chapter 3.

(5) Soldiers who do not meet the medical standards of chapter 3 will be referred to an MEB. However, for RC and ARNG/ARNGUS soldiers not on active duty, see chapters 9 and 10.

(6) All reports of periodic medical examinations will be reviewed by a physician designated by the MTF commander. (Those administered by a MEPS will be reviewed by the Chief Medical Officer.)

(7) The examinee will be counseled on remedial conditions found upon examination (appointments will be made for the purpose of instituting care), continuing care for conditions already under treatment, and general health education matters including, but not limited to, smoking, alcohol and drug abuse, weight control, and methods for correction.

(8) All personnel with potential hazardous exposures in their work environment for which medical surveillance examinations are required to ensure that there is no harmful effect to their health will receive appropriate medical surveillance examinations. Such examinations will be specific to job exposure.

*b. Followup.* Soldiers of the ARNG/ARNGUS or USAR who are not on active duty will be scheduled for followup appointment and consultations at Government expense when authorized. Treatment or correction of conditions or remediable defects as a result of examination will be scheduled if authorized. If individuals are not authorized treatment, they will be advised to consult a private physician of their own choice at their own expense.

*c. Frequency.* (See chap 6 for aviators, ATCs, and FSs.)

(1) All general officers (brigadier general and above) on active duty and all active duty soldiers age 60 or older will undergo an annual medical examination.

(2) Special Forces/Ranger combat divers and MOS 00B divers must have an examination every 3 years. The examination for divers must be performed by or reviewed by a DMO or an FS trained in diving medicine. The examination for MFF parachutists must be performed every 5 years in conjunction with physiologic training.

(3) All other personnel on active duty will have a periodic examination on record no older than 5 years beginning at age 30. Military medical exams conducted for purposes other than the periodic exam may be used to comply with the

periodic exam requirement. If the exam is not within the prescribed scope of a periodic exam in accordance with paragraph 8–12, only those tests and procedures needed to meet the additional requirements need to be accomplished and results recorded.

(4) All members of the Selected Reserve not on active duty will be examined at least once every 5 years. Army commanders, the Commander, AHRC, and the Chief, NGB may, at their discretion, direct more frequent medical examinations in individual cases.

(5) All members of the Ready Reserves not on active duty will be screened for medical fitness annually. DA Form 7349 (Initial Medical Review—Annual Medical Certificate) will be used for all Selected Reserve soldiers to record the results of this clinical screen. A medical exam will be accomplished, if, upon review of the form, it is clinically indicated. This form will be filed in the individual's health record. DA Form 3725 (Army Reserve Status and Address Verification) (AR 135–133) is used to meet the yearly screen for all other Individual Ready Reserve soldiers.

## 8–20. Frequency of additional/alternate examinations

*a. Female examinations.*

(1) In addition to the periodic medical examination, all women in the Army, regardless of age, on active duty or ADT/ADSW tours in excess of 1 year or Active Guard—Reserve (AGR) tours will undergo annual breast and pelvic examinations to include a cervical cytologic screening test for cancer. All women in the Army, under age 25, on active duty or ADT/ADSW tours in excess of 1 year or AGR tours will undergo a screening test for Chlamydia. These special examinations are mandatory and will be accomplished during the month of the soldier's birthday. Periodic medical examinations for ARNG/ARNGUS and USAR soldiers not on active duty will include current (within 1 year) pelvic examinations and a cervical cytologic screening test for cancer. Civilian test results attached to the periodic physical for ARNG/ARNGUS and USAR soldiers not on active duty will be acceptable.

(2) All women in the Army on active duty (including AGR) or ADT tours in excess of 1 year will have a mammographic study accomplished at ages 40, 42, 44, 46, 48, and 50. After age 50, the study will be repeated annually. A record of the examination and test results will be maintained in the health record. More frequent mammographic studies may be performed if clinically indicated.

(3) Army applicants are not required to undergo a pelvic examination or a cytologic screening test. However, once enlisted or appointed, the provisions of paragraph 8–20(1) apply.

*b. Medical surveillance examinations.* The frequency of medical surveillance examinations varies according to job exposure. Annual or less frequent examinations will be performed during the birthday month. More frequent examinations will be scheduled during the birthday month and at appropriate intervals thereafter.

## 8–21. Deferment of examinations

*a. Army-wide or at specific installations.* In circumstances requiring Army-wide or installation deferment of periodic examinations (where conditions of the Service preclude the accomplishment of periodic examinations) because resources are being directed to other missions (for example, screening for mobilization/contingency operations, heavy casualties, etc.), requests for exceptions to policies deferring examinations will be forwarded to TSG (ATTN: DASG–HS–AS).

*b. Soldiers in isolated areas.* Periodic medical examinations may be delayed by the commander concerned for those soldiers stationed in isolated areas; that is, Army attaches, military missions, and MAAGs, where medical facilities of the U.S. Armed Forces are not available. Medical examinations so delayed will be accomplished at the earliest opportunity in conjunction with leave, temporary duty, or when the individuals concerned are assigned or attached to a military installation having a medical facility. Medical examination of such individuals for retirement purposes may not be delayed.

*c. Other deferments.* In exceptional circumstances, in the case of an individual soldier, where conditions of the service preclude the accomplishment of the periodic examination, it may be deferred by direction of the commander having custody of personnel files until such time as its accomplishment becomes feasible. An appropriate entry explaining the deferment will be made in the health record and on an SF 600 when such a situation exists.

## 8–22. Promotion

Officers, warrant officers, and enlisted personnel, regardless of component, are considered medically qualified for promotion on the basis of the periodic medical examination outlined in paragraph 8–19.

## 8–23. Separation and retirement examinations

*a.* Soldiers separating from the Army will be given a medical interview using DD Form 2697. The interview will be conducted by a physician, physician assistant, or nurse practitioner to document any complaints or potential service–related (incurred or aggravated) illness or injury. The soldier must acknowledge with his or her signature in block 19 of the form that the information provided is true and complete. This form will be filed in the health record; a copy will be furnished to the Department of Veterans Affairs (VA). See paragraph 8–23*i* for hepatitis screening requirements.

*b.* Soldiers separating from the Army will receive a separation medical examination if the soldier requests it, or if, on review of the medical records or the DD Form 2697, a physician, a physician assistant, or a nurse practitioner feels

an examination is appropriate (with exception noted in c below). See table 8–2 for additional requirements based on the type of discharge. See d below for soldiers retiring from active service.

c. ARNG/ARNGUS or USAR soldiers ordered to active duty for war, national emergency, or Presidential Select Reserve Call-Up (10 USC 12301(a), 12302, or 12304) will undergo medical screening prior to mustering out of Federal service (ARNG/ARNGUS) or release from active duty (USAR). The scope of this screening (for example, medical interview with an examination if clinically indicated vs. a complete medical examination) will be determined by TSG prior to separation based on length of the mobilization/contingency operation and occupational exposures of the soldiers. However, all soldiers, as a minimum, will complete DD Form 2697 prior to mustering out of Federal service or release from active duty in accordance with a above.

d. Soldiers retiring from active service are required to undergo a medical examination prior to retirement, and will complete DD Form 2697.

e. Soldiers in paragraphs a, b, c, and d above who have indicated on DD Form 2697 that they intend to seek VA disability compensation or who have been referred to the Army Disability Evaluation System for determination of fitness will be given a standard VA compensation and pension physical in addition to any other examinations required by this regulation, AR 40–400, or AR 635–40. For those soldiers, the service medical record, proof of line of duty (LOD) determination, if necessary, and recent laboratory, radiological, and all other associated test results should accompany the claimant for VA benefits to the place of examination so that testing is not duplicated. A complete Review of Systems that documents the individual's physical condition at the time of separation from the military service shall also be conducted as part of the physical examination to minimize duplication. The location for the performance of such VA compensation examination, as well as which facilities shall be used for the laboratory, radiological, and other specialized testing, will be determined by the MTF commander and the VA medical center director and will be clearly delineated in a cost-neutral memorandum of understanding between the respective facilities. If the physical examination is conducted by the VA, a separate medical examination on DD Form 2808 need not be accomplished with the following caveats. A copy of the VA examination must be included in the soldier's military health record. If the VA does not accomplish the required tests contained in paragraph 8–12e, the military MTF will complete the additional tests and results will be included in the military health record. Both the VA exam and any additional test will be reviewed by the MTF Commander or the Commander's designee to ensure the soldier meets medical retention standards and is therefore medically cleared for separation or retirement.

