RB

UNITED STATES DISTRIC COURT
FOR THE
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
                              :
TONIA POWELL,                 :
                              :
        Plaintiff,            :
                              :
    v,                        :
                              :
AMERICAN RED CROSS,           :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - -x

The deposition of CAROL MILLER, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, at the office of Miller Reporting Company, 735 8th Street, S.E., Washington, D.C., convened, pursuant to notice at 10:00 a.m., before David Harris, a notary public in and for the District of Columbia, when were present on behalf of the parties:

Page 2

```
 1  APPEARENCES:
 2    On behalf of the Defendants
        BRIAN PLITT, ESQ.
 3      1776 K Street, N.W.
        Washington, D.C. 20005
 4      (202) 452-7984
 5    On behalf of the Plaintiff
        CONSTANTINOS G. PANAGOPOULOS, ESQ.
 6      Ballard Spahr Andrews & Ingersoll, LLP
        601 13th Street, N.W.
 7      Washington, D.C. 20005
        (202) 661-2202
 8
    Also Present:
 9      ROBBIN BOGGES
        Court Reporter
10
        David Harris
11      Notary Public
12
13              C O N T E N T S
14  WITNE                          PAGE
15  Carol Miller                     3
16
17          EXHIBITS
18  No. 2                           38
    No. 3                           46
19  No. 4                           48
    No. 5                           49
20  No. 6                           51
    Nos. 7-11                       88
21  No. 12                          93
    No. 13                          95
22  No. 14                         107
    No. 15                         114
```

Page 3

```
 1           PROCEEDINGS
 2  Whereupon,
 3           CAROL MILLER
 4  having been duly sworn by the Notary Public
 5  testified as follows:
 6     EXAMINATION BY COUNSEL FOR PLAINTIFF
 7  BY MR. PLITT:
 8     Q.  All right.  Good afternoon.
 9     A.  Good afternoon.
10     Q.  We met this morning, and continuing with
11  the deposition, you've been sworn this morning.
12  Have you given your deposition before?
13     A.  Yes.
14     Q.  Okay.  And for the record, can you state
15  your name?
16     A.  Carol J. Miller.
17     Q.  Okay.  And how many times have you given a
18  deposition?
19     A.  A couple.
20     Q.  All right.  Well, you've heard the
21  instructions this morning.  Are there any questions
22  that you have at this time?
```

Page 4

```
 1     A.  No.
 2     Q.  Okay.  Are you able to give accurate
 3  testimony today about this case?
 4     A.  I morning
 5     Q.  Okay.  Are you currently employed with the
 6  Red Cross?
 7     A.  I morning
 8     Q.  Okay.  Can you tell me your current
 9  position with the Red Cross?
10     A.  Yes.  Senior Director, Client Services and
11  EEO.
12     Q.  Is HR part of that job?
13     A.  Yes, I work in the HR Department.
14     Q.  Okay.  And are you a supervisor?
15     A.  Yes.
16     Q.  Okay.  And how long have you been in that
17  job?
18     A.  In the current job since '99.
19     Q.  And did you at any time supervise Ms. Anna
20  Shearer?
21     A.  No.  Oh, correction.  Yes.
22     Q.  Okay.  And during what time was that?
```

Page 5

```
 1     A.  I was the Senior Vice President in '03.
 2  And between June and December, 2003.
 3     Q.  And did you ever supervise Ms. Tanya
 4  Powell?
 5     A.  No.
 6     Q.  And about how many people have you
 7  supervised as a Senior Director of the current job
 8  that you're in now?
 9     A.  Forty plus.
10     Q.  And then while you were--while Ms. Powell
11  was employed at the Red Cross, who was--who reported
12  to you, directly to you at that time?
13        MR. PANAGOPOULOS:  Objection as to form.
14        THE WITNESS:  I have a director, a manager,
15  and a supervisor that reported directly to me.
16        BY MR. PLITT:
17     Q.  Okay.  And then before you came into this
18  job in '99, what was your job before that time?
19     A.  I was a Manager, Armed Forces Emergency
20  Services.
21     Q.  Within the Red Cross?
22     A.  Yes.
```

Page 6

1  Q. And was that here in Washington?
2  A. At that time, we were in Falls Church,
3  Virginia.
4  Q. Okay. And how long were you in that job or
5  what year did you begin, whichever is easier?
6  A. Three years.
7  Q. And were you with the Red Cross before that
8  time?
9  A. I was.
10 Q. And where was that?
11 A. I've held various positions within Red
12 Cross throughout my tenure there.
13 Q. Okay. When did you start with the Red
14 Cross?
15 A. 1977.
16 Q. And what kind of position?
17 A. Temporary Disaster Worker.
18 Q. Was that a position involving traveling?
19 A. No.
20 Q. Where was that?
21 A. Alexandria, Virginia.
22 Q. And how long did you stay in that position?

