RB                  UNITED STATES DISTRICT COURT
                            FOR THE
                    DISTRICT OF COLUMBIA

- - - - - - - - - - - - -x
                                :
TONIA POWELL,                   :
                                :
            Plaintive,          :
                                :
    v.,                         :
                                :
AMERICAN RED CROSS,             :
                                :
            Defendant.          :
                                :
- - - - - - - - - - - - -x

                        December 15, 2006
                        Washington, D.C.

        The deposition of ANNA SHEARER, called for
examination by counsel for the Defendant in the
above-entitled matter, pursuant to notice, at the
office of Miller Reporting Company, 735 8th Street,
S.E., Washington, D.C., convened, pursuant to
notice at 10:00 a.m., before David Harris, a
notary public in and for the District of Columbia,
when were present on behalf of the parties.

Page 2

1   APPEARANCES:
2     On behalf of the Defendants:
      BRIAN PLITT, ESQ.
3     1776 K Street, N.W.
      Washington, D.C. 20006
4     (202) 452-7984
5

      On behalf of the Plaintive
6     CONSTANTINOS G. PANAGOPOULOS, ESQ.
      Ballard Spahr Andrews & Ingersoll, LLP
7     601 13th Street, N.W.
      Washington, D.C. 20005
8     (202) 661-2202
9   Also Present:
      ROBBIN BOGGES
10    Court Reporter
11    DAVID HARRIS
      Notary Public
12
13

14          C O N T E N T S

    WITNESS                          PAGE
15    FOR THE PLAINTIFF                3
16    FOR THE DEFENDANT               95
17
18
19
20          EXHIBITS
21
22  No. 1                    10

---

Page 3

1          PROCEEDINGS
2     MR. DAVID HARRIS: The reporter taking the
3   deposition today is not a notary in the District.
4   Her application is pending.
5     I'm a notary in the District of Columbia,
6   and I'm here to swear the witness. Would you each
7   raise your right hand?
8   Whereupon,
9          ANNA SHEARER
10  having been duly sworn by the Notary Public
11  testified as follows:
12    EXAMINATION BY COUNSEL FOR PLAINTIFF
13    BY MR. PLITT:
14    Q.  Good morning. Ms. Shearer, my name is
15  Brian Plitt. I'm am the attorney for--
16    MR. PANAGOPOULOS: I'm sorry.
17    MR. PLITT: Yeah.
18    MR. PANAGOPOULOS: Just so that you know,
19  Anna has an allergy to cats. There have been a
20  bunch of cats in here.
21    MR. PLITT: All right.
22    MR. PANAGOPOULOS: If we need to take a

---

Page 4

1   break or if her voice starts cracking or something,
2   we'll let you know, because apparently they board
3   cats here as well, but just an FYI.
4     MR. PLITT: Okay. That sounds fine.
5     BY MR. PLITT:
6     Q.  On the record. Ms. Shearer, my name is
7   Brian Plitt. I represent Doreen Rainey in the
8   lawsuit that's the subject of this deposition.
9     MR. PANAGOPOULOS: You mean Tanya Powell?
10    MR. PLITT: I mean Tanya Powell. I'm
11  sorry.
12    BY MR. PLITT:
13    Q.  And I'm going to be asking you some
14  questions today related to the lawsuit. You're
15  familiar with Ms. Powell; correct?
16    A.  Yes.
17    Q.  Okay. The purpose of this deposition is to
18  go over issues or facts related to the lawsuit and
19  for you to recall to the best of your ability, the
20  facts related to it that may be important to the
21  case.
22    Have you given a deposition before?

---

Page 5

1     A.  Yes.
2     Q.  Okay. And how many times have given
3   deposition?
4     A.  A couple.
5     Q.  All right. So you're familiar with the
6   procedure?
7     A.  Yes.
8     Q.  I'll be asking questions. You'll be giving
9   answers. It's being taken down by a court reporter,
10  and you need to say yes or no and if I ask any
11  questions that you don't understand, please let me
12  know, and I'll ask a better question so we can get
13  the record clear; okay?
14    A.  Okay.
15    Q.  All right. Can you please give me a brief
16  thumbnail sketch of your employment history?
17    A.  At the Red Cross, I was employed in
18  February 2001 and remain employed.
19    Q.  Okay. And what was your employment before
20  the Red Cross?
21    A.  I worked for INOVA Health System.
22    Q.  And what was your employment there at

Page 6

1    INOVA?
2        A.  I worked there for about 13 years.
3        Q.  Okay.  And what was your position at INOVA?
4        A.  I held a variety of human resource
5    management positions.
6        Q.  Okay.  And can you tell me some of those
7    positions, please?
8        A.  Employee Relations Manager, Salary and
9    Compensation Manager, Director of HR, HRS Consultant
10    and Director.
11        Q.  Okay.  So that would be from about what
12    dates to what dates?
13        A.  1987 until 2001.
14        Q.  Okay.  All right.  And what about before
15    INOVA?
16        A.  I was the Director of Human Resources at
17    AMI, St. Joseph's Hospital in Omaha, Nebraska.
18        Q.  Okay.  And did you go to college?
19        A.  Yes.
20        Q.  About when did you graduate from college?
21        A.  I completed my undergraduate degree in 1975
22    and my graduate degree in 1999.

Page 7

1        Q.  Okay.  And did you have any employment
2    after you graduated from college?
3        A.  Yes.
4        Q.  And what was that?
5        A.  My first job was with the Lutheran Church
6    Board of Pensions in Minneapolis.
7        Q.  What was your position there?
8        A.  Claims Analyst.
9        Q.  Okay.  And what type of work was that?
10    What did you do as a Claims Analyst?
11        A.  Pension calculations and pension
12    administration work.
13        Q.  And was that a salaried position or was
14    that an exempt position--a non-exempt position?
15        A.  I don't recall.
16        Q.  Okay.  Have you ever worked in a position
17    where you were paid for overtime?
18        MR. PANAGOPOULOS:  I'm going to object as
19    to form.  Yeah, from time to time during the
20    deposition, you may hear me object.  You're still to
21    answer the question.  The objection is just simply
22    for the record unless I specifically not

Page 8

1    ask--instruct you not to answer.  So just go ahead
2    and answer the question if you can.
3        THE WITNESS:  I really don't recall.
4        BY MR. PLITT:
5        Q.  Okay.  Now, you are currently employed the
6    Red Cross?
7        A.  Yes.
8        Q.  Okay.  And you started with the Red Cross
9    in 2001?
10        A.  Yes.
11        Q.  And can you tell me what your position was
12    when you started with the Red Cross?
13        A.  Director, Retirement System.
14        Q.  And what department was that in?
15        A.  Human Resources.
16        Q.  And did you have any people working for
17    you?
18        A.  Yes.
19        Q.  Okay.  Who was working for you at that
20    time?
21        MR. PANAGOPOULOS:  Objection as to form.
22    You can answer it.

Page 9

1        THE WITNESS:  About 40 people.
2        BY MR. PLITT:
3        Q.  Okay.  All right.  And how long did you
4    have that position?
5        A.  Until January 2002.
6        Q.  And then what was your position after that?
7        A.  Senior Director, Employee Benefit and
8    Retirement Programs.
9        Q.  Also people working for you?
10        A.  Yes.
11        Q.  About how many?
12        A.  Thirty-five.
13        Q.  And then how long did you have that
14    position?
15        A.  That is my current position.
16        Q.  Now, it's my understanding that you have
17    been designated today to be the corporate
18    representative or one of the corporate
19    representatives for several parts of the deposition
20    notice, which I understand to be A--
21        MR. PANAGOPOULOS:  Brian, may I suggest
22    that you--

Page 10

1    MR. PLITT: D.

2    MR. PANAGOPOULOS: --give her the notes

3 you're talking about. I mean she doesn't--I'm

4 fairly confident she doesn't have the notes

5 memorized.

6    MR. PLITT: Fine. I'm going to mark this

7 as number one.

8    [Whereupon, Shearer Exhibit

9    Number 1 was marked for

10    identification.]

11    COURT REPORTER: You want this just at the

12 top?

13    MR. PLITT: Sure. That's fine.

14    BY MR. PLITT:

15    Q. I'm going to hand you Exhibit A, which is

16 the deposition notice for today, Ms. Shearer.

17    A. It's my understanding speaking with counsel

18 that you are designated as the corporate

19 representative or--

20    MR. PANAGOPOULOS: And, Brian, just for

21 clarity, you just said Exhibit A. It's marked as

22 one. Are you going to use letters or numbers?

Page 11

1    MR. PLITT: You did one? Okay. Exhibit 1.

2    MR. PANAGOPOULOS: Okay.

3    BY MR. PLITT:

4    Q. I've handed you what's been marked as

5 Exhibit 1. Thanks. And, Ms. Shearer, you've been

6 designated as the corporate representative for the

7 following letters: A, D, M, L, in whole or in part.

8 Is that correct?

9    MR. PANAGOPOULOS: And "N" in part.

10    THE WITNESS: Yes.

11    MR. PANAGOPOULOS: Brian, before you get to

12 your next question, let me just note for the record

13 that the copy--you know, the objection I made before

14 that the way some of these are drafted, they're

15 very, very broad; that we did what we could to

16 prepare the witnesses for questions reasonably

17 related to their lawsuit; but, you know, we reserve

18 the right to object if it goes too far a field, and

19 I'll just use "A" as a quick example, Defendant's

20 Contact with its Employees. That will be every

21 contact by the Red Cross with every one of its

22 employees, not limited in any way. We presume

Page 12

1 that's not what you meant, and I think if that is

2 what you meant, that we'd have to call the judge on

3 it, but I'll just state that now for the record and

4 let you go forward; and if we have an issue with any

5 of the questions you ask, we can bring it up at that

6 point in time.

