Page 240

1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4   - - - - - - - - - - - - - - -x

5   TONIA POWELL,                 :

6            Plaintiff,            :

7       vs.                       :   Case No. 1:06CV1173

8   AMERICAN RED CROSS,           :

9            Defendant.            :

10  - - - - - - - - - - - - - - -x  VOLUME II

11                                    Washington, D.C.

12                                    Tuesday, November 14, 2006

13  Continued Deposition of

14                    TONIA S. POWELL

15      Plaintiff, taken on behalf of counsel for the

16  Defendant in the above-entitled matter, before Denise

17  M. Brunet, RPR and Notary Public in and for the

18  District of Columbia, taken at the offices of Ballard

19  Spahr Andrews & Ingersoll, LLP, 601 13th Street,

20  Northwest, Suite 1000 South, Washington, D.C,

21  commencing at 2:18 p.m., when were present on behalf

22  of the respective parties:

98f13148-2c45-4a95-8425-66c07fa2ac6e

```
 1              A P P E A R A N C E S:

 2   ON BEHALF OF THE PLAINTIFF:

 3       BRIAN C. PLITT, ESQUIRE
         1239 C Street, Southeast
 4       Suite 4
         Washington, D.C.  20003
 5       (202) 546-5493

 6

     ON BEHALF OF THE DEFENDANT:
 7
         CONSTANTINOS G. PANAGOPOULOS, ESQUIRE
 8       Ballard Spahr Andrews & Ingersoll, LLP
         601 13th Street, Northwest
 9       Suite 1000 South
         Washington, D.C. 20005
10       (202) 661-2200

11

12

13

14

15                                       -oOo-

16

17

18

19

20

21

22
```

1   want to get what you actually did in terms of the

2   Workers' Compensation claims.

3              Did you fill out Workers' Compensation

4   forms?

5       A    Yes, I did.

6       Q    Now, did you have any discretion at all in

7   determining whether the Workers' Compensation

8   claims -- did you decide whether they could be paid or

9   not paid?

10      A    No, did not.

11      Q    Did you simply collect -- can you state

12  whether or not you collected information from the

13  workers that would go into a pre-prepared form?

14      A    That's correct.

15      Q    And then did you then -- can you state

16  whether or not you then gave over that information in

17  the form to someone else to decide whether or not that

18  would be covered in the Workers' Compensation?

19      A    Right.  I would get a report of the injury

20  from the employee, fill out the form and submit it to

21  Gates McDonald, and their nurse would pursue the claim

22  from there and make the decision on reimbursement and

1  any type of therapy. If they needed physical therapy,
2  they would certify or authorize that person to have
3  physical therapy.
4          So I didn't have any input in how it was
5  reimbursed or the services they would receive.
6    Q    And so can you state whether or not what
7  you were doing in terms of Workers' Compensation was
8  basically that sort of clerical duty?
9    A    It was clerical.
10   Q    All right. Now, in terms of working with
11 injured employees and the insurance carrier, I gather
12 injured -- I just want to get exactly what you did as
13 far as that was concerned just on a very basic
14 day-to-day --
15   A    If someone came in injured?
16   Q    Uh-huh.
17   A    I would assess their wound to make sure it
18 was something within our scope of basic first aid
19 care. If it was beyond basic first aid care, we would
20 get the client to either their doctor's -- call the
21 physician, go to the doctor's office, or if it
22 warranted for them to go to the emergency room.

1   Q   So you would look at them to see if this is
2   something the Red Cross could --
3   A   Right, within my scope or within the
4   practice scope of the wellness unit, yes. It was only
5   basic first aid.
6   Q   And basically, what -- you could provide
7   services in terms of aspirin, Band-Aids or --
8   A   Right. Band-Aids, cleansing wounds,
9   aspirins, ice packs.
10  Q   Anything else went to the emergency room?
11  A   Right.
12  Q   All right. Now, in terms of your work with
13  the personnel called AFES, we talked a lot about that
14  during the deposition.
15  A   Right.
16  Q   In terms of your work with the AFES people,
17  did you -- can you explain whether or not you had any
18  discretion in determining whether or not these
19  personnel could be -- would be deployed or not or
20  whether you collected information for other people to
21  make that determination?
22  A   All the information was collected according

