1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

TONIA POWELL,                              :

        Plaintiff,                     :

vs.                                        : Case No.
                                             1:06CV1173

AMERICAN RED CROSS,                        :

        Defendant.                     :

- - - - - - - - - - - - - - x

November 10, 2006

Washington, D.C.

DEPOSITION OF:

TONIA POWELL

Was called for examination by counsel for the

Defendant, pursuant to notice, in the offices of,

Ballard, Spahr, Andrews & Ingersoll, 601 13th

Street, N.W., Suite 1000 South, Washington, D.C.,

commencing at 9:53 a.m., before Carolyn Friend, a

Notary Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

**Page 2**

```
 1  APPEARANCES:
 2        BRIAN C. PLITT, ATTORNEY-AT-LAW
          1239 C Street, S.E.
 3        Suite 4
          Washington, D.C. 20003
 4        (202) 546-5493
          COUNSEL FOR THE PLAINTIFF
 5
          CONSTANTINOS G. PANAGOPOULOS,
 6        ATTORNEY-AT-LAW
          Ballard, Spahr, Andrews & Ingersoll
 7        601 13th Street, N.W., Suite 1000 S
          Washington, D.C. 20005
 8        (202) 661-2202
          COUNSEL FOR THE DEFENDANT
 9
10              C O N T E N T S
11  WITNESS:        EXAMINATION BY:      PAGE:
12  Tonia Powell         Mr. Panagopoulos   4
13          E X H I B I T S
14  NO.:    DESCRIPTION:           PAGE:
15  1       letter of hire          100
16  2       policies                107
17  3       job description         116
18  4       job description         117
19  5       job description         131
20  6       job description         135
21  7       job description         140
22  8       job description         142
```

**Page 3**

```
 1          E X H I B I T S (CONT'D)
 2  9       job description         149
 3  10      job description         172
 4  11      job description         179
 5  12      e-mail                  190
 6  13      e-mail                  199
 7  14      e-mail                  204
 8  15      e-mail                  208
 9  16      promotions              224
10
11  Note: Exhibits marked and retained by Counsel.
12
```

**Page 4**

P R O C E E D I N G S

1 Whereupon:

2          TONIA POWELL,

3 Was called for examination, and, after being

4 duly sworn, was examined and testified as

5 follows:

6          EXAMINATION BY COUNSEL FOR

7          DEFENDANT

8 BY MR. PANAGOPOULOS:

9    Q My name is Dino Panagopoulos. I

10 represent the American Red Cross, and as you know,

11 we are here to take your deposition today. Have you

12 ever been deposed before, ma'am?

13    A No. It's my first time.

14    Q Well, let me explain the process to you a

15 little bit so that we all have an understanding

16 going into it what is going to happen. I will be

17 asking you a series of questions. You are to answer

18 my questions to the best of your ability fully and

19 completely. Okay?

20    A Yes.

21    Q From time to time, as I ask questions,

**Page 5**

1 your attorney may object. The only proper objection

2 in federal court is objection as to form. So he may

3 say objection as to form.

4          Even if he objects, you are to still

5 answer my question. That's only for the record so

6 that he can preserve his objection. If he

7 specifically instructs you not to answer because

8 there is a privilege involved, then you can -- it's

9 your choice as to whether or not to obey that

10 instruction.

11          But if it's simply an objection, you are

12 still to answer. Okay?

13    A Yes.

14    Q I will assume that you understand my

15 questions and answered it as asked unless you tell

16 me there is something about it you don't understand.

17 So if you need me to clarify anything, please let me

18 know. I am not trying to trick you. We are just

19 trying to get at what the facts are of this case.

20 Okay?

21    A Okay.

22    Q Also, as you can see, we have a Court

**Page 30**

1 last employees that left to make sure all the
2 projects were completed. So I had an extended
3 severance in addition to a bonus.
4    Q All right. What year was that that it
5 closed?
6    A That was in -- I'm trying to think of
7 dates. I was trying to think --
8    Q You indicated you had started in '98.
9    A I did? Okay.
10    Q And you were there for five years. Was
11 it approximately 2003?
12    A I'm trying to think. I'm thinking about
13 my brother-in-law when he deceased. He deceased in
14 '99. Was I still there after he deceased? I can't
15 remember the dates.
16    Q Okay.
17    A I'm sorry.
18    Q How long were you out of a job after
19 ADPIMS closed?
20    A I was off for the summer. I got a --
21 because I had the severance. I started with an
22 agency, at Atlantic Health Services. That was in --

**Page 31**

1    Q An agency where? I'm sorry. I didn't
2 hear.
3    A It's called Atlantic Health Services.
4    Q When was that; do you recall?
5    A That was in late spring.
6    Q Do you recall the year?
7    A 2004.
8    Q And how long were you with the agency?
9    A Just a couple of months because I got a
10 call from the Red Cross recruiter who had my resume,
11 saw my resume on the Internet and wanted me to
12 interview for a position.
13    Q Had you posted a resume on the Red Cross
14 website?
15    A No. Just like on Monster.
16    Q Oh, Monster?
17    A Right. And she picked me up off one of
18 those.
19    Q When you were working for Atlantic, what
20 types of positions did you have?
21    A I was contracted to work for MRDDA here
22 in D.C.

**Page 32**

1    Q What is MRDDA?
2    A That's your Mental Retardation Disability
3 Administration here in D.C. It was down on H
4 Street. And the title there was nurse investigator.
5    Q What were your duties and
6 responsibilities as a nurse investigator?
7    A Well, initially, my duties were just to
8 do paper review of abuse allegations, looking at the
9 medical part of the abuse allegations because
10 investigators didn't have medical knowledge.
11     But eventually, that extended to where I
12 actually went out with investigators on my own to
13 the various sites to look into the allegations.
14    Q Okay. And were you paid by the agency
15 during that time period?
16    A That's correct. And it was hourly.
17    Q The agency paid you hourly and contracted
18 your services out to MRDDA?
19    A That's correct.
20    Q And that was until you started with the
21 Red Cross; is that correct?
22    A That's when I started with the Red Cross.

**Page 33**

1    Q Your counsel has asked for a break.
2 Before we do that, I'd like -- what was your first
3 position at the American Red Cross?
4    A I only had one position at the American
5 Red Cross.
6    Q And what position was that?
7    A That was called the wellness nurse.
8    Q When did you start in that position?
9    A I think end of October.
10    Q October 2004?
11    A It had to be because this is 2006.
12    Q Okay. And when you were hired, were you
13 hired in an exempt or hourly position?
14    A It was an exempt position.
15    Q What were your duties and
16 responsibilities?
17    A I was doing occupational health nursing
18 in a non-industrial setting.
19    Q Just explain to me briefly what that
20 means.
21    A What my duties were around that was doing
22 first aid, minimal first aid for clients who injured

Page 34

1 themselves. More, it was record review and
2 preparing physicals for people who were going out
3 for deployment. They had various people that would
4 go out.
5    Q    For AFES?
6    A    For AFES, um-hmm. I would do ergonomic
7 assessment, health education.
8    Q    Ergonomic assessment, what does that
9 mean? I remember when I was at the Red Cross,
10 someone would come around and adjust my chair --
11   A    That's correct.
12   Q    -- and I'd have to put it back to the
13 comfortable position after they left.
14        Is that one of the things you were doing?
15   A    The whole idea was, yes, to make your
16 work station more efficient and be pain free. But
17 you had to know what it was to do that, so --
18   Q    I remember having to take my screen off,
19 my computer screen off all the stands they kept
20 putting under it. And that --
21   A    I wasn't there at that time, so --
22   Q    Okay. Anything else? You have already

Page 35

1 discussed some first aid, records review for AFES
2 deployments, ergonomic review. Anything else?
3    A    Blood pressures, health counseling,
4 keeping their resting or sleeping rooms cleaned and
5 changed, the whole space, that area where they would
6 come in, dispensing of educational material, filling
7 the first aid boxes that were throughout the unit --
8 I shouldn't say throughout the unit, but throughout
9 the entire headquarters, including the ADE monitors,
10 attending --
11   Q    I'm sorry. You mean AED monitors or --
12   A    Um-hmm. And including staff meeting with
13 AFES personnel, briefings and debriefings with AFES
14 personnel, mothers -- the lactation room, can't
15 forget the lactation room, order of supplies, office
16 supplies, medical supplies, stocking, file
17 management.
18   Q    Okay.
19   A    That's what I initially did.
20   Q    Okay. Let's talk about the AFES meetings
21 and AFES reviews. What would you do with respect to
22 those meetings and reviews?

