RB                UNITED STATES DISTRICT COURT
                         FOR THE
                   DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
                            :
TONIA POWELL,               :
                            :
         Plaintive,         :
                            :
    v.,                     :
                            :
AMERICAN RED CROSS,         :
                            :
         Defendant.         :
                            :
- - - - - - - - - - - - - -x

                         December 15, 2006
                         Washington, D.C.

    The deposition of ANNA SHEARER, called for
examination by counsel for the Defendant in the
above-entitled matter, pursuant to notice, at the
office of Miller Reporting Company, 735 8th Street,
S.E., Washington, D.C., convened, pursuant to
notice at 10:00 a.m., before David Harris, a
notary public in and for the District of Columbia,
when were present on behalf of the parties.

222f256d-901c-40fe-bda3-80c760e6c5eb

Page 2

1  APPEARANCES:
2    On behalf of the Defendants:
       BRIAN PLITT, ESQ.
3      1776 K Street, N.W.
       Washington, D.C. 20006
4      (202) 452-7984
5
     On behalf of the Plaintive
6      CONSTANTINOS G. PANAGOPOULOS, ESQ.
       Ballard Spahr Andrews & Ingersoll, LLP
7      601 13th Street, N.W.
       Washington, D.C. 20005
8      (202) 661-2202
9    Also Present:
       ROBBIN BOGGES
10     Court Reporter
11     DAVID HARRIS
       Notary Public
12
13
             C O N T E N T S
14
     WITNESS                          PAGE
15     FOR THE PLAINTIFF                3
16     FOR THE DEFENDANT               95
17
18
19
20           EXHIBITS
21
22   No. 1                             10

Page 3

1           PROCEEDINGS
2       MR. DAVID HARRIS: The reporter taking the
3   deposition today is not a notary in the District.
4   Her application is pending.
5       I'm a notary in the District of Columbia,
6   and I'm here to swear the witness. Would you each
7   raise your right hand?
8   Whereupon,
9           ANNA SHEARER
10  having been duly sworn by the Notary Public
11  testified as follows:
12      EXAMINATION BY COUNSEL FOR PLAINTIFF
13      BY MR. PLITT:
14      Q. Good morning. Ms. Shearer, my name is
15  Brian Plitt. I'm am the attorney for--
16      MR. PANAGOPOULOS: I'm sorry.
17      MR. PLITT: Yeah.
18      MR. PANAGOPOULOS: Just so that you know,
19  Anna has an allergy to cats. There have been a
20  bunch of cats in here.
21      MR. PLITT: All right.
22      MR. PANAGOPOULOS: If we need to take a

Page 4

1   break or if her voice starts cracking or something,
2   we'll let you know, because apparently they board
3   cats here as well, but just an FYI.
4       MR. PLITT: Okay. That sounds fine.
5       BY MR. PLITT:
6       Q. On the record. Ms. Shearer, my name is
7   Brian Plitt. I represent Doreen Rainey in the
8   lawsuit that's the subject of this deposition.
9       MR. PANAGOPOULOS: You mean Tanya Powell?
10      MR. PLITT: I mean Tanya Powell. I'm
11  sorry.
12      BY MR. PLITT:
13      Q. And I'm going to be asking you some
14  questions today related to the lawsuit. You're
15  familiar with Ms. Powell; correct?
16      A. Yes.
17      Q. Okay. The purpose of this deposition is to
18  go over issues or facts related to the lawsuit and
19  for you to recall to the best of your ability, the
20  facts related to it that may be important to the
21  case.
22      Have you given a deposition before?

Page 5

1       A. Yes.
2       Q. Okay. And how many times have given
3   deposition?
4       A. A couple.
5       Q. All right. So you're familiar with the
6   procedure?
7       A. Yes.
8       Q. I'll be asking questions. You'll be giving
9   answers. It's being taken down by a court reporter,
10  and you need to say yes or no and if I ask any
11  questions that you don't understand, please let me
12  know, and I'll ask a better question so we can get
13  the record clear; okay?
14      A. Okay.
15      Q. All right. Can you please give me a brief
16  thumbnail sketch of your employment history?
17      A. At the Red Cross, I was employed in
18  February 2001 and remain employed.
19      Q. Okay. And what was your employment before
20  the Red Cross?
21      A. I worked for INOVA Health System.
22      Q. And what was your employment there at

