```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
_____
                              *
TONIA POWELL                  *
    Plaintiff,                *
    v.                        *     Case No. 1:06CV1173
                              *     Judge Huvelle
AMERICAN RED CROSS            *
    Defendant.                *
_____*
```

### PLAINTIFF TONIA POWELL'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS GENUINE ISSUE

Plaintiff, Tonia Powell, pursuant to Local Rule 108 (h), responds to Defendant's Statement of Material Facts (submitted in support of its Motion for Summary Judgment Regarding Damages), and sets forth the genuine issues and material facts as to which there exist genuine issues necessary to be litigated.

"Ex." refers to Exhibit, and "tr." refers to the designated deposition transcript, "Powell dec" refers to Ms. Powell's declaration, Ex. 3, attached to the Memorandum.

The Facts are numbered as in Defendant's Statement and any Additional Material Facts at Issue are stated afterwards.

5.  The Red Cross' offer letter to Ms. Powell did not "explain that her employment was exempt from the Fair Labor Standards Act ("FLSA") and the D.C. Wage and Hour Law." It stated that "your employment is classified [by the Red Cross] as Exempt." The offer letter did not "explain that she was an at-will employee." It stated that it, the letter, was not a contract of employment or a guarantee of continued employment. American Red Cross Motion for Summary Judgment "ARC MSJ" Ex. 4.

6.  Ms. Powell did not state that she understood that she did

not have a contract with the Red Cross. She stated that she understood that the HR policy said that it was a manual not a contract, Powell 11-14-06 tr. 109, 110 (ARC MSJ, Ex. 6), and that she was "not sure what you mean" by "no written employment contract" but that she had not "signed a written employment contract." ARC MSJ, Ex. 6, Powell 11-14-06 tr. 311:10-11.

    9. The transportation allowance was a benefit that Ms. Powell would have received if she had continued employment. Powell dec., Ex. 3, para. 11.

    10. The Red Cross' Human Resources Policy and Procedure Manual stated that "all paid positions in the Red Cross are classified as exempt or nonexempt from the overtime provisions of the Fair Labor Standards Act (FLSA) as administered by the U.S. Department of Labor. Human Resources is responsible for determining the exemption stats of all positions. Exempt employees are not eligible for overtime or compensatory time." ARC MSJ, Ex. 8.

    11. The Red Cross did classify a Nurse II, Employee Wellness position as exempt in 2004. The Red Cross' corporate representative was not able to identify the exemption under the FLSA used by the Red Cross. Miller tr. 83-84, Ex.6.

    12. Ms. Powell did not testify that analyzing medical records for AFES deployment was "her most important duty as a Wellness Nurse II." Ms. Powell testified that her AFES work was always important, but that all the duties listed in item 6 of Exhibit 8 hereto were important. Powell tr., Ex. 1, 145:10-146:4; Ex. 8, Powell Memorandum "Daily Activities for Wellness

Associate1."  These duties included "accomodations, ergonomics, worker's comp., illnesses, wellness questions, AFES, International, FMLA/STD, doctor's notes, ordering supplies, wellness memos and correspondence."

Powell's duties for AFES personnel included putting papers in files, labeling files, filing files in file cabinets, locking and unlocking file cabinets, keying the results of physical examinations and evaluations into a spreadsheet, notifying personnel when medical records were received, requesting submission of medical records for annual and deployment physical evaluations.  maintaining records on the medical status of deployed personnel, informing personnel and AFES personnel of next physical due from previously prepared checklist, reviewing medical records according to military guidelines, knowing who were the people that were going off for deployment and what stage they were at in their physical assessment, if they were ready for deployment, if they were coming back, finding out anything that happened while deployed (debriefing), and scheduling of their next physical, documentation of the medical records, e-mails, telephone calls.  Powell Answer to Interrogatory No. 1, Ex. 2, Powell dec., Ex. 3 para. 5-6;  Powell tr., Ex. 1 35:20-36:18; 126:12-127:1; 324:12-329:12.

14.  Ms. Powell did not spend more than 60% of her time "analyzing AFES medical Records."  Ms. Powell spend more than 60% of her day on <u>all</u> the responsibilities related to AFES personnel which included many clerical, non-discretionary, routine tasks. Powell tr., Ex. 1, 126:8-128:6;  Powell Answer to Interrogatory

No. 1, Ex. 2, Powell dec., Ex. 3, para. 5-6. These duties included those duties stated for Ms. Powell in "Fact as to Which there is Genuine Issue 12" above. Powell tr., Ex. 1, 35:20-36:18; 126:12-127:1; 324:12-329:12.

