IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____      *
                             *
TONIA POWELL                 *
     Plaintiff,              *
                             *
     v.                      *      Case No. 1:06CV1173
                             *      Judge Huvelle
AMERICAN RED CROSS           *
     Defendant.              *
_____      *
```

**PLAINTIFF TONIA POWELL'S MEMORANDUM OF POINTS AND AUTHORITIES OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

<u>Introduction</u>

This cause of action is brought by Tonia Powell ("Ms. Powell" or "Powell"), in part, under the D.C. Wage and Hour Act. (Count II of her Amended Complaint). Powell asserts that Defendant American Red Cross ("ARC" or "Red Cross"), failed to pay her proper overtime for hours worked over 40, per week during her employment.

Ms. Powell's two other Counts in her Amended Complaint assert discrimination under the D.C. Human Rights Act in terminating her employment and breach of contract in failing to award severance pay and unlawful termination. Amended Complaint, Counts I and III. As stated below, the ARC is precluded from consideration of any exemptions for their obligation to pay Ms. Powell for her many hours of overtime, and even if not precluded, a reasonable jury may find that Ms. Powell was entitled to overtime compensation. Genuine issues of disputed facts also exist for Ms. Powell's other causes of action. Therefore, Ms. Powell submits

that ARC's Motion should be denied.

Statement of Facts

Ms. Powell was employed at American Red Cross ("ARC"), 2025 E. Street, N.W., Washington, D.C.[1] as a Occupational Health Nurse[2] from November 15, 2004, through June 30, 2005. Answer to Amended Complaint para 6, 7.

Ms. Powell was employed in the Wellness Unit of the Red Cross' National Headquarters. She was initially one of three employees in the unit.

During her employment, Ms. Powell accomplished the tasks assigned to her. Shearer tr. 82-82, Exhibit ("Ex.") 5. The Senior Director of her Unit had "no concerns" with the quality of her performance as an employee. Shearer tr. 41, Ex. 5.

The Occupational Health Nurse was responsible for such as maintaining records on the medical status of personnel, keying in the result of physical examinations, and providing first aid when needed.

As Occupational Health Nurse, Ms. Powell had such duties as stocking medical supplies, replacing health literature on bookshelves, filing and labeling files, typing information given

---

[1] The ARC is a corporation that employed about "a thousand to 1,200 employees" at its National Center location during Ms. Powell's employment. Corporate Disclosure Statement of American Red Cross; Shearer tr. 88-89 (Exhibit 5).

[2] The position was also called "Wellness Associate (Pay Level II)."

by employees into standard forms on the computer, sending electronic notices to injured workers, maintaining records on the medical status of personnel (including Armed Forces Emergency Services personnel ("AFES")), keying in the result of physical examinations, and providing first aid when needed. Powell Answer to Interrogatory No. 1 (Exhibit 2).

On 1-16-05, the other Health Nurse in the Department, Jane Davis, a white employee, resigned. Powell dec., Ex. 3.

Before the departure of Jane Davis, ARC had routinely filled in vacant Health Nurse jobs by hiring contractors, whose company was paid on an hourly (not-exempt) basis. Shearer tr. 19, 22, 25, 40-41, 54, Ex. 5.

In fact, for the six months before Ms. Powell's hiring as a Health Nurse (Wellness Associate) her Wellness Nurse duties had been performed by contractors whose company was paid on an hourly basis. Shearer tr. 19, 22, 25, 54, Ex. 5.

This time, ARC assigned Ms. Powell, an African-American, virtually all the duties of Ms. Davis (with no increase in pay).[3] Powell Answer to Interrogatory 1 (Exhibit 2). These duties included the same type of duties Powell had been performing as Health Nurse. Powell Answer to Interrogatory 1 (Exhibit ("Ex.") 2.

These duties were added to Ms. Powell's existing duties as

---

[3]There were budgetary considerations and an effort to reduce the number of personnel. Shearer tr., Ex. 5, 57, 59.

Health Nurse.  Powell Answer to Interrogatory No. 1 (Exhibit 2). Shearer tr. 82-83 (Exhibit 5).[4]

After 1-7-05 until 3-16-05, Ms. Powell was required to work an average of 15 hours a week overtime (over the standard work week of 40 hours) to finish her tasks.  Powell Answer to Interrogatory No. 24., Ex. 2.  Corporate representative Shearer was aware Ms. Powell worked overtime.  Shearer tr. 60, 67; Ex. 5.

The supervisor of the Wellness Unit, Ken Thiel, then left ARC on March 16, 2005.  He was not replaced, again due in part to cost considerations.  Shearer tr. 65-66, Ex. 5;    Powell Declaration, Ex. 3.

ARC then assigned Ms. Powell many of the duties that Thiel had done, but these duties were of a non-discretionary, not-exempt nature.  Powell Answer to Interrogatory No. 2 (Exhibit 2).  The great majority of her duties remained the not-exempt clerical routine tasks of Wellness Nurse.  Powell depo 11-10-06 (Exhibit 1), tr. 127-29, Powell Answer to Interrogatory No. 2 (Exhibit 2).

These duties included maintaining and obtaining additional medical records for International personnel, filling out forms, and relaying medical forms.  Powell Response to Interrogatory 2, Ex. 2.  Still, Powell was expected to continue her prior duties. Powell continued to spend at least 50% or more of her time on the

---

[4]ARC was aware Powell was performing, and expected Ms. Powell to perform, her own Occupational Health Nurse job and also the duties previously assigned to Occupational Health Nurse Davis.  Shearer tr., Ex. 5, 82.  ARC had paid Davis more than Powell as Health Nurse. Powell tr. 300, 357, Ex. 1.

type of tasks assigned as occupational health nurse. Powell worked even more substantial overtime. Powell Responses to Interrogatories 2, 24, Ex. 2.

During the spring of 2005, ARC began implement a services review which resulted in closing the Wellness Unit. Shearer tr. 69-70, Ex. 5. By May 15, 2005, the ARC told Ms. Powell that she would have to take a new job in order to maintain employment with the ARC. Ms. Powell researched the new job, Staff Nurse for Disaster Services (Wellness Nurse III), finding that it had substantial new responsibilities, required substantial new training and was paid by ARC at a higher pay grade than her Health Nurse position, resulting in at least $5,000 more pay per year. Powell tr., Ex. 1, 197:14-199:5; 348:5-351:4 (training); 352:4-353:13 (skills).

Powell believed that the Staff Nurse for Disaster Services (Wellness Nurse, Level III) job that ARC offered Ms. Powell, was not "comparable" to her previous job of Occupational Health Nurse (Wellness Associate), even under the ARC's own regulations, as it did not require comparable skills and training. Powell Answer to Interrogatory No. 4, Ex. 2.

However, the ARC would not pay Ms. Powell in the new job at its own market rate (at least $5,000 more per year than Powell had been paid as Occupational Health Nurse (Wellness Associate, Level II)). Powell knew that Jane Davis had also previously occupied this position and had been paid at Level III, more than this

offer.  Powell tr., Ex. 1, 357-58.  She opposed continuing into the substantially increased responsibilities of Staff Nurse without at least a $5,000 increase of salary to the normal level for the Staff Nurse for Disaster Services position.  Powell tr. ex. 1, 355:14-20; Powell 6-2-05 email Ex. 10.

