RB                    UNITED STATES DISTRIC COURT
                              FOR THE
                       DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
                              :
TONIA POWELL,                 :
                              :
            Plaintiff,        :
                              :
     v,                       :
                              :
AMERICAN RED CROSS,           :
                              :
            Defendant.        :
                              :
- - - - - - - - - - - - - -x


        The deposition of CAROL MILLER, called for

examination by counsel for the Defendant in the

above-entitled matter, pursuant to notice, at the

office of Miller Reporting Company, 735 8th Street,

S.E., Washington, D.C., convened, pursuant to

notice at 10:00 a.m., before David Harris, a notary

public in and for the District of Columbia, when

were present on behalf of the parties:

Page 2

1  APPEARENCES:
2     On behalf of the Defendants
      BRIAN PLITT, ESQ.
3     1776 K Street, N.W.
      Washington, D.C. 20005
4     (202) 452-7984
5     On behalf of the Plaintiff
      CONSTANTINOS G. PANAGOPOULOS, ESQ.
6     Ballard Spahr Andrews & Ingersoli, LLP
      601 13th Street, N.W.
7     Washington, D.C. 20005
      (202) 661-2202
8
   Also Present:
9     ROBBIN BOGGES
      Court Reporter
10
      David Harris
11    Notary Public
12
13         C O N T E N T S
14  WITNE                        PAGE
15  Carol Miller                   3
16
17         EXHIBITS
18  No. 2                         38
    No. 3                         46
19  No. 4                         48
    No. 5                         49
20  No. 6                         51
    Nos. 7-11                     88
21  No. 12                        93
    No. 13                        95
22  No. 14                        107
    No. 15                        114

Page 3

1         P R O C E E D I N G S
2  Whereupon,
3              CAROL MILLER
4  having been duly sworn by the Notary Public
5  testified as follows:
6         EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. PLITT:
8    Q.  All right.  Good afternoon.
9    A.  Good afternoon.
10   Q.  We met this morning, and continuing with
11 the deposition, you've been sworn this morning.
12 Have you given your deposition before?
13   A.  Yes.
14   Q.  Okay.  And for the record, can you state
15 your name?
16   A.  Carol J. Miller.
17   Q.  Okay.  And how many times have you given a
18 deposition?
19   A.  A couple.
20   Q.  All right.  Well, you've heard the
21 instructions this morning.  Are there any questions
22 that you have at this time?

Page 4

1    A.  No.
2    Q.  Okay.  Are you able to give accurate
3  testimony today about this case?
4    A.  I morning
5    Q.  Okay.  Are you currently employed with the
6  Red Cross?
7    A.  I morning
8    Q.  Okay.  Can you tell me your current
9  position with the Red Cross?
10   A.  Yes.  Senior Director, Client Services and
11 EEO.
12   Q.  Is HR part of that job?
13   A.  Yes, I work in the HR Department.
14   Q.  Okay.  And are you a supervisor?
15   A.  Yes.
16   Q.  Okay.  And how long have you been in that
17 job?
18   A.  In the current job since '99.
19   Q.  And did you at any time supervise Ms. Anna
20 Shearer?
21   A.  No.  Oh, correction.  Yes.
22   Q.  Okay.  And during what time was that?

Page 5

1    A.  I was the Senior Vice President in '03.
2  And between June and December, 2003.
3    Q.  And did you ever supervise Ms. Tanya
4  Powell?
5    A.  No.
6    Q.  And about how many people have you
7  supervised as a Senior Director of the current job
8  that you're in now?
9    A.  Forty plus.
10   Q.  And then while you were--while Ms. Powell
11 was employed at the Red Cross, who was--who reported
12 to you, directly to you at that time?
13      MR. PANAGOPOULOS:  Objection as to form.
14      THE WITNESS:  I have a director, a manager,
15 and a supervisor that reported directly to me.
16      BY MR. PLITT:
17   Q.  Okay.  And then before you came into this
18 job in '99, what was your job before that time?
19   A.  I was a Manager, Armed Forces Emergency
20 Services.
21   Q.  Within the Red Cross?
22   A.  Yes.

Page 6

1    Q. And was that here in Washington?
2    A. At that time, we were in Falls Church,
3  Virginia.
4    Q. Okay. And how long were you in that job or
5  what year did you begin, whichever is easier?
6    A. Three years.
7    Q. And were you with the Red Cross before that
8  time?
9    A. I was.
10   Q. And where was that?
11   A. I've held various positions within Red
12 Cross throughout my tenure there.
13   Q. Okay. When did you start with the Red
14 Cross?
15   A. 1977.
16   Q. And what kind of position?
17   A. Temporary Disaster Worker.
18   Q. Was that a position involving traveling?
19   A. No.
20   Q. Where was that?
21   A. Alexandria, Virginia.
22   Q. And how long did you stay in that position?

Page 7

1    A. Just a couple of months. It was a
2  temporary job.
3    Q. Okay. And after that, where did you work?
4    A. I got a job in the--at that time called
5  Personnel Office in Alexandria.
6    Q. Okay. And what was that position?
7    A. Personnel Payroll Clerk.
8    Q. Okay. Was that an exempt position or
9  non-exempt position?
10   A. Non-exempt.
11   Q. Okay. And how long did you remain in that
12 position?
13   A. About 18 months.
14   Q. And where did you go after that time?
15   A. The Finance Payroll Unit.
16   Q. And what was your position there?
17   A. Payroll Clerk.
18   Q. Okay. During the time that Tanya Powell
19 was working at the Red Cross, who was supervising
20 the wellness unit at the Red Cross?
21   A. Direct supervisor when she started was Ken
22 Thiel; Anna Shearer was the direct supervisor when

Page 8

1  she left the Red Cross.
2    Q. And then who was above that in the
3  reporting chain?
4      MR. PANAGOPOULOS: At what point in time?
5      MR. PLITT: Well, I guess we're looking at
6  a period of time that Ms. Powell was employed by Red
7  Cross from about November of 2004 until June 2005.
8      THE WITNESS: Rick Pogue would have been
9  over Anna Shearer. Anna would have been over Ken
10 Thiel at the earlier part of that.
11     BY MR. PLITT:
12   Q. All right. And then who above Rick Pogue?
13   A. The president of the organization at--let
14 me go back. In the beginning part, from the
15 November through about--there was a reporting
16 structure change, and I'm trying to get the dates
17 straight in my mind. Rick Pogue reported to the
18 executive vice president, Alan McCurry, for a period
19 of that time. I'm unsure when he became a direct
20 report to the president right at this moment, so it
21 might have been Alan McCurry the entire time.
22   Q. Now, it's my understanding that you have

Page 9

1  been designated here today as the corporate
2  representative for certain items on the notice of
3  deposition; is that correct?
4    A. That's correct.
5    Q. Now, some of these items you are the
6  corporate representative and some of these items you
7  are the co-corporate representative; is that
8  correct?
9    A. That's correct.
10   Q. So I want to go through first the items
11 that you are the corporate representative.
12     MR. PANAGOPOULOS: Hand her the exhibit
13 again?
14     MR. PLITT: Yeah.
15     BY MR. PLITT:
16   Q. And I'm going to show you what's been
17 marked as Exhibit Number 1, which is the notice of
18 deposition. Do you see that notice?
19   A. Yes.
20   Q. Okay. Let me go through with you and
21 the--just to verify the items that you are the
22 corporate representative for the Red Cross first,

Page 10

1  and then I'll go through the ones in which you're

2  the co-representative. All right?

3      It's my understanding you are the corporate

4  representative for items B, C, F, G, H, I, J, N, O,

5  and P; is that correct?

6      A. Excuse me. N I believe I'm co. Yes, to

7  the rest.

8      Q. So those are the ones in which you're the

9  sole representative; correct?

10      MR. PANAGOPOULOS: She just clarified one

11  of your points. N that she's a co-representative

12  in.

13      MR. PLITT: I'm going to go through the

14  co-representatives in a minute.

15      MR. PANAGOPOULOS: I understand. I'm just

16  saying that you've asked--you gave her a list and

17  she said yes except for one. That's all I'm saying.

18      MR. PLITT: And you're restating the

19  question, but she's already said no as to one of

20  them. That's all.

