# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TONIA POWELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1173 (ESH)** |
| ) | |
| **AMERICAN RED CROSS,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiff Tonia Powell has sued her former employer, the American Red Cross ("defendant" or the "Red Cross"), asserting claims for violations of D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.*, and the D.C. Wage and Hour Law, D.C. Code § 32-1001 *et seq.*, as well as a claim for breach of contract. Defendant has filed a motion for summary judgment as to all of plaintiff's claims. Plaintiff has moved for partial summary judgment on her claim for overtime compensation under the D.C. Wage and Hour Law, limited to the issue of liability. For the reasons set forth herein, the Court will grant defendant's motion and deny plaintiff's motion.

## BACKGROUND

Plaintiff, a registered nurse, was hired as a "Wellness Associate" (also known as an "Occupational Health Nurse" or a "Wellness Nurse II") in the Wellness Unit of the American Red Cross national headquarters in November 2004. (Def.'s Ex. 4.) At that time, there were two other employees in the Wellness Unit: Jane Davis, who also held the position of Wellness

Associate, and Ken Thiel, the supervisor of the Unit.[1]  (Pl.'s Opp'n Ex. 1 ["Powell Dep."] at 44,

49; *see also* Def.'s Reply Ex. 2.)  Plaintiff is African-American.  (Pl.'s Opp'n at 3.)  Both Ms.

Davis and Mr. Thiel are Caucasian.  (Pl.'s Opp'n Ex. 3 ["Powell Decl."] ¶¶ 9, 10.)

　　As a Wellness Associate, plaintiff spent a majority of her time on matters relating to the

deployment of Red Cross Armed Forces Emergency Services ("AFES") personnel overseas.

(Powell Dep. at 126-28; *see also* Pl.'s Opp'n Ex. 5 ["Shearer Dep."] at 44-45.)  Plaintiff's AFES

responsibilities concerned the medical part of the deployment process.  (Powell Dep. at 77.)  She

collected and reviewed medical records for individuals being deployed to determine whether the

individual met the medical requirements for deployment under the applicable military guidelines.

(*Id.* at 36-37, 76-77.)  She kept track of who was scheduled to be deployed and what stage each

person was at in his or her physical assessment, including maintaining a spreadsheet with this

information.  (*Id.* at 36, 43-44; *see also* Powell Decl. ¶ 6.)  She also briefed and debriefed

personnel in connection with their deployments, consulted on medical issues that arose while

personnel were overseas, informed personnel when their next physicals were due, and maintained

the AFES personnel files.  (Powell Dep. at 35-39, 69-72; Powell Decl. ¶ 6; Def.'s Ex. 15.)  In

addition to her AFES work, plaintiff's job responsibilities included providing first aid for injured

employees; filing worker's compensation claims; performing ergonomic assessments; health

education and counseling; blood pressure monitoring; cleaning the resting/sleeping and lactation

rooms and tracking usage of those rooms; stocking the first aid boxes located throughout the Red

Cross national headquarters; ordering and stocking office and medical supplies; dispensing

---

[1]There was also a contractor who served as medical director of the Wellness Unit.  (Pl.'s
Opp'n Ex. 1 at 78.)

educational materials; and managing the files.  (Powell Dep. at 33-35, 40-41, 45-47, 82; Pl.'s

Opp'n Ex. 2 (Response to Interrogatory No. 1).)  The AFES work, however, "always came first."

(Powell Dep. at 145.)

  In January 2005, Jane Davis, the other Wellness Associate, resigned from the Red Cross

(*id.* at 48-49), and her position was not filled due, in part, to budgetary considerations.  (Shearer

Dep. at 59.)  When Ms. Davis left, plaintiff's workload increased, but she continued to spend a

majority of her time on her AFES-related work.  (*See* Powell Dep. at 128-29.)[2]  Plaintiff

estimates that she worked fifteen hours per week of overtime as a result of Ms. Davis's

departure.  (Pl.'s Opp'n Ex. 2 (Response to Interrogatory No. 24).)  Because plaintiff's position

was classified as exempt by the Red Cross, she did not receive any additional compensation for

her overtime hours.

  Plaintiff's workload again increased when her supervisor, Ken Thiel, resigned from the

Red Cross in March 2005, leaving plaintiff as the only employee in the Wellness Unit.  (Powell

Dep. at 55.)  Because the Red Cross was contemplating the elimination of the Wellness Unit at

that time, Mr. Thiel's position also was not filled.  (Shearer Dep. at 65-66.)  Following Mr.

Thiel's departure, plaintiff was assigned some of his former duties, including his International

Services work.  (Powell Dep. at 55-56; Shearer Dep. at 63.)  This work was similar to her AFES

work in some respects and included obtaining and reviewing physical examination reports for

International Services personnel being deployed overseas to make sure that there were no

limitations, advising personnel regarding immunizations, conducting briefings and debriefings of

---

[2]According to plaintiff, the AFES work consumed virtually all of her regular work day,
leaving her to perform her other duties during after-work hours.  (*Id.*)

personnel, and maintaining the files.  (Powell Dep. at 56-57, 64-71; Pl.'s Opp'n Ex. 2 (Response to Interrogatory No. 2); Shearer Dep. at 44, 63.)  After Mr. Thiel resigned, plaintiff also assumed responsibility for preparing OSHA reports regarding worker's compensation injuries, consulting on ADA issues, assisting the FMLA benefits nurse with medical questions, and updating policy and procedure binders (Powell Dep. at 56-58, 60-63, 89; Pl.'s Opp'n Ex. 2 (Response to Interrogatory No. 2)); however, Anna Shearer, who supervised plaintiff from March 2005 to June 2005, testified that the medical record review work took up fifty percent of her time during this period.  (Shearer Dep. at 44-45, 47; Pl.'s Mot. at 13.)  Plaintiff estimates that she was required to work an additional twelve hours of overtime per week as a result of Mr. Thiel's departure, for a total of twenty-seven hours of overtime per week.  (Pl.'s Opp'n Ex. 2 (Response to Interrogatory No. 24).)

In 2004 and 2005, the Red Cross conducted a "Core Services Analysis" in an effort to "address the financial challenges of national headquarters and set the course for the next decade." (Defs.' Exs. 17, 18.)  As part of a corporate restructuring undertaken as a result of this analysis, the Red Cross decided in May 2005 to eliminate the Wellness Unit, effective July 1, 2005. (Def.'s Ex. 18.)  The Red Cross announced its plans to close the Wellness Unit to all national headquarters staff via email on May 11, 2005 (*id.*), and plaintiff learned of this decision the following day.  (Def.'s Ex. 6 at 152; *see also* Shearer Dep. at 70.)  Plaintiff thereafter met with Ms. Shearer, Senior Director of Employee Benefit and Retirement Programs, and Bill Malfara, Vice President of Disaster Services, and was offered a position as a "Staff Health Nurse" (also known as a "Wellness Nurse III") with Red Cross Disaster Services, in which she would continue to have responsibility for the AFES-related work she had been doing as a Wellness Associate.