f. Voluntary requests for medical examinations should be submitted to the commander of the servicing MTF not earlier than 4 months nor later than 1 month prior to the anticipated date of separation or retirement (or if applicable and requested by the soldier, 4 months prior to transition leave). If the examination is accomplished earlier than 4 months, g, below, applies.

g. When accomplished incident to retirement, discharge, or release from active duty, medical examinations are valid for a period of 12 months from the date of examination. If the examination is accomplished more than 4 months prior to release from active duty, discharge, or retirement (or 4 months prior to transition leave date if the soldier requests it), DA Form 3081 will be attached to the original DD Form 2808.

h. Soldiers who have been in medical surveillance programs because of hazardous job exposure will have a clinical evaluation and specific laboratory tests accomplished prior to separation even though a complete medical examination may not be required.

i. Soldiers requesting HCV screening will be tested. If the test is positive, medical evaluation to confirm HCV infection, to determine the need for specific treatments, and to provide counseling on lifestyle modifications and steps to protect others from infection will be accomplished. The following statements will overprinted on a DA Form 4700 (Medical Record—Supplemental Medical Data), administered and placed in the medical record for all soldiers separating or retiring from active duty:

(1) Hepatitis C virus (HCV) is transmitted primarily by injections (for example, blood transfusions, contaminated needles, or sticks with contaminated sharp objects) of contaminated blood. The following are possible sources of HCV infection. If you can answer "yes" to any of these risk factors, you should receive a sample blood test to determine if you could have HCV. If you consider yourself at risk, based on an exposure to a possible source of HCV, you should have a simple blood test for HCV. You will not be asked to identify any specific risk factors to justify HCV testing. If the test is positive, you will receive a medical evaluation to confirm HCV infection, determine your need for specific treatments, and be provided counseling on lifestyle modifications and steps to protect others from infection.

(2) Risk factors are—

(a) Receiving a transfusion of blood or blood products before 1992.

(b) Ever injecting illegal drugs, including use once many years ago.

(c) Receiving clotting factor concentrates produced before 1987.

(d) Having chronic (long term) hemodialysis.

(e) Being told that you have persistent abnormal liver enzyme tests (alanine aminotransferase) or an unexplained liver disease.

(f) Receiving an organ transplant before July 1992.

*(g)* Having a needle stick, sharps, or mucosal exposure to potentially HCV-infected blood as part of your occupational duties and not having been previously evaluated for HCV infection.

(3) If the test is positive, you will receive a medical evaluation to confirm HCV infection, determine your need for specific treatments, and be provided counseling on lifestyle modifications and steps to protect others from infection.

(4) Circle yes or no to the following responses and sign and date.

*(a)* No—I do not want to be tested for HCV.

*(b)* Yes—I want to be tested for HCV.

*(c)* Signature and date.

## 8–24. Miscellaneous medical examinations

*a. SFAS, SFQC, MFF parachutists, Special Forces/Ranger Combat divers, and SERE medical examination reports.*

(1) Entrance into SFAS, SFQC, MFF parachuting, Special Forces/Ranger Combat diving, and SERE training will only be accomplished after meeting the medical fitness standards documented by the completion of the appropriate physical exam. The completed DD Form 2808 and DD Form 2807–1 (and supporting documents) must be reviewed and stamped "approved" by the U.S. Army Special Operations Command (USASOC) Surgeon's Office, or the surgeon's office that is designated by the USASOC Surgeon's Office as having review and approval authority.

(2) The Commander, USAJFKSWCS is the waiver authority for USAJFKSWCS schools. Individuals not meeting the medical fitness standards for USAJFKSWCS training courses will have their physicals and requests for waiver forwarded to Commander, USASOC, ATTN: AOMD–MT, Fort Bragg, NC 28307–5217.

*b. Certain geographic areas.*

(1) When an individual is alerted for movement to or is placed on orders for assignment to the system of Army attaches, military missions, MAAGs, or to isolated areas, the commander of the station to which he or she is assigned will refer the individual and his or her dependents, if any, to the medical facility of the command.

(2) The physician of the facility will carefully review the health records and other available medical records of these individuals. Medical fitness standards and factors to consider in the evaluation are contained in paragraph 5–13. Review of the medical records will be supplemented by personal interviews with the individuals to obtain pertinent information concerning their state of health. The physician will consider such other factors as length of time since the last medical examination, age, and the physical adaptability of the individual to the new area.

(3) If, after review of records and discussion, it appears that a complete medical examination is indicated, a medical examination will be accomplished.

(4) The commander having processing responsibility will ensure that this medical action is completed prior to the individual's departure from his or her home station.

(5) If, as a result of his or her review of available medical records, discussion with the individual and his or her dependents, and findings of the medical examination, if accomplished, the physician finds the individual medically qualified in every respect under paragraph 5–14c and qualified to meet the conditions that will be encountered in the area of contemplated assignment, he or she will complete and sign DA Form 3083 (Medical Examination for Certain Geographical Areas) prior to a permanent change of station. A copy of this statement will be filed in the health record or outpatient record (AR 40–66) and a copy forwarded to the commander who referred the individual to the medical facility.

(6) If the physician finds a dependent member of the family disqualified for the proposed assignment, he or she will notify the commander of the disqualification. The examiner will not disclose the cause of the disqualification of a dependent to the commander without the consent of the dependent, if an adult, or a parent if the disqualification relates to a minor. If the soldier or dependent is considered disqualified temporarily, the commander will be so informed and a re–examination scheduled following resolution of the condition.

(7) If the disqualification of the soldier is permanent or if it is determined that the disqualifying condition will be present for an extended period of time, the physician may refer the soldier to a medical board if the soldier does not meet medical retention standards. DA Form 3349 will be completed outlining specific limitations.

## 8–25. Cardiovascular Screening Program

*a.* The CVSP is required at the time of the periodic examination for all active duty, ARNG/ARNGUS, and USAR (Selective Reserve) soldiers age 40 and older.

*b.* The examination will consist of:

(1) Physical examination (DD Form 2808).

(2) Fasting blood sugar.

(3) Fasting lipid profile, including total cholesterol, LDL, HDL, and triglycerides.

(4) EKG.

(5) Smoking history.

(6) Blood pressure.

*c.* Medical followup by a health practitioner qualified to measure, interpret and treat cardiovascular risk factors for

soldiers who meet one or more of the following criteria: Use of tobacco products (any current use of cigarettes; frequent (daily) use of cigars).

*d.* Medical followup by a physician qualified to measure, interpret and treat cardiovascular risk factors for soldiers who meet one or more of the following criteria:

(1) A HDL cholesterol less than 35 mg/dL for men, less than 45 mg/dL for women, a LDL cholesterol greater than 160 mg/dL, triglycerides greater than 400 mg/dL or non-HDL cholesterol greater than 190 mg/dL (if LDL cholesterol is unavailable).

(2) A systolic blood pressure equal to or greater than 140 mm Hg, or a diastolic blood pressure equal to or greater than 90 mm Hg. (Followup is not necessary if 3 day serial blood pressure readings do not confirm elevated blood pressures.)

(3) Elevated fasting blood sugar greater than 115 mg/dL.

(4) Abnormal Q waves or other electrocardiographic findings suspicious for possible heart disease.

(5) Other medical conditions as defined by paragraphs 2–18 and 3–21 through 3–24.

(6) Any symptom (chest pain, dizziness, claudication, shortness of breath) that is suspicious for possible cardiac or atherosclerotic etiology. In the case of acute cardiac findings, immediate/emergency referral will be made.

*e.* The purpose of medical referral is to confirm the presence of a modifiable coronary risk factor and to advise and initiate medically appropriate treatments with the intent to modify cardiovascular risk. This followup may take place at the original examination site depending on availability of personnel (for example, smoking cessation counseling).

*Note.* If the soldier is already under treatment and the values are normal while on treatment, a separate referral for the purpose of the CVSP is not required. The medical records need to document the medical history, what treatment the soldier is currently under, and where the soldier is obtaining the treatment. If the values are not normal, the soldier will be referred back to his or her primary care provider for further care.

*f.* RC soldiers will be referred to their own medical provider outside of the military system for any further followup evaluation, treatment, etc. The soldier will provide copies of any records from their civilian medical provider pertaining to the evaluation for inclusion in their military medical health record.