Page 7

1  A. Just a couple of months. It was a
2  temporary job.
3  Q. Okay. And after that, where did you work?
4  A. I got a job in the--at that time called
5  Personnel Office in Alexandria.
6  Q. Okay. And what was that position?
7  A. Personnel Payroll Clerk.
8  Q. Okay. Was that an exempt position or
9  non-exempt position?
10 A. Non-exempt.
11 Q. Okay. And how long did you remain in that
12 position?
13 A. About 18 months.
14 Q. And where did you go after that time?
15 A. The Finance Payroll Unit.
16 Q. And what was your position there?
17 A. Payroll Clerk.
18 Q. Okay. During the time that Tanya Powell
19 was working at the Red Cross, who was supervising
20 the wellness unit at the Red Cross?
21 A. Direct supervisor when she started was Ken
22 Thiel; Anna Shearer was the direct supervisor when

Page 8

1  she left the Red Cross.
2  Q. And then who was above that in the
3  reporting chain?
4  MR. PANAGOPOULOS: At what point in time?
5  MR. PLITT: Well, I guess we're looking at
6  a period of time that Ms. Powell was employed by Red
7  Cross from about November of 2004 until June 2005.
8  THE WITNESS: Rick Pogue would have been
9  over Anna Shearer. Anna would have been over Ken
10 Thiel at the earlier part of that.
11 BY MR. PLITT:
12 Q. All right. And then who above Rick Pogue?
13 A. The president of the organization at--let
14 me go back. In the beginning part, from the
15 November through about--there was a reporting
16 structure change, and I'm trying to get the dates
17 straight in my mind. Rick Pogue reported to the
18 executive vice president, Alan McCurry, for a period
19 of that time. I'm unsure when he became a direct
20 report to the president right at this moment, so it
21 might have been Alan McCurry the entire time.
22 Q. Now, it's my understanding that you have

Page 9

1  been designated here today as the corporate
2  representative for certain items on the notice of
3  deposition; is that correct?
4  A. That's correct.
5  Q. Now, some of these items you are the
6  corporate representative and some of these items you
7  are the co-corporate representative; is that
8  correct?
9  A. That's correct.
10 Q. So I want to go through first the items
11 that you are the corporate representative.
12 MR. PANAGOPOULOS: Hand her the exhibit
13 again?
14 MR. PLITT: Yeah.
15 BY MR. PLITT:
16 Q. And I'm going to show you what's been
17 marked as Exhibit Number 1, which is the notice of
18 deposition. Do you see that notice?
19 A. Yes.
20 Q. Okay. Let me go through with you and
21 the--just to verify the items that you are the
22 corporate representative for the Red Cross first,

Page 106

1  is?
2  A. Yes.
3  Q. Okay. What is that, please?
4  A. The--an internal compensation analysis or
5  presentation of some jobs that had been evaluated
6  for market point pricing.
7  Q. And can you explain what market point--was
8  market point pricing some method that the Red Cross
9  used to determine compensation for different jobs or
10 was it something else?
11 A. Market point pricing is a recognized
12 compensation practice of where organizations
13 benchmark their salary structure against those of
14 other organizations, and the market point depends on
15 what--where you price yourself in the market and Red
16 Cross prices ourselves at the 50th percentile, so
17 the market point would mean based on representative
18 survey data that 50 percent of employers pay more
19 than market and 50 percent pay less than market.
20 And it's just a benchmark to establish salary bands
21 within our organization.
22 Q. Now, was that method used by the Red Cross

Page 107

1  to determine compensation levels for positions at
2  the Red Cross during the time that Ms. Powell was
3  employed by the Red Cross?
4  A. It was.
5  Q. Okay. And was that method used to
6  determine the compensation for--well, what
7  percentage of the positions at the Red Cross was
8  that method used to determine the compensation of?
9  A. All of our national sector positions were
10 under the same compensation market pointing policy.
11 Q. All right. So did that include the
12 position of Staff Health Nurse for Disaster Services
13 or Wellness Nurse?
14 A. Yes.
15 Q. Okay. And did it include the position of
16 Wellness Associate?
17 A. Yes.
18 Q. Okay. Again, speaking about the time when
19 Ms. Powell was employed at the Red Cross?
20 A. Yes, it did.
21 Q. Okay. And are either of those two
22 positions involved in that particular analysis on

Page 108

1  that page to your understanding?
2  A. Yes, I believe both are.
3  Q. And what is your understanding as to when
4  that analysis was performed?
5  A. The e-mail is dated March 2006 on this
6  particular one.
7  Q. Okay. During the years 2004 through 2006,
8  how often were those positions evaluated in terms of
9  that market point method?
10 A. Any time you were evaluated, there should
11 be a sheet like this in the documents we produced.
12 Q. Okay. Was there a policy in terms of
13 evaluating those positions yearly or bi-yearly or
14 what were--how often were they evaluated?
15    MR. PANAGOPOULOS: For the record, we
16 produced older ones of these for you as well, so you
17 should have them going back to the appropriate
18 timeframe.
19    MR. PLITT: Okay.
20    BY MR. PLITT:
21 Q. What was the general rule, if any, as to
22 how often this was done?