7    MR. PLITT: That's fine.

8    BY MR. PLITT:

9    Q. So it's our understanding you're the

10 corporate representative for those letters, for

11 questions reasonably related to this lawsuit?

12    A. Yes.

13    Q. Okay. Now, did you ever supervise as Red

14 Cross employee the Wellness Unit at the Red Cross?

15    A. Yes.

16    Q. And when did you begin supervising the

17 Wellness Unit?

18    A. February 2002.

19    Q. And how many employees were in the Wellness

20 Unit at that time?

21    A. I believe there were three.

22    Q. Okay. And can you tell me which employees

Page 13

1 those were?

2    A. I don't recall.

3    Q. Was Ken Thiel employed at that time?

4    A. No.

5    Q. Okay. And what about Jane Davis?

6    A. No.

7    Q. Can you tell me what positions there were

8 in the Wellness Unit at the time you were

9 supervising beginning in 2002.

10    A. Manager and two staff nurses.

11    Q. And the two staff nurses, did they have

12 titles? Can you tell me what their titles were?

13    A. I believe the title was Wellness Associate.

14    Q. For both?

15    A. Yes.

16    Q. Okay. And were these full-time or

17 part-time positions?

18    A. Full-time.

19    Q. Okay. And you know whether they were paid

20 on a exempt or non-exempt basis?

21    A. Exempt.

22    Q. All right. And were there any part-time

Page 14

1  workers helping out in wellness at that time?

2      A.  Not Red Cross employees.

3      Q.  But were there employees that were employed

4  as contractors in Wellness Unit?

5      MR. PANAGOPOULOS:  Objection as to form.

6      THE WITNESS:  No.  No.  Not employees.

7      BY MR. PLITT:

8      Q.  As a result of these questions, does that

9  refresh your recollection as to anybody who was

10  working in the Wellness Unit back in 2002?  You said

11  there were two Wellness Associates.  I'm just

12  wondering whether that has refreshed your

13  recollection as to who was working at that time.

14      MR. PANAGOPOULOS:  Brian, I will note that

15  this is beyond the, you know, the period that

16  plaintiff was employed at the Red Cross, which was

17  several years after that.  I mean you can test her

18  recollection on it, but I think it's beyond the

19  scope.

20      MR. PLITT:  I think it's relevant to

21  treatment of the Red Cross of other employees who

22  held the same position, so--

Page 15

1      MR. PANAGOPOULOS:  She's just told you they

2  were exempt.

3      MR. PLITT:  Yeah.  But I think it's--

4      MR. PANAGOPOULOS:  I'm not going to

5  instruct her not to answer.

6      MR. PLITT:  Okay.

7      MR. PANAGOPOULOS:  I'm just noting the

8  objection.

9      MR. PLITT:  Okay.  That's fine.

10      BY MR. PLITT:

11      Q.  You don't recall the names of the Wellness

12  Associates that were working in 2002?

13      A.  The manager was Linda Burnett.

14      Q.  And do you recall the names of the Wellness

15  Associates?

16      A.  I don't.

17      Q.  Okay.  And what kind of duties did the

18  Wellness Associates perform?

19      A.  A variety of duties really related to

20  running an on-site first aid respite area, as well

21  as checking medical clearances for Armed Forces

22  Emergency staff international delegates.  They

Page 16

1  handled the worker's compensation claims; provided

2  training on CPR AED; counseled employees on wellness

3  issues.

4      Q.  But what duties took up the majority of

5  their time as employees?

6      MR. PANAGOPOULOS:  Objection as to form.

7      THE WITNESS:  It varied.  It varied from

8  time of year to time of year.

9      BY MR. PLITT:

10      Q.  Can you tell me what—so it was cyclical?

11      MR. PANAGOPOULOS:  Objection.

12      BY MR. PLITT:

13      Q.  Was it cyclical?

14      A.  It depended on what was going on at the

15  time; how many deployments were taking place.

16      Q.  Okay.  Can you tell me the different parts

17  of the year and what duties took the most time

18  during those parts of the year?

19      MR. PANAGOPOULOS:  Objection as to form.

20      MR. PLITT:  You can answer it.

21      THE WITNESS:  If there was a major

22  international delegate deployment, it could take two

Page 17

1  days a week to handle that group of people leaving.

2      BY MR. PLITT:

3      Q.  Okay.  But outside of that sort of major

4  event, what was the typical duties it would take the

5  most of their time as employees?

6      MR. PANAGOPOULOS:  Objection.  Asked and

7  answered.  You can answer it now.

8      THE WITNESS:  I don't know that I can

9  assess that.

10      BY MR. PLITT:

11      Q.  When did—what were Linda Burnette's duties

12  as manager?

13      A.  Supervise the unit.

14      Q.  When did Linda Burnette leave as an

15  employee?

16      A.  End of 2002, I believe.

17      Q.  And then who replaced her?

18      A.  Ken Thiel.

19      Q.  Okay.  And then there were two Wellness

20  Associates when you began supervising the Wellness

21  Unit.  Did there then become more Wellness

22  Associates employed by that unit?

Page 18

1     A.  No.

2     Q.  You stated two?

3     A.  Correct.

4     Q.  All right.  So when did the--when did those

5  Wellness Associates change, if at all?

6         MR. PANAGOPOULOS:  Objection as to form.

7         THE WITNESS:  I don't recall.

8         MR. PANAGOPOULOS:  Go ahead.

9         THE WITNESS:  I don't recall.

10        BY MR. PLITT:

11    Q.  Okay.  Did Jane Davis become a Wellness

12  Associate?

13    A.  Yes.

14    Q.  All right.  About when did she start?

15    A.  I don't recall.

16    Q.  Was it 2003 or 2004, can you give me some--

17    A.  I would guess 2004.

18    Q.  --estimate?  And do you recall who she

19  replaced?

20    A.  I do not recall.

21    Q.  Were there more than the two Wellness

22  Associates whose names you can't recall that worked

Page 19

1  there before she began after you started supervising

2  the unit?

3     A.  As Red Cross employees?  I'm sorry.  Ask

4  your question again.

5     Q.  As Red Cross employees?

6     A.  Could you repeat your question?

7     Q.  Were there more Wellness Associates other

8  than the two wellness whose names you don't recall

9  who worked in the Wellness Unit before Jane Davis

10  began work there as a Wellness Associate?

11    A.  Not as Red Cross employees.

12    Q.  Okay.  All right.  Then were there some

13  people then performing some of the duties of

14  Wellness Associates who were not Red Cross

15  employees?

16    A.  Yes.

17    Q.  Okay.  Can you tell me about that?

18    A.  We used contract staff from Corporate

19  Nurse.

20        MR. PANAGOPOULOS:  Anna, make sure you let

21  Brian finish the question before you start

22  answering.  It's, you know, it's easy to anticipate

Page 20

1  and it gets conversational, but it makes it a little

2  harder.

3         BY MR. PLITT:

4     Q.  So what period of time did these people

5  work for the Red Cross in doing the Wellness Unit?

6         MR. PANAGOPOULOS:  Objection as to form.

7         BY MR. PLITT:

8     Q.  In doing the Wellness Associate duties?

9         MR. PANAGOPOULOS:  Same objection.

10        THE WITNESS:  Mid 2002 through late 2003.

11        BY MR. PLITT:

12    Q.  And you said it was corporate nurse?

13    A.  Yes.

14    Q.  That's the company?

15    A.  Yes.

16    Q.  Was it a staffing agency?

17    A.  Yes.

18    Q.  All right.  And which of the functions of

19  Wellness Associate did these contract staff perform?

20    A.  They handled more of the walk-in traffic

21  and activities like flu shots.

22    Q.  Okay.  Can you state all the duties that

Page 21

1  they performed during this time period?

2         MR. PANAGOPOULOS:  Objection as to form.

3         THE WITNESS:  No, I would not be able to

4  state all of their duties.

5         BY MR. PLITT:

6     Q.  Okay.  Could you state any of the duties of

7  Wellness Associate that these staff, that these

8  contract staff did not perform during this time?

9     A.  CPR AED training.  They would not have

10  reviewed international delegate files.  They would

11  not have handled worker's compensation claims.

12  Those are the three that I can recall.

13    Q.  Those are the three that they wouldn't have

14  performed?

15    A.  Predominantly.

16    Q.  Well, is there anything else?

17        MR. PANAGOPOULOS:  Objection as to form.

18        THE WITNESS:  They would not have done

19  higher-level employee counseling.  They would not

20  have made referrals to the employee assistance

21  program, for instance.