1  to the military guidelines. They had to meet that
2  specification. Then that was submitted to the AFES
3  manager for their employees to know or their personnel
4  to know they were going to be deployed or not.
5      Q   So was it the manager who then made the
6  decision as to whether or not that individual would be
7  deployed?
8      A   Yes. They have to say you're going to go
9  for deployment, yes.
10     Q   And you did not make that decision?
11     A   Right. I don't deploy people. That
12 department deploys people.
13     Q   Was your role entirely one of collecting
14 information from the employee to fill in to a chart or
15 spreadsheet or according to certain guidelines that
16 had been given to you?
17     A   Yes.
18         MR. PANAGOPOULOS: Objection as to form.
19         THE WITNESS: Yes. I would review medical
20 records based on the medical -- the criteria of the
21 military guidelines, and those records would be in a
22 file as well as on a spreadsheet so we can keep track

1  of who was on target for the deployment schedule.
2        BY MR. PLITT:
3    Q    So you had certain schedules that you
4  worked with, certain pre-prepared schedules?
5    A    Right.  The AFES team had short-term
6  deployments, three to six months.  So they had people
7  who were always being prepared for deployment six
8  months to a year out or sometimes even shorter, like
9  three months.  So it was on a cycle.
10   Q    Did you take down information that the AFES
11 people gave you, the employees?
12   A    Yes.  We asked for their submission of
13 their medical records, lab results, chest x-ray,
14 immunization records.  Any other type of records from
15 their physician, we would ask for those.
16   Q    And you then -- were you then in charge of
17 collecting all that information?
18   A    Yes.  And it was kept in a file.
19   Q    And then were you in charge of then turning
20 over that information to someone else?
21   A    We would give them the information to save
22 that they had met the requirement for medical

1  deployment, but they actually didn't get their
2  records. We kept all of the medical records in the
3  wellness unit in a cabinet, in a file cabinet.
4    Q    But in terms of determining whether or not
5  someone met the criteria for deployment, was that
6  cutoff determined by the regulations?
7    A    Yes. By military regulations.
8    Q    Okay. So you didn't have anything to say
9  about --
10   A    No.
11   Q    -- determining whether in fact it met that
12 cutoff or not?
13   A    That's correct. If I had a question about
14 a result or a test, I would call the CRC where -- to
15 where they were going, where they were -- which is the
16 command receiving center and talk to that physician
17 there and let them know this person is a Red Cross
18 AFES employee targeted for this type of deployment at
19 this particular time. This is the test result. Is
20 this person deemed necessary or eligible for
21 deployment.
22   Q    So that was a question for the

Page 342

1  A     No.

2         MR. PANAGOPOULOS: Objection as to form.

3         THE WITNESS: No.

4         BY MR. PLITT:

5  Q     And can you state whether or not you had
6  any discretion in terms of determining whether or not
7  the injuries would be -- OSHA injuries would be
8  covered?

9         MR. PANAGOPOULOS: Objection as to --
10 objection as to form.

11        THE WITNESS: OSHA has specific guidelines
12 and regulations of what injuries that occur in the
13 workplace they want to have knowledge of. And the
14 reason why they want that is in case that there is
15 some type of exposure that could affect the safety of
16 other personnel that needs to be reported. They want
17 to know how that industry or that company handled that
18 exposure. Like if any deaths happen on the job, they
19 want to know why did that person die.

20        BY MR. PLITT:
21 Q     All right. So you didn't have any
22 discretion as far as determining which -- what those

Misty Klapper & Associates
703-780-9559

Page 343

1  regulations would be or telling OSHA whether or not
2  they should know about a certain injury or not?
3           MR. PANAGOPOULOS: Objection as to form.
4           THE WITNESS: That's all federal and state
5  guidelines.
6           BY MR. PLITT:
7      Q    And in terms of this immunization, that was
8  Travax?
9      A    Yes, for international services.
10     Q    When you began working at Red Cross, did
11 you expect that you would have to work more than
12 40 hours per week?
13     A    No.
14     Q    And did there come a time after Jane Davis
15 left that -- can you state whether or not there came a
16 time after Jane Davis left that you had to work
17 overtime hours?
18          MR. PANAGOPOULOS: Objection as to form.
19          THE WITNESS: Yes, I did have to work
20 extended hours to complete the work.
21          BY MR. PLITT:
22     Q    More than 40 hours per week?