Page 36

1    A    In the meetings, it would be a core group
2 of people. It would be the AFES, managers, and the
3 CMAs, and they were re-reviewing the people who were
4 ready for deployment, for the next deployment, who
5 those people were.
6    Q    When you say CMA, what does that stand
7 for?
8    A    That's your client management associate.
9 That was your liaison between HR and -- and my
10 responsibility and my no role in that was knowing
11 who were the people that were going off for
12 deployment and what stage they were at in their
13 physical assessment, to see if they were ready for
14 deployment.
15        Or if they were coming back, anything
16 that happened to them over there and preparing for
17 their debriefing when they came back and the
18 scheduling of their next physical.
19   Q    Tell me specifically what would happen
20 with respect to the physical review. The individual
21 would be sent to the doctor, they would get a
22 physical, a report, and then you would review that

Page 37

1 report to determine if that person is deployable?
2    A    Right, and our determination would be
3 based on the military guidelines.
4    Q    So you were looking at the doctor's
5 report to determine whether or not that individual
6 was deployable, based on the military guidelines for
7 deployment?
8    A    That's correct.
9    Q    And that was because some of these
10 individuals were deployed into potential combat
11 zones; is that right?
12   A    That's correct.
13   Q    Now, on the return, was it the same type
14 of situation, where you would review their physicals
15 after they returned to determine what --
16   A    Well, the physicals didn't have the
17 review because that was done before they were
18 leaving. But let's say they had injuries or illness
19 while they were over there, we would discuss that
20 with them and follow up and make sure if they needed
21 any medical appointments.
22        We would look at their immunizations,

Page 38

1 because when you come back out, they do give you a
2 PPD testing. I had one client who actually had a
3 heart attack and ended up needing bypass surgery.
4 So he was in deployment, so I had to make
5 sure while he was there that he was under cardiac
6 care, what did he need, could he stay there, how do
7 we transport him back, can he come back by regular
8 big military flight, or does he have to come back in
9 a different type of flight, will there be medical
10 access on the flight where they can get him safely
11 here.
12    Q And that was all your responsibility to
13 make those determinations with respect to that
14 cardiac care patient?
15    A Yes, it was. The manager would call me
16 and say so-and-so had a heart attack. Can you
17 follow up what's going on, because they really
18 didn't know the language or the extent of what they
19 needed. And so they looked to my medical knowledge
20 to help guide them on this client. And even if he
21 could return, to be fit for duty for the next
22 appointment or if he would be completely discharged

Page 39

1 or released from the Red Cross.
2    Q What is PPD testing?
3    A That's tuberculosis testing.
4    Q Got it. Okay. Is that the extent of
5 your duties and responsibilities when you started at
6 the Red Cross?
7    A When I started?
8    Q Right.
9    A No.
10    Q What else was it that you were doing?
11    A My duties expanded, doubling when Jane
12 Davis left.
13    Q I want to talk about now before Jane
14 Davis left, just your initial duties. Your counsel
15 has asked for a break. I just want to get a sense
16 of what you did when you first started.
17    You have talked to me about a lot of the
18 administration function you had with respect to file
19 management, supplies. You have talked to me about
20 some of the discretion you had with respect to
21 taking care of making sure that people who had
22 health issues were taken care of, using the cardiac

Page 40

1 care as an example.
2    You have talked to me about the meetings
3 you had with management on whether or not
4 individuals were deployable, the medical review
5 there. You have talked to me about order review and
6 file management. You have talked to me about first
7 aid, taking care of the resting rooms, blood
8 pressure, monitoring some, I guess, health concerns,
9 educational materials.
10    Anything else that you did?
11    A Workmen's compensation filing.
12    Q I'm sorry?
13    A Workmen's compensation filing.
14    Q What did you do with to respect workers'
15 comp files?
16    A Any injuries that were reported, I had to
17 do the claims, do the claims submission.
18    Q You would fill out the information in
19 order to submit it to the Red Cross' carrier?
20    A Yes, that's correct. And I think the
21 carrier's thing was Gates McDonald.
22    Q Ordering supplies, was that you would

Page 41

1 look at the file room or whatever, the supply room,
2 and determine what was needed on your own and make
3 those decisions and order the supplies?
4    A Right.
5    Q What about file management?
6    A File management, keeping files locked.
7 We had different files for workmen's comp injuries,
8 we had different files for the medical excuses that
9 they show when people return from work, notifying
10 the managers for that, that this person had a valid
11 excuse, they can return to work.
12    If there was any ADA issues, how we would
13 refer that.
14    (Interruption by phone
15    ringing.)
16    (Thereupon, a brief recess was
17    taken.)
18    BY MR. PANAGOPOULOS:
19    Q I believe before we took a break we were
20 talking about your duties and responsibilities in
21 your first position, is that correct, ma'am, first
22 position at the Red Cross?

Page 46

1    A   Right, and then you may have people over
2  at Jefferson Park, who could walk over to the
3  wellness unit.  They had a wellness unit over at
4  Jefferson Park, but --
5    Q   And that's kind of my question.  I mean,
6  you specifically didn't deal with employees over at
7  Jefferson Park; you dealt with headquarters
8  employees; is that right?
9    A   Well, we were responsible for interacting
10  with people at Jefferson Park.
11    Q   How so?
12    A   Well, I did ergonomic training over at
13  Jefferson Park, I would send health materials over
14  to Jefferson Park.  Either I would walk over with
15  our health pamphlets or I would interdepartment mail
16  them over.
17          The wellness unit was unmanned, and I'm
18  not sure how highly used because Ken Thiel really
19  did not keep an accurate record of it, but that did
20  not mean that injuries were not occurring over
21  there.  And people were calling me for ergonomic
22  assessment or health counseling questions or

Page 47

1  workmen's compensation claims.
2    Q   But if someone trips and falls at
3  Jefferson Park, they don't hop on the Red Cross
4  shuttle and come to the national headquarters for
5  first aid, do they?
6    A   I never had an injury from there, but
7  I've had people come over for blood pressure checks
8  and to talk to me about blood pressure control, diet
9  control, things like that.
10    Q   So someone would call up and make an
11  appointment with you and you would deal with the
12  situation?
13    A   Right.  The other thing that I was slated
14  to do but never occurred was to be an instructor for
15  first responders.  You know, they had employees that
16  were supposed to be taught CPR, laymen's CPR so if
17  something happened in those distant locations, there
18  would be someone there.
19    Q   When you say training to become a first
20  responder, you mean something other than the regular
21  Red Cross first responder classes, the first aid and
22  CPR classes?

Page 48

1    A   Their first aid CPR classes.
2    Q   So you were a first aid CPR instructor?
3    A   I was slated to do that.  I was slated to
4  go for instruction, but when personnel changes
5  happened, it couldn't, you know --
6    Q   Just so I understand.  You were slated to
7  go to instructor training so that you could become
8  an instructor?
9    A   That's correct.
10    Q   And that never happened?
11    A   That never happened.
12    Q   Now, before we took a break, you started
13  to indicate that at some point your duties and
14  responsibilities were expanded; is that correct?
15    A   That's correct.
16    Q   What point did that occur?
17    A   It first occurred when Jane Davis
18  resigned suddenly from the Red Cross.
19    Q   When did Jane Davis resign; do you
20  recall?
21    A   Sometime early in January, I believe.
22    Q   January of '05?

Page 49

1    A   '05.
2    Q   So after you were there for a few months?
3    A   Right.
4    Q   What was Jane Davis' job title?
5    A   She had the same job title.
6    Q   Same duties?
7    A   Same duties.  We split them in half I was
8  hired to be the third person of this unit.  Prior to
9  me being there, they had a contract nurse there
10  doing the duties.  I'm not sure why that person
11  left, but that's who I replaced.
12          Jane Davis indicated that she could not
13  do this function alone and that's why they hired --
14  got someone full time for that position.
15    Q   All right.  So is it a fair
16  characterization, then, that your duties and
17  responsibilities remained the same; it is just that
18  the workload increased because one of the two
19  people, you and Jane Davis, one of those people who
20  were doing those duties left?
21    A   That's correct.  It doubled, the workload
22  double.

Page 50

1    Q   The workload essentially doubled?

2    A   Um-hmm.

3    Q   But there was no change in the duties
4  themselves, right?

5    A   No change in the duties.

6    Q   In other words, there wasn't some duty
7  that Jane was performing that you were not that you
8  had to take on in addition to what you did before,
9  some different duty?

10    A   The only duty that Jane did do was she
11  was an instructor for first responders.

12    Q   But you never got that training, so you
13  never did -- that's a duty that you didn't take on?

14    A   That's correct.

15    Q   Were there any other duties that Jane did
16  that you did not take on?

17    A   Well, she was backup for the manager.
18  When Ken was out, she would take over all of the
19  manager duties, dealing with international services
20  and the OSHA reports.  But she only did that if he
21  was on vacation.

22    Q   And did you become backup for those

Page 51

1  duties when she left?

2    A   No, because he was not on vacation during
3  that time.

4    Q   Well, let me ask it this way:  Were you
5  slated to become backup; you just didn't have an
6  opportunity to do it, or do you know?

7    A   No, to my knowledge, I was not slated to
8  do that.

9    Q   Was there a discussion as to who would
10  take over those duties if he went on vacation?

11    A   No.

12    Q   So you don't know?

13    A   Not to me.

14    Q   Right.  Okay.

15    A   Because Jane trained me.  She was like my
16  supervisor.

17    Q   Sure.  But, for example, Ken didn't come
18  to you and say; look, you are not going to be the
19  acting manager when I'm on vacation or when I'm
20  gone?

21    A   No.  He always reported to Jane.

22    Q   I am talking about after Jane left.

Page 52

1    A   Well, Ken told me that we were going to
2  replace and I would have to do Jane's job.

3    Q   And did you understand that to include
4  doing -- taking on Ken's duties when he was on
5  vacation or gone?

6    A   I guess I understood it without saying
7  it, but there was -- he had already been on vacation
8  when I got there, so it wasn't an issue for me.

9    Q   It didn't happen while you were there?

10    A   Right.

11    Q   And that's what I am trying to
12  understand.  There wasn't -- no one ever told you
13  this is not something you are going to do when Ken
14  is gone, right?

15    A   I am not sure what you mean.  When --

16    Q   Let me do it this way:  I think we have
17  gotten this, but I just want to make sure.  Jane
18  left and you were told that she is not going to be
19  replaced, correct?

20    A   Right.

21    Q   You had an understanding that if Ken went
22  out, you would also take on what Jane did and

Page 53

1  essentially become Ken while he was gone, but that
2  was never specifically discussed with you?