Page 18

1  A. No.
2  Q. You stated two?
3  A. Correct.
4  Q. All right. So when did the--when did those
5  Wellness Associates change, if at all?
6     MR. PANAGOPOULOS: Objection as to form.
7     THE WITNESS: I don't recall.
8     MR. PANAGOPOULOS: Go ahead.
9     THE WITNESS: I don't recall.
10    BY MR. PLITT:
11 Q. Okay. Did Jane Davis become a Wellness
12 Associate?
13 A. Yes.
14 Q. All right. About when did she start?
15 A. I don't recall.
16 Q. Was it 2003 or 2004, can you give me some--
17 A. I would guess 2004.
18 Q. --estimate? And do you recall who she
19 replaced?
20 A. I do not recall.
21 Q. Were there more than the two Wellness
22 Associates whose names you can't recall that worked

Page 19

1  there before she began after you started supervising
2  the unit?
3  A. As Red Cross employees? I'm sorry. Ask
4  your question again.
5  Q. As Red Cross employees?
6  A. Could you repeat your question?
7  Q. Were there more Wellness Associates other
8  than the two wellness whose names you don't recall
9  who worked in the Wellness Unit before Jane Davis
10 began work there as a Wellness Associate?
11 A. Not as Red Cross employees.
12 Q. Okay. All right. Then were there some
13 people then performing some of the duties of
14 Wellness Associates who were not Red Cross
15 employees?
16 A. Yes.
17 Q. Okay. Can you tell me about that?
18 A. We used contract staff from Corporate
19 Nurse.
20    MR. PANAGOPOULOS: Anna, make sure you let
21 Brian finish the question before you start
22 answering. It's, you know, it's easy to anticipate

Page 20

1  and it gets conversational, but it makes it a little
2  harder.
3     BY MR. PLITT:
4  Q. So what period of time did these people
5  work for the Red Cross in doing the Wellness Unit?
6     MR. PANAGOPOULOS: Objection as to form.
7     BY MR. PLITT:
8  Q. In doing the Wellness Associate duties?
9     MR. PANAGOPOULOS: Same objection.
10    THE WITNESS: Mid 2002 through late 2003.
11    BY MR. PLITT:
12 Q. And you said it was corporate nurse?
13 A. Yes.
14 Q. That's the company?
15 A. Yes.
16 Q. Was it a staffing agency?
17 A. Yes.
18 Q. All right. And which of the functions of
19 Wellness Associate did these contract staff perform?
20 A. They handled more of the walk-in traffic
21 and activities like flu shots.
22 Q. Okay. Can you state all the duties that

Page 21

1  they performed during this time period?
2     MR. PANAGOPOULOS: Objection as to form.
3     THE WITNESS: No, I would not be able to
4  state all of their duties.
5     BY MR. PLITT:
6  Q. Okay. Could you state any of the duties of
7  Wellness Associate that these staff, that these
8  contract staff did not perform during this time?
9  A. CPR AED training. They would not have
10 reviewed international delegate files. They would
11 not have handled worker's compensation claims.
12 Those are the three that I can recall.
13 Q. Those are the three that they wouldn't have
14 performed?
15 A. Predominantly.
16 Q. Well, is there anything else?
17    MR. PANAGOPOULOS: Objection as to form.
18    THE WITNESS: They would not have done
19 higher-level employee counseling. They would not
20 have made referrals to the employee assistance
21 program, for instance.
22    BY MR. PLITT:

Page 38

1  MR. PLITT: Sure.
2  MR. PANAGOPOULOS: Okay.
3  MR. PLITT: I understand.
4  MR. PANAGOPOULOS: Record keeping practices
5  of the company. That's a specific item, and you're
6  sitting here trying to put that item in another
7  broad, generalized category, and I've told you that
8  the designee for this is Carol, and we've got two
9  people here in order to do this efficiently; we're
10 not going to go over ground twice. I've told you
11 who the designee is on record keeping.
12     I mean she knows the--and I haven't told
13 her not to answer, but I'm trying to keep this
14 efficient and you're going beyond the scope for this
15 particular witness.
16     MR. PLITT: So is this witness being
17 tendered at all to speak about the hours that Ms.
18 Rainey, I mean Ms. Powell worked as an employee and
19 her duties as an employee?
20     MR. PANAGOPOULOS: Yeah, she's told you
21 about her duties. With respect to the hours worked,
22 I think she can tell you something about that as

Page 39

1  well, but when you're asking about the types of
2  records the Red Cross keeps and its general record
3  keeping practices on employees, I think you're going
4  beyond the scope of this particular witness. That's
5  all.
6      MR. PLITT: She's not being tendered as
7  your representative on that issue is what you're
8  saying?
9      MR. PANAGOPOULOS: That's what I said twice
10 at the beginning, once off the record, once on the
11 record.
12     MR. PLITT: That you're saying it's going
13 to be Ms. Miller?
14     MR. PANAGOPOULOS: And a third time now.
15     MR. PLITT: All right. You're saying it's
16 going to be Ms. Miller. That's fine.
17     All right.
18     BY MR. PLITT:
19     MR. PANAGOPOULOS: We've been going for
20 about an hour now. Can we take a quick break?
21     MR. PLITT: Yeah. That's fine.
22     MR. PANAGOPOULOS: Thanks.