15. Ms. Powell testified "the greatest bulk of the decision making was with AFES," not necessarily the majority of her decisions during her employment at Red Cross. Powell tr., Ex. 1, 287:21-288:8. Powell testified that she had "procedure manuals that [she] would have to look at to determine how to respond to certain situations." She performed her work, first by "daily" reference to "procedure manuals," and then work became "routine" and stayed in "one really basic or confined area of work and decision making." Powell tr., Ex. 1, 287:11-288:8.

16. Powell testified she reviewed, (not analyzed) medical records. Powell tr., Ex. 1, 35:20-37:8. Powell met with a core group of people, the AFES managers and client management associates who looked at doctor's reports and medical records to determine whether or not an individual was deployable, based on military guidelines. Powell tr., Ex. 1, 35:20-37:8.

Based on military guidelines, Powell reviewed medical records, to give a recommendation to the AFES group to determine whether the person's records met the military criteria for eligibility for deployment. Powell tr. Ex. 1, 74:16-21; 76:4-78:8.

Powell did not have discretion to determine which personnel would be deployed. Powell tr., Ex. 1 324:16-325:17-326:18. That decision was made by the AFES managers. Powell tr., Ex. 1,

324:16-325:12.

20.   Ms. Powell did not testify that she "used both her medical knowledge and the medical information in the guidelines" to make an initial recommendation.  Powell tr., Ex. 1, 44:1-45:2, 77:8-78:8.  Based on military guidelines, Powell reviewed medical records, to give a recommendation to the AFES group to determine whether the person's records met the military criteria for eligibility for deployment.  Powell tr. Ex. 1, 74:16-21; 76:4-78:8.

21.   Ms. Powell consulted with the wellness unit's doctor, a contractor, on rare occasions with respect to AFES personnel. Powell tr. Ex. 1, 78:9-79:5.  One time, Powell received a decision from military doctors overseas that one AFES person should come home by commercial carrier.  Powell tr., Ex. 1, 79:2-82:1  80:13-81:2.  Powell notified the AFES manager of their recommendation and the transportation arrangements were made.  Powell tr., Ex. 1, 80:13-82:1.

22.   Powell provided minimal first aid for clients who were injured.   Powell tr., Ex. 1, 33:17-35:17.     She filed OSHA reports, based on her training.  Powell tr., Ex. 1, 61:2-63:3. She also performed many other duties, including cleaning rooms, dispensing educational materials, filling first aid boxes throughout the headquarters, ordering and stocking office and medical supplies, and file management.  33:17-35:17;   See also Disputed Fact 12 above, Powell Responses to Interrogatories 1 and 2, Ex. 2.

23.  Jane Davis resigned 1-7-05.  Powell dec., Ex. 3, para. 7.  Ms. Powell's workload doubled.  Powell tr., Ex. 1, 49:15-50:5.

24.  Ms. Powell did not testify that she spent "more time analyzing AFES records."  Powell testified she reviewed, (not analyzed) medical records.  Powell tr., Ex. 1, 35:20-37:8.  Ms. Powell spend more of her day on all the responsibilities related to AFES personnel which included many clerical, non-discretionary, routine tasks.  Powell tr., Ex. 1, 126:8-128:6;  128:13-129:19; Powell Answer to Interrogatory No. 1, Ex. 2,  Powell dec., Ex. 3, para. 5-6.  These duties included those duties stated for Ms. Powell in "Fact as to Which there is Genuine Issue 13" above.  Powell tr., Ex. 1, 35:20-36:18; 126:12-127:1;  324:12-329:12.

25.  After Jane Davis resigned, on 1-7-06 Ms. Powell received all significant duties from her.  After Ken Thiel resigned on 3-16-05, the John Barton Payne and FMLA work went to Vicki Fleming.  Powell declaration, Ex. 3, para. 7.

26.  Ms. Davis' position was not filled because of budgetary considerations of trying to reduce expenses.  Shearer tr., Ex. 5, 59:3-59:21.

27.  Mr. Thiel resigned on March 16, 2004.  Powell declaration, Ex. 3, para. 7.

28.  Mr. Thiel's position was not filled because the Red Cross was considering the elimination of the Wellness Unit at the time he resigned and due to considerations of cost.  Shearer tr., Ex. 5, 65:20-66:10.