The Red Cross terminated Ms. Powell's employment effective 6-30-05 and failed to pay any severance.[5]  The Red Cross wrote the Md. Unemployment Compensation Division, however, that Ms. Powell had "quit."  Ex. 9, Request for Separation Information;  Miller tr., Ex. 6, 37:16-38:8.  A appeal hearing determined that she had been discharged, as she had maintained.  Powell tr., Ex. 1, 293:19-20;  Powell Answer to Interrogatory 7, Ex. 2.

## Memorandum of Points and Authorities

I.  THE STANDARD FOR DENYING SUMMARY JUDGMENT

In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) the Supreme Court emphasized that the trial court, in deciding a motion for summary judgment (or for judgment as a matter of law), "should review all of the evidence in the record" and "must draw all reasonable inferences in favor of the nonmoving party." (emphasis added)  In addition, the trial court "may not make credibility determinations or weigh the evidence" and "must

---

[5]Severance was due Ms. Powell, under the ARC's policy, as she had been offered a non-comparable position before her termination.  ARC MSJ, Ex. 7, "Severance Pay," Sec. B(2);  Powell 6-2-05 email, Ex. 10;  Powell tr. Ex. 1, 268:7-10;  Powell/Miller 6-14-05 email, ARC MSJ, Ex. 28.

disregard all evidence favorable to the moving party that the jury is not required to believe." Id., at 150-51. Therefore, ARC's motion for summary judgment must be denied.

## II.  THE STATUTORY FRAMEWORK FOR OVERTIME COMPENSATION

Count II in Ms. Powell's Amended Complaint provides for liability under the D.C. Wage and Hour Law ("DC Wage Law").

Under the D.C. Wage Law, employers are required to pay their employees time-and-a-half for work in excess of forty hours per week.  32 D.C. Code 1003(c).[6]

It is assumed under the D.C. Wage Law, that any employee, like Ms. Powell, is eligible ("not-exempt" under the FLSA) to collect compensation for overtime hours worked.

Under the D.C. Wage Law, the only possible exceptions to the employer's liability are the so-called "exemptions" of the federal Fair Labor Standards Act ("FLSA").  32 D.C. Code 1004(a)(1);  29 U.S.C. 213.

The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." A.H. Phillips Co., Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

Where an employer claims that an employee is exempt from

---

[6]The DC Wage Law also requires the employer to keep records for three years of each employee's hours worked each day and workweek.  32 D.C. Code 1008(a)(1)(D).

overtime provisions of the FLSA, <u>the burden is on that employer to prove that the employee falls within the claimed exemption</u>.  <u>Roney v. United States</u>, 790 F. Supp. 23, 26 (D.D.C. 1992)(emphasis added).

The criteria "provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protections of the Act."  <u>Roney v. United States</u>, <u>supra</u>., at <u>id</u>., (quoting <u>Mitchell v. Williams</u>, 420 F.2d 67, 69 (8th Cir. 1969)).

The FLSA is remedial legislation and the exemptions under the FLSA are <u>construed narrowly against</u> the employer.  <u>Mitchell v. Lublin, McGaughy & Assoc</u>., 358 U.S. 207, 211, 79 S.Ct. 260, 263, 3 L. Ed.2d 243 (1959)(emphasis added);  <u>D'Camera v. District of Columbia</u>, 693 F. Supp. 1208, 1210 (D.D.C. 1988).  The employer's claims must be proved by clear and affirmative evidence or the employee must be given coverage under the Act.  <u>Roney v. United States</u>, <u>supra</u>., at <u>id</u>.

The classification of employees is tied to "actual duties"-- it <u>is the burden of each employer to defend its classification of the employee in light of her actual duties</u>.[7]  (emphasis added);

---

[7]Job titles or the employer's descriptions, for example, should be disregarded as "[they] can be had cheaply and are of no determinative value."  29 C.F.R. 541.201(b).  <u>D'Camera v. District of Columbia</u>, 693 F.Supp. 1208, 1211 (D.D.C. 1988).

Similarly, lists of responsibilities unsupported by descriptions of what those responsibilities entail shed little light on the highly fact-specific inquiry into the tasks and responsibilities of the employee necessary to determine whather an exemption can be applied to her.  <u>Id</u>.

See generally Clark v. Benson, 739 F.2d 282, 286-87 (4th Cir. 1986).

The "independent judgment and discretion" evaluation under the FLSA's exemptions is dependent on a detailed analysis of the specific job responsibilities of the particular employee. Because the evaluation is case by case determinative, no single set of facts conclusively meets the requirements of the exemption.

III.  THE DEFENDANT IS PRECLUDED FROM DEMONSTRATING ANY ISSUE OF FACT ON AN EXEMPTION UNDER THE FLSA AS ITS CORPORATE REPRESENTATIVE COULD NOT NAME THE EXEMPTION(S) THE DEFENDANT RELIED UPON TO DENY OVERTIME COMPENSATION FOR THE HOURS OVER 40 A WEEK THAT MS. POWELL WORKED DURING 1-7-05 TO 6-30-05.

Pursuant to Fed. R. Civ. Proc. 30(b)(6), Defendant ARC was required to produce its corporate representative to testify at deposition as to "classification of Ms. Powell's position at ARC as exempt of non-exempt and ARC's payment or non-payment of overtime to her." Exch. 4, Plaintiff's Rule 30(b)(6) Notice of Deposition. The Rule requires that "[t]he persons so designated shall testify as to matters known or reasonably available to the organization." Fed. R. Civ. Proc. 30(b)(6).

Red Cross' corporate representative Miller testified that the Red Cross had no knowledge of what exemption was relied upon by the Red Cross to classify Ms. Powell as exempt and deny her overtime pay.[8]  Miller tr. 83-84 (Exhibit 6).

---

[8]Ms. Miller was deposed pursuant to Ms. Powell's deposition notice requesting the "the person designated pursuant to Rule 30(b)(6) as having familiarity with...(o) "classification of Ms. Powell's positions at Red Cross as exempt or non-exempt and Red Cross's payment or non-payment of overtime to her." Exhibit 4

Q....[T]o determine whether Ms. Powell's position was exempt or non-exempt....do you know whether the Red Cross used an administrative exemption or a professional exemption or some other exemption under the Fair Labor Standards Act or the D.C. Wage Act or Revision Act or some combination of factors?

A....I can't say with certainty which exemption test.

Q.  Or can you say that there was a combination of exemptions used?

A.  I cannot say.  Miller tr., Ex. 6, 83-84


Red Cross' corporate representative Miller could give no testimony as to the percentage of Ms. Powell's work that was found to be involved in exempt functions as opposed to non-exempt functions.

Q.   ...[C]an you testify as a corporate representative as to the percentage that Ms. Powell's work that was found to be exempt or non-exempt?

A.  No, I can't.

Q.  ...[C]an you testify as to the amount of time that--for Ms. Powell's work week that was found to be involved in exempt functions as opposed to non-exempt functions?

A.  No, I cannot.  Miller tr., Ex. 6, 100-01.[9]

---

hereto, Notice of Deposition.  Ms. Miller was the sole ARC corporate representative designated for this purpose.  Miller tr. 9-10, Ex. 6 hereto.

[9]Nor could corporate representative Shearer give percentages of time devoted to various duties Powell performed before March 16, 2005, when she began supervising her.  Shearer tr., Ex. 5,  42, 47, 48.