21      BY MR. PLITT:

22      Q. Okay. Which one are you clarifying? I'm

Page 11

1  sorry.

2      A. N I'm a co.

3      Q. Right. You're a co on N, but other than

4  that, that's accurate as to the ones in which you

5  are the sole corporate representative; correct?

6      A. That's correct.

7      Q. Okay. Now, let's go through the ones in

8  which you're the co-representative. It's my

9  understanding those items are on the notice of

10  deposition A, D, L, M, and N; is that correct?

11      A. That's correct.

12      Q. And on those you're the co-representative

13  with Anna Shearer; correct?

14      A. Correct.

15      MR. PANAGOPOULOS: And the only caveat to

16  that and I think it's on the record already is that

17  with respect to L, I believe I notified you that to

18  the extent we were talking about some of the direct

19  handbooks related to AAFES and International

20  services that was primarily I mean Ms. Shearer.

21      MR. PLITT: That's fine.

22      BY MR. PLITT:

Page 12

1      Q. Okay. Now, in terms of Ms. Powell's

2  employment at the Red Cross, were you involved at

3  all in Ms. Powell's hiring as a Wellness Associate

4  with the Red Cross?

5      A. No, I was not.

6      Q. Were you involved at all with the

7  assignment of duties to Ms. Powell from Jane Davis

8  after Jane Davis resigned in 2005?

9      A. No.

10      Q. Okay. Were you involved at all in the

11  assignment of duties from Ken Thiel to Ms. Powell

12  after Ken Thiel resigned in March of 2005?

13      A. No.

14      Q. Did you have contact with Ms. Powell

15  regarding the elimination of her job as Wellness

16  Associate?

17      A. Yes.

18      Q. Okay. And did you have contact with Ms.

19  Powell regarding an offer for a position in staff

20  health nurse or Wellness Nurse?

21      A. Yes.

22      Q. Did you have any knowledge regarding a

Page 13

1  communication by the Red Cross with the Maryland

2  Department of Labor Unemployment Division after Ms.

3  Powell left employment?

4      A. Yes.

5      Q. Can you tell me about that contact with the

6  Maryland Department of Labor?

7      A. My office is responsible for employment and

8  unemployment verifications. As part of the regular

9  routine duties, we would have responded to any

10  request. In this case, the request came from Ms.

11  Powell.

12      Q. Now, was there contact with the Maryland

13  Department after Ms. Powell left about how she left

14  the Red Cross?

15      A. We completed and returned the form.

16      Q. Stating how she left?

17      A. That's correct.

18      Q. And was a part of the information given to

19  the--by the Red Cross to the Maryland Department of

20  Labor that Ms. Powell had quit the Red Cross?

21      MR. PANAGOPOULOS: Brian, we've produced

22  and I think you've produced those forms in what was

Page 14

1  provided. I mean this isn't a memory test. To the
2  extent you want to show her what it is and ask her
3  if this is what the Red Cross said, that's fine.
4      But when you got a document from us and
5  then you got a document that you've given us as
6  well, can we use that so we're not?
7      MR. PLITT: Well, I mean I think we can ask
8  about documents, but we can also ask questions of
9  her as the corporate representative, so that's the
10  way I'd like to proceed at this point.
11      She's indicated she has a knowledge of what
12  it is.
13      BY MR. PLITT:
14      Q. Was the information provided to the
15  unemployment division of the Maryland Department of
16  Labor that Ms. Powell had quit her employment with
17  the Red Cross?
18      A. Yes.
19      Q. Okay. Ms. Powell had, in fact, been
20  terminated by the Red Cross; isn't that correct?
21      A. No.
22      MR. PANAGOPOULOS: Objection.

Page 15

1      BY MR. PLITT:
2      Q. She had not been terminated by the Red
3  Cross?
4      A. No.
5      Q. Her position as Wellness Associate was not
6  eliminated by the Red Cross?
7      A. It was.
8      Q. All right. And that was the position that
9  she had been in at the Red Cross; isn't that
10  correct?
11      A. Yes.
12      Q. Okay. Now, during the time that Ms. Powell
13  was employed by the Red Cross, were there corporate
14  records kept by the Red Cross with respect to
15  overtime hours worked by employees?
16      A. Yes. On exempt employees.
17      Q. Okay. And were there any records kept by
18  the Red Cross with respect to overtime hours worked
19  by Ms. Powell during her employment by the Red
20  Cross?
21      MR. PANAGOPOULOS: Objection as to form.
22      THE WITNESS: As an exempt worker, no. She

Page 16

1  would not have kept any overtime records.
2      BY MR. PLITT:
3      Q. But the Red Cross didn't—did the Red Cross
4  keep any records as to overtime hours that actually
5  worked—were worked by Ms. Powell?
6      A. There are no records on any exempt worker's
7  hours.
8      Q. And are there any records of any kind
9  regarding—kept by the Red Cross during Ms. Powell's
10  employment regarding her work at the Red Cross?
11      MR. PANAGOPOULOS: Objection. Wait a
12  minute. Regarding her work?
13      MR. PLITT: Her overtime work at the Red
14  Cross; excuse me.
15      THE WITNESS: No.
16      BY MR. PLITT:
17      Q. You testified that you didn't supervise Ms.
18  Powell during the time that she was employed at the
19  Red Cross, do you have any knowledge of the
20  percentage of time that she devoted to the tasks,
21  the various tasks that she performed as a Wellness
22  Associate at the Red Cross during the time she was

Page 17

1  employed there?
2      A. It would be a guess if I was to give you
3  percentages.
4      Q. So you wouldn't be able to give percentages
5  as to the amount of that work for each of the duties
6  that she performed during that time?
7      A. That's correct.
8      Q. Okay. Can you tell me which documents
9  you've reviewed in preparation for your testimony
10  here today?
11      A. Tanya's personnel file. HR policies that
12  would be responsive. Any e-mail communications that
13  were produced.
14      Q. Okay. And have those documents been
15  produced in discovery?
16      MR. PANAGOPOULOS: I will tell you yes if
17  you asked for them.
18      BY MR. PLITT:
19      Q. And have you spoken with anybody at the Red
20  Cross other than your attorney regarding preparing
21  for this deposition today?
22      A. No.

Page 18

1    Q.  All right.  You testified you didn't
2  supervise Ms. Powell.  Do you have any--can you
3  testify as to the number of hours worked by Ms.
4  Powell when she was employed by the Red Cross?
5    A.  No.
6    Q.  Now in discovery, there was a request for
7  admission that was sent out to the Red Cross, and
8  the request for admission asked to admit that
9  persons performing duties later performed by Ms.
10  Powell as a Wellness Associate received hourly pay.
11  And the response was that the Red Cross admits that
12  Brenna Aielo, spelled A-I-E-L-O, a part-time
13  employee took over some of the duties performed by
14  the Wellness Associates.
15    Do you know who Brenna Aielo is?
16    A.  I do.
17    Q.  Okay.  And do you know about when she began
18  employment with the Red Cross?
19    A.  No, I don't have anything specific.
20    Q.  But it was after Ms. Powell left the Red
21  Cross; correct?
22    MR. PANAGOPOULOS:  Objection.  You can

Page 19

1  answer if you know.
2    THE WITNESS:  I'm trying to--
3    MR. PANAGOPOULOS:  Okay.
4    THE WITNESS:  --she was--she worked with
5  Red Cross prior to Ms. Powell leaving.
6    BY MR. PLITT:
7    Q.  All right.  So do you know whether or not
8  she took over any duties that Ms. Powell had
9  performed?
10    A.  She did.
11    Q.  And which duties did she take over?
12    A.  The work related to medical fitness and
13  reviewing medical records for Armed Forces Emergency
14  Services personnel.
15    Q.  In the answers to interrogatories, number
16  15, it states that Champa Rajapakse was involved in
17  communicating with the Maryland Division of
18  Employment Office regarding Ms. Powell.
19    Can you tell me what department she works
20  in?
21    A.  During that time, she worked in my
22  department, Client Services and EEO.