-4-

(Shearer Dep. at 75-76; Powell Dep. at 156-57.)  The Staff Health Nurse position was a level 3 staff position and had a higher salary range than the Wellness Associate position, which was a level 2 staff position.  (*See* Shearer Dep. at 77.)[3]  Because the salary ranges for the positions overlapped, however, plaintiff's then-current salary of $57,096 was within both ranges. (*Compare* Def.'s Ex. 4, *with* Def.'s Exs. 22, 23.)

After the meeting, plaintiff requested an opportunity to discuss compensation with Mr. Malfara, who referred the issue to the Human Resources department.  (Def.'s Ex. 20.)  On May 15, 2005, Carol Miller, Senior Director of Client Services and Equal Employment Opportunity, informed plaintiff via email that she was being offered a "same or similar position" with the Red Cross as a result of the elimination of her former position and that her salary would "remain unchanged" as a result of the transfer.  (*Id.*; Powell Dep. at 205.)

To get a better sense of the responsibilities of the new position, plaintiff spent a day with Carolyn Williams, a nurse who had been working in Disaster Services in a volunteer capacity. (Powell Dep. at 159-60, 169-70, 348-49.)  Believing that the new position involved increased responsibility and in light of the higher salary range for that job, plaintiff then went to talk to

---

[3]The Red Cross sets salaries for national sector positions using "market point pricing," setting its "market point" for a position at the fiftieth percentile of what other organizations pay for comparable positions and offering salaries in a range of seventy-five to 125 percent of that market point.  (Def.'s Ex. 21 at 106-07, 111-12; *see also* Def.'s Statement of Undisputed Facts ¶ 43; Pl.'s Statement of Disputed Facts ¶ 43.)  As of August 2004, the market point for the Wellness Associate (or Wellness Nurse II) position was $58,347, and the salary range was $43,760.25 to $79,933.75.  (Def.'s Ex. 22; Def.'s Statement of Undisputed Facts ¶ 44.)  The market point for the Staff Health Nurse (or Wellness Nurse III) position was $70,073, and the salary range was $52,554.50 to $87,591.25.  (Def.'s Ex. 23; Def.'s Statement of Undisputed Facts ¶ 45.)

Rick Pogue[4] on May 20, 2005, to discuss the pay difference in the positions. (Powell Dep. at 249-50; *see also* Pl.'s Opp'n Ex. 10.) According to plaintiff, Mr. Pogue looked the two jobs up on his computer, saw that there was a difference in pay grades, and said that he would have Al Vinson, Vice President of Human Resource Operations, look into the matter. (Powell Dep. at 197-98, 251; *see also* Pl.'s Opp'n Ex. 10.) Although Mr. Vinson did so, he did not get back to plaintiff right away.[5] (*See id.* (May 31, 2005 email from plaintiff to Rick Pogue indicating that she had not yet heard from Al Vinson and asking whether there had been "any clarification of the compensation for the Staff Health Nurse position").)

On June 2, 2005, plaintiff was notified that Mr. Malfara needed to know by noon that day whether she was going to accept the position with Disaster Services. (Def.'s Exs. 25, 30.) Plaintiff responded that she had not received a final answer regarding the salary for the position following her discussion with Mr. Pogue, and that she could not accept the position before a final salary determination had been made. (Def.'s Ex. 25.) Plaintiff emailed Mr. Pogue, indicating that she was still waiting to hear back from him or Mr. Vinson about compensation. (Def.'s Ex. 30.) Later that day, Mr. Vinson called plaintiff and informed her that although there was a

---

[4]Mr. Pogue's job title is not identified; however, he appears to have held a position in the Human Resources department. (*See* Def.'s Ex. 28.)

[5]Mr. Vinson emailed Ms. Miller about the salary issue on May 25, 2005, asking whether plaintiff should receive an increase in pay for "going into a larger job with a higher market point." (Def.'s Ex. 24.) Ms. Miller responded that same day, indicating that although there was some difference in the market points for the Wellness Associate and Staff Health Nurse positions, plaintiff's existing salary was "over her current [market point] and well within the new range," and that "[s]taff that were placed in same or similar jobs due to the restructur[ing] did not get salary adjustments if the salary was within the range." (*Id.*) In fact, plaintiff's salary of $57,096 was slightly below the $58,347 market point for the Wellness Associate position. (*Compare* Def.'s Ex. 4, *with* Def.'s Ex. 22.)

$5,000 salary difference, she would not receive an increase in salary. (*See* Powell Dep. at 218, 255-56, 258-59; Def.'s Statement of Undisputed Facts ¶47; Pl.'s Statement of Disputed Facts ¶ 47.) Defendant asserts, and plaintiff does not dispute, that she declined the Wellness Nurse III position on June 2, 2005. (Def.'s Statement of Undisputed Facts ¶ 48; *see also* Def.'s Exs. 25, 27.) Plaintiff understood that her position as a Wellness Associate would be eliminated after June 30, 2005, and that she would no longer have a job with the Red Cross after that date, if she did not accept the Staff Health Nurse position. (*See* Def.'s Ex. 25; Powell Dep. at 262.)

On June 10, 2005, the Red Cross sent plaintiff a letter indicating that her position would be eliminated as a result of the restructuring of national headquarters effective at the close of business on June 30, 2005.[6] (Def.'s Ex. 27.) The letter also indicated that because plaintiff had declined the offer of a comparable position, she was not eligible for any additional salary and benefits under the Red Cross's severance policy. (*Id.*) Plaintiff disagreed that the Staff Health Nurse position she had been offered was comparable to her position as a Wellness Associate and requested that Human Resources management review the positions and reconsider the decision to deny her severance pay. (Def.'s Ex. 28.) The Human Resources department looked into plaintiff's concerns but concluded that the positions were comparable within the meaning of the severance policy. (*Id.*) Plaintiff's employment with the Red Cross ended on June 30, 2005. (*See* Def.'s Ex. 27; Powell Decl. ¶ 2.)

On June 9, 2006, plaintiff filed a complaint in D.C. Superior Court, asserting claims for

---

[6]On June 8, 2005, plaintiff had notified Andrea Longuillo, a Client Management Associate in the Human Resources department, that she had not yet received a written notice regarding the reduction in force that resulted in the elimination of her position and had requested that Longuillo advise her when she would receive such a notice. (Def.'s Ex. 19.)

race discrimination and retaliation pursuant to the DCHRA, seeking overtime pay under the D.C.

Wage and Hour Law, and alleging breach of contract.  Plaintiff filed an amended complaint the

following day, and defendant removed the case to this Court on June 27, 2006.

## LEGAL ANALYSIS

### I.    Summary Judgment Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255; *see also Wash.*

*Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P.