*g.* Medical records will be annotated that any required referrals have been made. All evaluations and recommendations from the medical followup examination on active and RC soldiers will be placed in the medical record.

*h.* For all soldiers upon reaching the age of 40, there is no need to require the cardiovascular screen prior to continuing PT and participating in the APFT. However, if a physician feels a profile restricting physical activity is warranted, the physician will complete the medical profile DA Form 3349 in accordance with chapter 7.

## 8–26. Speech Recognition in Noise Test for H3 profile soldiers

*a.* The Speech Recognition in Noise Test (SPRINT) will be used by audiologists at all Army facilities to assess all H–3 soldiers to provide recommendations concerning a potential communication handicap.

*b.* The tape-recorded test consists of monosyllabic words from the NU–6 lists in a background of speech babble noise. Normative data has been developed (see fig 8–1) so that the soldier's score can be compared to a large sample of H–3 soldiers' scores. This score, as a function of the soldier's length in service, will be used to determine an appropriate recommendation based on table 8–3.

*c.* These recommendations should be made to MMRBs and MEBs, and considered when completing the physical profile assignment limitations on DA Form 3349. The recommendations provide appropriate information with which the boards can make a final determination.

**Table 8–1**
**Recording of medical examination[1]**

| Item box number | | Explanatory notes and Model entries   (Model entries are in parentheses) Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 1 | (Date of examination) | Enter the date on which the medical examination is accomplished. |
| 2 | (Social security number) | Examinee's social security number. (SSN 396–38–0699) |
| 3 | (Name) | The entire last name, first name, and middle name are recorded. When Jr. or similar designation is used, it will appear after the middle name. (Jackson, Charles John) |
| 4 | (Home address) | Examinee's current mailing address (not the "home of record"—if different) (Street number, City, State, Zip Code or Unit mailing address) |
| 5 | (Telephone number) | Enter telephone number where the examinee can be reached—home or unit (202–555–1212) |
| 6 | (Grade) | Enter examinee's grade (E8, O4) |
| 7 | (Date of birth) | Record as year, month, day |

Table 8–1
Recording of medical examination[1]—Continued

| Item box number | | Explanatory notes and Model entries   (Model entries are in parentheses)<br>Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 8 | (Age) | List years of age at the time of examination (28 yr.) |
| 9 | (Sex) | Check female or male |
| 10 | (Race) | Check the applicable block |
| 11 | (Years of government service) | Not required |
| 12 | (Agency if not DOD) | To be used by other agencies as appropriate |
| 13 | (Organization unit) | The examinee's current military unit of assignment, Active or Reserve. If no current military affiliation, enter a dash.<br>(for example, "B Company, 2D Battalion, 325th, Infantry, 82nd Airborne Division, Fort Bragg, NC 28307–5100") |
| 14a | (Rating or specialty)<br>(Aviators only) | Not required on Army examinations unless directed by USAAMC |
| 14b | Total Flying Time<br>(Aviators only) | Not required on Army examinations unless directed by USAAMC |
| 14c | Last 6 Months<br>(Flying Time – Aviators only) | Not required on Army examinations unless directed by USAAMC. |
| 15a | (Service) | Check the appropriate service |
| 15b | (Component) | Check the appropriate component |
| 15c | (Purpose of examination) | Check or enter the purpose of the examination. |
| 16 | (Name of examining facility) | Name of the examining facility or examiner and address. If an Army post office, include local national location (Military Entrance Processing Station, 310 Gaston Ave., Fairmont, WV 12441–3217). |
| 17[2] | (Head, face, neck, scalp) | Record all swollen glands, deformities, or imperfections of the head or face. If a defect of the head or face, such as moderate or severe acne, cyst, exostosis, or scarring of the face is detected, a statement will be made as to whether this defect will interfere with the wearing of military clothing or equipment. If enlarged lymph nodes of the neck are detected they will be described in detail and a clinical opinion of the etiology will be recorded. |
| 18 | (Nose) | Record all abnormal findings. Record estimated percent of obstruction to airflow if septal deviation, enlarged turbinates, or spurs are present. |
| 19 | (Sinuses) | Record all abnormal findings ("Marked tenderness over left maxillary sinus"). |
| 20 | (Mouth, throat) | Record any abnormal findings. Enucleated tonsils are considered abnormal. (Tonsils enucleated) |
| 21 | (Ears) | If operative scars are noted over the mastoid area, a notation of simple or radical mastoidectomy will be entered (for example, "Bilateral severe swelling, injection and tenderness of both ear canals"). |
| 22 | (Eardrums) | Record all abnormal findings. In the event of scarring of the tympanic membrane, the percent of involvement of the membrane will be recorded as well as the mobility of the membrane. If tested, a definite statement will be made as to whether the eardrums move on valsalva maneuver or not and also noted in item 72b. |
| 23 | (Eyes) | Record abnormal findings. If ptosis of lids is detected, a statement will be made as to the cause and extent of the interference with vision. When pterygium is found, the following should be noted:<br><br>1. Encroachment on the cornea, in millimeters,<br>2. Progression,<br>3. Vascularity.<br><br>For example, "Ptosis, bilateral, congenital. Does not interfere with vision. Pterygium, left eye, 3mm encroachment on cornea; nonprogressive, avascular." |
| 24 | (Ophthalmoscope) | Whenever opacities of the lens are detected, a statement is required regarding size, progression since last examination, and interference with vision (for example, "Redistribution of pigment, macular, Rt eye, no loss of visual function. No evidence of active organic disease"). |
| 25 | (Pupils) | Record all abnormal findings. |
| 26 | (Ocular motility) | Record all abnormal findings. |

Table 8–1
Recording of medical examination[1]—Continued

| Item box number | | Explanatory notes and Model entries   (Model entries are in parentheses)<br>Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 27 | (Heart) | Abnormal heart findings are to be described completely. Whenever a cardiac murmur is heard, the time in the cardiac cycle, the intensity, the location, transmission, effect of respiration, or change in the position, and a statement as to whether the murmur is organic or functional will be included. When murmurs are described by grade, indicate basis of grade (for example, "Grade II/IV soft, systolic murmur heard only in pulmonic area and on recumbency, not transmitted. Disappears on exercise and deep inspirations, physiological murmur"). |
| 28 | (Lungs and chest) | Lungs: If rales are detected, state cause. The examinee will be evaluated on the basis of the cause of the pulmonary rales or other abnormal sounds and not simply on the presence of such sounds (for example, "Sibilant and sonorous rales throughout chest. Prolonged expiration").<br>Breast exam: Note location, size, shape, consistency, discreteness, mobility, tenderness, erythema, dimpling over the mass, etc. |
| 29 | (Vascular system) | Adequately describe any abnormalities. When varicose veins are present, a statement will include location, severity, and evidence of venous insufficiency (for example, "Varicose veins, mild, posterior superficial veins of legs. No evidence of venous insufficiency"). |
| 30 | (Anus, rectum)<br>(Prostate if indicated) | A definite statement will be made that exam has been performed. Note surgical scars and hemorrhoids in regard to size, number, severity, and location. Check fistula, cysts, and other abnormalities (for example, "One small external hemorrhoid, mild. Digital rectal normal. Stool guaiac negative"). In prostate exam note grade of prostatic enlargement, surface, consistency, shape, size, sensitivity, mobility. |
| 31 | (Abdomen, viscera) | Include hernia. Note any abdominal scars and describe the length in inches, location, and direction. If a dilated inguinal ring is found, a statement will be included in item 31 as to the presence or absence of a hernia (2-inch linear diagonal scar, right lower quadrant). |
| 32 | (External genitalia) | Describe any abnormalities. Include results of testicular exam on males. |
| 33 | (Upper extremities) | Record any abnormality or limitation of motion. If applicant has a history of previous injuries or fracture of the upper extremity, as, for example, a history of a broken arm with no significant finding at the time of examination, indicate that no deformity exists and function is normal. A positive statement is to be made even though the "normal" column is checked. If a history of dislocation is obtained, a statement that function is normal at this examination, if appropriate, is desired (for example, "No weakness, deformity, or limitation of motion, left arm"). |
| 34 | (Lower extremities) | Record any abnormality or limitation of motion. If applicant has a history of previous injuries or fracture of the lower extremity, as, for example, a history of a broken leg with no significant finding at the time of examination, indicate that no deformity exists and function is normal. A positive statement is to be made even though the "normal" column is checked. If a history of dislocation is obtained, a statement that function is normal at this examination, if appropriate, is required (for example, "No weakness, deformity, or limitation of motion, left leg"). |
| 35 | (Feet) | Record any abnormality. When flat feet are detected a statement will be made as to the stability of the foot, presence of symptoms, presence of eversion, stable, bulging of the inner border, and rotation of the astragalus. Pes planus will not be expressed in degree but should be recorded as mild, moderate, or severe (for example, "Flat feet, moderate. Foot asymptomatic, no eversion or bulging; no rotation"). Circle category relating to arch, degree, and symptoms. |
| 36 | (Spine, other musculoskeletal) | Include pelvis, sacroiliac, and lumbosacral joints. Check history. If scoliosis is detected, the amount and location of deviation in inches from the midline will be stated. |
| 37 | (Identifying body marks) | Only scars or marks of purely identifying significance or those that interfere with function are recorded here. Tattoos that are obscene or so extensive as to be unsightly will be described fully (for example, "1-in. vertical scar, dorsum; 3-in. heart–left forearm; shaped tattoo, lateral aspect middle 1/3 left arm"). |
| 38 | (Skin) | Describe pilonidal cyst or sinus. If skin disease is present, its chronicity and response to treatment should be recorded. State also whether the skin disease will interfere with the wearing of military clothing or equipment (for example, "Small discrete angular, flat papules of flexor surface of forearms with scant scale; violaceous in color; umbilicated appearance and tendency to linear grouping"). |
| 39 | (Neurologic) | Record complete description of any abnormality. |
| 40 | (Psychiatric) | Record all abnormalities. Before a psychiatric diagnosis is made, a minimum psychiatric evaluation will include Axis I, II, and III. |