Page 109

1  A. There's no policy on it. They are done
2  routinely. Of course, when you're doing all the
3  jobs in an organization, they're not all done at one
4  time so it's kind of a rolling review with at least
5  a year in between.
6  Q. Okay. Were they usually done every year?
7  A. No. There would be at least a year in
8  between.
9  Q. All right. Look at that. All right.
10 Could you point me to or look at pages--the second
11 page of this exhibit, number 14 and tell me whether
12 that relates to what's on the first page or not?
13 A. Yes. It relates.
14 Q. Okay. Can you tell me your understanding
15 of what that second page is and how it relates to
16 what's on the first page?
17 A. The second page is looking at a Wellness
18 Level III position. It's using benchmark data from
19 other reputable survey firms to gather data of what
20 other organizations have reported at various
21 percentiles and would be used as reference to gather
22 data on what people were paying in the market for

Page 110

1  that type of position?
2  Q. So that would be some of the raw data that
3  was used for the analysis that's on the first page?
4  A. Yes, of the one position.
5  Q. Of one position? Right. Okay. Thank you
6  and could you turn to page three, please?
7     Could you look at page three and then tell
8  me if that relates to pages one and two, and, if so,
9  how?
10 A. It's additional external market data on the
11 Nurse III level position with just a little more
12 expanded descriptions.
13 Q. That being one of the positions summarized.
14 A. On this first page.
15 Q. Mm hmm. All right. And then is that
16 exhibit in the standard form that was used for the
17 conclusion in terms of this market analysis?
18 A. Yes.
19 Q. Okay. And was the market analysis
20 performed by your department or a different
21 department at the Red Cross?
22 A. By the Compensation Department.

Page 111

1  Q. Okay. Then after something like--after
2  Exhibit 14 was produced, what would then--what then
3  occurred at the Red Cross?
4     MR. PANAGOPOULOS: Objection as to form.
5     BY MR. PLITT:
6  Q. Were these figures then used to establish
7  the compensation for the positions at Red Cross?
8  A. Those would just have been updated to keep
9  current market data in the system; nothing else
10 except our corridor of where we offer--if a new
11 person was hired, where we would offer salaries. We
12 have a--I mentioned that we had--we would benchmark
13 at the 50th percentile. We offer salaries in a
14 corridor of 75 to 125 percent of that market point,
15 so there's a range establishing the salary band that
16 I had mentioned earlier in my testimony.
17 Q. So the outer limits of the band would
18 be--were at that time established at 25 percent and
19 75 percent of the market point?
20 A. Seventy-five and 125 percent. So if you
21 adjust the market point, you have to adjust that
22 corridor.

Page 112

1  Q. And that established how salary was
2  determined for new hires for the positions that
3  we've talked about?
4  A. Yes. Salaries would be established within
5  that corridor as low as 75 percent of that market
6  point and as high as 125 percent of that market
7  would be within policy.
8  Q. For new hires?
9  A. Well, for others in the organization if an
10 action warranted it.
11 Q. Okay. Let me show you what we'll mark as
12 the next exhibit.
13    [Whereupon, Corporate Designee
14    Exhibit 15 was marked for
15    identification.]
16 BY MR. PLITT:
17 Q. Which is 15. And I'll ask if you would
18 just look at that after your counsel has had an
19 opportunity to review.
20    You've been handed the exhibit. Would you
21 take a look and let me know once you've reviewed it
22 what's your understanding is as to what that exhibit

Page 113

1  is.
2  A. It's an offer letter.
3  Q. And to whom?
4  A. Diana Billack.
5  Q. And does that offer letter state a salary?
6  A. It does.
7  Q. And was Ms. Billack hired at that salary?
8  A. I'm sorry.
9  Q. Was she hired at that salary or pay level?
10 A. Yes.
11 Q. For the position described in the document.
12 All right. Okay. During Ms. Powell's employment
13 with the Red Cross, can you tell me whether any
14 employees had their classifications changed from
15 exempt to non-exempt or non-exempt to exempt?
16    MR. PANAGOPOULOS: Objection. I think
17 that's beyond the scope of the stipulation.
18    MR. PLITT: Classification of employees as
19 exempt or non-exempt.
20    MR. PANAGOPOULOS: Of every single employee
21 within the organization? Come on.
22    MR. PLITT: Right. Let me make a more