22        BY MR. PLITT:

Page 22

1    Q. Okay. Anything else that you put into that
2  category of higher employee assistance?
3    A. I don't recall.
4    Q. Okay. All right. But aside from those,
5  they performed the duties of the Wellness
6  Associates?
7    A. Yes.
8    Q. And these--about how many contract staff
9  worked in this capacity during this time period?
10    A. I don't recall.
11    Q. Okay. And can you give me some estimate?
12  Was it 10, 20, 5?
13        MR. PANAGOPOULOS: Objection as to form.
14        THE WITNESS: I would estimate six.
15        BY MR. PLITT:
16    Q. Okay. And again, just an instruction. As
17  you're probably familiar, you can't estimate--you
18  can give an estimate in your testimony here today,
19  as long as you let me know you're estimating.
20        MR. PANAGOPOULOS: All right. But I don't
21  want you to speculate or guess. So I mean if it's a
22  reasonable estimate, that's fine. If he's asking

Page 23

1  you to guess, don't do it.
2        BY MR. PLITT:
3    Q. All right. Now, and how were these
4  contract staff paid? Were they paid on an hourly
5  basis?
6    A. I don't know. They were not Red Cross
7  employees.
8    Q. Were they paid according to the number of
9  hours that they worked?
10        MR. PANAGOPOULOS: Objection. Asked and
11  answered.
12        THE WITNESS: Again, I don't know how they
13  were paid by the staffing agency, their employer.
14        BY MR. PLITT:
15    Q. No, but I mean how did you pay the staffing
16  agency for their services?
17    A. By hour.
18    Q. Okay. And so if they were to work over 40
19  hours per week, they would have been eligible for
20  overtime; correct?
21        MR. PANAGOPOULOS: Objection as to form.
22        THE WITNESS: I don't know what their

Page 24

1  employment was with the staffing agency.
2        BY MR. PLITT:
3    Q. Again, well, I'm just talking about how the
4  Red Cross paid the staffing agency. If these
5  employees worked more than 40 hours per a week, then
6  the staffing agency would have been entitled to
7  receive overtime, a rate of pay for the services
8  over 40 hours a week; is that correct?
9        MR. PANAGOPOULOS: Objection as to form.
10        THE WITNESS: I don't recall that.
11        BY MR. PLITT:
12    Q. Did these employees ever work--did the
13  staffing agency ever provide the services of these
14  employees at over 40 hours a week?
15        MR. PANAGOPOULOS: Objection as to form.
16        THE WITNESS: I don't recall. I have no
17  knowledge of that.
18        BY MR. PLITT:
19    Q. But their compensation, the compensation of
20  the staff it would vary with the number of hours
21  worked by those employees; correct?
22        MR. PANAGOPOULOS: Objection as to form.

Page 25

1        THE WITNESS: Again, I don't know what the
2  staffing agency paid their staff.
3        BY MR. PLITT:
4    Q. I'm talking about the Red Cross'
5  compensation of the staffing agency for these
6  staffers, for instance.
7    A. Yes. Our payments to the staffing agency
8  were based on the number of hours their contract
9  staff provided us.
10    Q. Okay. Do you recall the names of any
11  contract staff that worked in this capacity during
12  this time period?
13    A. The first name of one person.
14    Q. Can you tell me what that is?
15    A. Eleanor.
16    Q. All right. Any last name? Where is--can
17  you give me the full name of Computer Nurse?
18    A. I guess Corporate Nurse?
19    Q. Corporate Nurse. Thank you. And where is
20  that located?
21    A. I do not know.
22    Q. Do you know the town?

## Page 26

1    A. I do not know.

2    Q. Do you know the state?

3    A. No.

4    Q. Okay. Who would know that answer?

5        MR. PANAGOPOULOS: Objection.

6        THE WITNESS: Contracting.

7        BY MR. PLITT:

8    Q. And who was that at that time period?

9    A. I don't recall.

10   Q. Who arranged for hiring this Corporate

11   Nurse Company?

12   A. The Wellness Unit manager.

13   Q. Okay. And who was that?

14   A. Linda Burnette.

15   Q. And do you know who--

16       MR. PANAGOPOULOS: That's fine. Go ahead.

17       BY MR. PLITT:

18   Q. --who provided for payment for the

19   Corporate Nurse Company?

20   A. Accounts Payable, American Red Cross.

21   Q. And who was that?

22   A. A department, not a single person.

## Page 27

1    Q. Okay. Can you give me the name of one or

2    more people who was in charge of that department at

3    that time?

4    A. No. I don't recall.

5    Q. Do you recall anybody who worked in that

6    department at that time?

7    A. Nope.

8    Q. You stated Jane Davis as someone who became

9    the Wellness Associate. Was there anybody else who

10   worked as a Wellness Associate before Tony Powell

11   began work as a Wellness Associate.

12       MR. PANAGOPOULOS: Objection as to form.

13       BY MR. PLITT:

14   Q. At the Red Cross, of course.

15       MR. PANAGOPOULOS: Same objection.

16       THE WITNESS: Yes.

17       BY MR. PLITT:

18   Q. Okay. And who was that?

19   A. Again, I don't recall names of previous

20   employees.

21   Q. Now, what had Jane Davis' job been before

22   she became Wellness Associate?

## Page 28

1        MR. PANAGOPOULOS: Objection as to form.

2        THE WITNESS: She was unemployed.

3        BY MR. PLITT:

4    Q. Had she worked for the Red Cross before as

5    a staff health nurse for disaster services?

6    A. Yes.

7    Q. And how long had she worked for the Red

8    Cross in that capacity?

9    A. I do not know.

10   Q. Can you give me an estimate of how many

11   years it was?

12       MR. PANAGOPOULOS: Don't guess.

13       BY MR. PLITT:

14   Q. An estimate I'm saying, not as speculation,

15   but an estimate.

16   A. I wouldn't even want to estimate.

17   Q. Was it over five years?

18   A. I do not believe it was over five years.

19   Q. Was it over two years?

20       MR. PANAGOPOULOS: Again, don't speculate.

21   If you know, that's fine.

22       THE WITNESS: I do not know.

## Page 29

1        BY MR. PLITT:

2    Q. You don't know whether it was over six

3    months?

4    A. No.

5    Q. Now, and she was a staff health nurse for

6    disaster services before 2004?

7    A. Yes.

8    Q. Okay. All right. At that time, was staff

9    health nurse for disaster services compensated at a

10   higher rate of pay than Wellness Associate?

11       MR. PANAGOPOULOS: Objection as to form.

12       THE WITNESS: I do not know.

13       BY MR. PLITT:

14   Q. And who was her supervisor when she was in

15   the staff health nurse position?

16   A. I don't know.

17   Q. Okay. Do you know what department she

18   worked in?

19   A. I believe at the time it was disaster

20   response.

21   Q. And who was the head of that department?

22   A. I don't know.

Page 34

1    MR. PANAGOPOULOS: It's fine. She may know
2  the answer to some of this stuff, but I think you're
3  getting to the point where you're starting to be
4  beyond the scope of this witness, but.
5    MR. PLITT: I guess I'm talking about her
6  duties.
7    MR. PANAGOPOULOS: I'm not instructing her
8  not to answer. I'm just letting you know that you
9  may be getting beyond the scope of this particular
10  witness. That's all.
11    MR. PLITT: I think we're within it, but
12  we'll deal with that when we come to it.
13    BY MR. PLITT:
14    Q. What type of documents would she use to
15  record her time of work?
16    A. None.
17    Q. Were there records that the American Red
18  Cross kept in terms of recording the time of work
19  for Ms. Rainey—Ms. Powell? Excuse me.
20    A. No.
21    Q. Okay. Were there records that the Red
22  Cross kept in terms of recording the time of work of

Page 35

1  its employees?
2    MR. PANAGOPOULOS: Objection.
3    THE WITNESS: Yes.
4    BY MR. PLITT:
5    Q. Okay. And what type of records were those?
6    A. For our non-exempt employees, we have a
7  time sheet.
8    Q. And were those records being kept by the
9  Red Cross as part of its business when Ms. Powell
10  began work at the Red Cross?
11    A. Yes.
12    Q. So the Red Cross does not have documents
13  that would show the number of hours that Ms. Powell
14  worked each day that she was employed with the Red
15  Cross?
16    MR. PANAGOPOULOS: Objection. Again,
17  you're beyond the scope of this particular witness.
18  If you recall, as far as the record keeping issues,
19  that's Carol Miller. Okay. That's all I'm talking
20  about, but I mean to the extent she knows, if she
21  can answer, but you clearly are beyond it.
22    MR. PLITT: I mean I think we're in "M,"

Page 36

1  which is participation in any and all work outside
2  business hours.
3    MR. PANAGOPOULOS: Well, no, we're not.
4  You're not asking whether she worked beyond normal
5  business hours. You're asking what were the record
6  keeping? Right? And you have a designation on
7  record keeping, and we've told you who the designee
8  is on that.
9    Now, you know, are some of your designation
10  so broad that you could potentially read anything
11  into it? Yes. Have we told you who's dealing with
12  record keeping? Yes. Are you beyond the scope with
13  respect to who we told you was dealing with record
14  keeping? Yes. Have I instructed anyone not to
15  answer a question yet? No. Am I going to let you
16  delve into it twice with two witnesses? No, we're
17  not going to backtrack.
18    So I'm just letting you know now you're
19  beyond the scope of this one.
20    MR. PLITT: Well, I think you've got some
21  co-designations, so, you know, I think it certainly
22  is within—arguably within the scope of "D," so I

Page 37

1  think that's what—
2    MR. PANAGOPOULOS: Record keeping is within
3  the scope of "D."
4    MR. PLITT: Yeah. I believe it is.
5    MR. PANAGOPOULOS: Work requirements.
6  Duties, compensation and conditions for all—full-
7  or part-time employees. No, it's not.
8    MR. PLITT: Which would include the record
9  keeping for those employees?
10    MR. PANAGOPOULOS: Well, not when you have
11  a separate record keeping item here.
12    MR. PLITT: I think it's the scope of work
13  requirements.
14    MR. PANAGOPOULOS: It's not.
15    MR. PLITT: Okay. Can you read back the
16  last question and then answer it, please?
17    COURT REPORTER: And what type—I don't
18  catch the whole thing. It's on tape. You want me
19  to play it back?
20    MR. PLITT: No, it's all right.
21    MR. PANAGOPOULOS: Basically, Brian, do you
22  see item "C" in your designation?