Page 347

1  exactly how many extra hours were involved after Ken
2  Thiel left.
3      A    Uh-huh.
4      Q    Do you recall --
5           MR. PANAGOPOULOS: Objection as to form.
6           BY MR. PLITT:
7      Q    Do you recall that testimony?
8      A    Yes.
9      Q    All right. Now, in your complaint, you
10 stated that the Red Cross, after Ken Thiel left,
11 required you to perform at least 12 to 18 hours of
12 additional overtime per week --
13     A    That's correct.
14     Q    -- over and above what you were doing after
15 Jane Davis left, after Ken Thiel left?
16     A    That's correct.
17     Q    All right.
18          MR. PANAGOPOULOS: Objection as to form.
19          BY MR. PLITT:
20     Q    Can you state whether or not that amount of
21 hours that you put in your complaint is accurate in
22 terms of what you did actually have to do after Ken

Misty Klapper & Associates
703-780-9559

98f13148-2c45-4a95-8425-66c07fa2ac6e

1  on doing this work on AFES, doing the work that you
2  had -- that Jane Davis had been doing and Ken Thiel
3  had been doing and the staff health nurse for disaster
4  services position at the same rate of pay?
5      A   Yes, I did.
6          MR. PANAGOPOULOS:  Objection as to form.
7          BY MR. PLITT:
8      Q   Now, you testified earlier that there was
9  one of the exhibits that you had not seen before you
10 came to the deposition.
11         Can you look at Exhibit Number 16, please?
12     A   I have it.
13     Q   Can you state whether or not that's the
14 document you hadn't seen before the deposition?
15     A   That's correct.  This is it.
16     Q   We talked about the end of the time that
17 you were working at the Red Cross, the last month you
18 were working there being June of 2006.
19     A   That's correct.
20     Q   Did you continue -- can you state whether
21 you continued doing your work through the end of that
22 month?

1    A    Yes, I did.  In addition to closing the
2  unit.
3    Q    You testified that Jane Davis, before she
4  worked as wellness associate or occupational health
5  nurse at the Red Cross, had actually worked as a staff
6  nurse for disaster services.
7    A    That's correct, she did.
8    Q    Was it your understanding that she had been
9  paid more or less as staff health nurse for disaster
10  services than you were paid as wellness associate?
11        MR. PANAGOPOULOS:  Objection as to form.
12        THE WITNESS:  That's correct.  She did tell
13  me that she had a higher salary.
14        BY MR. PLITT:
15    Q    And then while she was paid -- while she
16  was working as wellness associate and you were also
17  working as wellness associate, was her salary -- was
18  her rate of pay higher or lower than yours?
19        MR. PANAGOPOULOS:  Objection as to form.
20        THE WITNESS:  It was higher than mine,
21  according to her because she started in disaster
22  services initially.  And then when she left, they did

Page 358

1   not reduce her salary, even though it's a lower

2   position, level II versus level III.

3           BY MR. PLITT:

4       Q   There were some questions about your claim

5   for wage discrimination in terms of the complaint that

6   you filed.

7           Can you state whether or not it's part of

8   your claim of wage discrimination that Jane Davis was

9   paid more than you were at the wellness associate

10  position?

11          MR. PANAGOPOULOS:  Objection as to form.

12          THE WITNESS:  Yes, I consider it wage

13  discrimination.

14          BY MR. PLITT:

15      Q   And can you state whether or not it's part

16  of your claim of wage discrimination in this case that

17  Jane Davis was paid more as staff health nurse for

18  disaster services, later named wellness nurse, than

19  you were offered for that same position?

20          MR. PANAGOPOULOS:  Objection as to form.

21          THE WITNESS:  Yes, I do.

22

Misty Klapper & Associates
703-780-9559

98f13148-2c45-4a95-8425-66c07fa2ac6e

```
 1              BY MR. PLITT:
 2        Q     Do you recall testifying it was -- what was
 3   it, basically all of his duties or some of his duties?
 4        A     All of --
 5              MR. PANAGOPOULOS:  Same objection.
 6              THE WITNESS:  All of his duties except the
 7   John Barton Payne Fund.
 8              BY MR. PLITT:
 9        Q     And were you then paid any additional
10   hourly wage as a result of having to take on those
11   duties?
12              MR. PANAGOPOULOS:  Same objection.
13              THE WITNESS:  No, I was not.
14              BY MR. PLITT:
15        Q     Now, was it your understanding that Ken
16   Thiel was paid -- paid for his duties at the Red
17   Cross?
18        A     Yes.  He's a manager.
19        Q     And was he paid at a higher rate of pay at
20   the Red Cross than you were earning as wellness
21   associate or occupational health nurse?
22              MR. PANAGOPOULOS:  Objection as to form.
```

98f13148-2c45-4a95-8425-66c07fa2ac6e

1          THE WITNESS:  Yes, he was.

2          BY MR. PLITT:

3     Q    And can you state whether or not that's

4  part of your complaint, as you understand it, for wage

5  discrimination, that he was paid for his duties in his

6  position but you were not paid for taking over

7  those -- for having to take over those duties after he

8  left?