3    A   That was not discussed with me.

4    Q   But that was your understanding?

5    A   It was my understanding that in Ken's
6  absence -- let's say he got sick and someone came
7  and needed a manager, I would ask what they needed,
8  but let them know that Ken is not here.  I could not
9  perform his manager duties.  I didn't have his keys.
10  I didn't have any of that.

11    Q   Did Jane have his keys?

12    A   I believe she did.

13    Q   But you and Ken never talked about that
14  issue?

15    A   No.

16    Q   When you say you believe she did, do you
17  know whether or not she did, ma'am?

18    A   Well, I seen her go into his office.  She
19  had the ability to go in his office.

20    Q   Do you know whether or not the office
21  door was locked when she went in?

22    A   All the doors were locked.

**Page 54**

1  Q  Do you know whether he gave her a key on
2 the days that he was gone?
3  A  I just assumed she had a key. I got a
4 key to my office.
5  Q  I understand that you think she had a
6 key. I just want to know if you know whether or not
7 she had a key.
8  A  Well, I seen her go into his office when
9 it was locked, so she had a key.
10  Q  Was it on days that he was there?
11  A  No, because Ken was usually there before
12 we got there. No. I can say that she probably did
13 because if he was in a meeting and there was
14 something that they needed, she would go in his
15 office and get it.
16  Q  Did you ever ask Ken for one of his keys?
17  A  I never needed his key.
18  Q  Fair enough. All right. So January '05
19 Jane leaves, your workload increases, same types of
20 duties with the exceptions that we have discussed.
21 How long did that go on, your assumption of those
22 extra duties?

**Page 55**

1  A  That went on until I left Red Cross on
2 June 30th.
3  Q  Were you ever given additional duties?
4 Did your workload ever increase again?
5  A  Yes. When Ken Thiel resigned.
6  Q  When did Ken Thiel resign?
7  A  Sometime in -- I guess his last -- well,
8 February, March. I think he put in his resignation
9 in February and he left in March.
10  Q  So February, March Ken leaves. What
11 happens then?
12  A  There is no replacement. There is not
13 assistance from a volunteer. I end up picking up
14 Ken's duties.
15  Q  So you essentially become the manager of
16 the group --
17  A  I was never --
18  Q  -- but there is no group?
19  A  It was just me. I don't get the title of
20 manager. Anna Shearer -- she was our director, or
21 Ken's boss, his first boss -- came down and said,
22 you know, Ken has resigned. This will be his last

**Page 56**

1 day. I would transition or learn his duty and that
2 I would have to prioritize the work, but everything
3 still had to get done.
4  Q  Triage, huh?
5  A  Well, I don't know if you would call it
6 triage, because in an emergency room you have other
7 people to help you. I didn't have anyone else to
8 help me.
9  Q  What were the extra duties you were told
10 you would have to learn, Ken's duties?
11  A  I had to learn to do the OSHA reports. I
12 took up -- over international services, which
13 included additional briefings and debriefings of the
14 clientele --
15  Q  Okay.
16  A  -- interaction with other department
17 levels, dealing with issues, getting the passwords
18 or codes for our accounts with Travax, which was
19 the --
20  Q  I'm sorry. Your accounts with what?
21  A  Travax, which --
22  Q  Can you spell that for me?

**Page 57**

1  A  T-R-A-V-A-X. And we used --
2  Q  What was that?
3  A  That was our resource that we used to
4 look at immunizations, what immunizations were
5 needed cross-country or when they went out of
6 country.
7  You would go in, find the particular area
8 they were going, and look at the necessary
9 immunizations that they needed. I also got access
10 to his computers, which I got Jane Davis' -- well,
11 no, actually, he gave me Jane Davis' file folder
12 when she resigned, so I already had that, that I
13 didn't have access to.
14  Then I got access to his file folder and
15 the previous managerial predecessor's file folders,
16 in which all of the policies and procedures were
17 on-line, you know, what the physical
18 responsibilities were for the next year and what the
19 target plans or the goals were for how they want the
20 wellness unit to expand and take place.
21  I took over the ADA responsibilities and
22 interaction with the general counsel. I stepped up

Page 58

1  in helping the FMLA benefits nurse, helping with
2  her duties, because if there was ever a medical
3  question that she did not understand, I would be the
4  person to help her with that.
5       I think I had a good rapport with the
6  managers with AFES, but I had to introduce myself to
7  the managers with international services. I knew
8  them, but I never had to work with them and know
9  what their expectations were with international
10 services.
11      And at that time, it was Patty Barns, but
12 she is deceased. Then the other person that I
13 talked to about international services, she actually
14 was the client management associate for that group,
15 and that was Corinthia Sanderson or Nicky Sanderson.
16      So she gave me the whole history of
17 international services and the interaction or
18 history that Ken Thiel had with that department and
19 what the weak -- the weaknesses and the strengths
20 were, you know, with dealing with that population
21 because they are different from AFES.
22      AFES was short time, you know,

Page 59

1  deployment, but you had people at international
2  services that could be placed for a year or more and
3  we were lacking in getting responses or making sure
4  that they were sending us information that they were
5  keeping current with their immunizations.
6       So there were some things there that
7  needed to be ironed out as far as following the
8  personnel.
9    Q  What else? What other duties?
10   A  Well, just going through, making sure all
11 the policies and procedures were up to date. So
12 each of us had a set of policies, but I think he had
13 the original policy, so I had to make sure that what
14 I had was current with his policies, all the file
15 duties related to international services, which is a
16 different file system, different spreadsheet.
17   Q  I will talk about the specific duties you
18 identified. What I want now is just some -- any
19 other general categories of duties you assumed.
20 Have you identified all of those?
21   A  I think I have with Ken.
22   Q  Okay. You indicated that --

Page 60

1    A  You know what? No, I did not. I'm
2  sorry. He also was in charge of the John Barton
3  Payne fund. That fund was given to the FMLA
4  representative.
5    Q  That wasn't a duty you took on?
6    A  No, but I knew of that duty and saw the
7  record. There was like an EPA file, you know.
8    Q  Did you deal with that?
9    A  We didn't have any issues, per se, with
10 that organization, but there were some things that
11 came in from Oklahoma. There were some personnel
12 issues that came in.
13   Q  We will talk about that in a minute.
14 Anything else?
15   A  I think that's what I can recall right
16 now.
17   Q  One of the first things you identified
18 was OSHA reports. What did you have to do with OSHA
19 reports? What was your responsibility there?
20   A  OSHA reports is the reporting of all the
21 injuries, all the workmen's comp injuries that
22 occurred in 2025, Jefferson Park, and the unit we

Page 61

1  had over in D.C. -- I mean, in Virginia.
2    Q  So let's say someone carrying a file box
3  in 2025 trips, falls, skins the knee. What do you
4  have to do with respect to OSHA?
5    A  Dual duty. Workmen's comp has to be in
6  the files, and the OSHA report has to be listed.
7  You have to list all the injuries. You keep a
8  running log of it.
9       So at the end of the time period, the end
10 of the year, you send that report to OSHA that you
11 categorized what the injuries were, because they
12 want to know about any other extenuating
13 circumstances, that there is; biohazards, bloodborne
14 pathogens, all those things have to be reported.
15   Q  And you would make a determination as to
16 what to report, what to fill out on the form?
17   A  The OSHA report has guidelines as to what
18 types of injuries they want reported. So I reported
19 as -- according to what the guidelines stated.
20   Q  Right. And it was your discretion as to
21 what to report; you would look at the form, you
22 would look at the guidelines, and you would make a

Page 62

1 decision as to what to put on the form; is that
2 correct?
3    A   Based on the OSHA guidelines.
4    Q   Sure.
5    A   Right.
6    Q   Sure. But I guess what I am saying is,
7 no one would say to you, Tonia, you have to fill out
8 boxes A, B, C, D here; you would look at it, make a
9 determination as to what needed to be reported,
10 based on the guidelines and fill it out?
11    A   Well, Ken gave me a mini training of the
12 OSHA reporting that we went over, what the OSHA
13 report looks like.
14    Q   Sure. But we are talking about after
15 he's gone now.
16    A   Right.
17    Q   So Ken didn't tell you -- I understand
18 that he trained you on how to do it, but you were
19 the one, once he left --
20    A   Responsible for knowing when it was due,
21 responsible for filling it out; responsible for
22 getting it on time, because if you don't, there's a

Page 63

1 fine, a monetary fine, a huge monetary fine.
2    Q   And that was all your responsibility?
3    A   That was my responsibility to do that.
4    Q   All right. Now, you mentioned the John
5 Barton Payne fund, but I believe you said you didn't
6 have any responsibilities towards that fund. Is
7 that correct?
8    A   No. I actually did not sit on the
9 committee or -- but I had seen the reports come in
10 because they come onto my fax machine, and I would
11 put them in, you know, confidential areas.
12    Q   You just forwarded them on?
13    A   Yes.
14    Q   To the person who was dealing with that
15 issue?
16    A   That's correct.
17    Q   You then mentioned international
18 services, and I think we got into a little bit of
19 detail on that. Let me see if I can summarize this
20 fairly and if I haven't just tell me.
21      Just like AFES deploys people,
22 international services also deploys people to

Page 64

1 various international locations, correct?
2    A   That's correct.
3    Q   And before they are deployed, they need
4 to have, at times, medical exams, and a
5 determination had to be made on whether or not they
6 needed any immunizations as well; is that correct?
7    A   Right, based on the state's requirement.
8    Q   What were your duties with respect to
9 that process?
10    A   My duties -- I would be notified by the
11 international department and they would tell me
12 where this patient -- that patient -- I'm sorry --
13 that person was going, what country they were going
14 to.
15    Q   They would tell you, we are sending Brian
16 Plitt to Greece?
17    A   Or Cambodia; and then I would ask for the
18 physicals --
19    Q   I think he would enjoy Greece more.
20    A   -- their recent physical examination from
21 a physician to make sure there was no limitations.
22 I would do a search on the country into where they