Page 40

1  [Recess.]
2      MR. PLITT: Everybody ready to get started
3  again?
4      MR. PANAGOPOULOS: Yeah.
5      MR. PLITT: Back on the record.
6      MR. PANAGOPOULOS: Back on the record.
7      BY MR. PLITT:
8  Q. All right. Ms. Shearer, we're going to
9  talk a little bit more about the Wellness Unit
10 before Ms. Powell started.
11     Do I take it that your testimony is that
12 before Ms. Powell started in the Wellness Unit, the
13 Wellness Unit always had at least two Wellness
14 Associates and a manager?
15     MR. PANAGOPOULOS: Objection as to form.
16     THE WITNESS: Not consistently. There was
17 turnover in staff, and while there were staff
18 vacancies, we used the contract agency.
19     BY MR. PLITT:
20 Q. To fill in the gap?
21 A. Correct.
22 Q. Left by less than two Wellness Associates?

Page 41

1  A. Correct.
2  Q. All right. Now, what position was Ms.
3  Powell hired for? Was it Wellness Associate?
4  A. Yes.
5  Q. And what skills did she have that made her
6  qualified to work as a Wellness Associate?
7  A. Registered nurse.
8  Q. Were there any complaints about her work
9  ethics or professionalism or dress while she was a
10 Red Cross employee?
11 A. Not to my knowledge.
12 Q. Okay. Did you consider her to be an
13 accountable person, reliable and trustworthy
14 employee?
15     MR. PANAGOPOULOS: Objection as to form.
16     MR. PLITT: You can answer.
17     THE WITNESS: I only directly supervised
18 her for about three months. During that period, I
19 had no concerns with her performance.
20     BY MR. PLITT:
21 Q. Okay. Now, can you state the job duties
22 that Ms. Powell performed when she first began as a

Page 42

1  Wellness Associate at the Red Cross?
2      A.  She primarily handled walk-in employees,
3  tended to the respite area, the lactation area,
4  blood pressure checks, rate checks, employee health
5  counseling, those sorts of activities.
6      Q.  In terms of the walk-in employees, the
7  respite area, the blood, the lactation duties that
8  you just described, about what percentage of her
9  time did she spend on those duties?
10     A.  I wouldn't be able to estimate. I didn't
11 supervise her at that time.
12     Q.  All right. In terms of the employee
13 counseling, what did that involve?
14     A.  I'm sorry what did that involve?
15     Q.  Mm hmm. Yeah.
16     A.  Employees coming to the Wellness Center not
17 feeling well; anticipating being off for periods of
18 illness or surgery; a return to work question;
19 accommodation questions; some ergonomic questions;
20 workplace environment issues.
21     Q.  And about what percentage of her time was
22 taken up with those duties?

Page 43

1      A.  I would not be able to estimate.
2      Q.  And then what other duties did Ms. Powell
3  perform?
4      A.  My recollection is reasonably soon after
5  employment, she started learning some of the
6  specialty medical review work that that Wellness
7  Unit did: the review of medical records, the review
8  of--or developing her learning and understanding of
9  the military medical requirements, the international
10 requirements, becoming familiar with the software
11 systems that were used.
12     Q.  Can you be more specific as to what that
13 involved?
14        MR. PANAGOPOULOS: Objection as to form.
15     What's that?
16        MR. PLITT: What you've just described.
17 The duties you just described in your last answer.
18        THE WITNESS: The medical record review?
19        BY MR. PLITT:
20     Q.  Mm hmm.
21        MR. PANAGOPOULOS: You want her to go
22 through each of them?