30.  Ms. Powell's role was to collect medical records for review to ensure that an employee who was being considered for

International Services deployment had the proper records for deployment under the requirements. Powell tr., Ex. 1, 63:17-66:4.

32. Ms. Powell used the Travax travel service which was a previously prepared listing stating the immunizations required for each country. Powell tr., Ex. 1, 330:12-332:13.

33. For AFES, Ms. Powell passed on concerns first to the AFES Manager and for discussion at AFES team meetings. Powell tr., Ex. 1, 71:18-73:21. With respect to physicals for AFES, Powell would advise the person as to the AFES or military standard as to the test or test result required, and inform the AFES Manager of the issue, so that he and his team plan as to whether this person would meet the deadline for deployment. Powell tr., Ex. 1, 74:3-76:3. Ms. Powell's review of medical information did not require "some strategy," it was the AFES team and manager's planning to see if a person was going to meet the deployment deadline and whether to replace that person that required strategic planning. Powell tr., Ex. 1, 75:14-76:3; 77:13-21.

34. For both AFES and International Services, Ms. Powell reviewed medical records and notified employees of required tests, and recommended treatment under standards. ARC MSJ, Ex. 15

40. The position was also known as Staff Health Nurse for Disaster Services. Shearer tr., Ex. 5, 77:4-6.

42. Ms. Powell continued to pursue a higher salary for the Staff Health Nurse for the Disaster Services, Wellness Nurse III position after May 15, 2005. Powell tr., Ex. 1, 205:18-22, 218:8-13; ARC MSJ, Ex. 30 Powell/Pogue email 6-2-05.

43.   The ARC has a policy of permitting itself to offer salaries within a range of 75 to 125 percent of a given market point of a position. Miller tr., Ex. 6, 111:6-112:10.

46.   Miller stated that staff that was placed in same or similar jobs due to the restructure did not get salary adjustments if the salary was within the range.  ARC MSJ, Ex. 24, Miller/Vinson email, 5-25-05.

47.   On June 2, 2005, Mr. Vinson called Ms. Powell and said there was a $5,000 difference in pay, but that she would not receive more for the new job.  She could accept the new job at the offered salary and if she did not like it she could quit.  Powell tr., Ex. 1,  255:18-256:6, 258:2-259:2.

49.   The positions of Wellness Associate II (Occupational Health Nurse) and Staff Health Nurse for Disaster Services, Wellness Nurse III were not comparable and were significantly different in responsibilities, pay level and required skills and training.

Ms. Powell researched the new job, Staff Nurse for Disaster Services (Wellness Nurse III), finding that it had substantial new responsibilities, required substantial new training and was paid by ARC at a higher pay grade than her Health Nurse position, resulting in at least $5,000 more pay per year.  Powell tr., Ex. 1, 197:14-199:5;  348:5-351:4 (training); 352:4-353:13 (skills).

The new training involved policies and procedures related to disaster services and disaster sites.  Powell tr., Ex. 1, 348:5-351:4   New responsibilities included dealing with toxicology, hazard materials, and human resource development policies that

were significantly different in the disaster department. Powell tr., Ex. 1, 348:5-351:4;  352:4-353:13.

Powell noted these significantly different job responsibilities of the Staff Health Nurse for Disaster Services job to ARC in May and June 2005.[1]

52. Powell's employment at ARC was terminated June 30, 2005. Powell dec., Ex. 3.

55. Ms. Powell now makes just under $58,000. Powell tr., Ex. 1, 290:11-17.

Other Material Facts at Issue

A. Ms. Powell worked over 15 hours overtime per week during the time period 1-7-05 to 6-30-05. Powell Answer to Interrogatory No. 24, Ex. 2 hereto.

B. ARC cannot prove an exemption to the FLSA by a preponderance of the evidence.

Respectfully submitted,

TONIA POWELL

/s/

_____
Brian C. Plitt, Attorney at Law
1239 C. St., SE, Ste. 4
Washington, D.C.  20003
(202) 546-5493
Attorney for Plaintiff

---

[1] Powell 6-2-05 email, Ex. 10 ("my position remains that the jobs are not the same because of the increased responsibilities attaches with the Disaster Response position");  Powell tr. Ex. 1, 268:7-10 ("I disagreed that the position was considered comparable.");  Powell/Miller 6-14-05 email, ARC MSJ, Ex. 28 ("Documentation of the job description and scope of responsibilities for the Disaster Health Nurse far exceeds the daily tasks and responsibilities in my current position as the Wellness Associate and clearly is not a "comparable" position").

March 12, 2007