Without such evidence, ARC cannot meet its burden to prove an exemption under the Act.  Roney v. United States, supra., at 26, 28.

Here, however, in its Motion for Summary Judgment, ARC attempts to justify specific exemptions of professional or administrative under the FLSA.  This is not permissible as ARC's corporate representative was under obligation to give "binding answers" on behalf of the corporation.  Rainey v. American Forest and Paper Association, 26 F.Supp.2d 82, 94 (D.D.C. 1998).  A corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition.  Id.

Following her deposition, ARC Corporate Representative Miller authored and served a "Supplemental Response to Plaintiff's Interrogatories."  ARC MSJ Ex. 9.  In that response Miller never testified that Ms. Powell's work met either the professional or administrative exemptions to ARC's obligation to pay her overtime Id., at p. 2.

Therefore, ARC's arguments now as to the applicability of a "professional" or "administrative" exemption should be precluded and ARC should be bound by its corporate representative's testimony.


IV.  DEFENDANT HAS NOT AND CANNOT RAISE A GENUINE EXEMPTION TO THE FLSA, AND CERTAINLY NOT BEYOND ANY GENUINE DISPUTED ISSUE OF FACT.

A.  Ms. Powell's primary work as Occupational Health Nurse (including AFES work) was non-exempt clerical work.

Ms. Powell's work was routine work under guidelines

In Ms. Powell's case, she began at ARC on 11-15-04 as a Health Nurse.  She worked in the Wellness Unit.

This work involved variety of work involving Armed Forces (AFES) personnel.

Ms. Powell spent more than 60% of her day on <u>all</u> the responsibilities related to AFES personnel which included many clerical, non-discretionary, routine tasks.  Powell tr., Ex. 1, 126:8-128:6;  Powell Answer to Interrogatory No. 1, Ex. 2,  Powell dec., Ex. 3, para. 5-6;  Disputed Issue of Material Fact 14.

> Powell's duties for AFES personnel included:
> [P]utting papers in files, labeling files, filing files in file cabinets, locking and unlocking file cabinets, keying the results of physical examinations and evaluations into a spreadsheet, notifying personnel when medical records were received, requesting submission of medical records for annual and deployment physical evaluations, maintaining records on the medical status of deployed personnel, informing personnel and AFES personnel of next physical due from previously prepared checklist, knowing who were the people that were going off for deployment and what stage they were at in their physical assessment, if they were ready for deployment, if they were coming back, finding out anything that happened while deployed (debriefing), and scheduling of their next physical, documentation of the medical records, reviewing medical records according to military guidelines, e-mails, telephone calls.  Disputed Issue of Material Fact 12;  Powell Answer to Interrogatory No. 1, Ex. 2, Powell dec., Ex. 3 para. 5-6;  Powell tr., Ex. 1 35:20-36:18;  126:12-127:1; 324:12-329:12.

Powell did not have discretion to determine which personnel

would be deployed. Powell tr., Ex. 1, 325, 327. Ms. Powell's role was one of collecting information to fill in a chart or spreadsheet according to certain guidelines given to her. Powell tr., Ex. 1, 325-26.

Powell had no supervisory duties. Powell tr., Ex. 1, 171.

It is clear that such clerical, or non-discretionary work is not-exempt from the Act. 29 C.F.R. 541.205(c)(1); Clark v. Benson, supra., at id.

A few months later, as the ARC reorganized, Ms. Powell was assigned additional duties of exactly the same type--wellness nursing duties--from her resigning co-worker, another wellness nurse.

These wellness nursing duties remained the core or "primary" functions, Powell performed for the rest of her employment at ARC. Powell tr., Ex. 1, 126-27, 128-29. One of her supervisors left in March 2005 and she took on some of the tasks he had performed. These tasks were of a not-exempt nature. Powell Answer to Interrogatory 2 (Exhibit 1).

[In any event, these additional tasks did not allow her to fall into an administrative exemption because her primary duties continued to be the Health Nurse work that had been hers virtually from the beginning. Powell Answers to Interrogatories 1 & 2 (Exhibit 2). See generally, Clark v. Benson, supra., at id (when additional duties are added to not-exempt work, Court must determine whether employer can prove that the additional duties

13

were administrative <u>and</u> required over 50% of employee's work time, becoming her "primary duty.")

The FLSA exempts from the D.C. Law's overtime pay requirement "[a]ny employee employed in a <u>bona fide</u> executive, administrative or professional capacity."

<u>B.  Even if it is assumed that ARC attempted to rely upon the "administrative" exemption under 29 C.F.R. 213(a) to avoid paying Ms. Powell her overtime, a genuine fact issue exists regarding whether Ms. Powell is still properly classified as not-exempt and entitled to payment for her overtime</u>.

Under the relevant provisions of the regulations promulgated by the Department of Labor pertaining to the administrative exemption, to sustain the exemption, the employer must prove that the employee's:

> (1)  "[P]rimary duty consists of...the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers,...
>
>          and
>
> (2)  [that the employee] customarily and regularly exercises discretion and independent judgment" [in performing her normal day-to-day work]  29 C.F.R. 541.2

"Primary duty" generally means the major part, or over 50 percent of the employee's time.  29 C.F.R. 341.103; 541.206.

<u>C.  There is at least a genuine issue of disputed fact that Ms. Powell's primary duties did not deal directly relate to management policies or general business operations of ARC, but were instead involved with day to day carrying out of its business, so that ARC would not be able to prove an administrative</u>

<u>exemption by a preponderance of the evidence</u>.

The administrative exemption is actually quite demanding. To avoid overtime compensation for hours worked over 40 a week, the employer must prove the employee's primary duty consist of performance of work "<u>directly</u>" "related to the management policies or <u>general</u> business operations of his employer." 29 C.F.R. 541.2(a)-(e); 29 C.F.R. 541.205(a).

The essence of the test is whether the employee's primary activities are "directly related to management policies or general business operations," or "the running of a business and not merely the day-to-day carrying out of its affairs." <u>Roney v. United States</u>, <u>supra</u>., at 27, (<u>quoting</u> <u>Bratt v. County of Los Angeles</u>, 912 F.2d 1066, 1070 (9th Cir. 1990) <u>cert. denied</u> 111 S. Ct. 962 (1991)(emphasis in the original).

It is clear that those, like Ms. Powell's duties were of a day to day character and that she had little or no ability to create policy generally operate the Red Cross. Ms. Powell's primary duties related to AFES personnel, included day-to-day carrying out of Red Cross affairs as:

> I put papers in files, labeled files and filed the files in file cabinets as required for AFES personnel and American Red Cross employees. I locked and unlocked the file cabinets.