Page 20

1    Q.  Okay.  And can you tell me which
2  communications she had with the Maryland Division?
3    A.  She completed and signed the form.
4    Q.  The form talking about how Ms. Powell had
5  left the Red Cross?
6    A.  Yes, the one for Maryland.
7    Q.  And did you review that form before it was
8  submitted?
9    A.  I did not.
10    Q.  Now, are you aware of the compensation
11  level that was paid to Jane Davis when she was
12  employed as a Wellness Associate at the Red Cross?
13    A.  Her approximate compensation, yes.
14    Q.  And was she compensated at a higher rate
15  than Ms. Powell for her work as Wellness Associate?
16    A.  As I recall a comparable rate to Ms.
17  Powell.
18    Q.  But was it a higher rate than Ms. Powell
19  was receiving?
20    MR. PANAGOPOULOS:  Objection.  Asked and
21  answered.
22    MR. PLITT:  Well, I think within the realm

Page 21

1  of comparable, we can inquire as to whether it's
2  higher or lower.
3    MR. PANAGOPOULOS:  By the same token, she
4  said doesn't know.  She didn't have the exact
5  number.
6    MR. PLITT:  All right.
7    BY MR. PLITT:
8    Q.  So I guess we have one of these questions
9  where can you tell me without speculating whether
10  the employment that she received was higher or lower
11  than Ms. Powell?
12    MR. PANAGOPOULOS:  You mean the pay that
13  she received?
14    MR. PLITT:  The pay rate that she received
15  as Wellness Associate, whether it was higher or
16  lower than the rate that Ms. Powell received as
17  Wellness Associate at the same time?
18    THE WITNESS:  I can't say with surety.
19    BY MR. PLITT:
20    Q.  Can you--was the pay rate that Ms. Davis
21  received the same pay rate that she had received
22  earlier in terms of her work for Disaster Services?

Page 22

1    A. I don't know.

2    Q. What about for Ken Thiel. Can you testify

3 as to the pay level that he received for his duties

4 as Manager through the time that he resigned?

5    A. I can' say the exact salary?

6    Q. Was the rate of his compensation higher

7 than Ms. Powell's compensation as Wellness

8 Associate?

9    A. It was.

10    Q. Was a Diana Billack hired by the Red Cross

11 after Ms. Powell finished her employment with the

12 Red Cross?

13    A. Yes.

14    Q. And did she take on any duties that Ms.

15 Powell had performed while Ms. Powell was working at

16 the Red Cross?

17    A. Not that I'm aware of.

18    Q. She was hired as a position of Staff Health

19 Associate, staff deployment. Can you tell me

20 whether that position shared any responsibilities

21 with the position of Staff Health Nurse for Disaster

22 Services that was offered to Ms. Powell before Ms.

Page 23

1 Powell left the Red Cross?

2    A. It did share some responsibilities.

3    Q. And can you tell me what responsibilities

4 those were?

5    A. The disaster-related responsibilities.

6    Q. And can you tell me what those were?

7    A. It would be working on disaster,

8 health-related items like reviewing medical

9 requirements to go out on a disaster assignment;

10 working with a number of volunteers that also either

11 served on an assignment or

12 helped--volunteers--nursing volunteers--registered

13 nurses working with those to help prepare people for

14 assignments or respond to any medical conditions

15 that someone may have on an assignment.

16    Q. Okay. That was shared with the position

17 that was offered to Ms. Powell?

18    A. Yes, it was.

19    Q. Okay. Anything else that was shared with

20 that position that was offered to Ms. Powell?

21    A. Not that I'm aware of.

22    Q. Okay. Was there any part of the position

Page 24

1 that Ms. Billack took over that was not included in

2 the position that was offered to Ms. Powell--

3    A. Yes.

4    Q. --in disaster services?

5    A. Yes.

6    Q. Okay. And what would that be?

7    A. The Armed Forces Services Medicals.

8    Q. Had Ms. Powell performed that--those duties

9 as part of her duties as Wellness Associate at the

10 Red Cross?

11    A. Yes.

12    Q. And that was the part that not in the

13 position that was offered to Ms. Powell?

14    A. No. It was offered to Ms. Powell.

15    Q. Okay. All right. So what was offered to

16 Ms. Billack was part of what was had been offered to

17 Ms. Powell in the Staff Health Nurse position;

18 correct? And then the other part of the position

19 Ms. Billack took over was the part on medical

20 records that Ms. Powell had done earlier as Wellness

21 Associate; is that right?

22    A. I'm not sure I got all of that, so could

Page 25

1 you one more time? I'm sorry.

2    Q. So what--the position that Ms. Billack took

3 over had two parts. One was the Staff Health Nurse

4 position that was offered to Ms. Powell, and the

5 other part was the work that Ms. Powell had done

6 with the medical records for deployment that she had

7 worked on as Wellness Associate; is that fair to

8 say?

9    A. Ms. Billack did not ever do anything with

10 the parts of the job of AAFES that came from the

11 Medical Wellness Unit.

12    Q. But the other parts that Ms. Powell had

13 performed she worked on those?

14    MR. PANAGOPOULOS: Objection. You can

15 answer.

16    THE WITNESS: No, she--Ms. Billack never

17 assumed any of the former Wellness Unit duties that

18 Ms. Powell performed.

19    BY MR. PLITT:

20    Q. Who had been performing those duties before

21 Ms. Billack took over the duties?

22    A. The Armed Forces Emergency Services Medical

Page 26

1  approvals were done by Caroline Williams first and
2  then Brenna Aiello.
3     Q.  All right.  And were there any other duties
4  performed by Brenna Aiello?
5     A.  Yes.
6     Q.  And what were those?
7     A.  She also served as a Disaster Reserve,
8  which is a position that goes out on disaster
9  assignments as a registered nurse.
10    MR. PLITT:  Thank you.
11    BY MR. PLITT:
12    Q.  And was that a part of the job that was
13  offered to Ms. Powell in the Staff Health Nurse
14  position before she left the Red Cross?
15    A.  Ms. Powell was never offered a Disaster
16  Reserve position.
17    Q.  Okay.  Was going to disaster sites part of
18  the position as Staff Health Nurse that was offered
19  to Ms. Powell prior to her ending her employment
20  with the Red Cross?
21    A.  Yes.
22    Q.  So the job as Staff Health Nurse involved

Page 27

1  the deployment to disaster sites?
2     A.  On occasion.
3     Q.  Okay.  Can you explain the training that
4  Ms. Powell would have needed to serve in the
5  position of Staff Health Nurse?
6     A.  No.
7     Q.  Are you aware of any discussions regarding
8  training regarding that position?
9     A.  No.
10    MR. PANAGOPOULOS:  And I'll object to those
11  questions as being beyond the scope of the notice.
12    BY MR. PLITT:
13    Q.  You heard the testimony this morning that
14  the Staff Health Nurse position was classified at a
15  different pay level than the Wellness Associate
16  position.  Do you recall hearing that testimony?
17    A.  I do.
18    Q.  Okay.  That testimony is correct?
19    A.  Correct.
20    Q.  Okay.  When the position of Staff Health
21  was offered to Ms. Powell, she was not offered that
22  position at the rate at which it had been

Page 28

1  classified; isn't that correct?
2     MR. PANAGOPOULOS:  Objection.
3     THE WITNESS:  The jobs are classified in a
4  broad band system, so there's no particular rate
5  that anyone would ever be offered.
6     BY MR. PLITT:
7     Q.  She wasn't offered compensation within the
8  band of classification for the Staff Nurse position;
9  isn't that correct?
10    MR. PANAGOPOULOS:  Objection.  It
11  mischaracterizes testimony.
12    MR. PLITT:  It's a question.
13    THE WITNESS:  It's not correct.  She was
14  offered salary within the appropriate band of that
15  position.
16    BY MR. PLITT:
17    Q.  At the band at which it was classified?
18    A.  Yes.
19    Q.  The Staff Nurse position?
20    A.  Yes.
21    Q.  Yes?  Who had performed the Staff Health
22  position before or any Staff Health Nurse position

Page 29

1  before Ms. Powell was offered a Staff Health
2  position?
3     A.  Which Staff Health position?
4     Q.  In disaster services.
5     A.  Before Ms. Powell was Heather Jordan.
6  Heather--I think Heather Jordan I believe was her
7  name.
8     Q.  And how long did she perform--or when did
9  she perform it?
10    A.  Preceding Ms. Powell's offer.
11    Q.  And so directly preceding that and about
12  for how long?
13    A.  I can't say if there was a gap.
14    Q.  And about how long did she work in that
15  position?
16    A.  I'm unsure.
17    Q.  And what was her rate of pay in that
18  position?
19    A.  Comparable to Ms. Powell's.
20    Q.  Can you give me a range of what her salary
21  was or give me what her salary was?
22    A.  No, I can't give you the exact amount.