56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-moving party must provide

evidence that would permit a reasonable jury to find in its favor.  *Laningham v. U.S. Navy*, 813

F.2d 1236, 1242 (D.C. Cir. 1987).  "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal

citations omitted).  "While summary judgment must be approached with special caution in

discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial."  *Calhoun*

*v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation

omitted), *aff'd*, No. 99-5126, 1999 WL 825425 (D.C. Cir. Sept. 27, 2000).

## II.    D.C. Human Rights Act Claims

### A.    *Statute of Limitations*

Defendant first argues that plaintiff's race discrimination claim is barred by the

DCHRA's one-year statute of limitations.  (Def.'s Mot. at 12-13.)  A claim under the DCHRA

must be filed "within one year of the unlawful discriminatory act, or the discovery thereof."  D.C.

Code § 2-1403.16(a).  Since plaintiff filed her complaint on June 9, 2006, and since she does not

contend that the discovery rule applies, her discrimination claim is barred if the allegedly

discriminatory conduct occurred prior to June 9, 2005.

Plaintiff argues that the discriminatory conduct is the Red Cross's termination of her

employment when she would not accept the Staff Health Nurse position at the same rate of pay

she had been receiving as a Wellness Associate.  (Pl.'s Opp'n at 27-28.)  According to plaintiff,

this discriminatory conduct did not occur until her employment with the Red Cross ended on

June 30, 2005, because until that date, defendant had "the opportunity to meet [plaintiff's]

demand for continued employment at a fair, nondiscriminatory salary."  (*Id.* at 28.)  The Court

cannot agree.

To the extent that plaintiff is challenging the refusal of the Red Cross to offer her a higher

salary for the Staff Health Nurse position, the discriminatory conduct occurred, and the statute of

limitations began to run, no later than June 2, 2005, when the Red Cross notified plaintiff of its

final decision regarding the salary issue.  It is undisputed that plaintiff was initially informed on

May 15, 2005, that there would be no pay increase associated with the new job.  (Def.'s Ex. 20;

Def.'s Statement of Undisputed Facts ¶ 41.)  Plaintiff continued to pursue a higher salary for the position thereafter, meeting with Rick Pogue, who told her that he would have Al Vinson look into the matter.  (Powell Dep. at 197-98, 249-51; Pl.'s Opp'n Ex. 10; Def.'s Ex. 30.)  When plaintiff did not hear back from Mr. Vinson immediately, she continued to follow up with Mr. Pogue until June 2, when Mr. Vinson called her and confirmed that she would not receive an increase in pay.  (Pl.'s Opp'n Ex. 10; Def.'s Ex. 30; Powell Dep. at 218, 255-56; Def.'s Statement of Undisputed Facts ¶ 47; Pl.'s Statement of Disputed Facts ¶ 47.)  Plaintiff does not suggest that she continued to pursue a higher salary after hearing from Mr. Vinson on June 2. Indeed, plaintiff declined the Staff Health Nurse position that same day.  (Def.'s Statement of Undisputed Facts ¶ 48.)

Nor is plaintiff's allegation that the Red Cross terminated her employment when she refused to accept the Staff Health Nurse position at the allegedly discriminatory rate of pay sufficient to render her discrimination claim timely.  The statute of limitations begins to run on a claim for discriminatory termination under the DCHRA when the plaintiff is given unequivocal notice of the termination decision, even if one of the effects of the decision - - the eventual loss of the employee's position - - does not occur until later.  *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980); *Brown v. Nat'l Acad. of Sci.*, 844 A.2d 1113, 1118-19 (D.C. 2004).  Where the plaintiff is notified that her employment will end on a date certain in the future, "[t]he operative fact is not the formal termination date but, rather, is the moment [plaintiff] learned of definite injury."  *Stephenson v. Am. Dental Ass'n*, 789 A.2d 1248, 1251-52 (D.C. 2002); *see also Ricks*, 449 U.S. at 258 ("'[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts bec[o]me most painful.'" (quoting *Abramson v. Univ.*

*of Haw.*, 594 F.2d 202, 209 (1979)).

In this case, it is undisputed that the Red Cross notified plaintiff on May 12, 2005, that her position in the Wellness Unit would be eliminated effective July 1.  (Def.'s Ex. 6 at 152-53, 156, 202; Shearer Dep. at 70; Def.'s Ex. 18.)  The Red Cross thereafter offered plaintiff the Staff Health Nurse position, but, as noted, the Red Cross had informed plaintiff no later than June 2, 2005, that she would not receive a pay increase.  Thus, by June 2, the Red Cross had unequivocally notified plaintiff that she would be terminated effective July 1 unless she accepted the Staff Health Nurse position on compensation terms that she believed were discriminatory, and the "definite injury" that plaintiff claims to have suffered - - the termination of her employment when she would not accept a discriminatory pay rate - - should have been clear to her at that time.  Indeed, plaintiff admitted that she "felt [she] was being cheated" and was preparing to sue as of June 3.  (Powell Dep. at 217.)

Accordingly, because plaintiff did not file her complaint until June 9, 2006, her discrimination claim is barred by the DCHRA's one-year statute of limitations.[7]

B.     *Discrimination Claim*

Even if plaintiff's discrimination claim could be found to be timely, defendant would be entitled to summary judgment because plaintiff cannot prove pretext.

The DCHRA makes it unlawful for an employer to take certain employment actions "wholly or partially for a discriminatory reason based upon the actual or perceived . . . race . . . of

---

[7]The same analysis applies to plaintiff's retaliation claim.  Plaintiff alleges that she was terminated in retaliation for opposing a discriminatory pay rate for the Staff Health Nurse position (Am. Compl. ¶¶ 29-30); however, as noted, plaintiff was notified of her termination on May 12, 2005.

any individual," including:

> [t]o fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

D.C. Code § 2-1402.11(a), (a)(1). Plaintiff claims that the Red Cross discriminated against her based on her race by offering her a position in a higher salary range with increased responsibilities without a corresponding pay increase and by terminating her employment when she refused to accept the position. (Am. Compl. ¶¶ 29-30.)

In considering claims brought under the DCHRA, the D.C. Court of Appeals applies the familiar burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hollins v. Fed. Nat'l Mortgage Ass'n*, 760 A.2d 563, 571 (D.C. 2000). Under that test, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Hollins*, 760 A.2d at 571. If the plaintiff succeeds in proving a *prima facie* case, the burden then shifts to the defendant, who must "'produc[e] evidence' that the adverse employment action[] [was] taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Burdine*, 450 U.S. at 254); *see Hollins*, 760 A.2d at 571. The defendant's burden, at this stage, is only one of production; it "need not persuade the court that it was actually motivated by the proferred reasons." *Burdine*, 450 U.S. at 254; *see Hollins*, 760 A.2d 571. Finally, if the defendant satisfies its burden, "the *McDonnell Douglas* framework - - with its presumptions and burdens - - disappear[s], and the sole remaining

issue [i]s discrimination *vel non*.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

142-43 (2000) (internal citations and quotation marks omitted); *see Hollins*, 760 A.2d at 571.