Table 8–1
Recording of medical examination[1]—Continued

| Item box number | | Explanatory notes and Model entries   (Model entries are in parentheses) Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 41 | (Pelvic) | Note type of exam (for example, "bi-manual"). Record any abnormal findings. (See item 52a for pap smear.) |
| 42 | (Endocrine): | Describe every abnormality noted. |
| 43 | (Dental) | Examining physicians will apply the appropriate standards prescribed by chapters 2, 3, 4, or 6, and indicate "acceptable"or "non-acceptable." This does not replace the required annual dental examination by a dentist or the dentist's determination of the appropriate dental classification. |
| 44 | (Notes) | Describe every abnormality noted. Enter pertinent item number before each comment. Continue in item 73 if necessary. |
| 45[3] | (Urinalysis) a. Albumin b. Sugar | Record results (For other urine microscopic or specific gravity, record in box 52c.) |
| 46 | (Urine HcG) | Record results |
| 47 | (Hemoglobin/hematocrit) | Record Results |
| 48 | Blood Type | Record Results |
| 49 | (HIV) | Record date, results, add HIV specimen ID label in indicated section. |
| 50 | (Drugs) | Record results of Drug Tests, add Drug Test Specimen ID to indicated space. |
| 51 | (Alcohol) | Record results of alcohol screen |
| 52 | (Other / results) | 52a (use to record results of pap smear) 52b (use to record PSA result) 52c (use to record urine microscopic or urine specific gravity.) |
| 53 | (Height) | Record in inches to the nearest quarter inch (without shoes). For initial Classes 1 and 1A, initial Class 2 (Aviator), and continuance Class 2 (Aviator) not previously measured: Leg length, sitting height, and functional arm reach will be measured, in accordance with Aeromedical policy letters. |
| 54 | (Weight) | Record in pounds to the nearest whole pound (in PT clothes without shoes, or hospital gown). |
| 55 | (Maximal allowable weight) | This item is for accession medical examinations only. This does not replace the official weigh-in for soldiers in conjunction with the APFT and AR 600–9 |
| 56 | (Temperature) | Record in degrees Fahrenheit to the nearest tenth |
| 57 | (Pulse) | Record with arm at heart level |
| 58 a,b,c | (Blood pressure) | Record Results (for example, 110/76) 58 b and c are only required if elevated. |
| 59 | (Red/green vision test) | If examinee fails the color vision test in item 66, he/she will be tested to ensure he/she can distinguish between vivid red and vivid green and the results recorded as pass or fail. |
| 60 | (Other eye or vision test) | For example, results of red lens test. |
| 61 | (Distant vision) | Record in terms of the English Snellen Linear System (20/20, 20/30, etc.) of the uncorrected vision of each eye. If uncorrected vision of either eye is less than 20/20, entry will be made of the corrected vision of each eye (for example, "Right 20/50 corrected (corr) to 20/20 and Left 20/70 corr to 20/20"). |
| 62 | (Refraction) | The word "manifest" or "cycloplegic," whichever is acceptable, will be entered after refraction. An emmetropic eye will be indicated by plano or 0. For corrective lens, record refractive value (for example, "Right By −1.25 S − 0.25 CX 005. Left By −1.75 S − 0.25 CX 175"). |
| 63 | (Near vision) | Record results in terms of reduced Snellen. Whenever the uncorrected vision is less than normal (20/20), enter the corrected vision for each eye and lens value after the word "by" (for example, "Right 20/40 corr to 20/20 by Same and Left 20/40 corr to 20/20 by + 0.50"). |
| 64 | (Heterophoria) | Identify the test used; for example, either Maddox Rod or Stereoscope, Vision Testing (SVT), and record results, Prism Divergence not required. All subjective tests will be at 20 feet or at a distance setting of the SVT. Record distance interpupillary distance (PD) in mm (for example, "Esophoria degree 4 Exophoria degree 0. right hyperphoria 0 left hyperphoria 0., PD 63"). |

Table 8–1
Recording of medical examination[1]—Continued

| Item box number | | Explanatory notes and Model entries  (Model entries are in parentheses)<br>Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 65 | (Accommodation) | Record values without using the word "diopters" or symbols (for example, "Right 10.0; Left 9.5"). |
| 66 | (Color vision) | Record results in terms of test used, the results and the number of plates missed over number of plates in test. The FALANT (USN) may be utilized. If the examinee fails either of these tests, he or she will be tested for Red/Green vision and the results recorded in item 59 (for example, "PIP, pass, 3/14 or PIP, fail, 9/14"). |
| 67 | (Depth perception) | Identify the test used. Record the results "Corrected" or "Uncorrected," as applicable. Enter the score for Verhoeff or vision testing apparatus as "pass" or "fail" plus the number missed over maximum score for that test (for example, "Verhoeff pass 0/8; vision test apparatus (VTA) pass through D; VTA fail 1/9. Randot circles pass 0/10"). |
| 68 | (Field of vision) | Identify the test used and the results. If a vision field defect is found or suspected in the confrontation test, a more exact perimetric test is made using a perimeter and/or tangent screen. Findings are recorded on a visual chart and described in item 77. Copy of the visual chart must accompany the original DD Form 2808 (for example, "Confrontation test: Normal, full"). |
| 69 | (Night vision) | Test used and Score |
| 70 | (Intraocular tension) | Identify type of test used: applanation or non-contact. Record results numerically in millimeters of mercury of intraocular pressure. Describe any abnormalities (for example, "Normal O.D. 18.9 O.S. 17.3"). |
| 71a,b | (Audiometer) | Test and record results at 500, 1000, 2000, 3000, 4000, and 6000 Hertz using procedures prescribed in DA Pam 40–501. (71b is used for repeat tests if applicable) |
| 72a | (Read Aloud Test) | Enter RAT satisfactory or unsatisfactory |
| 72b | (Valsalva) | Enter satisfactory or unsatisfactory |
| 73 | (Notes) | Examiner will enter notes on examination as necessary. Significant medical events in the individual's life, such as major illnesses or injuries and any illness or injury since the last in-service medical examination, will also be entered. Such information will be developed by reviewing health record entries and questioning the examinee. Complications or sequelae, or absence thereof, will be noted where appropriate. Comments from other items may also be continued in this space.<br><br>This space is also used for additional tests when there is no specific box for the test on the DD 2808. For instance enter the results, if accomplished, of EKGs, chest x–rays, FBS, Fasting lipid profile, cholesterol, occult blood tests, sickle cell screens. Overprints or stamps may be used in this space. |
| 74a[4] | (Examinee/applicant qualification) | Indicate is qualified or not qualified for service. NOTE: EXAMINER SHOULD CORRESPOND THIS WITH THE PURPOSE OF THE EXAMINATION AS CHECKED IN ITEM 15c AND MUST CHECK EITHER QUALIFIED OR UNQUALIFIED IN THIS SECTION AND INSERT WHAT THE SOLDIER/APPLICANT IS QUALIFIED FOR (FOR EXAMPLE, "QUALIFIED FOR ACCESSION (Chap 2); QUALIFIED FOR RETENTION (Chap 3); QUALIFIED FOR SEPARATION (Chap 3); QUALIFIED FOR RETIREMENT (Chap 3)"). |
| 74b | (Physical profile) | The physical profile as prescribed in chapter 7 will be recorded. Any permanent profile with above a numerical designator of 1 should have a DA Form 3349 attached (for example, "111121"). |
| 75 | (Signature of examinee) | The examinee will sign the DD Form 2808 if he/she has a disqualifying condition to indicate that he/she has been advised of the disqualifying condition. |
| 76 | (Significant or Disqualifying Defects) | List the significant or disqualifying defects. On accession exams, list the correct ICD 9 code from chapter 2 that corresponds to the disqualifying condition. Any medical waivers for accession should also be noted here. |
| 77 | (Summary of defects) | Summarize medical and dental defects considered to be significant. Those defects considered serious enough to require disqualification or future consideration, such as waiver or more complete survey, must be recorded. Also record any defect that may be of future significance, such as nonstatic defects that may become worse. Enter item number followed by a short, concise diagnosis; do not repeat the full description of a defect that has already been described under the appropriate item. Do not summarize minor, non-significant findings. |
| 78 | (Recommendations) | Notation will be made of any further specialized examinations or tests that are indicated. |
| 79 | (MEPS WORKLOAD) | (MEPS use only) |