Page 38

1    MR. PLITT: Sure.
2    MR. PANAGOPOULOS: Okay.
3    MR. PLITT: I understand.
4    MR. PANAGOPOULOS: Record keeping practices
5  of the company. That's a specific item, and you're
6  sitting here trying to put that item in another
7  broad, generalized category, and I've told you that
8  the designee for this is Carol, and we've got two
9  people here in order to do this efficiently; we're
10  not going to go over ground twice. I've told you
11  who the designee is on record keeping.
12    I mean she knows the--and I haven't told
13  her not to answer, but I'm trying to keep this
14  efficient and you're going beyond the scope for this
15  particular witness.
16    MR. PLITT: So is this witness being
17  tendered at all to speak about the hours that Ms.
18  Rainey, I mean Ms. Powell worked as an employee and
19  her duties as an employee?
20    MR. PANAGOPOULOS: Yeah, she's told you
21  about her duties. With respect to the hours worked,
22  I think she can tell you something about that as

Page 39

1  well, but when you're asking about the types of
2  records the Red Cross keeps and its general record
3  keeping practices on employees, I think you're going
4  beyond the scope of this particular witness. That's
5  all.
6    MR. PLITT: She's not being tendered as
7  your representative on that issue is what you're
8  saying?
9    MR. PANAGOPOULOS: That's what I said twice
10  at the beginning, once off the record, once on the
11  record.
12    MR. PLITT: That you're saying it's going
13  to be Ms. Miller?
14    MR. PANAGOPOULOS: And a third time now.
15    MR. PLITT: All right. You're saying it's
16  going to be Ms. Miller. That's fine.
17    All right.
18    BY MR. PLITT:
19    MR. PANAGOPOULOS: We've been going for
20  about an hour now. Can we take a quick break?
21    MR. PLITT: Yeah. That's fine.
22    MR. PANAGOPOULOS: Thanks.

Page 40

1    [Recess.]
2    MR. PLITT: Everybody ready to get started
3  again?
4    MR. PANAGOPOULOS: Yeah.
5    MR. PLITT: Back on the record.
6    MR. PANAGOPOULOS: Back on the record.
7    BY MR. PLITT:
8    Q. All right. Ms. Shearer, we're going to
9  talk a little bit more about the Wellness Unit
10  before Ms. Powell started.
11    Do I take it that your testimony is that
12  before Ms. Powell started in the Wellness Unit, the
13  Wellness Unit always had at least two Wellness
14  Associates and a manager?
15    MR. PANAGOPOULOS: Objection as to form.
16    THE WITNESS: Not consistently. There was
17  turnover in staff, and while there were staff
18  vacancies, we used the contract agency.
19    BY MR. PLITT:
20    Q. To fill in the gap?
21    A. Correct.
22    Q. Left by less than two Wellness Associates?

Page 41

1    A. Correct.
2    Q. All right. Now, what position was Ms.
3  Powell hired for? Was it Wellness Associate?
4    A. Yes.
5    Q. And what skills did she have that made her
6  qualified to work as a Wellness Associate?
7    A. Registered nurse.
8    Q. Were there any complaints about her work
9  ethics or professionalism or dress while she was a
10  Red Cross employee?
11    A. Not to my knowledge.
12    Q. Okay. Did you consider her to be an
13  accountable person, reliable and trustworthy
14  employee?
15    MR. PANAGOPOULOS: Objection as to form.
16    MR. PLITT: You can answer.
17    THE WITNESS: I only directly supervised
18  her for about three months. During that period, I
19  had no concerns with her performance.
20    BY MR. PLITT:
21    Q. Okay. Now, can you state the job duties
22  that Ms. Powell performed when she first began as a

Page 42

1   Wellness Associate at the Red Cross?
2       A.   She primarily handled walk-in employees,
3   tended to the respite area, the lactation area,
4   blood pressure checks, rate checks, employee health
5   counseling, those sorts of activities.
6       Q.   In terms of the walk-in employees, the
7   respite area, the blood, the lactation duties that
8   you just described, about what percentage of her
9   time did she spend on those duties?
10      A.   I wouldn't be able to estimate.  I didn't
11  supervise her at that time.
12      Q.   All right.  In terms of the employee
13  counseling, what did that involve?
14      A.   I'm sorry what did that involve?
15      Q.   Mm hmm.  Yeah.
16      A.   Employees coming to the Wellness Center not
17  feeling well; anticipating being off for periods of
18  illness or surgery; a return to work question;
19  accommodation questions; some ergonomic questions;
20  workplace environment issues.
21      Q.   And about what percentage of her time was
22  taken up with those duties?

Page 43

1       A.   I would not be able to estimate.
2       Q.   And then what other duties did Ms. Powell
3   perform?
4       A.   My recollection is reasonably soon after
5   employment, she started learning some of the
6   specialty medical review work that that Wellness
7   Unit did:  the review of medical records, the review
8   of--or developing her learning and understanding of
9   the military medical requirements, the international
10  requirements, becoming familiar with the software
11  systems that were used.
12      Q.   Can you be more specific as to what that
13  involved?
14          MR. PANAGOPOULOS:  Objection as to form.
15  What's that?
16          MR. PLITT:  What you've just described.
17  The duties you just described in your last answer.
18          THE WITNESS:  The medical record review?
19          BY MR. PLITT:
20      Q.   Mm hmm.
21          MR. PANAGOPOULOS:  You want her to go
22  through each of them?

Page 44

1           MR. PLITT:  I'd like to know what Ms.
2   Powell did in terms of medical record review.
3           THE WITNESS:  For both the Armed Forces
4   Emergency Services staff and the International
5   Service delegates, it's two different sets of
6   criteria, but the process is similar.  It's
7   reviewing an individual's medical records, test
8   results, lab results, radiology results,
9   drug--prescription drug utilization, immunization
10  records, to be sure that they meet the required
11  criteria for a specific location and set of
12  conditions that a person is going to.
13          BY MR. PLITT:
14      Q.   Okay.  And what percentage of her time was
15  taken up with those duties?
16      A.   It would have varied.
17      Q.   And can you tell me what percentage--what
18  range of percentage was taken up with those duties?
19      A.   Anywhere from 10 percent to 75 percent.
20      Q.   What would--on the average, what was the
21  percentage of her time per week that was taken up
22  with those duties?

Page 45

1           MR. PANAGOPOULOS:  Objection as to form.
2           MR. PLITT:  When she performed them?
3           THE WITNESS:  For the period of time that I
4   am most familiar with 50 percent.
5           BY MR. PLITT:
6       Q.   Were there other duties that she performed?
7       A.   Yes.
8       Q.   What were those duties?
9       A.   I think I've already described them, but
10  handling sick employees.
11      Q.   I mean other than what you've described to
12  me so far.
13          MR. PANAGOPOULOS:  Do you want to give her
14  the list that she's given you so far, so we're not
15  repeating?
16          THE WITNESS:  Worker's comp.
17          MR. PLITT:  I think she knows what she's
18  told me.
19          THE WITNESS:  Review.  Family Medical Leave
20  Act Review.  Ergonomic assessments.  Briefings and
21  debriefing sessions of in-bound, out-bound
22  international travelers.

Page 46

1    BY MR. PLITT:
2    Q. Is this is in addition to what you've told
3    me so far? Are you going back to what you have told
4    me before?
5    MR. PANAGOPOULOS: Objection. I mean
6    you've got--at this point, you've got the record.
7    It tells you if there are any repeats.
8    MR. PLITT: I can ask the witness if her
9    intent is to repeat what she said earlier or to give
10   me something new.
11   THE WITNESS: OSHA log record keeping.
12   BY MR. PLITT:
13   Q. Can you tell me--what I need to know is are
14   these things in addition to what you've told me
15   before or are these part of what you've told me
16   already?
17   MR. PANAGOPOULOS: All right. You're
18   asking her intent or you're asking actually what
19   happened, because we can ask the Court Reporter to
20   read it back if you want her to write down a list of
21   what she said before and what she said now.
22   MR. PLITT: I'm asking whether she intends

Page 47

1    to tell me something new or whether it's her belief
2    or knowledge that's part of what she's already told
3    me.
4    THE WITNESS: I can't say that that's a
5    complete summary of everything that she did, but in
6    my estimation or my synopsis, that's a good summary
7    of her typical duties.
8    BY MR. PLITT:
9    Q. Okay. Can you tell me what percentage of
10   Ms. Powell's time was taken up FMLA work on average?
11   MR. PANAGOPOULOS: Objection as to form.
12   THE WITNESS: Five percent.
13   Q. You're stating that you directly supervised
14   her for what period of time?
15   A. From March of 2005 through June of 2005?
16   Q. And is your testimony as to what duties she
17   performed related to that time period?
18   A. Yes, I have the best knowledge of what work
19   she performed for that period of time.
20   Q. Are these estimates of what percentage of
21   her time was taken up with various duties related
22   specifically to that time period?