9          MR. PANAGOPOULOS:  Objection as to form.

10         THE WITNESS:  That's correct.

11         BY MR. PLITT:

12    Q    And can you state whether or not that you

13 believe that that is a race discrimination issue?

14    A    I believe it is a wage discrimination

15 issue.  Ken Thiel is Caucasian, and certainly they did

16 not replace him or send any type of help to assist me

17 with the duties.

18    Q    Can you state whether or not you believe

19 that that issue in your complaint is a sex

20 discrimination issue?

21         MR. PANAGOPOULOS:  Objection as to form.

22         THE WITNESS:  No, I don't -- I look at sex

98f13148-2c45-4a95-8425-66c07fa2ac6e

Page 362

1  discrimination as -- no, I can't say it's a sex
2  discrimination issue.
3           BY MR. PLITT:
4       Q   But in terms of him being male and you
5  being female?
6           MR. PANAGOPOULOS:  Same objection.
7           THE WITNESS:  No.  I --
8           BY MR. PLITT:
9       Q   In terms of -- can you state whether or not
10 you believe your position at the Red Cross was -- your
11 employment at the Red Cross was ended because you
12 opposed being paid for the position of wellness nurse
13 or staff health nurse at a rate that you consider to
14 be discriminatory?
15          MR. PANAGOPOULOS:  Objection as to form.
16          THE WITNESS:  Yes, I do.
17          BY MR. PLITT:
18      Q   Do you believe that your employment at the
19 Red Cross was terminated because you decided not to
20 work in the wellness nurse or staff health nurse
21 position and continue to perform duties that required
22 you to work extra hours over 40 hours a week?

Page 363

1          MR. PANAGOPOULOS: Objection as to form.

2          THE WITNESS: Yes, I do.

3          BY MR. PLITT:

4     Q    In terms of what you have suffered as a

5  result of what happened at the Red Cross, you

6  testified about feeling humiliated, harassed, and I

7  believe you used the word anguish at one point.

8          Can you explain how long you have felt

9  those feelings as a result of your employment at the

10 Red Cross?

11    A    Well, I felt the bulk of it when I was

12 given the deadline or the 12:00 deadline that you have

13 to accept this position or not.

14         But, yes, I did feel intimidated. It was

15 humiliating to know that -- I could tell in the job

16 description that they were two distinct positions,

17 separate and distinct, and that I would be doing the

18 work as a wellness unit as well as taking on all the

19 responsibility in disaster health.

20         So my job duties had tripled or quadrupled,

21 yes, and I wanted compensation for it. I didn't mind

22 the work, but I wanted to be paid for it.

1   Q   Now, since working at the Red Cross, have

2   you continued to -- can you state whether or not you

3   continue to feel those same feelings?

4   A   Well, I'm angry about it, yes, and I'm

5   willing to face a judge to get my point across, yes.

6   Q   As you sit here today, can you state

7   whether or not you still feel some sense of

8   humiliation, harassment or anguish?

9           MR. PANAGOPOULOS:  Objection as to form.

10          THE WITNESS:  Well, I can't say that

11  humiliation or the harassment is direct, but certainly

12  going through the process is humiliating because I

13  think it's fairly clear-cut, in policies and

14  procedures despite saying exempt, I wasn't hired to

15  work for three persons or to do the tasks of three

16  distinct positions.  I was hired to do a task of one

17  position, and I got no help when the second position

18  was eliminated, Jane Davis, and certainly no help when

19  the manager (sic).

20          BY MR. PLITT:

21  Q   In terms of talking about your duties at

22  the Red Cross in the position of wellness associate,

Page 384

1   the -- two questions based on the questions asked.
2          FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
3              BY MR. PLITT:
4       Q     Talking about the hours of overtime pay
5   that you worked, is it possible for you to estimate
6   the number of hours of overtime over 40 hours a week
7   that you worked after Ms. Jane Davis left?
8              MR. PANAGOPOULOS:  Objection as to form.
9              THE WITNESS:  Yes.  We did estimate that.
10             BY MR. PLITT:
11      Q     That's in your complaint?
12      A     That is in the complaint.
13      Q     Is it possible for you to estimate the
14  number of hours of overtime over 40 a week that you
15  had to work after Mr. Ken Thiel left?
16      A     That too is in the complaint.
17             MR. PLITT:  That's all.
18             MR. PANAGOPOULOS:  All right.  Ms. Powell,
19  you have the right to review the deposition and read
20  and sign it, or you can waive that right.  That choice
21  is yours.
22             I would suggest you talk to your counsel