Page 65

1 were going specifically, about the terrain, to make
2 sure they would get the proper immunizations,
3 especially if it's dealing with malaria.
4    Q   So if it's tropical or subtropical?
5    A   Exactly.
6    Q   And that was all your determination as to
7 what needed to be done, based on your review?
8    A   Based on the review of what Travax report
9 they gave me, yes. So I would pull up a report, let
10 the international people know this is what is
11 required of that person.
12      Sometimes they could go to their own
13 doctor and get the immunizations or a travel
14 specialist. But sometimes we could use the Farragut
15 medical clinic, and then there was also G.W. that
16 was available for them to get that.
17    Q   Did you have any interactions with the
18 clinic they would go to to get their immunizations
19 from?
20    A   Sometimes we would have phone calls or
21 conversations, but that was at a minimal.
22    Q   What about their own doctor? You just

Powell v. Red Cross                    Multi-Page                    Tonia Powell
11-10-06

---

Page 66

1  simply needed some type of proof from the --
2      A  Right.  They had to bring their
3  immunization records in that I could see that they
4  had those done.
5      Q  Anything else you did with respect to
6  international services, other than the deployment
7  issues we have discussed?
8      A  No.  Briefing and debriefing.
9      Q  When you say briefing, does that mean you
10 would brief employees before they went?
11     A  Absolutely.
12     Q  What types of things would you brief them
13 on?
14     A  We would review the medical records, make
15 sure they had all their medications and extra
16 eyeglasses, et cetera, make sure they understood to
17 report all injuries to me, make sure that they kept
18 up with -- if they were going to be there for two
19 years, I would insist that they remember to update
20 me yearly.  They had to give me a yearly update as
21 to what's going on, how to access me by e-mail and
22 number, how to access Gates McDonald as well.

---

Page 67

1          And then we gave them a little travel
2  pack that consisted of first aid, Gatorade, things
3  like that, to get them over to the trip.
4      Q  You'd tell them to watch out for
5  mosquitos?
6      A  Gave a health education.  Yes, we did
7  health education.
8      Q  And the health education varied based on
9  where these individuals were going?
10     A  Where they were going.
11     Q  And who made the determination as to
12 which particular health education training to give
13 these individuals?
14     A  That was the policies established by the
15 Red Cross.
16     Q  So in other words, again, we are
17 deploying Brian here to Cambodia.  What would you do
18 to determine which health briefing to give him?
19     A  Well, we only had one health briefing
20 that was general, but then the health briefing that
21 we got from Travax, those were the protocols that we
22 used as --

---

Page 68

1      Q  I see.  So you would say you need these
2  immunizations and this is what you need to watch out
3  for when you are there?
4      A  That's correct, in addition to telling
5  them to boil water, avoid fresh fruits, things like
6  that, any type of, you know, out of country travel.
7      Q  So you would basically be responsible for
8  telling them everything they needed to be aware of
9  from a health perspective?
10     A  Correct.
11     Q  And you would be responsible for making
12 sure that they had whatever protections they needed
13 from a health perspective with respect to their
14 health condition to their current health status and
15 immunization; is that correct?
16     A  That's correct.
17     Q  You would make sure that if there are
18 medications that they are on, that they had enough
19 of those medications, correct?
20     A  Correct.
21     Q  And make sure that they've got their
22 eyeglasses, extra pairs, contacts, whatever the case

---

Page 69

1  may be; is that right?
2      A  That's correct.
3      Q  Anything else you did with respect to the
4  deployment briefings?
5      A  No.
6      Q  Let's talk about debriefing.  What would
7  you do in order to debrief people?
8      A  Debriefing was when they came back, we
9  discussed any injuries or anything that happened.
10 Basically, talked about their trip.  The biggest
11 thing was looking at any stressors, any type of
12 emotional stressors that came back.
13          Sometimes, especially with the AFES team,
14 being a team, personality conflicts occurred.  So I
15 would look at those things and make sure that there
16 was no type of personnel issues that needed to be
17 resolved of that the manager needed to be aware of.
18     Q  You just said AFES.  I take it that you
19 did that for AFES and international services; is
20 that correct?
21     A  Correct.
22     Q  So with respect to the deployment, the

---

Page 70

1 briefing, and the debriefing it's the same set of
2 duties, but for two different units of the Red
3 Cross, one is AFES, the other is international
4 services?
5    A    Right.  International services is always
6 one on one for briefing and debriefing.  With AFES,
7 you did a group briefing.
8    Q    Because there were more people with AFES?
9    A    Exactly.  Your debriefing was one on one.
10    Q    So AFES, we have a group of people we are
11 sending to Bosnia, for example, you would bring
12 those people into --
13    A    Into a setting such as this.
14    Q    -- into a conference room?
15    A    We would use Power Point to do the
16 presentation.
17    Q    Was it just you giving the presentation?
18    A    Yes.  So I was responsible for all the
19 PACS, all the x-rays, all the -- you know, because
20 they had to have the Panorex of their teeth so if
21 something should happen, there would be a process of
22 identifying them.

Page 71

1    Q    That's pleasant, isn't it?
2    A    It's unfortunate, but that's what they
3 do.  And it's a lot of files.
4    Q    Okay.  So you would have to make sure
5 that everyone had all that information for --
6    A    Absolutely, that they had copies of that.
7    Q    And that was both for AFES and
8 international services?
9    A    Correct.
10    Q    Anything else that we haven't already
11 discussed with respect to your duties and
12 responsibilities as they related to AFES and
13 international services?
14    A    For Ken or just in general?
15    Q    In general.
16    A    In my whole time period being there?
17    Q    Yes.
18    A    Telephones, there were constant e-mails
19 that I got from personnel.
20    Q    Relating to what types of issues?
21    A    Lots of issues.  Personnel issues, people
22 being sick, trying -- I think the biggest argument

Page 72

1 was the physicals, how often they had to get their
2 physicals, because they had less personnel, some
3 more people were being deployed; so -- and then the
4 cost or the expense and just -- I was the person
5 that they could kill the messenger, essentially, so
6 I took the brunt of a lot of their frustration.
7    Q    So if someone says, look, I don't want to
8 have to take a physical every two years, you would
9 get that e-mail?
10    A    I sure would.
11    Q    And you would have to respond to that
12 e-mail?
13    A    I would respond to it.  I would first
14 contact the manager, Roger, and let him know that I
15 have a client that was pretty upset about the
16 physical, so I'm going to reiterate what the policy
17 is, but you need to be aware that this is someone
18 who, you know, is upset.
19    Q    So you would respond appropriately and
20 then inform the manager that you were responding to
21 the call?
22    A    To the best of my abilities, yes, I did.

Page 73

1    Q    You also mentioned -- that's what you
2 would do when someone griped about the physical, but
3 you also mentioned personnel issues.  If there is a
4 personnel issue, what would you do there?
5    A    The same thing, because each of the
6 groups had their CMA or their client management
7 associate who was a liaison between HR and -- and we
8 would basically discuss those issues in the
9 meetings, when we had the team meetings with AFES
10 personnel.  Whether it's at the time before
11 deployment or after they came back, those things
12 would be discussed.
13    Q    So with respect to personnel issues,
14 would you try to deal with the issue and then inform
15 the CMA, or would you just simply pass it on to the
16 CMA, or some other response?
17    A    Well, actually, they would be there.  I
18 would inform it first to Roger, because he was the
19 manager, and then it would be discussed openly or at
20 the meeting.  But I never contacted the CMA
21 directly.  I would actually go to the manager first.
22    Q    So there would be a group discussion on

Page 74

1  how to respond. Who would respond, then? Would it
2  be you or the CMA? So describe to me what would
3  happen. Someone comes in with a personnel issue,
4  you go to Roger. What happens then?
5      A  For example, I had a client that has an
6  issue with their blood pressure and the AFES
7  standard or military standard says that your blood
8  pressure has to be within a certain parameter. If
9  it is not, there is a blood pressure monitoring that
10  you have to do for over a five-day period.
11          Once you monitor them for the five-day
12  period, I need to know those results. And based on
13  those results, I can determine, based on the
14  criteria of the military, if this person is
15  deployable or not.
16          If that person's blood pressure is out of
17  whack, if it's higher, they can't go. I have to
18  stand them down and let them know at this time,
19  based on your blood pressure results or the
20  recordings that you submitted to me, you are
21  ineligible for deployment. What are you doing with
22  your physician? Get them to, you know, go to the

Page 75

1  physician, get their medication, and have their
2  doctor let me know what's going on for their blood
3  pressure.
4          In addition, after that, I would talk to
5  Roger about what I discovered and give him the
6  information without exposing their medical
7  confidentiality.
8      Q  Sure.
9      A  Then I had to notify or let the AFES
10  military personnel know that I have a person with
11  this blood pressure, and we are looking at him to
12  see if he will be able to -- or be eligible for
13  deployment.
14      Q  So with respect to Roger, what you would
15  say is, look, I have a medical deferment issue I'm
16  dealing with or something along those lines?
17      A  Right. And they need to know that
18  information because at any time they have to replace
19  that person out, especially -- they do everything on
20  a cycle. So they have to know who they can contact,
21  who they can move from one station to another
22  station for deployment.