Page 44

1        MR. PLITT: I'd like to know what Ms.
2  Powell did in terms of medical record review.
3        THE WITNESS: For both the Armed Forces
4  Emergency Services staff and the International
5  Service delegates, it's two different sets of
6  criteria, but the process is similar. It's
7  reviewing an individual's medical records, test
8  results, lab results, radiology results,
9  drug--prescription drug utilization, immunization
10 records, to be sure that they meet the required
11 criteria for a specific location and set of
12 conditions that a person is going to.
13        BY MR. PLITT:
14     Q.  Okay. And what percentage of her time was
15 taken up with those duties?
16     A.  It would have varied.
17     Q.  And can you tell me what percentage--what
18 range of percentage was taken up with those duties?
19     A.  Anywhere from 10 percent to 75 percent.
20     Q.  What would--on the average, what was the
21 percentage of her time per week that was taken up
22 with those duties?

Page 45

1        MR. PANAGOPOULOS: Objection as to form.
2        MR. PLITT: When she performed them?
3        THE WITNESS: For the period of time that I
4  am most familiar with 50 percent.
5        BY MR. PLITT:
6     Q.  Were there other duties that she performed?
7     A.  Yes.
8     Q.  What were those duties?
9     A.  I think I've already described them, but
10 handling sick employees.
11    Q.  I mean other than what you've described to
12 me so far.
13        MR. PANAGOPOULOS: Do you want to give her
14 the list that she's given you so far, so we're not
15 repeating?
16        THE WITNESS: Worker's comp.
17        MR. PLITT: I think she knows what she's
18 told me.
19        THE WITNESS: Review. Family Medical Leave
20 Act Review. Ergonomic assessments. Briefings and
21 debriefing sessions of in-bound, out-bound
22 international travelers.

Page 54

1  if you can estimate within reason.
2     A. Can you ask your question again?
3     Q. All right. Can you please tell me about
4  how long the Wellness Associate position was vacant
5  before Ms. Powell began?
6     A. Six months.
7     Q. Okay. And who performed that work while Ms.
8  Powell was--was still away?
9     A. Contract staff.
10    Q. Okay. All right. Now, when Ms. Powell
11 began work as a Wellness Associate, was her direct
12 supervisor Ken Thiel?
13    A. Yes.
14    Q. All right. Now, did Jane Davis then resign
15 around January 2005?
16    A. Yes.
17    Q. All right. And at that time, she was not
18 replaced with another Wellness Associate; correct?
19    A. Correct.
20    Q. And her duties were then assigned to Ms.
21 Powell after she left; isn't that correct?
22    A. Some of her duties were assigned.

Page 55

1     Q. Okay. And which of her duties were
2  assigned to Ms. Powell?
3     A. I can't give you a complete list, but the
4  Armed Forces Emergency Services work.
5     Q. Okay. Anything else?
6     A. Some other things that would have been
7  shared between the two of them. Some of that work
8  went to Tanya--walk-in.
9     Q. Can you tell me what work was shared
10 between them that went to Ms. Powell?
11    A. Primarily the walk-in traffic, the
12 counseling.
13    Q. Anything else?
14    A. Blood pressure checks. Monitoring the
15 lactation area and the cot rooms.
16    Q. Is there anything else?
17    A. That's to the best of my recollection.
18    Q. And what of Ms. Davis' work did not go to
19 Ms. Powell?
20    A. Some of the Armed Forces Emergency Services
21 stuff went to the manager. Worker's comp went to
22 the manager. FML, short-term disability work went

Page 56

1  to the manager. Employee counseling, some of the
2  employee counseling went to the manager.
3     Q. Okay. And which part of the Armed Forces
4  work went to the manager?
5     A. To the best of my recollection, it was some
6  of the briefing/debriefing work was done by the
7  manager. Some of the calls to the military.
8  Consulting our physician advisor, MD advisor.
9     Q. And then--and what part of employee
10 counseling went to the manager, the manager being
11 Ken Thiel; right?
12    A. Correct.
13    Q. Which part of that went to him?
14    A. Not a specific part or type of counseling.
15    Q. Can you describe which part went to Ken
16 Thiel and which part went to Ms. Powell?
17       MR. PANAGOPOULOS: Objection as to form.
18       BY MR. PLITT:
19    Q. Which employee counseling went to Ken
20 Thiel, which employee counseling went to Tanya
21 Powell?
22       MR. PANAGOPOULOS: The same objection.