>
> I keyed the result of physical examinations and evaluations onto a spreadsheet. I notified personnel when medical records were received. I requested submission of medical records for annual and deployment physical evaluations. I maintained records on the medical status of deployed personnel. I informed personnel and AFES personnel of next physical due, from previously prepared checklist. Powell dec., Ex. 3, paras. 5,6

Duties predominantly to carry out day-to-day, policies already established, are entitled to overtime, and are not exempt. <u>Jones & Assoc. v. District of Columbia</u>, 642 A.2d 130, 133-34

(D.C. App. 1994)(finding five child counselors, including three team leaders, at Department of Health and Human Services, entitled to overtime, not exempt); <u>Bratt v. County of Los Angeles</u>, 912 F.2d 1066, 1070 (9th Cir. 1990)(deputy probation officers and child treatment counselors entitled to overtime, not exempt; test is whether work primarily involves "day-to-day carrying out of the business affairs," rather than running the business itself or determining its overall course or policies); <u>Dalheim v. KDFW-TV</u>, 918 F.2d 1220, 1230 (5th Cir. 1990)(television news producers eligible for overtime, not exempt as their work focused on "the day to day service of production the news, rather than the overall policy or management of the television station"); <u>Bell v. Farmer's Insurance Exchange</u>, 87 Cal. App. 4th 805 (2001), 115 Cal. App. 4th 715 (2004)(insurance adjusters and claim agents entitled to overtime, not exempt).

   <u>D.  There is at least a genuine issue of disputed fact that Ms. Powell's work was primarily routine and under military and other guidelines.  Ms. Powell applied her knowledge in following prescribed procedures in her work at ARC (including AFES work), primarily passed on information, and therefore did not "customarily and regularly exercise discretion and independent judgment," so that a genuine issue exists that ARC would not be able to prove an administrative exemption by a preponderance of the evidence.</u>

   Only employees who "<u>customarily and regularly</u> exercise discretion and independent judgment" may meet the administrative exemption.  29 C.F.R. Sec. 541.2 (1999)(emphasis added).  <u>Rainey v. American Forest and Paper Ass'n, Inc.</u>, 26 F.Supp. 82, 87 (D.D.C. 1998).

16

The regulations make clear that:

an employee who "merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met..., is <u>not</u> exercising discretion and independent judgment within the meaning of Sec. 541.2 [the administrative exemption]. This is true even if there is some leeway in reaching a conclusion...." 29 CFR 541.207(c)(1)(1998)(emphasis added); <u>Rainey v. American Forest and Paper Association</u>, 26 F.Supp.2d 82, 88 (D.D.C. 1998).

Similarly, simply conveying information to other employees, is a role that falls short of work that affects management or business operations. 29 CFR 541.205(a); <u>Rainey v. American Forest and Paper Association</u>, 26 F.Supp.2d 82, 94 (D.D.C. 1998).

"An employee who merely applies his knowledge in following prescribed procedures or determining which procedures to follow...is <u>not</u> exercising discretion and independent judgment within the meaning of [the administrative exemption]." 29 C.F.R. Secs. 541.214; 541.207(a); 541.207(c)(1).

It is clear that any employee can perform some discretionary tasks in his/her day to day activities without necessarily falling into the administrative exemption. It is simply that at least the majority, (over 50%) of his/her duties--i.e. his/her "primary" duties--must be of the not-exempt character. 29 C.F.R. 541.103, 541.206(b); <u>Clark v. Benson</u>, 739 F.2d 282, 286 (4th Cir. 1986); <u>See also D'Camera v. District of Columbia</u>, 693 F. Supp. 1208, 1211 (D.D.C. 1988).

The regulations recognize that almost every employee exercises some discretion, as for example in selecting the order in which to perform different duties. 29 C.F.R. 541.207(d)(1),

cited in Clark v. Benson, 789 F.2d 282, 287 (4th. Cir. 1986).

Ms. Powell spent more than 60% of her day on all the responsibilities related to AFES personnel which included many clerical, non-discretionary, routine tasks.  See disputed issue of material fact no. 16, 13;  Powell tr., Ex. 1, 126:8-128:6;  Powell Answer to Interrogatory No. 1, Ex. 2,  Powell dec., Ex. 3, para. 5-6.

However, many of the AFES tasks Powell perfomed were routine, non-discretionary tasks and the remainder of AFES tasks, such as record review were performed under strict military guidelines-- following "prescribed procedures" and thefore did not involve significant discretion.  The defendant never established which AFES tasks took up most of the time.

> Powell's duties for AFES personnel included:
>     putting papers in files, labeling files, filing
> files in file cabinets, locking and unlocking file
> cabinets, keying the results of physical examinations
> and evaluations into a spreadsheet, notifying personnel
> when medical records were received, requesting
> submission of medical records for annual and deployment
> physical evaluations, maintaining records on the
> medical status of deployed personnel on a spreadsheet,
> informing personnel and AFES personnel of next physical
> due from previously prepared checklist, reviewing
> medical records according to military guidelines,
> knowing from the spreadsheet who were the people that
> were going off for deployment and what stage they were
> at in their physical assessment, if they were ready for
> deployment, if they were coming back, finding out
> anything that happened while deployed (debriefing), and
> scheduling of their next physical, documentation of the
> medical records, e-mails, telephone calls.  Powell
> Answer to Interrogatory No. 1, Ex. 2, Powell dec., Ex. 3
> para. 5-6;  Powell tr., Ex. 1 35:20-36:18; 126:12-127:1;
>  324:12-329:12.

Clearly many if not most of these duties are clerical, non discretionary duties and the remainder, such as document review, occurred under strict military guidelines, or qualify as simply "conveying information" and therefore could be viewed as non-discretionary.

Powell testified that she had "procedure manuals that [she] would have to look at to determine how to respond to certain situations."  She performed her work, including AFES, first by "daily" reference to "procedure manuals," and then any work became "routine" and stayed in "one really basic or confined area of work and decision making."  Powell deposition 11-14-06, Ex 1 at 287:11-288:8.

ARC's own corporate representative as to Ms. Powell's "work requirements, duties" (section "d" of the Notice of Deposition) described her work on with AFES personnel as:

> [R]eviewing an individual's medical records, test results, radiology results, drug--prescription drug utilization, immunization records, to be sure they meet the required criteria for a specific location and set of conditions that a person is going to."  Shearer tr. Ex. 5, 44-45:4.

Powell's role was one of collecting information to fill in a chart or spreadsheet according to certain guidelines given to her.  Powell tr., Ex. 1, 325:13-17; 325-26.

Ms. Powell's work in reviewing medical records for the Armed Forces Emergency Services personnel, AFES, all occurred within military guidelines.  Powell tr., Ex. 1, 74:16-21; 76:4-78:8.

19

327:4-328:14.

Ms. Powell did not have discretion to determine which
personnel would be deployed. Powell tr., Ex. 1 324:16-325:17-
326:18. That decision was made by the AFES managers after group
meetings with client management associates. Powell tr., Ex. 1,
324:16-325:12; 35:20-37:8.

The criteria for deployment was determined by military
regulations. Powell tr., Ex. 1, 327:4-10.

Powell's role in meetings on AFES personnel was primarily
informational: knowing who were the people that were going off
for deployment and what stage they were at in their physical
assessment, to see if they were ready for deployment. Or if they
were coming back, anything that happened to them over there and
preparing for their debriefing when they came back and the
scheduling of their next physical." Powell tr. 35:20-36:18

Briefings on health for AFES personnel followed pre-prepared
protocols given to her by a service called Travax. Powell tr.,
Ex. 1, 67,

The other 30 to 40 percent of Ms. Powell's time was spent on
very routine non discretionary duties such as blood pressure
checks, cleaning rooms, stocking first aid boxes, filing workman's
compensation, ordering and stocking office and medical supplies,
and file management, Powell tr., Ex. 1, 127; 33:17-35:17; Powell
Responses to Interrogatories 1 and 2, Ex. 2, monitoring the
lactation area and the cot rooms, Shearer tr. Ex. 5, 54:14-55:15;

handling walk-in employees, tending to the respite area, rate checks, employee health counseling.    Shearer tr. Ex. 5, 41:21-42:5.