Page 30

1    Q.  Can you give me an estimate of what it is?
2    A.  The range was comparable to Ms. Powell's
3  pay.
4    Q.  Was it higher than Ms. Powell's pay?
5    A.  I would be guessing.
6    Q.  You can't give a best estimate?
7    A.  No.
8    Q.  All right. Why was Ms. Powell denied
9  severance pay?
10    A.  Ms. Powell was offered a same or similar
11  job in accordance with our severance policy.
12  Declining that offer, according to our policy,
13  yields ineligibility for severance.
14    Q.  And how was the position the same or
15  comparable to the position that she was
16  offered--that she was already performing?
17    A.  As outline in our severance policy, a same
18  or similar position has three components that we
19  look at. One is the job knowledge and skills. One
20  is that there's no greater than a 10 percent pay
21  cut. And the final one is that it's within a
22  50-mile jurisdiction of the present position.

Page 31

1    Q.  And who made the decision that the position
2  offered was such that Ms. Powell--
3    MR. PANAGOPOULOS:  Same or similar?
4    MR. PLITT:  Same or similar or comparable>?
5    THE WITNESS:  In consultation with our
6  Compensation Unit, I made that decision.
7    BY MR. PLITT:
8    Q.  You made the decision?
9    A.  Yes.
10    Q.  All right. And who did you consult with on
11  that?
12    A.  Our Compensation Department. We have Comp
13  Analysts that took a look at it.
14    Q.  So tell me which analysts you spoke with or
15  conferred with?
16    A.  I did not have a direct compass
17  conversation. I referred it back to the Business
18  Unit, Eugena Blythe at the time, and they looked at
19  it for me.
20    Q.  Did you give any kind of a written document
21  to do that or was it verbal?
22    A.  No. it was verbal and they used the job

Page 32

1  documentation tools on file to take a look at it.
2    Q.  Now, was this before or after Ms. Powell
3  was offered this position?
4    A.  Before and after.
5    Q.  Did you receive any kind of written
6  response from the Compensation?
7    A.  Not that I recall.
8    Q.  Who reported back to you on the findings of
9  the Compensation before?
10    A.  To my best recollection, it was Eugena
11  directly--ms. Blythe. Eugena Blythe directly.
12    Q.  What was her position at that time?
13    A.  Senior Director of Compensation and
14  Employee Relations.
15    Q.  Where was she located?
16    A.  In Washington, D.C.
17    Q.  And what did she say to you?
18    A.  Just that it qualified as a same or similar
19  position.
20    Q.  Did she state what kind of analysis she
21  performed if any?
22    A.  They just look at the skills and

Page 33

1  requirements sections of the job descriptions--of
2  the Job Documentation Tool is the exact title of the
3  document.
4    Q.  Okay. And did she perform any kind of
5  analysis based on talking to the people that were
6  performing these positions or going out and seeing
7  what duties were actually performed by the people in
8  those positions?
9    A.  I don't know.
10    Q.  And you don't know whether that was done
11  the second time you talked with him either?
12    MR. PANAGOPOULOS:  Objection as to form.
13  Which that? I mean you had a couple of that's over
14  your last couple of questions.
15    BY MR. PLITT:
16    Q.  The second. You testified that you talked
17  to compensation before you offered the position of
18  Staff Health Nurse for Disaster to Ms. Powell and
19  then you testified you did it after Ms. Powell was
20  offered that position; correct?
21    A.  Yeah. I talked to Compensation before the
22  position was offered.

Page 34

1    Q.  Mm hmm.

2    A.  I did not talk to him after.  I did have

3  conversations after that with Ms. Powell.

4    Q.  I see.

5    A.  Communications with Ms. Powell.

6    Q.  Okay.  Did Compensation give you any reason

7  why they said that the positions were comparable?

8    A.  Yes.

9    Q.  What was that?

10    A.  The job requirements for both positions

11  were a registered nurse.  The job requirements for

12  both positions were a bachelor's degree in nursing

13  or related field and that the only difference would

14  be number of years of experience between those and

15  that the requisite number of years of experience

16  were--had already been obtained.

17    Q.  Okay.  In your position had you supervised

18  anybody working as a Staff Health Nurse in Disaster

19  Services?

20    A.  No.

21    Q.  Had you--what was the title of the position

22  that was offered to Ms. Powell?

Page 35

1    MR. PANAGOPOULOS:  Again, you have that in

2  a document, but you want to just see if she

3  remembers.

4    MR. PLITT:  I'm going to try to see if I

5  can help out with that.

6    BY MR. PLITT:

7    Q.  Was the position offered to Ms. Powell

8  entitled, officially entitled Wellness Nurse?

9    MR. PANAGOPOULOS:  Yeah.  Brian, if you're

10  reading from a document that was given to her, why

11  not just show it to the witness so she can tell you

12  if that's the document, or you just want to test

13  memory here?

14    MR. PLITT:  I'm not reading from a

15  document.  I'm asking the witness a question in her

16  position as representative.

17    MR. PANAGOPOULOS:  Yeah.  She's in the

18  position as representative, but there's no

19  requirement that she memorize every single document

20  and every single title, especially when we've

21  produced all these documents.  I mean you're getting

22  to the point of the ridiculous.

Page 36

1    MR. PLITT:  If she knows, she knows.  I

2  mean it's a very legitimate question.

3    MR. PANAGOPOULOS:  Well, I mean it seems

4  with a little preparation you could give her the

5  sheet of paper and then move on.  It's crazy.  If

6  you remember.

7    MR. PLITT:  It's a very simple question.

8    BY MR. PLITT:

9    Q.  Can you tell me whether the position was

10  entitled Wellness Nurse?

11    A.  I don't believe that was the exact position

12  title.

13    Q.  But the position had been known as Staff

14  Health Nurse for Disaster Services; correct?

15    A.  That sounds correct.

16    Q.  Had the position ever been entitled

17  Wellness Nurse before?

18    MR. PANAGOPOULOS:  Objection as to form.

19    THE WITNESS:  I don't know.

20    BY MR. PLITT:

21    Q.  All right.  Let me show you what we're

22  going to mark as I guess we'll mark this as Exhibit

Page 37

1  1 for this deposition.

2    MR. PANAGOPOULOS:  No, it's for the same

3  day.  It's Corporate Designee Deposition.  Just go

4  to two.

5    MR. PLITT:  Go to two.

6    MR. PANAGOPOULOS:  And we'll just ask the

7  Court Reporter at which point in the deposition we

8  switched representatives.

9    MR. PLITT:  Okay.

10    MR. PANAGOPOULOS:  That's fine.

11    MR. PLITT:  Let's mark this as number two.

12      [Whereupon, Corporate Designee

13      Exhibit 2 was marked for

14      identification.]

15    BY MR. PLITT:

16    Q.  All right.  Let me show you what's been

17  marked as Number 2, Ms. Miller.  Let me know when

18  you've had a chance to look at that, please.

19    A.  Okay.

20    Q.  Okay.  Can you tell me if that's the--if

21  that was sent by the Red Cross to the Maryland

22  Department of Labor, Unemployment Division?

Page 54

1    Q. No, but the question is what level of
2  points would result in a determination of exemption
3  or non-exemption?
4         MR. PANAGOPOULOS: Objection as to form.
5         THE WITNESS: I don't have a specific level
6  of points that I could share with you.
7         BY MR. PLITT:
8    Q. Is it your testimony that the person or
9  persons that prepared this document spoke with Ms.
10  Powell about her job duties before making
11  this--putting this document together?
12         MR. PANAGOPOULOS: Objection.
13  Mischaracterizes the testimony.
14         THE WITNESS: No, that's not my testimony.
15         BY MR. PLITT:
16    Q. Did they speak to Ms. Powell before
17  preparing this document?
18    A. I don't know.
19    Q. Okay. Do you have any evidence that they
20  did speak with Ms. Powell before preparing this
21  document?
22    A. No.