"At that point, to survive summary judgment the plaintiff must show that a reasonable jury could

conclude that [the employment action was taken] for a discriminatory reason." *Waterhouse v.

District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002).[8]

The Red Cross argues that it is entitled to summary judgment because plaintiff cannot

satisfy her initial burden of establishing a *prima facie* case of discrimination, having failed to

show that she suffered any adverse employment action, as well as her ultimate burden of proving

that the Red Cross's actions regarding her employment were taken for a discriminatory reason.

(Def.'s Mot. at 15-18, 22-24; Def.'s Reply at 5-7.)  The Court need not address the former

argument because it is clear that even if plaintiff could establish a *prima facie* case, she has not

put forth evidence from which a reasonable jury could infer that the reasons for the Red Cross's

employment actions were pretextual.  *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005);

*see also Hollins*, 760 A.2d at 571-72 (plaintiff must show "'*both* that the [preferred] reason was

false, *and* that discrimination was the real reason'") (quoting *St. Mary's Honor Ctr.*, 509 U.S. at

515).

The Red Cross has proffered legitimate, nondiscriminatory reasons for its employment

actions, satisfying its burden of production under the *McDonnell Douglas* framework.

Specifically, the Red Cross has produced evidence that (1) plaintiff's position was eliminated as

part of a restructuring undertaken after extensive review and analysis of the organization's core

---

[8]The D.C. Court of Appeals often "look[s] to federal Title VII cases in interpreting the
DCHRA." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003) (en banc).

functions (*see* Def.'s Ex. 18), and (2) consistent with its treatment of other employees whose

positions were eliminated, the Red Cross did not offer plaintiff a salary increase for the Staff

Health Nurse position because her existing salary was within the range for the new position. (*See*

Def.'s Ex. 24.)

 In response, plaintiff has failed to present any evidence that casts doubt on either of these

proferred explanations. She concedes that her position was eliminated as a result of the reduction

in force. (Def.'s Exs. 19, 25; Def.'s Statement of Undisputed Facts ¶ 39.) She likewise concedes

that the Red Cross "has a policy of permitting itself to offer salaries within a range of 75 to 125

percent of a given market point of a position" (Pl.'s Statement of Disputed Facts ¶ 43)[9] and that

the salary she received as a Wellness Associate was within the range for the Staff Health Nurse

position. (*See* Def.'s Ex. 4; Def.'s Statement of Undisputed Facts ¶ 44.) Nor can she point to

any other Red Cross employee affected by the reorganization who was offered an alternative

position at a higher salary.

 Instead, plaintiff cites three Caucasian employees who allegedly earned more than she did

in various positions at various times and argues that based on this evidence, together with the fact

that after plaintiff's employment ended, the Red Cross jeopardized her unemployment benefits by

informing the Maryland Division of Unemployment that she had quit, a reasonable jury could

---

 [9]Plaintiff asserts that this policy "cannot justify paying [plaintiff] . . . less than market
rate," noting that the market midpoint for the Staff Health Nurse position was $70,073, almost
$12,000 more than the midpoint for the Wellness Associate position. (*See* Pl.'s Opp'n at 36-37.)
However, plaintiff has produced no evidence to suggest that the Red Cross typically paid
employees at the market midpoint. On the contrary, the Red Cross's corporate representative
testified that "jobs are classified in a broad band system, so there's no particular rate that anyone
would ever be offered." (Pl.'s Opp'n Ex. 6 at 27-28.) And, in fact, both plaintiff and Jane Davis
(who is Caucasian) earned less than the market midpoint as Wellness Associates. (*See*
*supra* note 5; Def.'s Reply Exs. 2-3 (Davis's salary information).)

-14-

infer that the real reason that the Red Cross failed to offer plaintiff an appropriate pay increase was race discrimination.

Plaintiff first asserts that Jane Davis was paid a higher salary both as a Wellness Associate and in the Staff Health Nurse position, which plaintiff contends Ms. Davis had held some years earlier. However, the undisputed evidence contradicts this unsupported claim. Defendant has produced Ms. Davis employment application for the position of Wellness Associate and documentation regarding her salary for that position. (*See* Def.'s Reply Exs. 1-3.) The application reflects that Ms. Davis had never been employed by the Red Cross prior to being hired as a Wellness Associate, although she had served as a volunteer staff member in Fort Brag, North Carolina from September 2000 to July 2002.[10] (Def.'s Reply Ex. 1.) Moreover, when Ms. Davis was hired as a Wellness Associate in November 2003, her starting salary was $55,016, approximately $2,000 less than plaintiff was offered the following year. (Def.'s Reply Ex. 2.) Ms. Davis received a salary increase in October 2004, just before plaintiff was hired, and she and plaintiff thereafter earned the same salary of $57,096. (*Compare* Def.'s Reply Ex. 3, *with* Def.'s Ex. 4.)

The two other employees mentioned by plaintiff - - Ken Thiel and Diana Billack - - did, in fact, earn more than plaintiff (*see* Shearer Dep. at 78 (Thiel); Pl.'s Opp'n Ex. 12 (Billack)); however, this pay disparity cannot support an inference of discrimination because neither was

---

[10]At her deposition, Anna Shearer testified that Ms. Davis had previously worked for the Red Cross as a Staff Health Nurse for Disaster Services; however, Ms. Shearer could not provide any details regarding Ms. Davis's service in this position and could not even say whether the position was compensated at a higher rate of pay than the Wellness Associate position at the time. (Shearer Dep. at 27-29.) Ms. Shearer's testimony is therefore insufficient to create a factual issue as to whether the Red Cross ever paid Ms. Davis more than plaintiff in any capacity.

similarly situated to plaintiff. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 386 (D.C. 2002) (in a discrimination context, plaintiff must show that she was treated differently from another employee, "all of whose relevant employment aspects were 'nearly identical' to hers"). Mr. Thiel, as noted, was the manager of the Wellness Unit, and his position was not comparable to plaintiff's position. (*See* Shearer Dep. at 78-79.) Some (but not all) of Mr. Thiel's duties were assigned to plaintiff after he left the Red Cross in March 2005; however, plaintiff never performed any supervisory responsibilities. (*Id.* at 63-65, 67.) *See Wallace*, 799 A.2d at 386 (junior law firm associate was not similarly situated to senior associate who supervised her). Ms. Billack joined the Red Cross as a Staff Health Associate in October 2005, four months after plaintiff left. (Pl.'s Opp'n Ex. 12.) Ms. Billack's position had the same pay range as the Staff Health Nurse job that had been offered to plaintiff and included some of the same responsibilities that were part of that job, but the positions were not identical. (*See* Pl.'s Opp'n Ex. 6 at 22-25; Def.'s Reply Exs. 4, 5.) In particular, Ms. Billack's position did not include the AFES work that plaintiff had performed in the level 2 staff position of Wellness Associate. (Pl.'s Opp'n Ex. 6 at 22-25; Shearer Dep. at 88.) Plaintiff argues that the inclusion of the AFES work in the Staff Health Nurse position is further evidence that the failure to provide a pay increase was discriminatory, but, as noted, that work had previously been part of the lower-level Wellness Associate position. Moreover, Ms. Billack had a Master's Degree in Public Health, while plaintiff had not yet completed her Bachelor's Degree. (*See* Def.'s Reply Ex. 4; Def.'s Ex. 32.)