**Table 8–1**
**Recording of medical examination[1]—Continued**

| Item box number | | Explanatory notes and Model entries   (Model entries are in parentheses) Refer to the glossary for acronyms and abbreviations used |
|---|---|---|
| 80 | (Medical inspection date and physicians signature) | Used at the MEPS and includes inspection prior to movement to basic training of ht, wt, body fat if applicable, pregnancy test and a note of qualified or unqualified. The physician signature is the physician who has done the inspection and should not be confused with items 83–85 that are the signatures of the medical examiners who accomplished and reviewed the medical examination. |
| 81–84 | (Physician or examiner) | Enter the typed or printed names of examiner and signature (physician, posterior anterior or NP). If examination is not performed by a physician, a physician must co-sign the form in item 82a. |
| 85 | Administrative review | Any administrative review should be noted here by the signature of the reviewer, grade and date. Also indicate the number of attached sheets if applicable. |
| 86 | (Waiver Granted) | Indicate if a waiver was granted, date and by whom. |
| 87 | (Number of attached Sheets) | List the number of any attached sheets needed. |

Notes:
[1] Not all items are required on all examinations. See paragraph 8–12 to determine the scope of the examination based on the purpose of the examination.
[2] Note on the DD Form 2808, items 17 though item 39, the examiner must check normal, abnormal or NE (not examined). All abnormalities will be described in item 44 and continued in items 73 and 77 if needed.
[3] On page two of the DD 2808, re-enter the name and social security number of the examinee in the spaces provided.
[4] On page three of the DD 2808, re-enter the name and social security number of the examinee in the spaces provided.


**Table 8–2**
**Schedule of separation medical examination[4]**

| Action | Required | Not Required | Can be requested by soldier (in writing) |
|---|---|---|---|
| Retirement after 20 years or more of active duty | X | | |
| Retirement from active service for physical disability, permanent or temporary, regardless of length of service. | X | | |
| Expiration of term of active service (separation or discharge, less than 20 years of service). | | X | X |
| Upon review of health record, evaluating physician or physician assistant at servicing MTF determines that, because of medical care received during active service, medical examination will serve the best interests of soldier and Government: for example, hospitalization for other than diagnostic purposes within 1 year of anticipated separation date. | X | | |
| Individual is member of the ARNGUS on active duty or ADT in excess of 30 days. | | X | X |
| Individual is member of the ARNGUS and has been called into Federal service (10 USC 3501). (See paragraph 8–23b.) | | | |
| Prisoners of war, including internees and repatriates, undergoing medical care, convalescence or rehabilitation, who are being separated. | X | | |
| Officers, warrant officers, and enlisted soldiers previously determined eligible for separation or retirement for physical disability but continued on active duty after complete physical disability processing (AR 635–40, chapter 6, and predecessor regulations). | X (Plus MEB and PEB) | | |
| Officers and warrant officers being processed for separation under provisions of specific sections of AR 600–8–24 that specify medical examination and/or mental status evaluation. | X | | |
| Officers and warrant officers being processed for separation under provisions of specific sections of AR 600–8–24, when medical examination and/or mental status evaluation is not a requirement. | | X | X |
| Enlisted soldiers being processed for separation under provisions of AR 635–200, chapters 5 (paras 5–3, (involuntary separations only), 5–11, and 5–12 only), 8, 9, 11 (para 11–3b only), 12, and 18. | X | | |

**Table 8–2**
**Schedule of separation medical examination\*—Continued**

| Action | Required | Not Required | Can be requested by soldier (in writing) |
|---|---|---|---|
| Enlisted soldiers being processed for separation under provisions of AR 635–200, chapters 13, 14, (sec III only), and 15 (both mental evaluation and medical examination required). | X | | |
| Enlisted soldiers being processed for separation under provisions of AR 635–200, chapter 10. (If a medical examination is requested by the soldier, then mental status evaluation is required.) | | | X |
| Discharge in absentia (officers and enlisted soldiers): | | | |
| Civil confinement. | | X | |
| When a Bad Conduct Discharge or a Dishonorable Discharge is upheld by appellate review and the individual is on excess leave. | | X | |
| Deserters who do not return to military control. | | X | |
| Enlisted soldiers being processed for separation under provisions of AR 635–200, paragraphs 5–3 (involuntary separations only), 5–11, 5–12, 5–17, and 11–3b and chapters 8, 9, 12, and 18. | | X | X |

Notes:
\* See paragraph 8–23 for additional information on medical examinations for separation/retirement.

**Table 8–3**
**Results of Speech Recognition in Noise Test (SPRINT)**

| Categories and Recommendations | |
|---|---|
| A | Retention in current assignment. |
| B | Retention in current assignment with restrictions. |
| C | Reassignment to, or retention in, non–noise hazardous area of concentration (AOC)/MOS. |
| D. | Discretionary. (The audiologist should make a recommendation of Category C or E based on such factors as stability of loss, potential for further noise exposure, the soldier's AOC/MOS, and the recommendation of the soldier's commander. However, if the soldier has 18 or more years of active Service, the audiologist may recommend Category B.) |
| E | Separation from service. |

| CATEGORY | RECOMMENDATION |
|---|---|
| A | Retention in current assignment |
| B | Retention in current assignment with restrictions |
| C | Re-assignment to (or retention in) non-noise hazardous AOC/MOS |
| D | Discretionary ** |
| E | Separation from service |

** For soldiers falling in category D, the audiologist can make a recommendation associated with any category adjacent to Category D. Except for patients with 18+ years on active duty (for which a Category B recommendation could be made), this choice will be between Category C (re-assignment) or Category E (separation). The decision of which recommendation to make should be based on such factors as stability of loss, potential for further noise exposure, the soldier's AOC/MOS, and the recommendation of the local commander.



Figure 8–1. Normative data from speech recognition in noise test

## Appendix A
## References

### Section I
### Required Publications

**AR 40–3**
Medical, Dental, and Veterinary Care. (Cited in paras 8–12*b*(3) and 10–27*c*(2).)

**AR 40–8**
Temporary Flying Restrictions Due to Exogenous Factors. (Cited in para 6–13*a*.)

**AR 40–29/AFR 160–13/NAVMEDCOMINST 6120.2/CG COMDTINST M6120.8**
Medical Examination of Applicants for United States Service Academies, Reserve Officer Training Corps (ROTC) Scholarship Programs, Including 2- and 3-year College Scholarship Programs (CSP), and the Uniformed Services University of the Health Sciences (USUHS). (Cited in paras 1–6*c*, 8–7*c*, 8–10, 8–12*f*, and 8–15.)