Page 48

1    A. Yes.
2    Q. Okay. And do you not have the ability to
3    give this estimate for the period of--for the amount
4    of time that she worked on the various duties for
5    the other periods of time?
6    A. No. I don't. Again, when she started, she
7    worked very, very little on the more complex medical
8    review issues that grew over time.
9    Q. All right. So if I understand you
10   correctly, you can give an estimate as to the
11   percentages for this March through June time period,
12   but not for the other time period?
13   A. Correct.
14   Q. All right. All right. What about the
15   worker's compensation work. During this March to
16   June time period in 2005, can you give an estimate
17   of what percentage of her time on average was taken
18   up with that worker's compensation work?
19   A. Less than five percent.
20   Q. What about the ergonomic work?
21   A. Less than five percent.
22   Q. And what about the debriefings?

Page 49

1    A. Five percent.
2    Q. Okay. All right. Now, Ms. Powell started
3    as an employee in on November 15th, 2004; is that
4    correct?
5    A. Yes.
6    Q. All right. And at that time that she
7    joined the Red Cross, were there any other Wellness
8    Associates working in the Wellness Unit?
9    MR. PANAGOPOULOS: Objection as to form.
10   THE WITNESS: Yes.
11   BY MR. PLITT:
12   Q. Okay. And who were they?
13   A. Jane Davis.
14   Q. Okay. And had there been a vacancy in the
15   Wellness Unit for Wellness Associate that Ms. Powell
16   was filling?
17   A. Yes.
18   Q. Okay. And how long had that vacancy been
19   there?
20   A. I don't recall specifically.
21   Q. Okay. Can you give a best estimate? Was
22   it six months or was it a month or was it a year?

Page 50

1      MR. PANAGOPOULOS: Don't guess. Only if
2  you know.
3      MR. PLITT: Again, she's been instructed.
4  She can give her best estimate, so--
5      MR. PANAGOPOULOS: Well, but look. There's
6  estimate and there's speculation. I don't want her
7  to speculate. It's not admissible.
8      MR. PLITT: All right.
9      MR. PANAGOPOULOS: And I'm just instructing
10  my witness on the corporate issue not to speculate.
11      MR. PLITT: I understand.
12      MR. PANAGOPOULOS: That's all.
13      MR. PLITT: But you know we've been over
14  this, and she knows the rules and she knows she
15  can't speculate, but she does have to give her best
16  estimate if she can.
17      MR. PANAGOPOULOS: I have the right to
18  remind her--
19      MR. PLITT: I understand.
20      MR. PANAGOPOULOS: --if I want.
21      MR. PLITT: But we're getting into the
22  realm of going over this to the extent that I think

Page 51

1  we're verging on coaching, so I think--
2      MR. PANAGOPOULOS: There's no coaching
3  here. She told you she didn't know. And you're
4  trying to delve, and I'm just reminding her not to
5  guess. Okay? Because you can she push and push and
6  push.
7      MR. PLITT: She knows that already. She
8  does know that already.
9      MR. PANAGOPOULOS: I told her. You can
10  continue with your deposition or you can continue to
11  argue with me. It's your choice, Brian.
12      MR. PLITT: We don't have--I'm telling you.
13      MR. PANAGOPOULOS: I'm going to continue to
14  represent my witness in the way I believe I need to
15  represent my witness. Period.
16      MR. PLITT: I understand, but I am
17  cautioning you.
18      MR. PANAGOPOULOS: You can caution all you
19  want. I'm happy to call the court any time you
20  want. I have done nothing inappropriate. You want
21  to pick up the phone and call Judge Houvel [ph.];
22  pick up the phone and call Judge Houvel.

Page 52

1      MR. PLITT: Let me finish my objection,
2  please.
3      MR. PANAGOPOULOS: There's no objection.
4      MR. PLITT: All right.
5      MR. PANAGOPOULOS: I object.
6      MR. PLITT: Let me finish my answer; okay?
7  If it does get to that point, we will do that and it
8  will be charged against you.
9      MR. PANAGOPOULOS: It won't be charged
10  against me, because I haven't done anything
11  inappropriate; okay? And you don't need to lecture
12  me. If you want to call the court, call the court.
13  It's plain and simple.
14      MR. PLITT: I am telling you that at this
15  point.
16      MR. PANAGOPOULOS: I know what the rules
17  are. Period.
18      MR. PLITT: That's fine.
19      MR. PANAGOPOULOS: And you're the one who's
20  continuing, not me. I will continue to instruct my
21  witness as I see fit, period. End of story.
22      MR. PLITT: I think you're getting close to

Page 53

1  crossing the line, so--
2      MR. PANAGOPOULOS: Well, thanks for your
3  opinion.
4      BY MR. PLITT:
5      Q. All right. You're required to give me your
6  best estimate. You understand that?
7      A. Yes.
8      Q. Okay.
9      MR. PANAGOPOULOS: Well, I'm going to tell
10  you that you're not required to give him an estimate
11  if that would be a guess. I don't want you to
12  speculate. It's perfectly appropriate to say--when
13  he says you're required to give him an estimate,
14  that's not fair. You're required to give him an
15  estimate if you can. If you can't estimate it,
16  because it would be speculation, then that's what
17  you're required to tell him, so do not listen to
18  that instruction from him.
19      MR. PLITT: All right. Let me complete
20  what I'm saying.
21      BY MR. PLITT:
22      Q. You are required to give your best estimate

Page 54

1  if you can estimate within reason.

2      A.  Can you ask your question again?

3      Q.  All right.  Can you please tell me about

4  how long the Wellness Associate position was vacant

5  before Ms. Powell began?

6      A.  Six months.

7      Q.  Okay.  And who performed that work while Ms.

8  Powell was--was still away?

9      A.  Contract staff.

10     Q.  Okay.  All right.  Now, when Ms. Powell

11  began work as a Wellness Associate, was her direct

12  supervisor Ken Thiel?

13     A.  Yes.

14     Q.  All right.  Now, did Jane Davis then resign

15  around January 2005?

16     A.  Yes.

17     Q.  All right.  And at that time, she was not

18  replaced with another Wellness Associate; correct?

19     A.  Correct.

20     Q.  And her duties were then assigned to Ms.

21  Powell after she left; isn't that correct?

22     A.  Some of her duties were assigned.

Page 55

1      Q.  Okay.  And which of her duties were

2  assigned to Ms. Powell?

3      A.  I can't give you a complete list, but the

4  Armed Forces Emergency Services work.

5      Q.  Okay.  Anything else?

6      A.  Some other things that would have been

7  shared between the two of them.  Some of that work

8  went to Tanya--walk-in.

9      Q.  Can you tell me what work was shared

10  between them that went to Ms. Powell?

11     A.  Primarily the walk-in traffic, the

12  counseling.

13     Q.  Anything else?

14     A.  Blood pressure checks.  Monitoring the

15  lactation area and the cot rooms.

16     Q.  Is there anything else?

17     A.  That's to the best of my recollection.

18     Q.  And what of Ms. Davis' work did not go to

19  Ms. Powell?

20     A.  Some of the Armed Forces Emergency Services

21  stuff went to the manager.  Worker's comp went to

22  the manager.  FML, short-term disability work went

Page 56

1  to the manager.  Employee counseling, some of the

2  employee counseling went to the manager.

3      Q.  Okay.  And which part of the Armed Forces

4  work went to the manager?

5      A.  To the best of my recollection, it was some

6  of the briefing/debriefing work was done by the

7  manager.  Some of the calls to the military.

8  Consulting our physician advisor, MD advisor.

9      Q.  And then--and what part of employee

10  counseling went to the manager, the manager being

11  Ken Thiel; right?

12     A.  Correct.

13     Q.  Which part of that went to him?

14     A.  Not a specific part or type of counseling.

15     Q.  Can you describe which part went to Ken

16  Thiel and which part went to Ms. Powell?

17         MR. PANAGOPOULOS:  Objection as to form.

18         BY MR. PLITT:

19     Q.  Which employee counseling went to Ken

20  Thiel, which employee counseling went to Tanya

21  Powell?

22         MR. PANAGOPOULOS:  The same objection.

Page 57

1         THE WITNESS:  I'm not really able to answer

2  that question.  I don't know.  It would have been

3  based on who was there, what the workload was for

4  the day, who was busy doing something else.

5         BY MR. PLITT:

6      Q.  So it's fair to say that was shared between

7  the two of them on an ongoing basis?

8      A.  Correct.

9      Q.  I see.  And what about the disability work

10  that went to the manager.  What did that involve?

11     A.  Predominantly related to FML when employees

12  are out on disability; making sure that they had

13  returned to work authorization.

14     Q.  Okay.  Now, after Jane Davis resigned,

15  there were no contractors who came in to perform any

16  part of her duties after that time; is that correct?

17     A.  That's correct.

18     Q.  Now, after she resigned, Jane Davis, what

19  factors determined that she would not be replaced?