Page 76

1          So that really took some strategic
2  planning to see if this person was going to meet the
3  deadline or not.
4      Q  And you were part of that planning
5  process from the medical perspective, because you
6  had to let people know whether or not Brian is
7  deployable or Dino is deployable or whoever that
8  person is?
9      A  Say the question again.
10      Q  You would have to tell them whether or
11  not personnel were deployable?
12      A  Based on the guidelines.
13      Q  From a medical perspective, right, based
14  on the guidelines?
15      A  Yes, military guidelines.
16      Q  And you made that decision by reviewing
17  the guidelines and reviewing whatever health
18  information you had?
19      A  Through -- with the group and the
20  military guidelines.
21      Q  When you say with the group, what do you
22  mean with the group?

Page 77

1      A  The AFES group that we met, Roger
2  Kingsley, the manager, the CMA, and I, and there
3  were actually -- I don't know what Sheila Dunlow's
4  position was right now. She was with AFES too, but
5  I'm not sure of her title. But she was one of the
6  people that would coordinate who was scheduled for
7  deployment.
8      Q  Right. And I'm not talking about the
9  entire deployment process. But you basically had
10  responsibility for the medical part of that process,
11  though, right?
12      A  Right. I was hired to review that, yes.
13      Q  And you would make recommendations with
14  respect to the medical part of that process?
15      A  Yes.
16      Q  So if, in your opinion, someone was not
17  deployable from a medical standard, you would say,
18  look, you can't deploy this person based on the
19  guidelines here?
20      A  I would let them know that this person is
21  not meeting the criteria for deployment, yes.
22      Q  Did anyone ever overrule you on that?

Page 78

1    A   No, because those people would either --
2  do what was required.  And the stand-down would come
3  from Roger.
4    Q   But Roger never overruled one of your
5  decisions?
6    A   We never had a decision that had to be
7  overruled.  Everyone came into line as to what was
8  required.
9        Did you know we had a medical doctor, a
10  medical director, for the wellness unit?
11    Q   Who was the medical director for that?
12    A   His name was Tee Guidoti.  He was a
13  contractor from G.W.
14    Q   And that's if you had any questions about
15  the medical issues, that's who you were free to
16  contact to discuss those issues with, right?
17    A   Right.  Is that who you -- yes, Tee
18  Guidoti.  I'm not sure if he is still there or not.
19  I know his contract was up.  Well, he is probably
20  not, because the wellness unit is no longer there.
21        But prior to me knowing that the wellness
22  unit was going to be closed, he was our medical

Page 79

1  director for the wellness unit.
2    Q   So on what occasions would you contact
3  the doctor?
4    A   We had rare occasion as far as AFES
5  personnel.  We contacted him as far as our Hep B
6  vaccine, hepatitis B vaccine.  For sometime or
7  before I got there, they had where the nurses could
8  give the Hep B vaccine if one of the AFES personnel
9  needed it.
10        But that never happened during the time I
11  was there, that I had to administer a vaccination.
12    Q   Did you ever have to consult with him?
13    A   I consulted with him one time with a
14  client.  And I can't remember the client's name.
15    Q   I don't need the name.  Do you remember
16  what the issue was?
17    A   It was the cardiac guy.  So I notified
18  him and let him know that we had someone who had a
19  cardiac issue, internationally, bring them back, and
20  bring him back through a private airplane and not
21  through the military transport.
22    Q   What was his role in that decision

Page 80

1  process, if any?  You just simply talked to him
2  about whether or not it was appropriate to use the
3  military transport?
4    A   Well, no.  I talked to him to notify him
5  that there was a medical issue, a big medical issue,
6  just to keep him aware of what was going on.
7    Q   Okay.  So you were just updating him?
8    A   Right.
9    Q   You made the decision on how to get the
10  person back, when to get the person back, but you
11  just kept the doctor up to speed on what was going
12  on?
13    A   I played a part in how he would get back.
14    Q   What part did you play?
15    A   By talking to the military doctors there
16  and asking him how should he travel back, what do I
17  need to get this person back safely.  And he came --
18  they decided that he needed, you know, someone to be
19  with him medically, if something happened.
20        So he came back on a private plane.  He
21  did not come back by military --
22    Q   When you say private plane --

Page 81

1    A   By commercial airlines.
2    Q   Commercial airlines.
3    A   Commercial airlines.  Not on the
4  military --
5    Q   Transport?
6    A   Right, which I understand can be very
7  rough and exhausting and uncomfortable.
8    Q   All right.  So if I understand how that
9  process worked, the person has the medical issue,
10  you already described your role in dealing with his
11  treatment overseas, but then you talked to the
12  medical doctors that were treating him to determine
13  the best way to bring him back to the States, and
14  you dealt with that issue.
15        What did you do?  You talked to Roger and
16  said, look, he needs to come back by commercial
17  carrier, or you told him you need to make
18  reservations by commercial carrier?  What did you do
19  next?
20    A   I let Roger know what the medical doctor
21  had recommended and they made the transportation --
22    Q   The arrangements?

Page 82

1    A    Right.

2    Q    Anything else that you dealt with with

3    respect -- that we have not already discussed with

4    respect to AFES and/or international services?

5    A    We talked about file management,

6    spreadsheet, data, software.

7    Q    When you say file management --

8    A    We had actually -- I'm sorry.

9    Q    Go ahead.

10    A    We had actually hard copy files of the

11    spreadsheets on the computer software.

12    Q    When you say hard copy, what types of

13    files were you managing?

14    A    Paper files, medical record, confidential

15    records, excuses for people who returned back from

16    work, ADA claims, workmen's comp claims, all those

17    claims.

18    Q    So you were responsible for maintaining

19    all of those records and files?

20    A    Right.

21    Q    Now, one of the other things you

22    mentioned was interactions with department levels.

Page 83

1    What do you mean by that?

2    A    Well, with international services, I

3    never had to work with them until Ken had left.  So

4    I didn't know anyone.  I didn't know who -- what the

5    chain of command was, who was the manager, were

6    there any problems, what's the what current issue,

7    what was unresolved, what needs to be resolved.

8    Q    So you met with them to discuss those

9    issues?

10    A    That's correct.

11    Q    One of the other things you mentioned was

12    passwords for Travax immunization tracking.

13    A    Um-hmm.

14    Q    You have already talked to us about what

15    Travax is.  But what do you mean by dealing with

16    passwords?

17    A    Because it's password protected.

18    Q    What was your role in that?

19    A    I didn't have access to Travax.

20    Q    Until what point in time?

21    A    When Ken left.

22    Q    So once Ken left, you just had to get a

Page 84

1    password for Travax and after that point you --

2    A    I was able to access it, and I also, I

3    had to renew it.  It had renewal.

4    Q    So you managed, essentially, Red Cross

5    access to the Travax system; is that fair?

6    A    Right, renewals for the educational

7    materials that we had.

8    Q    But before Ken left, I take it you didn't

9    have to deal with Travax because that was more of an

10    international services issue than an AFES issue?

11    A    Well -- that's correct.  That's correct.

12    Q    Depending on the place, there might be an

13    immunization issue, though, right?

14    A    That's correct.

15    Q    But not on a regular basis?

16    A    That's correct.

17    Q    Whereas most of the international

18    services deployments are in locations where you

19    really have to consider whether or not you need

20    immunizations:  Africa, Southeast Asia, locations

21    like that right, right?

22    A    Right, like Sri Lanka, that's -- yeah.

Page 85

1    Q    The next thing you mentioned was EPA

2    issues and employees for Oklahoma.  Did you mean EAP

3    rather than --

4    A    Employee assistance program.

5    Q    The employee assistance program.

6    A    What did I say?

7    Q    EPA.

8    A    I'm sorry.  EAP.

9    Q    EAP.  All right.  And what was your role

10    with respect to EAP?

11    A    Well, in that one particular case, there

12    was a big blow-up over environmental allergens.

13    They had an employee who really felt that she was

14    reacting and it just took several levels of

15    complaints and anonymous callings and employees

16    feeling like they were, you know, being not heard or

17    misrepresented or cheated or --

18    Q    And were you counseling the employee?

19    What was your role?

20    A    Well, when I first got the call, I just

21    heard a client that was very upset and angry.  And I

22    let Anna Shearer know.  As a result of that, we

Page 126

1  others?
2     A.  You need to clarify that.  Are you asking
3  me my duties when all three persons were there, or
4  are you asking the duties when --
5     Q.  Let's start when you were first hired.
6     A.  When I was first hired, I could do 40
7  hours.
8     Q.  That's not what I'm asking you.  I'm
9  asking you to kind of, if you would, quantify for me
10  which of these particular duties took most of your
11  time.
12     A.  Most of my day was assigned to AFES
13  personnel.
14     Q.  So it was dealing with the medical and
15  certification issues that we were discussing earlier
16  with --
17     A.  All the responsibilities related to AFES
18  personnel, from briefing to debriefing, which
19  included keeping track of where they are in their
20  physical process, documentation of the medical
21  records, working on the spreadsheet, meeting with
22  AFES team manager, e-mails, telephone from AFES

Page 127

1  personnel.
2     Q.  What percentage of your day did the AFES
3  component of your job take up?
4     A.  Probably 60 to 70 percent of the day.
5     Q.  What was the other 30 to 40 percent
6  composed of?
7     A.  Doing blood pressure checks, cleaning the
8  cot rooms -- you know they have rooms where people
9  come in and they can lay down?
10     Q.  You told me that.
11     A.  Those were supplied with sheets, paper
12  sheets and paper pillow cases -- making sure the
13  lactation room was clean, filing workmen's
14  compensation, doing the ergonomic assessments,
15  filing, stocking of medical supplies, stocking of
16  the first aid boxes that are throughout the campus,
17  in addition, the first aid box, the AED was right
18  next to it, so communicating to the security that I
19  did those checks and that they were done.  They can
20  go and re-lock the box, re-lock the first aid boxes,
21  passing out any type of medical literature
22  throughout the campus.