Page 57

1       THE WITNESS: I'm not really able to answer
2  that question. I don't know. It would have been
3  based on who was there, what the workload was for
4  the day, who was busy doing something else.
5       BY MR. PLITT:
6     Q. So it's fair to say that was shared between
7  the two of them on an ongoing basis?
8     A. Correct.
9     Q. I see. And what about the disability work
10 that went to the manager. What did that involve?
11    A. Predominantly related to FML when employees
12 are out on disability; making sure that they had
13 returned to work authorization.
14    Q. Okay. Now, after Jane Davis resigned,
15 there were no contractors who came in to perform any
16 part of her duties after that time; is that correct?
17    A. That's correct.
18    Q. Now, after she resigned, Jane Davis, what
19 factors determined that she would not be replaced?
20    A. I did not feel that it was necessary given
21 the workload of that unit. We also shifted some of
22 the FML short-term disability processing to a

Page 58

1  benefits administrator level person.
2    Q. And who was that?
3    A. The name is Vicky Fleming.
4    Q. And which part of Jane Davis' work did she
5  perform?
6        MR. PANAGOPOULOS: Objection as to form.
7        THE WITNESS: She took over some of the
8  communication with employees, advising them of the
9  status of their claims.
10       BY MR. PLITT:
11   Q. And what was her position?
12   A. Benefits administrator.
13   Q. And was she paid on an hourly basis or a
14 exempt basis?
15   A. Exempt.
16   Q. Okay. And about what percentage of the
17 work had this--of Ms. Jane Davis' work had this work
18 taken up in terms of her time doing?
19       MR. PANAGOPOULOS: Objection as to form.
20       BY MR. PLITT:
21   Q. About how much of Jane Davis' time per week
22 had been taken up with this work that later went to

Page 59

1  Vicky Fleming after Jane left?
2    A. Ten percent.
3    Q. Were there budgetary considerations that
4  were affecting the Wellness Unit at the time that
5  Jane Davis left?
6    A. Yes. There are always budgetary
7  considerations.
8    Q. Can you describe what considerations those
9  were at that time?
10   A. Trying to reduce expense.
11   Q. Was there an effort also to reduce the
12 number of positions?
13       MR. PANAGOPOULOS: Objection as to form.
14       MR. PLITT: You can answer.
15       MR. PANAGOPOULOS: If you can.
16       MR. PLITT: You can answer.
17       THE WITNESS: Yes. Any time there is a
18 vacancy, there's an evaluation done as to whether
19 that position needs to be replaced, either as it was
20 previously or in some other fashion, or if there are
21 other individuals that can assume some of the work.
22       BY MR. PLITT:

Page 60

1    Q. All right. Now, after Jane Davis resigned,
2  and Tony Powell took over, at least some part of her
3  workload--did Tony Powell work hours over 40 a week
4  in her position as Wellness Associate?
5    A. Not to my knowledge.
6    Q. Okay. Do you dispute that she did work
7  hours over 40 a week after Jane Davis left and
8  before Ken Thiel left?
9        MR. PANAGOPOULOS: Objection as to form.
10       THE WITNESS: She may have occasionally
11 worked in excess of 40 hours per week, but not on
12 routine or scheduled basis.
13       BY MR. PLITT:
14   Q. Do you--can you make an estimate of how
15 many hours over a week she worked on average after
16 Jane Davis resigned and before Ken Thiel left Red
17 Cross?
18       MR. PANAGOPOULOS: Objection as to form.
19       THE WITNESS: No. I was not her immediate
20 supervisor.
21       BY MR. PLITT:
22   Q. Now, in March 2005, around March 16th, did

Page 61

1  Ken Thiel resign?
2    A. Yes.
3    Q. Do you have any knowledge of why Ken Thiel
4  resigned?
5        MR. PANAGOPOULOS: Objection. Ken is
6  improper as to have--in the deposition notice or the
7  allegations in this case.
8        MR. PLITT: Because the--you know, the
9  evidence will show that certain of Ken Thiel's job
10 duties were taken over by Tony Powell.
11       MR. PANAGOPOULOS: That has nothing to do
12 with the reason for his resignation.
13       MR. PLITT: It relates to the likelihood
14 that Ms. Powell had to take over his duties, which
15 relates to the likelihood that she had to work
16 overtime.
17       MR. PANAGOPOULOS: No, the fact that he
18 left relates to the fact that she may have taken her
19 duties, not the reason that he left.
20       MR. PLITT: Well, I think--
21       MR. PANAGOPOULOS: And I don't think that's
22 within the scope and I don't think that it's