E.   The "Professional Exemption" was not applicable to Ms. Powell's primary work at ARC for substantially the same reasons as the "administrative exemption" above.

ARC's arguments on the professional exemption run afoul of the same issues of fact and limited discretion as the arguments on administrative exemption.

Standard

> To meet the professional exemption, an employee's primary duty must consist of... (b) work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, and from training in performance of routine mental, manual or physical processes; and (c) the employee's work requires the consistent exercise of discretion and judgment in its performance; and (d) the employee's work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and (e) the employee does not devote more than 20% of the hours worked in the work week to activities which are not an essential part of and necessarily incident to the work described above.  29 C.F.R. 541.3(a)-(e).

Primary is that this exemption requires very specific "advanced knowledge involving the exercise of judgment and discretion." 29 C.F.R. 541.301(a).  At least a genuine issue exists for this attempted exemption (as for the attempted administrative exemption).

21

As ARC has not met the requirement for the application of the "professional" exception under the FLSA, the motion for summary judgment must be denied. Even if it is not clear whether ARC meets the exception then, given all inferences in favor of Ms. Powell, a jury question is presented as whether the preponderance of the evidence as to the true nature of Ms. Powell's work would support the exception.

F.  There is at least a genuine issue of disputed fact that Ms. Powell's primary duties did not deal directly "in an area of science", but were instead involved with day to day routine tasks and record review, so that ARC would not be able to prove a "professional exemption" by a preponderance of the evidence.

The ARC also cannot prove beyond genuine issue that Ms. Powell performed work "in a field of science," as is required by this exemption. 29 C.F.R. 541.300  As discussed below, even ARC's corporate representative on Ms. Powell's duties described Powell's tasks as "medical record review."

Moreover, the professional exemption requires work with "varying facts or circumstances" 29 CFR 541.301(b), "varied in character (as opposed to routine mental, manual or physical work)," and "of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time." 29 CFR 541.3(a)-(e).

Powell testified that she performed her work, including AFES, first by "daily" reference to "procedure manuals," and then any

decision making in AFES work became "routine" and stayed in "one really basic or confined area of work."  Powell deposition 11-14-06, Ex 1 at 287:11-288:8.

Here, a reasonable juror could clearly find that Ms. Powell's AFES work inputting names of AFES personnel into a spreadsheet, conducting briefings and debriefing based on a standard pre-approved list of questions and topics, and following military checklists to collect required tests, were   was routine, non professional work.

Further the professional employee is required not to devote more than 20% of his or her time to "activities which are not an essential part of and necessarily incident to the work described above."  29 C.F.R. 541.3(a)-(e).

Here, Ms. Powell was clear and consistent that the other 30 to 40 percent of her work outside of her work with AFES personnel consisted of such mundane, routine work such as doing blood pressure checks, cleaning "cot" rooms where ARC people could come to lie down, stocking medical supplies and first aid boxes, filing workman's compensation forms, passing out medical literature in the building, and other non-discretionary duties.  Powell tr., Ex. 1, 127;  Powell Answers to Interrogatory No. 1, Ex. 2.[10]

---

[10]The daily duties Powell performed each day were corroborated by a written list of the Wellness Nurse (Associate) duties given Powell by Jane Davis.  Ex. 8, Daily Activities for Wellness Associate;  Powell tr, Ex. 1, 142:5-7, 144:20-145:2.  AFES work was always important, but Powell testified all the duties on the listing were important.  Ex. 8, Daily Activities for Wellness Associate;  Powell tr, Ex. 1, 145:10-146:4. Summarizing, these included eight duties:

Further, Nurses are routinely paid overtime for their work. Ms. Powell in fact testified she was paid overtime at time and a half for her work as a regular staff nurse for five years during the 1980's.  Powell depo, Ex. 11-10-06, tr. 10-13;  Powell dec., Ex. 3.

G.  There is at least a genuine issue of disputed fact that Ms. Powell's worked under military guidelines to apply her knowledge in following prescribed procedures in her work at ARC (including AFES work) and therefore did not customarily and regularly exercise discretion and independent judgment in over 50% of her work, so that ARC would not be able to prove the professional exemption by a preponderance of the evidence

The same standards, facts and arguments apply here as in the administrative section above.

The term "discretion and independent judgment" is a fact

1. Unlock filing cabinets and cabinets in medicine room.
2. Review the blood pressure memory and check off BP daily chart.
3. Check the cot rooms to see if they were used during the night, and check off on the daily chart.  Clean cots and replace cot sheets and pillow cases.
4. Check the fax machine.  Place the information in the appropriate folders...
5. Check on current status of AFES deployments.
6. Daily Wellness issues, address and prioritize!! ....AFES...ordering supplies, wellness memos and correspondence....
7. Review AFES annual spread sheet and sent out the annual physical information....
8. At the end of the day:
        -pick up the Wellness charts and total them
        -Lock files and cabinets
        -Make sure that the medicine room is locked
        -clean cot room beds if used during the day

Ex. 8, Daily Activities for Wellness Associate

based decision where a reasonable juror could credit Ms. Powell's testimony that her work in processing medical information for scores of AFES personnel was "routine."

Powell testified that she performed her work, including AFES, first by "daily" reference to "procedure manuals," and then any decision making in AFES work became "routine" and stayed in "one really basic or confined area of work."  Powell deposition 11-14-06, Ex 1 at 287:11-288:8.

Further this requirement of "independent judgment and discretion" is demanding to prove the professional exemption, which generally requires "consistent exercise" of this discretion.

A reasonable juror could find Ms. Powell credibly testified that her work was conducted in applying military medical guidelines.

Based on military guidelines, Powell reviewed medical records, to give a recommendation to the AFES group to determine whether the person's records met the military criteria for eligibility for deployment.  Powell tr. Ex. 1, 74:16-21; 76:4-78:8.

ARC's own corporate representative as to Ms. Powell's "work requirements, duties" (section "d" of the Notice of Deposition) described her work on with AFES personnel as:

> [R]eviewing an individual's medical records, test results, radiology results, drug--prescription drug utilization, immunization records, to be sure they meet

the required criteria for a specific location and set of conditions that a person is going to." Shearer tr. Ex. 5, 44-45:4.

If there was any question about determining whether or not someone in AFES met the criteria for deployment, this was a decision for the command receiving center where they were going and Powell would call the physician there. Powell tr. Ex. 1, 327:4-21.

The AFES manager, not Ms. Powell, made any decision as to whether or not an individual would be deployed. 324:16-325:5-9

ARC's own AFES policy states that it is only the "Wellness Manager at national headquarters"--not Ms. Powell's position of Wellness Associate--who grants medical approvals for AFES personnel to be deployed. Armed Forces Emergency Services (AFES) Field Staff-General Information, Policy No. 701.00, ARC MSJ, EX. 10; Powell's declaration, Exhibit 3 hereto..

This clearly is at issue with the Department of Labor regulations defining "the exercise of discretion and independent judgment," a requirement for the professional exemption as the ARC admits, in 29 C.F.R. 541.301(a)("perform work involving the exercise of judgment and discretion"):[11]

> [t]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after various possibilities have been considered.....