Page 55

1    Q. All right. Now, this document here says
2  indicate below which leveling chart will be used to
3  evaluate the job. Do you see that under part nine
4  in the last page?
5    A. I do.
6    Q. Can you explain what that means?
7    A. There are various--we have a job leveling
8  system, which allows people to have jobs in
9  different tracks, like career tracks, and these
10  would represent career tracks to level jobs.
11    Q. Can you explain what leveling means?
12    A. Moving through various levels of a
13  particular, like a registered nurse career track or
14  medical career track; in this case, a professional.
15    Q. Can you explain to me how leveling would
16  relate to classifying a job as exempt or non-exempt?
17    A. It would only be part of the
18  considerations. They would look at the Fair Labor
19  Standards Act and administer the appropriate
20  exemption test.
21    Q. All right. So this last page of the
22  document, this chart, would be part and only part of

Page 56

1  the determination as to whether a position was
2  exempt or not exempt in the Red Cross's view?
3    A. Yes.
4    Q. Okay. Now, can you show me anywhere in
5  that document how the exemptions under the Fair
6  Labor Standards Act or under the D.C. Wage and Hour
7  Act or Wage Revision Act were applied to determine
8  whether or not Ms. Powell's position was exempt or
9  not exempt?
10    A. I'm not a direct compensation practitioner,
11  so I'm going to give you the basic answer, which is,
12  these are the direct areas that the Fair Labor
13  Standards Act asks you to look at for duties
14  performed and make a determination based on a range
15  and that's what Compensation did using this tool to
16  determine the level of discretion, latitude, or
17  impact on the organization--those categories I read
18  earlier.
19    Q. Can you explain how the leveling chart
20  relates to the exemptions under the Fair Labor
21  Standards Act?
22         MR. PANAGOPOULOS: Objection. Asked and

Page 57

1  answered.
2         THE WITNESS: We have various job levels.
3  At the Red Cross, they look at those as well as the
4  latitude and, you know, moving through different
5  levels. It doesn't naturally correlate with an
6  exemption, but it's looked at in whole, along with
7  the feedback from the supervisor or someone familiar
8  with the position.
9         MR. PLITT: Let me take a look at the
10  document.
11         BY MR. PLITT:
12    Q. Okay. So this is the chart that you've
13  indicated was a factor in determining whether or not
14  Ms. Powell was an exempt or non-exempt employee;
15  correct?
16    A. Yes.
17    Q. All right. So if you follow with me on
18  this chart, looking at the top line, it says,
19  frequent use and general knowledge of industry,
20  practices, techniques, and standards, general
21  application of concepts and principles. Can you
22  explain to me which exemption under the Fair Labor

Page 70

1    MR. PANAGOPOULOS: Well, I'm not talking
2    about it. I'm talking about the kind of stuff that
3    you're pulling because you obviously have done
4    nothing to prepare on this thing. It's insane.
5    MR. PLITT: Well, preparation goes with the
6    witness. Now, if she's not prepared to answer
7    questions on things that are fairly within that
8    deposition notice--
9    MR. PANAGOPOULOS: They're not fair, and
10   what I'm saying--
11   MR. PLITT: --that's on the Red Cross.
12   MR. PANAGOPOULOS: All right. You know
13   what? Let's just do this: there's no reason for us
14   to do this. Let me put this statement on the
15   record. Okay.
16   The Red Cross has prepared its witness to
17   talk about the general classification of this
18   position as set forth in the documents we've
19   described. We did not prepare someone to talk
20   specifically about the specific individual steps to
21   classify this individual position.
22   MR. PLITT: Ms. Powell. Ms. Powell.

Page 71

1    MR. PANAGOPOULOS: All right? And with
2    respect to that issue, what I'm saying is if you
3    want someone to do that, we'll see what we can do.
4    But this witness is done on that issue
5    because she's not the one for it.
6    MR. PLITT: You're not prepared to testify
7    further on that issue?
8    MR. PANAGOPOULOS: That's what I said.
9    That's what I've been saying forever.
10   MR. PLITT: That is your duty to present
11   someone.
12   MR. PANAGOPOULOS: It's my duty to present
13   someone on this notice. I've done that.
14   MR. PLITT: I think you're bound by her
15   testimony and I am questioning her on that issue.
16   MR. PANAGOPOULOS: Okay. We're done on
17   that issue. I'm telling you she's not prepared to
18   testify anymore on that issue.
19   MR. PLITT: You are not prepared to give
20   any more testimony on the issue of Ms. Powell's
21   classification--
22   MR. PANAGOPOULOS: Not on the specific--

Page 72

1    MR. PLITT: --let me make the record of
2    exempt and non-exempt.
3    MR. PANAGOPOULOS: All right. We are not
4    prepared at this point to go into--we've shown. Let
5    me finish. You asked me a question. Let me answer
6    it.
7    MR. PLITT: I'm trying. I'm asking you to
8    answer the question I've asked.
9    MR. PANAGOPOULOS: Okay. Then stop asking
10   me to answer it, and let me answer it.
11   MR. PLITT: All right. Do you understand
12   the question?
13   MR. PANAGOPOULOS: You know what? This is
14   not your deposition of me, so don't go that route,
15   or we will leave because this is getting ridiculous.
16   MR. PLITT: The deposition of your
17   corporate representative.
18   MR. PANAGOPOULOS: Are you done? Let me
19   know when you're done. I'll make my statement for
20   the record, and you can continue.
21   MR. PLITT: I'd like you to answer--
22   MR. PANAGOPOULOS: No. I'm not answering

Page 73

1    any of your questions. Let me know when you're
2    done.
3    MR. PLITT: I'm not finished. I'd like you
4    to answer the question is this all the answers that
5    your corporate representative will give on the issue
6    of Ms. Powell's classification of exempt or
7    non-exempt?
8    MR. PANAGOPOULOS: Our corporate
9    representative has prepared and has answered
10   questions that we thought were reasonably within
11   your notice the way it was drafted. I've said that
12   repeatedly. I'm saying it for the last time now.
13   I have also said to you if you want to get
14   into more detailed analysis, to let me know and I'll
15   see what I can do. Do you understand that?
16   MR. PLITT: I am asking you whether at this
17   time this corporate representative I can question
18   her further on Ms. Powell's classification of exempt
19   or non-exempt?
20   MR. PANAGOPOULOS: And what I'm saying to
21   you is if you want to give me a more detailed
22   designation of what you want on the classification

## Page 78

1  are making that proffer for the record. If I can,
2  then I need to be able to ask her further questions
3  regarding her statements as a corporate
4  representative.
5       MR. PANAGOPOULOS: I want you to make a
6  proffer on the record what those further questions
7  are, and I'll tell you if she can answer it.
8       MR. PLITT: There's a lot of questions.
9       MR. PANAGOPOULOS: Go for it.
10      MR. PLITT: You want to make—well, I need
11 to question her regarding this particular document.
12      MR. PANAGOPOULOS: That you have.
13      MR. PLITT: How it was used. I haven' gone
14 through the whole thing. I have questions regarding
15 what the policy was. She hasn't identified the
16 policy. I've produced every document that I know I
17 could be able to find. I will give her the other
18 documents produced and she can show me the policy.
19 I need to know how—
20      MR. PANAGOPOULOS: Is there anything else?
21      MR. PLITT: I need to know how and using
22 what factors her position was classified as exempt.