Finally, plaintiff points to the Red Cross's response to a form request from the Maryland Division of Unemployment Insurance for information regarding the reason for plaintiff's

-16-

separation from employment as further evidence of discriminatory animus toward plaintiff. (Pl.'s Opp'n at 38-39.) The Red Cross indicated on the form that the reason for plaintiff's separation was that she had quit. (Pl.'s Opp'n Ex. 9.) Although plaintiff argues that "[t]his was a false statement that could have cost [plaintiff] unemployment benefits" (Pl.'s Opp'n at 39), there is no evidence that the Red Cross believed that its response was incorrect, much less that it was motivated by racial animus. Rather, the Red Cross regarded plaintiff's separation as voluntary because she had turned down the offer of an alternative position. (*See* Def.'s Ex. 25.)

In sum, plaintiff has failed to offer any evidence to show that defendant's proffered reasons for its compensation decision were pretextual. The Court will therefore grant defendant's summary judgment motion as to plaintiff's discrimination claim for this reason as well.

C.    *Retaliation Claim*

The DCHRA also prohibits retaliation, making it unlawful to "coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, . . . any right granted or protected under [the Act]." D.C. Code § 2-1402.61(a). Invoking this provision, plaintiff alleges that she was terminated in retaliation for opposing the discriminatory rate of pay she was offered for the Staff Health Nurse position. (Am. Compl. ¶¶ 29, 30.) To establish a *prima facie* case of retaliation, plaintiff must show: (1) that she engaged in protected activity; (2) that she was subjected to adverse action by the employer; and (3) that there existed a causal link between the adverse action and the protected activity. *Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006); *Hollins*, 760 A.2d at 579. Defendant argues that plaintiff has failed to show that she engaged in any protected activity

-17-

or that there was any causal connection.  (Def.'s Mot. at 20-22.)  The Court agrees and will therefore grant defendant's motion as to plaintiff's retaliation claim.

Although, as plaintiff correctly observes, protected activity need not take the form of a lawsuit or formal complaint to an enforcement agency (*see* Pl.'s Opp'n at 34), not every complaint by an employee is encompassed by the DCHRA.  *See Broderick*, 437 F.3d at 1232. Rather, the plaintiff "must alert the employer that she is lodging a complaint about allegedly discriminatory conduct." *Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994); *see also Broderick*, 437 F.3d at 1232 ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").

At her deposition, plaintiff testified that she "oppose[d] the idea that [she] should have to do this staff health nurse for disaster services position at the same rate of pay that [she had] been paid as [a] wellness associate" and that she "oppose[d] the idea of continuing on doing this work on AFES . . . and doing the staff health nurse for disaster services position at the same rate of pay." (Powell Dep. at 355-56.)  While plaintiff appears to have opposed the offered pay rate, there is nothing in the record to suggest that she complained to anyone at the Red Cross that the rate of pay was racially discriminatory.  The record reflects that plaintiff expressed to Anna Shearer and Rick Pogue her belief that she should receive a higher salary for the Staff Health Nurse position, but there is no evidence that she alerted either of them that her complaint had anything to do with race or an assertion of her rights under the DCHRA.  (*See* Shearer Dep. at 77-78; Powell Dep. at 197-98, 250-52; Def.'s Ex. 30.)[11]  Indeed, plaintiff acknowledged as much,

---

[11]On the contrary, plaintiff's complaint appears to have been that the offered salary was too low in light of "the increased responsibilities attached with the Disaster Response position." (Def.'s Ex. 30.)

testifying at her deposition that she had never complained about discrimination while she worked

at the Red Cross.  (Powell Dep. at 309-10.)  In these circumstances, plaintiff cannot demonstrate

that she engaged in protected activity within the meaning of the DCHRA.  *See Green*, 652 A.2d

at 48 (finding that plaintiff had failed to establish that she had engaged in protected activity

where there was "nothing in the record to suggest that the [employer] was alerted that [plaintiff]

was actually complaining of sexual orientation discrimination").[12]

Accordingly, the Court will grant defendant's motion for summary judgment as to

plaintiff's retaliation claim.

### III.    D.C. Wage and Hour Law Claim

Plaintiff has also sued the Red Cross pursuant to the D.C. Wage and Hour Law, D.C.

Code § 32-1001 *et seq.*, alleging that she was required to work significantly more than forty

hours per week following Jane Davis's resignation in January 2006, and seeking overtime

compensation for those overtime hours, as well as liquidated damages in the amount of the

unpaid overtime wages.  (Am. Compl. ¶¶ 34-36.)

The D.C. Wage and Hour Law requires employers in the District of Columbia to

compensate employees at a rate not less than one and a half times the employee's regular rate of

pay for hours worked in excess of forty per week, unless the employee is covered by one of a

number of statutory exemptions.  *See* D.C. Code §§ 32-1003(c), 32-1004.  In particular, overtime

---

[12]Since the Court finds no protected activity, it need not address the issue of causation.  It
does, however, bear noting that plaintiff's position was eliminated before the defendant offered
her the position of Staff Health Nurse, so plaintiff's objection to the salary could not have caused
her termination.  *See Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 85 (D.D.C. 2002) (to
establish causation, plaintiff must show that "the employer knew about the employee's
participation in protected activity and thereafter took an adverse personnel action against her").

compensation is not required for "[a]ny employee employed in a bona fide executive, administrative, or professional capacity . . . (as these terms are defined by the Secretary of Labor under 201 *et seq.* of the Fair Labor Standards Act)."  D.C. Code § 32-1004(a)(1).  These statutory exemptions are to be construed narrowly, and the burden is on the employer to prove that a particular exemption applies.  *Jones & Assocs., Inc. v. District of Columbia*, 642 A.2d 130, 133 (D.C. 1994); *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 523 (5th Cir. 1999).[13]

Both parties have moved for summary judgment with respect to plaintiff's overtime claim.  The Red Cross argues that plaintiff is not entitled to overtime compensation because, based on the undisputed facts concerning her job responsibilities, her position was properly classified as exempt under both the "administrative" and "learned professional" exemptions.[14] Plaintiff contends that neither of these exemptions applies and that, at a minimum, factual disputes preclude entry of summary judgment in defendant's favor.[15]

---

[13]Because the D.C. Wage and Hour Law specifically refers to the Fair Labor Standards Act ("FLSA") and the regulations promulgated thereunder, "decisions of the federal courts construing the [FLSA] and regulations are especially persuasive authority."  *Jones & Assocs., Inc.*, 642 A.2d at 134.

[14]The exemption for employees "employed in a bona fide . . . professional capacity" encompasses both "learned" and "creative" professionals, 29 C.F.R. §§ 541.300(a)(2)(i)-(ii), 541.301, 541.302; however, only the exemption for learned professionals is at issue here.