**AR 40–66**
Medical Record Administration and Health Care Documentation. (Cited in paras 8–5*b*, 8–17, and 8–24*b*(5).)

**AR 40–400**
Patient Administration. (Cited in paras 3–3, 6–9*e*(2), 6–9*e*(3), 6–9*e*(5), 8–4*a*, 8–8, and 8–23*e*.)

**AR 40–562/AFJI 48–110/BUMEDINST 6230.15/CG COMDTINST M6230.4E**
Immunizations and Chemoprophylaxis. (Cited in paras 9–6*a* and 10–9.)

**AR 55–46**
Travel Overseas. (Cited in para 5–14*c*.)

**AR 95–1**
Flight Regulations. (Cited in para 6–11*d*.)

**AR 95–20/AFJI 10–220/NAVAIRINST 3710.1E/DCMA INST 8210.1**
Contractor's Flight and Ground Operations. (Cited in para 4–31*a*(2).)

**AR 135–18**
The Active Guard/Reserve (AGR) Program. (Cited in para 10–3*b*.)

**AR 135–100**
Appointment of Commissioned and Warrant Officers of the Army. (Cited in para 9–5*a*.)

**AR 135–175**
Separation of Officers. (Cited in paras 3–7*h*, 9–10*a*, and 9–13*d*.)

**AR 135–178**
Army National Guard and Army Reserve Enlisted Administrative Separations. (Cited in paras 3–7*h*, 9–10*a*, and 9–13*d*.)

**AR 140–10**
Assignments, Attachments, Details, and Transfers. (Cited in paras 3–7*h*, 9–10*a*, 9–13*a*, and 9–13*d*.)

**AR 145–1**
Senior Reserve Officers' Training Corps Program: Organization, Administration, and Training. (Cited in paras 8–15 and 9–2*a*(1).)

**AR 145–2**
Organization, Administration, Operation, and Support. (Cited in para 9–2*a*(1).)

**AR 600–8–24**
Officer Transfers and Discharges. (Cited in paras 3–3*b*, and 7–9*b*(3), and table 8–2.)

**AR 600–8–101**
Personnel Processing (In-, Out-, Soldier Readiness, Mobilization, and Deployment Processing). (Cited in para 5–14c.)

**AR 600–8–105**
Military Orders. (Cited in para 6–18f(2).)

**AR 600–9**
The Army Weight Control Program. (Cited in paras 2–21a, 4–17, 4–31c, 5–9l, 5–11l, 5–11m(2), and 7–13 and tables 2–1 and 2–2.)

**AR 600–85**
Army Substance Abuse Program (ASAP). (Cited in para 4–23h(2).)

**AR 600–105**
Aviation Service of Rated Army Officers. (Cited in paras 4–2b(2), 4–2c, 4–23l, 4–29a, 4–29b, 6–2a, 6–2k, 6–4f, 6–4j(4), 6–4j(7), 6–8b(4), 6–10f, 6–11c, 6–11i(1), 6–12b(1), 6–17b, 6–17f, 6–19c(4), 6–19g, and table 8–1.)

**AR 600–106**
Flying Status for Nonrated Army Aviation Personnel. (Cited in paras 4–2d and 6–2a.)

**AR 600–110**
Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus (HIV). (Cited in paras 3–7h, 4–5b, 4–33b(8), 8–12c(2), 8–12d(2), 8–12f(2), 8–14a(8), and 10–22c.)

**AR 601–270/AFR 33–7/MCO P–1100.75A**
Military Entrance Processing Stations (MEPS). (Cited in paras 8–4a and 8–15.)

**AR 608–75**
Exceptional Family Member Program. (Cited in para 5–14b.)

**AR 611–85**
Aviation Warrant Officer Training. (Cited in para 4–2a(1).)

**AR 611–110**
Selection and Training of Army Aviation Officers. (Cited in para 4–2a(1).)

**AR 614–30**
Overseas Service. (Cited in para 7–9d(1).)

**AR 614–200**
Enlisted Assignments and Utilization Management. (Cited in para 5–14c.)

**AR 635–40**
Active Duty Enlisted Administrative Separations. (Cited in paras 2–2c(2)(b), 3–3, 3–3b, 3–3e, 3–7h, 6–12b(1), 6–12b(2), 8–23e, 10–26b, table 7–2, and table 8–2.)

**AR 635–200**
Active Duty Enlisted Administrative Separations. (Cited in paras 2–2c(2)(a), 3–3b, 7–9b(3), and table 8–2.)

**TB MED 287**
Pseudofolliculitis of the Beard and Acne Keloidalis Nuchae. (Cited in para 7–3e(4).) (Available at http://www.armymedicine.army.mil.)

**TC 8–640**
Joint Motion Measurement. (Cited in paras 2–9a, 2–10a, 3–12b, and 3–13d.)

**APL series**
Aeromedical Policy Letters. (Cited in paras 4–1*e*, 4–4*d*, 4–5*a*(2), 4–6*b*, 4–8, 4–9, 4–10, 4–11*g*(1), 4–11*g*(2), 4–12*a*(4), 4–12*a*(5), 4–13*c*, 4–13*d*, 4–13*e*, 4–15*a*(6), 4–15*a*(12), 4–15*a*(15), 4–15*b*, 4–15*e*, 4–15*f*, 4–15*i*, 4–18*e*, 4–20*a*, 4–23*h*(2), 4–23*i*, 4–23*m*,, 4–27*b*, 4–31*b*(1), 4–31*b*(3), 4–32*a*, 4–33*b*(5), 4–33*b*(10), 6–2*d*, 6–2*q*, 6–5*b*, 6–9*b*, 6–10*e*, 6–11*f*, 6–12*a*, 6–12*c*(3), 6–12*e*, 6–15*d*, 6–17*c*,, and 6–19*b*.) (Available at http://www.rucker.amedd.army.mil/flightsurgeons.html.)

**ATB series**
Aeromedical Technical Bulletins. (Cited in paras 4–1*e*, 4–5*b*, 4–12*a*(3), 4–12*a*(6), 4–15*a*(15), 4–15*f*, 4–30, 4–31*b*(1), 4–31*b*(3), 4–32*a*, 4–33*b*(8), 6–2*d*, 6–5*b*, 6–7*b*, 6–9*a*, 6–10*e*, 6–11*d*, 6–12*a*, 6–12*c*(3), 6–12*i*(3), 6–13*c*, 6–17*c*, 6–19*b*, and 8–12*i*.) (Available at http://www.rucker.amedd.army.mil/flightsurgeons.html.)

**DSM–IV**
Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Revised, American Psychiatric Association. (Cited in paras 3–30*j* and 4–23.) (This manual may be ordered at www.appi.org.)

**Section II**
**Related Publications**
A related publication is a source of additional information. The user does not have to read a related publication to understand this regulation. Unless otherwise indicated, DOD publications are available at http://www.dtic.mil/whs/directives. The United States Code and the Code of Federal Regulations are available at http://www.gpoaccess.gov/.

**AR 40–5**
Preventive Medicine

**AR 40–562/AFJI 48–110/BUMEDINST 6230.15/CG COMDTINST M6230.4E**
Immunizations and Chemoprophylaxis

**AR 135–91**
Service Obligations, Methods of Fulfillment, Participation Requirements, and Enforcement Procedures

**AR 135–133**
Ready Reserve Screening, Qualification Records System and Change of Address Reports

**AR 140–1**
Mission, Organization, and Training

**AR 140–185**
Training and Retirement Point Credits and Unit Level Strength Accounting Records

**AR 350–1**
Army Training and Education

**AR 385–95**
Army Aviation Accident Prevention

**AR 600–8–10**
Leaves and Passes

**AR 600–20**
Army Command Policy

**AR 600–60**
Physical Performance Evaluation System

**AR 611–75**
Management of Army Divers

**AR 614–10**
U.S. Army Personnel Exchange Program With Armies of Other Nations; Short Title: Personnel Exchange Program

**AR 635–10**
Processing Personnel for Separation

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia

**5 CFR Part 339**
Medical qualification determinations. (Available at http://www.gpoaccess.gov.)

**14 CFR Part 61**
Certification: Pilots, flight instructors, and ground instructors. (Available at http://www.gpoaccess.gov.)