20     A.  I did not feel that it was necessary given

21  the workload of that unit.  We also shifted some of

22  the FML short-term disability processing to a

Page 58

1  benefits administrator level person.
2      Q.  And who was that?
3      A.  The name is Vicky Fleming.
4      Q.  And which part of Jane Davis' work did she
5  perform?
6      MR. PANAGOPOULOS:  Objection as to form.
7      THE WITNESS:  She took over some of the
8  communication with employees, advising them of the
9  status of their claims.
10     BY MR. PLITT:
11     Q.  And what was her position?
12     A.  Benefits administrator.
13     Q.  And was she paid on an hourly basis or a
14  exempt basis?
15     A.  Exempt.
16     Q.  Okay.  And about what percentage of the
17  work had this--of Ms. Jane Davis' work had this work
18  taken up in terms of her time doing?
19     MR. PANAGOPOULOS:  Objection as to form.
20     BY MR. PLITT:
21     Q.  About how much of Jane Davis' time per week
22  had been taken up with this work that later went to

Page 59

1  Vicky Fleming after Jane left?
2      A.  Ten percent.
3      Q.  Were there budgetary considerations that
4  were affecting the Wellness Unit at the time that
5  Jane Davis left?
6      A.  Yes.  There are always budgetary
7  considerations.
8      Q.  Can you describe what considerations those
9  were at that time?
10     A.  Trying to reduce expense.
11     Q.  Was there an effort also to reduce the
12  number of positions?
13     MR. PANAGOPOULOS:  Objection as to form.
14     MR. PLITT:  You can answer.
15     MR. PANAGOPOULOS:  If you can.
16     MR. PLITT:  You can answer.
17     THE WITNESS:  Yes.  Any time there is a
18  vacancy, there's an evaluation done as to whether
19  that position needs to be replaced, either as it was
20  previously or in some other fashion, or if there are
21  other individuals that can assume some of the work.
22     BY MR. PLITT:

Page 60

1      Q.  All right.  Now, after Jane Davis resigned,
2  and Tony Powell took over, at least some part of her
3  workload--did Tony Powell work hours over 40 a week
4  in her position as Wellness Associate?
5      A.  Not to my knowledge.
6      Q.  Okay.  Do you dispute that she did work
7  hours over 40 a week after Jane Davis left and
8  before Ken Thiel left?
9      MR. PANAGOPOULOS:  Objection as to form.
10     THE WITNESS:  She may have occasionally
11  worked in excess of 40 hours per week, but not on
12  routine or scheduled basis.
13     BY MR. PLITT:
14     Q.  Do you--can you make an estimate of how
15  many hours over a week she worked on average after
16  Jane Davis resigned and before Ken Thiel left Red
17  Cross?
18     MR. PANAGOPOULOS:  Objection as to form.
19     THE WITNESS:  No.  I was not her immediate
20  supervisor.
21     BY MR. PLITT:
22     Q.  Now, in March 2005, around March 16th, did

Page 61

1  Ken Thiel resign?
2      A.  Yes.
3      Q.  Do you have any knowledge of why Ken Thiel
4  resigned?
5      MR. PANAGOPOULOS:  Objection.  Ken is
6  improper as to have--in the deposition notice or the
7  allegations in this case.
8      MR. PLITT:  Because the--you know, the
9  evidence will show that certain of Ken Thiel's job
10  duties were taken over by Tony Powell.
11     MR. PANAGOPOULOS:  That has nothing to do
12  with the reason for his resignation.
13     MR. PLITT:  It relates to the likelihood
14  that Ms. Powell had to take over his duties, which
15  relates to the likelihood that she had to work
16  overtime.
17     MR. PANAGOPOULOS:  No, the fact that he
18  left relates to the fact that she may have taken her
19  duties, not the reason that he left.
20     MR. PLITT:  Well, I think--
21     MR. PANAGOPOULOS:  And I don't think that's
22  within the scope and I don't think that it's

Page 62

1    relevant.

2          MR. PLITT: It may relate to the level of

3    work in the organization, which relates to the

4    likelihood that she performed overtime work.

5          MR. PANAGOPOULOS: How does it relate to

6    the level of work in the organization and the reason

7    he left?

8          MR. PLITT: That can be a reason for

9    leaving.

10         MR. PANAGOPOULOS: That he didn't have

11   enough work? Or that he had too much work? I mean

12   I'm fine with you asking those questions if those

13   are the two specific reasons that he left, but I

14   don't think anything else is relevant to this.

15         MR. PLITT: I think it's relevant that it

16   could lead to relevant information, which is--

17         MR. PANAGOPOULOS: How?

18         MR. PLITT: --by the answer. And--

19         MR. PANAGOPOULOS: Well, I mean, we'll

20   stipulate that he didn't leave because of lack of

21   work or because of too much work.

22         MR. PLITT: I think we've got some broadly

Page 63

1    way to ask questions that may lead to relevant

2    information.

3          MR. PANAGOPOULOS: And I'm asking you for a

4    proffer as to how the reason if he left, if it's

5    unrelated to volume of work can lead to relevant

6    admissible evidence?

7          MR. PLITT: Okay.

8          BY MR. PLITT:

9          Q. Let me ask another question. Ken Thiel

10   resigned, Ms. Shearer. After he resigned, was Ms.

11   Powell then assigned Ken Thiel's duties?

12         A. Yes. Some of his duties were transferred

13   to her.

14         Q. Okay. And who assigned her those duties?

15         A. I did.

16         Q. Okay. And which duties that Ken Thiel had

17   been performing were assigned to Ms. Powell?

18         A. International Services work.

19         Q. All right. And what did that work involve?

20         A. Reviewing medical records for people being

21   deployed as an international delegate.

22         Q. And does this begin the period of time

Page 64

1    where you said that you could talk about her--what

2    she did?

3          A. Yes.

4          Q. All right. And what other duties were

5    assigned by you to her from Ken Thiel?

6          A. Worker's compensation claims.

7          Q. Okay. And what are the duties?

8          A. Pardon?

9          Q. What are the duties?

10         A. In the event of a worker's compensation

11   claim, monitoring it, getting the first report,

12   reporting it to the third party administrator,

13   talking to the employee about their absence, keeping

14   track of the number of days, talking to the manager

15   about when they would likely be returning to work;

16   if there were any accommodations that were going to

17   be necessary.

18         Q. Okay. What about FMLA work?

19         MR. PANAGOPOULOS: Objection as to form.

20         BY MR. PLITT:

21         Q. Was that assigned to--from Ken Thiel to

22   Tony Powell?

Page 65

1          A. Some of that work went to Vicky Fleming.

2          Q. Okay. And did some of it go to Tanya

3    Powell?

4          A. Tanya was more involved in the review of

5    the medical information related to FML, but not the

6    employee counseling notification process.

7          Q. Okay. What other duties of Ken Thiel did

8    you assign to the Tanya Powell?

9          A. That's the most--those are the most

10   significant duties.

11         Q. Okay. Were any contractors or any other

12   employees other than you mentioned Vicky Fleming

13   employed to take over the duties that had been

14   performed by Ken Thiel?

15         A. No.

16         Q. About what percentage of Ken Thiel's time

17   per week was taken up with the FMLA work or other

18   work that was sent to Ms. Fleming after he left?

19         A. I would estimate 20 percent.

20         Q. Was Ken Thiel then replaced at any point as

21   manager?

22         A. No.

Page 66

1  Q.  What factors determined he would not be
2  replaced?
3  A.  The organization was going through what we
4  call the Core Services Review, and it was--we were
5  at the stage where it was possible that the Wellness
6  Unit would be closed down.  So a decision was made
7  not to replace the manager.
8  Q.  Now, was cost a part of that--the factors
9  leading to that?
10  A.  Yes.  Yes.
11  Q.  The decision to close the unit was not made
12  until after Ken Thiel resigned?
13  A.  Correct.
14  Q.  Who was responsible for the budget and
15  operations of the Wellness Unit?
16  A.  The manager.
17  Q.  Okay.  And Ken Thiel when he was there, in
18  other words?
19  A.  Correct.
20  Q.  Okay.  Was human resources responsible for
21  that budget in operations?
22  A.  Yes.  The Wellness Unit was a division,

Page 67

1  department, whatever you want to call it within the
2  Human Resources Department.
3  Q.  Now did Ms. Powell have any duties as a
4  supervisor while she worked in the Wellness Unit?
5  A.  No.
6  Q.  Did--after Ken Thiel resigned, did Tony
7  Powell then work hours over 40 hours a week at the
8  Red Cross?
9  A.  Not on a routine or consistent basis.
10  Q.  Okay.  But did she work at times hours more
11  than 40 a week?
12  A.  She may have occasionally worked over 40
13  hours a week.
14  Q.  About how many hours over 40 per week on
15  average did she work as an employee after Ken Thiel
16  resigned?
17  MR. PANAGOPOULOS:  Objection as to form.
18  THE WITNESS:  One to two hours.
19  BY MR. PLITT:
20  Q.  And how do you know she worked hours over
21  40 a week after Ken Thiel resigned?
22  A.  For instance, on occasion, there would be a

Page 68

1  luncheon meeting of the Armed Forces Emergency
2  Services Group, and she would attend that luncheon.
3  Q.  And how did you know that she was working
4  hours over 40 to attend that luncheon?
5  A.  Because her normal hours were 7:30 to 4:30,
6  with an hour for lunch, and I would be aware of when
7  the meeting was scheduled.
8  Q.  Okay.
9  A.  And it would have been over her normal
10  pattern of taking lunch for an hour at about twelve
11  to one.
12  Q.  Any other indication that you had that she
13  was working hours over 40 per week?
14  A.  Occasionally, there would be an e-mail or a
15  conversation at 4:45 in the afternoon, if somebody
16  had just arrived at the unit at 4:25, Tanya would
17  not leave at 4:30.  She would stay to finish out
18  whatever that activity was.  But as--
19  Q.  Now, after Ken Thiel resigned, you were
20  aware that Tanya Powell was continuing to perform
21  the duties that were assigned to her from Jane Davis
22  after Jane Davis resigned?