Page 128

1     Q.  It sounds like you are describing
2  everything else.  Was everything else basically, I
3  guess, equal in increments, so that you had your
4  main duties dealing with AFES, and everything else
5  took up some period of time?
6     A.  That's correct.
7     Q.  Okay.
8     A.  The first aid box, for instance, we would
9  get a trigger from the security department saying,
10  these boxes and this for the campus were open and I
11  had to go and check those particular boxes and
12  restock them.
13     Q.  Fair enough.  Now, when Jane Davis left,
14  you have already told us what duties were added.
15  I'd like you to tell me which duty or duties took up
16  most of your time during that time frame.
17     A.  The AFES consumed it.  It was a hundred
18  percent of the time.
19         (Court Reporter changing
20         paper.)
21     BY MR. PANAGOPOULOS:
22     Q.  Okay.  You indicated AFES consumed it 100

Page 129

1  percent of the time?
2     A.  That's correct.
3     Q.  That means you weren't able to perform
4  any of the other duties?
5     A.  After work, I did.
6     Q.  So it wasn't 100 percent of your time,
7  then; you spent other time doing the other duties?
8     A.  After work hours, yes.  After filing any
9  workmen's comp claims that came in, probably started
10  at 5:00 or so.  If I was there to do first aid -- I
11  don't know if Ken actually did.  I mean, I wasn't
12  there.
13     Q.  So how many hours a day did the AFES
14  stuff take?
15     A.  The whole day, eight hours, because I now
16  had from one to two teams that I had to get ready
17  for deployment up to five teams, especially when she
18  left, immediately, there were five teams that had to
19  go out within a period of two months.
20     Q.  So it varied a bit based on the
21  deployments that were going out?
22     A.  Yes, but considering that war time that

Powell v. Red Cross                    Multi-Page                    Tonia Powell II
11-14-06

240

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - -x
                                    :
TONIA POWELL,                       :
                                    :
         Plaintiff,                 :
                                    :
    vs.                             : Case No. 1:06CV1173
                                    :
AMERICAN RED CROSS,                 :
                                    :
         Defendant.                 :
                                    :
- - - - - - - - - - - - - -x VOLUME II


                         Washington, D.C.

                         Tuesday, November 14, 2006

Continued Deposition of

                    TONIA S. POWELL

    Plaintiff, taken on behalf of counsel for the

Defendant in the above-entitled matter, before Denise

M. Brunet, RPR and Notary Public in and for the

District of Columbia, taken at the offices of Ballard

Spahr Andrews & Ingersoll, LLP, 601 13th Street,

Northwest, Suite 1000 South, Washington, D.C,

commencing at 2:18 p.m., when were present on behalf

of the respective parties:

Page 241

A P P E A R A N C E S :

ON BEHALF OF THE PLAINTIFF:

    BRIAN C. PLITT, ESQUIRE
    1239 C Street, Southeast
    Suite 4
    Washington, D.C. 20003
    (202) 546-5493

ON BEHALF OF THE DEFENDANT:

    CONSTANTINOS G. PANAGOPOULOS, ESQUIRE
    Ballard Spahr Andrews & Ingersoll, LLP
    601 13th Street, Northwest
    Suite 1000 South
    Washington, D.C. 20005
    (202) 661-2200

-oOo-

Page 242

I N D E X

CONTINUED DEPOSITION OF TONIA S. POWELL

NOVEMBER 14, 2006

EXAMINATION BY                                          PAGE

    Mr. Panagopoulos                                    243

    Mr. Plitt                                           316

    Mr. Panagopoulos                                    372

    Mr. Plitt                                           384


EXHIBITS          DESCRIPTION                           PAGE

Powell 17         Series of E-mails                     251

Powell 18         Series of E-mails                     259

Powell 19         Letter dated 6/10/05                  266

Powell 20         Series of E-mails                     268

Powell 21         Series of E-mails                     278

Powell 22         Exit Procedure Checklist              279
                  Employee Separation Form

Powell 23         State of Maryland Unemployment        291
                  Insurance Request for Information

Powell 24         Letter dated 7/23/05                  295

Powell 25         Organizational Chart                  295

Powell 26         Resume of Tonia S. Powell             297

                  (Note: Exhibits attached to transcript.)

Page 243

P R O C E E D I N G S

Thereupon,

        TONIA S. POWELL

was called for further examination by counsel for the Defendant and, after having been resworn by the Notary Public, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

    BY MR. PANAGOPOULOS:

    Q   Good afternoon, Ms. Powell. As you know, my name is Dino Panagopoulos. We're here today to resume and complete the deposition that we started the other day.

        The same instructions and rules apply with respect to questions and answers. I won't bother repeating them unless you don't recall them and would like me to go through it again.

        Do you recall my instructions regarding how the deposition would work, ma'am?

    A   Yes, I do.

    Q   And the last time we met, you indicated you were not on any types of medications which would

Page 244

prevent you from understanding and fully responding to my questions.

        Is the same true today?

    A   That's correct.

    Q   And have you had any alcohol in the last 24 hours?

    A   No, I have not.

    Q   I believe when we broke, one of the things that we were doing was going through what had happened once it had been announced that there were going to be changes at the Red Cross along with a reduction in force. And you had indicated that you were asked to shadow a position with Carolyn Williams and Bill Malfera's group, and we had talked some about that.

        I'd like to continue on with that discussion, if we may. Okay?

    A   Okay.

    Q   How long did you shadow Ms. Williams?

    A   I think I spent one day.

    Q   One day? Did you have any contact with her after that day?

    A   With Carolyn Williams?

Page 285

1  had his holiday, we don't work.  I didn't get paid.
2  So -- but, yes, I tried to do all the hours I could.
3      Q   And it was generally 40 hours a week?
4      A   Yes.
5      Q   Was it ever more than 40 hours a week?
6      A   It did at the end get to 40 hours a week.
7  I was -- they asked me to lead a project for them in
8  closing up a study project.  And that took some
9  overtime which he did pay me for, but that was at the
10  very end.
11     Q   Okay.  And where do you -- where did you
12  start on April 3rd?
13     A   Montgomery County Department of Health and
14  Human Services.
15     Q   And what's your job title with the
16  Montgomery County Department of Health and Human
17  Services?
18     A   Community health nurse.
19     Q   And what are your duties and
20  responsibilities as a community health nurse?
21     A   I specifically work with the aging and
22  disability paid population, Montgomery County.  And

Page 286

1  there's various county dollars that -- or federal
2  dollars that are awarded to the state for the elderly
3  and disabled to maximize their living at home or their
4  return to home from the nursing home or from a
5  community to assisted living and nursing home.
6          I also work directly with Adult Protective
7  Services for abuse or neglect cases.  I work directly
8  with social workers and -- well, they say social
9  worker to adult cases as a consult.
10     Q   And do you work within certain guidelines
11  and procedures?
12     A   Oh, absolutely.
13     Q   Is your position classified as exempt or
14  non-exempt?
15     A   It is an exempt position.
16     Q   And under your position, when you say you
17  operate within the guidelines and procedures, how does
18  that work?  Do you have a procedures manual?
19     A   Procedures manual.  Uh-huh.
20     Q   That tells you what an appropriate response
21  is for any particular situation?
22     A   That's correct.

Page 287

1      Q   How often do you refer to that procedures
2  manual throughout the course of the day?
3      A   Initially it was daily.  As I'm getting
4  more familiar with the job, it's not as daily, but you
5  still have to refer to it because I don't do -- I
6  don't have the same case every time.
7          There's various programs that a client can
8  access or be eligible for.  They have to be eligible
9  medically and financially.  So there's different
10  dollars that are available that could help clients.
11     Q   When you were at the Red Cross and were
12  working your various duties, did you have a manual or
13  procedures that you would have to look at to determine
14  how to respond to certain situations?
15     A   We did have procedure manuals, yes.
16     Q   How often did you refer to those procedure
17  manuals?
18     A   Initially they were daily.
19     Q   And then as time went on, you didn't have
20  to refer to them?
21     A   It got pretty routine because I stayed in
22  one really basic or confined area of work and decision

Page 288

1  making where the greatest bulk of the decision making
2  was with AFES.  The next biggest bulk would be
3  considered workmen compensation.  Later it graduated
4  to international services and ADA accommodations.  We
5  always had the medical excuses, but they weren't as
6  time-consuming as the other work.  But it was a very
7  limited scope of my function at the national
8  headquarters.
9      Q   Well, with respect to ADA accommodation
10  issues, I mean, the disability obviously could be, you
11  know, anything, right?
12     A   Right.
13     Q   And the proposed accommodation could be
14  anything, right?
15     A   It could be.
16     Q   Okay.  So with respect to your duties
17  there, it could be varied depending on the situation?
18     A   Well, yes.
19     Q   Okay.  And with respect to your duties with
20  AFES, you know, again, the medical information you
21  received was fairly varied, right?
22     A   It was varied because they're individual