Page 66

1  Q. What factors determined he would not be
2  replaced?
3  A. The organization was going through what we
4  call the Core Services Review, and it was--we were
5  at the stage where it was possible that the Wellness
6  Unit would be closed down. So a decision was made
7  not to replace the manager.
8  Q. Now, was cost a part of that--the factors
9  leading to that?
10 A. Yes. Yes.
11 Q. The decision to close the unit was not made
12 until after Ken Thiel resigned?
13 A. Correct.
14 Q. Who was responsible for the budget and
15 operations of the Wellness Unit?
16 A. The manager.
17 Q. Okay. And Ken Thiel when he was there, in
18 other words?
19 A. Correct.
20 Q. Okay. Was human resources responsible for
21 that budget in operations?
22 A. Yes. The Wellness Unit was a division,

Page 67

1  department, whatever you want to call it within the
2  Human Resources Department.
3  Q. Now did Ms. Powell have any duties as a
4  supervisor while she worked in the Wellness Unit?
5  A. No.
6  Q. Did--after Ken Thiel resigned, did Tony
7  Powell then work hours over 40 hours a week at the
8  Red Cross?
9  A. Not on a routine or consistent basis.
10 Q. Okay. But did she work at times hours more
11 than 40 a week?
12 A. She may have occasionally worked over 40
13 hours a week.
14 Q. About how many hours over 40 per week on
15 average did she work as an employee after Ken Thiel
16 resigned?
17    MR. PANAGOPOULOS: Objection as to form.
18    THE WITNESS: One to two hours.
19    BY MR. PLITT:
20 Q. And how do you know she worked hours over
21 40 a week after Ken Thiel resigned?
22 A. For instance, on occasion, there would be a

Page 68

1  luncheon meeting of the Armed Forces Emergency
2  Services Group, and she would attend that luncheon.
3  Q. And how did you know that she was working
4  hours over 40 to attend that luncheon?
5  A. Because her normal hours were 7:30 to 4:30,
6  with an hour for lunch, and I would be aware of when
7  the meeting was scheduled.
8  Q. Okay.
9  A. And it would have been over her normal
10 pattern of taking lunch for an hour at about twelve
11 to one.
12 Q. Any other indication that you had that she
13 was working hours over 40 per week?
14 A. Occasionally, there would be an e-mail or a
15 conversation at 4:45 in the afternoon, if somebody
16 had just arrived at the unit at 4:25, Tanya would
17 not leave at 4:30. She would stay to finish out
18 whatever that activity was. But as--
19 Q. Now, after Ken Thiel resigned, you were
20 aware that Tanya Powell was continuing to perform
21 the duties that were assigned to her from Jane Davis
22 after Jane Davis resigned?

Page 69

1  A. Correct.
2  Q. Okay. And after Ken Thiel resigned, the
3  duties performed by Jane Davis weren't assigned to
4  anybody else other than what we've discussed--Tanya
5  Powell and to some extent the other worker, Vicky
6  Fleming?
7  A. That's correct. Some work was just
8  stopped. They stopped doing some work. So--
9  Q. And what work was that?
10 A. Employee education development, delivery.
11 Q. This is work that Jane Davis had been
12 performing?
13 A. Mm hmm. Yes.
14 Q. And do you have an estimate of what
15 percentage of Jane Davis' time that that work had
16 taken up?
17 A. I'm not able to estimate.
18 Q. Now, did you have any contact with Tanya
19 Powell regarding whether her job as Wellness
20 Associate would be eliminated?
21 A. Yes.
22 Q. Okay. Can you tell me what that contact

Page 82

1   A. No.
2   Q. Are you aware whether or not that training
3   was discussed with Ms. Powell?
4   A. No.
5   Q. Did you have any contact with Ms. Powell
6   regarding whether or not she would receive severance
7   pay as a result of leaving the Red Cross?
8       MR. PANAGOPOULUS: That is an area
9   designated for Carol Miller.
10      BY MR. PLITT:
11  Q. During the time after Jane Davis had
12  resigned and before Ken Thiel resigned, was Ms.
13  Powell expected to perform the duties of Jane Davis
14  that were assigned to her after Jane Davis had left?
15      MR. PANAGOPOULUS: Objection as to form.
16      THE WITNESS: Yes, if the manager assigned
17  them, she would have been expected to perform them.
18      BY MR. PLITT:
19  Q. And after Ken Thiel had left was Ms. Powell
20  expected to perform the duties of Ken Thiel that
21  were assigned to her after Ken Thiel left?
22  A. Yes.