> An employee who merely applies his knowledge in

---

[11]ARC Motion for Summary Judgment at 25, 31.

following prescribed procedures or determining which procedures to follow...is not exercising discretion and independent judgment. 29 C.F.R. 241.214; 541.207(a).


V.  THERE ARE GENUINE ISSUES OF DISPUTED FACT WITH RESPECT TO MS. POWELL'S OTHER CAUSES OF ACTION


A.  Ms. Powell's Race Discrimination and Retaliation Claim under the DCHRA is Within the One-Year Statute of Limitations

Ms. Powell filed her Original Complaint in Superior Court on June 9, 2006, within one year after the ARC terminated her employment on June 30, 2006.

The Defendant admits that the DCHRA's one year statute of limitations begins running "on the date of the last allegation of discrimination." ARC Motion for Summary Judgment, p. 12 (citing Simpson v. Dist. of Columbia OHR, 597 A.2d 392, 399 (D.C. 1991).

Here, the last allegation of discrimination Ms. Powell alleged in her Amended Complaint was the Red Cross's "termination of her employment" when she would not accept the offer of non-comparable employment (for Wellness Nurse) at the same wages as Occupational Health Nurse. Amended Complaint, paras. 29-30, para. 28, 17-26. Ms. Powell also alleged that the ARC "failed to employ" her for fulfillment of the position of Staff Health Nurse for Disaster Services (Wellness Nurse). Amended Complaint, para. 29. Each of these allegations relate, therefore to the termination of Ms. Powell's employment, which occurred, according to Ms. Powell on June 30, 2005.

The discrimination alleged by Ms. Powell is not her own "turning down" of the ARC's offer of continued employment at a discriminatory rate of pay, but the ARC's discrimination and retaliation against her, in terminating her (on June 30, 2005) when she would not accept employment at a discriminatory rate of pay.  Amended Complaint, para. 33.

The ARC had, through June 30, 2005, the opportunity to meet Ms. Powell's demand for continued employment at a fair, nondiscriminatory salary.  When that date passed and the ARC failed to do so, the discrimination against Ms. Powell occurred.

Ms. Powell's DCHRA Claim is therefore timely, viewed favorably to Ms. Powell, being filed within one year of her last allegation of discrimination, her termination of employment on June 30, 2005.

B.  Fact Issues Remain For Ms. Powell's Race Discrimination and Retaliation Causes of Action under the DCHRA

Ms. Powell has raised genuine factual issues that the ARC's failure to offer her its own "market rate" pay (or at least the salary paid to caucasian workers) for the Staff Health Nurse for Disaster Services (Wellness Nurse) position and its termination of her on June 30, 2005, when she would not accept lower pay than what had been paid to caucasian workers was discriminatory and retaliatory.

Background

By May 15, 2005 the ARC told Ms. Powell that she would have to take a new job in order to maintain employment with the ARC. Ms. Powell researched the new job, Staff Nurse for Disaster Services (Wellness Nurse III), finding that it had substantial new responsibilities, required substantial new training and was paid by ARC at a higher pay grade than her Health Nurse position, resulting in at least $5,000 more pay per year. Powell tr., Ex. 1, 197:14-199:5; 348:5-351:4 (training); 352:4-353:13 (skills). The Staff Nurse for Disaster Services (Wellness Nurse, Level III) job that ARC offered Ms. Powell, as it did not require comparable skills and training, was therefore not "comparable" to her previous job of Wellness Associate, even under the ARC's own regulations. Powell Answer to Interrogatory No. 4, Ex. 2.

However, the ARC would not pay Ms. Powell in the new job at its own market rate (at least $5,000 more per year than Powell had been paid as Occupational Health Nurse (Wellness Associate, Level II)). Powell knew that Jane Davis had also previously occupied this position and had been paid at Level III, more than this offer. Powell tr. 357-58. She opposed continuing into the increased responsibilities of Staff Nurse without this at least $5,000 increase of salary to the normal level for the Staff Nurse for Disaster Services position. Powell tr. ex. 1, 355:14-20

The Red Cross terminated Ms. Powell's employment effective 6-30-05.

C.  Ms.  Powell's  Causes  of  Action  Meet  the  Prima  Facie
<u>Standards</u>

Ms. Powell's Amended Complaint explains that ARC's failure to pay Ms. Powell at the appropriate raise in pay for the Disaster Health Nurse position and ARC's termination of her employment when she would not accept employment at a lower pay rate, was discrimination and retaliation under the DCHRA.  Amended Complaint, paras. 28-30.

Ms. Powell clearly meets the standard prima facie case elements of (1) membership in a protected class, (2) suffering an adverse action with respect to her employment and (3) circumstances allowing an inference of discrimination or retaliation.  <u>See, e.g.</u>, <u>Mastro v. Potomac Elec. Power Co</u>., 447 F.3d 843, 850 (D.C. Cir. 2006).

### (1)  Protected Class

It is undisputed that Ms. Powell is African-American, a protected class.

### (2)  Suffering an Adverse Action

With respect to the adverse action element, and discriminatory failure to pay Ms. Powell equally with caucasian workers, it is clear that Powell raises a genuine issue that the Staff Health Nurse for Disaster Services position ARC offered her in May 2005, should have been a "promotion" in pay, and clearly involved a "significant increase or change in job

responsibilities."

Powell has testified the new job, Staff Nurse for Disaster Services (Wellness Nurse III) had substantial new responsibilities, required substantial new training and was paid by ARC at a higher pay grade than her Health Nurse position, resulting in at least $5,000 more pay per year. Powell tr., Ex. 1, 197:14-199:5; 348:5-351:4 (training); 352:4-353:13 (skills).

The new required training involved policies and procedures related to disaster services and disaster sites. Powell tr., Ex. 1, 348:5-351:4  New substantial responsibilities included dealing with toxicology, hazard materials, and human resource development policies that were significantly different in the disaster department. Powell tr., Ex. 1, 348:5-351:4;  352:4-353:13.

Powell noted these significantly different job responsibilities of the Staff Health Nurse for Disaster Services job to ARC in May and June 2005.[12]

The two positions were paid at significantly different pay levels. Shearer tr. Ex. 5, 77:10-18.

Powell met with ARC Director Rick Pogue and looked on his PC and saw there was a difference in pay grades for the new position

_____

[12]Powell 6-2-05 email, Ex. 10 ("my position remains that the jobs are not the same because of the increased responsibilities attaches with the Disaster Response position");  Powell tr. Ex. 1, 268:7-10 ("I disagreed that the position was considered comparable.");  Powell/Miller 6-14-05 email, ARC MSJ, Ex. 28 ("Documentation of the job description and scope of responsibilities for the Disaster Health Nurse far exceeds the daily tasks and responsibilities in my current position as the Wellness Associate and clearly is not a "comparable" position").

, given her time, starting salary was about $62,000, which was a $5,000 "difference from what I was making." Powell tr., Ex. 1, 197-99. This was also verified by another ARC officer Al Vinson, who verified the salary range and said there was a $5,000 increase between the position that was closed and the position into which she was then to move. Powell tr., Ex. 1, 198-99, 204, 251. Vinson stated "there is a 5,000 difference, why not just take it the job (at the same salary) and "if you don't like it quit." Powell tr., Ex. 1, 255-56.