## Page 79

1  And I need to know which factors were used and which
2  exemptions it falls under under the FLSA or the D.C.
3  Wage and Hour Act. And—
4       MR. PANAGOPOULOS: Anything else?
5       MR. PLITT: There are probably other
6  questions as well.
7       MR. PANAGOPOULOS: All right. I need a
8  proffer from you.
9       MR. PLITT: I need to know the analysis
10 that was performed.
11      MR. PANAGOPOULOS: Okay. All right.
12 Here's my statement, the final statement, and we'll
13 bring the witness in.
14      With respect to that proffer, I think you
15 have asked each of those questions, and I think
16 she's answered those questions. You did a general
17 corporate designee notice that there's no way one
18 person could ever do; that is over broad; that we
19 prepared for. Frankly, I think you did this in an
20 attempt to avoid having to depose several people.
21 That's fine. Whatever you want to do you do.
22      She can testify as to the document. She

## Page 80

1  can review and tell you what the document says. If
2  you want to take me up on my—you can ask her those
3  questions you said you want to ask. If you want to
4  take me up on my offer of to work this out of
5  providing someone who can answer those specific
6  questions, that's fine. If you don't, you can just
7  leave it be, and we'll go to Judge Houvel on it, or
8  you can go to Judge Houvel on it or you can take the
9  position that we're far from it, whatever. I'm
10 going to talk to my witness. We'll be back in.
11      [Recess.]
12      MR. PLITT: Okay. Ready to go back on the
13 record?
14      COURT REPORTER: Mm hmm.
15      MR. PLITT: Okay.
16      BY MR. PLITT:
17 Q.  Going back on the record. You're looking
18 at Exhibit Number 6. Can you tell me based upon
19 this first line, under knowledge, how that language
20 with the "X" on it, is that the factor that was used
21 in order to determine whether Ms. Powell was exempt
22 or not exempt?

## Page 81

1  A.  As I said before, this document was not
2  done by me. These were documents that were
3  completed by Compensation to make their
4  determination. They're the corporate document on
5  file, supporting their decision.
6  Q.  Did you speak to Ms. Smith about how she
7  made this determination?
8  A.  I did not.
9  Q.  Do you know whether—is it your testimony
10 that this information in the box marked X on the top
11 level of this chart, on the final page of Exhibit 6,
12 is that a factor that was used in determining
13 whether Ms. Powell's position was classified as
14 exempt or non-exempt?
15 A.  Again, I didn't make the determination.
16 This is the corporate document that's in the file.
17 Ms. Dillworth Smith made the determination.
18 Q.  You don't know whether that was the factor
19 that was used in that determination?
20 A.  No, I don't.
21 Q.  Do you know whether any of these factors on
22 the top level were used?

Page 82

1    MR. PANAGOPOULOS: Objection. Document
2  speaks for itself.
3    BY MR. PLITT:
4    Q.  Do you know?
5    A.  No, I don't.
6    Q.  All right.  In terms of the second level of
7  the chart, the second from the top down, do you know
8  how and to what degree any of these factors were
9  used to determine whether or not Ms. Powell's
10  position was classified as exempt or non-exempt?
11    A.  No, I do not.
12    Q.  Okay.  In terms of level three on the
13  chart, do you know whether any of these factors were
14  used in determining whether Ms. Powell's position
15  was classified as exempt or not exempt, and, if so,
16  how?
17    A.  No, I did not make that determination.
18    Q.  Now, what about for the fourth level.  Do
19  you have any knowledge as to how and to what degree
20  those factors were used to determine whether Ms.
21  Powell's position was exempt or non-exempt and on
22  what basis?

Page 83

1    A.  No.
2    Q.  Okay.  And in terms of the last line on the
3  document, do you have any knowledge as to how any of
4  those factors were used to determine whether or not
5  Ms. Powell's position was classified by the Red
6  Cross as exempt or non-exempt, and, if so, to what
7  degree?
8    A.  No.
9    Q.  Okay.  Now, do you know whether the Red
10  Cross used an administrative exemption or a
11  professional exemption or some other exemption under
12  the Fair Labor Standards Act or the D.C. Wage Act or
13  Revision Act or some combination of factors?
14    A.  The document is all that speaks for itself.
15    Q.  Okay.  So but is it your understanding that
16  the determination was made based upon a professional
17  exemption or an administrative exemption or some
18  other exemption or a combination of those
19  exemptions?
20    MR. PANAGOPOULOS:  Objection.  Asked and
21  answered.  She already answered your question.
22    MR. PLITT:  Well, I need to know what her

Page 84

1  interpretation of--
2    MR. PANAGOPOULOS:  But she just told you.
3    MR. PLITT:  --of this analysis is.
4    MR. PANAGOPOULOS:  You can answer it.
5  Okay.
6    THE WITNESS:  That the document stands for
7  itself for the exemption and that the test was
8  administered by compensation.  I can't say with
9  certainty which exemption test.
10    BY MR. PLITT:
11    Q.  Or can you say that there was a combination
12  of exemptions used?
13    A.  I cannot say.
14    Q.  All right.  We've spoken about what the
15  policy of the Red Cross was in terms of how to
16  determine whether or not a certain position should
17  be classified as exempt or not exempt.  Do you
18  remember that questioning?
19    A.  Yes.
20    Q.  Okay.  I have given you every document I
21  could find that appeared to me to relate to that.  I
22  will hand you the rest of the documents that were

Page 85

1  produced in discovery, and ask if you can locate for
2  me the Red Cross policy that applied in terms of how
3  positions were classified as exempt or non-exempt
4  during the time that Ms. Powell was employed at the
5  Red Cross.
6    MR. PANAGOPOULOS:  I guess we can take a
7  minute to go through those.
8    COURT REPORTER:  You want to go off the
9  record?
10    MR. PANAGOPOULOS:  Yes.  Go off the record.
11    [Recess.]
12    COURT REPORTER:  Hang on.
13    MR. PANAGOPOULOS:  For the record, the
14  witness has pulled policy number 603, dated April
15  4th, 1996; Policy 201, dated January 16th, 2004;
16  Policy 202, dated January--or September 27th, 2004;
17  Policy 110, dated March 15th, 2004; Policy 206,
18  dated January 16th, 2004; Policy 205, dated January
19  16th, 2004; Policy 205, dated November 1, 2005; and
20  Policy 110, dated--I don't know if this was handed
21  or not, Carol?
22    THE WITNESS:  Some of them cross two

Page 86

1  periods.

2      MR. PANAGOPOULOS:  Cross two periods.  And

3  November 1, 2005.  And Policy 603, November 1, 2005.

4      MR. PLITT:  Can I take a look at the

5  documents?

6      MR. PANAGOPOULOS:  Absolutely.

7      MR. PLITT:  Thanks.  All right.  Let's mark

8  all of these.  I've got nine in all it looks like.

9          [Whereupon, Exhibit Numbers

10             7-11 were marked for

11             Identification.]

12      We can just start.  That's what we'll do.

13  We're going to start with the first three.

14      BY MR. PLITT:

15      Q.  All right.  Let me show you what's been

16  marked as Exhibit Number 7 for identification.

17      I gather this is a policy on overtime time

18  report; is that correct?

19      MR. PANAGOPOULOS:  Objection.

20  Mischaracterizes the title of the document.

21      BY MR. PLITT:

22      Q.  Okay.  Can you state to me what that policy

Page 87

1  is?

2      A.  Non-exempt time reporting.

3      Q.  All right.  So would that be the policy

4  related to how employees are—were classified by the

5  Red Cross during Ms. Powell's employment as exempt

6  or non-exempt?

7      A.  No.

8      Q.  Okay.  Let me show you what's been marked

9  as Exhibit Number 8.  Can you identify that for me,

10  please?

11      A.  Okay.

12      Q.  Have you had a chance to look at it?

13      A.  Mm hmm.

14      Q.  Can you tell me what that is?

15      A.  The overall compensation philosophy, the

16  policy in the manual.

17      Q.  Okay.  And is that the policy that

18  determines how—that determined how an employee was

19  classified as exempt or not exempt during the time

20  of Ms. Powell's employment?

21      A.  No.

22      Q.  Okay.  And let me show you what's been

Page 88

1  marked as Exhibit Number 9, and ask you if you could

2  identify that, please?

3      MR. PANAGOPOULOS:  You can describe it.

4      THE WITNESS:  Okay.

5      BY MR. PLITT:

6      Q.  Okay.  Can you tell me—did you tell me

7  what that was already?

8      A.  No.

9      Q.  Okay.  Could you tell me, please?

10      A.  It's the pay practices policy out of the

11  policy manual.