[15]Plaintiff also argues that the Red Cross should be precluded from invoking any of the statutory exemptions because its corporate representative could not identify the particular exemption or exemptions it relied on to classify plaintiff's position as exempt, notwithstanding that the Rule 30(b)(6) deposition notice included the "classification of [plaintiff's] positions at Red Cross as exempt or non-exempt" as one of the topics as to which testimony was being sought.  (Pl.'s Mot. at 8-9; Pl.'s Opp'n at 9-11.)  Plaintiff relies principally on *Rainey v. American Forest & Paper Association, Inc.*, 26 F. Supp. 2d 82, 93-96 (D.D.C. 1998), in which the Court foreclosed a corporate defendant from introducing on summary judgment an affidavit from a former employee that varied in critical respects from the deposition testimony of the defendant's corporate representatives.  Absent any showing by the defendant that the assertions

-20-

Under the Department of Labor ("DOL") regulations,[16] an employee is "employed in a bona fide . . . professional capacity" as a learned professional (and therefore exempt from the overtime pay requirements of both the FLSA and the D.C. Wage and Hour Law) if the employee (1) is compensated "on a salary or fee basis at a rate of not less than $455 per week" and (2) has as his or her "primary duty" the "performance of work . . . [r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a). To prove that the exemption applies, the employer must show that the position in question satisfies both the salary and the primary duty tests. "The question of how [an employee] spent his working time is a question of fact, but whether his particular activities excluded him from the overtime requirements of the FLSA is a question of law." *Edwards v. Audubon Ins. Group, Inc.*, No. 02-1618, 2004 WL 3119911, at *4 (S.D. Miss. Aug. 31, 2004).

In this case, there is no question that plaintiff's Wellness Associate position satisfied the

_____

in the proffered affidavit were unavailable at the time of the corporate representatives' depositions, the Court found the defendant's "eleventh hour alteration" of its corporate representatives' testimony to be both "inconsistent with [Federal Rule of Civil Procedure] 30(b)(6)" and "precluded by it." *Id.* at 94-95.

Here, in contrast, the Red Cross does not seek to present any new evidence that is at odds with the corporate representative's testimony. The Red Cross asserts, and plaintiff does not dispute, that it classified plaintiff's position as exempt in 2004 (Def.'s Statement of Undisputed Facts ¶ 11; Pl.'s Statement of Disputed Facts ¶ 11); however, it makes no assertions regarding the particular exemption it relied on in making that classification decision. Rather, the Red Cross makes the legal argument that plaintiff's position was in fact exempt under both the professional and administrative exemptions, regardless of whether the Red Cross actually relied on those exemptions in 2004. This argument does not have the effect of revising the corporate representative's testimony, and the Red Cross is not precluded from raising it.

[16]Because plaintiff was not hired by the Red Cross until November 2004, the Court will apply the current DOL regulations, which took effect in August 2004.

salary test. It is undisputed that plaintiff earned a salary of $57,096 annually (or $1,098 per week) during her tenure at the Red Cross (Def.'s Ex. 4), well in excess of the $455 per week required for the exemption. 29 C.F.R. § 541.300(a)(1).

With respect to the primary duty requirement, the regulations specify that the test has three components:

> (1) The employee must perform work requiring advanced knowledge;
>
> (2) The advanced knowledge must be in a field of science or learning; and
>
> (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a). Moreover, the performance of such exempt work must be the employee's "primary duty," *id.*, or the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a).

The regulations contemplate that registered nurses will generally satisfy this test:

> Registered nurses who are registered by the appropriate State examining board generally meet the duties requirement for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

29 C.F.R. § 541.301(e)(2); *see also Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F. Supp. 2d 181, 187 (E.D.N.Y. 2004) (finding that plaintiffs satisfied the duties test for the professional exemption because they were registered nurses); *Richardson v. Genesee County Cmty. Mental Health Servs.*, 45 F. Supp. 2d 610, 615 (E.D. Mich. 1999) (same); *Hofer v. Fed. Cartridge Corp.*, 71 F. Supp. 243, 245 (D. Minn. 1947) (finding that registered nurses satisfied the duties requirement based on their job responsibilities). At a minimum, this provision makes clear that,

as a registered nurse, plaintiff possesses "advanced knowledge . . . in a field of science" of a type that "must be customarily acquired by a prolonged course of specialized intellectual instruction," satisfying the second and third elements of the primary duty test. The fact that registered nurses are generally exempt so long as they are "registered by the appropriate State examining board" suggests that they possess advanced knowledge in a field of science based on their possession of a registered nurse license. Likewise, the distinction the regulation draws between registered nurses (who are generally exempt) and licensed practical nurses (who are not) based on their level of academic training suggests that registered nurses possess the type of specialized academic training necessary for the learned professional exemption.

Although the Court is unaware of any case in which a registered nurse has been found not to satisfy the primary duty test, the above provision is not necessarily dispositive of the first element of that test, *i.e.*, whether a particular nursing position has as its primary duty the performance of work requiring advanced knowledge. *See Flood v. Premier Internal Med. Assocs.*, No. 00-328, 2000 WL 782950, at *5 (M.D. Fla. Apr. 25, 2000) (dismissal of claim for overtime compensation under the FLSA was not required based on the mere fact that plaintiff was a registered nurse where plaintiff had alleged sufficient facts to support a finding that she was not performing "professional" tasks); 29 C.F.R. § 541.2 (exempt or nonexempt status of an employee must be determined based on whether the employee's salary and duties meet the requirements of the regulations for a particular exemption). The parties agree that plaintiff's primary duty as a Wellness Associate was AFES or AFES-type work. (*See* Pl.'s Mot. at 6; Pl.'s

Opp'n at 15; Def.'s Mot. at 27; Def.'s Opp'n at 6-7.)[17]  The question, therefore is whether that

work "requir[ed] advanced knowledge" within the meaning of the DOL regulations.  Under those

regulations,

> "work requiring advanced knowledge" means work which is
> predominantly intellectual in character, and which includes work requiring
> the consistent exercise of discretion and judgment, as distinguished from
> performance of routine mental, manual, mechanical or physical work.  An
> employee who performs work requiring advanced knowledge generally
> uses the advanced knowledge to analyze, interpret or make deductions
> from varying facts or circumstances.  Advanced knowledge cannot be
> attained at the high school level.

29 C.F.R. § 541.301(b).

Having carefully reviewed the record, the Court finds that there are no material facts in

dispute regarding what tasks the plaintiff performed; rather, the serious debate between the

parties relates to how plaintiff's AFES work should be characterized.  From plaintiff's point of

view, her duties consisted of nothing more than "clerical, nondiscretionary, routine" work.