**14 CFR Part 65**
Certification: Airmen other than flight crewmembers. (Available at http://www.gpoaccess.gov.)

**14 CFR Part 67**
Medical standards and certification. (Available at http://www.gpoaccess.gov.)

**DA Pam 40–501**
Hearing Conservation Program

**DA Pam 351–4**
U.S. Army Formal Schools Catalog

**DA Pam 600–8**
Management and Administrative Procedures

**DA Pam 611–21**
Military Occupational Classification and Structure

**DFAS–IN Regulation 37–1**
Finance and Accounting Policy Implementation. (Available at http://www.asafm.army.mil.)

**DOD 7000.14–R, Vol 7A**
Department of Defense Financial Management Regulations. (Available at www.dtic.mil/whs/directives.)

**DODD 1308.1**
DOD Physical Fitness and Body Fat Program. (Available at www.dtic.mil/whs/directives.)

**DODD 6130.3**
Physical Standards for Appointment, Enlistment, and Induction. (Available at www.dtic.mil/whs/directives.)

**DODI 1332.39**
Application of the Veterans Administration Schedule for Rating Disabilities. (Available at www.dtic.mil/whs/directives.)

**DODI 6130.4**
Criteria and Procedure Requirements for Physical Standards for Appointment, Enlistment, or Induction in the Armed Forces. (Available at www.dtic.mil/whs/directives.)

**FM 3–04.300**
Flight Operations Procedures. (Available at https://www.us.army.mil/suite/login/welcome.html.)

**FM 3–04.301**
Aeromedical Training for Flight Personnel. (Available at https://www.us.army.mil/suite/login/welcome.html.)

**FM 21–20**
Physical Fitness Training. (Available at https://www.us.army.mil/suite/login/welcome.html.)

**NATO STANAG 3526**
Interchangability of NATO Aircrew Medical Categories. (Available at http://dodssp.daps.mil.)

**NGR 600–200**
Enlisted Personnel Management. (Available at http://www.ngbpdc.ngb.army.mil/arngfiles.asp.)

**OPM Operating Manual**
Qualification Standards Handbook for General Schedule Positions. (Available at http://www.opm.gov/qualifications/index.htm.)

**Publication 70–003–A**
Coronary Risk Handbook. (American Heart Association.) (This publication is available at all medical examining facilities.)

**Publication 70–008–A**
Exercise Testing and Training of Apparently Healthy Individuals. (American Heart Association.) (This publication is available at all medical examining facilities.)

**Publication 70–008–B**
Exercise Testing and Training of Individuals with Heart Disease or at High Risk for Its Development. (American Heart Association.) (This publication is available at all medical examining facilities.)

**Publication 70–041**
The Exercise Standards Book. (American Heart Association.) (This publication is available at all medical examining facilities.)

**TB MED 523**
Control of Hazards to Health From Microwave and Radio Frequency Radiation and Ultrasound. (Available at http://www.armymedicine.army.mil.)

**TB MED 524**
Occupational and Environmental Health: Control of Hazards to Health From Laser Radiation. (Available at http://www.armymedicine.army.mil/.)

**USASOC Suppl 1 to AFJI 48–110/AR 40–562/BUMEDINST 6230.15/CG COMDTINST M6230.4E**
Immunizations and Chemoprophylaxis. (This publication is available from the U.S. Army Special Operations Command, Information Technology Center/Information Services Division, ATTN: AFZA–IT/Installation Publications Center, Fort Bragg, NC 28310.)

**5 USC 552a(b)7**
(Available at http://www.gpoaccess.gov.)

**10 USC 3501**
(Available at http://www.gpoaccess.gov.)

**10 USC 10148**
(Available at http://www.gpoaccess.gov.)

**10 USC 10206**
(Available at http://www.gpoaccess.gov.)

**10 USC 12301–12304**
(Available at http://www.gpoaccess.gov.)

**Section III**
**Prescribed Forms**
Except where otherwise indicated below the following forms are available as follows: DA Forms are available on the APD Web site (http://www.apd.army.mil); DD Forms are available at http://www.dior.whs.mil.

**DA Form 3081**
Periodic Medical Examination (Statement of Exemption). (Prescribed in paras 8–14, 8–19, and 8–23.)

**DA Form 3083**
Medical Examination for Certain Geographical Areas. (Prescribed in para 8–24b(5).)

**DA Form 3349**
Physical Profile. (Prescribed in paras 3–24, 3–25, 7–4, 7–8, 7–9, 7–11, 7–13, 8–12, 8–24, 8–25, 8–26, and 10–25 and table 7–2.)

**DA Form 4186**
Medical Recommendation for Flying Duty. (Prescribed in paras 4–2, 6–2, 6–4, 6–8, 6–9, 6–12, 6–13, 6–15, 6–16, 6–17, and 6–18.)

**DA Form 4497**
Interim (Abbreviated) Flying Duty Medical Examination. (Prescribed in paras 6–7 and 6–9.)

**DA Form 7349**
Initial Medical Review—Annual Medical Certificate. (Prescribed in paras 8–19, 10–5, 10–6, 10–23, 10–25, and 10–28).)

**DD Form 2697**
Report of Medical Assessment. (Prescribed in paras 8–12 and 8–23.)

**DD Form 2807–1**
Report of Medical History. (Prescribed in paras 6–6, 6–7, 6–9, 6–10, 8–5, 8–13, 8–14, 8–24, 9–5, 10–7, 1–20, and 10–23.)

**DD Form 2808**
Report of Medical Examination. (Prescribed in paras 6–6, 6–7, 6–9. 6–10, 7–7, 8–4, 8–5, 8–6, 8–10, 8–12, 8–13, 8–14, 8–23, 8–24, 8–25, 9–5, 10–7, 10–18, 10–20, and 10–25 and table 8–1.)

**Section IV**
**Referenced Forms**
Except where otherwise indicated below the following forms are available as follows: DA Forms are available on the APD Web site (www.apd.army.mil); DD Forms are available at http://www.dior.whs.mil.

**DA Form 1379**
U.S. Army Reserve Components Unit Record of Reserve Training. (This form is available in paper through normal supply channels.)

**DA Form 3725**
Army Reserve Status and Address Verification

**DA Form 4700**
Medical Record—Supplemental Medical Data

**DA Form 5570**
Health Questionnaire for Dental Treatment. (Available through normal forms supply channels.)

**DA Form 5888**
Family Member Deployment Screening Sheet

**DD Form 689**
Individual Sick Slip

**DD Forms 1966/1 through 5**
Record of Military Processing—Armed Forces of the United States

**DD Form 2005**
Privacy Act Statement—Health Care Records

**DD Form 2351**
DOD Medical Examination Review Board (DODMERB) Report of Medical Examination

**DD Form 2766**
Adult Preventive and Chronic Care Flowsheet. (Available through normal forms supply channels.)

**DD Form 2807–2**
Medical Prescreen of Medical History Report

**DD Form 2813**
Department of Defense Active Duty/Reserve Forces Dental Examination

**NGB Form 62**
Application for Federal Recognition as an ARNG Officer or Warrant Officer and Appointment as a Reserve Commissioned Officer or Warrant Officer of the Army in the ARNG of the United States. (This form is available at http://www.ngbpdc.ngb.army.mil.)