Page 69

1  A.  Correct.
2  Q.  Okay.  And after Ken Thiel resigned, the
3  duties performed by Jane Davis weren't assigned to
4  anybody else other than what we've discussed--Tanya
5  Powell and to some extent the other worker, Vicky
6  Fleming?
7  A.  That's correct.  Some work was just
8  stopped.  They stopped doing some work.  So--
9  Q.  And what work was that?
10  A.  Employee education development, delivery.
11  Q.  This is work that Jane Davis had been
12  performing?
13  A.  Mm hmm.  Yes.
14  Q.  And do you have an estimate of what
15  percentage of Jane Davis' time that that work had
16  taken up?
17  A.  I'm not able to estimate.
18  Q.  Now, did you have any contact with Tanya
19  Powell regarding whether her job as Wellness
20  Associate would be eliminated?
21  A.  Yes.
22  Q.  Okay.  Can you tell me what that contact

Page 70

1   was?

2      A.  After the decision was made to close that

3   unit and the wellness positions eliminated, I did

4   meet with her, in the middle of May to let her know

5   that decision.

6      Q.  And what did you tell her at that time?

7      A.  I told her the results of the Core Services

8   Review and that the organization had made a decision

9   to close that unit and transition the essential

10  components of that unit's work to other

11  organizations or other divisions within the Red

12  Cross; and that the unit would be closing; the space

13  was going to be reassigned to another department.

14     Q.  And as a result of that decision, who ended

15  up performing the duties that Tanya Powell had been

16  performing at the time that the Wellness Unit was

17  closed?

18     A.  Some of the duties are no--some of the

19  services are no longer provided.  What was

20  considered to be essential must continue

21  services--have been distributed to a variety of

22  places.

Page 71

1      Q.  Now, which services are no longer provided?

2      A.  We no longer have a walk-in, a respite

3   area.  We don't provide blood pressure checks or

4   weight checks.  We don't provide any medication of

5   in-person first-aid treatment.  We don't provide any

6   health counseling.

7      Q.  And which of Tony Powell's duties--well,

8   who's performing the remainder of the duties, the

9   ones that are essential and being provided?

10     MR. PANAGOPOULOS:  Objection as to form.

11     THE WITNESS:  I don't know that I can speak

12  to all of them, but, for instance, ergonomic

13  assessments are now performed by one of our

14  corporate safety staff members.

15     BY MR. PLITT:

16     Q.  And who's that?

17     A.  There are several of them.

18     Q.  Can you tell me who they are?

19     A.  Mike Gorman.

20     Q.  What is his position?

21     MR. PANAGOPOULOS:  Objection.  Asked and

22  answered.

Page 72

1      THE WITNESS:  I don't know his title

2   specifically.  The international services work.  At

3   the time of the closing of the unit, that work was

4   to be outsourced.

5      BY MR. PLITT:

6      Q.  And was it outsourced?

7      A.  I do not know what the final decision was.

8      Q.  Outsourced to a staffing agency?

9      A.  No.  Outsourced to a medical clinic, an

10  international medical clinic.

11     Q.  Do you know the name of the clinic?

12     A.  Farragut Medical Center.

13     Q.  And was that service to be provided on an

14  hourly basis, hourly compensation basis?

15     MR. PANAGOPOULOS:  Objection as to form.

16     THE WITNESS:  I don't believe that that was

17  the plan.  It's on a per case basis.

18     BY MR. PLITT:

19     Q.  Has that ever been achieved, the

20  outsourcing?

21     A.  I do not know.  I do not know.

22     Q.  Okay.  What about the other duties that Ms.

Page 73

1   Powell performed?

2      MR. PANAGOPOULOS:  Objection as to form.

3   What do you mean by what about them?

4      MR. PLITT:  I'm talking about who ended up

5   performing the other duties that Ms. Powell had

6   performed while she was Wellness Associate at the

7   time of the closing of the--the elimination of her

8   position?

9      THE WITNESS:  The Armed Forces Emergency

10  Services work was taken on by the Disaster Group.

11  Vicky Fleming took over responsibility for the

12  worker's comp.  And all of the FML short-term

13  disability work that was part of the short-term

14  disability work was also outsourced.

15     BY MR. PLITT:

16     Q.  And who was that outsourced to?

17     A.  Aetna.

18     Q.  Was that outsourced on an hourly or per

19  case basis?

20     MR. PANAGOPOULOS:  Objection as to form.

21     THE WITNESS:  Per employee.

22     BY MR. PLITT:

Page 74

1    Q. Per employee?
2    A. It's a third party administrator, ASO,
3 administrative services only, contract. It's on a
4 per head.
5    Q. And what's the company that's performing
6 that duty?
7    A. Aetna.
8    Q. Okay. And which location?
9    A. Tampa, Florida.
10    Q. Any other part to the name Aetna?
11    A. Pardon?
12    Q. Any other part to that name, Aetna? Is it
13 just Aetna or is Aetna Financial Services or is
14 there more to the name?
15    A. It's just Aetna. It's a disability
16 services division under Aetna.
17    Q. Do you know what part of Florida?
18    A. Pardon?
19    Q. Do you know what city in Florida?
20    A. Tampa.
21    Q. Okay. And what about the Armed Forces
22 Services work that Ms. Powell had been performing,

Page 75

1 who ended up performing that work after she left?
2    A. Caroline Williams.
3    Q. And was Caroline Williams employed or was
4 she a volunteer?
5    A. I don't know.
6    Q. Now, did you have any contact with Ms.
7 Powell regarding her receiving an offer of another
8 job after she found out that her job as Wellness
9 Associate would be eliminated?
10    A. Another Red Cross job?
11    Q. Yes.
12    A. Yes.
13    Q. Can you tell me what that contact was?
14    A. At the time that she was informed that the
15 Wellness Unit was closing, I and Bill Malfara met
16 with her to let her know that some of the duties
17 that she had been performing as a Wellness Associate
18 were transitioning to disaster and that she would be
19 transferred to that department or she had the
20 opportunity to transfer to that department.
21    Q. And did you discuss the rate of pay issue
22 with her?

Page 76

1    A. I did not.
2    Q. And which of her duties were being
3 transferred to this new position?
4    A. The Armed Forces Emergency Services work.
5    Q. Okay. Was it your understanding that
6 she--that she was expected to perform any other part
7 of what she had been performing as previously as
8 Wellness Associate in this new position?
9       MR. PANAGOPOULOS: Objection as to form.
10       THE WITNESS: Could you ask the question
11 again?
12       BY MR. PLITT:
13    Q. Okay. Was it your understanding that after
14 it--to continue doing other parts of what she had
15 been doing as Wellness Associate other than this
16 Armed Forces work?
17       MR. PANAGOPOULOS: Objection as to form.
18       THE WITNESS: She should not have expected
19 to have to do any of the other duties. The unit was
20 closing.
21       BY MR. PLITT:
22    Q. Now, this new position of--what did you say

Page 77

1 the name of it was?
2    A. Staff health associate, I think. I'm not
3 sure.
4    Q. Was this the same job that had been
5 entitled staff health nurse for disaster services?
6    A. I believe so.
7    Q. And this was the same position that Jane
8 Davis had held some years previously?
9    A. I don't know that.
10    Q. Did you have any contact with Ms. Powell
11 regarding her desire that the position of staff
12 nurse for disaster services should be paid at a rate
13 higher than the rate paid for Wellness Associate?
14       MR. PANAGOPOULOS: Objection as to form.
15       THE WITNESS: Yes. Tanya and I were both
16 aware that the position in disaster was a level
17 three staff position. Wellness associate is a level
18 two staff position.
19       BY MR. PLITT:
20    Q. And what contact did you have with her
21 about that issue?
22    A. She did express to me that she thought she

Page 78

1  should have an increase in pay if she accepted that
2  other position that had been offered to her.
3      Q.  About what was the difference in pay
4  between the two positions?
5      MR. PANAGOPOULOS:  Objection as to form.
6      THE WITNESS:  I don't know.
7      MR. PANAGOPOULOS:  In addition, it's an
8  area that Carol Miller can speak to.
9      BY MR. PLITT:
10     Q.  When Ken Thiel had been working as a
11 manager, was his rate of pay higher, lower, or the
12 same as Tanya Powell's?
13     A.  Higher.
14     Q.  Work as Wellness Associate?  Higher?  All
15 right.  What was Ken Thiel's rate of pay as--in his
16 position as manager of the Wellness Unit?
17     MR. PANAGOPOULOS:  Objection as to form.
18     THE WITNESS:  I don't know.
19     BY MR. PLITT:
20     Q.  Do you know the level or classification of
21 his position as manager?
22     MR. PANAGOPOULOS:  Same objection.

Page 79

1      THE WITNESS:  I don't specifically recall.
2  His position as a manager would have been in a
3  different family of jobs.
4      BY MR. PLITT:
5      Q.  Okay.  Can you estimate how much he earned
6  per year on average?
7      MR. PANAGOPOULOS:  Objection.  Don't
8  speculate.
9      THE WITNESS:  Yeah.  I don't recall, and I
10 did not review anything with respect to Ken Thiel
11 before this deposition.
12     BY MR. PLITT:
13     Q.  Can you make a reasonable estimate as to
14 how much he earned per year?
15     A.  No, that would be a guess.
16     Q.  Now, when Jane Davis was working as a
17 Wellness Associate, and Tanya Powell was working as
18 Wellness Associate--
19     A.  Mm hmm.
20     Q.  --and it was during a time that they both
21 were employed in that position, was Jane Davis
22 earning more than Tanya Powell in that position?