| Page 289 | Page 291 |
|---|---|
| 1 results, but the same testing or the same scope of<br>2 what we were trying to get the client to meet<br>3 according to their medical criteria was the same.<br>4    Q Right.<br>5    A So it did not go outside the scope. It was<br>6 still a very focused scope, still a routine. It was<br>7 still a routine.<br>8    Q Sure. You had to determine based on a<br>9 medical exam report you received whether an individual<br>10 was eligible for deployment, right?<br>11    A Would be cleared for deployment, correct.<br>12    Q And the same is true for international<br>13 services. There, it was a little bit different.<br>14 You'd look at medical exams, but they weren't required<br>15 to follow military procedures, right, or military<br>16 guidelines?<br>17    A No.<br>18    Q But the complicating factor there was the<br>19 vaccines that might be needed for the different<br>20 deployments for which you'd use the Travax system,<br>21 right?<br>22    A Correct. | 1    Q Okay. What benefits do you receive at the<br>2 county?<br>3    A Full medical, dental, eye, tuition. I get<br>4 compensation. I get comp time.<br>5    Q Okay. What else? You already said<br>6 tuition.<br>7    A Right.<br>8    Q Are they comparable --<br>9    A Retirement plan.<br>10    Q Are the benefits better than your Red Cross<br>11 benefits?<br>12    A Yes.<br>13    (Thereupon, the document was marked as<br>14    Powell Deposition Exhibit No. 23 for<br>15    identification.)<br>16    BY MR. PANAGOPOULOS:<br>17    Q You've been handed what's been marked as<br>18 Exhibit Number 23.<br>19    A Uh-huh.<br>20    Q Do you recognize this document?<br>21    A No, not really. I would have to look at it<br>22 real good. Let's see. Unemployment insurance. |

| Page 290 | Page 292 |
|---|---|
| 1    Q And the educational component with respect<br>2 to international service was again different based on<br>3 where people were deployed?<br>4    A Correct.<br>5    Q Did you receive any raises while you were<br>6 at Quadrant?<br>7    A No.<br>8    Q So you started at $30 an hour, you ended at<br>9 $30 an hour when you started with the county?<br>10    A That's correct.<br>11    Q Okay. What is your rate of pay at the<br>12 county?<br>13    A Fifty-seven -- well, no, I did get a raise.<br>14 It's almost -- no, I'm right. It's almost 58,000.<br>15 It's not quite 58,000. I started at 57, got a<br>16 3 percent because of the union. I got a 3 percent<br>17 because of the union.<br>18    Q Okay. So you're at just under 59, then?<br>19    A I'm just at 58.<br>20    Q You're at 58?<br>21    A I'm at 58, right. But I have benefits and<br>22 tuition benefits. | 1    Q This is what the Red Cross submitted to<br>2 unemployment. Do you know if you've seen this before?<br>3    A No. This is the first time I've seen it.<br>4    Q Do you see where it says reason for<br>5 separation down there in the middle?<br>6    A Uh-huh.<br>7    Q I'm sorry. You need to --<br>8    A Oh, I'm sorry. Yes, I do.<br>9    Q And the reason they checked was number 6,<br>10 quit.<br>11    Do you see that?<br>12    A Correct. I do see that.<br>13    Q And did you understand that that's what<br>14 they were going to say based on the position they took<br>15 with you, that your failure to accept a position was<br>16 considered a voluntary resignation?<br>17    A No. I know that Andrea Longuillo at the<br>18 time of the interview said that the Red Cross is not<br>19 responsible or has no decision as to if I would be<br>20 eligible for unemployment benefits.<br>21    Q All right. Well, that's not my question.<br>22    A Oh, okay. |

Page 325

1  to the military guidelines. They had to meet that
2  specification. Then that was submitted to the AFES
3  manager for their employees to know or their personnel
4  to know they were going to be deployed or not.
5      Q  So was it the manager who then made the
6  decision as to whether or not that individual would be
7  deployed?
8      A  Yes. They have to say you're going to go
9  for deployment, yes.
10     Q  And you did not make that decision?
11     A  Right. I don't deploy people. That
12  department deploys people.
13     Q  Was your role entirely one of collecting
14  information from the employee to fill in to a chart or
15  spreadsheet or according to certain guidelines that
16  had been given to you?
17     A  Yes.
18         MR. PANAGOPOULOS: Objection as to form.
19     THE WITNESS: Yes. I would review medical
20  records based on the medical -- the criteria of the
21  military guidelines, and those records would be in a
22  file as well as on a spreadsheet so we can keep track

Page 326

1  of who was on target for the deployment schedule.
2      BY MR. PLITT:
3      Q  So you had certain schedules that you
4  worked with, certain pre-prepared schedules?
5      A  Right. The AFES team had short-term
6  deployments, three to six months. So they had people
7  who were always being prepared for deployment six
8  months to a year out or sometimes even shorter, like
9  three months. So it was on a cycle.
10     Q  Did you take down information that the AFES
11  people gave you, the employees?
12     A  Yes. We asked for their submission of
13  their medical records, lab results, chest x-ray,
14  immunization records. Any other type of records from
15  their physician, we would ask for those.
16     Q  And you then -- were you then in charge of
17  collecting all that information?
18     A  Yes. And it was kept in a file.
19     Q  And then were you in charge of then turning
20  over that information to someone else?
21     A  We would give them the information to save
22  that they had met the requirement for medical

Page 327

1  deployment, but they actually didn't get their
2  records. We kept all of the medical records in the
3  wellness unit in a cabinet, in a file cabinet.
4      Q  But in terms of determining whether or not
5  someone met the criteria for deployment, was that
6  cutoff determined by the regulations?
7      A  Yes. By military regulations.
8      Q  Okay. So you didn't have anything to say
9  about --
10     A  No.
11     Q  -- determining whether in fact it met that
12  cutoff or not?
13     A  That's correct. If I had a question about
14  a result or a test, I would call the CRC where -- to
15  where they were going, where they were -- which is the
16  command receiving center and talk to that physician
17  there and let them know this person is a Red Cross
18  AFES employee targeted for this type of deployment at
19  this particular time. This is the test result. Is
20  this person deemed necessary or eligible for
21  deployment.
22     Q  So that was a question for the

Page 328

1  discretion --
2      A  Sure.
3      Q  -- of the CRC?
4      A  Right.
5      Q  Now --
6      A  Because they still have to go through
7  another physical once we do a physical here, once they
8  go through deployment for the CRC. They look at all
9  the medical records that they have, and they're going
10  to keep a copy and I have a copy, and that medical
11  physician or that Army personnel or doctor is going to
12  look at those records and then also look to see if
13  they are medically cleared. So it's like a double
14  process.
15     Q  So basically, can you state whether or not
16  what you're doing at AFES was collecting information
17  regarding these employees and then passing it on to
18  other people?
19         MR. PANAGOPOULOS: Objection, asked and
20  answered several times already.
21         MR. PLITT: Okay. Again, we've had the
22  agreement the objection is going to be as to form.

Page 329

1    MR. PANAGOPOULOS: Well, yeah, we have an
2 agreement, but you said you were going to clarify some
3 issues and all you're doing is asking the same
4 question over and over again.
5    BY MR. PLITT:
6    Q   Again, you can answer the question.
7    A   I would collect the medical records which
8 would be sent with the client. They would have a copy
9 of it, so when they went through the CRC, that medical
10 personnel, that physician would also have those
11 records before they can go actually into the area that
12 they would be stationed.
13    Q   Were you the only person working on
14 collecting this information about the AFES people --
15    MR. PANAGOPOULOS: Objection as to form.
16    BY MR. PLITT:
17    Q   -- and transmitting it as you discussed?
18    A   Initially, no. Yes, after Jane Davis
19 resigned.
20    Q   And then after she resigned, about how many
21 AFES people were you working on a month?
22    MR. PANAGOPOULOS: Objection as to form.

Page 330

1    THE WITNESS: When Jane resigned, we had
2 about three to five teams that were scheduled for
3 deployment within two months, and there was about
4 three to four people in each team.
5    BY MR. PLITT:
6    Q   And did that continue in terms of that
7 level throughout the rest of the time you were at Red
8 Cross?
9    A   It was dependent on their schedule, on how
10 the AFES department scheduled their personnel for
11 deployment.
12    Q   In terms of the international services
13 employees --
14    A   Uh-huh.
15    Q   -- do you recall testifying about the work
16 you did for those people?
17    A   Yes, I do.
18.   Q   All right. In terms of those employees,
19 there was a -- there was some work you did in terms of
20 immunization for those employees.
21    Do you recall testifying about that?
22    A   Right.

Page 331

1    Q   Again, in terms of immunization of -- can
2 you state whether or not you had the -- made any final
3 determination about whether or not these people would
4 actually be immunized as opposed to collecting
5 information from them for someone else to determine
6 that?
7    MR. PANAGOPOULOS: Objection as to form.
8    THE WITNESS: They use what we called the
9 Travax travel service to look at what immunization
10 would be required for that person depending upon what
11 country they were going to.
12    BY MR. PLITT:
13    Q   So you would collect information from them
14 as to what --
15    A   Right.
16    Q   -- country they were going to, and then
17 compare that against a prepared chart that would state
18 what immunizations were required for that country?
19    A   It was the CDC and Travax. See, Travax
20 uses CDC reports. That's basically what they do.
21 They use CDC recommendations on what a client or any
22 person going internationally, what they need for

Page 332

1 health protection.
2    Q   Travax had already been -- that information
3 had already been prepared?
4    A   Right.
5    Q   You didn't play a part in preparing that
6 information?
7    A   No. That's all based on CDC
8 recommendations.
9    Q   And so then you would look in that Travax
10 and then transmit that information?
11    A   That's right.
12    Q   And that was your job?
13    A   That was my job.
14    Q   And that was the majority of the work in
15 terms of international services --
16    MR. PANAGOPOULOS: Objection as to form.
17    THE WITNESS: Right, including the
18 briefings and debriefings.
19    BY MR. PLITT:
20    Q   Briefings would be -- can you state whether
21 or not that was to speak with the people to
22 understand?