Page 83

1   Q. And did Ms. Powell perform those duties
2   that had been assigned to her after Jane Davis left?
3   A. Yes.
4   Q. And, did she perform those duties and also
5   the duties that were assigned to her from Ken Thiel
6   after Ken Thiel left?
7       MR. PANAGOPOULUS: Objection as to form.
8       BY MR. PLITT:
9   Q. Do you understand the question?
10  A. Yes. She performed the duties that were
11  assigned to her.
12  Q. And did she continue to perform those
13  duties through the date of her termination?
14      MR. PANAGOPOULUS: Objection at to form.
15      BY MR. PLITT:
16  Q. Do you understand my question?
17  A. Yes. Through about, up until about the
18  last week of her employment, last week to ten days,
19  yes.
20      BY MR. PLITT:
21  Q. Okay. Let me show you what has already
22  been an exhibit in a previous deposition from Ms.

Page 84

1   Powell. It's Exhibit Number 8 from Ms. Powell. I'll
2   show it to your counsel, and you take a look at it.
3   Go ahead. After he's reviewed it, I want you to
4   look at it.
5       MR. PLITT: And I'm proposing if it's all
6   right with counsel since it's already part of the
7   record, we can just refer to it in that way for this
8   record.
9       MR. PANAGOPOULUS: That's fine with me.
10      MR. PLITT: Okay.
11      BY MR. PLITT:
12  Q. Would you take a look at that?
13      MR. PANAGOPOULUS: Well, with the caveat,
14  Brian, that I mean I'm taking your representation
15  that this is Exhibit 8. I obviously I don't know
16  what the exhibits were, so let's, you know, I didn't
17  memorized them, so, just for the record, just to be
18  clear, let's do this: that this is a one-page fax,
19  with a fax strip at the top dated, it looks like is
20  9/1/2006; 13:44 is the time. And the fax number
21  240-777-1317 from Montgomery County DHHS, and it's
22  an e-mail from Tanya Powell's Red Cross e-mail

Page 85

1   address to apparently her home e-mail address, and
2   the subject is daily activities for Wellness
3   Associate I, date Friday 3 June, 2005.
4       BY MR. PLITT:
5   Q. Okay. Would you take a look at that and
6   let me know when you've had a chance to review it,
7   please?
8   A. Okay.
9   Q. Does that memorandum fairly describe the
10  duties performed by Ms. Powell as Wellness
11  Associate?
12      MR. PANAGOPOULUS: Objection as to form.
13      THE WITNESS: I would say not.
14      BY MR. PLITT:
15  Q. Okay. Why do you say not? Those duties
16  weren't performed by her?
17      MR. PANAGOPOULUS: Which question do you
18  want her to answer?
19      BY MR. PLITT:
20  Q. Were those duties not performed by Ms.
21  Powell?
22  A. She would not have been expected to clean

Page 94

1  Q. During when Ms. Powell was working for you?
2     MR. PANAGOPOULOS: Brian, all she's saying
3  is that the Wellness Unit was eliminated so there's
4  nothing left to supervise.
5     MR. PLITT: Right. Right. Right.
6     BY MR. PLITT:
7  Q. But it's the same position you were in when
8  Ms. Powell was working--
9  A. Correct.
10 Q. --in the Wellness Unit and when there was
11 one. Okay.
12    MR. PLITT: All right. I'm sorry.
13    EXAMINATION BY COUNSEL FOR THE DEFENDANT
14    BY MR. PANAGOPOULOS:
15 Q. Okay. I have just a couple of questions,
16 clarification questions.
17    Ms. Shearer, you indicated that when Jane
18 Davis left that some of Ms. Davis' duties were no
19 longer performed and one of the examples were or
20 that you gave I believe was employee education.
21 When Ms. Davis left, were there any duties that Ms.
22 Powell had prior to that time that she no longer had

Page 95

1  to perform in assuming some of Ms. Davis' duties?
2     MR. PLITT: Objection as to form.
3     THE WITNESS: Yes. Some of the duties
4  associated with short-term disability claims, FML
5  claims, went to Vicky Fleming, the benefits
6  administrator, who was physically located near that
7  area. So in terms of file maintenance,
8  notifications to employees, notifications to
9  payroll, problem solving payroll problems, problem
10 solving manager questions, Vicky took on some of
11 those responsibilities.
12    BY MR. PANAGOPOULOS:
13 Q. Okay.
14 A. Anything having to do with a medical issue
15 or interpretation of a medical condition or return
16 to work was done by the registered nurse.
17 Q. Okay. So the point is, however, that even
18 though some duties were added to Ms. Powell's plate,
19 there were other duties that were essentially taken
20 away or shifted elsewhere?
21    MR. PLITT: Objection as to form.
22    THE WITNESS: Yes.