An adverse employment decision includes such a "failure to promote" or "reassignment" "with significantly different job responsibilities." See, e.g., Russell v. Principi, 257 F.3d 815, 818 (D.C.Cir. 2001).

With respect to Ms. Powell's termination, that clearly qualifies as an adverse action. And her termination indisputedly occurred because she did not accept the Staff Health Nurse for Disaster Services position offered at the pay level offered and ARC failed to offer her the requested pay level.

(3)    Circumstances exist allowing for an inference of discrimination or retaliation

D.  Issues of Pretext Exist for a Reasonable Jury to Find Discrimination or Retaliation

1.  Wage Discrimination

Jane Davis, a European-American had worked as Staff Health Nurse for Disaster Services before Powell was offered the position

in May 2005, and had been paid more than Powell was offered for that position.  Powell tr., ex. 1, 306, 357-58.

To make the lower pay rate even more discriminatory, Powell, had she accepted the Staff Health Nurse position (Wellness Nurse III), would have been expected to continue doing substantial AFES work, which she had done as Occupational Health Nurse, as part of the Staff Health Nurse for Disaster Services position, at a lower rate-- though AFES work had never been part of the Staff Health Nurse for Disaster Services before.  This included when Jane Davis had been paid more for doing the Staff Health Nurse job (Wellness Nurse III) (without the AFES responsibilities).  Powell tr., ex. 1, 353:14-354:12;  Shearer tr. Ex. 5, 75:13-76:4.

A jury could make a reasonable inference that ARC's offer of lower pay for the Staff Health Nurse position to Powell was discriminatory, taking into account it had paid Jane Davis at a higher rate as Wellness Associate (Occupational Health Nurse) during 11-15-04 to 1-7-05 than it had paid Powell for the same position during that time.  Powell tr., ex. 1, 300, 357-58.

A jury could also make such a reasonable inference of ARC's discriminatory intent, from the fact that ARC expected Powell to perform her job as Wellness Associate, and Jane Davis' duties (after Davis left) at less pay, during 1-7-05 to 3-16-05 than Davis had been paid for her own Wellness Associate duties alone, during 11-15-04 - 1-6-05.

Further, a jury could also make such a reasonable inference

33

from the fact that Ken Thiel's rate of pay was higher than Powell's. Shearer tr. Ex. 5, 78:10-13; Miller tr., Ex. 6, tr. 22:2-9, and the fact that Powell from 3-16-05 to 6-30-05, was assigned substantial duties formerly performed by caucasian supervisor Ken Thiel at a higher rate of pay before 3-16-05, for no more pay to Powell. A reasonable jury could believe that a fact issue therefore exists as to pretext for the ARC's failure to pay Powell at market rate or at the rate previously paid to Jane Davis for her work as a Staff Health Nurse for Disaster Services (Wellness Nurse III).

### 2. Retaliation

Here, Ms. Powell faced a situation she believed to be discriminatory, where Jane Davis, a caucasian, had been paid more by ARC both in her position as Wellness Nurse and in the position of Staff Nurse for Disaster Services, than Powell was offered for that Staff Nurse position in June 2005.

Reprisal can be not only for participation in EEO activity, but can also be actionable for "opposition" to actions believed to be discriminatory, even if no Title VII proceeding is filed.

Under Section 704(a) of Title VII, an employee is protected from retaliation for opposing employment practices she believes to have been discriminatory, even when such opposition is not manifested through participation in Title VII proceedings. Clark v. Alexander, 664 F.2d 1168 (D.C.Cir. 1981).

Powell considered it to be wage discrimination for Davis to

have been paid more for the Staff Health Nurse for Disaster Services position than she was offered for the position. Powell, tr, Ex. 1, 358:15-21.    Powell also considered it wage discrimination for Davis to be paid more at the Wellness Associate position. Powell tr. ex. 1, 358:4-13.

Powell opposed working the Staff Health Nurse for Disaster Services position at the same rate of pay she had been paid as Occupational Health Nurse (Wellness Associate), which was less than Davis had been paid for the Staff Health Nurse position. Powell tr. ex. 1, 355:14-20.    Powell opposed continuing doing her AFES work, the work previously done by caucasians Davis and Thiel (without additional compensation), and that of the Staff Health Nurse for Disaster Services at the same rate of pay.    Powell tr. ex 1, 355:22-356:5.

A reasonable jury could find that ARC's offer of a rate of pay to Powell less than that paid Jane Davis for the same Staff Health Nurse for Disaster Services position was discriminatory and that because because Ms. Powell opposed what she believed to be a discriminatory rate of pay and refused to accept it, and ARC failed to offer a non-discriminatory pay rate for the position, her employment at ARC was ended.[13]

E.  The Failure to Pay Ms. Powell for the Staff Health Nurse

---

[13]In addition to continued employment at ARC at an increased pay, the transportation allowance was a benefit that Ms. Powell would have received if she had continued employment. Powell dec., Ex. 3, para. 11.

<u>for Disaster Services at the Market Rate or the rate paid Ms.</u>
<u>Davis is not Justified by Legitimate, Non-Discriminatory Reasons</u>

The Red Cross may have been engaged in a corporate restructuring in 2005, but it had an obligation during that restructuring and at other times to administer pay in a non-discriminatory manner. Part of that obligation was not to pay Powell less than any caucasian performing the essential duties of the same job, and, less than the market mid-point.

Here, a reasonable jury could infer that it was discriminatory to pay Davis more than Powell for the Staff Health Nurse position and the Occupational Health Nurse position. A reasonable jury could find that inference aided by the fact that Powell, African-American was given the additional work of two caucasian workers, Davis and Thiel during 1-7-05 to 3-16-05 (Davis) and then to 6-30-05 (Davis and Thiel) without any higher rate of pay.

The Red Cross attempts to justify its actions by pointing to an ARC corporate policy that it could pay a range of salaries at each pay level. ARC MSJ, p. 24. However, this system cannot justify paying Powell less than Davis for the Staff Health Nurse position or less than market rate.

Market point pricing set the typical annual pay level for each position at ARC. Miller tr., Ex. 6, 106:7-107:16. The typical market rate or mid-point pay rate for a Level III Wellness Nurse position (of Staff Health Nurse for Disaster Services) was,

in 1994, $70,073 annually, while for a Level II Wellness nursing position, such as Ms. Powell's Wellness Associate (Occupational Health Nurse) job, only $58,347; a difference of $11,626 per year. ARC MSJ, Ex. 22, 8-19-04 Market Point memorandum.

ARC's own analyses, which were done at least yearly show that Level III Nurse positions, such as the Staff Health Nurse for Disaster Services (Wellness Nurse III), had market value at least $10,000 more than Level II Nurse positions, such as Ms. Powell's position as Wellness Associate (Occupational Health Nurse II). This difference continued. See, e.g., Exhibit 11 hereto, "Market Point Updates," 2006 memo, Powell, tr., Ex. 1, 105:6-108:2.

A reasonable juror could find that it was discriminatory pretext for ARC to fail to pay African-American Powell at the market rate or at least the higher rate previously paid Caucasian Ms. Davis for the more significantly more demanding Staff Health Nurse, Wellness Nurse III job. There is no clearly legitimate reason and any explanation could be viewed as pretextual.