12      Q.  All right.  Is that the policy that the Red

13  Cross used during Ms. Powell's employment to

14  determine whether or not employees were exempt or

15  non-exempt?

16      A.  No.

17      Q.  Okay.  And let me show you what's been

18  marked as Exhibit Number 10.

19      MR. PANAGOPOULOS:  Counsel, you keep saying

20  the policy they used to determine whether or not

21  they're not exempt or non-exempt.  It's not a policy

22  that says you're exempt or you're not exempt.  It's

Page 89

1  not a policy that says you're exempt or you're not

2  exempt.  I mean I'm just going to do a continuing

3  objection to that question.  I mean I don't

4  understand how a policy can do that.  But—

5      MR. PLITT:  I'm asking her—

6      MR. PANAGOPOULOS:  These are all the Fair

7  Labor Standards Act related policies.

8      MR. PLITT:  Right.  I'm asking for the

9  Red—what the Red Cross's policy was at the time.

10      MR. PANAGOPOULOS:  For what?

11      MR. PLITT:  For classification of their

12  employees as exempt or non-exempt.  They obviously

13  made the decision, so I need to know what the policy

14  was.  That's all.  And I'm asking the witness about

15  that from the document that she identified.

16      BY MR. PLITT:

17      Q.  I guess I asked if that was the policy the

18  Red Cross used to classify employees as exempt or

19  non-exempt.

20      MR. PANAGOPOULOS:  Objection as to form on

21  all those questions because I don't think that makes

22  sense, but—

Page 90

1    BY MR. PLITT:

2    Q.  Was that the policy that the Red Cross used

3    during Ms. Powell's employment at the Red Cross to

4    determine whether if positions at the Red Cross were

5    exempt or not exempt?

6    A.  This new policy you just handed me entitled

7    work schedules—

8    Q.  Yes.

9    A.  —was not.

10    Q.  Okay.  All right.  Let me show you Exhibit

11    Number 11 and ask if you have the answer to that

12    question?  Okay.  What is that document, please?

13    A.  Job Documentation and Evaluation Policy.

14    Q.  All right.  And can you tell me whether or

15    not that's the policy used by the Red Cross during

16    Ms. Powell's employment to classify employees as

17    exempt or non-exempt?

18    A.  Used in particularly

19    Q.  All right.  Can you explain how that—what

20    part of that document was used in that way?

21    A.  This would be the tools that we looked at

22    earlier where data was captured, recorded the types

Page 91

1    of duties, the level of education, those sorts of

2    things.

3    Q.  Can you show me what part of the document

4    you're referring to, please?

5    A.  It's short.  It's in the entirety.  It's

6    talking about the tools first, the job document tool

7    and how they go through it, and then that they

8    evaluate the position as a result of that tool.

9    Q.  Okay.  You're looking at, for the record,

10    under Roman IIA and B; is that correct?

11    A.  Yes.

12    Q.  Okay.  Am I correct this document doesn't

13    refer to exempt or not exempt status?  It refers to

14    pay back status?

15    A.  It actually is referring to the tool that

16    we've been referring to.

17    Q.  Okay.  Let me show you what is going to be

18    marked as the next exhibit.

19    COURT REPORTER:  Twelve.

20    MR. PLITT:  Twelve.  Thank you.

21    [Whereupon, Corporate Designee

22    Exhibit 12 was marked for

Page 92

1    Identification.]

2    BY MR. PLITT:

3    Q.  And ask can you take a look and identify

4    that for me, please?  Can you tell me what that is?

5    A.  Overtime pay and Fair Labor Standards Act

6    Policy.

7    Q.  All right.  Can you tell me if that is the

8    policy that was used by the Red Cross in terms of

9    classifying employees as exempt or not exempt during

10    the time that Ms. Powell was employed at the Red

11    Cross?

12    MR. PANAGOPOULOS:  Objection.  You can

13    answer.

14    THE WITNESS:  It is the policy on overtime

15    and Fair Labor Standards in effect from January

16    16th, '04 for outlining Red Cross's policy on

17    determining exemptions and non exemptions.

18    BY MR. PLITT:

19    Q.  Okay.  Can you tell me whether that was the

20    policy in effect at the Red Cross for determining

21    whether employees were classified as exempt or

22    non-exempt during the time of Ms. Powell's

Page 93

1    employment?

2    MR. PANAGOPOULOS:  Same objection and asked

3    and answered.

4    THE WITNESS:  Yes.  For at least part of

5    the time that she was employed.

6    BY MR. PLITT:

7    Q.  Okay.  Can I take a look at the document

8    and see.  Okay.

9    MR. PANAGOPOULOS:  No one stepped on a cat?

10

11    BY MR. PLITT:

12

13    Q.  And it's your testimony that this was

14    effective January 16th, 2004?

15

16    A.  It is.

17    Q.  All right.  All right.  Thank you.  And

18    then the final document you identified is marked as

19    Number 13.

20    [Whereupon, Corporate Designee

21    Exhibit Number 13 was marked

22    for Identification.]

Page 94

1    BY MR. PLITT:

2    Q.  Can you turn to part of it inside.  Can you

3  take a look at that and tell me--

4        MR. PANAGOPOULOS:  You just want her to

5  look at that specific page you just pointed her to?

6        MR. PANAGOPOULOS:  Yeah.

7        BY MR. PLITT:

8    Q.  If you want to look at the whole document,

9  you can but you opened it to that particular page.

10  So if you want to look at the whole document, let me

11  know if I turned to the right part.

12        MR. PANAGOPOULOS:  Carol, I think you

13  should--if I recall correctly, you pointed to more

14  than one part of that document.

15        THE WITNESS:  Yes.  The one that's marked

16  as Exhibit 13 is just--is not a relevant policy.

17  It's a collection of policies by--one, two, three

18  policies within this batch of policies.

19        BY MR. PLITT:

20    Q.  Okay.

21    A.  That I pointed to.

22    Q.  Can you point me to the first one that you

Page 95

1  were referring to, please?

2    A.  The overtime and Fair Labor Standards Act

3  policy Number 205.

4    Q.  Okay.  And when was that policy effective?

5    A.  November 1st, 2005.

6    Q.  Okay.  So was that after Ms. Powell's

7  employment at the Red Cross?

8    A.  Yes.

9    Q.  Okay.  All right.  So--

10        MR. PANAGOPOULOS:  For the record, I think

11  it's the same as the previous policy we went to.

12  They're updated every once in a while, so there are

13  going to be different dates based on the latest

14  update.

15        MR. PLITT:  All right.

16        MR. PANAGOPOULOS:  But the policy--

17        MR. PLITT:  But that particular policy may

18  not have been in effect, but a same or similar

19  policy was in effect; is that your testimony?

20        THE WITNESS:  That's correct.

21        BY MR. PLITT:

22    Q.  Okay.  And the next policy point?

Page 96

1    A.  Work schedules.

2    Q.  Right.

3    A.  The same thing effective November 1st,

4  2005.

5    Q.  All right.  Can you tell me which part of

6  that policy was used to determine whether employees,

7  including Ms. Powell, were classified as exempt or

8  non-exempt>?

9        MR. PANAGOPOULOS:  Objection to form.

10        THE WITNESS:  This one was not for

11  exemption, and it was dated after Ms. Powell's--

12        BY MR. PLITT:

13    Q.  Employment?

14    A.  After her employment.

15    Q.  Not to quiz you. I mean the parties have

16  stipulated that her employment ended on June 30th,

17  2005, just for your records.

18    A.  Right.

19    Q.  Okay.

20    A.  It's just to show a policy remains in

21  effect and that they're revisited periodically.

22    Q.  And is it your testimony that a same or

Page 97

1  similar policy was in effect before that date on

2  those issues?

3    A.  Yes.

4    Q.  Okay.  And the last policy?

5    A.  The last one was time and leave reporting,

6  again with that same November 1, 2005, effective

7  date.

8    Q.  All right.  And was that the policy with

9  respect to--can I take a look at that?

10    A.  All right.  I think we've dealt with this

11  before.

12        MR. PANAGOPOULOS:  I think we've dealt with

13  all of them before.  That batch is the 2005 batch.