(Powell Decl. ¶ 5.)  Defendant, on the other hand, argues that plaintiff's work involved the

exercise of judgment and discretion.  Plaintiff's own deposition testimony reflects that her AFES

duties included determining whether personnel scheduled to be deployed overseas met the

medical requirements for deployment (Powell Dep. at 37, 76-77), following up on medical issues

that arose during that process or while personnel were overseas (*see id.* at 38, 74), briefing and

debriefing AFES personnel before and after their deployments (*id.* at 35-37, 66-69), and

responding to emails and phone calls from such personnel.  (*Id.* at 126-27.)  Plaintiff also

_____

[17]The Red Cross suggests that plaintiff's primary duty was "work relating to AFES and
International Services," but it emphasizes the similarity of plaintiff's AFES and International
responsibilities.  (*See* Def.'s Mot. at 27.)

testified that she was responsible for keeping track of who was scheduled to be deployed and
what stage each person was at in his or her physical assessment (*id.* at 36, 126), maintaining a
spreadsheet with this information (*id.* at 43-44, 126), and managing the files. (*Id.* at 70-71.)

With respect to the deployment decisions, plaintiff was responsible for determining
whether an individual was deployable from a medical standpoint based on the applicable military
guidelines. (*See id.* at 37, 77.) To make this determination, plaintiff had to review the
individual's medical records, including lab results, radiology results, prescription drug
utilization, and immunization records, and evaluate them against the health and functional
requirements for deployment to assess whether the individual had any disqualifying medical
condition, such as a "[h]istory of or current cardiovascular disorders," "[a]sthma or other chronic
or recent respiratory problems," or "[a]bnormal lab or other medical test results." (*See* Shearer
Dep. at 44; Powell Dep. at 325-26; Def.'s Ex. 11 (health requirements for processing AFES
personnel), 12 (military medical requirements).) It is clear, based on the technical, medical
nature of both the records and the guidelines involved, that plaintiff used her advanced
knowledge as a registered nurse in making these important determinations. It is also clear that
plaintiff exercised discretion and judgment in doing so, requesting additional testing when
necessary to evaluate an employee's medical condition and advising employees how to address
health issues so as to ensure that they would be deployable. (*See* Def.'s Ex. 15 (June 16, 2005
email from plaintiff requesting that the recipient get an EKG, despite the military physicians'
belief that it was unnecessary, to determine whether recipient would be rejected for deployment
based on valvular heart disease); *id.* (March 9, 2005 email from plaintiff recommending that
recipient modify his or her diet and exercise regimen to address elevated cholesterol and advising

recipient to seek medical advice regarding the need for prescribed intervention); *id.* (June 22, 2006 email from plaintiff advising recipient to monitor his or her blood pressure and seek treatment if it remained elevated).)

 Plaintiff raises a host of arguments as to why this medical record review work was not exempt, but none is persuasive. Plaintiff argues, for example, that this work was "routine" and did not involve the "varying facts or circumstances" required for the professional exemption. (Pl.'s Opp'n at 19, 22.) At her deposition, plaintiff testified that, as time went on, her work "got pretty routine because [she] stayed in one really basic or confined area of work and decision making where the greatest bulk of the decision making was with AFES." (Powell Dep. at 287-88.) Although her AFES decision making may have had a "focused scope," plaintiff acknowledged that the medical information she received and reviewed in doing this work was "varied" in the sense that it involved "individual results." (*Id.* at 288-89.) This is entirely consistent with the DOL regulations, under which "[a]n employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *See* 29 C.F.R. § 541.301.

 Plaintiff also asserts that the ultimate decision as to whether a particular individual would be deployed was made by the AFES manager, not by her (Pl's Opp'n at 20, 26), but that is beside the point. Plaintiff was responsible for the medical aspect of the deployment process. (Powell Dep. at 77.) In that capacity, she made recommendations to the AFES manager as to whether a particular individual could be deployed from a medical standpoint, and her recommendations were never overruled. (*Id.* at 77-78.) Nor does plaintiff's testimony that if she had a question about a result or test, she would call the physician at the Command Receiving Center where the

person was going (*id.* at 327), undercut the conclusion that plaintiff exercised discretion.  *See De Jesús-Rentas v. Baxter Pharmacy Servs. Corp.*, 400 F.3d 72, 75 (1st Cir. 2005) (fact that pharmacists consulted among themselves and supervisors in difficult cases did not preclude a finding that they exercised discretion and judgment in those cases); *cf.* 29 C.F.R. § 541.202(c) (decisions made as a result of the exercise of discretion and independent judgment "may consist of recommendations for action" and may, upon occasion, be "revised or reversed after review").

Plaintiff further contends that her work in this area did not involve the exercise of discretion because it was performed "under strict military guidelines - - following 'prescribed procedures.'"  (Pl.'s Opp'n at 18.)  However, "reliance on . . . guidelines does not, by itself, indicate the lack of professional discretion and judgment."  *Owsley*, 187 F.3d at 526; *see also* 29 C.F.R. § 541.704 ("The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption . . . .").  The Court has reviewed the guidelines the Red Cross provided to plaintiff for processing AFES personnel (Def.'s Ex. 11), as well as the military requirements used to screen such personnel, including the Department of the Army's Standards of Medical Fitness, which set forth the medical conditions that may prevent an individual from being deployed.  (Def.'s Ex. 12.)  Although the Army Standards are detailed, they did not eliminate the need for plaintiff to make judgments about whether particular medical issues were disqualifying. Moreover, as noted, the record reflects that plaintiff exercised discretion to request additional testing when necessary to properly evaluate an individual's medical condition, directing one individual to get an EKG so that she could better assess the person's cardiac status, even though

-27-

military physicians thought that this test was unnecessary.  (Def.'s Ex. 15 [June 16, 2005 email].)
*See De Jesús-Rentas*, 400 F.3d at 75 (pharmacists exercised judgment and discretion because,
*inter alia*, they were responsible for contacting the prescribing physician if they believed a drug
was contraindicated to discuss whether the prescription needed modification).  And, when
potentially disqualifying health issues were identified during the course of her reviews, plaintiff
advised employees how to treat the problem.  (Def.'s Ex. 15 [Mar. 9, 2005 email regarding
employee's elevated cholesterol levels; June 22, 2005 email regarding employee's blood
pressure].)  *See Owsley*, 187 F.3d at 526 (athletic trainers exercised discretion in making
judgments about athletes' suitability for further action); *Hofer*, 71 F. Supp. at 245 (nurses
exercised discretion and judgment in determining the nature of a person's complaint, what
preliminary treatment should be administered, and the necessity for further treatment).

    In any event, plaintiff's AFES responsibilities were not limited to the record review work.
Plaintiff was also consulted on medical issues that arose while AFES employees were deployed.
(*See* Def.'s Ex. 15 [Feb. 16, 2005 email from plaintiff to Carolyn Seldon recommending that
AFES staffer who had been injured while deployed go to the hospital emergency room for
treatment]; Powell Dep. at 38 (testifying that when an employee had a heart attack while
deployed, the AFES managers "looked to [her] medical knowledge to help guide them on th[e]
client" in terms of what he needed and how to transport him back home).)  In addition, she
conducted one-on-one debriefings of deployed personnel upon their return, a process that
included discussing any injuries or illnesses the employee had sustained while overseas and
determining whether they needed any medical treatment.  (*Id.* at 37, 69-70.)  In these situations,
plaintiff used her medical knowledge unconstrained by the military guidelines.