**SF 507**
Clinical Record—Report on or Continuation of SF. (Available from http://contacts.gsa.gov/webforms.nsf.)

**SF 513**
Medical Record—Consultation Sheet. (Available from http://contacts.gsa.gov/webforms.nsf.)

**SF 600**
Health Record—Chronological Record of Medical Care. (Available from http://contacts.gsa.gov/webforms.nsf.)

**SF 603**
Health Record–Dental. (This form is available through normal forms supply channels.)

**SF 603–A**
Health Record–Dental–Continuation. (Available through normal forms supply channels.)

## Glossary

**Section I**
**Abbreviations**

**AA**
aeromedical adaptability

**ACAP**
Aeromedical Consultant Advisory Panel

**ACS**
Aeromedical Consultative Service

**ADSW**
active duty for special work

**ADT**
active duty for training

**AEDR**
Aviation Epidemiology Data Register

**AFVT**
Armed Forces Vision Tester

**AGR**
Active Guard—Reserve

**AHRC**
U.S. Army Human Resources Command

**AMC**
Aviation Medicine Consultant

**AMEDD**
Army Medical Department (U.S.)

**ANSI**
American National Standards Institute

**APA**
aeromedical physician assistant

**APFT**
Army Physical Fitness Test

**APL**
Aeromedical Policy Letter

**ARC**
Army Reserve Command

**ARMA**
Adaptability Rating for Military Aeronautics

**ARNG**
Army National Guard

**ARNGUS**
Army National Guard of the United States

**ASD(HA)**
Assistant Secretary of Defense (Health Affairs)

**AT**
annual training

**ATB**
Aeromedical Technical Bulletin

**ATC**
air traffic controller

**AV**
atrioventricular

**CDQC**
(Special Forces) Combat Diving Qualification Course

**cm**
centimeter

**COAD**
continued on active duty

**CONUS**
continental United States

**corr**
corrected

**CT**
Cover Test

**CV**
cardiovascular

**CVSP**
Cardiovascular Screening Program

**DA**
Department of the Army

**DAC**
Department of the Army civilian

**dB**
decibel(s)

**dBA**
dB measured on the A scale

**DCS, G–1**
Deputy Chief of Staff, G–1

**DMO**
diving medical officer

**DMT**
diving medical technician

**DNIF**
duties not to include flying

**DOD**
Department of Defense

**DODMERB**
Department of Defense Medical Examination Review Board

**DSM–IV**
Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition

**E**
eyes (profile)

**EEG**
electroencephalogram

**EKG**
electrocardiogram

**FAA**
Federal Aviation Administration

**FALANT**
Farnsworth Lantern Test (United States Navy)

**FDME**
flying duty medical examination

**FEB**
flying evaluation board

**FEVI**
forced expiratory volume in 1 second

**FFD**
full flying duties

**FS**
flight surgeon

**FTA–ABS**
fluorescent treponemal antibody absorption (test)

**FTNGD**
full–time National Guard duty

**H**
hearing and ear (profile)

**HALO**
high altitude low opening

**HCT**
hematocrit

**HCV**
hepatitis c virus

**HDL**
high–density lipoprotein

**HGB**
hemoglobin

**HIV**
human immunodeficiency virus (see HTLV–III)

**HPSP**
Health Professions Scholarship Program

**HQDA**
Headquarters, Department of the Army

**ICD**
International Classification of Disease

**IDT**
inactive duty training

**in**
inch(es)

**ISO**
International Standards Organization

**L**
lower extremities (profile)

**LOC**
loss of consciousness

**LOD**
line of duty

**m**
minutes

**MAAG**
Military Assistance Advisory Group

**MDRB**
Medical Duty Review Board

**MEB**
medical evaluation board

**MEDCEN**
medical center (U.S. Army)

**MEDDAC**
medical department activity (U.S. Army)

**MEPCOM**
U.S. Military Entrance Processing Command

**MEPS**
military entrance processing stations

**METS**
metabolic equivalents

**MFF**
Military Freefall

**mg**
milligram

**mg/dl**
milligrams per deciliter

**MILPO**
military personnel office

**mm**
millimeter(s)

**mmHg**
millimeters of mercury

**MMRB**
MOS medical retention board

**MOPP**
mission oriented protective posture

**MOS**
military occupational specialty

**MTF**
military treatment facility

**NGB**
National Guard Bureau

**NGR**
National Guard Regulation

**NPC**
near point of convergence

**OCONUS**
outside continental United States

**OCS**
Officer Candidate School

**ODCS, G-1**
Office of the Deputy Chief, G-1

**P**
permanent (profile) and physical capacity or stamina (profile)

**Pap smear (test)**
Papanicolaou's test

**PD**
pupillary distance

**PEB**
physical evaluation board

**PIP**
pseudoisochromatic plates

**PMCS**
preventive maintenance checks and services

**POR**
preparation of replacements for oversea movement

**PT**
physical training

**PULHES**
(see separate letters for profile codes)

**RANDOT**
random dots

**RC**
Reserve Component

**ROTC**
Reserve Officers' Training Corps

**RPR**
rapid plasma reagin (test)

**RRC**
Regional Readiness Command

**rt**
right

**s**
psychiatric (profile)

**SCUBA**
self–contained underwater breathing apparatus

**SERE**
survival, evasion, resistance, escape

**SFAS**
Special Forces Assessment and Selection

**SFQC**
Special Forces Qualification Course

**SIDPERS**
Standard Installation/Division Personnel System

**SPRINT**
speech recognition in noise test

**STARC**
State Area Command

**SVT**
Stereoscope, Vision Testing

**T**
temporary (profile)

**TOE**
table(s) of organization and equipment

**TSG**
The Surgeon General

**U**
upper extremities (profile)

**USAAMA**
U.S. Army Aeromedical Activity

**USAAMC**
U.S. Army Aeromedical Center

**USAJFKSWCS**
U.S. Army John F. Kennedy Special Warfare Center and School

**USAMEDCOM**
U.S. Army Medical Commmand

**USAR**
U.S. Army Reserve

**USAREC**
U.S. Army Recruiting Command

**USASOC**
U.S. Army Special Operations Command

**USMA**
U.S. Military Academy

**USUHS**
Uniformed Services University of the Health Sciences

**VA**
Department of Veterans Affairs

**VDRL**
venereal disease research laboratory (test)

**VTA**
vision testing apparatus

**Section II**
**Terms**

**Accepted medical principles**
Fundamental deduction consistent with medical facts and based upon the observation of a large number of cases. To constitute accepted medical principles, the deduction must be based upon the observation of a large number of cases over a significant period of time and be so reasonable and logical as to create a moral certainty that they are correct.

**Applicant**
A person not in a military status who applies for appointment, enlistment, or reenlistment in the USAR.

**Candidate**
Any individual under consideration for military status or for a military service program whether voluntary (appointment, enlistment, ROTC) or involuntary (induction).

**Civilian physician**
Any individual who is legally qualified to prescribe and administer all drugs and to perform all surgical procedures in the geographical area concerned.

**Enlistment**
The voluntary enrollment for a specific term of service in one of the Armed Forces as contrasted with induction under the Military Selective Service Act.

**Impairment of function**
Any anatomic or functional loss, lessening, or weakening of the capacity of the body, or any of its parts, to perform that which is considered by accepted medical principles to be the normal activity in the body economy.

**Latent impairment**
Impairment of function that is not accompanied by signs and/or symptoms but is of such a nature that there is reasonable and moral certainty, according to accepted medical principles, that signs and/or symptoms will appear within a reasonable period of time or upon change of environment.

**Manifest impairment**
Impairment of function that is accompanied by signs and/or symptoms.

**Medical capability**
General ability, fitness, or efficiency (to perform military duty) based on accepted medical principles.

**Obesity**
Excessive accumulation of fat in the body manifested by poor muscle tone, flabbiness and folds, bulk out of proportion to body build, dyspnea and fatigue upon mild exertion, and frequently accompanied by flat feet and weakness of the legs and lower back.

**Physical disability**
Any manifest or latent impairment of function due to disease or injury, regardless of the degree of impairment, that reduces or precludes an individual's actual or presumed ability to perform military duty. The presence of physical disability does not necessarily require a finding of unfitness for duty. The term "physical disability" includes mental diseases other than such inherent defects as behavior disorders, personality disorders, and primary mental deficiency.

**Physician**
A doctor of medicine or doctor of osteopathy legally qualified to prescribe and administer all drugs and to perform all surgical procedures.

**Retirement**
Release from active military services because of age, length of service, disability, or other causes, in accordance with Army regulations and applicable laws with or without entitlement to receive retired pay. For purposes of this regulation, this includes both temporary and permanent disability retirement.

**Sedentary duties**
Tasks to which military personnel are assigned that are primarily sitting in nature, do not involve any strenuous physical efforts, and permit the individual to have relatively regular eating and sleeping habits.

**Separation (except for retirement)**
Release from the military service by relief from active duty, transfer to a Reserve Component, dismissal, resignation, dropped from the rolls of the Army, vacation of commission, removal from office, and discharge with or without disability severance pay.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

**UNCLASSIFIED**

PIN 015562–000

# USAPD

ELECTRONIC PUBLISHING SYSTEM
OneCol FORMATTER WIN32 Version 219

PIN:          015562–000
DATE:         01-28-05
TIME:         10:15:06
PAGES SET:    125

DATA FILE:    C:\wincomp\r40-501.fil
DOCUMENT:     AR 40–501

SECURITY:     UNCLASSIFIED
DOC STATUS:   REVISION