Page 80

1      A.  I don't recall specifically, but their pay
2  rates were very comparable.
3      Q.  Do you dispute that Jane Davis was being
4  employed at a higher rate of pay than Tanya Powell
5  as Wellness Associate during the time they both had
6  that position?
7      MR. PANAGOPOULOS:  Objection as to form.
8      THE WITNESS:  I don't know the specific pay
9  rates.
10     BY MR. PLITT:
11     Q.  You don't know?
12     A.  No.
13     Q.  Did Tanya--did Jane Davis receive the same
14 rate of pay as Wellness Associate that she had
15 earned previously as Staff Health Nurse for Disaster
16 Services?
17     A.  I don't know.
18     Q.  Okay.  Am I correct in saying that was only
19 part of Ms. Powell's work as well as Wellness
20 Associate that was transferred over to this new
21 proposed--over to this new position as Staff Health
22 Nurse for Disaster Services.

Page 81

1      MR. PANAGOPOULOS:  Objection, just the
2  form.  Asked and answered.
3      THE WITNESS:  Yes.
4      BY MR. PLITT:
5      Q.  Okay.  So the positions were not the same?
6      MR. PANAGOPOULOS:  Objection as to form.
7      BY MR. PLITT:
8      Q.  Were the positions the same?
9      A.  No.
10     Q.  Now, did Ms. Powell's work as Wellness
11 Associate involve the eight service areas of the Red
12 Cross?
13     MR. PANAGOPOULOS:  Objection as to form.
14     THE WITNESS:  Yes, we have National Sector
15 Employees a few in each of those Service Area
16 Offices.
17     BY MR. PLITT:
18     Q.  Did you have any contact with Ms. Powell
19 regarding whether Ms. Powell should have training in
20 order to perform the position, the new position that
21 was being offered to her as a result of the
22 elimination of her Wellness Associate position?

Page 82

1    A. No.

2    Q. Are you aware whether or not that training

3    was discussed with Ms. Powell?

4    A. No.

5    Q. Did you have any contact with Ms. Powell

6    regarding whether or not she would receive severance

7    pay as a result of leaving the Red Cross?

8    MR. PANAGOPOULOS: That is an area

9    designated for Carol Miller.

10    BY MR. PLITT:

11    Q. During the time after Jane Davis had

12    resigned and before Ken Thiel resigned, was Ms.

13    Powell expected to perform the duties of Jane Davis

14    that were assigned to her after Jane Davis had left?

15    MR. PANAGOPOULOS: Objection as to form.

16    THE WITNESS: Yes, if the manager assigned

17    them, she would have been expected to perform them.

18    BY MR. PLITT:

19    Q. And after Ken Thiel had left was Ms. Powell

20    expected to perform the duties of Ken Thiel that

21    were assigned to her after Ken Thiel left?

22    A. Yes.

Page 83

1    Q. And did Ms. Powell perform those duties

2    that had been assigned to her after Jane Davis left?

3    A. Yes.

4    Q. And, did she perform those duties and also

5    the duties that were assigned to her from Ken Thiel

6    after Ken Thiel left?

7    MR. PANAGOPOULOS: Objection as to form.

8    BY MR. PLITT:

9    Q. Do you understand the question?

10    A. Yes. She performed the duties that were

11    assigned to her.

12    Q. And did she continue to perform those

13    duties through the date of her termination?

14    MR. PANAGOPOULOS: Objection at to form.

15    BY MR. PLITT:

16    Q. Do you understand my question?

17    A. Yes. Through about, up until about the

18    last week of her employment, last week to ten days,

19    yes.

20    BY MR. PLITT:

21    Q. Okay. Let me show you what has already

22    been an exhibit in a previous deposition from Ms.

Page 84

1    Powell. It's Exhibit Number 8 from Ms. Powell. I'll

2    show it to your counsel, and you take a look at it.

3    Go ahead. After he's reviewed it, I want you to

4    look at it.

5    MR. PLITT: And I'm proposing if it's all

6    right with counsel since it's already part of the

7    record, we can just refer to it in that way for this

8    record.

9    MR. PANAGOPOULOS: That's fine with me.

10    MR. PLITT: Okay.

11    BY MR. PLITT:

12    Q. Would you take a look at that?

13    MR. PANAGOPOULOS: Well, with the caveat,

14    Brian, that I mean I'm taking your representation

15    that this is Exhibit 8. I obviously I don't know

16    what the exhibits were, so let's, you know, I didn't

17    memorized them, so, just for the record, just to be

18    clear, let's do this: that this is a one-page fax,

19    with a fax strip at the top dated, it looks like is

20    9/1/2006; 13:44 is the time. And the fax number

21    240-777-1317 from Montgomery County DHHS, and it's

22    an e-mail from Tanya Powell's Red Cross e-mail

Page 85

1    address to apparently her home e-mail address, and

2    the subject is daily activities for Wellness

3    Associate I, date Friday 3 June, 2005.

4    BY MR. PLITT:

5    Q. Okay. Would you take a look at that and

6    let me know when you've had a chance to review it,

7    please?

8    A. Okay.

9    Q. Does that memorandum fairly describe the

10    duties performed by Ms. Powell as Wellness

11    Associate?

12    MR. PANAGOPOULOS: Objection as to form.

13    THE WITNESS: I would say not.

14    BY MR. PLITT:

15    Q. Okay. Why do you say not? Those duties

16    weren't performed by her?

17    MR. PANAGOPOULOS: Which question do you

18    want her to answer?

19    BY MR. PLITT:

20    Q. Were those duties not performed by Ms.

21    Powell?

22    A. She would not have been expected to clean

Page 86

1    the cot rooms.  Other than that, yes, she may have
2    done these things when she was the only staff person
3    there.  When there were more people there, because
4    she left at 4:30, she would not have locked files
5    and cabinets.  She would have been leaving before
6    the work day was over.
7        Q.  Okay.  And who expected to clean the cot
8    rooms?
9        A.  Facilities.  The cleaning crew.
10       Q.  What about locking up after did you say the
11   cabinets?
12       A.  Yeah.  All cabinets at the Red Cross are
13   kept locked.  Specifically within the Wellness Unit,
14   there was a room or was a room that had medical
15   record file cabinets and a medication refrigerator.
16   That specific office, like lots of other offices in
17   the Red Cross, are locked.  Like I lock my office at
18   night.  I also unlocked in the morning.  The staff
19   in the Wellness Center all had keys, so whoever came
20   in first in the morning, would unlock things. The
21   person who left at the end of the day would lock
22   them.

Page 87

1        Q.  So who was responsible for locking?
2        A.  The manager was responsible for making sure
3    that the unit was secure and all of the medications
4    and records were secure.
5        Q.  So in other words, the last person working
6    in the Wellness Unit was responsible for locking the
7    cabinets?
8        A.  Yes, takes all of one minute.
9        MR. PANAGOPOULUS:  Do you want that
10   calculated as a percentage of time?
11       BY MR. PLITT:
12       Q.  No.  But I'd like to know after Ken Thiel
13   resigned, that that duty fell to Ms. Powell
14   entirely; correct?
15       A.  Yes, although I would because Tanya left at
16   4:30 generally, I would sometimes go down there at
17   5:30 or so just to ensure that things were locked
18   and that employees were not there having expected to
19   get services or maybe they could think they can talk
20   to somebody a nurse about their blood pressure or
21   blood sugar or illness.
22       Q.  Now, Ms. Powell did not always leave at

Page 88

1    4:30; is that correct?
2        A.  Yeah, she did not leave every day at
3    exactly 4:30.  We don't keep clock-in, clock-out
4    times.  She would occasionally stay past 4:30.
5        Q.  You testified about the period of time
6    where Ms. Powell's position as Wellness Associate
7    had been announced to be eliminated and she was
8    offered this position as Staff Health Nurse for
9    Disaster Services, and you testified that certain
10   functions were to be transferred to the staff health
11   nurse section.
12       A.  Yes.
13       Q.  About what percentage of the time of Ms.
14   Powell's--about what percentage of the time that Ms.
15   Powell had been putting in in terms of Wellness
16   Associate was to be transferred to the staff health
17   nurse position?
18       MR. PANAGOPOULOS:  Objection as to form.
19       THE WITNESS:  I would estimate 40 percent.
20       BY MR. PLITT:
21       Q.  Okay.  About how many employees were
22   working at the Red Cross at the time that Ms. Powell

Page 89

1    was employed with the Red Cross?
2        MR. PANAGOPOULOS:  Objection as to form.
3        THE WITNESS:  National Center employees?
4        BY MR. PLITT:
5        Q.  Yeah.  At that same location.
6        A.  At that location?
7        Q.  Mm hmm.
8        A.  A thousand to 1,200.
9        Q.  Okay.  And you know about what percentage
10   of those employees were compensated as non-exempt
11   employees?
12       A.  I do not know that.
13       MR. PANAGOPOULOS:  And I'm going to
14   obviously object to it as beyond the scope.
15       MR. PLITT:  Okay.  I'm just asking, so I
16   think it might be Part "D," but I understand the
17   objection.
18       MR. PANAGOPOULOS:  No, I don't think it's
19   Part "D" at all, at least not Part "D" that, you
20   know, we would have prepared to answer for this
21   lawsuit.  You asked for duties of plaintiff and
22   people in the wellness area.  You didn't ask