Page 333

1  A  Right.  Briefings -- briefing was all
2 about -- I'm sorry.
3  Q  That's okay.
4  MR. PANAGOPOULOS: While she's drinking
5 water, I'm just going to go ahead and state another
6 objection as to form.
7  THE WITNESS: The briefings were -- with
8 AFES, there would be a group of people, three to four
9 people depending on how many teams.  And we would give
10 a PowerPoint presentation of travel precautions and
11 things that they needed for travel, their medications,
12 eyeglasses, et cetera --
13  BY MR. PLITT:
14  Q  And you were transmitting --
15  A  -- their medical records.
16  Q  -- information from -- information that had
17 already been prepared for you --
18  A  Right.
19  Q  -- to them?
20  MR. PANAGOPOULOS: Objection as to form.
21  THE WITNESS: We actually had a program, a
22 software program that someone did on PowerPoint.

Page 334

1  The briefings with the international people
2 occurred one to one because they didn't go out in
3 groups.
4  Debriefings was always one to one, whether
5 it was AFES or international.  It was a more
6 confidential type of review of their trip, going over
7 any problems, if they had any injuries or medical
8 illnesses.  Also an opportunity for me to identify if
9 there were any stressors involved that their
10 management team needs to know about, any employment
11 issues, staff issues.
12  Also, usually when they come back, they get
13 some type of immunization on the way back with AFES
14 personnel.  International service, maybe they did,
15 maybe they did not, depending on the availability or
16 where they were as far as a medical center where they
17 could get that type of care.
18  MR. PANAGOPOULOS: Counsel, I'd like to
19 talk to you about where we're going at this point.  If
20 you want to do this without your client in the room,
21 if you're concerned about the scope of the objection,
22 that's fine.  But at this point, I think I've got a

Page 335

1 fairly serious issue that we need to talk about, about
2 what's going on.
3  Again, if you don't want your client to
4 hear the basis of the objection because it's more than
5 just to form, that's fine, but I do want this issue on
6 the record.
7  MR. PLITT: That's fine.  I'm not going to
8 take a lot of time on it, because, you know, we've --
9 just for the record, I mean, we've had a day and a
10 half of your deposition and there's a lot of ground
11 that I want to cover and clarify.  So I don't want to
12 eat into the time that we have here today.
13  MR. PANAGOPOULOS: I just have a simple
14 question for you.  Do you want to do this out of the
15 presence of your client or in the presence of your
16 client?
17  MR. PLITT: I'll do it out of the presence,
18 but --
19  MR. PANAGOPOULOS: Okay.
20  MR. PLITT: -- I'm not going to take
21 much --
22  MR. PANAGOPOULOS: Why don't you give us a

Page 336

1 minute -- it's not going to be much.  I just want to
2 state the basis of this objection.
3  MR. PLITT: I'm not going to take much time
4 on it because we really have to cover a good deal of
5 information.  So maybe we ought to step out of the
6 room and talk.
7  MR. PANAGOPOULOS: Well, no.  I want this
8 on the record.
9  MR. PLITT: Oh, on the record?
10  MR. PANAGOPOULOS: Yeah.  But if you're
11 concerned that it's going to, you know, suggest
12 answers or something, that's why I -- or it's
13 inappropriate in some way.
14  You know, the reason for the objections as
15 to form is, you know, because you don't want someone's
16 lawyer coaching them.  But when you have that own
17 person's lawyer asking the questions, I think it's
18 different --
19  MR. PLITT: Okay.  I think we're getting
20 into something with the client in the room, and I
21 don't think --
22  MR. PANAGOPOULOS: Let's -- yeah, just for

Page 369

1 people used in the wellness unit. All the education
2 material that we used, all those were filed.
3     Q Anybody else doing that besides yourself?
4     A Well, initially, it was all three of us,
5 Ken, Jane and I. And then eventually, it just became
6 me after those two resigned.
7     Q And then you kept statistical reports on
8 the amount of the use of your wellness unit?
9     A Right. Every service. That's how they
10 would determine how active the wellness unit was used
11 by the employees. We had blood pressure monitoring,
12 heights and weights. There was a lactation room.
13 First aid that I had given. Any type of health
14 education.
15     We also had rooms, two rooms, with two cots
16 each in it where people can come and lay down if they
17 were feeling sick. Or sometimes you had an
18 international person that was traveling that just
19 needed some, you know, downtime to sleep, and they
20 would come in and use that room. And we would keep
21 track of it.
22     Q You kept track of exactly who was using,

Page 370

1 for example, the lactation room, how --
2     A Well, we didn't keep names. We did ask
3 them to mark off the time that they entered into the
4 room. We just had a grid of -- every day of all the
5 times, all the 8-hour time period.
6     Q That was a piece of paper?
7     A Right, from a spreadsheet that we
8 developed.
9     Q In the room?
10     A Actually on the door --
11     Q All right.
12     A -- of whatever that area they were using,
13 on the lactation room, behind the scale, near the
14 blood pressure, in the room where the cots were.
15     Then we kept that same thing inside the
16 actual examination room where we could do the first
17 aid and where the files are kept.
18     Q And how did you know whether someone was
19 using one of those facilities?
20     A I would either see them, and it was just
21 part of the Red Cross procedure, part of the wellness
22 procedure, that that's what that employee was to do,

Page 371

1 was to --
2     Q They were supposed to do what with the
3 piece of paper?
4     A To check off if they had used that service.
5 My duty was if I was there and they hadn't checked it
6 off, I would check it off, or they would check it off
7 and then I would collect all that information and put
8 it into a spreadsheet to give a monthly total. We had
9 monthly reports to say this is what the wellness unit
10 did for the month of.
11     Q So the use of all these facilities was
12 tracked by pieces of paper that were written on by you
13 or by the employees?
14     A That's correct.
15     Q All right. And you then would take that
16 information and type it into a spreadsheet?
17     A That's correct, and we would present it at
18 a manager meeting.
19     Q And that was how you managed the
20 statistical reports?
21     A Right.
22     Q Okay.

Page 372

1     MR. PLITT: That's all I have.
2     MR. PANAGOPOULOS: I have a few other
3 questions, based on counsel's questions.
4 FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
5     BY MR. PANAGOPOULOS:
6     Q All right. The last time we met, we went
7 over your job in a significant amount of detail.
8     Do you recall that?
9     A I do recall, with explanation.
10     Q Right.
11     A Okay.
12     Q And do you -- your counsel asked you some
13 very narrow questions on limited pieces of your job
14 today.
15     Were your answers today meant to narrow or
16 change any of the descriptions you gave to me when we
17 talked about your job description the other day?
18     MR. PLITT: Object as to form.
19     THE WITNESS: Narrow? No.
20     BY MR. PANAGOPOULOS:
21     Q Okay. Thank you.
22     A Because there were questions that you asked

Page 377

1 Jane came in later, because of her commute schedule.
2 But I didn't have --
3    Q   What time did you come in every day?
4    A   I was the early person. I was there at
5 7:30.
6    Q   Okay. You were in at 7:30.
7        And what time were you scheduled to leave
8 every day?
9    A   5:30.
10   Q   Is when you were scheduled to leave every
11 day?
12   A   (Nods head affirmatively.)
13   Q   Okay. Did you leave at 5:30 every day?
14   A   When Jane was -- and Ken were there, yeah.
15 There was no problem leaving on time.
16   Q   After Jane left, when were you leaving
17 every day?
18   A   Probably 6:30, quarter to 7:00.
19   Q   Now, that wasn't every day, right?
20   A   Three or four times a week, yes.
21   Q   But did you keep track of which days you
22 left late and which days you didn't?

Page 378

1    A   No, I did not.
2    Q   Okay. When Ken left, what time -- your
3 start time, I assume, stayed the same?
4    A   It stayed the same.
5    Q   All right. What time would you leave?
6    A   7:30, 8:00.
7    Q   Every day?
8    A   Three or four times a week.
9    Q   And did you keep track of which days you
10 stayed late?
11   A   No, I did not.
12   Q   Did you keep track whether it was three
13 days a week or four days a week?
14   A   It was definitely three or four days a
15 week.
16   Q   I understand that that's what you're
17 telling me now. I'm asking if you kept track at the
18 time --
19   A   An actual written record, no, I did not.
20   Q   Did you keep any type of a record?
21   A   I had a calendar, but I didn't keep a
22 calendar.

Page 379

1    Q   You didn't keep the calendar?
2    A   You know, a little desk calendar.
3    Q   I understand. So you had some type of
4 record, but you didn't keep it?
5    A   That's correct.
6    Q   Now, with respect to the disaster services
7 position, you never actually worked in the position;
8 is that correct?
9    A   That's correct.
10   Q   Now, did you ever complain about the number
11 of hours you were working after Ms. Davis left?
12   A   Yes.
13   Q   To whom did you complain?
14   A   Ken Thiel.
15   Q   What did you say to him?
16   A   Ken, I need some help. You're not giving
17 me any help with this procedure. And he basically
18 said, well, you're going to have to work late.
19   Q   Did you ever tell him you believed you were
20 entitled to overtime pay?
21   A   He would say I could have comp time.
22   Q   Okay. My question is different. I know he

Page 380

1 would offer you comp time. My question is did you
2 ever believe -- did you ever tell him that you
3 believed you were entitled to overtime pay?
4    A   No, I never told him I wanted overtime pay.
5    Q   Okay. Same questions with respect to when
6 he left.
7        Did you ever complain about the number of
8 hours you were working to anyone after Mr. Thiel left?
9    A   To Anna Shearer. She knew the bulk of the
10 work.
11   Q   Did you ever tell her that you believed you
12 were entitled to overtime pay?
13   A   No, I did not tell her that I wanted
14 overtime.
15   Q   Okay. Where did Jane --
16   A   But she never told me that he was not going
17 to be replaced either.
18   Q   Okay. Where --
19   A   I did know Jane was not going to be
20 replaced.
21   Q   Okay. Where did Ms. Davis go to school?
22   A   Jane Davis?