Page 96

1     BY MR. PANAGOPOULOS:
2  Q. Okay.
3  A. As the staff shrunk, some things were just
4  eliminated or scaled back.
5  Q. Okay.
6  A. And the employee counseling education is
7  probably the best example; the development of
8  educational programs, brown bag lunch type things
9  were just discontinued. And Tanya and Jane would
10 have both done that type of work.
11 Q. Okay. Now, what about when Mr. Thiel left?
12 You explained what additional duties Ms. Powell
13 assumed. Were there other duties that she had
14 performed prior to that time that she no longer had
15 to do from that point forward?
16 A. Sort of the same response. Just additional
17 scaling back, and some work of Ken's just no longer
18 done, for example, attending Safety Committee
19 meetings. That would normally have been done by the
20 wellness manager.
21 Q. Okay.
22 A. We just stopped participating in those

Page 97

1  meetings.
2  Q. Okay. And obviously, Mr. Thiel was a
3  supervisor. There were no more supervisory duties
4  to perform--
5  A. Correct.
6  Q. --either; correct?
7  A. And we scaled back the hours that the unit
8  was staffed.
9  Q. Okay. Do you know whether or not Ms.
10 Powell typically took her one-hour lunch break?
11 A. Yes, she did.
12 Q. Okay. Tell me about how you're aware of
13 that?
14 A. I would say she had a pretty set pattern of
15 taking lunch, 11:45, 12:00 o'clock; leaving the
16 building for about an hour; walking--so, you know,
17 putting on her sneakers and walking; taking a walk
18 around the neighborhood.
19 Q. Okay.
20 A. And eating presumably at the same time.
21 Q. Okay. And do you know whether she did this
22 typically alone or with others?

Page 98

1  A. No. She most--I would most often see her
2  with Vicky Fleming.
3  Q. Okay. All right. Now, after Ms. Thiel
4  left, would you from time to time head down to the
5  Wellness Unit?
6  A. Yeah. Before Ken left, I would rarely go
7  down to that area.
8  Q. Okay.
9  A. After Ken left, you know, we were trying to
10 cover the unit for as many hours as we could.
11 Tanya's normal hours were 7:30 to 4:30, so I would
12 with some frequency swing by that area at the end of
13 my work day, 5:30 to 6:00 o'clock just to be sure
14 that the unit was locked, lights out, and that there
15 weren't any employees there, you know, resting or
16 looking for services that might have been missed in
17 the 4:30 to 5:30 hour.
18 Q. Okay. Did you ever see Ms. Powell down
19 there?
20 A. I do not recall ever seeing her.
21 Q. Okay. Now, you also earlier testified that
22 there may have been a time when she stayed, you

Page 99

1  know, a little later than 4:30 because someone had
2  come in close to that time, to perform services.
3  A. Right.
4  Q. Is that--are you speaking of, you know, a
5  minimal period of time after 4:30 then typically?
6  A. Yeah. I would say quarter to five, 5:00
7  o'clock time frame.
8  Q. Okay.
9  MR. PANAGOPOULOS: Thank you. I have no
10 further questions.
11 MR. PLITT: Okay.
12 MR. PANAGOPOULOS: All right. What do you
13 want to do? You want to do a 45-minute break?
14 MR. PLITT: Whatever is good with you. I
15 mean 45's we did the last time. I mean I don't
16 know. It's--you know there's a lot of restaurants
17 around here, but you have to walk, you know, at
18 least a block or so, so if you want--
19 MR. PANAGOPOULOS: Okay. Why don't we
20 shoot for 45, 50 minutes or so if we can.
21 MR. PLITT: If you want to make it an hour,
22 I think it will work okay.

Page 100

1  MR. PANAGOPOULOS: Do you have an estimate
2  of how long you're going to go with Carol?
3  MR. PLITT: It's going to be a little
4  longer. I think three to four hours, but I'll tell
5  you.
6  MR. PANAGOPOULOS: Okay. Well, why don't
7  we shoot first close to 45 minutes as we can then to
8  get back here so we can get going?
9  MR. PLITT: Okay. That's fine. But you've
10 got a little grace period.
11 MR. PANAGOPOULOS: Thank you.
12 MR. PLITT: Okay.
13 [Whereupon, at 12:45 p.m., the taking of the
14 deposition concluded.]
15           (Signature not waived)

222f256d-901c-40fe-bda3-80c760e6c5eb