Subsequent events also corroborate this reasonable inference of discrimination. The person ARC hired in Sept. 2005 to take on the substantial Disaster Nurse Duties offered to Ms. Powell in May 2005 (but without the AFES duties that would have been required of Ms. Powell) was hired at a pay level of $68,016, $10,920 more than the pay level offered Ms. Powell. Ex. 12, Offer Letter (Diane Billack) Staff Health Associate, 9-27-05, Miller tr., Ex. 6, 112:13-113:10.

ARC hired Billack as Staff Health Associate, staff deployment after Powell was terminated. This position shared the disaster-related responsibilities of the Staff Health Nurse for Disaster Services that was offered to Ms. Powell. It did not include, however the significant AFES work that Powell would have been expected to perform in that position for $11,000 less per year. Miller tr., Ex. 6, tr.23:18-24:11.

Why would ARC pay an insider like Billack $11,000 more than Powell, who was already a well-performing employee at the organization or even refuse her request to be paid only an additional $5,000? In the context of the fact that Davis, a white female, was paid more than Powell, an African American female, for their work as Wellness Nurses, during the period 11-15-04 - 1-7-07, when both were employed in the same job in the same department, this can raise a reasonable inference of discrimination, when viewed favorably to Ms. Powell.

Finally, there is further evidence of ARC animus toward Powell, that could support an inference of hostility and therefore discriminatory intent.

In June, ARC demanded Powell resign her position if she would not accept the same salary for the new, significantly more demanding job. Powell refused. Powell tr., Ex. 1 218:1-219:3; 259:22-260:18; Powell/Longuillo email 6-6-05, ARC MSJ, Ex. 19, 25 ("I will not submit a letter of resignation").

ARC later wrote to unemployment Powell had "quit" (to the

Maryland Division of Unemployment).  Ex. 9, Request for Separation Information;  Miller tr., Ex. 37:16-38:8.

This was a false statement that could have cost Powell unemployment benefits had she not successfully appealed to Md. Unemployment and proven the ARC's statement false.  Powell dec., Ex. 3.

F.  It is a jury question as to whether Ms. Powell is at least entitled to severance pay or for suit for breach of the severance policy.

The provision

Under ARC's Severance Policy, an employee may be provided severance pay when the employee is involuntarily terminated and no comparable new assignment is offered by the Red Cross, "comparable position" being defined as requiring skills and training comparable to the skills and/or training needed in the current position, and with a base salary within 10% of the individual's current salary, and located within 50 miles of the employee's current home location.  ARC MSJ, Ex. 7, ARC Severance Pay Policy.

Factual support

Ms. Powell was entitled to severance pay

Ms. Powell researched the new job, Staff Nurse for Disaster Services (Wellness Nurse III), finding that it had substantial new responsibilities, required substantial new training and was paid by ARC at a higher pay grade than her Health Nurse position, resulting in, according to Powell's research, at least $5,000 more

pay per year.   Powell tr., Ex. 1, 197:14-199:5;   348:5-351:4 (training); 352:4-353:13 (skills).

It was therefore not "comparable" to Ms. Powell's Wellness Associate (Occupational Health Nurse) position,

To determine the skills and training needed in the Staff Nurse for Disaster Services position, Powell personally sat down with the person then performing the position for a day, spoke with her and observed what she was doing.  Powell tr., Ex. 1, 162-63, 170-71, 196

The substantial new required training involved policies and procedures related to disaster services and disaster sites. Powell tr., Ex. 1, 348:5-351:4   New responsibilities included dealing with toxicology, hazard materials, and human resource development policies that were significantly different in the disaster department.  Powell tr., Ex. 1, 348:5-351:4;   352:4-353:13.

Powell noted these significantly different job responsibilities of the Staff Health Nurse for Disaster Services job to ARC in May and June 2005.  Severance was due Ms. Powell, under the ARC's policy as she had been offered a non-comparable position before her termination.  ARC MSJ, Ex. 7, "Severance Pay," Sec. B(2);  Powell 6-2-05 email, Ex. 10 ("my position remains that the jobs are not the same because of the increased responsibilities attaches with the Disaster Response position"); Powell tr. Ex. 1, 268:7-10 ("I disagreed that the position was

considered comparable."); Powell/Miller 6-14-05 email, ARC MSJ, Ex. 28 ("Documentation of the job description and scope of responsibilities for the Disaster Health Nurse far exceeds the daily tasks and responsibilities in my current position as the Wellness Associate and clearly is not a "comparable" position").

Ms. Powell's testimony and memoranda are corroborated by a written description given Powell by the previous Staff Health Nurse for Disaster Health Services, in which Ms. Powell was not familiar with three out of the four major duties listed. Ex. 7 hereto, Description, Staff Health; Powell tr, Ex. 1, 173-176.

The most important duties were significantly different. Ex. 7 hereto, Description, Staff Health; Powell tr, Ex. 1, 173:4-22.

For Example, Ms. Powell's duties as Wellness Nurse did not include such duties of the Staff Nurse for Disaster Services as to "train and mentor RN/Physicians and Chapter staff in the proper review of Health Status Records, the application of hardship codes and handling of the records." Powell tr, Ex. 1, 175:3-22. Nor did it include coding of health records, with which Ms. Powell was not familiar. Powell tr, Ex. 1, 175:3-22.

Nor was the base pay of the Staff Health Nurse Position within 10% of Ms. Powell's pay as Occupational Health Nurse. According to ARC's internal memoranda, the base, market point salary of the new position was at least $70,073 annually, over 22% percent above Ms. Powell's annual pay of $57,096 in her Occupational Health Nurse position. ARC MSJ, Ex. 22, 8-19-04

Market Point memorandum.; ARC MSJ, Ex. 4.

It then becomes at least a jury question as to whether ARC in fact offered Ms. Powell a "comparable job" to the staff nurse position.

The ARC defends stating that it does not believe that the provisions of its own policies created a contract with Ms. Powell.

However, it is clear that the ARC's Human Resources Policy and Procedure Manual set out policies of ARC. Contrary to ARC's assertions the Manual not disclaim reliance on its provisions, simply that employment was at will and could be terminated at the time chosen by the employer. ARC MSJ, Ex. 5, Human Resources Policy and Procedure Manual.

Significantly, ARC itself relies and relied upon the provisions of the Manual to state that Powell was not entitled to more pay for the disaster nurse position as it argued in 2005 and argues, incorrectly , that it was comparable to Ms. Powell's occupational health nurse position. ARC MSJ, Ex. 28, 6-14-05 Miller/Powell email ("According to out Severance Policy, a comparable job...includes....the letter dated June 10, reflects...the impact on severance."); ARC MSJ, p. 33, n14 It also attaches that Severance policy from the Manual to its Memorandum in Support of Summary Judgment. Exhibit 7, ARC Motion for S.J.

Relying itself on the provisions of its Manual, ARC is equitably estopped from disclaiming the Manual. ARC cannot have

it both ways.  Ms. Powell is entitled to rely upon the provisions of the ARC Manual as creating an implied contract in fact.

For the following reasons, the Court is requested to deny the Defendant's Motion for Summary Judgment.

Respectfully submitted,

TONIA POWELL

/s/

_____
Law

Brian C. Plitt, Attorney at

1239 C. St., SE, Ste. 4
Washington, D.C.  20003
(202) 546-5493
Attorney for Plaintiff

43