14  The previous batch is the 2004 batch.

15        MR. PLITT:  Okay.  All right.

16        BY MR. PLITT:

17    Q.  So you've given me all the policy documents

18  from the document production?

19    A.  Yes.

20    Q.  Okay.  Thank you.  Now, in terms of the

21  analysis that was performed with respect to Ms.

22  Powell's position during her employment at the Red

## Page 98

1  Cross, did the person performing that analysis take

2  into account the percentage of time that Ms. Powell

3  worked on any particular task that she was in charge

4  of performing?

5      MR. PANAGOPOULOS:  You want to show her the

6  document?

7      BY MR. PLITT:

8      Q.  Well, without looking at the document, do

9  you know?

10      MR. PANAGOPOULOS:  I think we've already--I

11  think she's already established that it's not her

12  particular area of expertise and that she needs the

13  document.

14      MR. PLITT:  Okay.  She needs to answer the

15  question.

16      BY MR. PLITT:

17      Q.  Do you need to see the document in order to

18  answer that question?

19      A.  I'm not sure which document you're

20  referring to.

21      Q.  Let me just--before I show you the

22  document, do you know whether or not the person

## Page 99

1  who--whether the Red Cross considered the percentage

2  of time that Ms. Powell spent on any particular task

3  in determining whether or not she was an exempt

4  employee or a non-exempt employee for the purposes

5  of the Red Cross?

6      A.  The Red Cross would have run an exemption

7  test, so I would say yes, the Red Cross looked at

8  that.

9      Q.  But do you know whether the Red Cross

10  looked at that or not?

11      MR. PANAGOPOULOS:  Objection.  Asked and

12  answered.

13      THE WITNESS:  The completed form would

14  indicate to me that that was done.

15      BY MR. PLITT:

16      Q.  Okay.  So you want to look at the completed

17  form?

18      A.  Yes.

19      Q.  Okay.

20      A.  The document speaks for itself.  The test

21  is attached and signed for.

22      Q.  Okay.  Is there any indication, do you find

## Page 100

1  any indication in the document that sort of

2  percentage was used in order to determine whether

3  Ms. Powell's position was exempt or non-exempt?

4      A.  There are percentages listed at the bottom

5  of the form.

6      MR. PANAGOPOULOS:  The record is there are

7  percentages listed at the bottom of page four of

8  four.  There are percentages identified on page

9  three of four in the description.

10      BY MR. PLITT:

11      Q.  Okay.  Do you know what percentage of Ms.

12  Powell's work was found to be exempt or non-exempt,

13  if any?

14      A.  I don't know anything more than this

15  document presents.

16      Q.  Okay.  Now, that you've reviewed the

17  document, can you testify as a corporate

18  representative as to the percentage that Ms.

19  Powell's work that was found to be exempt or

20  non-exempt?

21      MR. PANAGOPOULOS:  Objection as to form.

22      THE WITNESS:  No, I can't.

## Page 101

1      BY MR. PLITT:

2      Q.  After having reviewed the document, can you

3  testify as to the amount of time that--for Ms.

4  Powell's work week that was found to be involved in

5  exempt functions as opposed to non-exempt functions?

6      MR. PANAGOPOULOS:  Objection.  Asked and

7  answered.

8      THE WITNESS:  No, I cannot.

9      BY MR. PLITT:

10      Q.  I think what time do you have?

11      MR. GUEST:  Quarter to four.

12      MR. PLITT:  I think we can go off the

13  record now.  I'd like to take a break and review and

14  see if I have any other questions to ask at this

15  point.

16      MR. PANAGOPOULOS:  So you think you're

17  almost done?  If you're almost done, let's go

18  through it and get it done.

19      MR. PLITT:  Well, I want to go through and

20  see exactly what else I have, because I think we've

21  been going for a while, and that way I can give a

22  better idea of how much more I have, and--

Page 102

1     MR. PANAGOPOULOS: You want five minutes?
2     MR. PLITT: Let's take a 10-minute break
3   and then I can give you the best idea. I can't--I
4   want to conclude as soon as I can as well, and I
5   think that's the best way to get it wrapped up.
6     MR. PANAGOPOULOS: All right. Okay.
7   [Recess.]
8     MR. PLITT: Just a few more questions.
9     MR. PANAGOPOULOS: Mm. What was that?
10    MR. PLITT: I said just a few more. I
11  guess I'm pretty happy about that one.
12    THE WITNESS: Before you get started, I was
13  thinking about one question you asked me. I'd like
14  to provide a little clarification, if that's
15  possible?
16    MR. PLITT: Sure.
17    THE WITNESS: You asked me if I had spoken
18  with MJ Dillworth Smith. And I responded no, which
19  was accurate. There wasn't a follow-up question,
20  but I did want to let you know what I didn't do any
21  follow up with her. She's no longer with the Red
22  Cross, so I was unable to do follow up with her to

Page 103

1   get specifics on her findings and her exemption
2   test. But I did talk with the compensation
3   department, both Karen Euler and Erica Johnson to
4   pull the documents to produce for today.
5     So I just wanted to put that information
6   out there for you.
7     BY MR. PLITT:
8     Q. Okay. Did you--can you tell me what
9   attempts you made to try to reach Ms. Smith?
10    A. None at all, since she was a former
11  employee.
12    Q. Okay. Did you review Exhibit 6 at all with
13  the employees that you mentioned who were still with
14  the Red Cross?
15    A. Yes.
16    Q. Prior to your testimony today?
17    A. Yes.
18    Q. Okay. Now, I'm just saying this document
19  that Ms. Powell's name is not mentioned anywhere in
20  Exhibit 6?
21    A. That's correct.
22    Q. Now, what's your understanding as to when

Page 104

1   that document was created?
2     A. The date that the analysis was completed,
3   according to this form, was February 23rd, 2004.
4     Q. Okay. And do you know whether or not that
5   document was revisited or any subsequent analysis
6   was done for Ms. Powell after that document in terms
7   of whether she was performing exempt or non-exempt
8   duties?
9     A. For the position or for Ms. Powell?
10    Q. Well, for Ms. Powell.
11    A. Not for Ms. Powell specifically.
12    Q. Okay. And this position was not--this
13  analysis was not done for Ms. Powell specifically;
14  correct?
15    A. Correct.
16    Q. Do you think there was a subsequent
17  analysis, a generic analysis performed at a later
18  date?
19    MR. PANAGOPOULOS: Objection as to form.
20    THE WITNESS: If there was, we would have
21  included in our documents--I know there were a
22  number of compensation documents submitted.

Page 105

1     BY MR. PLITT:
2     Q. All right. So you don't know of any others
3   other than what's been provided so far in the
4   discovery?
5     A. That's correct.
6     Q. Let me show what's going to be marked as
7   the next exhibit.
8       This is going to be number 14 for
9   identification.
10      [Whereupon, Corporate Designee
11      Exhibit 14 was marked for
12      identification.]
13    BY MR. PLITT:
14    Q. I'm going to hand it to your counsel and
15  after he's reviewed it, I'd like to ask you a
16  question about it. You've been handed the document.
17  Could you take a look at it? It's several pages and
18  if you want to look at all the pages, I appreciate
19  it.
20    A. Yes.
21    Q. Okay. Looking at the first page of that
22  exhibit, can you tell me if you recognize what that

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4   - - - - - - - - - - - - - -x

5   TONIA POWELL,                    :

6              Plaintiff,            :

7        vs.                         :   Case No. 1:06CV1173

8   AMERICAN RED CROSS,              :

9              Defendant.            :

10  - - - - - - - - - - - - - -x VOLUME II

11                          Washington, D.C.

12                          Tuesday, November 14, 2006

13  Continued Deposition of

14              TONIA S. POWELL

15      Plaintiff, taken on behalf of counsel for the

16  Defendant in the above-entitled matter, before Denise

17  M. Brunet, RPR and Notary Public in and for the

18  District of Columbia, taken at the offices of Ballard

19  Spahr Andrews & Ingersoll, LLP, 601 13th Street,

20  Northwest, Suite 1000 South, Washington, D.C,

21  commencing at 2:18 p.m., when were present on behalf

22  of the respective parties:

98f13148-2c45-4a95-8425-66c07fa2ac6e