Finally, plaintiff argues that the Red Cross cannot sustain its burden to show that the performance of exempt work was her primary duty because it never established which AFES tasks took up most of her time and therefore cannot show that she spent more than fifty percent of her time on exempt tasks.[18]  (Pl.'s Opp'n at 17-18; Pl.'s Reply at 2.)  That, however, is not the test.  An employee's primary duty is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of the employee[,] . . . [t]ime alone . . . is not the sole test, and nothing in [the DOL regulations] requires that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700(b).  Rather, the employee's primary duty must be determined "based on all the facts in a particular case," including such factors as the relative importance of the exempt and nonexempt duties, the time spent on exempt work, the employee's relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. § 541.700(a).  Applying these factors, courts have not hesitated to find that an employee's primary duty is that which is of "principal importance" to the employer, even if the employee spent more time on collateral tasks.  *See Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742 (6th Cir. 2000); *Reich v. State of Wyoming*, 993 F.2d 739, 742 (10th Cir. 1993).

_____

[18]Plaintiff relies on outdated DOL regulations in making this argument, but even those earlier regulations made clear that exempt work could be an employee's primary duty even if she spent less than fifty percent of her time on exempt duties.  29 C.F.R. § 541.103 (2003).  Plaintiff also relies on outdated DOL regulations to argue that a professional employee may not devote more than twenty percent of her time to "'activities which are not an essential part of and necessarily incident to the work described above.'" (Pl.'s Opp'n at 23 (quoting 29 C.F.R. § 541.3(a)-(e)).)  This provision was eliminated in 2004.

While it is true that plaintiff's AFES work included nonexempt tasks such as maintaining the AFES personnel files and entering the results of physical examinations into a spreadsheet (Powell Decl. ¶ 6), it is clear that her exempt duties in determining whether AFES personnel met the medical requirements for deployment and addressing their health issues were of principal importance to the Red Cross, as it was this work that enabled the Red Cross "to maintain a workforce [to] support[] [its] organizational mission on a worldwide scope." (Def.'s Ex. 10 [AFES Policy].) Accordingly, such exempt work was plaintiff's primary duty, even if it occupied less than fifty percent of her workday,[19] and summary judgment must be entered for the defendant under the learned professional exemption.[20]

## IV. Breach of Contract Claim

Although she asserted a broader claim for breach of contract in her amended complaint (*see* Am. Compl. ¶¶ 37-40), plaintiff only pursues her claim based on the Red Cross's severance policy in response to defendant's summary judgment motion, arguing that she is entitled to severance pay under the terms of that policy. (Pl.'s Opp'n at 39-43.) The Red Cross argues that plaintiff cannot recover on this claim because it had no contractual obligation to provide her with severance pay. (Def.'s Mot. at 32-33.)

While "contractual rights may arise from language in employee manuals[,] . . . employers can effectively disclaim any implied contractual obligation arising from such provisions." *Strass*

---

[19]The Court notes that, with respect to the period beginning in March 2005, when Anna Shearer directly supervised plaintiff, Ms. Shearer estimated that plaintiff spent 50 percent of her time on medical record review. (Shearer Dep. at 44-47.)

[20]Because the Court finds that defendant has satisfied its burden to show that plaintiff's position was properly classified as exempt under the learned professional exemption, the Court need not decide whether the position was also exempt under the administrative exemption.

*v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1011 (D.C. 2000).  "'The legal effect

of such a disclaimer is, in the first instance, a question for the court to decide.'"  *Id.* (quoting

*Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 (D.C. 1993)).

      The Red Cross Human Resources Policy and Procedure Manual includes policies relating

to at-will employment and severance pay.  (Def.'s Exs. 5, 7.)  The at-will employment policy

specifies both that the Manual "is not a contract of employment" and that "employment with the

Red Cross is on an at-will basis."  (Def.'s Ex. 5.)  The severance policy provides:

> For the sole purpose of providing a safety net for employees who may be
> faced with a period of unemployment, Red Cross *may* provide severance
> pay to regular full-time and regular part-time paid staff regularly scheduled
> to work 20 or more hours per work week.  Employees are covered under
> this policy if they are involuntarily terminated under limited
> circumstances, are not offered a comparable assignment, and sign a
> release.

(Def.'s Ex. 7 (emphasis added).)  The severance policy goes on to define in greater detail the

circumstances in which severance pay "*may* be provided."  (*Id.* (emphasis added).)

      Plaintiff argues that the disclaimer in the at-will employment policy is ineffective because

it does not address whether employees may rely on the Manual's provisions but simply provides

that employment with the Red Cross is at-will and can be ended at any time.  (Pl.'s Opp'n at 42.)

This is incorrect, however, as the disclaimer also expressly provides that the Manual "is not a

contract of employment."  (Def.'s Ex. 5.)  Moreover, the severance policy also uses permissive

language to describe the availability of severance benefits.  (Def.'s Ex. 7 ("Red Cross *may*

provide severance pay . . .") (emphasis added).)  The D.C. Court of Appeals has found that the

use of such permissive language in a personnel manual is, as a matter of law, insufficient to

create contractual rights.  *Perkins v. Dist. Gov't Employees Fed. Credit Union*, 653 A.2d 842,

843 (D.C. 1995) (personnel manual provision specifying that "when terminating a 'permanent employee, management *in their discretion may* give the employee two weeks notice, or *may* give him two weeks severance pay, or *may* terminate the employee without any of the foregoing, if the termination is for cause" did not restrict the employer's discretion to one of the three conditions); *cf. Strass*, 744 A.2d at 1012 (jury question raised as to whether policy manual created contractual rights, notwithstanding disclaimer, based in part on manual provisions using the mandatory term "shall" rather than the permissive "may"). Therefore, there can be no contract claim here.

Plaintiff also argues that the Red Cross is equitably estopped from denying that the severance policy applies, having denied her severance pay in June 2005 on the ground that she did not meet the requirements of that policy. (Pl.'s Opp'n at 42.) Plaintiff offers no legal support for this position. Moreover, the D.C. Court of Appeals has held that "'[a] party raising equitable estoppel must show that [she] changed [her] position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act.'" *Gonzalez v. Internacional de Elevadores, S.A.*, 891 A.2d 227, 241 (D.C. 2006). Plaintiff has made no such showing here.

Because the Red Cross severance policy did not create any contractual rights, plaintiff's breach of contract claim will be dismissed.[21]

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for partial summary judgment. A separate Order accompanies this

---

[21]In light of this holding, the Court need not decide whether plaintiff met the requirements for severance pay under defendant's policy.

Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE

Date:   June 13, 2007